## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------x
: 
In re                                                    : Chapter 11
: 
Trident Microsystems, Inc., *et al.*,[1]                  : Case No. 12-_____ (_____)
: 
Debtors.                                          : (Jointly Administered)
: 
--------------------------------------------------------------x

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION PURSUANT TO SECTIONS 105(A), 363 AND 365 OF THE BANKRUPTCY CODE FOR AN ORDER (I)(A) APPROVING PROCEDURES IN CONNECTION WITH THE SALE OF CERTAIN OF THE DEBTORS' ASSETS RELATED TO THEIR SET TOP BOX BUSINESS; (B) APPROVING THE STALKING HORSE PROTECTIONS; (C) SCHEDULING THE RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE; (D) APPROVING PROCEDURES RELATED TO THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (E) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (F) GRANTING RELATED RELIEF; AND (II)(A) AUTHORIZING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS RELATED TO THEIR SET TOP BOX BUSINESS PURSUANT TO SUCCESSFUL BIDDER'S ASSET PURCHASE AGREEMENT FREE AND CLEAR OF LIENS, CLAIMS ENCUMBRANCES, AND OTHER INTERESTS; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move the

Court (the "Motion") for the entry of an order pursuant to sections 105(a), 363 and 365 title 11 of

the United States Code (the "Bankruptcy Code"), Rules 2002, 6005, 6006, 9007 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1

of the Local Rules Bankruptcy Practice and Procedure of the United States Bankruptcy Court for

---

[1]     The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd.  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 1170 Kifer Road, Sunnyvale, California 94086.

the District of Delaware (the "<u>Local Rules</u>") for an order (i)(a) approving procedures in

connection with the sale of certain of the Debtors' assets related to their set top box business; (b)

approving the Stalking Horse Protections (as defined below); (c) scheduling the related auction

and hearing to consider approval of sale; (d) approving procedures related to the assumption of

certain executory contracts and unexpired leases; (e) approving the form and manner of notice

thereof; and (f) granting related relief; and (ii)(a) authorizing the sale of such assets free and

clear of liens, claims, encumbrances and other interests, except as provided in an Asset Purchase

Agreement (as defined below); (b) approving the assumption and assignment of certain of the

Debtors' executory contracts and unexpired leases related thereto; and (c) granting relief related

relief.  In support of this Motion, the Debtors further respectfully state as follows:

### Jurisdiction and Venue

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.

This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this district under 28

U.S.C. §§ 1408 and 1409.

### Background

2.      On January 4, 2012 (the "<u>Petition Date</u>"), each of the Debtors filed with this Court

a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      Trident Microsystems, Inc. ("<u>TMI</u>") was incorporated in California in 1987 and

reincorporated in Delaware in 1992.  TMI is the direct parent company of Trident Microsystems

(Far East) Ltd., an exempted company incorporated in the Cayman Islands with limited liability

("<u>TMFE</u>").  TMFE is the direct or indirect parent of subsidiary entities organized under the laws

of various foreign countries (the "<u>Foreign Subsidiaries</u>" and together with TMI and TMFE,

"<u>Trident</u>").

4.      Trident currently designs, develops, and markets integrated circuits and related software for processing, displaying, and transmitting high quality audio, graphics, and images in home consumer electronics applications such as digital TVs, PC-TV, and analog TVs, and set-top boxes. Trident's product line includes system-on-a-chip ("SoC") semiconductors that provide completely integrated solutions for processing and optimizing video, audio, and broadcast and satellite signals to produce high-quality and realistic images and sound.  Trident's products also include frame rate converter, demodulator, audio decoder products, interface devices, and media processors.  Trident's customers have included many of the world's leading manufacturers of consumer electronics, computer display, and set-top box products, including Samsung, LG, Sony, Sharp, Philips, Comcast, and DirecTV.

5.      TMI serves as the corporate head of Trident and provides the corporate oversight and administrative services necessary for Trident's operations.  TMFE serves as the manufacturing procurement hub and primary accounts payable center for Trident.  TMFE holds most of Trident's intellectual property assets and contracts with all suppliers for use of the intellectual property and the production of finished goods.  Pursuant to a distribution and supply agreement between TMFE and non-debtor Trident Microsystems (Hong Kong) Limited ("TMHK"), TMFE sells finished goods to TMHK for re-sale to Trident's customers.  TMFE also serves as Trident's primary accounts payable processor and processes payments due to suppliers as well as payments to the non-revenue generating Foreign Subsidiaries that provide research and development, sales and marketing services for Trident.

6.      Like many technology based industries, the set-top box and television industries in which Trident focuses its operations have been undergoing rapid changes which have made it difficult for Trident to operate profitably.  Trident has faced increased pricing pressure from

Taiwanese SoC suppliers who have recently made great inroads in penetrating the market.

Additionally, industry semiconductor inventory levels are currently elevated due to slowdown in

consumer electronics markets primarily driven by slowdown in Western economies, which has

forced all market participants, including Trident, to further adjust pricing to manage inventory

levels.  These pricing pressures have been compounded by set-top box manufacturers who have

been slower than anticipated in launching new products.  As a result, suppliers have been

straddled with higher than anticipated inventory levels and high development costs that cannot

be offset by next generation product sales.  In addition to these pricing and inventory pressures,

there has also been a shift in the industry's supply chain dominated by Asian OEMs (original

equipment manufacturers) and TV manufacturers are increasingly depending on  manufacturing

SoC and FRC (frame rate converter) components for high-end TVs in-house, reducing the need

to look to outside suppliers for products.

       7.     As a result of these developments, Trident has experienced continued operating

losses which have resulted in declining cash over the past year.  The deteriorated value of the

outstanding common stock and the termination of the Bank of America line of credit have

restricted Trident's ability raise money through traditional means.  The combination of lower

margins and sale volumes, high employee costs and limited access to new capital has

significantly affected Trident's liquidity and ability to pay its debts as they become due.

       8.     Prior to filing these chapter 11 cases, the Debtors undertook a marketing effort to

identify a potential purchaser of their set-top box business line.  As discussed in various motions

filed contemporaneously herewith, the Debtors have identified a stalking horse bidder for their

set-top box business.  The Debtors believe that a rapid sale of the set-top box business will

allow them to immediately stop the drain on cash balances and afford them an opportunity to

determine which, if any, of the Debtors' other business lines should be marketed for sale and take such other steps necessary to reorganize their remaining operations into a profitable and sustainable business.

