potential liability of another Person for infringement, misappropriation or violation of any Intellectual Property.

(g)    To the Company's Knowledge, no Person has infringed or misappropriated, and no Person is currently infringing or misappropriating any Seller Intellectual Property Assets. The Company has not notified any Person of any actual or suspected infringement or misappropriation of any Seller Intellectual Property Assets.

(h)    All STB Employees, STB Former Employees, STB Service Providers, current and former directors, members, independent contractors and consultants of the Company or a Subsidiary: (i) are a party to a "work-for-hire" and/or other agreements with the Company or a Subsidiary that has accorded the Company or a Subsidiary full, effective, exclusive and original ownership of all Purchased Intellectual Property Assets arising or relating to their respective work, services and/or relationship with or for Company or a Subsidiary; or (ii) have executed appropriate instruments of assignment in favor of the Company or a Subsidiary as assignee that have conveyed to the Company or a Subsidiary effective and exclusive ownership of all Seller Intellectual Property Assets arising or relating to their respective work, services and/or relationship with or for Company or a Subsidiary other than non-assignable rights and statutory revisionary rights. No STB Employee, STB Former Service Provider, or STB Service Provider has disclosed any prior inventions in any of such confidentiality and assignment of invention agreements.

(i)    Section 3.21(i) of the Disclosure Schedule contains a complete and accurate list of all Seller Software identifying the owner of the Software and the identity of both the licensor and licensee of any such Software, if owned by a Third Party. Except as specified in Section 3.21(ii) of the Disclosure Schedule, the Company or a Subsidiary is in actual and sole possession of the complete source code of the Seller Software. To the Knowledge of the Company, except as set forth Section 3.21(iii) of the Disclosure Schedule, there are no material defects in the Seller Software currently used or held for use by the Company or any Subsidiary and there are no material errors in any design documentation relating to the Seller Business Software.

(j)    The source code for all Seller Software contains customary annotations and programmer's comments, and otherwise has been documented in a professional manner that is both: (i) consistent with customary code annotation conventions and best practices in the software industry; and (ii) sufficient to independently enable a sufficiently proficient programmer of reasonable skill, training, experience and competence to understand, analyze, and interpret program logic, correct errors and improve, enhance, modify and support the STB Business Software.

(k)    Except as disclosed in Section 3.21(k) of the Disclosure Schedule, no Product contains, is derived from, is distributed with, or is being or was developed using Open Source Code that is licensed under any terms that (i) impose or could impose a requirement or condition that any Product or part thereof (A) be disclosed or distributed in source code form, (B) be licensed for the purpose of making modifications or derivative works, or (C) be redistributable at no charge, or (ii) otherwise impose or could impose any other material

28.

limitation, restriction, or condition on the right or ability of the Purchaser or its Subsidiaries to use or distribute any Product.

(l)    The Company and each Subsidiary has taken all reasonable steps to safeguard the information technology systems utilized in the Seller Software, including the implementation of procedures to ensure that such systems are free from disabling codes or instructions, time, copy protection device, clock, counter or other limiting design or routing and any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus" or other software or hardware that permit unauthorized access or the unauthorized disablement or erasure of data or other software by a Third Party. To date, to the Knowledge of the Company, there have been no successful unauthorized intrusions or breaches of the security of such systems.

(m)    Except as set forth in Section 3.21(m) of the Disclosure Schedule, neither the Company nor any Subsidiary is or has ever been a member or promoter of, or a contributor to, any industry standards body or similar organization that requires or obligates the Company or any Subsidiary to grant or offer to any other Person any license or right to any Seller Intellectual Property Asset.

### Section 3.22    Taxes.

(a)    Except as set forth in Section 3.22(a) of the Disclosure Schedule, the Company (with respect to income Taxes) has timely filed all income Tax Returns and other material Tax Returns that it was required to file. All such Tax Returns were complete, accurate and prepared in compliance with all applicable Laws. All Taxes payable by the Company (with respect to income Taxes), whether or not shown on any Tax Return, have been paid in full. The Company (with respect to income Taxes) currently is not the beneficiary of any extension of time within which to file any Tax Return, other than an extension which is granted automatically under applicable Law. No claim has ever been made by an authority in a jurisdiction where the Company (with respect to income Taxes) does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction. There are no Encumbrances (other than Permitted Encumbrances) on any Purchased Assets that arose in connection with any failure or alleged failure to pay any Tax.

(b)    There is no presently outstanding dispute or claim concerning any Liability for Taxes of the Company or otherwise on account of the STB Business claimed or raised by any Governmental Authority. Except as set forth in Section 3.21(b) of the Disclosure Schedule, there is no pending or, to the Knowledge of the Company, threatened or anticipated audits or other investigations in respect of Taxes of the Company or otherwise on account of the STB Business.

(c)    The Company (with respect to income Taxes) has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, which waiver or extension remains currently in effect.

(d)    The Company has not (i) ever been a member of an "affiliated group" within the meaning of Code § 1504(a) Law filing a consolidated federal income Tax Return or any similar group for any foreign, state or local income Tax purpose (other than a group of which

29.

the Company was the common parent) or (ii) has any liability for Taxes of any Person under Reg. § 1.1502-6 or any similar Law or as a transferee or successor, by operation of law, contract or otherwise.

      (e)      The Company is not a party to any Tax allocation or sharing Contract.

      (f)      Neither the Company nor any Subsidiary has been a United States real property holding corporation within the meaning of Code § 897(c)(2) during the applicable period specified in Code § 897(c)(1)(A)(ii).

**Section 3.23    Litigation.**    Except for the Chapter 11 Case and the Cayman Insolvency Case, neither the Company nor any Subsidiary is a party to or bound by any Order (or any agreement entered into in any administrative, judicial or arbitration proceeding with any Third Party or governmental or other authority) with respect to the Purchased Assets or the STB Business. Section 3.23 of the Disclosure Schedule contains a complete and accurate list of each action, suit, proceeding, hearing, or investigation of, in, or before (or that there is a Basis on which it could come before) any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before (or that could come before) any arbitrator, (i) against the Company, any Subsidiary or any of their respective directors, officers and stockholders that is related to the STB Business, (ii) with respect to or affecting (a) the Purchased Assets or Assumed Liabilities or (b) the operations, assets, business or financial condition of the STB Business, or (iii) related to the consummation of Contemplated Transactions. No notice, citation, inquiry or complaint is pending against or, to the Knowledge of Company, threatened against the Company or any Subsidiary alleging any violation of or material Liability under any Environmental Law or Environmental Permit with respect to the STB Business.

**Section 3.24    Compliance with Laws.**

      (a)      Neither the Company nor any Subsidiary is, or during the past three years, has been in violation of, delinquent under or being investigated for violation of any Law, Order or Permit (a) relating to the STB Business or the Purchased Assets or Assumed Liabilities or (b) to which the any of the Purchased Assets, personnel of the STB Business, business activities relating to the STB Business or Leased Real Estate are subject and neither the Company nor any Subsidiary has received any notices of such violations, delinquency or investigations. The Company and each Subsidiary have complied at all times and in all material respects with all of the Company Privacy Policies and with all applicable Law pertaining to privacy, User Data, or Personal Data.

      (b)      The conduct of the STB Business have at all times conducted, their export transactions in accordance with all applicable U.S. export and re export controls, including the United States Export Administration Act and Export Administration Regulations, the International Traffic in Arms Regulations, and Foreign Assets Control Regulations, other U.S. economic sanction requirements and customs regulations and all other applicable import/export controls in other countries in which the Company and Subsidiaries conduct STB Business, including obtaining all Export Approvals (ii) the Company and the Subsidiaries are in compliance with the terms of all applicable Export Approvals, (iii) there are no pending or, to the

30.

Company's Knowledge, threatened claims against the Company or any of its Subsidiaries with respect to such Export Approvals or any activities requiring Export Approvals.

**Section 3.25  Business Continuity.**  To the Knowledge of the Company, none of the information technology systems, STB Business Software, computer hardware (whether general or special purpose), telecommunications capabilities (including all voice, data and video networks) and other similar or related items of automated, computerized, and/or software systems and any other networks or systems and related services that are used by or relied on by the Company and/or any Subsidiary in the conduct of the STB Business and that constitute Purchased Assets (collectively, the *"Systems"*) have, in the past twelve (12) months, caused any substantial disruption or interruption in or to the use of any such Systems by the Company or any Subsidiaries.

**Section 3.26   Certain Business Practices.**   The Company and its, and the STB Business's employees or other representatives (a) has not used and is not using any funds for any unlawful contributions, unlawful gifts, unlawful entertainment or other unlawful expenses; (b) has made any direct or indirect unlawful payments to any foreign or domestic Government Official; (c) has not violated and is not violating any Anti-Corruption Laws; (d) has not established or maintained, and is not maintaining, any unlawful or unrecorded fund of monies or other properties; (e) has not made, and is not making, any false or fictitious entries on its accounting books and records; (f) has not made, and is not making, any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of any nature, or paid or paying any fee, commission or other payment that has not been properly recorded on its accounting books and records as required by the Anti-Corruption Laws; or (g) has not otherwise given or received anything of value to or from a Government Official, an intermediary for payment to any individual including Government Officials, any political party or customer for the purpose of obtaining or retaining business.

**Section 3.27   Brokers.**  Except as set forth on Section 3.27 of the Disclosure Schedule, neither the Company nor any Subsidiary has any Liability to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions.

**Section 3.28   Complete Disclosure.**   The representations and warranties in this Article III do not contain any untrue statement or omit to state a material fact necessary to make the statements and information in this Article III not misleading.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to the Company as follows as of the date hereof and as of the Closing Date:

**Section 4.1    Organization.**  Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

**Section 4.2    Power and Authority.**  Purchaser has full power and authority to enter into and perform this Agreement and all other Transaction Documents to be executed by Purchaser pursuant to this Agreement (collectively, the *"Purchaser Documents"*).

**Section 4.3    Enforceability.** This Agreement has been duly executed and delivered by Purchaser and constitutes a valid and legally binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as enforceability may be limited by the Bankruptcy and Equity Exceptions.  Upon execution and delivery by Purchaser, the other Purchaser Documents will have been duly executed and delivered by Purchaser and will constitute valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as enforceability may be limited by the Bankruptcy and Equity Exceptions.

**Section 4.4    Consents.** No consent, authorization, Order or approval of, or filing, declaration or registration with, or notification with any Governmental Authority or other Person is required for Purchaser's execution and delivery of the Purchaser Documents or Purchaser's consummation of the Contemplated Transactions.

