## Exhibit 1

**(Bidding Procedures)**

# BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed in connection with the sale of certain tangible and intangible assets related to the set-top box business (the "Purchased Assets") of the Debtors and of each of the Debtors' subsidiaries that owns Purchased Assets (the "Subsidiaries", and together with the Debtors, the "Sellers"), in connection with the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), lead case number [12-10069 (CSS)].

The Sellers entered into that certain asset purchase agreement, dated January 3, 2012 between the Sellers on the one hand and Entropic Communications, Inc. (the "Stalking Horse Purchaser"), pursuant to which the Stalking Horse Purchaser shall acquire the Purchased Assets on the terms and conditions specified therein (together with the schedules and related documents thereto, the "Stalking Horse Agreement"). The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Stalking Horse Agreement.

## I.   ASSETS TO BE SOLD

The Debtors seek to complete a sale of all or substantially all of the Purchased Assets (the "Sale"). The Purchased Assets comprise, among other things:

(a) all products of the STB Business, including products under development, together with masks and mask works for the products and their associated codes and materials;

(b) all inventory of the STB Business that are held for sale or resale including any raw materials, work in process, finished goods, consumables, service parts, packing materials and supplies, wherever located and the open purchase orders with NXP for inventory to the extent Purchaser elects at Closing to assume such purchase orders;

(c) trade accounts receivable, notes receivable, negotiable instruments and chattel paper of the STB Business, excluding that certain note receivable from NXP classified as a note receivable from related party on the Interim Balance Sheet;

(d) the Leased Real Estate leased or subleased by the Company or any Subsidiary listed in Schedule 1.1(d) to the Stalking Horse Agreement;

(e) all tangible assets of the STB Business, including machinery, equipment (including laboratory equipment and test equipment), tools, dies, appliances, furniture, supplies, office supplies, office equipment, fixtures, information technology related hardware and equipment (including computers, servers, storage devices, telecommunications facilities and printers), telephone systems, telecopiers and photocopiers and other tangible personal property of every kind and description (i) that are either

(a) listed in Schedule 1.1(e)(i) of the Disclosure Schedule to the Stalking Horse Agreement or (b) located in the facilities subject to the Transferred Leases on the date of the Stalking Horse Agreement, including without limitation, the data centers in Belfast, Ireland and Austin, Texas, (none of which Tangible Personal Property shall be relocated between signing and Closing), (ii) all Personal Productivity Tools, (iii) fifty percent (50%) of the Miscellaneous Office Supplies located at the facilities subject to the Facility Use Agreement, and (iv) all leases and subleases of any such Tangible Personal Property as to which the Company or any Subsidiary is the lessee or sublessee, together with any options to purchase the underlying Tangible Personal Property, which leases and subleases are listed in Schedule 1.1(e)(iv) of the Disclosure Schedule to the Stalking Horse Agreement;

(f) all Software owned by or licensed to the Company or any Subsidiary, including all Software bundled and/or licensed with any Products, owned by the Company or any Subsidiary;

(g) all Purchased Intellectual Property Assets, all goodwill associated with the Purchased Intellectual Property Assets and all rights of the Company or any of its Subsidiaries under the Purchased Intellectual Property Assets, including remedies against past, present, and future infringement or misappropriation of the Purchased Intellectual Property Assets, including, without limitation, income, royalties and damages related to any of the foregoing, and rights to protection of past, present, and future interests in any Purchased Intellectual Property Assets under the Laws of all jurisdictions, except any royalties or license fees payable to the Company or its Subsidiaries under that certain IP Block License and Development Agreement dated December 23, 2011 between the Company and RDA Technologies, Ltd.;

(h) the Company's and each Subsidiary's right, title and interest in, to or under each Contract for Licensed Intellectual Property Assets that are used in the STB Business, including processors, busses, input/output, memory and other IP blocks for integration with or into the system-on-a-chip Products, operating systems, middleware, libraries, drivers and development tools bundled with any Products or used in the development of any Products assumed by Purchaser at Closing *plus* any Contracts assumed pursuant to Section 7.9 of the Stalking Horse Agreement;

(i) all Seller Contracts to which the Company or a Subsidiary is a party and that are listed in Schedule 1.1(i)(i) to the Stalking Horse Agreement (including, but not limited each such Seller Contract for Licensed Intellectual Property, all purchase orders and license agreements with customers of the STB Business, all supply chain related agreements and all distribution agreements) and any outstanding offers or solicitations listed in Schedule 1.1(i)(ii) of the Disclosure Schedule Stalking Horse

