## Exhibit B

**(Stalking Horse Agreement)**

---

ASSET PURCHASE AGREEMENT

Dated as of January __, 2012

By and Between

ENTROPIC COMMUNICATIONS, INC.

as Purchaser,

and

TRIDENT MICROSYSTEMS, INC.

and specified TRIDENT MICROSYSTEMS Subsidiaries

as Sellers.

---

735819 v8/SD

## Table of Contents

| | | Page |
|---|---|---|
| ARTICLE I | SALE AND PURCHASE OF ASSETS | 1 |
| Section 1.1 | Purchased Assets | 1 |
| Section 1.2 | Excluded Assets | 4 |
| Section 1.3 | Assumed Liabilities | 5 |
| Section 1.4 | Retained Liabilities | 6 |
| Section 1.5 | Pro-Ration | 7 |
| Section 1.6 | Intentionally Omitted | 7 |
| Section 1.7 | Foreign Assets | 7 |
| Section 1.8 | Purchase Price | 8 |
| Section 1.9 | Working Capital; Adjustment to Purchase Price | 8 |
| Section 1.10 | Disputes Concerning Adjustment | 9 |
| Section 1.11 | Holdback | 10 |
| Section 1.12 | Allocation | 11 |
| ARTICLE II | CLOSING; CLOSING CONDITIONS; CLOSING DELIVERIES | 11 |
| Section 2.1 | Time and Place of Closing | 11 |
| Section 2.2 | Conditions to Closing Obligations of the Company | 12 |
| Section 2.3 | Conditions to Closing Obligations of Purchaser | 12 |
| Section 2.4 | Closing Deliveries of the Company | 15 |
| Section 2.5 | Closing Deliveries of Purchaser | 16 |
| ARTICLE III | REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY | 17 |
| Section 3.1 | Organization/Governing Documents | 17 |
| Section 3.2 | Power and Authority | 17 |
| Section 3.3 | Subsidiaries | 18 |
| Section 3.4 | Enforceability | 18 |
| Section 3.5 | Consents | 18 |
| Section 3.6 | No Conflicts | 18 |
| Section 3.7 | Financial Statements | 19 |
| Section 3.8 | Undisclosed Liabilities | 20 |
| Section 3.9 | Title to Assets | 20 |
| Section 3.10 | Condition of Assets/Tangible Assets | 20 |

# Table of Contents
(continued)

| | | Page |
|---|---|---|
| Section 3.11 | Inventory | 21 |
| Section 3.12 | Receivables | 21 |
| Section 3.13 | Product Liability/Warranty | 21 |
| Section 3.14 | Insurance | 21 |
| Section 3.15 | Permits | 21 |
| Section 3.16 | Conduct of Business | 22 |
| Section 3.17 | Contracts | 22 |
| Section 3.18 | Employees | 23 |
| Section 3.19 | Employee Benefits | 24 |
| Section 3.20 | Real Estate | 25 |
| Section 3.21 | Seller Intellectual Property | 26 |
| Section 3.22 | Taxes | 29 |
| Section 3.23 | Litigation | 30 |
| Section 3.24 | Compliance with Laws | 30 |
| Section 3.25 | Business Continuity | 31 |
| Section 3.26 | Certain Business Practices | 31 |
| Section 3.27 | Brokers | 31 |
| Section 3.28 | Complete Disclosure | 31 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 31 |
| Section 4.1 | Organization | 31 |
| Section 4.2 | Power and Authority | 31 |
| Section 4.3 | Enforceability | 32 |
| Section 4.4 | Consents | 32 |
| Section 4.5 | No Conflicts | 32 |
| Section 4.6 | Financing | 32 |
| ARTICLE V | PRE-CLOSING COVENANTS | 32 |
| Section 5.1 | Further Actions | 32 |
| Section 5.2 | Operation of the Business | 33 |
| Section 5.3 | Negative Covenants | 34 |
| Section 5.4 | Access Rights | 35 |
| Section 5.5 | Notifications; Disclosure Updates | 36 |

735819 v8/SD

**Table of Contents**
(continued)

| | | Page |
|---|---|---|
| Section 5.6 | Intentionally Omitted | 37 |
| Section 5.7 | Bulk Sales Laws | 37 |
| Section 5.8 | Competing Transaction | 37 |
| Section 5.9 | Employee Matters | 38 |
| Section 5.10 | Bankruptcy and Insolvency Matters | 40 |
| ARTICLE VI | TERMINATION | 41 |
| Section 6.1 | Termination Events | 41 |
| Section 6.2 | Effect of Termination | 43 |
| Section 6.3 | Break-Up Fee; Expense Reimbursement | 43 |
| ARTICLE VII | ADDITIONAL COVENANTS AND AGREEMENTS | 43 |
| Section 7.1 | Further Assurances | 43 |
| Section 7.2 | Books and Records | 43 |
| Section 7.3 | Litigation Support | 44 |
| Section 7.4 | Transition | 44 |
| Section 7.5 | Payment of Transaction Taxes and Fees | 44 |
| Section 7.6 | Payments of Receivables | 45 |
| Section 7.7 | Confidentiality | 45 |
| Section 7.8 | Post-Closing Consents | 46 |
| Section 7.9 | Post-Closing Assumption and Rejection of Contracts and Leases | 47 |
| Section 7.10 | Audits of Carve-Out Financial Statements | 47 |
| Section 7.11 | Limited Trademark License | 48 |
| Section 7.12 | Deletion/Destruction of Confidential Information | 48 |
| Section 7.13 | Relocation of Certain Excluded Assets | 48 |
| Section 7.14 | Other Contractual Matter | 48 |
| ARTICLE VIII | INDEMNIFICATION | 49 |
| Section 8.1 | Indemnification Obligations of the Company | 49 |
| Section 8.2 | Limitations on Indemnification Obligations of the Company | 50 |
| Section 8.3 | Indemnification Obligations of Purchaser | 51 |
| Section 8.4 | Third-Party Claims | 51 |
| Section 8.5 | Right of Setoff | 52 |

-iii-

**Table of Contents**
(continued)

Page

Section 8.6     Reduction of Purchase Price ........................................................... 52

Section 8.7     Other Indemnification Provisions .................................................... 52

Section 8.8     Construction ................................................................................... 53

Section 8.9     Claim Process................................................................................. 53

Section 8.10    Holdback Release........................................................................... 53

ARTICLE IX      GENERAL PROVISIONS ............................................................. 54

Section 9.1     Publicity ......................................................................................... 54

Section 9.2     Notices ........................................................................................... 54

Section 9.3     Fees and Expenses ......................................................................... 55

Section 9.4     Entire Agreement ........................................................................... 55

Section 9.5     Amendments .................................................................................. 55

Section 9.6     Non-Waiver.................................................................................... 55

Section 9.7     Assignment .................................................................................... 55

Section 9.8     Binding Effect; Benefit .................................................................. 56

Section 9.9     Severability ................................................................................... 56

Section 9.10    References...................................................................................... 56

Section 9.11    Construction .................................................................................. 56

Section 9.12    Governing Law; Venue................................................................... 56

Section 9.13    Consent to Jurisdiction................................................................... 57

Section 9.14    Waiver of Trial by Jury.................................................................. 57

Section 9.15    Counterparts................................................................................... 57

Section 9.16    Specific Performance ..................................................................... 57

Section 9.17    No Other Representations or Warranties ........................................ 58

Section 9.18    Disclosure Schedule....................................................................... 58

EXECUTION VERSION

## INDEX OF EXHIBITS AND SCHEDULES

EXHIBIT A    DEFINITIONS

EXHIBIT B    PURCHASE PRICE ALLOCATION

EXHIBIT C    FORM OF TRANSITION SERVICES AGREEMENT

EXHIBIT D    FORM OF LICENSE AGREEMENT

EXHIBIT E    FORM OF NON-COMPETITION AGREEMENT

EXHIBIT F    FORM OF BILL OF SALE

EXHIBIT G    FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT H    FORM OF FACILITY USE AGREEMENT

EXHIBIT I    FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AND
             ASSUMPTION AGREEMENT

EXHIBIT J    BID PROCEDURES

EXHIBIT K    NXP MANUFACTURING SERVICES AGREEMENT TERM
             SHEET

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this *"Agreement"*) dated January __, 2012 is by and between ENTROPIC COMMUNICATIONS, INC., a Delaware corporation (*"Purchaser"*), and TRIDENT MICROSYSTEMS, INC., a Delaware corporation (the *"Company"*), and each of its Subsidiaries that owns Purchased Assets (the *"Seller Subsidiaries"*). Purchaser, the Company and Seller Subsidiaries are collectively referred to herein as the *"Parties"* and individually as a *"Party"*. Capitalized terms used herein are defined in **Exhibit A**.

## RECITALS

**WHEREAS,** the Company and its Subsidiaries design, develop, market and distribute a comprehensive suite of digital set-top box components and system solutions for worldwide satellite, terrestrial, cable and IPTV networks, including demodulators, set-top box systems-on- a chip semiconductors, DOCSIS modems, interface devices and media processors and complete reference designs that are bundled with a range of operating systems, middleware, drivers and development tools (the *"STB Business"*), among other product lines;

**WHEREAS,** the Company is preparing to file a Chapter 11 bankruptcy petition pursuant to Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the *"Bankruptcy Code"*) and its wholly owned subsidiary, Trident Microsystems (Far East) Ltd, a Cayman company is preparing to file a bankruptcy petition pursuant to applicable law;

**WHEREAS,** the Company desires to sell, assign, convey, transfer and deliver to Purchaser, and Purchaser desires to purchase from the Company, all of the assets, rights and properties of the Company and its Subsidiaries used in or related to the STB Business (other than the Excluded Assets), on the terms and subject to the conditions hereinafter set forth; and

**WHEREAS,** the execution and delivery of the Non-Competition Agreement by any purchaser of any or all of the Excluded Assets used in the Company's DTV Business, and the obligations of the Company hereunder to cause such transactions, are a material inducement to Purchaser to consummate the transactions contemplated by this Agreement, and the Purchase Price and the License Agreement constitute due consideration to be tendered by Purchaser in exchange for the Non-Competition Agreement and the other benefits to be received by Purchaser hereunder.

## AGREEMENTS

**NOW, THEREFORE,** in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

## ARTICLE I
## SALE AND PURCHASE OF ASSETS

**Section 1.1    Purchased Assets.** On the Closing Date, upon the terms and conditions set forth in this Agreement, the Company agrees to, and shall cause each of its Subsidiaries to, sell, assign, convey, transfer and deliver to Purchaser, and Purchaser agrees to acquire from the

1.