**Preliminary Statement**

9.      The Debtors have determined, after the exercise of due diligence and in consultation with their financial advisor, FTI Consulting, Inc. ("FTI"), that maximizing the value of the Debtors' estates is best accomplished through the sale, free and clear of liabilities, of certain tangible and intangible assets related to the set-top box business (as described more fully herein, the "Purchased Assets") of the Debtors and of each of the Debtors' subsidiaries that owns Purchased Assets (the "Subsidiaries", and together with the Debtors, the "Sellers").

10.      The Sellers entered into that certain asset purchase agreement, dated January 3, 2012 between the Sellers on the one hand and Entropic Communications, Inc. (the "Stalking Horse Purchaser"), pursuant to which the Stalking Horse Purchaser shall acquire the Purchased Assets on the terms and conditions specified therein (together with the schedules and related documents thereto, the "Stalking Horse Agreement," a copy of which is attached hereto as Exhibit B).[2]  The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein.  Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Purchaser has agreed to purchase the Purchased Assets for the assumption of certain liabilities and a cash payment of $55,000,000, subject to certain adjustments (the "Stalking Horse Purchase Price").  The Stalking Horse Purchaser, in making this offer, has relied on promises by the Debtors to seek the Court's approval of reimbursement of its

---

[2]      Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Stalking Horse Agreement.

reasonable expenses, with such amount to be provided to all bidders by no later than February 8,

2012, and a break-up fee of $1,650,000 (each as described more fully below, together, the

"Stalking Horse Protections"), and in reasonable expectation that this Court would enter an

order providing such relief.  The Debtors, in the exercise of their business judgment, believe

that the Stalking Horse Protections are a necessary inducement for the Stalking Horse

Purchaser, and thus, necessary to establish a "floor" for the sale of the Purchased Assets and

ultimately encourage competitive bidding and realization of the highest value for the Purchased

Assets.

11.     The Debtors will also consider and entertain bids for a larger transaction that

includes the Purchased Assets, including a sale of substantially all of the Debtors' assets.

12.     The sale of the Purchased Assets pursuant to the procedures and on the timeline

proposed herein presents the best opportunity to maximize the value of the Purchased Assets for

all interested parties.  Moreover, the rapid transition to new ownership will maximize the value

of the Purchased Assets.

## Relief Requested[3]

13.     *First*, the Debtors request entry of an order, attached hereto as Exhibit C (the

"Bidding Procedures Order"):  (A) approving procedures (the "Bidding Procedures," the form

of which is attached thereto as Exhibit 1) for (i) submitting bids for any or all of the Purchased

Assets of the Debtors and (ii) conducting an auction (the "Auction") with respect to the

Purchased Assets in the event the Debtors receive at least one additional bid; (B) approving the

Stalking Horse Protections; (C) scheduling the Auction for February 15, 2012 at 10:00 a.m.

---

[3]     In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the transaction as currently set forth in the Asset Purchase Agreement have been summarized and are attached hereto as Exhibit A.

(prevailing Eastern Time) at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020, or at such other place, date and time as may be designated by the Debtors; (D) scheduling a hearing to approve any sale of Purchased Assets with respect to any bid(s) accepted by the Debtors on or before February 20, 2012; (E) approving procedures (the "Cure Procedures"), as set forth below, for the assumption and assignment of certain executory contracts (the "Contracts") and unexpired leases (the "Leases") of the Debtors to any purchaser(s) of the Purchased Assets, and to resolve any objections thereto; and (F) approving (i) the form of notice of the Auction and Sale (the "Procedures Notice"), attached hereto as Exhibit D, to be served on the Procedures Notice Parties (as defined below) and (ii) the form of notice to parties holding Contracts and Leases likely to be assumed and assigned in connection with the sale of Purchased Assets, in the form attached hereto as Exhibit E (the "Cure Notice").

14.     *Second*, the Debtors will request entry of an order in the form attached hereto as Exhibit F (the "Sale Order"), pursuant to sections 105, 363 and 365 of the Bankruptcy Code:  (i) approving the sale of the Purchased Assets of the Debtors to the purchaser, free and clear of all liens, claims, encumbrances and liabilities, except as provided in an Asset Purchase Agreement (as defined below), and (ii) authorizing the Debtors to consummate the Sale (as defined below) and all documents, agreements and contracts executed in conjunction therewith.

## I.     PROPOSED BID AND SALE PROCEDURES

### Assets to be Sold

15.     As noted above, the Debtors seek to complete a sale (the "Sale") of the Purchased Assets, which comprise, among other things:

(a)     all products of the STB Business, including products under development, together with masks and mask works for the products and their associated codes and materials;

(b)     all inventory of the STB Business that are held for sale or resale  including any raw materials, work in process, finished goods, consumables, service parts, packing materials and supplies, wherever located and the open purchase orders with NXP for inventory to the extent Purchaser elects at Closing to assume such purchase orders;

(c)     trade accounts receivable, notes receivable, negotiable instruments and chattel paper of the STB Business, excluding that certain note receivable from NXP classified as a note receivable from related party on the Interim Balance Sheet;

(d)     the Leased Real Estate leased or subleased by the Company or any Subsidiary listed in Schedule 1.1(d) to the Stalking Horse Agreement;

(e)     all tangible assets of the STB Business, including machinery, equipment (including laboratory equipment and test equipment), tools, dies, appliances, furniture, supplies, office supplies, office equipment, fixtures, information technology related hardware and equipment (including computers, servers, storage devices, telecommunications facilities and printers), telephone systems, telecopiers and photocopiers and other tangible personal property of every kind and description (i) that are either (a) listed in Schedule 1.1(e)(i) of the Disclosure Schedule to the Stalking Horse Agreement or (b) located in the facilities subject to the Transferred Leases on the date of the Stalking Horse Agreement, including without limitation, the data centers in Belfast, Ireland and Austin, Texas, (none of which Tangible Personal Property shall be relocated between signing and Closing), (ii) all Personal Productivity Tools, (iii) fifty percent (50%) of the Miscellaneous Office Supplies located at the facilities subject to the Facility Use Agreement, and (iv) all leases and subleases of any such Tangible Personal Property as to which the Company or any  Subsidiary is the lessee or sublessee, together with any options to purchase the underlying Tangible Personal Property, which leases and subleases are listed in Schedule 1.1(e)(iv) of the Disclosure Schedule to the Stalking Horse Agreement;

(f)     all Software owned by or licensed to the Company or any Subsidiary, including all Software bundled and/or licensed with any Products, owned by the Company or any Subsidiary;