**Section 4.5    No Conflicts.** Neither Purchaser's execution and delivery of the Purchaser Documents nor Purchaser's consummation of the Contemplated Transactions will conflict with or result in a breach of any provision of Purchaser's Governing Documents or any Law or Order to which Purchaser is party or by which Purchaser is bound.  Purchaser is not a party to or bound by any Contract under which (a) Purchaser's execution and delivery of or performance under the Purchaser Documents or consummation of the Contemplated Transactions will constitute a default, breach or event of acceleration, or (b) performance by Purchaser according to the terms of the Purchaser Documents may be prohibited, prevented or delayed.

**Section 4.6    Financing.** Purchaser has, and will have throughout the period beginning as of the date of this Agreement and ending on the Closing Date, sufficient cash in immediately available funds to pay the Purchase Price and to consummate the Closing and the transactions contemplated by this Agreement.

## ARTICLE V
## PRE-CLOSING COVENANTS

**Section 5.1    Further Actions.**

(a)    Each Party will, and will cause its Affiliates to, use commercially reasonable efforts to cooperate with the other Parties and their Affiliates and to take such actions and execute and deliver any documents or instruments that are necessary, proper or advisable to consummate the Contemplated Transactions as promptly as practicable, including using commercially reasonable efforts to (a) obtain each of the consents, authorizations, Orders, acknowledgements or approvals required to be disclosed pursuant to Section 3.5, Section 3.6, Section 4.4 or Section 4.5 or listed in Schedule 2.3(h) or required to transfer any Assumed Contract, (b) prevent the entry, enactment or promulgation of any pending or threatened Order that would prevent, prohibit or delay the consummation of the Contemplated Transactions, (c) lift or rescind any existing Order preventing, prohibiting or delaying the consummation of the Contemplated Transactions, (d) effect all necessary, registrations, applications, notices and other filings required by applicable Law to consummate the Contemplated Transactions, and (e) cooperate with the other Parties with respect to all filings by any other Party that is required by

applicable Law or that such other Party otherwise elects to make to consummate the Contemplated Transactions.

(b)     In the event that there are any Seller Contracts which were not included in the Purchased Assets or the Assumed Liabilities and which were not specifically excluded from the transfers under this Agreement, but which would have been transferred to Purchaser as part of this Agreement but for the fact that such Seller Contract was not discovered until after the Closing or inadvertently was not assigned (each, a *"Later Discovered Contract"*), to the extent permitted under the terms and conditions of such Later Discovered Contract and under the applicable Laws and subject to Section 7.8 and Section 7.9, Purchaser and the Company agree to cooperate in assigning to Purchaser such Later Discovered Contract or the applicable rights or obligations under such Later Discovered Contract. In addition, the Company will and will cause its Affiliates to deliver to Purchaser or its designated Subsidiaries any tangible Purchased Assets that were inadvertently not transferred at Closing.

Section 5.2    Operation of the Business. Between the date of this Agreement and the Closing Date, unless required by order of the Bankruptcy Court or the Cayman Court, or Purchaser shall otherwise agree in writing, the Company shall cause the STB Business to be conducted only in the Ordinary Course of Business, and shall use its commercially reasonable efforts to preserve substantially intact the organization of the STB Business, substantially keep available the services of the STB Employees and STB Service Providers and substantially preserve the current relationships of the STB Business with customers, suppliers and other Persons with which the STB Business has material business relations. For the avoidance of doubt, the Company shall, and shall cause its applicable Subsidiaries to, pay all registration, maintenance, renewal, and annuity fees and Taxes due by Company or any Subsidiary prior to and as of the Closing Date, without extensions of time or late payment fees, and have all necessary documents prepared and filings timely made in connection therewith, for the maintenance, prosecution, registration and filing of each item of Purchased Intellectual Property Assets, including taking all Required Actions. In furtherance of the foregoing and in no way limiting the foregoing, between the date of this Agreement and the Closing Date, the Company shall, except as set forth on Schedule 5.2:

(a)     if requested in writing by Purchaser, to the extent permitted by applicable Law, report to Purchaser regarding the STB Business and the status of the STB Business and the Company's and each Subsidiary's operations and finances; provided, that, the Company shall only be required to report information that is currently available to the Company and that is prepared in a format that is currently used by the Company to report such information or a format required pursuant to this Agreement;

(b)     report to Purchaser on a weekly basis the names of any STB Employees who give notice of termination of employment or who threaten to terminate employment;

(c)     maintain the Purchased Assets in a state of repair and condition that is consistent with the Ordinary Course of Business;

(d)     pay or otherwise satisfy in the Ordinary Course of Business all of its material Liabilities of the STB Business to the extent permitted under bankruptcy Law;

(e)     promptly take all Required Actions and any other office actions with respect to any Registered IP and provide drafts of any proposed office actions to Purchaser in advance of filing (and reasonably take into account any comments of Purchaser in all such office actions);

(f)     keep in full force and effect, without amendment or other modification, all material rights relating to the STB Business;

(g)     comply in all material respects with all Laws and Orders relating to the STB Business;

(h)     continue in full force and effect the insurance coverage under the policies required to be disclosed in Section 3.14 of the Disclosure Schedule or substantially equivalent policies;

(i)     maintain all books and records relating to the STB Business in the Ordinary Course of Business and in accordance with GAAP; and

(j)     cooperate with and assist Purchaser in identifying all Permits required by Purchaser to operate the STB Business after the Closing Date.

**Section 5.3    Negative Covenants.**  Between the date of this Agreement and the Closing Date, the Company shall not directly or indirectly take any of the following actions in connection with the STB Business or the Purchased Assets without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), except as set forth on Schedule 5.3:

(a)     issue, sell, pledge, dispose of or otherwise subject to any Encumbrance any Purchased Assets, other than sales, transfers or dispositions of Owned Inventory in the Ordinary Course of Business;

(b)     amend, waive, modify or consent to the termination of any Seller Contract or Permit or amend, waive, modify or consent to the termination of rights of the Company or any Subsidiary thereunder, or enter into any Contract that would be a Seller Contract if entered into prior to the date hereof, other than in the Ordinary Course of Business;

(c)     authorize, or make any commitment with respect to, any single capital expenditure for the STB Business that is in excess of $25,000 or capital expenditures which are, in the aggregate, in excess of $100,000 for the STB Business taken as a whole;

(d)     enter into any lease of real or personal property or any renewals thereof for the STB Business involving a term of more than two months;

(e)     move any Tangible Personal Property included in the Purchased Assets from any facility subject to a Transferred Lease or to be subject to the Facility Use Agreement;

(f)     increase the compensation payable or to become payable or the benefits provided to the STB Employees, except as required by Law, grant or pay bonuses to any STB

34.

Employee, other than sales commissions payable under existing Seller Employee Benefit Plans and consistent with past practices, or grant any severance or termination payment to, or pay, loan or advance any amount to, any STB Employee, or establish, adopt, enter into or amend any Seller Employee Benefit Plan or accelerate vesting of any equity awards or other benefits of any STB Employee under any Seller Employee Benefit Plan;

   **(g)** make any change in any method of accounting or accounting practice or policy affecting the financial statements of the STB Business, except as required by GAAP or any changes to GAAP required to be applied after the date of this Agreement;

   **(h)** pay, discharge or satisfy any claim, liability or obligation (absolute, accrued, asserted or unasserted, contingent or otherwise) relating to the STB Business or the Purchased Assets, other than the payment, discharge or satisfaction of Liabilities in the Ordinary Course of Business, pursuant to an order of the Bankruptcy Court or the Cayman Court or as otherwise contemplated by this Agreement;

   **(i)** permit the lapse of any right relating to Seller Intellectual Property Assets or any other intangible Purchased Asset;

   **(j)** except for the collection of receivables, use any assets of the STB Business to pay any costs or expenses arising out of or relating to the Contemplated Transactions;

   **(k)** engage in any practice, take any action, or enter into any transaction of the sort described in Section 3.17 above;

   **(l)** enter into any settlement of any litigation, proceeding or governmental investigation with any Governmental Authority or other Person relating to the STB Business or any Purchased Assets or any Assumed Liability;

   **(m)** enter into any Contract to license any of the Patents or other Purchased Intellectual Property Assets or renew, extend, expand, or otherwise amend the terms of any existing license or Encumbrance on the Patents or other Purchased Intellectual Property Assets; or

   **(n)** enter into an agreement to do any of the foregoing.

 **Section 5.4** **Access Rights.** The Company agrees that from the date of this Agreement until the earlier of the Closing and the termination of this Agreement, the following provisions shall apply:

   **(a)** Without interfering with the Company's conduct of the business before Closing, Purchaser shall be permitted reasonable access to any STB Employees to discuss the STB Business following the consummation of the Contemplated Transactions, including, without limitation, in-person contact and communication with such STB Employees at the Company's or its Subsidiaries' premises during the Company's or such Subsidiaries' normal business hours, provided that Purchaser shall give the Company notice of such plans and shall provide details of such plans if requested.  The Company and Purchaser shall cooperate with each other in

35.

arranging or coordinating any access by Purchaser to STB Employees for the purpose of contacting or communicating with them under this Section 5.4(a).

(b)     The Implementation Manager and its designees shall have reasonable access, upon reasonable advance notice, and subject to compliance with Law, to the Company's or its Subsidiaries' premises, facilities, materials and personnel during normal business hours for the purpose of coordinating and implementing the sale and transfer of the STB Business from the Company to Purchaser pursuant to this Agreement.    Notwithstanding the foregoing, the Company shall conduct its operations in the Ordinary Course of Business as if the Contemplated Transactions were not occurring, prior to Closing.

(c)     The Company shall cooperate with and assist Purchaser in implementing the sale and transfer of the STB Business and Purchased Assets from the Company to Purchaser at Closing, including, without limitation, with respect to (i) implementing the separation of the Purchased Assets from the Excluded Assets, which cost and expense shall be borne equally by the Company and Purchaser except as set forth in this Agreement or other Seller Document, and performing all activities associated therewith to the extent necessary to carry out the purposes of this Agreement, (ii) transferring, moving or transporting any Purchased Assets to or from the premises subject to the Transferred Leases, or the premises subject to the Sublease or subject to the Facility Use Agreements, which cost and expense shall be borne equally by the Company and Purchaser, and (iii) transitioning operation of the Company's STB Business to Purchaser upon Closing. Purchaser will be responsible for the registration and/or recordation of the transfers and assignments of the Purchased Intellectual Property Assets, and the out-of-pocket fees paid to the US Patent and Trademark Office or any other government intellectual property office in connection therewith shall be shared equally by the Company and Purchaser (as part of the Transfer Charges and subject to), except that the Company shall bear 100% of the out-of-pocket fees and reasonable expenses incurred in connection with addressing the chain of title, recordation issues set forth on Schedule 5.4(c) solely through a deduction from the Holdback.