Agreement made by or to the Company or any Subsidiary to enter into any Contract relating to the STB Business or any Purchased Asset in both cases to the extent such Seller Contracts are assumed by Purchaser at Closing or assumed by Purchaser pursuant to Section 7.9 of the Stalking Horse Agreement *except* Purchaser prior to Closing may elect, in its sole discretion, to exclude any such Seller Contract from the Purchased Assets (and such Contract shall automatically become a Retained Contract);

(j)   all prepaid expenses, deposits and advance payments of the Company or any Subsidiary with respect to the STB Business or Leased Real Estate and all rights of the Company or any Subsidiary to receive discounts, refunds, reimbursements, rebates, awards and other similar benefits, in each case, with respect to the STB Business or Leased Real Estate;

(k)   cash in an amount equal to the Company Retention Bonus Liability, Accrued Severance Benefits and the Accrued Retirement Benefits (provided, that to the extent the Accrued Retirement Benefits are funded through cash held in trusts or other accounts that can be transferred or rolled over to the Purchaser as of the Closing, then the delivery of such trusts or accounts shall be made in lieu of the delivery of cash);

(l)   claims and rights (and benefits arising therefrom) with or against all Persons, including all rights against suppliers, under warranties covering any Owned Inventory or Tangible Personal Property included within the Purchased Assets;

(m)   all Export Approvals and all Permits used in or related to the STB Business to the extent transferable or assignable to Purchaser;

(n)   books and records, ledgers, forms, records, documents, Tax Returns, Tax Return workpapers, files, invoices, vendor or supplier lists, reference materials, price guides, payroll records, personnel files, insurance records, accounts receivable and payable, inventory, maintenance and asset history records and copies of all books of original entry, export control license records, laboratory notebooks and electronic notebooks and other research and development records and databases, e-mails and other data relating to the ownership, use, maintenance or enjoyment of the Purchased Assets or the operation of the STB Business and that are owned or used by the Company or any Subsidiary; provided, however, that the Company may retain copies of such Records as required by applicable Law and as reasonably necessary to enable the Company to fulfill its Tax filing, regulatory or statutory obligations after the Closing Date;

(o)   all grant applications submitted by the UK Subsidiary prior to the date of the Stalking Horse Agreement, including the Invest Northern Ireland grant, and any open grant awards;

(p) any lock boxes to which account debtors of the Company or any Subsidiary remit payment relating solely to Receivables;

(q) all goodwill and other intangible assets to the extent associated with the STB Business, including customer and supplier lists;

(r) all preference or avoidance claims and actions of the Company arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code relating to the Purchased Assets and/or Assumed Liabilities, including all actions relating to vendors and service providers used in the STB Business, counterparties to Assumed Contracts and Transferred Leases and Transferred Employees (the "Preference Avoidance Claims"); and

(s) all other assets of the Company and its Subsidiaries used in or related to the STB Business, other than the Excluded Assets.

The Purchased Assets shall not include, among other things:

(a) trade accounts receivable, customer purchase orders, notes receivable, negotiable instruments and chattel paper not arising from the STB Business, the NXP Note and any Excluded Royalties;

(b) all (i) existing products and products under development of the Company's DTV Business, PC TV Business, Audio Business and the Terrestrial Demod Product Business and (ii) all masks for such products;

(c) the Company's and each Subsidiary's right, title and interest in, to or under (i) each Contract for Licensed Intellectual Property Assets that are not used in the STB Business, (ii) each Contract listed on Schedule 1.2(c) to the Stalking Horse Agreement and (iii) each Retained Contract;

(d) all commercial off-the-shelf Software loaded on desktop or laptop computers that are not part of the Tangible Personal Property;

(e) all of the Company's and each Subsidiary's cash and cash equivalents except for (i) any cash and cash equivalents included in the Working Capital Statement, if any, or taken into account in calculating the Final Working Capital, and (ii) the Required Cash;

(f) claims (and benefits arising therefrom) that relate to any Liability other than the Assumed Liabilities;

(g) the Company's and each Seller Subsidiary's financial accounting books and records, corporate charter, minute and stock record books, income tax returns, corporate seal, checkbooks and canceled checks;

    (h)    all rights (including any claims, rights and interest in and to any refunds for Taxes with respect to the Purchased Assets and STB Business for Pre-Closing Tax Periods) relating to the Retained Liabilities;

    (i)    except as provided in Section 7.11 to the Stalking Horse Agreement, the names and trademarks *"Trident Microsystems, Inc."*, any other use of *"Trident Microsystems"* together with any other word or phrase, including the Trident Microsystems logo;

    (j)    all preference or avoidance claims and actions of the Company arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code other than the Preference Avoidance Claims; and

    (k)    all rights of the Company under the Stalking Horse Agreement.