Company and each applicable Seller Subsidiary, all right, title and interest in and to the Purchased Assets, free and clear of any and all Encumbrances other than Permitted Encumbrances. As used herein, *"Purchased Assets"* shall mean all right, title and interest of the Company and its Subsidiaries in and to any and all assets and properties used in or related to the STB Business, including assets acquired during the Pre-Closing Period, other than Excluded Assets, including, without limitation, the following assets and properties of the STB Business:

(a)     All products of the STB Business, including products under development, together with masks and mask works for the products and their associated codes and materials (the *"Products"*);

(b)     All inventory of the STB Business that are held for sale or resale including any raw materials, work in process, finished goods, consumables, service parts, packing materials and supplies, wherever located (*"Owned Inventory"*) and the open purchase orders with NXP for inventory to the extent Purchaser elects at Closing to assume such purchase orders (the *"NXP Purchase Orders"*);

(c)     trade accounts receivable, notes receivable, negotiable instruments and chattel paper of the STB Business (the *"Receivables"*), excluding that certain note receivable from NXP classified as a note receivable from related party on the Interim Balance Sheet (*"NXP Note"*);

(d)     the Leased Real Estate leased or subleased by the Company or any Subsidiary listed in Schedule 1.1(d) (*"Transferred Leases"*);

(e)     all tangible assets of the STB Business (the *"Tangible Personal Property"*), including machinery, equipment (including laboratory equipment and test equipment), tools, dies, appliances, furniture, supplies, office supplies, office equipment, fixtures, information technology related hardware and equipment (including computers, servers, storage devices, telecommunications facilities and printers), telephone systems, telecopiers and photocopiers and other tangible personal property of every kind and description (i) that are either (a) listed in Schedule 1.1(e)(i) of the Disclosure Schedule or (b) located in the facilities subject to the Transferred Leases on the date of this Agreement, including without limitation, the data centers in Belfast, Ireland and Austin, Texas, (none of which Tangible Personal Property shall be relocated between signing and Closing), (ii) all Personal Productivity Tools, (iii) fifty percent (50%) of the Miscellaneous Office Supplies located at the facilities subject to the Facility Use Agreement, and (iv) all leases and subleases of any such Tangible Personal Property as to which the Company or any Subsidiary is the lessee or sublessee, together with any options to purchase the underlying Tangible Personal Property, which leases and subleases are listed in Schedule 1.1(e)(iv) of the Disclosure Schedule;

(f)     all Software owned by or licensed to the Company or any Subsidiary, including all Software bundled and/or licensed with any Products, owned by the Company or any Subsidiary (the *"Seller Software"*);

(g)     all Purchased Intellectual Property Assets, all goodwill associated with the Purchased Intellectual Property Assets and all rights of the Company or any of its Subsidiaries

2.

under the Purchased Intellectual Property Assets, including remedies against past, present, and future infringement or misappropriation of the Purchased Intellectual Property Assets, including, without limitation, income, royalties and damages related to any of the foregoing, and rights to protection of past, present, and future interests in any Purchased Intellectual Property Assets under the Laws of all jurisdictions, except any royalties or license fees payable to the Company or its Subsidiaries under those certain agreements listed on Schedule 1.1(g) (*"Excluded Royalties"*);

        **(h)**     the Company's and each Subsidiary's right, title and interest in, to or under each Contract for Licensed Intellectual Property Assets that are used in the STB Business, including processors, busses, input/output, memory and other IP blocks for integration with or into the system-on-a-chip Products, operating systems, middleware, libraries, drivers and development tools bundled with any Products or used in the development of any Products (collectively, the *"Licensed Intellectual Property Assets"*) assumed by Purchaser at Closing *plus* any Contracts assumed pursuant to Section 7.9;

        **(i)**     all Seller Contracts to which the Company or a Subsidiary is a party and that are listed in Schedule 1.1(i)(i) (including, but not limited each such Seller Contract for Licensed Intellectual Property, all purchase orders and license agreements with customers of the STB Business, all supply chain related agreements and all distribution agreements) and any outstanding offers or solicitations listed in Schedule 1.1(i)(ii) of the Disclosure Schedule made by or to the Company or any Subsidiary to enter into any Contract relating to the STB Business or any Purchased Asset in both cases to the extent such Seller Contracts are assumed by Purchaser at Closing or assumed by Purchaser pursuant to Section 7.9 of this Agreement *except* Purchaser prior to Closing may elect, in its sole discretion, to exclude any such Seller Contract from the Purchased Assets (and such Contract shall automatically become a Retained Contract);

        **(j)**     all prepaid expenses, deposits and advance payments of the Company or any Subsidiary with respect to the STB Business or Leased Real Estate and all rights of the Company or any Subsidiary to receive discounts, refunds, reimbursements, rebates, awards and other similar benefits, in each case, with respect to the STB Business or Leased Real Estate;

        **(k)**     cash in an amount equal to the Company Retention Bonus Liability, Accrued Severance Benefits and the Accrued Retirement Benefits (provided, that to the extent the Accrued Retirement Benefits are funded through cash held in trusts or other accounts that can be transferred or rolled over to the Purchaser as of the Closing, then the delivery of such trusts or accounts shall be made in lieu of the delivery of cash) (*"Required Cash"*);

        **(l)**     claims and rights (and benefits arising therefrom) with or against all Persons, including all rights against suppliers, under warranties covering any Owned Inventory or Tangible Personal Property included within the Purchased Assets;

        **(m)**     all Export Approvals and all Permits used in or related to the STB Business to the extent transferable or assignable to Purchaser;

        **(n)**     books and records, ledgers, forms, records, documents, Tax Returns, Tax Return workpapers, files, invoices, vendor or supplier lists, reference materials, price guides,

3.

payroll records, personnel files, insurance records, accounts receivable and payable, inventory, maintenance and asset history records and copies of all books of original entry, export control license records, laboratory notebooks and electronic notebooks and other research and development records and databases, e-mails and other data relating to the ownership, use, maintenance or enjoyment of the Purchased Assets or the operation of the STB Business and that are owned or used by the Company or any Subsidiary (collectively, the *"Records"*); provided, however, that the Company may retain copies of such Records as required by applicable Law and as reasonably necessary to enable the Company to fulfill its Tax filing, regulatory or statutory obligations after the Closing Date;

(o)    all grant applications submitted by the UK Subsidiary prior to the date of this Agreement, including the Invest Northern Ireland grant, and any open grant awards ("*Grants*");

(p)    any lock boxes to which account debtors of the Company or any Subsidiary remit payment relating solely to Receivables;

(q)    all goodwill and other intangible assets to the extent associated with the STB Business, including customer and supplier lists;

(r)    all preference or avoidance claims and actions of the Company arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code relating to the Purchased Assets and/or Assumed Liabilities, including all actions relating to vendors and service providers used in the STB Business, counterparties to Assumed Contracts and Transferred Leases and Transferred Employees (the *"Preference Avoidance Claims"*); and

(s)    all other assets of the Company and its Subsidiaries used in or related to the STB Business, other than the Excluded Assets.

Section 1.2    Excluded Assets.    The Company and its Subsidiaries are not selling, conveying, assigning, transferring or delivering to Purchaser, and the term *"Purchased Assets"* shall not include, the following assets (collectively, the *"Excluded Assets"*):

(a)    trade accounts receivable, customer purchase orders, notes receivable, negotiable instruments and chattel paper not arising from the STB Business, the NXP Note and any Excluded Royalties;

(b)    All (i)    existing products and products under development of the Company's DTV Business, PC TV Business, Audio Business and the Terrestrial Demod Product Business and (ii) all masks for such products;

(c)    the Company's and each Subsidiary's right, title and interest in, to or under (i) each Contract for Licensed Intellectual Property Assets that are not used in the STB Business, (ii) each Contract listed on Schedule 1.2(c) (the Contracts in (i) and (ii) collectively, the *"Excluded Licensed Intellectual Property Assets"*) and (iii) each Retained Contract;

(d)    all commercial off-the-shelf Software loaded on desktop or laptop computers that are not part of the Tangible Personal Property;

4.

(e)     all of the Company's and each Subsidiary's cash and cash equivalents except for (i) any cash and cash equivalents included in the Working Capital Statement, if any, or taken into account in calculating the Final Working Capital, and (ii) the Required Cash;

(f)     claims (and benefits arising therefrom) that relate to any Liability other than the Assumed Liabilities;

(g)     the Company's and each Seller Subsidiary's financial accounting books and records, corporate charter, minute and stock record books, income tax returns, corporate seal, checkbooks and canceled checks;

(h)     all rights (including any claims, rights and interest in and to any refunds for Taxes with respect to the Purchased Assets and STB Business for Pre-Closing Tax Periods) relating to the Retained Liabilities;

(i)     except as provided in Section 7.11, the names and trademarks *"Trident Microsystems, Inc."*, any other use of *"Trident Microsystems"* together with any other word or phrase, including the Trident Microsystems logo;

(j)     all preference or avoidance claims and actions of the Company arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code other than the Preference Avoidance Claims; and

. (k)     all rights of the Company under this Agreement.

**Section 1.3    Assumed Liabilities.**    On the terms and subject to the conditions contained in this Agreement, at the Closing, Purchaser will assume and agree to discharge and perform when due (i) all Liabilities arising out of or relating to the ownership, operation and use of the Purchased Assets after the Closing Date and the operation and conduct of the STB Business after the Closing Date; (ii) all Liabilities arising after or otherwise required to be performed under any Seller Contract or the NXP Purchaser Orders included in the Purchased Assets or any lease with respect to any Transferred Leases after the Closing Date (other than those which are not assignable under Section 365 of the Bankruptcy Code or as to which Consent is required to be obtained from any Person in order to permit the sale or transfer of the Seller Contract), including Seller Contracts assumed pursuant to Section 7.9; (iii) Closing Trade Payables (provided such Liability is included in the calculation of Closing Working Capital) other than the Inventory Contingency Accrual; (iv) the obligation to credit to all Transferred Employees  all vacation or other paid time off accrued or vested for each such Transferred Employee as of the Closing Date (*"Assumed PTO"*); *provided, however* in the case of clause (ii) and clause (iii) Purchaser is not assuming any Liabilities under any Seller Contract or any lease with respect to any Transferred Leases that relates to a breach of or default under, or any non-compliance with Laws with respect to, any such Seller Contract or lease that occurred on or prior to the Closing Date and Purchaser is not assuming any Liabilities for wages, bonuses, retention bonuses or payments, employee benefits, accrued vacation, or other accrued or vested paid time off, assessments, severance or other employment compensation for any employees, or employer Taxes, including without limitation, any arising from the vesting of any equity grants upon the closing of the Contemplated Transactions other than Assumed PTO, or unpaid amounts to any

5.

consultants of the Company or any Subsidiary of the Company accrued or arising prior to the Closing (the *"Assumed Liabilities"*).