(g)     all Purchased Intellectual Property Assets, all goodwill associated with the Purchased Intellectual Property Assets and all rights of the Company or any of its Subsidiaries under the Purchased Intellectual Property Assets, including remedies against past, present, and future infringement or misappropriation of the Purchased Intellectual Property Assets, including, without limitation, income, royalties and damages related to any of the foregoing, and rights to protection of past, present, and future interests in any Purchased Intellectual Property Assets under the Laws of all

jurisdictions, except any royalties or license fees payable to the Company or its Subsidiaries under that certain IP Block License and Development Agreement dated December 23, 2011 between the Company and RDA Technologies, Ltd.;

(h)     the Company's and each Subsidiary's right, title and interest in, to or under each Contract for Licensed Intellectual Property Assets that are used in the STB Business, including processors, busses, input/output, memory and other IP blocks for integration with or into the system-on-a-chip Products, operating systems, middleware, libraries, drivers and development tools bundled with any Products or used in the development of any Products assumed by Purchaser at Closing *plus* any Contracts assumed pursuant to Section 7.9 of the Stalking Horse Agreement;

(i)     all Seller Contracts to which the Company or a Subsidiary is a party and that are listed in Schedule 1.1(i)(i) to the Stalking Horse Agreement (including, but not limited each such Seller Contract for Licensed Intellectual Property, all purchase orders and license agreements with customers of the STB Business, all supply chain related agreements and all distribution agreements) and any outstanding offers or solicitations listed in Schedule 1.1(i)(ii) of the Disclosure Schedule Stalking Horse Agreement made by or to the Company or any Subsidiary to enter into any Contract relating to the STB Business or any Purchased Asset in both cases to the extent such Seller Contracts are assumed by Purchaser at Closing or assumed by Purchaser pursuant to Section 7.9 of the Stalking Horse Agreement *except* Purchaser prior to Closing may elect, in its sole discretion, to exclude any such Seller Contract from the Purchased Assets (and such Contract shall automatically become a Retained Contract);

(j)     all prepaid expenses, deposits and advance payments of the Company or any Subsidiary with respect to the STB Business or Leased Real Estate and all rights of the Company or any Subsidiary to receive discounts, refunds, reimbursements, rebates, awards and other similar benefits, in each case, with respect to the STB Business or Leased Real Estate;

(k)     cash in an amount equal to the Company Retention Bonus Liability, Accrued Severance Benefits and the Accrued Retirement Benefits (provided, that to the extent the Accrued Retirement Benefits are funded through cash held in trusts or other accounts that can be transferred or rolled over to the Purchaser as of the Closing, then the delivery of such trusts or accounts shall be made in lieu of the delivery of cash);

(l)     claims and rights (and benefits arising therefrom) with or against all Persons, including all rights against suppliers, under warranties covering any Owned Inventory or Tangible Personal Property included within the Purchased Assets;

(m)     all Export Approvals and all Permits used in or related to the STB Business to the extent transferable or assignable to Purchaser;

(n)     books and records, ledgers, forms, records, documents, Tax Returns, Tax Return workpapers, files, invoices, vendor or supplier lists, reference materials, price guides, payroll records, personnel files, insurance records, accounts receivable and payable, inventory, maintenance and asset history records and copies of all books of original entry, export control license records, laboratory notebooks and electronic notebooks and other research and development records and databases, e-mails and other data relating to the ownership, use, maintenance or enjoyment of the Purchased Assets or the operation of the STB Business and that are owned or used by the Company or any Subsidiary; provided, however, that the Company may retain copies of such Records as required by applicable Law and as reasonably necessary to enable the Company to fulfill its Tax filing, regulatory or statutory obligations after the Closing Date;

(o)     all grant applications submitted by the UK Subsidiary prior to the date of the Stalking Horse Agreement, including the Invest Northern Ireland grant, and any open grant awards;

(p)     any lock boxes to which account debtors of the Company or any Subsidiary remit payment relating solely to Receivables;

(q)     all goodwill and other intangible assets to the extent associated with the STB Business, including customer and supplier lists;

(r)     all preference or avoidance claims and actions of the Company arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code relating to the Purchased Assets and/or Assumed Liabilities, including all actions relating to vendors and service providers used in the STB Business, counterparties to Assumed Contracts and Transferred Leases and Transferred Employees (the "Preference Avoidance Claims"); and

(s)     all other assets of the Company and its Subsidiaries used in or related to the STB Business, other than the Excluded Assets.

16.     The Debtors shall entertain only cash bids for the Purchased Assets.  The

Purchased Assets shall not include the assets forth in Section 1.2 of the Stalking Horse

Agreement (the "Excluded Assets"), including without limitation:

(a)     trade accounts receivable, customer purchase orders, notes receivable, negotiable instruments and chattel paper not arising from the STB Business, the NXP Note and any Excluded Royalties;

(b)     all (i)  existing products and products under development of the
Company's DTV Business, PC TV Business, Audio Business and the
Terrestrial Demod Product Business and (ii)  all masks for such products;

(c)     the Company's and each Subsidiary's right, title and interest in, to or
under  (i) each Contract for Licensed Intellectual Property Assets that are
not used in the STB Business, (ii) each Contract listed on <u>Schedule 1.2(c)</u>
to the Stalking Horse Agreement and (iii) each Retained Contract;

(d)     all commercial off-the-shelf Software loaded on desktop or laptop
computers that are not part of the Tangible Personal Property;

(e)     all of the Company's and each Subsidiary's cash and cash equivalents
except for (i) any cash and cash equivalents included in the Working
Capital Statement, if any, or taken into account in calculating the Final
Working Capital, and (ii) the Required Cash;

(f)     claims (and benefits arising therefrom) that relate to any Liability other
than the Assumed Liabilities;

(g)     the Company's and each Seller Subsidiary's financial accounting books
and records, corporate charter, minute and stock record books, income tax
returns, corporate seal, checkbooks and canceled checks;

(h)     all rights (including any claims, rights and interest in and to any refunds
for Taxes with respect to the Purchased Assets and STB Business for Pre-
Closing Tax Periods) relating to the Retained Liabilities;

(i)     except as provided in <u>Section 7.11</u> to the Stalking Horse Agreement, the
names and trademarks ***"Trident Microsystems, Inc."***, any other use of
***"Trident Microsystems"*** together with any other word or phrase, including
the Trident Microsystems logo;

(j)     all preference or avoidance claims and actions of the Company arising
under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code other
than the Preference Avoidance Claims; and

(k)     all rights of the Company under the Stalking Horse Agreement.

The Debtors will not entertain bids for all or substantially all of the Purchased Assets that do not

at least meet or exceed the Stalking Horse Purchase Price plus the sum of the Stalking Horse

Protections, plus six-hundred thousand dollars ($600,000).