(d)     The Company shall, upon reasonable advance notice and subject to compliance with Law, provide the Purchaser with full access to, and copies of, all of the properties, books, contracts, documents, insurance policies, records and personnel relating to the STB Business, STB Employees, STB Service Providers and the Purchased Assets, including without limitation, all accounting records, ledgers, invoices and other documents supporting the amounts reflected in the Carve-Out Financial Statements, during normal business hours; *provided, however,* that any such access shall be conducted at Purchaser's expense under the supervision of appropriate personnel of the Company. Nothing herein shall require the Company to disclose any information to Purchaser if such disclosure would jeopardize any attorney-client or other legal privilege.

Section 5.5     **Notifications; Disclosure Updates**.

(a)     Until the Closing, each Party will promptly deliver written notice to the other Parties of any event, fact, circumstance or condition that constitutes or could reasonably be expected to cause (i) a breach of any of such Party's covenants under this Agreement, (ii) render the satisfaction of the conditions in Section 2.2 or Section 2.3 impossible or unlikely, or (iii) a prevention, prohibition or delay of the timely consummation of the Contemplated Transactions.

(b)     Until the Closing, the Company will, as soon as possible after discovery deliver to Purchaser written notice (each, a *"Disclosure Schedule Update"*) in the form of an amendment or supplement to the Disclosure Schedule to (i) reflect any event occurring or fact, circumstance or condition arising after the date of this Agreement that, if such event occurred or such fact, circumstance or condition arose before or on the date of this Agreement would have been required to be disclosed in the Disclosure Schedule or (ii) correct any existing inaccuracy or deficiency in the Disclosure Schedule based on any event that occurred or fact, circumstance or condition existed before or on the date of this Agreement; provided, however, that no such amendment or supplement will either cure any failure to satisfy the condition in Section 2.3(b) that might otherwise exist or otherwise prejudice Purchaser's termination rights under Article VI; provided, further, that any amendment or supplement pursuant to this Section 5.5(b) shall be not be deemed to have modified the Disclosure Schedule or qualified the representations and warranties in Article III for purposes of Purchaser's indemnification rights under Article VIII. Notwithstanding the foregoing, the Company shall not be obligated to provide a Disclosure Schedule Update to Purchaser more than once every two (2) calendar weeks (but in any event all Disclosure Schedule Updates must be provided to Purchaser at least five (5) Business Days prior to the Closing Date).

**Section 5.6     Intentionally Omitted.**

**Section 5.7     Bulk Sales Laws.** Purchaser hereby waives compliance by the Company and the Seller Subsidiaries with the requirements and provisions of any "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any and all liens (as defined in Section 101(37) of the Bankruptcy Code), claims (as defined in Section 101(5) of the Bankruptcy Code, including, without limitation, claims for successor liability under any theory of Law or equity), interests, or Encumbrances, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date, including any liens or claims arising out of the "bulk-transfer" Laws.

**Section 5.8     Competing Transaction.** This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Company and the Bankruptcy Court of higher or otherwise better competing bids. From and after the date hereof until the earlier of (i) the entry of the Bid Procedures Order and (ii) the termination of this Agreement (the *"Exclusivity Period"*), neither the Company nor any Seller Subsidiary or any of its their respective representatives or Affiliates shall directly or indirectly (a) negotiate, initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser and its affiliates, agents and representatives) with respect to any transaction (or series of transactions), whether direct or indirect, concerning a sale, financing, recapitalization, liquidation or other disposition of the Company or Seller Subsidiary or any portion thereof (whether by merger, sale of assets or stock, or otherwise), the consummation of which would be substantially inconsistent with the Contemplated Transactions (a *"Competing Transaction"*), or (b) provide any confidential information regarding the Company, any Seller Subsidiary, the STB Business or any of the Purchased Assets to any Person other than the Purchaser, except to the extent expressly permitted herein. During the Exclusivity Period, the Company will promptly (and in all events within 24 hours) inform and provide a summary to Purchaser of any other

offer, proposal or expression of interest for the Company, any Seller Subsidiary or any portion thereof that it or any of its affiliates or representatives may receive. Nothing contained herein shall be construed to prohibit the Company and their representatives from soliciting, considering, negotiating, agreeing to or otherwise taking action in furtherance of, any Competing Transaction after the entry of the Bid Procedures Order; *provided, however,* neither the Company nor any of its Affiliates or their respective representatives shall provide any Confidential Information to any strategic bidders without appropriate assurances of confidentiality.

### Section 5.9    Employee Matters.

(a)    The Purchaser may extend to any of the STB Employees, and may extend to any STB Employee hired with the consent of the Purchaser to replace any STB Employee terminated following the date hereof, an offer of employment (*"Transfer Offer"*) that, if accepted, shall become effective immediately after the Closing. The Company shall (and shall procure that each Seller Employer shall) use reasonable endeavors to encourage STB Employees to accept Transfer Offers, and each Local Asset Transfer Agreement shall set forth specific provisions for cooperation between the Company and Purchaser to best effectuate the transfer of STB Employees, in the respective jurisdictions. Employment pursuant to a Transfer Offer shall be contingent, among other requirements stated in the Transfer Offer, upon such STB Employee's remaining employed by a Seller Employer as of the Closing. Employees of any Seller Employer who commence employment with Purchaser pursuant to a Transfer Offer or who transfer to Purchaser pursuant to this Section 5.9(a) shall be referred to herein as *"Transferred Employees."* Except as provided in an individual Transfer Offer or the applicable Local Asset Transfer Agreement, Transfer Offers shall include credit for the employee's service with Seller Employers for purposes of vacation accrual rates but not for purposes of retirement or severance benefits, and shall offer base salary compensation equal to the base salary compensation paid by the Seller Employer immediately prior to the execution of this Agreement. Transfer Offers shall offer STB Employees eligibility for benefits consistent with benefits offered to equivalent positions with Purchaser. Nothing in this Section 5.9 or elsewhere in this Agreement shall be construed to create a right in any STB Employee, or in any other employee of the Company or a Seller Subsidiary, to employment with Purchaser. The employment of each Transferred Employee who was an STB (U.S.) Employee shall be "at will" employment. Purchaser will hire each employee who accepts a Transfer Offer and meets the contingencies therein, provided that, except as otherwise provided in any individual employment agreement between Purchaser and an STB Employee, Purchaser will not be obligated to maintain the employment of, or the compensation, benefits, or terms of employment provided in any Transfer Offer for any specified period thereafter. Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Purchaser to terminate, reassign, promote, or demote any Transferred Employee after the Closing Date or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, compensation, benefits, or terms or conditions of employment of such Transferred Employee.

(b)    The Transferred Employees shall be eligible to participate in Purchaser's health and welfare benefit plans, to substantially the same extent as similarly situated employees of Purchaser. To the extent that service is relevant for eligibility, accrual rates, or benefit levels under any health or welfare benefit plan of Purchaser or compensation program such as vacation or paid time off, then Purchaser shall ensure that such health or welfare benefit plan or

38.

compensation program shall, for purposes of eligibility, accrual rates, or benefit levels but not for purposes of accrued balances, credit Transferred Employees for service with the Seller Employers.

(c)    The Purchaser shall not assume any Liabilities or obligations for the provision of advance notice of employment termination, payment in lieu of notice of termination, severance, or any applicable penalties with respect to Transferred Employees or any other employees of or individuals providing services to the Company or its Seller Subsidiaries under any Law, under the WARN Act or any similar Law, Seller Employee Benefit Plan, policy of the Company or any Seller Subsidiary, or other Contract, arising as a result of the Contemplated Transactions.

(d)    Purchaser shall have no Liability in connection with the termination by the Company or a Seller Subsidiary of the employment or engagement of any employee of or other Person providing services to the Company or to a Seller Subsidiary, including any STB Employee or STB Service Provider.

(e)    The Company will be responsible for the payment and satisfaction of (i) all wages and other remuneration due to the STB Employees and STB Service Providers with respect to their services to Seller Employers through the Closing Date (including fiscal year 2011 bonus payments, if any), (ii) all payments required under the WARN Act with respect to actions or activities occurring on or prior to the Closing Date in connection with the Contemplated Transactions, (ii) the provision of health plan continuation coverage for (A) any employee of the Company or any Seller Subsidiary (including any STB Employee or STB Service Provider) terminated or who resigned prior to the Closing, and (B) any employee of the Company or any Seller Subsidiary that is not a Transferred Employee terminated after the Closing, in each case, in accordance with the requirements of COBRA and ERISA §§ 601-608, (iv) all termination or severance payments to any STB Employee or STB Service Provider who resigned or was terminated on or prior to the Closing Date and any claims that consummation of the Contemplated Transactions or any measures to be imposed in connection with the Contemplated Transactions constitutes an involuntary termination or constructive termination of the employment of any of STB Employees or STB Service Providers, and (v) all Liabilities arising under claims by the STB Employees or STB Service Providers for benefits attributable to periods on or prior to the Closing Date under any Seller Employee Benefit Plan. Purchaser shall assume the Assumed PTO.

(f)    Purchaser shall not adopt or assume any Seller Employee Benefit Plan or any obligations thereunder and all Liabilities under such Seller Employee Benefit Plans shall remain the Liability of the Company. Purchaser is not obligated under this Agreement to assume any agreements with a Labor Organization.

(g)    Nothing herein express or implied by this Agreement shall confer upon any STB Employee, or legal representative thereof, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement.

(h)    The Company undertakes to the Purchaser:

(i)      that it has complied and shall comply in all respects with its obligations under regulation 11 of TUPE;

(ii)     that it has complied and shall comply in all respects with regulation 13 of TUPE and Part IV of TULRCA (and that it has provided and shall provide to the Purchaser such information as the Purchaser may request in writing in order to verify such compliance);

(iii)    that it has not terminated and shall not terminate or take any steps to terminate (constructively or otherwise) the employment of any of the STB Employees without the prior written consent of the Purchaser;

(iv)    that it has not transferred and shall not transfer any of the STB Employees from working within the STB Business, it has not induced and shall not induce any STB Employee to resign their employment in the STB Business, and it has not agreed and shall not agree to transfer any STB Employee from the STB Business (without the prior written consent of the Purchaser);

(v)     that it shall not employ, engage or transfer any Person who is not an STB Employee to work in the Business without the prior written consent of the Purchaser.