## II.    THE BID PROCEDURES

In order to ensure that the Debtors receive the maximum value for the Purchased Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Assets.

### A.    Provisions Governing Qualifications of Bidders

Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person other than the Stalking Horse Purchaser who wishes to participate in the bidding process (a "Potential Bidder") must deliver the following to the Notice Parties (as defined below):

    (i)    a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; and

    (ii)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Debtors, in substantially the same form as signed by the Stalking Horse Purchaser (or not more onerous than the form signed by the Stalking Horse Purchaser) and which shall inure to the benefit of any purchaser of the Purchased Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

A Potential Bidder that delivers the documents and information described above and that the Debtors determine in their reasonable business judgment, after consultation with their advisors, is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale, will be deemed a "Qualified Bidder." The Debtors shall notify the Office of the United States Trustee and the Committee if a Potential Bidder that delivers the required documents and information is deemed not to be a Qualified Bidder. The Debtors will limit access to due diligence to those parties it believes, in the exercise of their reasonable judgment,

are pursuing the transaction in good faith. If the Debtors limit access to due diligence to any potential purchaser, they will inform the Committee and the Office of the United States Trustee.

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors will determine and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

### B. Due Diligence

The Debtors will afford any Qualified Bidder such due diligence access or additional information as the Debtors, in consultation with their advisors, deem appropriate, in their reasonable discretion, which must include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information. The Debtors must promptly advise the Stalking Horse Purchaser in the event any other Potential Bidder receives diligence the Stalking Horse Purchaser has not previously received and shall promptly be provided with access to such diligence materials. The due diligence period shall extend through and include the Bid Deadline (as defined below). Additional due diligence will not be provided after the Bid Deadline.

### C. Provisions Governing Qualified Bids

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

    (i) it states that the applicable Qualified Bidder offers to purchase, in cash, the Purchased Assets upon the terms and conditions that the Debtors reasonably determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

    (ii) it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, and (ii) the date that is ten (10) business days after the Sale Hearing;

    (iii) confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

    (iv) it includes a duly authorized and executed copy of an Asset Purchase Agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement ("Marked Agreement") and the proposed orders to approve the sale by the Bankruptcy Court;

    (v) it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction,

that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

(vi) it provides for the repayment of all other costs, simultaneously with the closing of the transaction contemplated under the Asset Purchase Agreement;

(vii) it has a value to the Debtors, in the Debtors' exercise of their reasonable business judgment, after consultation with their advisors, that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (A) the aggregate amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (B) $600,000;

(viii) it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume, provides details of the Qualified Bidder's proposal for the treatment of related cure costs;

(ix) it includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Asset Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

(x) it includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

(xi) it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to 10% of the Purchase Price;

(xii) it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Sellers;

(xiii) it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

    (xiv) it contains such other information reasonably requested by the Debtors; and

    (xv) it is received prior to the Bid Deadline.

Notwithstanding the foregoing, the Stalking Horse Purchaser will be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the sale.

The Debtors shall notify the Stalking Horse Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Stalking Horse Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as, the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided such notification shall not be given later than two (2) business days following the expiration of the Bid Deadline.

### D. Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtors: DLA Piper LLP (US), 203 N. LaSalle Street, Suite 1900, Chicago, Illinois 60601 (Attn: Richard A. Chesley, Esq. (richard.chesley@dlapiper.com)); (ii) counsel to the Stalking Horse Purchaser: Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036 (Attn: Cathy Hershcopf, Esq. (chershcopf@cooley.com) and Alex R. Velinsky (avelinsky@cooley.com)); (iii) counsel to any statutory committee of unsecured creditors, and (iv) by email to the Office of the United States Trustee (Juliet.M.Sarkessian@usdoj.gov), so as to be received by the Debtors not later than **9:00 a.m. EST on February 21, 2012** (the "Bid Deadline"). The Bid Deadline may not be extended without the written consent of the Stalking Horse Purchaser.

### E. Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of such bid, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse Agreement, (4) the ability of the Potential Bidders to obtain appropriate regulatory approvals, and (5) any other factors deemed relevant by the Debtors in their reasonable discretion.

### F. No Qualified Bids

If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, the Debtors will not hold an auction and the Stalking Horse Purchaser will be named the Successful Bidder on the Bid Deadline.