**Section 1.4    Retained Liabilities.** Other than the Assumed Liabilities, Purchaser will not assume, and will not be responsible for or otherwise bear the economic burden of, any Retained Liability. The Company shall remain responsible for and will discharge and perform in full when due all of the Retained Liabilities. *"Retained Liabilities"* shall mean all Liabilities of the Company and its Subsidiaries other than the Assumed Liabilities and shall include, without limitation:

(a)    any Liability relating to or arising from any Closing Trade Payables which are not taken into account in connection with the calculation of Closing Working Capital;

(b)    any Liability (whether direct or as a result of successor liability, transferee liability, joint and several liability or contractual liability) for Taxes related to the STB Business or any Retained Employee, STB Employee, Transferred Employee for periods (or portions thereof) ending on or prior to the Closing Date and retained by Company pursuant to Section 5.9 or the Excluded Assets;

(c)    any Liability (whether direct or as a result of successor liability, transferee liability, joint and several liability or contractual liability) for income Taxes or Taxes that are unrelated to the Purchased Assets;

(d)    any Liability under or relating to or arising from any Retained Contract;

(e)    any Liability relating to or arising from any Seller Employee Benefit Plan other than the specific Liabilities being assumed by Purchaser pursuant to Section 5.9;

(f)    any contingent Liability to NXP under the Manufacturing Agreement that is accrued or should be accrued, in accordance with the Company's historical practices, on the consolidated balance sheet of the Company as of the Closing Date (*"Inventory Contingency Accrual"*);

(g)    any Liability arising out of or resulting from the non-compliance with any Law by the Company or any of its Subsidiaries on or prior to the Closing Date;

(h)    any costs and expenses incurred by the Company or any of its Subsidiaries incident to the negotiation and preparation of the Transaction Documents or consummation of the Contemplated Transactions;

(i)    any Liability of the Company or any of its Subsidiaries to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions;

(j)    any Liability of the Company or any of its Subsidiaries relating to any Excluded Asset, including any Retained Contract;

(k)    any Liability of the Company or any Subsidiary for any payment due or benefit owing to any director, officer or employee of such entity that arises prior to or as a result

of the Contemplated Transactions including, but not limited to, any payment, severance, benefit, vesting, or equity that is due upon a change in control pursuant to any contract, policy or plan and any Liability specifically identified in Section 5.9;

(l)        any Liability relating to or arising out of any employment related actions taken by any Seller Employer with respect to STB Employees or STB Service Providers on or before the Closing Date including, but not limited to, any adverse employment actions, corrective actions, transfers or terminations;

(m)        any Liability of the Company or any of its Subsidiaries relating to or arising from the Transaction Documents; or

(n)        any Liability arising from the transfer or claimed transfer to the Purchaser, by virtue of TUPE, of the employment of any employee of a Seller Employer other than the Transferred Employees.

**Section 1.5    Pro-Ration.**    All rent accrued on any of the Transferred Leases and any utility, real estate taxes or similar charge under the Transferred Leases relating to the period prior to the Closing Date will be the Liability of the Company.  Any installment of rent due on any of the Transferred Leases and any utility, real estate taxes or similar charge payable that are paid in the month of the Closing for which the Company does not get credit as a prepaid expense in the calculation of Working Capital, in each case with respect to the period in which the Closing occurs shall be prorated between the parties hereto on the basis of the actual number of days applicable to pre-Closing and post-Closing occupancy or use.

**Section 1.6    Intentionally Omitted**

**Section 1.7    Foreign Assets.**    A list of the Purchased Assets used in foreign operations of the Company and its Seller Subsidiaries by country (the *"Foreign Assets"*) is set forth on Schedule 1.7.  The Purchased Assets shall be sold, conveyed, transferred, assigned and delivered, and the Assumed Liabilities shall be assumed, pursuant to transfer and assumption agreements and such other instruments in such form as may be necessary or appropriate to effect a conveyance of the Purchased Assets and an assumption of the Assumed Liabilities in the jurisdictions in which such transfers are to be made.  Such transfer and assumption agreements and other instruments and documents shall be jointly prepared by the Parties and shall include (i) the Bill of Sale, (ii) the Assignment and Assumption Agreement, (iii) the Cayman Sale Order, (iv) an allocation of the Purchase Price to the Purchased Assets located within each jurisdiction and (v) to the extent reasonably requested by Purchaser or otherwise required by Law, local asset transfer agreements for each jurisdiction other than the United States (including without limitation the Cayman Islands, the Republic of China, the People's Republic of China, the Republic of Korea, India, Japan, United Kingdom and France in which Purchased Assets or Assumed Liabilities are located (*"Local Asset Transfer Agreements"*), and (vi) such other agreements as may reasonably be required to effect the purchase and assignment of the Purchased Assets and Assumed Liabilities, including where necessary separate agreements to effect the transfer of Purchased Intellectual Property and shall be executed no later than at or as of the Closing by the Company and/or one or more of its Seller Subsidiaries, as appropriate, and Purchaser or one or more of its Subsidiaries, as appropriate.  Such assignment, transfer or

7.

conveyance will be effective as of such times as provided in each respective Transaction Document and will be subject to the terms and conditions of this Agreement or other Transaction Document. The Foreign Assets shall otherwise be treated as Purchased Assets for all purposes under this Agreement.

### Section 1.8    Purchase Price.

(a)    The purchase price for the sale, assignment and delivery of the Purchased Assets, and subject to adjustment in accordance with Section 1.9 below, shall consist of (i) the assumption of Assumed Liabilities and (ii) a cash payment *"Cash Amount"*) calculated as (a) Fifty-Five Million Dollars ($55,000,000.00) *plus* (b) the amount, if any, by which the Estimated Working Capital exceeds the Target Working Capital, *minus* (c) the amount, if any, by which the Target Working Capital exceeds the Estimated Working Capital, *minus* (d) the Holdback Amount, *minus* (e) the dollar value of the Assumed PTO. The Cash Amount as adjusted pursuant to Section 1.9 below plus any Holdback Amount paid to the Company after the Closing Date shall be referred to herein as the *"Purchase Price."* At the Closing, Purchaser shall pay the Cash Amount, by wire transfer of immediately available funds to an account that has been designated by the Company.

(b)    Notwithstanding any other provision of this Agreement (except for Section 1.8(c) below, which shall not be modified or affected by this Section 1.8(b) and except for actions for specific performance), except in the case of Fraud or knowing or intentional breaches of this Agreement, the Company's aggregate obligations and liabilities to Purchaser under all provisions of this Agreement shall not exceed Six Million Dollars ($6,000,000.00).

(c)    The limitation in Section 1.8(b) shall not apply to the Company's and the Seller Subsidiaries' obligation to deliver Required Cash or to pay or discharge (i) Excluded Liabilities, (ii) Cure Costs, (iii) payments made by the Company pursuant to the last sentence of Section 2.3(h), (iv) the Company's payment obligations under Section 5.4(c)(other than for out-of-pocket fees and expenses relating to chain of title patent recordation issues), Section 7.5(a) and Section 7.14, or (v) any liability or obligation of the Company under the License Agreement, the Transition Agreement, any Facilities Use Agreement or the Non-Competition Agreement.

### Section 1.9    Working Capital; Adjustment to Purchase Price.

(a)    At least five (5) Business Days prior to the Closing Date, the Company shall deliver to Purchaser a working capital statement (the *"Estimated Working Capital Statement"*), setting forth the Company's calculation of Closing Working Capital with respect to the STB Business as of the opening of business on the Closing Date (*"Estimated Working Capital"*). For purposes of this Agreement, "Closing Working Capital" shall mean the amount by which (i) Current Assets exceed (ii) Current Liabilities. Closing Working Capital will exclude any and all inter-company receivables, payables or other balances between the Company or any Subsidiary, on the one hand, and the Company or any Subsidiary, on the other hand. To the extent Current Liabilities exceed Current Assets, Estimated Working Capital shall be stated as a negative number and shall be deemed less than Target Working Capital. The term *"Current Assets"* means the Receivables, Owned Inventory and Specified Prepaid Expenses included in the Purchased Assets. The term *"Specified Prepaid Expenses"* means prepaid royalties, fees or

8.

other payments treated under GAAP as a prepaid expense of the STB Business as of the Closing under the Seller Contracts specified on Schedule 1.9(a) to the extent such Seller Contracts are included in the Purchased Assets. The term *"Current Liabilities"* means the total Closing Trade Payables included in the Assumed Liabilities. The Estimated Working Capital Statement shall be prepared in accordance with the same accounting principles, practices, methodologies and policies used to prepare the Carve-Out Financial Statements and, to the extent consistent with the foregoing, in accordance with GAAP. Notwithstanding the foregoing, (A) any assets of the Company or a Subsidiary that are not part of the Purchased Assets shall not under any circumstances be deemed a Current Asset and (B) any Liabilities of the Company or a Subsidiary that are not part of the Assumed Liabilities shall not under any circumstances be deemed a Current Liability.

(b)     Within sixty (60) days after the Closing Date, Purchaser shall deliver to the Company a working capital statement (the *"Working Capital Statement"*), setting forth Purchaser's calculation of Closing Working Capital with respect to the STB Business as of the opening of business on the Closing Date. The Working Capital Statement shall be prepared in accordance with the same accounting principles, practices, methodologies and policies used to prepare the Carve-Out Financial Statements and, to the extent consistent with the foregoing, in accordance with GAAP. The Company shall cause its employees to assist Purchaser and its representatives in the preparation of the Working Capital Statement and shall provide Purchaser and its representatives reasonable access, during normal business hours and upon reasonable prior notice, to the personnel, properties, books and records of the Company and its Subsidiaries for such purpose.

(c)     If Final Working Capital (as defined in Section 1.10 below) exceeds Estimated Working Capital, then Purchaser shall pay to the Company an amount equal to the difference between Final Working Capital and Estimated Working Capital. If Estimated Working Capital exceeds Final Working Capital, then the Company shall pay to Purchaser an amount equal to the difference between Estimated Working Capital and Final Working Capital. Any payment required to be made pursuant to this Section 1.9(c) shall be made within five (5) Business Days after the Company's acceptance of the Working Capital Statement or, if applicable, within five (5) Business Days after receipt of a determination and resolution of any dispute over the Working Capital Statement as provided in Section 1.10 below. Any such amount payable by Purchaser pursuant to this Section 1.9(c) shall be paid by wire transfer of immediately available funds (in U.S. Dollars) to an account or accounts designated in writing by the Party entitled to receive such payment (or by such other means as are mutually agreeable to the Parties).

Section 1.10    Disputes Concerning Adjustment.

(a)     If the Company does not deliver a Dispute Notice to Purchaser within ten (10) Business Days of receiving the Working Capital Statement, the Company shall be deemed to have agreed with the Working Capital Statement presented by Purchaser and the Closing Working Capital set forth on the Working Closing Statement shall be deemed the *"Final Working Capital"* for purposes of this Agreement. *"Final Working Capital"* shall have the meaning assigned to such term in Section 1.10(b) below.