17.     Except as otherwise provided in an Asset Purchase Agreement (as defined

below), all of the Debtors' rights, title and interest in all of the Purchased Assets shall be sold

free and clear of any liens, security interests, claims, charges or encumbrances in accordance with section 363 of the Bankruptcy Code.  The Debtors propose that any such liens, security interests, claims, charges or encumbrances shall attach to the amounts payable to the Debtors' estates resulting from the Sale, net of any transaction fees (the "<u>Sale Proceeds</u>"), in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

<b><u>Summary of Proposed Bidding Procedures</u></b>

18.    In order to ensure that the Debtors receive the maximum value for the Purchased Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Assets.

**A.    Provisions Governing Qualifications of Bidders**

19.    Unless otherwise ordered by the Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person other than the Stalking Horse Purchaser who wishes to participate in the bidding process (a "<u>Potential Bidder</u>") must deliver the following to the Notice Parties (as defined below):

(a)    a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; and

(b)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Debtors, in substantially the same form as signed by the Stalking Horse Purchaser and which shall inure to the benefit of any purchaser of the Purchased Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

20.    A Potential Bidder that delivers the documents and information described above or that the Debtors determine in their reasonable business judgment, after consultation with their advisors, is likely (based on availability of financing, experience and other considerations) to be

able to consummate the sale, will be deemed a "<u>Qualified Bidder</u>." The Debtors will limit access to due diligence to those parties it believes, in the exercise of their reasonable judgment, are pursuing the transaction in good faith.

21.     As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors will determine and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

**B.      Due Diligence**

22.     The Debtors will afford any Qualified Bidder such due diligence access or additional information as the Debtors, in consultation with their advisors, deem appropriate, in their reasonable discretion, which must include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information. The Debtors must promptly advise the Stalking Horse Purchaser in the event any other Potential Bidder receives diligence the Stalking Horse Purchaser has not previously received and shall promptly be provided with access to such diligence materials. The due diligence period shall extend through and include the Bid Deadline (as defined below). Additional due diligence will not be provided after the Bid Deadline.

**C.      Provisions Governing Qualified Bids**

23.     A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "<u>Qualified Bid</u>"):

(a)     it states that the applicable Qualified Bidder offers to purchase, in cash, the Purchased Assets upon the terms and conditions that the Debtors reasonably determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

(b)     it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is

selected as the Successful Bidder its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, and (ii) the date that is ten (10) business days after the Sale Hearing;

(c)     confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

(d)     it includes a duly authorized and executed copy of an Asset Purchase Agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement ("Marked Agreement") and the proposed orders to approve the sale by the Bankruptcy Court;

(e)     it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

(f)     it provides for the repayment of all other costs, simultaneously with the closing of the transaction contemplated under the Asset Purchase Agreement;

(g)     it has a value to the Debtors, in the Debtors' exercise of their reasonable business judgment, after consultation with their advisors, that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (A) the aggregate amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (B) $600,000;

(h)     it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume, provides details of the Qualified Bidder's proposal for the treatment of related cure costs;

(i)     it includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Asset Purchase Agreement; and

(D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

(j)    it includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

(k)    it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to 10% of the Purchase Price;

(l)    it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Sellers;

(m)    it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

(n)    it contains such other information reasonably requested by the Debtors; and

(o)    it is received prior to the Bid Deadline.

24.    Notwithstanding the foregoing, the Stalking Horse Purchaser will be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the sale.

25.    The Debtors shall notify the Stalking Horse Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Stalking Horse Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as, the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided such notification shall not be given later than two (2) business days following the expiration of the Bid Deadline.

D.    **Bid Deadline**

26.    A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtors: DLA Piper LLP (US), 203 N. LaSalle Street, Suite 1900, Chicago, Illinois 60601 (Attn: Richard A. Chesley, Esq. (richard.chesley@dlapiper.com)); (ii) counsel to the Stalking Horse Purchaser: Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Cathy Hershcopf, Esq. (chershcopf@cooley.com) and Alex R. Velinsky (avelinsky@cooley.com)); and (iii) counsel to any statutory committee of unsecured creditors appointed in these cases, so as to be received by the Debtors not later than 9:00 a.m. EST on February 10, 2012 (the "Bid Deadline").  The Bid Deadline may not be extended without the written consent of the Stalking Horse Purchaser.

E.    **Evaluation of Competing Bids**

27.    A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of such bid, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse Agreement, (4) the ability of the Potential Bidders to obtain appropriate regulatory approvals, and (5) any other factors deemed relevant by the Debtors in their reasonable discretion.

F.    **No Qualified Bids**

28.    If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, the Debtors will not hold an auction and the Stalking Horse Purchaser will be named the Successful Bidder on the Bid Deadline.

G.    **Auction Process**

29.    If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Agreement, the Debtors will conduct the Auction of the Purchased Assets, which shall be

transcribed at <u>10:00 a.m. (EST) on February 15, 2012</u>, at the offices of DLA Piper LLP (US),
1251 Avenue of the Americas, New York, New York 10020, or such other location as shall be
timely communicated to all entities entitled to attend the Auction.  The Auction shall run in
accordance with the following procedures:

(a)     only the Debtors, the Stalking Horse Purchaser, and the unsecured
         creditors committee, and the advisors to each of the foregoing, and any
         other Qualified Bidder that has timely submitted a Qualified Bid, shall
         attend the Auction in person, and only the Stalking Horse Purchaser and
         such other Qualified Bidders will be entitled to make any subsequent bids
         at the Auction;

(b)     each Qualified Bidder shall be required to confirm that it has not engaged
         in any collusion with respect to the bidding or the sale;

(c)     at least one (1) business day prior to the Auction, each Qualified Bidder
         who has timely submitted a Qualified Bid must inform the Debtors
         whether it intends to attend the Auction; <u>provided</u> that in the event a
         Qualified Bidder elects not to attend the Auction, such Qualified Bidder's
         Qualified Bid shall nevertheless remain fully enforceable against such
         Qualified Bidder until the date of the selection of the Successful Bidder
         and Back-Up Bidder at the conclusion of the Auction.  At least one (1)
         business day prior to the Auction, the Debtors will provide copies of the
         Qualified Bid or combination of Qualified Bids which the Debtors believe,
         in their reasonable discretion after consultation with committee counsel, is
         the highest or otherwise best offer (the "<u>Starting Bid</u>") to the Stalking
         Horse Purchaser and all other Qualified Bidders;

(d)     all Qualified Bidders who have timely submitted Qualified Bids will be
         entitled to be present for all Subsequent Bids (as defined below) at the
         Auction and the actual identity of each Qualified Bidder will be disclosed
         on the record at the Auction; <u>provided</u> that all Qualified Bidders wishing
         to attend the Auction must have at least one individual representative with
         authority to bind such Qualified Bidder attending the Auction in person;