(i)      If any Contract of employment or engagement or collective agreement or other workforce agreement not disclosed to the Purchaser is found or alleged to have effect as if originally made between the Purchaser and any Person or body or their representatives as a result of the provisions of TUPE or otherwise, then (without prejudice to any other rights or remedies which may be available to the Purchaser) the Purchaser may terminate such Contract or agreement within thirty (30) days of becoming aware of such transfer or alleged transfer

(j)      Without prejudice to the other provisions of this Section 5.9, the Company shall, at its own expense, give the Purchaser such assistance as the Purchaser may reasonably require to contest any demand by any Person, other than any of the STB Employees, employed or engaged in the STB Business at or before the Closing Date or their representatives resulting from or in connection with this Agreement. The Company shall, on request by the Purchaser and at the Company's expense, provide to the Purchaser such information or documents as the Purchaser may reasonably require relating to the terms of employment, pension and life assurance arrangements, health benefits, welfare or any other matter concerning any of the STB Employees or any trade union, employee representative or body of employees or their representatives or relating to collective agreements or collective or individual grievances in the period before the Closing Date.

### Section 5.10   Bankruptcy and Insolvency Matters.

(a)      Company and each Seller Subsidiary shall commence the Chapter 11 Case, file the U.S. Sale Motion, the Bid Procedures Motion, commence the Cayman Insolvency Case and file the Cayman Sale Motion no later than January 4, 2012;

40.

**(b)**    Following the commencement of the Chapter 11 Case, the Company shall continue to operate its business and manage its assets as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**(c)**    The Company and the Seller Subsidiaries agree that they shall not file any motion in the Chapter 11 Case or the Cayman Insolvency Case that is not (i) provided to Purchaser before filing and (ii) reasonably acceptable in form and substance to Purchaser.

**(d)**    If the US Sale Order, Bid Procedures Order, Cayman Sale Order or any other Orders of the Bankruptcy Court or Cayman Court relating to this Agreement are appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument are filed with respect to any such Order), the Company and each Seller Subsidiary shall diligently defend against such appeal, petition or motion and shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion; provided that the Company consult with Purchaser at Purchaser's reasonable request regarding the status of any such Actions.

**(e)**    The Company and each Seller Subsidiary further covenant and agree that, after the Closing, the terms of any plan it submits to the Bankruptcy Court, the Cayman Court or any other court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Contemplated Transactions, including, any transaction contemplated by or approved pursuant to the Sale Orders.

**(f)**    The Parties shall reasonably cooperate with one another, and use their respective reasonable best efforts, to cause the entry of the Bid Procedures Order, the US Sale Order and the Cayman Sale Order on or prior to the dates specified in <u>Section 2.3(f).</u>

**(g)**    The Company shall pay all Cure Costs associated with the Seller Contracts, subject to any reduction agreed to by the Parties or by order of the Bankruptcy Court, as and when provided for in the Sale Motion and the Sale Order.

## ARTICLE VI
## TERMINATION

**Section 6.1    Termination Events.**    This Agreement and the Contemplated Transactions may, with written notice given before the Closing, be terminated:

**(a)**    by mutual written consent of Purchaser and the Company;

**(b)**    by the Company (i) upon a breach of any covenant or agreement on the part of Purchaser in this Agreement, in either case, such that the conditions set forth in <u>Section 2.2(b)</u> or <u>Section 2.2(c)</u>, would not be satisfied (a ***"Purchaser Terminating Breach"***), provided that, if such Purchaser Terminating Breach is curable prior to the expiration of thirty (30) days from notice of such breach (but in no event later than the End Date) by Purchaser, through the exercise of its commercially reasonable efforts and for so long as Purchaser, continues to exercise such commercially reasonable efforts, the Company may not terminate this Agreement under this <u>Section 6.1(b)(i)</u> unless such thirty (30) day period expires without such

41.

Purchaser Terminating Breach having been cured, (ii) if a court of competent jurisdiction or Governmental Authority shall have issued an order, decree or ruling or taken any other action, in each case having the effect of restraining, enjoining or otherwise prohibiting the Contemplated Transaction, or (iii) the Closing has not occurred before or on the End Date (provided that the right to terminate this Agreement under this Section 6.1(b)(iii) shall not be available if the Company's failure to fulfill any obligation under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or before such date before or on the End Date); or

(c)     by Purchaser (i) upon a breach of any covenant or agreement on the part of the Company in this Agreement, in either case, such that the conditions set forth in Section 2.3(b), Section 2.3(c) or Section 2.3(d), would not be satisfied (a *"Company Terminating Breach"*), provided that, if such Company Terminating Breach is curable prior to the expiration of thirty (30) days from notice of such breach (but in no event later than the End Date) by the Company, through the exercise of its commercially reasonable efforts and for so long as the Company, continues to exercise such commercially reasonable efforts, Purchaser may not terminate this Agreement under this Section 6.1(c)(i) unless such thirty (30) day period expires without such Company Terminating Breach having been cured, (ii) if a court of competent jurisdiction or Governmental Authority shall have issued an order, decree or ruling or taken any other action, in each case having the effect of restraining, enjoining or otherwise prohibiting the Contemplated Transaction, (iii) the Closing has not occurred before or on the End Date (provided that the right to terminate this Agreement under this Section 6.1(c)(iii) shall not be available if Purchaser's failure to fulfill any obligation under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or before such date before or on the End Date); or (iv) if there shall have occurred any Company Material Adverse Change since the date of this Agreement that shall be continuing.

(d)     by Purchaser if (i) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal of the Bid Procedures Order, or (ii) the Bankruptcy Court has not entered the US Sale Order by February 20, 2012, (iii) the Cayman Court has not entered the Cayman Sale Order by February 20, 2012, (iv) the US Sale Order has not become a Final Order on or prior March 5, 2012, (v) the Cayman Sale Order has not become a Final Order on or prior March 5, 2012, or (v) the Bid Procedures Order, the US Sale Order or the Cayman Sale Order have been stayed, vacated, modified or supplemented without Purchaser's prior written consent;

(e)     by Purchaser or the Company, if Company and each Seller Subsidiary complies with the Bid Procedures and accepts a Qualifying Bid (as defined in the Bid Procedures) from a Person other than Purchaser or its permitted transferee or (ii) by Purchaser, if the Company enters into an agreement or transaction, including any Competing Transaction with a Third Party (including any of the Company or any of its Subsidiaries' creditors or stockholders) that is materially inconsistent with this Agreement and the Contemplated Transactions in any material respect;

(f)     by Purchaser, if the Company has not commenced the Chapter 11 Case and the Cayman Insolvency Case on or prior to January 4, 2012; or

(g)    by Purchaser, if the Auction (if any) shall not have commenced within three (3) days of the Auction Date.

**Section 6.2    Effect of Termination**.

(a)    The termination rights of the Parties under <u>Section 6.1</u> are in addition to their rights under this Agreement or otherwise, and the exercise of any termination right will not be an election of remedies.

(b)    If a Party terminates this Agreement pursuant to <u>Section 6.1</u>, then all liability or obligations of the Parties for willful breach of this Agreement shall survive and all other obligations under this Agreement, other than those under <u>Section 6.3</u> and <u>Section 9.3</u>, will terminate.

**Section 6.3    Break-Up Fee; Expense Reimbursement**.    If this Agreement is terminated in accordance with <u>Section 6.1(e)</u>, then the Company and each Seller Subsidiary shall, promptly (and in any event as of the closing of the corresponding transaction) jointly and severally pay Purchaser in immediately available funds, and Purchaser shall be deemed to have earned, both (i) the Expense Reimbursement and (ii) an amount equal to 1,650,000 (the "***Break-Up Fee***"). If this Agreement is terminated by Purchaser for any reason in accordance with <u>Section 6.1</u> (other than <u>Section 6.1(e)</u>) and the Company subsequently consummates a sale of all or a substantial portion of the Purchased Assets with a Person other than the Purchaser, including in connection with any Competing Transaction, then the Company and each Seller Subsidiary shall promptly (and in any event within five (5) Business Days after such event) jointly and severally pay Purchaser in immediately available funds, and Purchaser shall be deemed to have earned, the Expense Reimbursement. The Expense Reimbursement and the Break-Up Fee shall constitute administrative expenses of the Company with priority over any and all administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code until paid and shall be payable from the proceeds of the sale with a Third Party within two (2) Business Days, notwithstanding Section 507(a) of the Bankruptcy Code. The Parties hereby acknowledge that the amounts payable pursuant to this <u>Section 6.3</u> are commercially reasonable and necessary to induce Purchaser to enter into this Agreement and consummate the Contemplated Transactions. For the avoidance of doubt, the covenants set forth in this <u>Section 6.3</u> are continuing obligations, separate and independent from the other obligations of the Parties (and shall not limit Purchaser's other rights and remedies under or in respect of this Agreement), and survive termination of this Agreement.

# ARTICLE VII
## ADDITIONAL COVENANTS AND AGREEMENTS

**Section 7.1    Further Assurances**.    After the Closing, each Party will take all further actions and execute and deliver all further documents after the Closing that are necessary to (a) transfer and convey the Purchased Assets to Purchaser on the terms herein contained, or (b) consummate the Contemplated Transactions.

**Section 7.2    Books and Records**.    The Company and its Subsidiaries and Purchaser and its Subsidiaries will each retain and make their respective books and records (including work

43.

papers in the possession of their respective accountants) with respect to the STB Business available for inspection and copy by the other Party or its duly appointed representatives (reasonably acceptable to the other Party) for reasonable business purposes at reasonable times during normal business hours for a period consistent with such Party's record-retention policies and practices to enable the other Party to prepare financial statements or Tax returns or deal with Tax audits. The Company will use reasonable efforts to enforce its contractual rights to cause NXP to retain and make its books and records (including work papers in the possession of its accountants) with respect to the STB Business available to the extent required under the Share Exchange Agreement dated as of October 4, 2009 among the Company, Trident Microsystems (Far East), Ltd. and NXP B.V., as amended, and the transaction documents entered into in connection with the closing thereunder, and upon the request of Purchaser shall obtain copies of such books and records from NXP and make them available for inspection and copying by Purchaser as if these books and records were books and records of the Company. On or prior to the Closing Date, the Company will provide Purchaser with a legible and non-watermarked electronic copy of all documentation included in the Dataroom.