### G. Auction Process.

If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Agreement, the Debtors will conduct an auction (the "Auction") of the Purchased Assets, which shall be transcribed at **10:00 a.m. (EST) on February 23, 2012**, at the offices of DLA Piper LLP (US),

1251 Avenue of the Americas, New York, New York 10020, or at such other location as shall be identified in a notice filed with the Bankruptcy Court at least 24 hours before the Auction. The Auction shall run in accordance with the following procedures:

    (i) all creditors shall be entitled to attend the Auction in person, but only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

    (ii) each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

    (iii) at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction. At least one (1) business day prior to the Auction, the Debtors will provide copies of the Qualified Bid or combination of Qualified Bids which the Debtors believe, in their reasonable discretion after consultation with committee counsel, is the highest or otherwise best offer (the "Starting Bid") to the Stalking Horse Purchaser and all other Qualified Bidders;

    (iv) all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

    (v) the Debtors, after consultation with their advisors, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

    (vi) bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "Subsequent Bid") providing a net value to the estate of at least an additional $300,000 above the prior bid. After the first round of bidding and between each subsequent round of bidding, the Sellers shall announce the bid (and the value of such bid) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Each Qualified Bidder will only have one opportunity to pass. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent

Bids (including any Subsequent Bid by the Stalking Horse Purchaser), the Debtors will give effect to the Break-Up Fee and Expense Reimbursement payable to the Stalking Horse Purchaser under the Stalking Horse Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors;

### H. Selection of Successful Bid

Prior to the conclusion of the Auction, the Debtors, in consultation with their advisors and the Committee, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer from among the Qualified Bidders (including the Stalking Horse Purchaser) submitted at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and communicate to the Stalking Horse Purchaser and the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

Within two (2) business days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.

Within 24 hours after adjournment of the Auction, the Debtors shall file a notice identifying the Successful Bidder with the Bankruptcy Court and shall serve such notice by fax, email or overnight mail to all counterparties whose contracts are to be assumed and assigned.

The Debtors will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing (as defined below).

### I. Return of Deposits

All deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder (as defined below) no later than five (5) business days following the conclusion of the Auction.

### J. Back-Up Bidder

If an Auction is conducted, the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until ten (10) business days after the Sale Hearing. Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

### III. THE BID PROTECTIONS

In recognition of this expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Purchaser is not the Successful Bidder, the Debtors will pay the Stalking Horse Purchaser (i) an aggregate fee of approximately One Million Six Hundred and Fifty Thousand dollars and 00/100 ($1,650,000), which is equal to 3% of the aggregate Purchase Price set forth in the Stalking Horse Agreement, prior to any closing adjustments (the "Break-Up Fee"), and (ii) an amount in cash equal to the aggregate amount of the reasonable charges, costs, fees, payments, and expenses (including, without limitation, all reasonable fees, expenses and disbursements of any representatives of Stalking Horse Purchaser and its Affiliates) paid or incurred by or on behalf of Stalking Horse Purchaser or its Affiliates relating to or in connection with its bid (the "Expense Reimbursement"). The amount of the Expense Reimbursement will be disclosed no later than February 8, 2012. The Stalking Horse Purchaser shall provide reasonable documentation of the Expense Reimbursement to the Debtors and the Office of the United States Trustee. The Break-Up Fee and Expense Reimbursement shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement.

The Debtors have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to the Stalking Horse Agreement shall survive termination of the Stalking Horse Agreement, shall, to the extent owed by the Debtors, constitute an administrative expense claim under section 503(b) of the Bankruptcy Code and shall be payable within two (2) business days after the closing of the sale under the terms and conditions of the Stalking Horse Agreement and the Bid Procedures Order, notwithstanding section 507(a) of the Bankruptcy Code.

### IV. Sale Hearing

The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin on or before **February 27, 2012, at** _2:00 p.m._ **(prevailing Eastern Time)**, to approve and authorize the sale transaction to the Successful Bidder on terms and conditions determined in accordance with the Bid Procedures.

## Exhibit 2

## (Significant Dates)[1]

- **Cure Objection Deadline:**         February 16, 2012 at 4:00 p.m. (EST)
- **Assignment Objection Deadline:**   February 16, 2012 at 4:00 p.m. (EST)
- **Sale Objection Deadline:**         February 17, 2012 at 4:00 p.m. (EST)
- **Bid Deadline:**                    February 21, 2012 at 9:00 a.m. (EST)
- **Auction:**                         February 23, 2012 at 10:00 a.m. (EST)
- **Sale Hearing:**                    February 27, 2012 at 2:00 p.m. (EST)

---

[1] The dates stated herein may be modified in accordance with the Motion and Order.

EAST\47399174.16