**(b)**     If the Company delivers a Dispute Notice to Purchaser within ten (10) Business Days of receiving the Working Capital Statement, then the Company and Purchaser shall negotiate in good faith to resolve the dispute. If, after twenty (20) days from the date a Dispute Notice is given hereunder, the Company and Purchaser cannot agree on the resolution of the dispute, then the Arbitrating Accountant shall be jointly engaged to arbitrate the dispute. Within twenty (20) days after the Arbitrating Accountant accepts the engagement, as evidenced by an engagement letter signed by the Arbitrating Accountant and the Parties (the date of such acceptance being referred to herein as the *"Engagement Date"*), Purchaser, on the one hand, and the Company, on the other hand, shall prepare and submit to the Arbitrating Accountant a written brief stating their respective positions on the disputed issue(s). Such briefs shall be submitted simultaneously by the Parties. Within ten (10) days thereafter, Purchaser, on the one hand, and the Company, on the other hand, shall prepare and submit to the Arbitrating Accountant a reply brief to the brief submitted by the other Party or Parties, as applicable. Such reply briefs shall be submitted simultaneously. Within forty (40) days after the Engagement Date, the Arbitrating Accountant shall determine whether disputed issues of material fact exist between the Parties and, if such determination is made, shall require that an evidentiary hearing be held and completed not later than the fifty-fifth (55th) day after the Engagement Date. The Arbitrating Accountant shall render its final decision and award regarding the disputed matters not later than the fifth (5th) day after the evidentiary hearing is held or, if no evidentiary hearing is to be held, not later than the fifty-fifth (55th) day after the Engagement Date. When acting pursuant to this Section 1.10(b), the Arbitrating Accountant shall determine whether and to what extent, if any, Purchaser's calculation of the Closing Working Capital (determined based on the Working Capital Statement) requires adjustment. The Arbitrating Accountant shall address only those issues in dispute, and may not assign a value to any item greater than the greatest value for such item claimed by a Party or less than the smallest value for such item claimed by a Party. In addition, the Arbitrating Accountant shall apportion its fees and expenses between the Company, on the one hand, and Purchaser, on the other hand, in proportion to the difference between the relative position of each Party and the Arbitrating Accountant's ultimate determination with respect to the amount of the Closing Working Capital. The decision and award of the Arbitrating Accountant, including the apportionment of its fees, shall be final and binding on the Parties and shall be subject to confirmation and entry of judgment in accordance with applicable Law. In no event shall the Arbitrating Accountant award either Party consequential, incidental or punitive damages. Purchaser and the Company shall make all books, records and work papers reasonably requested by the Arbitrating Accountant in connection with the resolution of the item(s) disputed hereunder available to the Arbitrating Accountant. The Closing Working Capital as determined pursuant to the terms of this Section 1.10(b) shall be deemed the *"Final Working Capital"* for purposes of this Agreement.

**Section 1.11   Holdback.**   To secure the indemnification, payment and performance obligations of the Company under Section 1.9(c), Article VII and Article VIII and the other post-closing covenants of the Company in this Agreement and in the Transition Agreement and each of the Facility Use Agreements, Purchaser will withhold Six Million Dollars ($6,000,000) of the Purchase Price (the *"Holdback"*) to be held and distributed by the Purchaser on the terms and conditions of Section 8.10).

**Section 1.12    Allocation.**

(a)    The Company and Purchaser agree that the gross purchase price, as represented by the sum of the Purchase Price (as adjusted pursuant to Section 1.9), the Assumed Liabilities and other appropriately capitalized amounts (the *"Consideration"*), shall be allocated among the Purchased Assets in a reasonable manner consistent with Section 1060 of the Code and the rules and regulations promulgated thereunder (and any similar provision of state, local or foreign law, as appropriate).

(b)    The Parties shall agree to an initial allocation (based on the fair market value of the Consideration, with reference to the Cash Amount, as determined as of the date of this Agreement) and such preliminary initial allocation is set forth on **Exhibit B** (the *"Allocation"*). As soon as practicable after the Closing Date and in no event later than thirty (30) days after the Final Working Capital is determined under Section 1.10, Purchaser shall submit the proposed final Allocation to the Company to reflect any post-closing adjustments solely to the extent there any changes in the composition and value of the assets as reflected in the Allocation as of the Closing Date. The Company shall thereupon have thirty (30) days to review the proposed final Allocation and to notify Purchaser of any aspects of the proposed final Allocation with which it disagrees. In the event of any such disagreement, the Parties shall negotiate in good faith to resolve such disagreement. Should the Parties fail to resolve any disagreement within thirty (30) days after the Company notifies Purchaser that the Company disagrees with any aspect of the preliminary Allocation, a determination regarding the disputed item(s) shall be made by a mutually agreed upon and jointly engaged Arbitrating Accountant, whose decision shall be final and whose fees shall be shared equally by the Company and Purchaser. The Allocation shall be further adjusted as appropriate in accordance with the principles and procedures in this Section 1.12 to reflect any additional adjustments in the gross purchase price, as so determined, made following the Closing Date in accordance with this Agreement.

(c)    The Company and Purchaser agree to file all Tax Returns in a manner consistent with this Section 1.12 and the Allocation and will not, in connection with the filing of such Tax Returns, make any allocation that is contrary to the Allocation unless required to do so by applicable Law and after prior written notice thereof to the other such Party. The Company and Purchaser agree to consult with each other with respect to all issues related to the Allocation in connection with any Tax audits, controversies, or litigation.

## ARTICLE II
## CLOSING; CLOSING CONDITIONS; CLOSING DELIVERIES

**Section 2.1    Time and Place of Closing.**    The closing of the Contemplated Transactions (the *"Closing"*) will occur at the offices of Cooley LLP in San Diego, California, commencing at 9:00 a.m. local time on the second (2nd) Business Day after the satisfaction or waiver of all conditions in Section 2.2 and Section 2.3 (other than conditions with respect to actions that the respective Parties will take at the Closing) or such other date as the Parties mutually determine (the *"Closing Date"*). The Closing will be effective as of 12:01 a.m. local time on the Closing Date.

**Section 2.2    Conditions to Closing Obligations of the Company.** The obligations of the Company to consummate the Contemplated Transactions is subject to the fulfillment, before or at the Closing, of the following conditions:

(a)    **Deliveries of Purchaser.** Purchaser has delivered all of the agreements, documents and instruments required under Section 2.5 to be delivered by Purchaser before or at the Closing.

(b)    **Representations and Warranties.** The representations and warranties of Purchaser contained in this Agreement shall be true and correct in the aggregate in all material respects (without giving effect to any limitation as to materiality or Material Adverse Effect set forth therein), in each case at and as of the date of this Agreement and the Closing Date with the same force and effect as though then made at and as of the Closing Date (except to the extent expressly made as of a particular date, in which case as of such date).

(c)    **Obligations of Purchaser.** Purchaser has duly performed, complied with and fulfilled in all material respects all of the covenants, obligations and conditions under this Agreement that are to be performed, complied with and fulfilled by Purchaser before or at the Closing.

(d)    **No Legal Proceedings.** There shall not be pending before any court of competent jurisdiction any claim, suit, action or proceeding commenced against any Party by a Governmental Authority or any Third Party that is reasonably likely to result in a judgment that could prevent, unwind or impose material limitations or conditions on the Contemplated Transactions.

(e)    **No Injunction.** No court of competent jurisdiction or Governmental Authority shall have issued an Order or Law enjoining or otherwise prohibiting the Contemplated Transactions.

(f)    **Bankruptcy Court.**

(i)    The Bankruptcy Court shall have entered the US Sale Order no later than February 20, 2012, which date may be waived or extended by Purchaser in its sole discretion, and the US Sale Order shall have become a Final Order, shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Purchaser's prior written consent.

(ii)    The Cayman Court shall have entered the Cayman Sale Order no later than February 20, 2012, which date may be waived or extended by Purchaser in its sole discretion, and the Cayman Sale Order shall have become a Final Order, shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Purchaser's prior written consent.

**Section 2.3    Conditions to Closing Obligations of Purchaser.** The obligation of Purchaser to consummate the Contemplated Transactions is subject to the fulfillment, before or at the Closing, of the following conditions:

(a)    **Deliveries of the Company.**    The Company has delivered all of the agreements, documents and instruments required under Section 2.4 to be delivered by the Company before or at the Closing.

(b)    **Representations and Warranties.**

(i)    · The representations and warranties of the Company contained in Sections 3.1, 3.2, 3.9 and 3.21(b) of this Agreement shall be true and correct in the aggregate in all material respects (without giving effect to any limitation as to materiality or Material Adverse Effect set forth therein), in each case at and as of the date of this Agreement and the Closing Date with the same force and effect as though then made at and as of the Closing Date (except to the extent expressly made as of a particular date, in which case as of such date), without giving effect to any Disclosure Schedule Updates.

(ii)    The other representations and warranties of the Company contained in this Agreement shall be true and correct in the aggregate in all respects (without giving effect to any limitation as to materiality or Material Adverse Effect set forth therein), in each case at and as of the date of this Agreement and the Closing Date with the same force and effect as though then made at and as of the Closing Date (except to the extent expressly made as of a particular date, in which case as of such date), without giving effect to any Disclosure Schedule Updates, in each case except where the failure of such representations and warranties to be true and correct would not individually or in the aggregate, have a Material Adverse Effect.

(c)    **Obligations of the Company.**    The Company has duly performed, complied with and fulfilled in all material respects all of the covenants, obligations and conditions of the Company under this Agreement that are to be performed, complied with and fulfilled by the Company before or at the Closing. The Company or the Seller Subsidiaries shall have paid the known Cure Costs for all Seller Contracts and to the extent not paid, the Purchaser may pay the Cure Costs to the applicable Third Parties and deduct such Cure Costs from the Cash Amount.

(d)    **No Legal Proceedings.**    There shall not be pending before any court of competent jurisdiction any claim, suit, action or proceeding commenced against any Party by a Governmental Authority or any Third Party (i) that is reasonably likely to result in a judgment that could prevent, unwind or impose material limitations or conditions on the Contemplated Transactions, or (ii) that seeks, or is reasonably likely to result in, a material judgment.

(e)    **No Injunction.**    No court of competent jurisdiction or Governmental Authority shall have issued an Order or Law enjoining or otherwise prohibiting the Contemplated Transactions.

(f)    **Bankruptcy Court.**

(i)    The Company shall have commenced the Chapter 11 Case no later than January 4, 2012.

(ii)    Trident Microsystems (Far East) Ltd shall have commenced the Cayman Insolvency Case no later than January 4, 2012.

13.

(iii)     The Company shall have filed the US Sale Motion no later than January 4, 2012.

(iv)     Trident Microsystems (Far East) Ltd shall have filed the Cayman Sale Motion no later than January 4, 2012.

(v)     The Bid Procedures Order shall have been entered no later than January 13, 2012, and such order shall have become a Final Order and remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Purchaser's prior written consent.

(vi)     The Bankruptcy Court shall have entered the US Sale Order no later than February 20, 2012, which date may be waived or extended by Purchaser in its sole discretion, and the US Sale Order shall have become a Final Order, shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented without Purchaser's prior written consent.

(g)     **HSR Clearance.**   All applicable waiting periods (and any extensions thereof) under the HSR Act, if applicable, and any other applicable Antitrust Laws shall have expired or otherwise been terminated.