(e)     the Debtors, after consultation with their advisors, may employ and
         announce at the Auction additional procedural rules that are reasonable
         under the circumstances for conducting the Auction, <u>provided</u> that such
         rules are (i) not inconsistent with the Bidding Procedures appended as
         <u>Exhibit 1</u> to the Bidding Procedures Order, the Bankruptcy Code, or any
         order of the Court entered in connection herewith, and (ii) disclosed to
         each Qualified Bidder at the Auction; and

(f)     bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "Subsequent Bid") providing a net value to the estate of at least an additional $300,000 above the prior bid.  After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid) that it believes to be the highest or otherwise better offer (the "Leading Bid").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.  Each Qualified Bidder will only have one opportunity to pass.  Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse Purchaser), the Debtors will give effect to the Break-Up Fee and Expense Reimbursement payable to the Stalking Horse Purchaser under the Stalking Horse Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors.

**H.     Selection of Successful Bid**

30.     Prior to the conclusion of the Auction, the Debtors, in consultation with their advisors, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer from among the Qualified Bidders (including the Stalking Horse Purchaser) submitted at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and communicate to the Stalking Horse Purchaser and the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid.  The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

31.     Within two (2) business days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.  Within two (2) business days after adjournment of the Auction, the Debtors shall file a notice identifying the Successful Bidder with the Bankruptcy Court.

32.     The Debtors will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing (as defined below).

**I.     Return of Deposits**

33.     All good faith deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder (as defined below) no later than five (5) business days following the conclusion of the Auction.

**J.     Back-Up Bidder**

34.     If an Auction is conducted, the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until ten (10) business days after the Sale Hearing.  Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

**K.     The Bid Protections**

35.     In recognition of this expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Purchaser is not the Successful Bidder, the Debtors will pay the Stalking Horse Purchaser (i) an aggregate fee of approximately One Million Six Hundred And Fifty Thousand dollars and 00/100 ($1,650,000), which is equal to 3% of the aggregate Stalking Horse Purchase Price, prior to any closing adjustments (the "Break-Up Fee"), and (ii) an amount in cash equal to the aggregate amount of the reasonable charges, costs,

fees, payments, and expenses (including, without limitation, all reasonable fees, expenses and disbursements of any representatives of Stalking Horse Purchaser and its Affiliates) paid or incurred by or on behalf of Stalking Horse Purchaser or its Affiliates relating to or in connection with its bid (the "Expense Reimbursement").  The amount of the Expense Reimbursement will be disclosed no later than February 8, 2012.  The Stalking Horse Purchaser shall provide reasonable documentation of the Expense Reimbursement to the Debtors and the Office of the United States Trustee.  The Break-Up Fee and Expense Reimbursement shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement.

36.     The Debtors have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to the Stalking Horse Agreement shall survive termination of the Stalking Horse Agreement, shall, to the extent owed by the Debtors, constitute an administrative expense claim under section 503(b) of the Bankruptcy Code and shall be payable within two (2) business days under the terms and conditions of the Stalking Horse Agreement and the Bid Procedures Order, notwithstanding section 507(a) of the Bankruptcy Code.

**L.     Sale Hearing**

37.     The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin on or before February 20, 2012 (prevailing Eastern Time), to approve and authorize the sale transaction to the Successful Bidder on terms and conditions determined in accordance with the Bid Procedures.

**Notice of Sale Hearing**

38.     As stated above, the Debtors request that this Court schedule the Sale Hearing for February 20, 2012.  The Debtors propose that any objections to the Sale be filed by 4:00 p.m. (prevailing Eastern Time) three business days prior to the Sale Hearing.

39.      The Debtors also request that the Court approve the form of the Procedures
Notice, substantially in the form of <u>Exhibit D</u> hereto.  The Debtors will serve a copy of the
Procedures Notice on the following parties:  (a) the U.S. Trustee, (b) the Official Committee of
Unsecured Creditors, (c) any parties requesting notices in these cases pursuant to Bankruptcy
Rule 2002, (d) all known creditors of the Debtors, (e) counsel to the Stalking Horse Purchaser,
and (f) all Potential Bidders (collectively with the parties specified in this paragraph, the
"<u>Procedures Notice Parties</u>").

40.      The Debtors propose to serve the Procedures Notice within two (2) business days
following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the
Procedures Notice Parties.  The Procedures Notice provides that any party that has not received
a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the
Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a
request in writing to Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA
90245, or by calling the following toll-free number: (866) 967-0267.

41.      The Debtors submit that the foregoing notices comply fully with Bankruptcy
Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding
Procedures, Auction and Sale, and Sale Hearing to the Debtors' creditors and other parties in
interests as well as to those who have expressed an interest or are likely to express an interest in
bidding on the Purchased Assets.  Based on the foregoing, the Debtors respectfully request that
this Court approve these proposed notice procedures.

**<u>Sale Hearing</u>**

42.      At the Sale Hearing, the Debtors will seek Court approval of the Sale to the
Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363
of the Bankruptcy Code, with all liens, claims and encumbrances to attach to the Sale Proceeds

with the same validity and in the same order of priority as they attached to the Purchased Assets prior to the Sale, including the assumption by the Debtors and assignment to the Successful Bidder of the assumed Contracts and Leases pursuant to section 365 of the Bankruptcy Code. The Debtors will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable and in the best interest of the Debtors' estates and all interested parties.

### Procedures for the Assumption and Assignment of Assumed Contracts and Leases

43.    As noted above, the Debtors will seek to assume and assign certain Contracts and Leases to be identified on schedules to the Stalking Horse Agreement other than those agreements excluded by the Successful Bidder pursuant to such bidder's Asset Purchase Agreement (collectively, the "Assumed Executory Contracts").

44.    At least initially, the Assumed Executory Contracts will be those Contracts and Leases that the Debtors believe may be assumed and assigned as part of the orderly transfer of the Purchased Assets.  The Successful Bidder may choose to exclude (or to add) certain Contracts or Leases to the list of Assumed Executory Contracts, subject to further notice.