**Section 7.3    Litigation Support.**    If any Party is actively contesting or defending against any action, suit, proceeding, hearing, investigation, charge, compliant, claim or demand in connection with the Contemplated Transactions, then, for so long as such contest or defense continues, each Party will, at the sole cost and expense of the contesting or defending Party (unless the contesting or defending Party has a right to indemnification therefor under Article VIII in which case Article VIII, and not this Section 7.3, shall govern), (a) reasonably cooperate with the contesting or defending Party and its counsel in the contest or defense and (b) make available all personnel and provide all testimony and access to its books that is necessary or reasonably requested by the contesting or defending Party in connection with such contest or defense (in all cases after reasonable notice and during normal business hours).

**Section 7.4    Transition.**    After the Closing the Company shall (a) reasonably cooperate with Purchaser in its efforts to continue and maintain for Purchaser's benefit those business relationships of the Company and each of its Subsidiaries existing before the Closing and related to the STB Business with any lessor, licensor, customer, supplier or other Person having a business relationship (following the Closing, and only for the duration of such business relationship) with the Company or any Subsidiary before the Closing and related to the STB Business and (b) refer to Purchaser all inquiries relating to the STB Business. Pursuant to the Transition Agreement, the Company and its applicable Subsidiaries shall provide certain post-closing services to Purchaser and its Subsidiaries, as specified therein. The Company and the UK Subsidiary shall use commercially reasonable efforts to cause all Grants to be finally awarded to and grant funds to be received by Purchaser's Subsidiary doing business in the United Kingdom.

**Section 7.5    Payment of Transaction Taxes and Fees.**

(a)    Except as specifically set forth to the contrary in this Agreement, the Company and Purchaser will share equally of all Taxes, conveyance fees, title application fees, registration fees, recording charges and other out-of-pocket fees and charges (including any interest and penalties) incurred in connection with consummation of the Contemplated Transactions (*"Transfer Charges"*), regardless of the Person on whom applicable Law imposes

such Transfer Charges. The Purchaser shall not be obligated to pay for more than One Million Dollars ($1,000,000) in total Transfer Charges. The Company will, at its own expense, file all necessary Tax Returns and other documentation with respect to such Transfer Charges. If required by applicable Law, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

(b)    The Parties agree that the sale of the Purchased Assets under this Agreement is an occasional sale of assets by the Company in which the Company does not trade in the Ordinary Course of Business. The Parties shall take commercially reasonable actions to assert and establish the occasional sale exemption from any sales Tax associated with the transactions contemplated hereby, to the extent such exemption is available. The Company acknowledges that its accounting records treat the Purchased Assets as a separate business operation, and that business was identified on its books as a separate operation prior to the Closing Date. The Company agrees to convey documentation on or before the Closing Date to Purchaser attesting that its accounting records identified the Purchased Assets as a separate identifiable operation. The Parties agree that the acceptable form of documentation will be true and actual copies of the Company's Updated Carve-Out Financial Statements for periods prior to the Closing Date. Purchaser shall provide the Company with an exemption certificate for any tangible personal property included in the Purchased Assets which is eligible for any sales Tax exemption. For sales Tax purposes, Purchaser and the Company shall use the same Allocation of the Purchase Price for any such Purchased Assets that are subject to sales Tax as is set out in **Exhibit B**. The Company shall arrange for electronic delivery to Purchaser or its designated Affiliates of all Seller Intellectual Property Assets at Closing to the extent such delivery reduces or eliminates applicable Taxes.

**Section 7.6    Payments of Receivables.** If the Company or any of its Affiliates receives any payment relating to any Receivable after the Closing, such Person will promptly endorse (where necessary) and deliver to Purchaser all cash, checks and other documents received on account of such Receivable and will advise Purchaser (promptly upon the discovery or awareness of the Company or its Affiliate) of any counterclaims or off-sets that may arise after the Closing with respect to such Receivable.

**Section 7.7    Confidentiality.** This Agreement is not intended to supersede or replace the Confidentiality Agreement. The Confidentiality Agreement will survive the execution and delivery of this Agreement and remain in full force and effect in accordance with its terms, and the Company and Purchaser will continue to be obligated to perform and comply with its obligations under the Confidentiality Agreement until the Closing. Following the Closing, Company shall, and shall cause its representatives, advisors, consultants and affiliates to, keep confidential and not, directly or indirectly, divulge to any person or use for their own benefit, any Confidential Information included in the Purchased Assets or owned by Purchaser or its Affiliates, except for disclosures requested or required by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process, and then only in accordance with the procedure hereinafter described, or otherwise required by law. In the event that the Company or any Seller Subsidiary or any of their respective representatives, advisors, consultants or affiliates (each a *"Seller Party"*) is requested or required by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process to

45.

disclose any Confidential Information, such Seller Party shall notify Purchaser of the request or requirement so that Purchaser may seek an appropriate protective order or waive compliance with the provisions of this Section 7.7. If, in the absence of a protective order or the receipt of a waiver hereunder, such Seller Party believes in good faith, after consulting with counsel, that it is compelled to disclose any such Confidential Information to the tribunal or else stand liable for contempt, such Seller Party may disclose such Confidential Information to the tribunal; *provided, however,* that such Seller Party shall use its commercially reasonable efforts to obtain, at the request and cost of Purchaser, an Order or other assurance that confidential treatment will be accorded to such portion of such Confidential Information required to be disclosed.   The prohibitions against disclosure and use of Confidential Information recited herein are in addition to, and not in lieu of, any rights or remedies that Purchaser may have available pursuant to the laws of any jurisdiction or at common law to prevent the disclosure of trade secrets or proprietary information, and the enforcement by Purchaser of its rights and remedies pursuant to this Agreement shall not be construed as a waiver of any other rights or available remedies that it may possess in law or equity against this Agreement. The Parties agree that the Company and the Purchaser shall file this Agreement but not the accompanying Disclosure Schedule, without redaction, with the SEC as an exhibit to Company and Purchaser's periodic reports and will file the Exhibits to this Agreement, with confidential treatment to be requested for mutually agreed upon terms.

### Section 7.8   Post-Closing Consents.

(a)   To the extent that the sale, conveyance, transfer, assignment or delivery or attempted sale, conveyance, transfer, assignment or delivery to Purchaser of any Purchased Asset would result in a violation of any applicable Law, would require any Consent or waiver of any Governmental Authority or third Person and such Consent or waiver shall not have been obtained prior to the Closing, this Agreement shall not constitute a sale, conveyance, transfer, assignment or delivery, or an attempted sale, conveyance, transfer, assignment or delivery thereof if any of the foregoing would constitute a breach of applicable Law or result in a termination of any Contract.   To the extent that any consents, authorizations, approvals or acknowledgements with respect to any Purchased Asset, Permit, Seller Contract or Later Discovered Contract (each a "*Consent*") have not been obtained prior to Closing, then following the Closing, the Company and Purchaser shall use commercially reasonable efforts to promptly obtain such Consent, the cost of which (exclusive of Cure Costs) shall be exclusively recovered from the Holdback Amount, and to the extent any excess cost is not recoverable from the Holdback Amount, such excess cost shall be borne solely by Purchaser.  Pending receipt of any such Consent, the Parties shall cooperate with each other in any reasonable and lawful arrangements designed to provide to Purchaser and the Subsidiaries the benefits of such Purchased  Asset, Permit or Seller Contract or to obtain such Consent.  To the extent that a Consent for any such Purchased Asset, Permit or Seller Contract cannot be obtained for Purchaser or the full benefits of use of any such Purchased Asset, Permit or Seller Contract cannot be provided to Purchaser and its Subsidiaries following the Closing, then the Parties, at the Company's sole cost and expense, shall endeavor to enter into such arrangements (including subleasing or contracting if permitted) to provide to Purchaser and the Subsidiary the economic (taking into account Tax costs and benefits) and operational equivalent of obtaining such Consent.  Nothing in this Section 7.8 shall limit the Company's obligation to pay Cure Costs pursuant to Section 7.9.

(b)    Once such Consent or waiver is obtained, the Company shall, or shall cause its Seller Subsidiaries to, sell, assign, transfer, convey and license such Purchased Asset to Purchaser for no additional consideration.

**Section 7.9    Post-Closing Assumption and Rejection of Contracts and Leases.** Between signing and Closing, the Company and each applicable Seller Subsidiary shall deliver to Purchaser copies of all Seller Contracts listed on the Schedules or Disclosure Schedule that were not provided to Purchaser prior to the execution of this Agreement. At the election of Purchaser pursuant to written notice given to Company and the Seller Subsidiaries at any time within ninety (90) days of the Closing Date, Company or the applicable Seller Subsidiary shall seek to assume or reject, as directed by Purchaser, any executory contracts or unexpired leases included in the Seller Contracts to which any Company or Seller Subsidiary is a party or is otherwise bound, including any Later Discovered Contracts. Sellers shall give written notice to Purchaser prior to the submission of any motion in its Chapter 11 Case to assume or reject any executory contracts or unexpired leases included in the Seller Contracts other than Retained Contracts, and, without the prior written consent of Purchaser, the Company and the Seller Subsidiaries shall not assume or reject any executory contract or unexpired lease relating to the STB Business other than Retained Contracts. Purchaser shall reimburse Company and/or each applicable Seller Subsidiary, for all actual expenses paid by Company and/or an applicable Seller Subsidiary, under applicable Seller Contracts attributable to the period from the Closing Date through the date upon with the applicable Seller Contract is assumed or rejected on a per Contract per diem basis. Any executory contracts or unexpired leases that are rejected subject to Bankruptcy Court approval or are the subject of a rejection motion on the Closing Date, after complying with the provisions of this <u>Section 7.9</u> shall constitute Excluded Assets at Closing and shall not constitute an Assumed Contract or Purchased Asset. The Company shall promptly provide Purchaser with a written schedule containing the Company's best estimate of the Cure Costs for each executory contract or unexpired lease to which each Seller is a party or is otherwise bound. For purposes of this Agreement, "Cure Costs" shall mean all monetary liabilities, including prepetition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of the Company and Seller Subsidiaries' monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Purchaser as provided hereunder as such amounts are determined by the Bankruptcy Court.

**Section 7.10    Audits of Carve-Out Financial Statements.** The Company shall deliver, or cause to be delivered to Purchaser within 60 days following the Closing audited Updated Carve-Out Financial Statements that conform in all material respects to the published rules and regulations of the SEC applicable to acquired company financial statements for each of the periods that Purchaser is required to file with the SEC under such published rules and regulations and shall cause the auditing firm or firms to deliver any consents required in order for the Purchaser to file the Updated Carve-Out Financial Statements with the SEC or to incorporate the Updated Carve-Out Financial Statements into any registration statement of Purchaser or its parent under the Securities Act. If prior to Closing, the Company revises any of the Carve-Out Financial Statements delivered at or prior to signing of this Agreement, then the Company shall promptly notify Purchaser and deliver to Purchaser a copy of the revised Carve-Out Financial Statements.