(h)     **Consents.**   The Company shall have obtained and have delivered reasonable evidence of (i) each of the consents to assignment of the Seller Contracts and Transferred Leases set forth in Schedule 2.3(h)(1), in accordance with Schedule 2.3(h)(1), (ii) at least 70% of the consents to assignments of the Seller Contracts set forth on Schedule 2.3(h)(2) (each of (i) and (ii), a "*Required Consent*") and each Required Consent shall be in full force and effect.   Purchaser shall not withhold entering into any such Required Consent (other than with respect to any of the Seller Contracts set forth on Schedule 2.3(h)(1)) if the commercial terms offered by the applicable Third Party for such Required Consent are reasonable without material change to the terms of such Seller Contract or Transferred Lease in place as of the date of this Agreement. In addition, the Company shall have caused the Seller Contract listed on Schedule 2.3(h)(3) to become fully paid, without any material change to such Seller Contract or any cost to Purchaser.

(i)     **No Material Adverse Change.**   Since the date of this Agreement, there has been no Material Adverse Change.

(j)     **Employment Retention.**   At least 85% of the STB Employees accepted Transfer Offers and meet the requirements therein to become Transferred Employees as of the Closing.   At least 80% of the Key Employees accepted offers of employment with Purchaser, and remain available to become employees of Purchaser as of the Closing.

(k)     **Carve-Out Financial Statements.**   The Company shall have delivered to Purchaser updated Carve-Out Financial Statements that include balance sheets as of December 31, 2010, and December 31, 2011 and a statement of operations and statement of cash flows for the period from February 8, 2010 and December 31, 2010 and from January 1, 2011 to December 31, 2011 ("*Updated Carve-Out Financial Statements*") and Purchaser shall have

14.

determined that the audit of the Updated Carve-Out Financial Statements shall be completed as required by Section 7.10.

(l)     **NXP Agreements.** The Purchaser or applicable Subsidiary shall have entered into with NXP a Manufacturing Services Agreement consistent with the NXP Manufacturing Services Agreement Term Sheet and the Transition Services Agreement with NXP covering related supply chain, product engineering and product support services, and such agreements shall remain in full force and effect.

**Section 2.4     Closing Deliveries of the Company.** At the Closing, the Company will deliver to Purchaser:

(a)     a *transition services* agreement in the form of **Exhibit C** (the *"Transition Agreement"*), executed by the Company;

(b)     a license agreement in the form of **Exhibit D** (the *"License Agreement"*), executed by the Company;

(c)     a non-competition agreement in the form of **Exhibit E** (the *"Non-Competition Agreement"*), pursuant to which the Company agrees to certain restrictive covenants, executed by the Company;

(d)     a certificate of the Company signed by an executive officer of the Company certifying that the conditions set forth in Section 2.3(b) and Section 2.3(c) above have been satisfied;

(e)     a certificate of the Secretary of the Company and each Seller Subsidiary, certifying that attached thereto are true and complete copies of (i) the Governing Documents of the Company and each Seller Subsidiary, as amended through and in effect on the Closing Date, and (ii) resolutions of the board of directors or the equivalent governing body of the Company and each Seller Subsidiary authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and consummation of the transactions contemplated hereby and thereby, and certifying as to the incumbency of the officer of the Company and Seller Subsidiary executing this Agreement and each Transaction Document on behalf of the Company and each Seller Subsidiary;

(f)     certificates of good standing for the Company issued by the secretary of state of the state of incorporation or formation of the Company and by secretaries of state, or equivalent Governmental Authority, of each other jurisdiction in the United States where the Company is qualified as a foreign corporation;

(g)     a bill of sale in the form of **Exhibit F**, executed by the Company (*"Bill of Sale"*);

(h)     an Assignment and Assumption Agreement in the form of **Exhibit G** (the *"Assignment and Assumption Agreement"*), executed by the Company;

15.

(i)      Local Asset Transfer Agreements in each applicable foreign jurisdiction executed by the Company and/or one or more Seller Subsidiaries;

(j)      a facility sharing agreement between the Company or any applicable Subsidiary and Purchaser or its applicable Subsidiary for a portion of each facility listed on Schedule 2.4(j)(1) which facility sharing agreement shall contain, among other terms, the terms set forth on Schedule 2.4(j)(2) and shall be in the form of **Exhibit H** (the *"Facility Use Agreements"*) and evidence that the Company or any applicable Subsidiary shall have prepaid rent for the term of the applicable Facility Use Agreement;

(k)      Lease Assignments, executed by the Company;

(l)      all other separate assignments of any intangible Purchased Assets necessary, proper or advisable to record the transfer of such Purchased Assets with any applicable Governmental Authority, lessor or other Person with whom such assignments must be filed;

(m)      certificates of title or origin with respect to all vehicles and equipment included in the Purchased Assets for which a certificate of title or origin is required to transfer title to Purchaser;

(n)      copies of all Required Consents obtained pursuant to Section 2.3(h);

(o)      releases of Encumbrances other than (i) Permitted Encumbrances on the Purchased Assets and (ii) Permitted Encumbrances on the assets and properties of the UK Subsidiary;

(p)      a FIRPTA certificate, certifying that the Company and each Seller Subsidiary that is transferring any U.S. real property interest within the meaning of Code § 897(c) is a Person not subject to withholding under the Foreign Investment in Real Property Tax Act of 1980, 26 U.S.C. § 897, *et. seq*;

(q)      an Intellectual Property Assignment and Assumption Agreement in the form of **Exhibit I** (the *"IP Assignment and Assumption Agreement"*), executed by the Company; and

(r)      the Required Cash in immediately available funds.

**Section 2.5    Closing Deliveries of Purchaser.** At the Closing, Purchaser will deliver to the Company the following (each in a form and substance reasonably satisfactory to the Company):

(a)      the Cash Amount in accordance with Section 1.8;

(b)      the Transition Agreement, executed by Purchaser;

(c)      the License Agreement, executed by Purchaser;

16.

(d)     the Non-Competition Agreement, executed by Purchaser;

(e)     a certificate of Purchaser signed by an executive officer of Purchaser certifying that the conditions set forth in Section 2.2(b) and Section 2.2(c) above have been satisfied;

(f)     a certificate of the Secretary of Purchaser, certifying that attached thereto are true and complete copies of (i) the Governing Documents of Purchaser, as amended through and in effect on the Closing Date, and (ii) member resolutions authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and consummation of the transactions contemplated hereby and thereby, and certifying as to the incumbency of the officer of Purchaser executing this Agreement and each Transaction Document on behalf of Purchaser;

(g)     a certificate of good standing of Purchaser issued by the Delaware Secretary of State;

(h)     the Lease Assignments, executed by Purchaser;

(i)     the Facility Use Agreements, executed by Purchaser;

(j)     Local Asset Transfer Agreements, executed by Purchaser;

(k)     the Assignment and Assumption Agreement, executed by Purchaser; and

(l)     the Intellectual Property Assignment and Assumption Agreement, executed by Purchaser.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

Subject to the exceptions noted in the schedule delivered by the Company concurrently herewith and identified as the *"Disclosure Schedule,"* the Company represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date:

**Section 3.1     Organization/Governing Documents.**   The Company is a corporation duly incorporated or organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation. The Company is qualified to conduct business and is in good standing as a foreign corporation under the Laws of each jurisdiction where the failure to be so qualified and in good standing would not reasonably be expected to be materially adverse to the STB Business. All jurisdictions in which the Company is qualified as a foreign corporation are disclosed in Section 3.1 of the Disclosure Schedule. Purchaser has been provided with access to complete copies of the Company's Governing Documents. There are no outstanding powers of attorney executed on behalf of the Company or any Subsidiary with respect to the STB Business or any Purchased Asset.

**Section 3.2     Power and Authority.**   The Company has all necessary corporate power and authority to conduct its business as currently conducted. The STB Business is conducted,

17.

and the Purchased Assets are all owned, by the Company and the Subsidiaries listed on Section 3.2 of the Disclosure Schedule (the *"Seller Subsidiaries"*) and not by any other Subsidiary of the Company. Subject only to the entry of the Bid Procedures Order, US Sale Order, Cayman Sale Order and applicable provisions of the Bankruptcy Code, the Company has full corporate power and authority to execute, deliver and perform its obligations under this Agreement and all other Transaction Documents (collectively, the *"Seller Documents"*). The execution, delivery and performance by the Company of the Transaction Documents have been duly authorized by all requisite corporate and stockholder action in accordance with applicable Law and the Company's Governing Documents. No vote of Company's stockholders is necessary to approve this Agreement or the Contemplated Transactions.

    **Section 3.3    Subsidiaries.** Each Seller Subsidiary is a corporation or limited liability company duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or organization. Each Seller Subsidiary is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required except where the failure to be so qualified and in good standing would not reasonably be expected to be materially adverse to the STB Business. Each Seller Subsidiary has full corporate power and authority to (i) carry on the businesses in which such Subsidiary is engaged, (ii) own and use the properties owned and used by such Subsidiary and (iii) execute, deliver and perform its obligations under this Seller Documents. Each Seller Subsidiary is wholly-owned by the Company or a wholly-owned Subsidiary of the Company.

    **Section 3.4    Enforceability.** This Agreement has been duly executed and delivered by the Company and each Seller Subsidiary and, subject only to the entry of the Bid Procedures Order, US Sale Order, Cayman Sale Order and applicable provisions of the Bankruptcy Code, will constitute a valid and legally binding obligation of the Company and each respective Seller Subsidiary, enforceable against the Company and each Seller Subsidiary in accordance with its terms, subject to the Bankruptcy and Equity Exceptions. Upon execution and delivery, the other Seller Documents will have been duly executed and delivered by the Company and respective Seller Subsidiary and, subject only to the entry of the Bid Procedures Order, US Sale Order, Cayman Sale Order and applicable provisions of the Bankruptcy Code, will constitute valid and legally binding obligations of the Company and the respective Seller Subsidiary, enforceable against the Company and the respective Seller Subsidiary in accordance with their respective terms, subject to the Bankruptcy and Equity Exceptions.

    **Section 3.5    Consents.** Except to the extent excused by or rendered unenforceable against the Purchaser or the Sellers as a result of the Chapter 11 Case or Cayman Insolvency Case, no consent, authorization, Order or approval of, or filing, declaration or registration with, or notification with any Governmental Authority or consent, authorization, Order or approval of, or filing, declaration or registration with, or notification with any other Person is required for the Company's or any Seller Subsidiary's execution and delivery of the Seller Documents or consummation of the Contemplated Transactions, except as set forth in Section 3.5 of the Disclosure Schedule.

    **Section 3.6    No Conflicts.** Except to the extent excused by or rendered unenforceable against the Purchaser or the Sellers as a result of the Chapter 11 Case or Cayman Insolvency Case, and as set forth in Section 3.6 of the Disclosure Schedule, subject only to the entry of the

18.