45.    In the interim, the Debtors will serve the Motion and the Cure Notice, substantially in the form of Exhibit E hereto, upon each counterparty to the Assumed Executory Contracts by no later than February 3, 2012.  The Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which any objection to the assumption and assignment of Assumed Executory Contracts must be filed and served.  The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").  If a Contract or Lease is assumed and assigned pursuant to Court Order, then unless the Assumed Executory Contract counterparty properly files and serves an objection to

the Cure Amount contained in the Cure Notice, the Assumed Executory Contract counterparty will receive at the time of the Closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any, with payment to be made pursuant to the terms of the Successful Bidder's Asset Purchase Agreement.  If an objection is filed by a counterparty to an Assumed Executory Contract, the Debtors propose that such objection must set forth a specific default in any executory contract or unexpired lease and claim a specific monetary amount that differs from the amount, if any, specified by the Debtors in the Cure Notice.  To the extent there is a contract to be assumed pursuant to the Successful Bidder's Asset Purchase Agreement, this Motion constitutes a separate motion to assume and assign that contract to the Successful Bidder pursuant to section 365 of the Bankruptcy Code; each such contract will be listed on an exhibit to the Successful Bidder's Asset Purchase Agreement, and will be given a separate Cure Notice.

46.    If any counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract (a "Cure Amount Objection"), the Debtors propose that the counterparty must file the objection by no later than (i) 4:00 p.m. (prevailing Eastern Time) on February 16, 2012 or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after the Auction), provided, however, that any counterparty may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed Executory Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract.  After receipt of a Cure Amount Objection, the Debtors will attempt to reconcile any differences in the Cure Amount.  In the event that the Debtors and the non-debtor party cannot resolve the Cure Amount Objection, and

the Court does not otherwise make a determination at the Sale Hearing, the Debtors may, in

their discretion, segregate any disputed Cure Amounts pending the resolution of any such

disputes by the Court or mutual agreement of the parties.

47.    The Successful Bidder shall be responsible for satisfying any requirements

regarding adequate assurance of future performance that may be imposed under section 365(b)

of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory

Contract, and the failure to provide adequate assurance of future performance to any

counterparty to any Assumed Executory Contract shall not excuse the Successful Bidder from

performance of any and all of its obligations pursuant to the Successful Bidder's Asset Purchase

Agreement.  The Debtors propose that the Court make its determinations concerning adequate

assurance of future performance under the Assumed Executory Contacts pursuant to section

365(b) of the Bankruptcy Code at the Sale Hearing.  Cure Amounts disputed by any

counterparty will be resolved by the Court at the Sale Hearing or such later date as may be

agreed to or ordered by the Court.

48.    Except to the extent otherwise provided in the Successful Bidder's Asset

Purchase Agreement, the Debtors and the Debtors' estates shall be relieved of all liability

accruing or arising after the assumption and assignment of the Assumed Executory Contracts

pursuant to section 365(k) of the Bankruptcy Code.

## II.    APPLICABLE AUTHORITY

### A.    The Sale of the Purchased Assets is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment

49.    In accordance with Bankruptcy Rule 6004, sales of property rights outside the

ordinary course of business may be by private sale or public auction.  The Debtors have

determined that the Sale of the Purchased Assets by public auction will enable it to obtain the

highest and best offer for these assets (thereby maximizing the value of estates) and is in the

best interests of the Debtors' creditors.  In particular, the Stalking Horse Agreement is the result

of comprehensive, arm's length negotiations for the Sale of the Purchased Assets, and the Sale

pursuant to the terms of the Stalking Horse Agreement, subject to higher or otherwise better

offers at the Auction, will provide a greater recovery for the Debtors' creditors than would be

provided by any other existing alternative.

   50.  Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a

standard for determining when it is appropriate for a court to authorize the use, sale or lease of

property of the estate, a sale of a debtor's assets should be authorized if a sound business

purpose exists for doing so.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d

Cir. 1996); In re Abbotts Dairies of Pennsylvania, Inc., 788 P.2d 143 (2d Cir. 1986); In re

Titusville Country Club, 128 BR. 396 (W.D. Pa. 1991); In re Delaware & Hudson Ry. Co., 124

BR. 169, 176 D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV

Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec.

Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Committee of

Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville

Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

   51.  The paramount goal in any proposed sale of property of the estate is to maximize

the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558,

564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the

value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a well-established

principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.  GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd., 331 B.R. 251, 255 (N.D. Tex. 2005); In re Lajijani, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); In re WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

52.     Applying section 363, the proposed Sale of the Purchased Assets should be approved.  As set forth above, the Debtors have determined that the best method of maximizing the recovery of the Debtors' creditors would be through the Sale of the Purchased Assets.  The fairness and reasonableness of the consideration to be paid by the purchaser(s) will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means for establishing whether a fair and reasonable price is being paid.  In order to ensure a fair auction process, the Debtors have and will continue to solicit interest from numerous potential purchasers.

53.     Further, the Debtors believe that the value the Debtors' estates—and, thus, the Debtors' creditors—will receive for the Sale of the Purchased Assets as a going concern exceeds any value the Debtors' estates could get for the Purchased Assets if the Debtors were required to liquidate their assets piecemeal.  The Debtors also believe that the value of the

consideration likely to be received for the Purchased Assets under an Asset Purchase Agreement is fair and reasonable.  As further assurance of value, however, bids will be tested through the Auction consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to the Bidding Procedures approved by the Court.  Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.

54.     The Debtors and their investment banker believe that the timeline for the marketing and sale of the Purchased Assets is adequate, and balances the need to fully market the Purchased Assets and maintain continuity in the operation of the set-top box business for vendors, customers and employees.  The Debtors' investment banker is prepared to quickly contact potential interested parties and determine the level of interest in a potential acquisition and provide them access to a confidential set-top box business overview management presentation and access to a data room that has been assembled upon the execution of an appropriate confidentiality agreement.  There is a limited universe of potential acquirers of the Purchased Assets, and, during the latter half of 2011, the Debtors and their investment banker had preliminary discussions with many of these potential purchasers.

**B.     The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Purchased Assets.**

55.     As noted above, the paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of

bankruptcy sales.  See, e.g., In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr.

S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an

adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution

of bankrupt estates").

56.    Procedures to dispose of assets, similar to the proposed Bidding Procedures,

have been approved in other large, complex bankruptcy cases.  See, e.g., In re Conex Holdings

LLC, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2011); In re Barnes Bay Development

Ltd., Case No. 11-10792 (PJW) (Bankr. D. Del. May 19, 2011); In re East West Resort

Development V, L.P., L.L.L.P., Case No. 10-10452 (BLS) (Bankr. D. Del. March 31, 2010); In

re Dana Corp., Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); In re Delphi Corp., Case

No. 05-44481 (Bankr. S.D.N.Y. June 22, 2006); In re Oxford Automotive, Inc., Case No. 04-

74377 (Bankr. E.D. Mich. Jan. 24, 2005); see also In re Calpine Corp., Case No. 05-60200

(Bankr. S.D.N.Y. Dec. 6, 2006).