735819 v8/SD

**Section 7.11   Limited Trademark License.**   The Company hereby grants Purchaser and its Subsidiaries a nonexclusive, nontransferable, royalty free, worldwide license to use the Company's trademark, trade name, and service marks *"Trident Microsystems"* and the *Trident Microsystems* logo, alone or in combination with any other words or terms or variation of such words or terms (the *"Trident Microsystems Marks"*) to the same extent and with the same scope as used by the Company in the STB Business prior to the Closing until all Products manufactured with the Trident Microsystems Marks are sold.

**Section 7.12   Deletion/Destruction of Confidential Information.**   Promptly following the Closing, but no later than sixty (60) days following the Closing, the Company and its Subsidiaries will use commercially reasonable efforts to delete or destroy all Confidential Information included in the Purchased Assets from all books and records retained by the Company and its Subsidiaries as Excluded Assets, including all books and records in electronic form, including databases, e-mails and backups retained for archival and disaster recovery purposes; provided, however, that the Company and its Subsidiaries shall first ensure that it has delivered all such Confidential Information to Purchaser. As part of this process, the Company shall inform all employees and consultants (other than Transferred Employees) of the obligation to delete such Confidential Information from employee desktops, notebooks, files or databases maintained by such employees. Upon Purchaser's request, the Company shall certify to Purchaser that it has and continues to comply with this <u>Section 7.12</u>. During the period commencing sixty (60) days following the Closing Date through the date ending seventy-five (75) following the Closing Date, without interfering with the Company's conduct of the business before Closing, Purchaser shall be permitted reasonable access to the Company's and Subsidiaries' premises during normal business hours in order to perform an audit to confirm the deletion and destruction of all Confidential Information included in the Purchased Assets (the *"Data Audit"*). The Company shall cooperate with Purchaser in arranging or coordinating any access by Purchaser to the Company's and Subsidiaries' premises for the purpose of complying with this <u>Section 7.12</u>. The Company shall delete and destroy any such Confidential Information that is discovered through the Data Audit and to the extent that the Data Audit reveals material Confidential Information that has not been deleted, then the Company shall pay Purchaser for the cost of the Data Audit, which shall constitute Damages under <u>Section 8.1(b)</u>.

**Section 7.13   Relocation of Certain Excluded Assets.**   Promptly following the Closing, to the extent any Excluded Assets constitute equipment or other personal property located at the Leased Real Estate subject to the Transferred Leases, the Sublease or the Facility Use Agreements, the Company shall cause, at the Company's sole cost and expense, such equipment or other personal property to be relocated.

**Section 7.14   Other Contractual Matter.**   Prior to the Closing, the Company shall obtain an appraisal of the Patents being sold to Purchaser that are subject to the agreement listed on <u>Schedule 7.14</u> (*"Sale Proceeds Sharing Contract"*). The Company shall be obligated to remit to the Third Party to the Sales Proceeds Sharing Contract fifty percent of the net purchase price paid by Purchaser for the subject Patents (which the Parties believe should be the appraised value of such subject patents); *provided, however,* that to the extent that the payment obligation exceeds $1,250,000, the Company shall pay the first $1,250,000 and the Company and Purchaser shall each pay 50% of the payment obligation in excess of $1,250,000 and *provided further*, that to the extent that the payment is remitted to such Third Party when Purchaser continues to hold

48.

the Holdback, then the Company shall be entitled to have up to $1,250,000 and if the payment exceeds $1,250,000, the Company's 50% share of the excess amount released from the Holdback and paid directly to such Third Party. In no event shall Purchaser be responsible for the payment of any Cure Costs under the Sales Proceeds Sharing Contract. The payment under the Sales Proceeds Sharing Contract shall constitute the full and entire compensation payable in connection with the transfer and sale of the subject Patents and the subject Patents shall be transferred free and clearance of any Encumbrances, including any ongoing payment obligations under the Sales Proceeds Sharing Contract or otherwise.    If the amount of the payment obligation under the Sales Proceeds Sharing Contract is not resolved at the time the Holdback is scheduled to be released, then Purchaser can withhold all of the remaining Holdback until such payment obligation is finalized.  In no event shall the Company's obligation under this Section 7.14 exceed the Holdback and Purchaser shall be responsible for any payments relating to the sale of the subject patents under the Sale Proceeds Sharing Contract in excess of the Holdback. Notwithstanding the foregoing, if Purchaser elects in its sole discretion not to have the subject patents included in the Purchased Assets, then the Company shall be obligated to grant to Purchaser a perpetual, irrevocable, worldwide, royalty-free, fully paid license (with rights to sublicense), to use, make, have made, import, sell, offer to sell, lease, and otherwise dispose of any products and services, practice any method or process and otherwise commercialize and exploit the subject patents in any field, that will be transferrable in connection with the sale of the STB Business or the sale of all or substantially all of the assets of Purchaser  and the Company shall be responsible for any payments payable to the Third Party under the Sale Proceeds Sharing Contract.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.1    Indemnification Obligations of the Company.**  Notwithstanding the Closing, the Company covenants and agrees to indemnify, defend and hold Purchaser and its Affiliates, directors, managers, officers, employees, equityholders, successors and assigns (collectively, the *"Purchaser Indemnitees"*) harmless from and against all losses, liabilities, demands, claims, actions or causes of action, regulatory, legislative or judicial proceedings or investigations, assessments, levies, fines, penalties, damages, costs and expenses (including reasonable attorneys', accountants', investigators', and experts' fees and expenses) incurred in connection with the defense or investigation of any claim  (*"Damages"*) sustained or incurred by any Purchaser Indemnitee arising from or related to:

(a)    any inaccuracy in or breach of any of the Company's representations and warranties in this Agreement;

(b)    any breach by the Company or any Seller Subsidiary of, or failure by the Company or Seller Subsidiary to comply with, any of covenants or obligations of the Company and Seller Subsidiaries under this Agreement (including post-closing covenants or obligations and including payment obligations in Section 5.10(g) and Section 7.5), the Transition Agreement or any of the Facility Use Agreements;

(c)    any Retained Liabilities or Excluded Asset (including any Retained Liability or any Excluded Asset that becomes a Liability of Purchaser under any bulk transfer

Law, common law doctrine of de facto merger or successor liability or otherwise by operation of Law);

(d)     failure of any Products sold prior to Closing or included in Inventory at Closing to comply with the terms and requirements of any applicable warranty, Product data sheet or customer specification or other Contract in excess of the warranty reserve accrued in the Final Working Capital; or

(e)     the reasonable cost incurred by Purchaser to obtain replacement Contracts for each of the Seller Contracts listed on Schedule 8.1(e) which will not be assigned to Purchaser as part of the Purchased Assets.

**Section 8.2     Limitations on Indemnification Obligations of the Company.**   The obligations of the Company pursuant to the provisions of Section 8.1 are subject to the following limitations:

(a)     The Company's representations and warranties in Article III, and the Purchaser Indemnitees' corresponding rights to indemnification pursuant to Section 8.1(a), will survive the Closing (and none will merge into any instrument of conveyance), regardless of any investigation by any Party and survive until the date that is ninety (90) days after the Closing Date.

*provided, however,* that if, at any time prior to the expiration of such representations and warranties, any Purchaser Indemnitee (acting in good faith) delivers to the Company a written notice alleging the existence of an inaccuracy in or a breach of any of the representations and warranties made by the Company (and setting forth in reasonable detail the basis for such Purchaser Indemnitee's belief that such an inaccuracy or breach exists) and asserting a claim for recovery under Section 8.1 or prospective recovery under Section 8.1 based on such alleged inaccuracy or breach, then the claim asserted in such notice shall survive until such time as such claim is fully and finally resolved.

(b)     Except in the case of Fraud, the Purchaser Indemnitees will not be entitled to recover under Section 8.1(a) for inaccuracies, breaches or alleged inaccuracies or breaches of the Business Warranties until the total amount that Purchaser Indemnitees would recover under Section 8.1(a) but for this Section 8.2(b) exceeds Fifty Thousand Dollars ($50,000.00) (the *"Basket"*).  If such amount exceeds the Basket, then the Purchaser Indemnitees will be entitled to recover all Damages including the amount of the Basket.

(c)     Except in the case of Fraud, the Purchaser Indemnitees will not be entitled to recover under Section 8.1(a) for inaccuracies, breaches or alleged inaccuracies or breaches of the representations and warranties for the amount of Damages in the aggregate in excess of the Holdback (or the remaining amount of the Holdback).

(d)     The amount of any indemnity provided in Section 8.1 shall be computed net of any insurance proceeds actually received by a Purchaser Indemnitee connection with or as a result of any claim giving rise to an indemnification claim under Section 8.1 (reduced by any retroactive premium increase and further reduced by the net present value of any other premium increase resulting therefrom) and net of any reimbursements that are actually received by a

Purchaser Indemnitee in connection with such Damages or the circumstances giving rise thereto. If the indemnity amount is paid prior to the Purchaser Indemnitee's actual receipt of insurance proceeds related thereto, and a Purchaser Indemnitee subsequently receives such insurance proceeds, then the Purchaser Indemnitee shall promptly pay to the Company the amount of insurance proceeds subsequently received (net of all related costs, expenses and other Damages), but not more, in the aggregate, than the indemnity amount paid by the Company to such Purchaser Indemnitee in respect of such claim.

(e)    The representations and warranties made by the Company, and the covenants and obligations of each of the Company and Seller Subsidiaries, and the rights and remedies that may be exercised by the Purchaser Indemnitees, shall not be limited or otherwise affected by or as a result of any information furnished to, or any investigation made by or Knowledge of, any of the Purchaser Indemnitees or any of their representatives.

**Section 8.3    Indemnification Obligations of Purchaser.**    Notwithstanding the Closing, Purchaser covenants and agrees to indemnify, defend and hold the Company and its Affiliates, directors, managers, officers, employees, equityholders, successors and assigns (collectively, the *"Seller Indemnitees"*) harmless from and against all Damages sustained or incurred by any Seller Indemnitee arising from or related to:

(a)    any inaccuracy in or breach of any of Purchaser's representations and warranties in this Agreement;

(b)    any breach by Purchaser of, or failure by Purchaser to comply with, any of its covenants or obligations under this Agreement; or

(c)    any Assumed Liability.