Bid Procedures Order, US Sale Order, Cayman Sale Order and applicable provisions of the Bankruptcy Code, neither the execution and delivery of the Seller Documents nor the consummation of the Contemplated Transactions by the Company or any Seller Subsidiary will (a) conflict with or result in a breach of or default under any term, condition or provision of or require a consent or approval under (i) the Company's Governing Documents or any Seller Subsidiary's Governing Documents, (ii) any Law or Order to which the Company or any of its Subsidiaries is party or by which the Company or any of its Subsidiaries is bound, or (iii) any Seller Contract, (b) result in the creation of any Encumbrance upon any Purchased Asset other than Permitted Encumbrances, (c) terminate, amend or modify, or give any Person the right to terminate, accelerate, amend or modify, abandon or refuse to perform any Seller Contract, (d) violate any *"no shop"* or any exclusivity agreement entered into with any Person or any option, right of first refusal, right of first offer, right of first negotiation, pre-emptive right or other similar right of any Person with respect to the sale of the STB Business or any of the Purchased Assets, (e) result in the imposition of any restrictions on the Purchased Assets or the conduct of the STB Business or (f) result in a triggering event or distribution of rights under any rights agreement or *"poison pill"* of the Company. There is no Seller Contract under which performance by either the Company or any of its Subsidiaries according to the terms of the Seller Documents may be prohibited, prevented or delayed.

### Section 3.7    Financial Statements.

(a)    Section 3.7 of the Disclosure Schedule contains complete and accurate copies of the carve-out unaudited balance sheet of the STB Business as of September 30, 2011, and as of December 31, 2010 and the carve-out unaudited statement of operations and statement of cash flows of the STB Business for the periods from January 1, 2011 through September 30, 2011, and February 8, 2010 through December 31, 2010 (the *"Carve-Out Financial Statements"*). The Carve-Out Financial Statements and any updates to the Carve-Out Financial Statements delivered pursuant to this Agreement were and will be derived from the Company's historical financial statements, were and will be prepared in accordance with GAAP throughout the periods covered thereby, comply as to form in all material respects with the published rules and regulations of the SEC applicable to the presentation of acquired company financial statements, and accurately present the financial position of the STB Business as of the respective dates thereof and the results of operations and cash flows of the STB Business for the periods covered thereby; *provided, however,* that the Carve-Out Financial Statements are unaudited, and in the case of the Interim Financial Statements subject to normal year-end adjustments (which are not material individually or in the aggregate) and lack footnote disclosures required by GAAP. The Company and each of its consolidated Subsidiary's books, accounts and records are, and have been, maintained in accordance with GAAP and properly reflect all material transactions of the STB Business entered into by the Company and the Subsidiaries, on a consolidated basis.

(b)    The Company maintains, and at all times since February 8, 2010 has maintained, a system of internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) which is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, and includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the

19.

transactions and dispositions of the assets of the STB Business; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and that receipts and expenditures are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of the STB Business that could have a material effect on the Carve-Out Financial Statements. The Company's management has completed an assessment of the effectiveness of the Company's system of internal controls over financial reporting in compliance with the requirements of Section 404 of the Sarbanes-Oxley Act for the fiscal year ended December 31, 2010, and such assessment concluded that such controls were effective and the Company's independent registered accountant has issued (and not subsequently withdrawn or qualified) an attestation report concluding that the Company maintained effective internal control over financial reporting as of December 31, 2010. To the Knowledge of the Company, since January 1, 2010, none of the Company or any of its Subsidiaries nor the Company's independent registered accountant has identified or been made aware of: (A) any significant deficiency or material weakness in the design or operation of internal control over financial reporting utilized by the Company and its Subsidiaries; (B) any illegal act or fraud, whether or not material, that involves the Company's or its Subsidiaries' management or other employees; or (C) any claim or allegation regarding any of the foregoing.

(c)    Set forth on Section 3.7(c) of the Disclosure Schedule is a list of off-balance sheet obligations or commitments of the Company or any Subsidiary relating to the STB Business, including the dollar amount of the commitment to NXP under the Manufacturing Agreement as of the date of this Agreement.

**Section 3.8    Undisclosed Liabilities.**  Neither the Company nor any Subsidiary has any Liability that would constitute an Assumed Liability hereunder or to which Purchaser would become subject under applicable Law that is not disclosed on the Carve-Out Financial Statements or incurred by the Company or Seller Subsidiary after the date of the Interim Financial Statements in the Ordinary Course of Business (none of which results from or is related to any breach of contract, breach of warranty, tort, infringement or violation of Law).

**Section 3.9    Title to Assets.**  The Company and the Seller Subsidiaries have good and marketable title to, or a valid leasehold interest in, the Purchased Assets (excluding any Intellectual Property covered by Section 3.21) free and clear of all Encumbrances other than Permitted Encumbrances, other than properties and assets disposed of in the Ordinary Course of Business since the date of the Interim Financial Statements. No unreleased mortgage, trust deed, chattel mortgage, security agreement, financing statement or other instrument encumbering any of the Purchased Assets has been recorded, filed, executed or delivered.

**Section 3.10    Condition of Assets/Tangible Assets.**  With the exception of the Excluded Assets, the Purchased Assets (a) include all Patent Rights owned by the Company or any of its Subsidiaries and all Seller Intellectual Property Assets, including all Licensed Intellectual Property Assets, and (b) include all of the other assets, including all tangible personal property, used in the operation of the STB Business as currently conducted. The Tangible Personal Property included in the Purchased Assets, (a) are adequate to conduct the STB Business as currently conducted, (b) are in reasonably good operating condition and repair

20.

(normal wear and tear excepted), suitable for the uses intended therefore, and free from latent defects other than such defects as do not interfere with the intended use thereof in the conduct of normal operations, and (c) have been maintained in accordance with the normal practice of the Company. All Tangible Personal Property is located at the locations set forth on <u>Section 3.10</u> of the Disclosure Schedule.

**Section 3.11  Inventory.**  <u>Section 3.11</u> of the Disclosure Schedule contains a complete and accurate list of all Owned Inventory. All Owned Inventory consists of items of a quantity and quality historically useable and/or saleable in the Ordinary Course of Business. All Owned Inventory is free from defects in materials and workmanship (normal wear and tear excepted) except for immaterial defects and deficiencies. The Owned Inventory is not excessive in kind or amount, or slow moving, in light of the STB Business as currently conducted. All Owned Inventory is located at the location(s) listed on <u>Section 3.11</u> of the Disclosure Schedule or is in transit to such locations from the Company's or any Seller Subsidiary's manufacturer.

**Section 3.12  Receivables.**  <u>Section 3.12</u> of the Disclosure Schedule contains a complete and accurate list of all outstanding Receivables as of the date of this Agreement. All of the Receivables are reflected on the Carve-Out Financial Statements or arose after the date of the Interim Financial Statements in the Ordinary Course of Business, represent valid obligations of customers arising from bona fide transactions in the Ordinary Course of Business, are current and will be collected in full when due without any set-off or counterclaim except to the extent of the reserves, allowances and discounted reflected in the Interim Financial Statements or accrued in the Ordinary Course of Business since the date of the Interim Financial Statements and reflected in Estimated Working Capital. All reserves, allowances and discounts reflected in the Carve-Out Financial Statements were and are adequate and consistent in extent with reserves, allowances and discounts previously maintained by the Company and the Seller Subsidiaries in the Ordinary Course of Business.

**Section 3.13  Product Liability/Warranty.**  Except as set forth in <u>Section 3.13</u> of the Disclosure Schedule, each Product that has been sold, licensed or distributed by any of the Company or Seller Subsidiary to any Person conformed and complied in all material respects with the terms and requirements of any applicable warranty, applicable Product data sheet or specification, applicable customer specification or other Contract, subject to product returns not exceeding the STB Business' historical warranty reserves, and with all applicable Laws; and was free of any design defects or other defects or deficiencies at the time of sale.

**Section 3.14  Insurance.**  <u>Section 3.14</u> of the Disclosure Schedule contains a complete and accurate list of all insurance policies as of the date of this Agreement (including the names of the insurers and policy numbers) that are owned by the Company or any Subsidiary or name the Company or any Subsidiary as an insured or loss payee and that pertain to the Company's or any Subsidiary's assets, real estate, business, employees, or other liabilities related to the STB Business.

**Section 3.15  Permits.**  <u>Section 3.15</u> of the Disclosure Schedule contains a complete and accurate list of all Permits as of the date of this Agreement. Except to the extent excused by or rendered unenforceable against the Purchaser or the Sellers as a result of the Chapter 11 Case or Cayman Insolvency Case, all Permits (a) have been applied for, are pending by or have been

issued or given to the Company or a Subsidiary and no other Person, and (b) together constitute all licenses, permits, registrations, accreditations, certifications, approvals and agreements and consents that are required for the Company and the Seller Subsidiaries to conduct the STB Business as currently conducted.  The Company and each of the Seller Subsidiaries is in compliance in all material respects with each Permit.  Purchaser has been provided with access to complete copies of all Permits. Each of the Company and its Subsidiaries has made available in the Dataroom true and complete copies of all issued and pending Export Approvals relating to the Products or any Owned Inventory, to the extent in the Company or any of its Subsidiaries possession or control.

**Section 3.16  Conduct of Business.**  Except for the commencement of, and orders entered in connection with, the Chapter 11 Case and the Cayman Insolvency Case, since September 30, 2011, neither the Company nor any of its Subsidiaries has (with respect to the STB Business) taken any action that, if taken, would have required the written consent of Purchaser pursuant to Section 5.2.

**Section 3.17  Contracts.**

(a)    Except as set forth in Section 3.17 of the Disclosure Schedule:

(i)    each Contract set forth on Schedule 1.1(i)(i) (the *"Assumed Contracts"*) is a valid and binding agreement of the Company or the applicable Subsidiary, enforceable against the Company or such Subsidiary in accordance with its terms, subject to Bankruptcy and Equity Exceptions);

(ii)    the Company or the applicable Subsidiary is not in material breach of or default under any Assumed Contract, and no event has occurred that with the passage of time or giving of notice or both would constitute such a breach or default, result in a loss of material rights, result in the payment of any damages or penalties or result in the creation of any Encumbrance thereunder or pursuant thereto other than Permitted Encumbrances;

(iii)    to the Knowledge of the Company, no other Person party to any Assumed Contract has breached in any material respect any provision, or is in material default under, any Assumed Contract;

(iv)    the Company or the applicable Subsidiary has not, at any time since January 1, 2010, received any written notice or, to the Knowledge of the Company, other communication, in each case regarding any actual, alleged or potential violation or breach of, or default under, any of the Assumed Contracts;

(v)    there are no pending renegotiations of any of the Assumed Contracts and the Company or the applicable Subsidiary has not received written notice from any Person party to any Assumed Contract regarding the termination, cancelation or material change to the terms of, any such Assumed Contract; and

(vi)    the STB Business does not rely upon or use rights under any Assumed Contract that has expired or been terminated.

22.