57.    The Debtors believe that the Bidding Procedures will establish the parameters

under which the value of the Purchased Assets may be tested at an auction and through the

ensuing Sale Hearing.  Such procedures will increase the likelihood that the Debtors' creditors

will receive the greatest possible consideration for their assets because they will ensure a

competitive and fair bidding process.  They also allow the Debtors to undertake an auction in as

expeditious and efficient manner as possible, which the Debtors believe is essential to

maximizing the value of the Debtors' estates for their creditors.

58.    The Debtors also believe that the proposed Bidding Procedures will promote

active bidding from seriously interested parties and will dispel any doubt as to the best and

highest offer reasonably available for the Debtors' assets.  In particular, the proposed Bidding

Procedures will allow the Debtors to conduct an auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.

59.    In sum, the Debtors believe that the Bidding Procedures will encourage bidding for the Purchased Assets and are consistent with the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed Bidding Procedures are reasonable, appropriate and within the Debtors' sound business judgment.

**C.    The Sale of the Purchased Assets Free and Clear of Liens and Other Interests is Authorized by Sections 363(f)**

60.    The Debtors further submit that it is appropriate to sell the Purchased Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the Sale Proceeds of the Purchased Assets to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

61.    This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

62.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of liens and interests.  In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

63.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Purchased Assets pursuant to the Stalking Horse Agreement. In particular, the Debtors believe that at least sections 363(f)(2) and (3) will be met in connection with the transactions proposed under the Stalking Horse Agreement because (i) each of the parties holding liens on the Purchased Assets will consent or, absent any objection to this motion, will be deemed to have consented to the Sale, and (ii) the Purchased Assets are being sold at a price well in excess of the aggregate amount of any liens encumbering such assets. Any lienholder also will be adequately protected by having their liens, if any, in each instance against the Debtors or their estates, attach to the Sale Proceeds ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtors may possess with respect thereto.  Accordingly, section 363(f)

authorizes the transfer and conveyance of the Debtors' assets free and clear of any such claims,

interests, liabilities or liens.

64.    Although section 363(f) of the Bankruptcy Code provides for the sale of assets

"free and clear of any interests," the term "any interest" is not defined anywhere in the

Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d

Cir. 2000).  In the case of In re Trans World Airlines, Inc.,  322 F.3d 283, 288-89 (3d Cir.

2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third

Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in

rem interests in property," the trend in modern cases is towards "a more expansive reading of

'interests in property' which 'encompasses other obligations that may flow from ownership of

the property.'"  Id. at 289 (citing 3 Collier on Bankruptcy 15th Ed. Rev., ¶ 363.06[1] (L. King,

15th rev. ed. 1988)).  As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co.,

99 F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third

Circuit in Folger, supra, the scope of section 363(f) is not limited to in rem interests.  Thus, the

Third Circuit in Folger stated that Leckie held that the debtors "could sell their assets under

§ 363(f) free and clear of successor liability that otherwise would have arisen under federal

statute."  Folger, 209 F.3d at 258.

65.    Courts have consistently held that a buyer of a debtor's assets pursuant to a

section 363 sale takes such assets free from successor liability resulting from pre-existing

claims.  See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732

(Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and

clear of any interest that could be brought against the bankruptcy estate during the bankruptcy);

MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94

(2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); WBO Partnership v. Virginia Dept. of Medical Assistance Servs. (In re WBO Partnership), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[4]  The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct.  Under section 363(f) of the Bankruptcy Code, the purchaser is entitled to know that the Debtors' assets are not infected with latent claims that will be asserted against the purchaser after the proposed transaction is completed.  Accordingly, consistent with the above-cited case law, the order approving the Sale should state that the Successful Bidder is not liable as a successor under any theory of successor liability, for claims that encumber or relate to the Purchased Assets.

---

[4]     Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority.  See, e.g., Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

**D.      The Proposed Notice of Bidding Procedures and Auction Is Appropriate**

66.      The Debtors believe that they will obtain the maximum recovery for creditors of the Debtors' estates if the Purchased Assets of the Debtors are sold through a well-advertised sale and auction.  The Debtors have already taken significant steps to identify potential purchasers.

67.      Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtors' creditors and other interested parties, as well as to those parties who have expressed an interest, or may express an interest, in bidding on the Purchased Assets.  The proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction should provide interested purchasers ample time to participate in the Auction.

**E.      The Stalking Horse Protections Are Appropriate Under the Circumstances**

68.      As noted above, the Stalking Horse Purchaser proceeded in reliance on promises by the Debtors to seek the Stalking Horse Protections and in reasonable expectation that this Court would enter an order providing such relief.  The Debtors submit that the Stalking Horse Protections are a normal and oftentimes necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  In particular, such protections encourage a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  <u>See, e.g.</u>, <u>In re Comdisco, Inc.</u>, Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, <u>inter alia</u>, an actual and necessary cost and

expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); Integrated Resources, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); In re Marrose Corp., 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); In re 995 Fifth Ave.  Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

69.    Moreover, bid protections, similar to the Stalking Horse Protections sought to be approved by this Motion, have been approved in other chapter 11 cases in this Court.  See, e.g., In re Conex Holdings, LLC, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2012) (approving break-up fee of 3% of final purchase price); In re Nortel Networks Inc., Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee in connection with $17.65 million sale, or 5.9%); In re Tallygenicom, L.P., Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) (approving $2 million break-up fee in connection with $36.6275 million sale, or 5.5%); In re Fluid Routing Solutions Intermediate Holding Corp., Case No. 09-10384

(CSS) (Bankr. D. Del. Feb. 19, 2009) (court approved expense reimbursement of up to $1.25 million in connection with a $11 million sale, or up to 11.4%); In re Archway Cookies, LLC, Case No. 08-12323 (CSS) (Bankr. D. Del. Dec. 3, 2008) (approving $750,000 break-up fee in connection with a $25 million sale, or 3.8%); In re Wickes Holdings, LLC, et al., Case No. 08-10212 (KJC) (Bankr. D. Del. Feb. 19, 2008) (authorizing debtor to enter into stalking horse agreement providing break-up fee of up to 3%); In re Tweeter Home Entm't Group, Inc., Ch. 11 Case No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) (authorizing debtor to pay stalking horse's termination fee); In re Radnor Holdings, Case No. 06-10110 (CSS) (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted).