**Section 8.4    Third-Party Claims.**    If a Third-Party notifies any Purchaser Indemnitee or Seller Indemnitee (each collectively the *"Indemnified Parties"* or individually, a *"Indemnified Party"*) with respect to any matter (a *"Third-Party Claim"*) that may give rise to a claim by the Purchaser Indemnitees or the Seller Indemnitees for indemnification against the Company, on one hand, or Purchaser, on the other hand (each collectively the *"Indemnifying Parties"* or individually, a *"Indemnifying Party"*), respectively, under this Article VIII, then the Indemnified Parties will promptly deliver written notice thereof to each Indemnifying Party; provided, however, that no delay in delivering such notice will relieve the Indemnifying Parties from any indemnification obligation under this Agreement unless, and then only to the extent that, the Indemnifying Parties are actually and materially prejudiced.

(a)    The Indemnifying Parties will have the right to contest and defend against the Third-Party Claim at the Indemnifying Parties' sole cost and expense and with legal counsel of their choice (reasonably satisfactory to the Indemnified Parties); provided that (i) the Indemnifying Parties notify the Indemnified Parties, in writing within fifteen (15) days after receiving notice of the Third-Party Claim from the Indemnified Parties, that the Indemnifying Parties will indemnify the Indemnified Parties from and against all Damages that the Indemnified Parties may suffer resulting from or related to the Third-Party Claim, (ii) the Indemnifying Parties provide the Indemnified Parties with evidence acceptable to the

51.

Indemnified Parties that the Indemnifying Parties will have the financial resources to defend against such Third-Party Claim and fulfill their indemnification obligations under this Agreement, (iii) the Third-Party Claim involves only money damages and does not seek an injunction or other equitable relief, (iv) settlement of, or an adverse judgment with respect to, the Third-Party Claim is not, in the Indemnified Parties' good faith judgment, likely to establish a precedential custom or practice adverse to any Indemnified Party or the STB Business, and (v) the Indemnifying Parties conduct the defense of the Third-Party Claim actively and diligently.

(b)     If the Indemnifying Parties elect to contest or defend against a Third-Party Claim in accordance with Section 8.4(a), then (i) the Indemnified Parties may, at their sole cost and expense, retain separate co-counsel of their choice and otherwise participate in such contest or defense of the Third-Party Claim, (ii) the Indemnified Parties will not consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim without the Indemnifying Parties' prior written consent (not to be unreasonably withheld, conditioned or delayed), and (iii) the Indemnifying Parties will not consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim without the Indemnified Parties' prior written consent (not to be unreasonably withheld, conditioned or delayed).

(c)     If any condition in Section 8.4(a) is or becomes unsatisfied, then (i) the Indemnified Parties may, in good faith and with the advice of legal counsel, contest, defend against, consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim in any manner that the Indemnified Parties reasonably deem appropriate (without prior consultation with or consent from any Indemnifying Party), (ii) the Indemnifying Parties will reimburse the Indemnified Parties promptly and periodically for all Damages of contesting, defending against and settling the Third-Party Claim, and (iii) the Indemnifying Parties will remain responsible for any Damages that the Indemnified Parties suffer resulting from or relating to the Third-Party Claim as provided in, and subject to the terms, conditions and limitations set forth in this Article VIII.

Section 8.5    Right of Setoff.    Purchaser may set-off any indemnification claim for Damages against any amounts payable by Purchaser to the Company under this Agreement and any other Transaction Document and any other agreement or instrument otherwise then in effect between Purchaser and the Company.

Section 8.6    Reduction of Purchase Price.    All indemnification payments made pursuant to this Article VIII will be adjustments to the Purchase Price.

Section 8.7    Other Indemnification Provisions.

(a)     Purchaser acknowledges and agrees (on behalf of itself and all of the Purchaser Indemnitees) that, the indemnification provisions in this Article VIII shall be the sole and exclusive remedy of the Purchaser Indemnitees for any and all claims against the Company for Damages under this Agreement. The Company acknowledges and agrees (on behalf of itself and all of the Seller Indemnitees) that, the indemnification provisions in this Article VIII shall be the sole and exclusive remedy of the Seller Indemnitees for any and all claims against Purchaser for Damages under this Agreement. Notwithstanding the foregoing, nothing contained herein shall prevent, or be interpreted to prevent, any of the Parties from bringing an action and

52.

obtaining a remedy based on allegations of Fraud with respect to the other Parties in connection with this Agreement or the Contemplated Transactions.

(b)    Losses shall not include speculative or unforeseeable Damages or punitive damages. Any liability for indemnification under this Agreement shall be determined without duplication of recovery by reason of the state of facts giving rise to such liability constituting a breach of more than one representation, warranty, covenant or agreement.

**Section 8.8    Construction.** For purposes of calculating Damages in connection with a claim for indemnification under this Article VIII (but not with respect to determining whether a breach has occurred), each of the representations and warranties that contains any qualifications as to "materiality" or "Company Material Adverse Effect" shall be deemed to have been given as though there were no such qualifications. In addition, for purposes of determining whether a breach has occurred and calculating Damages in connection with a claim for indemnification under this Article VIII, all information contained in any Disclosure Schedule Update shall be disregarded for purposes of this Article VIII.

**Section 8.9    Claim Process.** In order to seek indemnification under this Section 8, (and in addition to the procedures in connection with a Third Party Claim), the Indemnified Party shall deliver a written demand (a *"Claim Notice"*) to the Indemnifying Party which contains (a) a description and the amount of any Damages incurred or reasonably expected to be incurred by the Indemnified Party, to the extent known, (b) a statement that the Indemnified Party is entitled to indemnification under Section 8 for such Damages and a reasonable explanation of the basis therefor, and (c) a demand for payment in the amount of such Damages. Within twenty (20) days after delivery of a Claim Notice, the Indemnifying Party shall deliver to the Indemnified Party a written response (the *"Response"*); provided that failure by the Indemnifying Party to deliver a Response within twenty (20) days after the delivery of a Claim Notice shall be deemed an acceptance by the Indemnifying Party of the claim contained in said Claim Notice. If the Indemnifying Party in such Response contests the payment of all or part of the Damages claimed in the Claim Notice, the Indemnifying Securityholder and the Indemnified Party shall use good-faith efforts to resolve such dispute. If such dispute is not resolved within thirty (30) days following the delivery by the Indemnifying Party of such response, the Indemnifying Party and the Indemnified Party shall each have the right to submit such dispute to a court of competent jurisdiction in accordance with the provisions of Sections 9.12, 9.13 and 9.14.

**Section 8.10    Holdback Release.**

(a)    Within three (3) Business Days after the date that is the later of (i) ninety (90) days after the Closing Date (the *"Indemnification Expiration Time"*) and (ii) the determination of the Final Working Capital pursuant to Section 1.10, Purchaser shall release to the Company the Holdback Amount less (ii) the Indemnification Holdback Amount; *provided, however*, that Purchaser shall not be obligated to release the Holdback Amount if as of the Indemnification Expiration Time, the Company has not fully performed its obligations under this Agreement, the Transition Agreement and the Facilities Use Agreements that are secured by the Holdback Amount. The term *"Indemnification Holdback Amount"* shall mean, as of the Indemnification Expiration Time, the aggregate amount of all Damages relating to unresolved Third-Party Claims and other claims that are the subject of a Response that have not previously

been resolved or satisfied in accordance herewith or that were otherwise asserted under this Agreement but otherwise unsatisfied as of the Indemnification Expiration Time, including any Third Party Claims or other claims for which a Claim Notice has been delivered but for which no Response has been delivered or which Claim Notice has been deemed accepted.  After the resolution of any Third-Party Claim or other claim relating to any of the Indemnification Holdback Amount and completion of the Company's performance of its obligations under this Agreement, the Transition Agreement and the Facilities Use Agreements, the portion of the Indemnification Holdback Amount for such Third-Party Claim not distributed to the Company shall be released promptly thereafter by Purchaser to the Company.

**(b)**    Any portion of the Holdback Amount released by Purchaser pursuant to this Section 8.10 shall be made by wire transfer of immediately available funds to an account that has been designated by the Company.

**ARTICLE IX**
**GENERAL PROVISIONS**

**Section 9.1    Publicity.**    The Parties will announce the execution of this Agreement through a joint press release approved by both Parties.  Except as otherwise required by Law or applicable stock exchange rules, press releases and other publicity concerning the Contemplated Transactions may be made only with the prior agreement of the Company and Purchaser (and in any event, the Parties will use all reasonable efforts to consult and agree with each other with respect to the content of any such required press release or other publicity).

**Section 9.2    Notices.**    All notices and other communications required or permitted under this Agreement (a) must be in writing, (b) will be duly given (i) when delivered personally to the recipient, (ii) one (1) Business Day after being sent to the recipient by nationally recognized overnight private carrier (charges prepaid), by facsimile transmission or electronic mail (with confirmation of delivery retained), or (iii) four (4) Business Days after being mailed to the recipient by certified or registered mail (postage prepaid and return receipt requested), and (c) addressed as follows (as applicable):

If to the Purchaser:                              With a copy (not constituting notice) to:

                                                                  Cooley LLP
            4401 Eastgate Mall
            San Diego, California  92121
            Attn: Barbara Borden
            Tel.: (858) 550-6064
            Fax: (858) 550-6420
            Email: bborden@cooley.com

If to Company:                              With a copy (not constituting notice) to:

            DLA Piper LLP
            Howard Clowes
             2000 University Avenue
            East Palo Alto, California  94303-2214

54.

Attn: Howard Clowes
Tel: (650) 833-2153
Fax: (650) 833-2001
Email: howard.clowes@dlapiper.com

or to such other respective addresses and/or fax number as each Party may designate by notice given in accordance with the provisions of this Section 9.2.

**Section 9.3    Fees and Expenses.** Subject to Section 6.3, Section 7.5 and Article VIII, each Party will bear all fees and expenses (including financial advisors', attorneys', accountants' and other professional fees and expenses) incurred by such Party in connection with, arising from or relating to the negotiation, execution, delivery and performance of the Transaction Documents and consummation of the Contemplated Transactions.

**Section 9.4    Entire Agreement.** This Agreement, together with the other Transaction Documents and the Confidentiality Agreement, constitutes the complete agreement and understanding among the Parties regarding the subject matter of this Agreement and supersedes any prior agreement (including, without limitation, the Term Sheet) understanding or representation regarding the subject matter of this Agreement.

**Section 9.5    Amendments.** This Agreement may not be amended or modified except by an instrument in writing signed by or on behalf of each of the Parties hereto.

**Section 9.6    Non-Waiver.** The Parties' respective rights and remedies under this Agreement are cumulative and not alternative. Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. No waiver will be effective unless it is in writing and signed by an authorized representative of the waiving Party. No waiver given will be applicable except in the specific instance for which it was given. No notice to or demand on a Party will constitute a waiver of any obligation of such Party or the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

**Section 9.7    Assignment.** Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by a Party (including by operation of law or through a Change of Control of the Party) without the prior written consent of all of the Parties to this Agreement; provided, however, that Purchaser may, without the prior approval of any other Party, assign any or all of its rights and interests hereunder to any Affiliate of Purchaser. For purposes of this subsection, a *"Change of Control"* means (a) a merger or consolidation of Party or any of its controlling Affiliates in which the holders of the voting securities of such Party or such Affiliate outstanding immediately prior to the closing of such merger or consolidation cease to hold at least fifty percent (50%) of the combined voting power of the surviving entity (or its parent entity) immediately after the closing of such merger or consolidation, (b) a Third Party, together with its controlling Affiliates, becoming, directly or indirectly, the beneficial owner of fifty percent (50%) or more of the combined voting power of a

55.

Party or any of its controlling Affiliate, or (c) the sale to a Third Party of all or substantially all of a Party's assets.

    **Section 9.8    Binding Effect; Benefit.** This Agreement will inure to the benefit of and bind the Parties and their respective successors and permitted assigns. Nothing in this Agreement, express or implied, may be construed to give any Person other than the Parties and their respective successors and permitted assigns any right, remedy, claim, obligation or liability arising from or related to this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns.

    **Section 9.9    Severability.** If any court of competent jurisdiction holds any provision of this Agreement invalid or unenforceable, then the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

    **Section 9.10    References.** The headings of Articles and Sections are provided for convenience only and will not affect the construction or interpretation of this Agreement. Unless otherwise provided, references to "Article(s)", "Section(s)" and "Exhibit(s)" refer to the corresponding article(s), section(s) and exhibit(s) of or to this Agreement. Unless otherwise provided, references to "Schedule(s)" refer to the corresponding Section(s) of the Disclosure Schedule. Each Exhibit and the Disclosure Schedule is hereby incorporated into this Agreement by reference. Reference to a statute refers to the statute, any amendments or successor legislation and all rules and regulations promulgated under or implementing the statute, as in effect at the relevant time. Reference to a contract, instrument or other document as of a given date means the contract, instrument or other document as amended, supplemented and modified from time to time through such date. Disclosures included in any Section of the Disclosure Schedule shall be considered to be made for purposes of all other Sections of the Disclosure Schedule to the extent that the relevance of any such disclosure to any other Section of the Disclosure Schedule is reasonably apparent from the text of such disclosure. The inclusion of any matter on the Disclosure Schedule shall not constitute an admission as to its materiality as it relates to any provision of this Agreement.

    **Section 9.11    Construction.** Each Party participated in the negotiation and drafting of this Agreement, assisted by such legal and tax counsel as it desired, and contributed to its revisions. Any ambiguities with respect to any provision of this Agreement will be construed fairly as to all Parties and not in favor of or against any Party. All pronouns and any variation thereof will be construed to refer to such gender and number as the identity of the subject may require. The terms "include" and "including" indicate examples of a predicate word or clause and not a limitation on that word or clause.

    **Section 9.12    Governing Law; Venue.** This Agreement will be governed and construed in accordance with the internal laws of the State of Delaware. Prior to the Petition Date, any legal action or other legal proceeding relating to this Agreement for the enforcement of any provision of this Agreement may be brought or otherwise commenced in any state or federal court located in Wilmington, Delaware. On or after the Petition Date, any legal action or legal

proceeding relating to this Agreement and or to interpret or enforce any provision thereof shall only be brought or commenced in the Bankruptcy Court and/or the Cayman Court.

### Section 9.13   Consent to Jurisdiction.

(a)   With respect to any legal action or other legal proceeding commenced prior to the Petition Date, each Party hereby (a) agrees to the exclusive jurisdiction of any federal or state court located in Wilmington, Delaware with respect to any claim or cause of action arising under or relating to this Agreement or any of the Contemplated Transactions, (b) waives any objection based on *forum non conveniens* and waives any objection to venue of any such suit, action or proceeding, (c) waives personal service of any and process upon it, and (d) consents that all services of process be made by registered or certified mail (postage prepaid, return receipt requested) directed to it at its address stated in Section 9.2 and service so made will be complete when received. Nothing in this Section 9.13 will affect the rights of the Parties to serve legal process in any other manner permitted by law.

(b)   With respect to any legal action or other legal proceeding commenced after the Petition Date, each party hereby (a) agrees to the jurisdiction of the Bankruptcy Court and/or the Cayman Court with respect to any claim or cause of action arising under or relating to this Agreement or any of the Contemplated Transactions, (b) waives any objection based on *forum non conveniens* and waives any objection to venue of any such suit, action or proceeding, (c) waives personal service of any and process upon it, and (d) consents that all services of process be made by registered or certified mail (postage prepaid, return receipt requested) directed to it at its address stated in Section 9.2 and service so made will be complete when received. Nothing in this Section 9.13 will affect the rights of the Parties to serve legal process in any other manner permitted by law.

### Section 9.14   Waiver of Trial by Jury.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN CONNECTION WITH ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER TRANSACTIONS CONTEMPLATED HEREBY.

### Section 9.15   Counterparts.   This Agreement may be executed by facsimile or electronic (.pdf) delivery of original signatures, and in counterparts, both of which shall be considered one and the same agreement, and shall become effective when such counterparts have been signed by each party and delivered, including by facsimile or other electronic means, to the other party.  No Party may raise (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature, agreement or instrument was signed and subsequently transmitted or communicated through the use of a facsimile or email transmission as a defense to the formation or enforceability of a contract, and each Party forever waives any such defense.

### Section 9.16   Specific Performance.   The Parties hereto agree that irreparable harm would occur if any of the provisions of this Agreement were not performed in accordance with their specific terms on a timely basis or were otherwise breached.  It is accordingly agreed that, without posting bond or other undertaking, the Parties hereto shall be entitled to injunctive or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms

735819 v8/SD

and provisions of this Agreement in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law or in equity. In the event that any such action is brought in equity to enforce the provisions of this Agreement, no Party hereto will allege, and each Party hereto hereby waives the defense or counterclaim, that there is an adequate remedy at law. The Parties hereto further agree that (a) by seeking any remedy provided for in this Section 9.16, a Party hereto shall not in any respect waive its right to seek any other form of relief that may be available to such Party hereto under this Agreement and (b) nothing contained in this Section 9.16 shall require any Party hereto to institute any action for (or limit such Party's right to institute any action for) specific performance under this Section 9.16 before exercising any other right under this Agreement.

### Section 9.17    No Other Representations or Warranties.

(a)    Except for the representations and warranties contained in Article III, none of the Company nor its Affiliates, nor any of their respective directors, officers, employees, agents or representatives, makes or has made any other representation or warranty on behalf of the Company or otherwise in respect of the Company or its Seller Subsidiaries. The Company and each Seller Subsidiary expressly disclaims any and all other representations and warranties, whether express or implied.

(b)    Except for the representations and warranties contained in Article IV, none of Purchaser nor any of its Affiliates, nor any of their respective directors, officers, employees, agents or representatives, makes or has made any other representation or warranty on behalf of Purchaser.  Purchaser expressly disclaims any and all other representations and warranties, whether express or implied.

**Section 9.18    Disclosure Schedule.**  The Disclosure Schedule shall be subject to the following terms and conditions:  (a) items shall be arranged in sections corresponding to the numbered and lettered sections of this Agreement; (b) any item disclosed in the Disclosure Schedule with respect to any particular section of this Agreement shall be deemed to be disclosed with respect to all other sections of this Agreement to the extent that it is reasonably apparent from the fact of such disclosure that such disclosure is intended to modify other sections of the representations and warranties in this Agreement; (c) no disclosure of any matter contained in the Disclosure Schedule shall create an implication that such matter meets any standard of materiality, is outside the Ordinary Course of Business or constitutes noncompliance with, or a violation of applicable Law, any order by a Governmental Authority or Contract; (d) headings and introductory language have been inserted on the sections of the Disclosure Schedule for convenience of reference only and shall to no extent have the effect of amending or changing the corresponding provisions in this Agreement; and (e) all references in the Disclosure Schedule to the enforceability of agreements with third parties, the existence or non-existence of Third-Party rights, the absence of breaches or defaults by third parties, or similar matters or statements, are intended only to allocate rights and risks between Purchaser and the Company and were not intended to be admissions against interests, give rise to any inference or proof of accuracy, be admissible against any Party to this Agreement by any Person who is not a party to this Agreement, or give rise to any claim or benefit to any Person who is not a party to this Agreement.

58.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day, month and year first above written.

<u>COMPANY</u>:

TRIDENT MICROSYSTEMS, INC.

By: _____
Name: _____
Title: _____

<u>SELLER SUBSIDIARIES</u>:

TRIDENT DIGITAL SYSTEMS (UK) LTD.

By: _____
Name: _____
Title: _____

TRIDENT MICROELECTRONICS, LTD.

By: _____
Name: _____
Title: _____

TRIDENT MICROSYSTEMS (FAR EAST) LTD.

By: _____
Name: _____
Title: _____

59.

TRIDENT MICROSYSTEMS (INDIA) PVT. LTD.


By: _____
Name: _____
Title: _____


TRIDENT MICROSYSTEMS (JAPAN) GK


By: _____
Name: _____
Title: _____


TRIDENT MICROSYSTEMS (KOREA) LIMITED


By: _____
Name: _____
Title: _____


TRIDENT MICROSYSTEMS (NEDERLAND) B.V.
FRANCE BRANCH OFFICE


By: _____
Name: _____
Title: _____


TRIDENT MICROSYSTEMS (TAIWAN) LTD.


By: _____
Name: _____
Title: _____

735819 v8/SD

TRIDENT      MULTIMEDIA      TECHNOLOGIES
(SHANGHAI) CO., LTD.


By: _____
Name: _____
Title: _____


TRIDENT      MULTIMEDIA      TECHNOLOGIES
(SHANGHAI) CO., LTD. SHENZHEN BRANCH


By: _____
Name: _____
Title: _____




**PURCHASER:**


ENTROPIC COMMUNICATIONS, INC.


By: _____
Name: _____
Title: _____

735819 v8/SD