### Section 3.18   Employees.

(a)   Section 3.18(a) of the Disclosure Schedule contains a complete and accurate list of the employees of the Company and Seller Subsidiaries who shall be deemed *"STB Employees"* identifying the employing entity (whether the Company or a Seller Subsidiary; in either case the *"Seller Employer"*), the primary work location of the STB Employee, their respective position, service date and salary or wage rate and the Assumed PTO as of December 6, 2011, assuming the Closing occurred as of that date. There is no employee of the Company or any Seller Subsidiary who devotes equal or greater than fifty (50) percent of his/her working time to the STB Business who is not listed as an STB Employee. The Company has disclosed to Purchaser the information required under regulation 11 of TUPE in relation to each of the STB Employees subject to TUPE and shall notify the Purchaser of any changes in that information prior to the Closing Date. No STB Employee has given notice terminating his or her employment with a Seller Employer, or with the Purchaser subsequent to Closing.

(b)   Section 3.18(b) of the Disclosure Schedule contains an accurate list of all Persons other than STB Employees who provide services (other than general and administrative services) used in or related to the STB Business for or on behalf of the Company or any Seller Subsidiary, identifying the STB Service Provider's name and primary work location. The Persons required to be set forth on Section 3.18(b) of the Disclosure Schedule along with the Persons providing general and administrative services used in or related to the STB Business for or on behalf of the Company or any Seller Subsidiary, are referred to herein as the *"STB Service Providers"*.

(c)   No Seller Employer is party or subject to any collective bargaining agreement, or other Contract with a Labor Organization with respect to STB Employees, nor is any such agreement pending or presently being negotiated, nor is there any duty on the part of the Company or any Seller Subsidiary to bargain with, consult with, or obtain the approval of, any Labor Organization or labor-related Governmental Authority prior to the execution of this Agreement or as a condition to closing the Contemplated Transactions. There is no pending or, to the Knowledge of the Company, threatened, with respect to the STB Employees: (i) strike, slowdown, picketing, work stoppage, boycott, lockout, job action, labor dispute, (ii) charge, grievance proceeding or other claim against or affecting any Seller Employer pertaining to labor relations or employment matters, asserted by an STB Employee or any Labor Organization, or pending before any Governmental Authority, (iii) union organizing activity, or (iv) question concerning representation or application for certification of a collective bargaining agent.

(d)   No Seller Employer is delinquent in payments to the STB Employees, to STB Former Employees, or to STB Service Providers, for any wages (including overtime pay), salaries, commissions, bonuses or other compensation and no STB Employee or STB Service Provider has made a claim or, to the Knowledge of the Company, threatened to make a claim, against any Seller Employer. Each Seller Employer has made all required payments to the relevant unemployment compensation reserve account or national insurance account with the appropriate Governmental Authorities with respect to the STB Employees (and, insofar as applicable, the STB Service Providers) and such accounts have positive balances.

23.

(e)     The employment of each STB Employee whose primary work location is in the United States (*"STB (U.S.) Employee"*) is terminable at will without cost to any Seller Employer other than reimbursements for business expenses, payments of accrued salaries, wages and vacation pay.

(f)     Except as required by Code § 4980B and ERISA § 601 et seq. and any similar state or foreign Law (collectively, *"COBRA"*), no Seller Employer has any Liability to provide medical or life benefits to STB Former Employees or their spouses or dependents or any other individual not employed by the Seller Employer.

(g)     No Seller Employer has incurred any obligation or Liability under the WARN Act or any similar Laws that remains unsatisfied, nor shall any terminations of STB Employees on or prior to the Closing Date result in any obligation or Liability under any Law, or under the WARN Act or any similar Laws, Seller Employee Benefit Plans or other Contracts.

(h)     No Seller Employer has offered, promised or agreed to any future variation in any Contract of employment of any of the STB Employees or any other Person employed by the Seller Employer in respect of whom Liability is deemed by TUPE to pass to the Purchaser, and no negotiations for an increase in the remuneration or benefits of any STB Employee are current or likely to take place within six (6) months after Closing.

### Section 3.19   Employee Benefits.

(a)     Each Foreign Employee Benefit Plan has been maintained in accordance with applicable Laws. No Foreign Employee Benefit Plan (other than a Foreign Employee Benefit Plan maintained under applicable Law by a Governmental Authority) that provides benefits to current or former employees of any foreign Subsidiary provides for post-employment or retiree health, life insurance and/or other welfare benefits, and the neither the Company nor any foreign Subsidiary has any obligation under any such Foreign Employee Benefit Plan to provide such benefits, except as required by applicable Law. None of the Company or any Seller Subsidiary has any unfunded Liabilities pursuant to any Foreign Employee Benefit Plan. The Accrued Retirement Benefits of STB Employees under applicable Law as of the date hereof are set forth on Section 3.19(a) of the Disclosure Schedule and will not exceed the amount of Accrued Retirement Benefits funded by the Company as of the Closing Date.

(b)     Full payment has been made of all amounts that the UK Subsidiary is obligated to pay under all Seller Employee Benefit Plans attributable to any period before the Closing, or such amounts will be accrued and reflected in the Carve-out Financial Statements in accordance with the Company's past practice.

(c)     None of the Company and its ERISA Affiliates sponsors, maintains or otherwise contributes to, or at any time during the six (6) year period preceding the Closing Date has sponsored, maintained or contributed to, or has any Liability with respect to any Seller Employee Benefit Plan that is a *"defined benefit plan"* as defined in ERISA § 3(35) or that is subject to ERISA Title IV.

(d)     None of the Company and its ERISA Affiliates contributes to, has any obligation to contribute to, or at any time during the six (6) year period preceding the Closing

24.

Date has sponsored, maintained or contributed to, or has any Liability (including withdrawal liability as defined in ERISA § 4201) under or with respect to any "*multi-employer plan*" as defined in ERISA § 3(37) pursuant to which any STB Employee is a beneficiary.

(e)     Neither the Company nor any of its ERISA Affiliates has any Liability as a result of the failure to comply with COBRA requirements.

(f)     There are no pending or, to the Knowledge of the Company, threatened claims, lawsuits, audits or other actions against any Seller Employee Benefit Plan by any employee or beneficiary covered under any Seller Employee Benefit Plan or otherwise involving any Seller Employee Benefit Plan (other than routine claims or benefits).

(g)     Except as disclosed in Section 3.19(g) of the Disclosure Schedule, consummation of the Contemplated Transactions will not (i) entitle any STB Employee, or any STB Former Employee to severance pay, pay in lieu of notice, unemployment compensation or any similar payment, (ii) accelerate the time of payment or vesting, or increase the amount of any compensation due to, or in respect of, any STB Employee, or any STB Former Employee or (iii) result in or satisfy a condition to the payment of compensation to any STB Employee that would, in combination with any other payment, result in an "*excess parachute payment*" within the meaning of Code § 280G.

### Section 3.20    Real Estate.

(a)     Section 3.20(a) of the Disclosure Schedule contains a complete and accurate list of the Leased Real Estate. Neither the Company nor any Subsidiary owns any real estate used in the STB Business or is affiliated with, or has an economic interest in, the other party to any lease or sublease for the Leased Real Estate. All of the terms and conditions of the leases or subleases to the Leased Real Estate are as set forth in the written leases and subleases for the Leased Real Estate made available to Purchaser in the Dataroom (collectively, the "*Leases*"), without any modification of any kind.    Other than the Leases, there are no agreements, leases, tenancies, guaranties, licenses or assignments with respect to any real property or premises which would become an obligation or be binding upon or enforceable against Purchaser after Closing. Neither the Company's nor any Subsidiary's possession and quiet enjoyment of the Leased Real Estate has been disturbed and there are no disputes with respect to any Lease. Neither the Company nor any Subsidiary owes, or will owe in the future, any brokerage commissions or finder's fees with respect to any Lease. Neither the Company nor any Subsidiary has subleased, licensed or otherwise granted any Person the right to use or occupy the Leased Real Estate or any portion thereof or has collaterally assigned or granted any other Encumbrance (other than Permitted Encumbrances) in such Lease or any interest therein.

(b)     The improvements on the Leased Real Estate are in good operating condition and repair (ordinary wear and tear excepted). No lienable work has been performed by or on behalf of the Company or any Subsidiary on any of the Leased Real Estate for which payment has not been made in full. No improvements on the Leased Real Estate encroach on a Third Party's real property or on set-back other restricted areas. No improvements on the Leased Real Estate violate any use or occupancy restriction, limitation, condition or covenant of record or any applicable zoning or building Law or public utility or other easement. There are no (i)

25.

challenges or appeals pending, or, to the Knowledge of the Company, threatened regarding the amount of the Taxes on, or the assessed valuation of, the Leased Real Estate, and neither the Company nor any Subsidiary has entered into any special arrangements or agreements with any Governmental Authority with respect thereto, (ii) condemnation proceedings pending or, to the Knowledge of the Company, threatened with respect to the Leased Real Estate, or (iii) outstanding options, rights of first offer, rights of first refusal or contracts to purchase any Leased Real Estate or any portion thereof.

(c)     There exists no: (i) underground storage tanks or lines, (ii) materials or equipment containing asbestos, polychlorinated biphenyls, or radioactive materials, (iii) groundwater monitoring wells, drinking water wells, production water wells, or injection wells, or (iv) landfills, surface impoundments or disposal areas at any of the Leased Real Estate. There has been no storage, treatment, generation, transportation, handling, disposal (whether on-site or offsite) or Release of any Hazardous Materials at the Leased Real Estate by any of the Company, any Subsidiary, any of their respective Affiliates and the Company's or any Subsidiary's predecessors-in-interest or by any other Person for which the Company or any Subsidiary is responsible. Except for cleaning supplies maintained on the Leased Real Estate in the Ordinary Course of Business, no Hazardous Materials are located at, on, under or, are migrating to or from the Leased Real Estate.

(d)     Neither the Company nor any Subsidiary has designed, manufactured, or installed products or other items containing asbestos or polychlorinated biphenyls at the Leased Real Estate.

### Section 3.21   Seller Intellectual Property.

(a)     Section 3.21(a) of the Disclosure Schedule identifies: (i) each item of Registered IP in which the Company or any Subsidiary has or purports to have an ownership interest of any nature (whether exclusively, jointly with another Person, or otherwise); (ii) owner(s) thereof, registration, issuance, grant, serial, and application or other identifying number, filing, registration, issuance, grant, renewal, and expiration date, and title, as applicable; and (iii) any other Person that has an ownership interest in such item of Registered IP and the nature of such ownership interest. Section 3.21(a) of the Disclosure Schedule describes each filing, payment, and action that must be made or taken on or before the date that is 120 days after the date of this Agreement in order to file, prosecute and maintain each such item of Registered IP ("Required Actions"). The Company has taken all action necessary to file, prosecute and maintain all Registered IP in full force and effect as of the date hereof and all Patent Rights included in the Registered IP are valid. No Registered IP is or has been involved in any inventorship challenge, interference, opposition, reissue, reexamination, revocation, or equivalent proceeding, in which the scope, validity or enforceability of any Registered IP listed on Section 3.21(a) of the Disclosure Schedule is being or has been contested or challenged, or the Company's or any Subsidiary's ownership or right to exploit is being contested or challenged, and to the Company's Knowledge, no such proceeding has been threatened with respect to any Registered IP.

(b)     The Company or a Seller Subsidiary has good, valid, unexpired and enforceable title (free and clear of all Encumbrances) to all Purchased Intellectual Property

26.

Assets. Except as set forth in <u>Section 3.21(b)</u> of the Disclosure Schedule, holds title of the Seller Owned Intellectual Property in the name of the Company or the applicable Seller Subsidiary (with all prior assignments of ownership recorded in the case of any Registered IP). The Company's or the Subsidiary's rights as a licensee with respect to each item of the Licensed Intellectual Property Assets (including Seller Software) are legal, valid, binding, enforceable and in full force, subject to the Bankruptcy and Equity Exceptions, and free and clear of all Encumbrances. Neither the Company nor any Subsidiary has any duty or obligation (whether present, contingent, or otherwise) to deliver, license, or make available the source code for any Seller Software to any escrow agent or other Person. To the Company's Knowledge, there is no Intellectual Property owned by any other Person that is necessary for the Company to conduct its business as currently conducted (except for Intellectual Property to which the Company has rights as of the date hereof).

(c)     The Company and its Subsidiaries have taken all reasonable measures, including measures against unauthorized disclosure, to protect, preserve and maintain its rights, title and interests in and to all Seller Intellectual Property Assets, and the secrecy and confidentiality of all trade secrets and other material confidential information owned or controlled by the Company or its Subsidiaries necessary to enable operation of its business as now being conducted and as currently contemplated to be conducted.

(d)     Neither the execution and delivery of this Agreement nor the consummation of Contemplated Transactions will conflict with, alter or impair, the validity, enforceability, use or right to use by Purchaser or its Affiliates, ownership, priority, duration, scope or effectiveness of any such Seller Intellectual Property Assets, result in any Third Party being granted rights of access to , use of, or the placement in or release from escrow of, or otherwise trigger any additional payment obligations with respect to any Seller Business Intellectual Property Assets.

(e)     <u>Section 3.21(e)(i)</u> of the Disclosure Schedule identifies each Contract pursuant to which any Licensed Intellectual Property Asset is or has been licensed, sublicensed, sold, assigned, or otherwise conveyed or provided to the Company. <u>Section 3.21(e)(ii)</u> of the Disclosure Schedule lists each Contract containing any license, sublicense, permissions or covenant not to sue relating to any Seller Intellectual Property Assets, which the Company or any Subsidiary has granted or agreed to grant (by way of an option or other commitment), excluding (A) non-disclosure agreements, but only if the licenses, sublicenses, permissions and covenants not to sue specified therein are limited to non-commercial rights, and (B) implied licenses granted as the result of commercial sales of Products.

(f)     To the Knowledge of the Company, there is not as of the date hereof, and has not been during the past five (5) years, any infringement (including inducing, contributory or vicarious infringement), misappropriation, dilution or unauthorized use or disclosure by the Company or any Subsidiary or any predecessor of any Third Party's Intellectual Property relating to the Purchased Assets. To the Company's Knowledge, no Person has asserted any claim in writing regarding the use of, or challenging or questioning the Company's or any Subsidiary's right or title in, any of the Purchased Intellectual Property Assets or alleging infringement or misappropriation of any Seller Intellectual Property Assets. The Company has never assumed, or agreed to discharge or otherwise take responsibility for, any existing or

27.

potential liability of another Person for infringement, misappropriation or violation of any Intellectual Property.

(g) To the Company's Knowledge, no Person has infringed or misappropriated, and no Person is currently infringing or misappropriating any Seller Intellectual Property Assets. The Company has not notified any Person of any actual or suspected infringement or misappropriation of any Seller Intellectual Property Assets.

(h) All STB Employees, STB Former Employees, STB Service Providers, current and former directors, members, independent contractors and consultants of the Company or a Subsidiary: (i) are a party to a "work-for-hire" and/or other agreements with the Company or a Subsidiary that has accorded the Company or a Subsidiary full, effective, exclusive and original ownership of all Purchased Intellectual Property Assets arising or relating to their respective work, services and/or relationship with or for Company or a Subsidiary; or (ii) have executed appropriate instruments of assignment in favor of the Company or a Subsidiary as assignee that have conveyed to the Company or a Subsidiary effective and exclusive ownership of all Seller Intellectual Property Assets arising or relating to their respective work, services and/or relationship with or for Company or a Subsidiary other than non-assignable rights and statutory revisionary rights. No STB Employee, STB Former Service Provider, or STB Service Provider has disclosed any prior inventions in any of such confidentiality and assignment of invention agreements.

(i) Section 3.21(i) of the Disclosure Schedule contains a complete and accurate list of all Seller Software identifying the owner of the Software and the identity of both the licensor and licensee of any such Software, if owned by a Third Party. Except as specified in Section 3.21(ii) of the Disclosure Schedule, the Company or a Subsidiary is in actual and sole possession of the complete source code of the Seller Software. To the Knowledge of the Company, except as set forth Section 3.21(iii) of the Disclosure Schedule, there are no material defects in the Seller Software currently used or held for use by the Company or any Subsidiary and there are no material errors in any design documentation relating to the Seller Business Software.

(j) The source code for all Seller Software contains customary annotations and programmer's comments, and otherwise has been documented in a professional manner that is both: (i) consistent with customary code annotation conventions and best practices in the software industry; and (ii) sufficient to independently enable a sufficiently proficient programmer of reasonable skill, training, experience and competence to understand, analyze, and interpret program logic, correct errors and improve, enhance, modify and support the STB Business Software.

(k) Except as disclosed in Section 3.21(k) of the Disclosure Schedule, no Product contains, is derived from, is distributed with, or is being or was developed using Open Source Code that is licensed under any terms that (i) impose or could impose a requirement or condition that any Product or part thereof (A) be disclosed or distributed in source code form, (B) be licensed for the purpose of making modifications or derivative works, or (C) be redistributable at no charge, or (ii) otherwise impose or could impose any other material

28.

limitation, restriction, or condition on the right or ability of the Purchaser or its Subsidiaries to use or distribute any Product.

(l)     The Company and each Subsidiary has taken all reasonable steps to safeguard the information technology systems utilized in the Seller Software, including the implementation of procedures to ensure that such systems are free from disabling codes or instructions, time, copy protection device, clock, counter or other limiting design or routing and any "back door," "time bomb," "Trojan horse," "worm," "drop dead device," "virus" or other software or hardware that permit unauthorized access or the unauthorized disablement or erasure of data or other software by a Third Party.  To date, to the Knowledge of the Company, there have been no successful unauthorized intrusions or breaches of the security of such systems.

(m)     Except as set forth in Section 3.21(m) of the Disclosure Schedule, neither the Company nor any Subsidiary is or has ever been a member or promoter of, or a contributor to, any industry standards body or similar organization that requires or obligates the Company or any Subsidiary to grant or offer to any other Person any license or right to any Seller Intellectual Property Asset.

Section 3.22   Taxes.

(a)     Except as set forth in Section 3.22(a) of the Disclosure Schedule, the Company (with respect to income Taxes) has timely filed all income Tax Returns and other material Tax Returns that it was required to file.  All such Tax Returns were complete, accurate and prepared in compliance with all applicable Laws.  All Taxes payable by the Company (with respect to income Taxes), whether or not shown on any Tax Return, have been paid in full.  The Company (with respect to income Taxes) currently is not the beneficiary of any extension of time within which to file any Tax Return, other than an extension which is granted automatically under applicable Law.  No claim has ever been made by an authority in a jurisdiction where the Company (with respect to income Taxes) does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction.  There are no Encumbrances (other than Permitted Encumbrances) on any Purchased Assets that arose in connection with any failure or alleged failure to pay any Tax.

(b)     There is no presently outstanding dispute or claim concerning any Liability for Taxes of the Company or otherwise on account of the STB Business claimed or raised by any Governmental Authority.  Except as set forth in Section 3.21(b) of the Disclosure Schedule, there is no pending or, to the Knowledge of the Company, threatened or anticipated audits or other investigations in respect of Taxes of the Company or otherwise on account of the STB Business.

(c)     The Company (with respect to income Taxes) has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, which waiver or extension remains currently in effect.

(d)     The Company has not (i) ever been a member of an "affiliated group" within the meaning of Code § 1504(a) Law filing a consolidated federal income Tax Return or any similar group for any foreign, state or local income Tax purpose (other than a group of which

29.

the Company was the common parent) or (ii) has any liability for Taxes of any Person under Reg. § 1.1502-6 or any similar Law or as a transferee or successor, by operation of law, contract or otherwise.

(e)    The Company is not a party to any Tax allocation or sharing Contract.

(f)    Neither the Company nor any Subsidiary has been a United States real property holding corporation within the meaning of Code § 897(c)(2) during the applicable period specified in Code § 897(c)(1)(A)(ii).

**Section 3.23  Litigation.**  Except for the Chapter 11 Case and the Cayman Insolvency Case, neither the Company nor any Subsidiary is a party to or bound by any Order (or any agreement entered into in any administrative, judicial or arbitration proceeding with any Third Party or governmental or other authority) with respect to the Purchased Assets or the STB Business. Section 3.23 of the Disclosure Schedule contains a complete and accurate list of each action, suit, proceeding, hearing, or investigation of, in, or before (or that there is a Basis on which it could come before) any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before (or that could come before) any arbitrator, (i) against the Company, any Subsidiary or any of their respective directors, officers and stockholders that is related to the STB Business, (ii) with respect to or affecting (a) the Purchased Assets or Assumed Liabilities or (b) the operations, assets, business or financial condition of the STB Business, or (iii) related to the consummation of Contemplated Transactions. No notice, citation, inquiry or complaint is pending against or, to the Knowledge of Company, threatened against the Company or any Subsidiary alleging any violation of or material Liability under any Environmental Law or Environmental Permit with respect to the STB Business.

**Section 3.24  Compliance with Laws.**

(a)    Neither the Company nor any Subsidiary is, or during the past three years, has been in violation of, delinquent under or being investigated for violation of any Law, Order or Permit (a) relating to the STB Business or the Purchased Assets or Assumed Liabilities or (b) to which the any of the Purchased Assets, personnel of the STB Business, business activities relating to the STB Business or Leased Real Estate are subject and neither the Company nor any Subsidiary has received any notices of such violations, delinquency or investigations. The Company and each Subsidiary have complied at all times and in all material respects with all of the Company Privacy Policies and with all applicable Law pertaining to privacy, User Data, or Personal Data.

(b)    The conduct of the STB Business have at all times conducted, their export transactions in accordance with all applicable U.S. export and re export controls, including the United States Export Administration Act and Export Administration Regulations, the International Traffic in Arms Regulations, and Foreign Assets Control Regulations, other U.S. economic sanction requirements and customs regulations and all other applicable import/export controls in other countries in which the Company and Subsidiaries conduct STB Business, including obtaining all Export Approvals (ii) the Company and the Subsidiaries are in compliance with the terms of all applicable Export Approvals, (iii) there are no pending or, to the

30.