70.    A proposed bidding incentive, such as the Break-Up Fee and Expense Reimbursement, should be approved when it is in the best interests of the estate.  In re S.N.A. Nut Co., 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992).  Typically, this requires that the bidding incentive provide some benefit to the debtor's estate.  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

71.    In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy), the Third Circuit found that whether break-up fees and expenses could be paid to Calpine Corp. ("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the value of the estate.  O'Brien Envtl. Energy, 181 F.3d at 536.  The court determined that Calpine's right to break-up fees and expenses depended on whether it provided a benefit to the

debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company.  Id. at 537.  The Debtors believe that approval of the Stalking Horse Protections will create such a competitive bidding process.

72.     First, the Break-Up Fee induced the Stalking Horse Purchaser to submit a bid that will serve as a minimum floor bid upon which other bidders may rely.  Therefore, the Stalking Horse Purchaser has provided a material benefit to the Debtors, their estates and their respective creditors by encouraging bidding and increasing the likelihood that the best possible price for the Purchased Assets will be received.  See, e.g., In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. 8. N.D. Ill. Aug. 9, 2002) (finding proposed termination fee to be of substantial benefit to the debtor's estate); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002); Integrated Resources, 147 B.R. at 659 (noting that termination payment is an "important tool to encourage bidding and to maximize the value of the debtor's assets").

73.     Second, the Debtors believe that the proposed Expense Reimbursement is fair and reasonably compensates the Stalking Horse Purchaser for taking actions that will benefit the Debtors' estates.  The Expense Reimbursement compensates the Stalking Horse Purchaser for diligence and professional fees incurred in negotiating the terms of the Stalking Horse Agreement on an expedited timeline.

74.     Third, the proposed Stalking Horse Protections are the result of an arm's-length negotiated agreement between the Debtors and the Stalking Horse Purchaser.  There is no evidence or reason to believe that the relationship between the Debtors and the Stalking Horse Purchaser has been tainted by self-dealing or manipulation.

75.     Fourth, the Debtors do not believe that the Stalking Horse Protections will have a chilling effect on the sale process.  Rather, the Stalking Horse Purchaser has increased the likelihood that the best possible price for the Purchased Assets will be received, by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse Purchaser, and moreover, by allowing qualified bidders to utilize the Stalking Horse Agreement as a platform for negotiations and modifications in the context of a competitive bidding process.

76.     Finally, the Stalking Horse Protections will be paid only if, among other things, the Debtors enter into a transaction with a bidder other than the Stalking Horse Purchaser. Accordingly, no Stalking Horse Protections will be paid unless a higher and better offer is achieved and consummated.

77.     In sum, the Stalking Horse Protections are reasonable under the circumstances and will enable the Debtors to maximize the value for the Purchased Assets while limiting any chilling effect in the sale process.  The Break-Up Fee, in the amount of $1,650,000, represents 3% of the Stalking Horse Purchase Price.  The Stalking Horse Protections not only compensate the Debtors for the risk that they assume in foregoing a known, willing and able purchaser for a new potential acquirer, but also ensure that there is an increase in the net proceeds received by their estates, after deducting the Stalking Horse Protections to be paid to the Stalking Horse Purchaser in the event of a prevailing overbid.

## F.     Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

78.     Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a trustee "may assume or reject any executory contracts or unexpired leases of the debtor." 11 U.S.C. § 365(a).  Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.  See Nostas Assocs. v.

Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

79.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an

executory contract or unexpired lease of nonresidential real property if:

>           (A)     the trustee assumes such contract or lease in accordance with the
>     provisions of this section; and
>
>           (B)     adequate assurance of future performance by the assignee of such
>     contract or lease is provided, whether or not there has been a default in such
>     contract or lease.

11 U.S.C. § 365(f)(2).

80.     The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction."  See

Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J.

1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate

assurance of future performance does not mean absolute assurance that debtor will thrive and

pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("Although no single solution will satisfy every case, the required assurance will fall

considerably short of an absolute guarantee of performance.").

81.     Among other things, adequate assurance may be given by demonstrating the

assignee's financial health and experience in managing the type of enterprise or property

assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance

of future performance is present when prospective assignee of lease has financial resources and

expressed willingness to devote sufficient funding to business to give it strong likelihood of

succeeding; chief determinant of adequate assurance is whether rent will be paid).

82.     The Debtors and the Successful Bidder will present evidence at the Sale Hearing to prove the financial credibility, willingness and ability of the Successful Bidder to perform under the Contracts or Leases.  The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder to provide adequate assurance of future performance under the Contracts or Leases, as required by section 365(b)(1)(C) of the Bankruptcy Code.

83.     In addition, the Cure Procedures are appropriate and consistent with section 365 of the Bankruptcy Code.  To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Successful Bidder's Asset Purchase Agreement.  Any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code.

84.     Accordingly, the Debtors submit that the Cure Procedures for effectuating the assumption and assignment of the Assigned Contracts as set forth herein are appropriate and should be approved.

**G.     The Successful Bidder should be Afforded All Protections Under Section 363(m) as A Good Faith Purchaser**

85.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  <u>In re Chateaugay Corp.</u>, 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting <u>In re Abbotts Dairies of Penn., Inc.</u>, 788 F.2d 143, 147 (3d Cir. 1986)); <u>see also</u> <u>Allstate Ins. Co. v. Hughes</u>, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); <u>In re Stein & Day, Inc.</u>, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

86.     The selection of the Successful Bidder will be the product of arm's-length, good faith negotiations in an anticipated competitive purchasing process.  The Debtors intend to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**H.     Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

87.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Order be effective immediately by providing that the ten (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

88.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, <u>Collier</u> suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  <u>Collier on Bankruptcy</u> P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Furthermore, <u>Collier</u> provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id.</u>

89.     The Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

<u>**Notice**</u>

90.     Notice of this Motion shall be provided to:  (a) the Office of the United States Trustee for the District of Delaware, (b) the Debtors' twenty largest unsecured creditors, as identified in their respective chapter 11 petitions, (c) counsel to the Stalking Horse Purchaser, (d) the United States Attorney's Office for the District of Delaware and (e) the Securities and Exchange Commission.

*[remainder of this page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter orders substantially in the form attached hereto as <u>Exhibit C</u> and <u>Exhibit F:</u> (a) granting the relief requested herein and (b) granting to the Debtors such other and further relief as the Court may deem proper.

Dated:  January 4, 2012
       Wilmington, Delaware

Respectfully submitted,

 /s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
Cynthia Moh (DE 5041)
DLA PIPER LLP (US)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@dlapiper.com
       cynthia.moh@dlapiper.com

     -and-

Richard A. Chesley (IL 6240877)
Kimberly D. Newmarch (DE 4340)
Chun I. Jang (DE 4790)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516
Email:    richard.chesley@dlapiper.com
       kim.newmarch@dlapiper.com
       chun.jang@dlapiper.com

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION