This is the Exhibit shown to me and marked "Exhibit 4" to the Affidavit of Colin Douglas McKie

Sworn before me this 20th day of January 2012.



Notary Public

**Before me, Chandra A Ebanks, a Notary Public**
**in and for the Cayman Islands**

this 20th day of January 2012

(My commission expires on 31st January 2012)

## INDEX TO EXHIBIT 4 TO AFFIDAVIT OF
## COLIN DOUGLAS MCKIE

| DOCUMENT | PAGE NO. |
|---|---|
| *Attorney General of the Cayman Islands v Euro Bank Corp.* [2002] CILR 334 | 1-20 |
| *Ebanks v United Kingdom* [2010] 1 CILR 200 (ECHR) | 21-52 |
| *Ebanks v R* [2006] CILR 198 (PC) | 53-76 |
| *Re Fruit of the Loom* [2000] CILR N-7 | 77 |
| *Re Legend International Resorts Limited* [2006] HKCA 74 | 78-98 |
| *Re China Milk Products Group Limited* (Grand Court, Unreported, 22 July 2011) | 99-110 |
| *In Re XL Capital Ltd.* [2010] (1) CILR 52 | 111-118 |
| *Re British Aviation Insurance Co* [2006] 1 BCLC 665 | 119-156 |

[2002 CILR 334]

## ATTORNEY GENERAL v. EURO BANK CORPORATION, EVANS and ROBB EVANS AND ASSOCIATES

COURT OF APPEAL (Zacca, P., Collett and Rowe, JJ.A.): July 15th, 2002

*Companies—winding up under court's supervision—proceedings against company—court's leave under Companies Law (2000 Revision), s.101 required to bring civil proceedings against company in compulsory or supervised voluntary winding up*

*Companies—winding up under court's supervision—proceedings against company—no leave required to prosecute company in compulsory or supervised voluntary winding up—Companies Law (2000 Revision), s.101 invalid in respect of criminal proceedings, since conflicts with Attorney General's right to prosecute without restriction under Constitution, s.16A(1)(a) and (5)—court's inherent power to control own process unaffected*

*Criminal Procedure—proceeds of criminal conduct—confiscation order—for purposes of Proceeds of Criminal Conduct Law (2000 Revision), s.5(3), bank charged with money laundering benefits from deposited funds as owner of property—benefit (liable to confiscation as realisable property) is value of all funds remaining, not merely profit made*

*Criminal Procedure—proceeds of criminal conduct—restraint order— discharge—no discharge under Proceeds of Criminal Conduct Law (2000 Revision), s.17(2) if liquidators' distribution of property to legitimate creditors not inhibited—if no known creditor with direct claim against holder of property (besides perpetrators of offences by which property obtained), no conflict between restraint order and liquidators' functions*

The liquidators of a bank applied for the court's approval of a deed of release and assignment, to allow for the discharge of a restraint order against the bank. In separate proceedings, they sought a ruling on whether the Attorney General was required to obtain leave under s.101 of the Companies Law (2000 Revision) to bring criminal charges against the bank, which was being wound up under the supervision of the court.

In November 2000, under the Proceeds of Criminal Conduct Law, s.10, a restraint order was made against the bank's liquidators, relating to

various accounts held with the bank, including one in the names of T and his wife, the alleged perpetrators of a large-scale US credit card fraud. The bank was subsequently charged with money-laundering offences. T was convicted of fraud-related offences in the United States and a receiver was appointed over his assets and those of companies in his control.

The liquidators applied to the court for a ruling on whether the Attorney General required leave to institute the criminal proceedings against the bank, whether such leave should be granted and what, if any, conditions should be attached.

T's receiver later applied for the variation or discharge of the restraint order as a corollary to the liquidators' application for approval of a proposed deed of release and assignment, requiring them to admit to proof his claims on behalf of victims of the fraud. Payments could then be made to him by the liquidators to compensate those victims pursuant to an order of the US court. The Crown also asserted a claim to the funds in the account on the basis that they would be subject to confiscation, as the proceeds of crime from which the bank had benefited, if it were convicted in future.

The Grand Court held that the Attorney General required the court's leave to institute proceedings against the bank. Under s.154 of the Companies Law the need to obtain leave applied equally to a company in voluntary liquidation under the court's supervision as to one in compulsory liquidation. Section 101, by analogy with similar legislation construed in English case law, applied to criminal as well as civil proceedings. It was not incompatible with the Attorney General's power under s.16A(1)(a) and (5) of the Constitution to institute and undertake criminal proceedings free of the direction or control of others. That section of the Constitution (introduced in 1993) preserved his independence from political or other extraneous interference, but did not preclude the court's intervention under its inherent or statutory jurisdiction (preserved by s.49H) to control its own process. For the same reason, s.101 was not invalidated under s.2 of the Colonial Laws Validity Act 1865 as being repugnant to the Constitution. The proceedings in the Grand Court are reported at 2001 CILR 156.

In separate proceedings, the court held, as a preliminary point, that for the purposes of s.5(3), the bank had "benefited" from its own money-laundering offences to the value of all the funds remaining in the account, and not just the profit it had made from handling the account. However, the restraint order should not have been made, since s.17(2) of the Proceeds of Criminal Conduct Law prevented the court from making such an order in relation to realisable property held by a company already in liquidation. The funds in the account formed part of the liquidation estate in respect of which the liquidator exercised its functions. The order was discharged. The proceedings are reported at 2001 CILR 405. The proceedings were consolidated on appeal.

On appeal, the Attorney General submitted that (a) s.101 did not apply to the bank, since companies in voluntary liquidation were dealt with by

335

separate sections of the Law; (b) the court's power to grant or refuse leave to institute proceedings did not apply to criminal proceedings, since the words "suit" and "action" in s.101 referred to civil proceedings, and "other proceedings" should be construed *ejusdem generis* with them; (c) under s.57(2) of the Constitution, s.101 should be construed as subject to the Attorney General's exclusive constitutional powers to institute criminal proceedings free of the direction or control of others; (d) alternatively, the section was void and inoperative under s.2 of the Colonial Laws Validity Act, as being repugnant to the Constitution; (e) for the purposes of s.5(3), the bank had benefited from all the funds in the restrained account as realisable property obtained from its alleged money-laundering offences, which was therefore liable to confiscation; and (f) s.17(2) of the Law should be construed purposively, so as to avoid creating a loophole by which the liquidators could apply the funds for the benefit of the bank's creditors (including, in theory, the perpetrators of the fraud), rather than compensating the victims of the offences charged.

The liquidators submitted in reply that (a) under s.154 of the Companies Law, the order that the bank's winding up should continue under supervision conferred on the court power under s.101 to grant or refuse leave to institute proceedings, since that was the construction placed by English case law on parallel legislation formerly in force there; (b) in the absence of an express limitation, the words "other proceedings" in s.101 were to be broadly construed to cover proceedings of all kinds, including criminal proceedings; (c) the court's power under s.101 was compatible with the Attorney General's constitutional right to institute criminal proceedings, since s.16A(5) did not preclude intervention by the courts, and in any event, s.49H preserved the Grand Court's existing statutory jurisdiction under, *e.g.* the Companies Law, s.101 and the Grand Court Law, s.11; (d) the bank had not, in fact, "benefited" from the offence for the purposes of s.5(3) to the extent of the funds formerly restrained, since it was entitled only to the interest from the account and its own fees and charges, and not to the funds themselves; (e) the order had properly been discharged as invalid under s.17(2), since it would inhibit them from exercising their function of distributing the bank's property to its legitimate creditors; and (f) they could not apply the funds in the account to repay creditors who were in fact the perpetrators of fraud, since they were not permitted to admit such claims to proof.

**Held,** allowing the appeals:

(1) It was clear from the provisions of ss. 151 and 154 of the Companies Law that the powers of the court applicable to a company in compulsory liquidation were also conferred on the court in respect of a company in voluntary liquidation continuing under its supervision. Accordingly, the court had power under it to grant or refuse leave to institute proceedings against such a company (paras. 7–9).

336

3

(2) Furthermore, subject to its constitutional validity, s.101 applied to both criminal and civil proceedings. The court would not interfere with the reasoning of the Chief Justice in the court below, based on developments in English case law dealing with parallel or similar legislation, and on the public policy interest in requiring leave to prosecute a company in supervised liquidation (para. 17).

(3) However, the Grand Court had erred in finding that the power to grant or refuse leave to prosecute was not overridden by, or invalid as being repugnant to, the Attorney General's unfettered power to prosecute under s.16A(1)(a) and (5) of the Constitution (as amended in 1993). Section 57(2) of the Constitution required that existing laws of the Cayman Islands, such as s.101, should be construed with the necessary modifications to bring them into conformity with the Constitution. Section 16A took precedence over other Laws, and could not be reconciled with s.101 by reference to s.49H of the Constitution. Whilst that section preserved the jurisdiction and powers vested in the court by "any other law," it did not elevate either the Companies Law, s.101 or the Grand Court Law, s.11 to the status of constitutional law. Both were subject to s.16A. Nor could the reference in s.16A(5) to interference by "any other person or authority" properly be construed to exclude control by the courts. Not only was such control within the ordinary and natural meaning of those words, but if it were permitted under s.16A, the legislature would be free to fetter the Attorney General's discretion to initiate criminal proceedings in any number of ways. The court's inherent power to control its own process to prevent abuse was unaffected (paras. 20–21; paras. 25–32; para. 35).

(4) Accordingly, the Attorney General had not required leave to prosecute the bank, and the conditions subsequently imposed by the court when granting leave were invalid (para. 24; para. 36).

(5) The bank had benefited from its alleged offences to the full extent of the funds restrained, since the meaning of "benefit," for the purposes of s.5(3) of the Proceeds of Criminal Conduct Law, was not confined to the profit it had obtained thereby. The proceeds of the fraud paid into the account had become the bank's property, the depositors having only a contractual right to recover an equivalent amount. Accordingly, the whole amount so obtained was to be regarded as realisable property obtained as a result of or in connection with the bank's alleged money-laundering offences, and was liable to confiscation. The court was satisfied that this wider construction, approved by the Chief Justice on the basis of English authority, was correct (paras. 53–56).

(6) The restraint order should not have been discharged under s.17(2)(a) of the Proceeds of Criminal Conduct Law, since it did not inhibit the liquidators from exercising their functions of distributing the

337

4

company's property to its creditors. Under the principle *ex turpi causa non oritur actio*, persons whose claims were based upon their involvement in fraud or any other offence were not legitimate creditors to whom distribution could be made. Moreover, the receiver was not a creditor either, since his claim to the funds in the account was primarily against T for misappropriation, and only if that claim succeeded could he bring a tracing claim against the bank. Accordingly, in relation to this account, there were no lawful creditors in respect of whom the liquidators could exercise the powers contemplated by s.17(2)(a), and the discharge of the restraint order had been unjustified. The funds would remain under restraint until the conclusion of the criminal proceedings against the bank and would be available to meet a confiscation order or compensation order (paras. 47–52).

**Cases cited:**
(1) *Aro Co. Ltd., In re*, [1980] Ch. 196; [1980] 1 All E.R. 1067, referred to.
(2) *Briton Medical & Gen. Life Assur. Assn., In re* (1886), 32 Ch. D. 503; 55 L.J. Ch. 416, considered.
(3) *Brooks* v. *D.P.P.*, [1994] 1 A.C. 568; [1994] 2 All E.R. 231; (1994), 44 W.I.R. 332, explained.
(4) *Burrows (J.) (Leeds) Ltd., In re*, [1982] 1 W.L.R. 1177; [1982] 2 All E.R. 882, followed.
(5) *Connelly* v. *D.P.P.*, [1964] A.C. 1254; [1964] 2 All E.R. 401, referred to.
(6) *K., In re*, [1990] T.L.R. 629, followed.
(7) *Metcalfe, In re*, English Court of Appeal, Crim. App. No. 199905420/24, May 18th, 2001, unreported, followed.
(8) *R.* v. *Dickson*, [1991] BCC 719; (1991), 94 Cr. App. R. 7, followed.
(9) *Rhondda Waste Disposal Ltd., In re*, [2001] Ch. 57; *sub nom. Environment Agency* v. *Clark (Admor. of Rhondda Waste Disposal Ltd.)*, [2000] BCC 653, followed.

**Legislation construed:**
Companies Law (2000 Revision) (Laws of the Cayman Islands, 1963, *cap.* 22, revised 2000), s.101: The relevant terms of this section are set out at para. 10.
s.151: The relevant terms of this section are set out at para. 7.
s.154: The relevant terms of this section are set out at para. 7.

Grand Court Law (1995 Revision) (Law 8 of 1975, revised 1995), s.11: The relevant terms of this section are set out at para. 25.

Proceeds of Criminal Conduct Law (2000 Revision) (Law 15 of 1996, revised 2000), s.5(3): The relevant terms of this sub-section are set out at para. 40.
s.17(1)(a): The relevant terms of this paragraph are set out at para. 41.
    (2): The relevant terms of this sub-section are set out at para. 41.

338

Cayman Islands (Constitution) Order 1972 (S.I. 1972/1101), Schedule 2, s.16A(1)(a), as added by the Cayman Islands (Constitution) (Amendment) Order 1993 (S.I. 1993/3143), s.5: The relevant terms of this paragraph are set out at para. 21.

s.16A(2): The relevant terms of this sub-section are set out at para. 21.

  (5): The relevant terms of this sub-section are set out at para. 21.

s.49H(1), as added by the Cayman Islands (Constitution) (Amendment) Order 1993 (S.I. 1993/3143), s.22: The relevant terms of this sub-section are set out at para. 25.

s.57(2): The relevant terms of this sub-section are set out at para. 20.

  (4): "In this section the expression 'existing laws' means laws and instruments (other than Acts of Parliament of the United Kingdom and instruments made thereunder) having effect as part of the law of the Islands before the appointed day."

Colonial Laws Validity Act 1865 (28 & 29 Vict., c.63), s.2:

  "Any colonial law which is or shall be in any respect repugnant to the provisions of any Act of Parliament extending to the colony to which such law may relate, or repugnant to any order or regulation made under authority of such Act of Parliament . . . shall be read subject to such Act, order, or regulation, and shall, to the extent of such repugnancy, but not otherwise, be and remain absolutely void and inoperative."

*D.F. Ballantyne*, Attorney General, *A.R. Mitchell*, *Q.C.*, and *K. Talbot* for the appellant;

*A. Malek*, *Q.C.* and *C.D. McKie* for the liquidators;

*R.D. Alberga*, *Q.C.*, *G.F. Ritchie* and *Mrs. R.C. Whittaker-Myles* for the receiver.

1   **COLLETT, J.A.**, delivering the judgment of the court: These consolidated appeals are brought by the Attorney General of the Cayman Islands against three separate rulings of the Grand Court (Smellie, C.J.), respectively given on April 4th, 2001, September 24th, 2001 and October 22nd, 2001. The background to the issues canvassed in these appeals covers the period 1998–2001 and has been encapsulated in a joint statement of facts agreed by all parties and handed in at the hearing.

2   Essentially, the first issue for determination here is whether or not the learned Chief Justice was correct to hold, in his April 4th ruling, that the appellant was obliged to seek the leave of the Grand Court for the institution of criminal proceedings against a company already in liquidation under the supervision of the court, pursuant to s.101 of the Companies Law (2000 Revision), or whether, in reliance upon s.16A of the Constitution, he was entitled to institute and undertake such proceedings without any such leave. The learned Chief Justice held that leave was indeed required.

339

6

3   Secondary issues, dependent upon the resolution of the first, are whether, if he was correct in so holding, (i) he was also correct in granting leave to impose specific conditions in relation to the prosecution and its conduct, and (ii) the conditions so imposed are reasonable in all the relevant circumstances.

4   There is a third, and entirely discrete, issue between the appellant and the second respondent in regard to the discharge of a restraint order made pursuant to the Proceeds of Criminal Conduct Law ("the PCCL") in relation to an account in the name of Kenneth Taves at the bank. This account contains moneys alleged to have been fraudulently obtained by him and placed in that account as an act of money laundering, with the complicity of the bank and of some of its former officers. The receiver represents the interest of victims of the fraud. This issue will involve a detached examination of the terms and purposes of the PCCL and, in particular, of s.17 thereof. The order of discharge which is now appealed against was made as part of the October 22nd ruling of the Chief Justice.

5   Mr. Malek, Q.C., in his skeleton submissions on behalf of the first respondent, has helpfully identified three separate sub-issues in relation to the question of leave:

    (a) Whether s.154 of the Companies Law makes s.101 of that Law applicable to the winding up of the bank under the supervision of the court.

    (b) Whether, if s.101 applies, it extends to criminal proceedings.

    (c) Whether, if so, that conclusion offends against s.16A of the Constitution.

Each of these points was addressed by the learned Chief Justice in his April 4th ruling and each now needs to be considered in turn.

6   The learned Attorney General submits that s.101 of the Companies Law applies only to companies being wound up compulsorily by order of the court, and not to those in voluntary liquidation under the court's supervision, as is the bank in this case. Voluntary liquidations are dealt with in a separate set of sections of the Law. Mr. Malek, on the other hand, demonstrates that the genesis of this section was s.87 of the English Companies Act 1862 and that s.154 of the Cayman Companies Law is in almost identical terms to s.151 of that Act. Thus, he submits that although supervised liquidations no longer form part of English company law, the contemporary authorities from that jurisdiction ought to be applied in these Islands, and that they predominantly favour the view that s.101 applies.

7   The Chief Justice found in favour of the first respondent on this point. His reasons are set out in his ruling (2002 CILR 156, at paras. 5–15),

C.A.                    ATT. GEN. v. EURO BANK CORP. (Collett, J.A.)

where he drew attention to, *inter alia*, the wording of ss. 151 and 154 of
the Companies Law. Section 151 provides that a petition for a supervised
voluntary winding up "shall, for the purpose of giving jurisdiction to the
Court over suits and actions, be deemed to be a petition for winding up
the company by the Court." Section 154, while preserving the authority
of the original liquidators appointed by resolution of the company,
provides that any order made by the court shall "for all purposes
(including the staying of actions, suits and other proceedings) be deemed
to be an order of the Court for winding up the company by the Court . . ."

8   The text books on English company law, including *Palmer's
Company Law*, 24th ed. (1987) and *Gore-Brown on Companies*, 44th ed.,
Supplement 24 (1986), all regard the rules applicable to compulsory
winding up as applicable also to supervised winding up and the views
there expressed are fortified by the observation of Brightman, L.J., in *In
re Aro Co. Ltd.* (1) ([1980] Ch. at 204).

9   No authority was cited in support of the Attorney General's argument
to the contrary. Both for that reason and on account of the plain wording
of the relevant sections just quoted, it appears to us that the learned Chief
Justice was clearly correct in holding that s.151 is applicable to the
winding up of the respondent bank.

10   The next point requiring consideration is whether or not s.101
includes criminal as well as civil proceedings. The section provides as
follows:

   "When an order has been made for winding up a company *no suit,
   action or other proceeding* shall be proceeded with or commenced
   against the company except with the leave of the Court and subject
   to such terms as the Court may impose." [Emphasis supplied.]

11   The learned Attorney General submits that this phrase ought to be
construed *ejusdem generis*; the *genus* being constituted by the words
"suit" and "action" (both of which refer to civil proceedings only), so that
the words "other proceedings" should be confined to civil proceedings
only. Mr. Malek, however, contends that "other proceedings" is a phrase
apt in its ordinary meaning to comprise proceedings of every description,
including criminal.

12   The context of the Law itself does not disclose any definite priorities
as to which of these contending interpretations ought to prevail. Section
109 draws a clear distinction between civil and criminal proceedings that
is absent in s.101. It is also suggested that the logic of compulsory
liquidation situations requires that all kinds of proceedings against the
company should be stayed unless leave is specifically granted in the
interest of protecting the available assets in the liquidator's hands for
orderly distribution *pari passu* to creditors in due course.

341

8

13   The learned Chief Justice dealt with this question in his ruling (2001 CILR 156, at paras. 16–32) and there exhaustively reviewed the English authorities which are relevant to it. It is correct to say that none of them is precisely on point. The first in time, *In re Briton Medical & Gen. Life Assur. Assn.* (2), concerned an attempt by a private prosecutor to recover statutory penalties against an association in liquidation. Kay, J. refused leave to institute such proceedings, which he described as quasi-criminal in nature, on account of the embarrassment which they would tend to cause to the orderly winding up of the association. However, the learned judge left open the question of whether or not the court would have power to restrain the Attorney General from instituting a public prosecution against it, and in an *obiter dictum*, seemed to suggest that it might not.

14   The question was next considered by Slade, J. in *In re J. Burrows (Leeds) Ltd.* (4), where a company in liquidation was prosecuted for failure to pay Social Security contributions. While refusing to stay the proceedings, the learned judge endorsed the concession made by counsel for the prosecution there that criminal proceedings were indeed comprised within the term "proceedings" used in the relevant English legislation.

15   Subsequently, in *R. v. Dickson* (8), the English Court of Appeal endorsed these comments of Slade, J., whilst holding that leave was indeed required for the institution of criminal proceedings against a company in liquidation, pursuant to s.130(2) of the Insolvency Act 1986. The relevant wording of that sub-section, however, is "no action or proceeding," which is insufficient on its face to constitute a *genus* restricted to civil proceedings, and therefore the inclusion of criminal proceedings within the ordinary meaning of the words used is clearly indicated as a matter of construction. This case also is not conclusive as to the proper interpretation of s.101.

16   The final authority relied upon by the learned Chief Justice in reaching his conclusion on the point was *In re Rhondda Waste Disposal Ltd.* (9), where the English Court of Appeal had to construe the words "no proceedings and no execution or other legal process may be commenced or continued . . . against the company or its property," as used in ss. 10 and 11 of the Insolvency Act 1986. Rejecting the submission that these words should be construed *ejusdem generis*, the court went on to hold that criminal proceedings were encompassed in the natural meaning of that provision, with the result that the prosecution under consideration in that case could not proceed without leave.

17   Having considered the trend of authority disclosed in an examination of the cases cited, as well as the public policy aspects of the question whether criminal proceedings ought reasonably to be comprised within the ambit of s.101 so as to require the grant of leave for prosecutions of

companies in compulsory or supervised liquidations, the learned Chief Justice held in favour of the liquidators on this point. Having carefully examined his reasons in the light of the full argument addressed to us by both counsel at the hearing of this appeal, we have concluded that he was correct in his determination that s.101 does indeed encompass criminal proceedings and that, where the section is applicable, its provisions apply (or before 1993 applied) to any prosecution so as to require leave to be obtained and to empower the court to impose terms upon the prosecutor.

18   The third sub-issue in relation to the question of leave is based upon the bold proposition, advanced by the learned Attorney General, to the effect that s.101, construed, as we have held, as encompassing criminal prosecutions of companies in compulsory liquidation, is now repugnant to s.16A of the Constitution in so far as it requires the Attorney General to seek leave to institute or undertake such a prosecution. The argument so advanced has two complementary limbs—the first based upon the internal machinery of the Constitution itself; the second upon the Colonial Laws Validity Act 1865 of the United Kingdom.

19   The Cayman Islands, as is well known, enjoys the international law status of an autonomous, but still dependent, territory of the United Kingdom. As such, it does not yet itself enjoy the status of sovereignty but is subject to the sovereignty of Her Majesty the Queen in Parliament, the sovereign entity of the United Kingdom. The emanation of that sovereignty, in so far as these Islands are concerned, is contained in the Cayman Islands (Constitution) Order 1972, made by Her Majesty in Council pursuant to powers conferred by the West Indies Act 1962 of the UK Parliament. The Constitution was annexed to that Order and came into force upon the dissolution of the Legislative Assembly next following August 22nd, 1972. The Constitution has been subsequently amended, in particular by a further Order in Council in 1993 which contained a new s.16A, the foundation of the appellant's present arguments.

20   It is to be noted that s.101 of the present Companies Law (2001 Second Revision) was first introduced into Cayman law in 1964 by an enactment of the local legislature. It is therefore part of the "existing laws" of the Islands as defined in s.57(4) of the Constitution. Section 57(2) provides that—

> "subject to the provisions of the next following subsection, the existing laws shall on and after the appointed day [for coming into force of the Constitution] be construed with such modifications, adaptations, qualifications and exceptions as are necessary to bring them into conformity with the Constitution."

21   Section 16A, in force as part of the Constitution since the 1993 amendment, reads, in so far as is relevant, as follows:

"(1) The Attorney-General shall have power in any case in which he considers it desirable so to do—

    (a)  to institute and undertake criminal proceedings against any person before any court in respect of any offence against any law in force in the Islands . . .

(2) The powers conferred upon the Attorney-General under subsection (1) of this section may be exercised by him in person or by officers subordinate to him acting under and in accordance with his general or special instructions.

    . . .

(5) In the exercise of the powers conferred on him by this section . . . the Attorney-General shall not be subject to the direction or control of any other person or authority."

22  It is the case for the appellant that the provisions of sub-s. (1)(a), read with those of sub-s. (5) of s.16A, empower him to proceed with a prosecution of Euro Bank for offences of money laundering without the necessity for him to seek the leave of the court under s.101 of the Companies Law, notwithstanding that the bank has been, at the relevant times, in liquidation under the court's supervision. He further submits that it is necessary for s.101 to be construed, in order to bring it into conformity with s.16A of the Constitution, as subject to an exception in favour of any criminal proceedings which he considers it necessary to bring against any company, notwithstanding that it is in compulsory or supervised liquidation.

23  As an alternative but parallel submission, he contends that, in so far as s.101 purports to require him to seek leave, its provisions are void and inoperative as being repugnant to an Order made under an Act of Parliament—namely, the Cayman Islands (Constitution) Order 1972, as amended in 1993—pursuant to s.2 of the Colonial Laws Validity Act 1865.

24  As the learned Chief Justice acknowledged in his ruling, acceptance of either of these alternative contentions would leave the Attorney General free to prosecute the bank without seeking the leave of the court. It would also follow that the imposition of any conditions limiting the ambit of his discretion to prosecute the bank would be made without jurisdiction and that the purported exercise of the court's discretion to impose such conditions would necessarily lack any legal force.

25  The Chief Justice, however, sought in his ruling to escape from the conclusion logically stemming from the apparent clash of these provisions by pointing to a further amendment of the Constitution contained in the 1993 amending Order. This was the introduction of a

344

new s.49H, sub-s. (1) of which redefines the jurisdiction and powers of the Grand Court as follows: "There shall be a Grand Court for the Cayman Islands which shall be a superior Court of Record and shall have such jurisdiction and powers as may be conferred upon it by this Constitution or any other law." Attention was also drawn in his ruling to the provisions of s.11 of the Grand Court Law which invest the Grand Court with—

"the like jurisdiction which is vested in or capable of being exercised in England by—

(a)  Her Majesty's High Court of Justice; and

(b)  the Divisional Courts of that Court . . ."

26   The ruling proceeded to suggest that the solution to the apparent conflict might not simply be to regard the s.16A powers vested in the Attorney General as taking precedence, but instead as requiring an interpretation which would lead to a reconciliation of the apparent conflict between them.

27   With the greatest respect, this view of the conflict seems to ignore the status of s.16A as a specific provision of the Constitution itself, relative to that of the other provisions as Laws of the subordinate legislature of the Islands. The reference in s.49H to jurisdiction and powers vested in the court by "any other law" cannot reasonably be construed as conferring Constitutional status or force upon any provision of the local legislature which is seen to be in conflict with any other specific provision of the Constitution itself. Inevitably, such provisions of local Laws, including s.101 of the Companies Law and s.11 of the Grand Court Law, enjoy the force of a Law of the local legislature only and cannot be elevated by a mere reference to "any other law" in s.49H to constitutional status. If in actual conflict with a provision of the Constitution itself, such as s.16A, these local provisions are bound to give way to the extent of the conflict disclosed.

28   When, therefore, in his April ruling (2001 CILR 156, at para. 53), the learned Chief Justice concludes that the powers contained in the cited local laws "are shown to be elevated to the same constitutional validity as are the powers given in s.16A," we are unable to agree. They are not so shown, for the reasons just advanced, and the apparent conflict does not disappear.

29   The only way in which it could be made to disappear is if the phrase "any other person or authority" in s.16A(5) could legitimately be construed as not including a court of law or any judge thereof. Mr. Malek has sought to make good this construction of s.16A(5), despite its apparent departure from the basic rule of construction that words used in

345

a statute should be given their ordinary and natural meaning. First, he argues that the clear intention of s.16A is to shield the Attorney General in the exercise of those powers from improper political influence and not from the control of the courts.

30   It does not seem to me, however, that this laudable intention can be fully achieved if the construction for which he contends is, indeed, correct. It would leave a legislature predominantly controlled by local politicians who would be free, by passing local legislation, to circumscribe the discretion to institute criminal proceedings by requiring the leave of the court in any number of unnecessary and undesirable ways. That possibility, far-fetched though it might appear, would always remain open if his argument were correct.

31   Secondly, counsel sought to rely upon judicial authority. It is not in dispute that nothing in s.16A purports to better the long-established power of the Grand Court to control its own proceedings for the purpose of preventing an abuse of its process and ensuring a fair trial: see *Connelly* v. *D.P.P.* (5). In *Brooks* v. *D.P.P.* (3), Lord Woolf, in delivering the opinion of the Board, made reference to s.94(6) of the Jamaica Constitution, which is in substantially similar terms to s.16A(5) here. He stated ([1994] 2 All E.R. at 238):

> "Section 94(6) does not refer to a court because its primary purpose is to protect the DPP from the type of objectionable political interference referred to in the passage . . . already cited. It is not intended to apply to judicial control of the proceedings."

32   No issue can be taken with this observation of the learned Law Lord if its purport is confined to a further vindication of the court's inherent power to control its own process so as to prevent abuse. It does not, taken in its context, seek to extend that power to the fettering of the powers vested in the Jamaican D.P.P. under s.94. *Brooks's case* (3) was in fact concerned with the question whether the D.P.P. could validly seek leave of a High Court Judge to prefer a voluntary bill of indictment in a case where an examining magistrate had refused to commit the defendant for trial after a preliminary inquiry—this despite the existence of a parallel power in the D.P.P. to prefer one without such leave. It was held that it was proper for him to do so. Significantly, Lord Woolf remarked (*ibid.*, at 238–239): "It is, however, one thing to impose control over the appropriate law officer against his wishes and another to impose control at his request."

33   We discern in *Brooks's case* a further pointer to the resolution of the question now being canvassed in this appeal. The Constitution of Jamaica contains a provision that has no parallel in the Cayman Islands Constitution. Section 1(9) specifically provides that—

"no provision . . . that any person or authority shall not be subject to the direction or control of any other person or authority in exercising any functions under this Constitution shall be construed as precluding a court from exercising jurisdiction in relation to any question whether that person or authority has performed those functions in accordance with this Constitution or any other law."

This sub-section is clearly intended to preserve the jurisdiction of judicial review in such cases arising in Jamaica. Its inclusion in the Jamaica Constitution leads to the presumption that its draftsmen entertained, at the least, some doubt that without it the jurisdiction of the courts in judicial review might be circumscribed. That is only consistent with the view that "any other person or authority," in its natural meaning, includes a court of law.

34   Reference was also made at the hearing to a number of English authorities on the question whether and in what circumstances prosecutorial discretion can be controlled or regulated by statute. These are of little assistance to us because of the absence of a written constitution in the United Kingdom. Thus, there is no superior body of constitutional law which is ever capable of overriding the power of an Act of Parliament to change the law (whether consisting of previous statute, common law or Royal prerogative) and no body of rules by which the validity of any statute can be measured by the courts.

35   We have not considered it necessary in this judgment to enter into a consideration of the numerous public policy submissions which were canvassed at the hearing by counsel on both sides as well as in the April ruling of the Chief Justice. How far the public interest in the freedom to bring public prosecutions ought or ought not to give way to the public interest in the orderly winding up of Cayman-registered companies is a philosophical question worthy of careful consideration. But the issues raised here are questions of pure law and must, in the end, be answered as such without reference to questions of public policy. Although this is a matter of first impression free from any known or reported Commonwealth authority, we have, after careful consideration, reached the conclusion that s.16A of the Constitution prevails over s.101 of the Companies Law.

36   It follows, in our judgment, that the conclusions reached in the April ruling (2001 CILR, at paras. 66, 67 and 68.3 and 4) are incorrect. No leave was required by the Attorney General to issue the summonses against Euro Bank in liquidation. When leave was subsequently granted in purported exercise of a discretion under s.101 there was no jurisdiction to impose terms, and the conditions purported to be so imposed lack any validity. The question of whether or not they are reasonable conditions is therefore moot and need not be given further consideration in this judgment.

347

14

37   Let us now turn to the second of the major issues which these appeals present. It revolves about the proper construction of the Proceeds of Criminal Conduct Law (2000 Revision) ("the PCCL"). Two restraint orders were made against Euro Bank in the course of proceedings in the Grand Court against the bank at the instance of the Attorney General. Both have subsequently been discharged by orders of the court but only one of these discharges is the subject of this appeal.

38   At the outset it is necessary to consider the purpose as well as some of the detailed provisions of the PCCL. Its main purpose is not in dispute. The Law is designed to enable the Grand Court, at the instance of the Attorney General, in any appropriate case to order the confiscation of the property of an offender convicted of any indictable offence in addition to any other sentence passed upon him, to the extent that he can be shown to have benefited from that offence. The only exception relates to drug-trafficking offences, to which a similar, but not identical, regime is prescribed under the Misuse of Drugs Law.

39   In order to prevent the dissipation or removal of assets prior to a conviction, the PCCL provides for the court to make a restraint order against the property of a person charged or about to be charged with any such indictable offence. Such an order may only be made *ex parte*, on the application in Chambers by the Attorney General whenever it appears to the judge that there are reasonable grounds for thinking that a confiscation order may eventually be made. There is machinery provided for any person affected by the making of such an order to seek its discharge by an application to the court.

40   Confiscation orders are limited in amount to the extent of the offender's realisable property, which is defined as the sum total of his property and of any property which he has gifted to a third party. It is also limited by the extent of the benefit derived from the offence by the convicted person and this is defined in s.5(3) of the Law as comprising the value of property obtained "as a result of or in connection with its commission." One of the questions which arise for determination here is the proper interpretation of this definition.

41   A special regime applies under s.17 of the PCCL in respect of restraint orders made in respect of the property of a company which is subsequently, or which has previously become, the subject of an order or resolution for its winding up. No difficulty arises in the former case, since s.17(1)(a) makes it clear that "the functions of the liquidator . . . shall not be exercisable in relation to property for the time being subject to a restraint order made before [the commencement of the winding up] . . ." Difficulty has arisen, however, in respect of s.17(2), which applies where the resolution or order for winding up has preceded the making of the relevant restraint order. In such a case that sub-section provides that—

348

"the powers conferred on the Grand Court . . . shall not be exercised in relation to any realisable property held by the company in relation to which the functions of the liquidator are exercisable—

    (a)   so as to inhibit him from exercising those functions for the purpose of distributing any property held by the company to the company's creditors; or

    (b)   so as to prevent the payment out of any property or any expenses . . . properly incurred in the winding up in respect of the property."

42   The relevant restraint order concerned in this appeal was made on November 2nd, 2000, which was subsequent to the order for the supervised winding up of Euro Bank. Its terms were to prohibit the bank from dealing with a considerable body of numbered accounts at the bank, the most notable being account No. 33169 in the names of Kenneth and Teresa Taves. This account is said to contain approximately US$8.3m., which is alleged to be part of the proceeds of the fraud for which Kenneth Taves has already been convicted in the United States. Other parts of these proceeds, comprising an even larger sum, passed through the bank and were routed overseas. Their precise whereabouts is still uncertain.

43   The second respondent, the receiver, now lays claim to these US$8.3m. He derives his authority from an order of the US District Court for California, having been appointed to represent the interests of the very large number (in excess of 300,000) of victims of the fraud, each of whom has lost approximately US$20 or upwards. His status as receiver has been acknowledged in these Islands by an order of the Grand Court and he asserts both a moral and a legal claim to the assets on behalf of these victims, for whose benefit he has organized a US compensation scheme designed to ensure restitution.

44   At the instance of both respondents, the learned Chief Justice, in his ruling dated October 22nd, 2001, discharged the restraint order of November 2nd, 2000. His reason for so doing was a perceived conflict between the terms of that order and the requirements of s.17(2) of the PCCL. The order would, in his judgment, inhibit the liquidators from exercising the functions of their office for the purpose of distributing the property of the company by way of dividends to a creditor of the bank, here the receiver, the second respondent.

45   Recognizing that, without more, the discharge of the restraint order might leave the liquidators *carte blanche* to pay a dividend out of account No. 33169 that on no account should be allowed to go to Mr. Taves, the Chief Justice then proceeded to give directions to the liquidators not to admit the proof of debt of the receiver in whole or in part until such time as they were satisfied that proper arrangements had been made to pass on

such dividend to the victims of the fraud, and not to pay over the dividend to the receiver until satisfied that such arrangements were operational.

46   This further order is relied upon by the respondents as showing that any possibility of the Taveses recovering these funds is quite illusory, despite the discharge of the restraint order formerly preventing it. Mr. Mitchell, Q.C., who argued on behalf of the Attorney General on this issue, nevertheless contends for a restoration of the restraint order, arguing that without it these liquidators will be able to employ the previously restrained funds in the numbered accounts in various ways which he stigmatized as undesirable. This would include topping-up the 80% dividend which they are presently authorized to pay to legitimate creditors whose proofs have already been accepted, thus placing them in a better position than if no money-laundering charges had been preferred against the bank. This would leave little or no funds remaining in the bank from which a confiscation order could be satisfied in the event of a conviction of the bank.

47   Be that as it may, the question whether the restraint order was properly discharged or ought to have been allowed to remain in force must essentially be answered in the light of the correct construction of s.17(2) of the PCCL and its application to the facts of this case. Mr. Mitchell contends for what he described as a "purposive" construction of the sub-section. It could never have been the intention of the legislature to have left a loophole in the scheme of the Law whereby, even in theory, assets identified as the product of money laundering could be returned by liquidators to the perpetrators of crime under the guise of "creditors" within the sub-section. Creditors, in this connection, should only mean legitimate creditors of the bank. Mr. Alberga sought to counter this line of argument by suggesting that this would still fall foul of the sub-section by depriving liquidators of their function of deciding who was and who was not a lawful creditor.

48   There is no authority which can assist in any meaningful way in the resolution of this question, from either local or Commonwealth sources or, indeed, from the courts of the United Kingdom, upon whose parallel legislation the PCCL (including s.17) is closely modelled. One is obliged to begin the examination of the question by asking: Who is a creditor in law? This can only be answered by saying that it is a person who can assert a legal claim against another. A claim based upon or involving crime can never give rise to a judgment against an alleged debtor—*ex turpi causa non oritur actio.* Hence, the claim is bound to be rejected and the claimant cannot be recognized as a creditor. When this analysis is applied to a company liquidation situation, it follows that the liquidators are obliged to reject any proof which relies upon such an unlawful claim, and have no duty to pay any part of the assets of the company to any such alleged creditor as a dividend or otherwise.

C.A.                    ATT. GEN. v. EURO BANK CORP. (Collett, J.A.)

49   This surely must supply the answer to the question of the proper construction of s.17(2). A restraint order cannot inhibit the payment out of dividends to lawful creditors whose proofs have been properly accepted by the liquidators but it can indeed restrain the payment out of suspected illicit funds which could never be the subject-matter of a judgment against the company concerned. It is necessary, therefore, to ask the further question, is there a lawful creditor of Euro Bank in respect of the funds lodged in account No. 33169 or any of the other numbered accounts specified in the restraint order before its discharge?

50   We have reached the conclusion that no such lawful creditor exists. These funds are the alleged proceeds of fraud and money laundering. Clearly, the Taveses are not the lawful creditors of the bank in this respect. The receiver, on the other hand, has a lawful claim recognized by the courts both here and in the United States, on behalf of the victims, but it is a claim at second hand. The primary claim of the receiver is against the Taveses for misappropriation, and only if that claim succeeds—as it is likely to do—is the receiver entitled then to pursue the bank for the funds in the Taves account in a tracing action. This does not, in our judgment, constitute the receiver as a lawful creditor of the bank. He is at most a prospective creditor in respect of a prospective claim.

51   Money laundering, like possession of an unlicensed firearm or importation of a controlled drug, is essentially a victimless crime. This has perhaps been overlooked here because of the vast number of victims whom the receiver represents, but they are victims of the Taveses' fraud and not of the bank's alleged offence. So, they are not direct creditors of the bank, and the receiver's proof cannot yet be properly admitted for payment.

52   We have to conclude, therefore, that there was no actual conflict with the terms of the restraint order and no justification for its discharge. Its reinstatement will obviate the need for the elaborate machinery put in place by the Chief Justice's ruling to prevent the leakage of the bank's available assets. It will, as Mr. Mitchell has pointed out, allow the funds in account No. 33169 to remain under restraint until, in due course, the bank is either convicted or acquitted. In the event of conviction, the court, under its criminal jurisdiction, can then be asked to consider a confis-cation order, a compensation order in favour of victims represented by the receiver under s.28 of the Penal Code, or a combination of both. Machinery has been identified under the PCCL to make these orders, and the existence of the restrained funds will ensure that they are effective and realisable.

53   It remains to consider the further contention which has been advanced by the second respondent but which was rejected by the Chief Justice in his October ruling, concerning the proper interpretation of

351

"benefit" in relation to confiscation orders. That term, as we have seen, is interpreted in s.5(3) of the PCCL. Mr. Alberga, on behalf of the second respondent, contends that "benefit," in this connection, should be restricted to the gross profits made by Euro Bank in and about the administration of account No. 33169 and the other formerly restrained accounts. Mr. Mitchell, on the other hand, argues that "benefit" includes all the moneys that are the proceeds of fraud that have passed into those accounts as part of the money-laundering process operated by the bank.

54   In practice, the Attorney General is content to limit his potential claim to the US$8.3m. or so that still rest in the account, a somewhat less than generous concession, since the realisable property of the bank, if convicted, is unlikely to exceed that amount. However, Mr. Alberga points out that if the wider meaning of "benefit" is accepted, then, in other cases, the interests of innocent depositors could be in jeopardy as a result of enormous confiscation orders being made. There is some merit in that submission.

55   The learned Chief Justice's approach was, correctly in our view, to examine the statutory interpretation provided by s.5(3) in the light of the English authorities decided on a similar question arising under the parallel English legislation. The value of property obtained by an offender as a result of or in connection with the commission of the relevant offence cannot, in the ordinary connotation of that phrase, be confined to the gross profit which the offender has obtained as a result of its commission. Money paid into a bank becomes the property of that bank and its depositor has only a contractual right to recover an equivalent amount in due course with or without stipulated interest. Thus, if Euro Bank has received tainted money in connection with a money-laundering scheme to which it is party, the whole amount so obtained must be regarded as its benefit from the offence for the purposes of the PCCL.

56   The Chief Justice considered the recent English authority on the point, including *In re K.* (6) and *In re Metcalfe* (7). The unanimous view of the English courts was that "benefit," for the purposes of the corresponding UK legislation, should be given the wider construction. We can see no good reason for departing from this clear line of authority, and consider that it ought to be applied in the interpretation of s.5(3) as the learned Chief Justice held. The contentions of the respondent's notice filed by the second respondent must therefore be rejected.

57   In the result, therefore, we make the following orders:

   1. Both appeals are allowed.

   2. It is hereby declared that the Attorney General did not require leave to issue the summonses directed to Euro Bank in liquidation and the

352

19

C.A.                    ATT. GEN. V. EURO BANK CORP. (Collett, J.A.)

Grand Court's finding to the contrary in April 2001 is quashed. The conditions applied to the subsequent grant of leave to the Attorney General are null and void.

3. It is hereby declared that the restraint order dated November 2nd, 2000 ought not to have been discharged. It is restored with immediate effect.

4. "Benefit," for the purposes of the PCCL, has the meaning ascribed to it by the learned Chief Justice in his ruling of October 22nd, 2001, and the contentions of the second respondent's notice are rejected.

5. By consent, there shall be no order as to the costs of the appeal as between the Attorney General and the first respondent. The second respondent shall pay the costs of and occasioned by the Attorney General's appeal in relation to the discharge of the restraint order and the second respondent's notice, save that in relation to the discharge of the restraint order, the second respondent shall pay only one-half of the Attorney General's costs, such costs to be taxed if not agreed.

*Appeals allowed.*

Attorneys: *Government Legal Dept.* for the appellant; *Maples & Calder* for the liquidators; *Charles Adams, Ritchie & Duckworth* for the receiver.

––––––––––––––––––

353

## [2010 (1) CILR 200]

## K.F. EBANKS v. UNITED KINGDOM

EUROPEAN COURT OF HUMAN RIGHTS (Judge Bonello (President), Judges Bratza, Björgvinsson, Šikuta, Hirvelä, Bianku and Vučinić, and F. Araci (Deputy Section Registrar)): January 26th, 2010

*Human Rights—right to fair trial—matters of fact on appeal—appeal court not invariably required to hear oral evidence if factual dispute arises on appeal—to consider whether dispute may be resolved on affidavits or if fairness requires oral evidence—to take into account strength of written evidence, ambiguities, and possible clarification by oral evidence—if evidence unambiguous, oral evidence not required by fairness*

*Human Rights—right to fair trial—conduct of defence—preferable (under European Convention, art. 6(1)) if accused's choice not to give evidence recorded in writing—if no written record, whether chose to remain silent to be resolved by court on available evidence*

*Human Rights—right to fair trial—conduct of defence—accused deprived of right to fair trial under European Convention, art. 6(1) if wrongly advised by counsel that not giving evidence precludes challenge to truth of prosecution evidence—if accused refuses to testify about alleged confession to police, defence counsel may still question police evidence*

The applicant and his co-accused were charged with murder in the Grand Court.

The applicant was convicted of murder on the basis of a statement he had made to police officers—who claimed that he had admitted to them that he had taken part in the offence—notwithstanding that his co-accused had claimed that he alone was responsible for the fatal stabbing. The applicant had challenged the admissibility of the alleged statement to the police officers in *voir dires* (in proceedings reported at 2001 CILR 24) on the grounds that no formal caution had been given and it had been obtained through oppression. The applicant refused to give evidence to rebut the officers' testimony, despite being encouraged to do so by the trial judge, and the objections were therefore dismissed. At trial, having been fully consulted by his counsel, the applicant also declined to give evidence and did not advance the allegation that he had not made the disputed confession. He was convicted and sentenced to life imprisonment.

Nine months later, the applicant appointed a new lawyer and, on appeal

against the conviction on the ground that it was unsafe, submitted an affidavit stating that his trial lawyers had persuaded him for tactical reasons not to allege that the police were lying and had manufactured the statement. The applicant's lawyers responded with affidavits stating that throughout the matter they had followed his clear and unequivocal instructions, which included his intention not to give evidence. The Court of Appeal (Zacca, P., Rowe and Taylor, JJ.A.) concluded (in proceedings reported at 2002 CILR 197), on the basis of the affidavits, that it was satisfied that the appellant took a deliberate and constant decision not to give evidence, and further stated that it would have been improper for the appellant's counsel to suggest to the police officers that they had fabricated the account they were giving, unless he was prepared to call the appellant as a witness. Despite the conflict between the affidavits, the Court of Appeal rejected the appellant's application to hear oral evidence to resolve the conflict and dismissed his appeal.

The applicant subsequently appealed to the Privy Council (Lord Rodger of Earlsferry, Lord Steyn, Lord Carswell, Lord Mance and Sir Swinton Thomas) and submitted that (a) he had been talked out of testifying against the police officers' fabrication by his lawyers; (b) since they had failed to record in writing his refusal to testify, his version of events should be favoured; and (c) the lawyers should have followed his instructions and cross-examined the police, regardless of whether he was willing to testify. The Privy Council (by a 3:2 majority (Lord Steyn and Sir Swinton Thomas dissenting) in proceedings reported at 2006 CILR 198) dismissed the appeal, concluding that (i) the lawyers' failure to record his refusal to testify did not warrant setting aside his conviction, especially given the care his counsel had taken throughout the trial to ensure that he understood the proceedings; (ii) although there was conflict between the affidavits, the Court of Appeal had been entitled to conclude that his lawyers had not acted against his instructions without taking further oral evidence; and (iii) it would have been wrong to conclude that the applicant's refusal to testify meant that it was improper for his counsel to cross-examine the police officers as to the truth of their statements but the affidavits suggested that the lawyers had simply acted upon the applicant's instructions not to advance the objection.

The applicant applied to the European Court of Human Rights complaining that the failure of his trial lawyers to ensure that his case was put before the court and in accordance with his instructions, and the failure of the Court of Appeal and Privy Council to remedy this, violated his right to a fair trial guaranteed by art. 6 of the European Convention on Human Rights. He submitted that (a) he was wrongly discouraged by his lawyers from giving oral evidence at his trial and they failed to act in accordance with his instructions to submit that he had not made the alleged confession; (b) the refusal to hear oral evidence had a detrimental effect on his appeal; and (c) the lack of a written record of his decision not to give evidence prevented his having a fair trial.

The UK Government submitted in reply that the proceedings were in all

respects fair and in accordance with art. 6 because (a) the applicant had been represented throughout by experienced lawyers who had made every effort to comply with his instructions—as shown by the affidavit evidence—and at no stage during the trial had he voiced any concerns, nor did he file his affidavit on appeal until nine months after the conclusion of his trial; (b) it had been determined that there was no evidence supporting to his allegation that he had wished to give evidence at trial; (c) the Privy Council had considered his complaints in detail with the benefit of a full transcript of the proceedings and it was not for the European Court of Human Rights to reconsider the domestic courts' findings of fact; and (d) the appeal courts were not required to hear new evidence when a factual dispute arose between the parties and were therefore entitled to reach their conclusions on the basis of the available evidence, without hearing oral evidence.

**Held,** dismissing the application:

(1) Having considered the proceedings as a whole, including the decisions of the appellate courts and the way in which the evidence had been heard, the court was satisfied that the applicant's rights under art. 6 of the Convention had not been infringed. His application would therefore be dismissed (paras. 72–73; para. 84).

(2) It was unfortunate that the applicant's desire not to give evidence had not been recorded in writing, but in the absence of a written record, the question whether the applicant chose not to remain silent of his own free will was to be resolved on the basis of the available evidence. It was not unreasonable for the appeal courts, having considered the affidavits and the lawyers' experience—with the benefit of the full transcript of the hearing revealing counsel's efforts to consult the applicant regularly and the fact that the complaint had not been made until nine months after trial—to conclude that the applicant had willingly decided not to give evidence in his own defence. Since it was not for the court to substitute its own assessment of the facts for that of the domestic courts (as they were not manifestly unreasonable or otherwise arbitrary), there was no ground to interfere with their decisions in this regard (paras. 76–77).

(3) Moreover, even though it would have been unfair and would have deprived the applicant of his right to a fair trial if his lawyers had advised him that his decision not to give evidence would preclude his disputing the making of the statement, there was nothing in the affidavits to suggest that his lawyers had given him this advice. The Court of Appeal's erroneous understanding of this matter—by dismissing the applicant's appeal on the ground that he could only challenge the statement if he gave supporting oral evidence—was immaterial. While it was for the applicant, with the advice of his counsel, to select the defence he wished to put to the court, in the interests of justice he could not be allowed to seek to advance an alternative defence after his conviction unless there were special circumstances which gave rise to a real concern that his legal representation at

trial was fundamentally defective. The domestic courts had again been entitled to conclude that the applicant's case had been properly put in accordance with his instructions since, according to the verbatim transcript available to the Privy Council, his counsel had been attentive to the applicant's instructions throughout the case and this was further strengthened by the nine-month delay in the applicant's raising his complaint (paras. 78–82).

(4) An appeal court was not required to hear oral evidence when a factual dispute arose on appeal, since this would otherwise restrict its ability to deal with cases appropriately and proportionately. It was entitled to consider whether it was able to resolve the dispute on the basis of the affidavits before it or if fairness required further oral evidence to be heard, and in doing so the court should have regard to the strength of the written evidence and, if any ambiguity existed, whether there was any potential clarification oral evidence could bring. The Court of Appeal and Privy Council had therefore been entitled to conclude that fairness did not require the hearing of oral evidence in the appeal, given that the evidence it already had to consider was unambiguous (para. 75; para. 77; para. 83).

(5) A lawyer, even if officially appointed, was not an organ of the state but an independent professional whose conduct of a case was a matter between himself and his client. The State could not, therefore, incur liability under the Convention as a direct consequence of a lawyer's conduct. However, although no complaint could legitimately be made about the effectiveness of the lawyers in the present case, there would be occasions when the State would have to act in response to problems of legal representation brought to the attention of the relevant authorities in order to ensure that the legal representation, guaranteed by art. 6(3)(c) of the Convention, was effective (paras. 71–72).

**Cases cited:**
  (1) *Artico* v. *Italy* (1980), 3 E.H.R.R. 1; [1980] ECHR 6694/74, referred to.
  (2) *Benham* v. *United Kingdom* (1996), 22 E.H.R.R. 293; [1996] ECHR 19380/92, referred to.
  (3) *Bethel* v. *State* (1998), 55 W.I.R. 394; [1998] UKPC 51, considered.
  (4) *Cuscani* v. *United Kingdom* (2002), 36 E.H.R.R. 2; 13 BHRC 540; [2003] Crim. L.R. 50; [2002] ECHR 32771/96, referred to.
  (5) *Daud* v. *Portugal* (1998), 30 E.H.R.R. 400; 4 BHRC 522, referred to.
  (6) *Edwards* v. *United Kingdom* (1992), 15 E.H.R.R. 417; [1992] ECHR 13071/87, referred to.
  (7) *Goddi* v. *Italy* (1984), 6 E.H.R.R. 457; [1984] ECHR 8966/80, referred to.
  (8) *IJL* v. *United Kingdom*, [2002] BCC 380; (2000), 33 E.H.R.R. 11; 9 BHRC 222; [2001] Crim. L.R. 133; [2002] ECHR 29522/95, referred to.

(9) *Imbrioscia* v. *Switzerland* (1993), 17 E.H.R.R. 441; [1993] ECHR 13972/88, referred to.

(10) *Klaas* v. *Germany* (1993), 18 E.H.R.R. 305; [1993] ECHR 15473/89, referred to.

(11) *Kulikowski* v. *Poland*, [2009] ECHR 18353/03, referred to.

(12) *R.* v. *Bevan* (1993), 98 Cr. App. R. 354; 157 J.P. 1121, considered.

(13) *R.* v. *Callaghan* (1979), 69 Cr. App. R. 88, considered.

(14) *R.* v. *Chatroodi*, [2001] EWCA Crim 585, considered.

(15) *R.* v. *O'Neill* (1950), 34 Cr. App. R. 108, considered.

(16) *Rutkowski* v. *Poland*, [2000] ECHR 45995/99, referred to.

(17) *Schenk* v. *Switzerland* (1988), 13 E.H.R.R. 242; [1988] ECHR 10862/84, referred to.

(18) *Sialkowska* v. *Poland* (2007), 22 BHRC 695; [2007] ECHR 8932/05, referred to.

(19) *Staroszczyk* v. *Poland* (2007), 50 E.H.R.R. 6; [2007] ECHR 59519/00, referred to.

(20) *Tuzinski* v. *Poland*, [1999] ECHR 40140/98, referred to.

(21) *Vidal* v. *Belgium*, [1992] ECHR 12351/86, referred to.

**Legislation construed:**

European Convention for the Protection of Human Rights and Fundamental Freedoms (Rome, November 4th, 1950; Treaty Series 71 (1953)) (Cmnd. 8969), art. 6(1): The relevant terms of this paragraph are set out at para. 59.

art. 6(3): The relevant terms of this paragraph are set out at para. 59.

*R.J. McMillan* for the applicant;
*Ms. H. Upton*, as agent for the United Kingdom.

1    **Judgment of the court:**

### A. PROCEDURE

The case originated in an application (No. 36822/06) against the United Kingdom of Great Britain and Northern Ireland, lodged with the court under art. 34 of the Convention for the Protection of Human Rights and Fundamental Freedoms ("the Convention") by a Caymanian national, Mr. Kurt Ebanks ("the applicant"), on August 23rd, 2006.

2    The applicant was represented by Mr. R. McMillan, a lawyer practising in Grand Cayman. The UK Government ("the Government") were represented by their agent, Ms. H. Upton, from the Foreign and Commonwealth Office.

3    On January 22nd, 2009, the Vice President of the Fourth Section decided to communicate the application to the Government. It was also decided to examine the merits of the application at the same time as its admissibility (art. 29(3)).

## B. THE FACTS

### 1. The circumstances of the case

#### (i) The background facts

4   On the morning of January 18th, 2000, the body of Curtis Seymour, a taxi driver, was found in a refuse disposal area in Grand Cayman. He had been stabbed to death. His van, which he used as a taxi, was found nearby with blood on the interior upholstery. An examination of the van revealed a palm print on the passenger door frame which matched that of Mr. Brian Powell, who at that time was living with the applicant. Mr. Powell's fingerprint was also found at the gate of the refuse disposal area together with another set of blood-stained fingerprints.

5   On February 5th, 2000, Mr. Powell was arrested. When interviewed, he denied any personal knowledge of the murder. On February 9th, 2000, he made a statement under caution. He claimed that the applicant had developed a plan to rob a taxi driver and that Mr. Powell had accompanied him for this purpose. They had travelled in a taxi driven by Mr. Seymour. When the taxi stopped, the applicant had held Mr. Seymour from behind and demanded money. Mr. Powell had searched for money and the applicant had produced a knife from his back pocket and stabbed Mr. Seymour in the chest. The applicant had then dragged the body to the refuse disposal area and Mr. Powell had opened the gate. Having moved the body, the applicant threw the knife into some bushes before driving the taxi to a swamp area where he tried to dispose of the vehicle. The taxi became bogged down. Mr. Powell and the applicant subsequently removed their blood-stained clothing and hid it in some bushes.

6   In the meantime, on February 4th, 2000, the applicant was arrested in respect of an unrelated offence of theft. It subsequently became apparent that the applicant was involved in a number of other offences against property and offences of dishonesty. He was held without charge for the purposes of investigation between February 4th and 7th, 2000. He was subsequently held in custody without charge between February 7th and 17th, 2000 for investigation for murder.

7   On February 9th, 2000, the applicant was first questioned under caution after being shown a copy of Mr. Powell's statement. The applicant denied Mr. Powell's version of events and made no further comments to subsequent questions put to him.

8   On February 11th, 2000, Mr. Powell took the police to the area where he claimed the knife and blood-stained clothes had been hidden. During the search, the police recovered a knife and several items of blood-stained clothing. Mr. Seymour's DNA was subsequently found on an item of clothing belonging to Mr. Powell.

9  On February 16th, 2000, Mr. Powell was again questioned under caution. He confirmed the accuracy of his statement of February 9th, 2000 and added that the applicant had used his right hand to stab Mr. Seymour and that he, Mr. Powell, had touched the deceased while searching for money. He identified the knife recovered by the police as the murder weapon.

10  On February 17th, 2000, Police Const. Angela Campbell and Det. Const. Wayne Powell ("the police officers") interviewed the applicant a second time. He was asked whether he would answer questions, to which he replied that he would not. At that stage, Det. Const. Powell reminded the applicant that he did not need to say anything. The applicant was given no formal caution. The police officers later testified that the applicant then asked them whether he was being recorded, to which they replied in the negative. They also testified that the applicant asked Police Const. Campbell to open her jacket in order to demonstrate that she was not carrying a recording device, which she did.

11  The police officers alleged that the applicant then began to speak about God and about having had a difficult past. Police Const. Campbell told him that God could help him have a better life. At that point, the applicant allegedly sighed and hung his head. He then said that Mr. Powell's statement was three-quarters lies and proceeded to give his own version of events. He said that if he spoke the truth he would go to jail, but he wanted to leave a free man as he did not kill Mr. Seymour. He said that the "mental Lahee patient" (a reference to Mr. Powell) had killed Mr. Seymour. He claimed that on the night in question, he had been looking for women but that Mr. Powell had dragged him away with him. They were picked up by Mr. Seymour, whom Mr. Powell instructed to drive to an address which caused the applicant surprise. When the taxi stopped, Mr. Powell grabbed Mr. Seymour from behind and demanded money. The applicant found $200 in the ashtray. The applicant was armed with a knife and Mr. Powell asked for the knife because Mr. Seymour had seen their faces. The applicant gave Mr. Powell the knife and Mr. Powell stabbed Mr. Seymour, using both hands. Mr. Powell then tried to pull the deceased out of the van but was unable to do so. He told the applicant to get rid of the knife by throwing it in the bushes. The applicant then undid Mr. Seymour's seatbelt and Mr. Powell pulled the deceased from the van and, after searching the body, dragged it to the dumpster. The applicant described how he had driven the van to the swamp area and tried to dispose of the vehicle by putting a rock on the accelerator, but this was unsuccessful. He threw the car keys into the bushes because he thought his fingerprints would be on them. As the applicant and Mr. Powell left the scene, the applicant saw that Mr. Powell had Mr. Seymour's mobile telephone. Mr. Powell wanted to use the phone to ask someone to come and collect them, but the applicant told Mr. Powell that he was crazy as the police would be

able to trace the call. Mr. Powell threw the mobile telephone away. The applicant removed his shirt and jacket and gave them to Mr. Powell, who threw them away. They were subsequently met by a friend of Mr. Powell, who gave the latter a shirt which he in turn gave to the applicant.

12    The police officers alleged that the conversation with the applicant lasted about one hour. No notes were made during the course of the interview and the applicant asked that what he had said should not be put into writing as he wanted some time to think about it. He wanted to tell the truth but did not want to go to prison for something he did not do. The police officers testified that, immediately afterwards, they made witness statements as to their recollections of the conversation with the applicant. The two statements were almost identical. They were never shown to the applicant. The applicant denies having made any statement to the police officers.

13    On January 19th, 2000, a post-mortem examination revealed that Mr. Seymour had suffered four stab wounds: two in the neck area and two on the front of the chest. It was suggested that the nature of the injuries and the lack of defence wounds on the arms or hands of the deceased indicated stabbing from behind.

14    On February 21st, 2000, Mr. Powell made another statement in which he described the events surrounding the murder in some detail.

### (ii) The domestic proceedings

### (a) *The proceedings before the Grand Court*

15    The applicant and his co-accused, Mr. Powell, were tried for murder before the Grand Court sitting—at the defendants' request—without a jury. The applicant was represented by two counsel. Leading counsel was an experienced criminal practitioner who had travelled from London to the Cayman Islands for the applicant's trial.

16    At trial, Mr. Powell amended his version of events. He admitted that he had stabbed Mr. Seymour but claimed that it was in self-defence and that he had been alone in the taxi with Mr. Seymour at the time. He alleged that his original statement implicating the applicant in the murder had been invented out of revenge following a misunderstanding regarding the theft of drugs which had been in Mr. Powell's possession. The only evidence against the applicant was therefore the alleged statement to the police officers.

17    At a first *voir dire* on January 15th and 16th, 2001, the applicant challenged the admissibility of the evidence of the police officers as to his alleged statement. The challenge was made on the grounds that (i) no formal caution had been given; and (ii) the manner in which the statement

was taken was unfair. The police officers gave evidence and were cross-examined. The defence called no evidence.

18    A second *voir dire* was subsequently held on the admissibility of the alleged statement to the police officers. The judge noted that such a course of action was unusual but acceded to the request for a further *voir dire* in the light of the seriousness of the charge. At the hearing, the applicant's lawyers alleged that the statement had been obtained through oppression. Again, the applicant did not testify.

19    The record of the *voir dire* hearings showed that the trial judge had positively encouraged the applicant to give evidence, but he did not do so. At no stage in either *voir dire* did the applicant's lawyers put to the police officers the fact that the applicant denied having made the statement.

20    In his ruling on the admissibility of the alleged statement, the judge (Henderson, Ag. J.) found that, while it would have been appropriate for a further caution to have been given on February 17th, it was not a requirement. He emphasized that at the start of the conversation the officers did not have enough evidence to charge the applicant with murder. He further concluded that there was nothing to suggest that the manner in which the statement was taken was unfair and that there was no evidence that any inducement had been offered to the applicant to encourage him to make the alleged statement. He said (2001 CILR 24, at para. 14):

> "There is no direct evidence here of why Mr. Ebanks spoke to the officers. I infer that he believed that what he said could not be used as evidence if it was not recorded or written down as he spoke. I also infer, as I have indicated, that he believed that it would be easier to deny it later if no record was made of it. I infer that he spoke partly because of the need to unburden himself, due to remorse and his religious beliefs."

21    As regards the allegations of oppression, the judge found that even assuming, without finding, that the detention without charge was unlawful, that in itself was insufficient to indicate that the applicant had made his statement as a result of oppression. He noted (*ibid.*, at para. 32):

> ". . . [The applicant] showed considerable presence of mind on February 17th. For example, he insisted that the conversation not be tape-recorded. He asked Det. Const. Campbell to open her jacket for the purpose of proving to him that she had no concealed tape recorder on her person. Many of his answers show a considerable mental acuity, which is the opposite of the state we associate with oppressive conduct."

22    The judge observed, in the course of submissions, that he had heard nothing to indicate that the applicant's detention had had any adverse affect on him. He indicated that he would normally expect to see evidence

of a psychiatrist or psychologist as to the effect of oppressive conduct and quite likely evidence from the accused himself. Shortly after this observation, counsel for the applicant sought a short break in order to allow him to seek instructions from the applicant. When proceedings resumed, counsel continued his argument, in the course of which he agreed that "there is no positive evidence by the defence as to the effect of the oppression." Accordingly, the judge found the statement to be admissible as evidence in the main trial, concluding that no oppression had been demonstrated.

23   Following the ruling in the *voir dire*, the examination in chief and cross-examination of the police officers were adopted for the purposes of the main trial proceedings. At that time, counsel for the applicant said:

> "My Lord, may I just take a moment? . . . My Lord, I just want to make sure my client understands that we were adopting cross-examination from earlier . . . My Lord, in light of that, I have no further questions."

24   The applicant did not give evidence at his trial. His allegation that he did not make the disputed confession was not put before the court. The transcript of the trial shows that on several occasions, his lawyer took time to ensure that the applicant understood and agreed to various steps being taken on his behalf.

25   The prosecution case included evidence that the deceased had been carried from the vehicle to the location where his body was found by two people, and dragged for some distance. It also included a statement from the applicant's former girlfriend to the effect that in January 2000 the applicant had said that he knew about a murder and a statement dated March 8th, 2000 from the applicant's cousin to the effect that the applicant had made incriminating statements and that, following the murder, the applicant and Mr. Powell had planned to leave Grand Cayman and go to Honduras. At trial, the applicant's cousin claimed that his statement was untrue and had been made under the influence of alcohol and cocaine.

26   Both defendants were convicted by the judge of murder on January 26th, 2001 and sentenced to life imprisonment. The judge, in a fully reasoned judgment, found that Mr. Powell had administered the knife wounds, that his evidence that the applicant was not present was untrue, and that the applicant's confession was true.

**(b) *The proceedings before the Cayman Islands Court of Appeal***

27   On February 9th, 2001, the lawyers who had conducted the trial on behalf of the applicant gave notice of an application for leave to appeal against the conviction on the grounds that it was unsafe and unsatisfactory. They indicated that full written grounds would follow.

28   At some later date, the applicant appointed a new lawyer and, on

October 22nd, 2001, he swore an affidavit regarding the conduct of Mr. St. John Stevens and Mr. McGrath, his lawyers at trial. In his affidavit, he argued:

"11. When the *voir dire* started concerning my statement, I was expecting Mr. St. John Stevens to charge right to the two police officers who were lying and try to discredit them. But he didn't, and he kept telling me: 'This way is better. They gave you a truncated form of your rights.' He also kept saying to me: 'You've told me that you did not make the statement, but I'm going to attack it this way. They kept you in custody too long without charging you. I'll get the statement thrown out because of oppressive conduct.' Never once did he put to the officers the fact that I didn't make the statement at all. I sat in the court and listened to the two officers' lies and kept thinking that I would have my chance to talk later. At all times, I wanted to testify and tell the judge under oath what I have stated in this affidavit. Then the time came and I was talked out of it by the two lawyers. They made me think that they knew best and so I put all my trust in them.

12. During the testimony of Angela Campbell, when I heard her lying about a number of things, I got upset and I raised my hand and said: 'I want to testify. I want to tell my side of the story.' Mr. Stevens jumped up and rushed back to me and said: 'Be careful what you're doing, Kurt. They haven't proven anything against you. They're not hurting you, they're not hurting you, so relax and behave and keep quiet. And don't put yourself in the stand and give them a chance to cross-examine you.' I told him: 'I don't have any problem going on the stand. I'm not guilty of anything. I don't have anything to hide.' He told me that if I took the stand and rebutted whatever the officers were saying the judge would more than likely believe them over me and, in doing so, my ground of appeal 'would be thrown out the window.' If I didn't testify they would have a chance for an argument on the appeal. Mr. Stevens said that was the best way to approach the case.

13. At lunchtime on that day, Mr. McGrath came to see me about taking the stand. Mr. McGrath did not actually play much part in my trial. He was not in court every day and it was Mr. St. John Stevens who conducted my defence. On this day, Mr. McGrath gave me the impression that Mr. Stevens had sent him to talk to me. He said, 'This is the turning point in your case. We have to make a tactical decision. I know you were adamant from Day 1 that you gave no statement to the police officers.' I said: 'Yes, sir.' He then said: 'It will be better to approach the case this way since nothing is damaging you.' He just talked and talked and I got confused and thought, 'Well, he's the lawyer,' and he talked me out of testifying.

Because of that, the judge never got to hear what was the most important thing and that was that those two police officers fabricated a statement that I never made to them. Because of that statement, I have been convicted of a murder I did not commit and had nothing to do with."

29   On October 24th, 2001, the applicant's lawyer gave notice that the applicant was applying to the Court of Appeal to have the affidavit received in evidence.

30   The applicant issued a release of privilege, thereby releasing his trial lawyers from the lawyer/client privilege in relation to their communications in respect of the trial proceedings. His trial lawyers subsequently also swore affidavits.

31   Mr. McGrath filed his affidavit on November 15th, 2001, replying that—

"4. From a very early stage the appellant's instructions were firm and unequivocal in a number of regards: (i) he would contest the allegation; (ii) he would elect trial by judge alone; (iii) he disputed the making of the alleged confession; and (iv) at no stage in the proceedings would he give evidence.

5. The appellant alleges that his case was presented in defiance of his instructions. This is untrue. The conduct of the case at trial was entirely consistent with the appellant's particular instructions. Whilst it is correct to say that no positive case was ever put in relation to 4(iii) above, this was upon the appellant's instructions.

6. The appellant's instructions that he would not give evidence in the proceedings remained a central tenet of his position throughout.

7. The consequences of his not giving evidence were discussed in great detail with the appellant, both prior to the arrival of leading counsel and in the presence of leading counsel. The decision not to give evidence in the trial created tactical considerations and decisions for the appellant.

8. I explained to the appellant and advised him how this decision might affect his trial. I was present when leading counsel advised the appellant how this might affect his trial. I am satisfied that the appellant understood the advice and that he understood the implications of his decision not to give evidence.

9. The appellant chose to challenge the alleged confession on the basis of its admissibility. Upon instructions it was argued on the *voir dire* that the Crown could not satisfy the tribunal to the requisite criminal standard that what the police officers alleged had been said, had been said voluntarily. I am satisfied that the appellant understood

the advice offered and the instructions he was providing in relation to the conduct of the *voir dire*.

10. On the *voir dire* the learned trial judge ruled against the appellant and in favour of the Crown in relation to the submission that the alleged confession should be excluded. The potential consequences of such a ruling had been discussed and were discussed with the appellant before and during the trial. Because he would not give evidence, the appellant chose not to put his case about not making the confession to the police officers in the course of the trial proper. This was a topic which was discussed with him in some detail. I am satisfied that the appellant was aware that, having provided such instructions, the only triable issue for him would be the admissibility of the alleged confession.

. . .

13. Paragraph 11 of the [appellant's] affidavit is not true. Mr. St. John Stevens was instructed to challenge the admissibility of the alleged admission on the *voir dire*. At no stage did the appellant indicate to me any desire to testify in the proceedings. I did not 'talk him out of it.' I explained to the appellant on many occasions that the decision whether to give evidence or not was his and his alone. I explained that he could not be compelled to give evidence, neither could anyone stop him from giving evidence. Mr. St. John Stevens did not, as far as I am able to say, put any undue influence or pressure upon the appellant not to give evidence.

. . .

15. I did have many conversations with the appellant in the cells during the course of his trial. Mr. St. John Stevens did communicate to me that the appellant had become upset in the dock during the proceedings and there had been a short adjournment. The words which the appellant attributes to me in para. 13 of his affidavit are inaccurate in detail and in substance. At no stage did I say or would I say: 'We have a tactical decision to make.' I made it clear at all stages that the decision about testifying, as well as other substantial decisions, were matters for the appellant and not matters for me or for leading counsel. I did not talk the appellant out of testifying. There was never any change of instructions in relation to the appellant's decision not to give evidence, nor in relation to the way he wished his case to be conducted."

32  Mr. St. John Stevens filed his affidavit on November 21st, 2001. In it, he said:

"2.1  The appellant's case was presented in accordance with and upon clear and unequivocal instructions.

2.2   I am satisfied that at each material stage both before and during the trial the appellant's instructions that he would not himself give evidence were unequivocal.

2.3   I am satisfied that those instructions were given and confirmed after the ramifications of not giving evidence, whether it be during the *voir dire* or the trial, had been explained in detail by myself and David McGrath, both together and independently, and that the appellant fully understood that advice.

2.4   The ramifications of not giving evidence were discussed and advice given in the context of the *voir dire*, the trial and potential grounds of appeal.

The appellant's instructions were that the Crown should be put to proof as to establishing that the confession in issue was made voluntarily and that no positive case would be put over and above this issue.

. . .

These 'bedrock' instructions did not change. Up to the time of verdict, when the learned judge 'retired' for three days to consider his judgment, the appellant was quite satisfied with the conduct of his defence and understood the avenue of appeal. I am satisfied that the appellant's case was presented in accordance with and upon clear and unequivocal instructions. I am satisfied that the instructions were given upon careful consideration, both before and during the trial, and that advice was fully understood. I am satisfied from all I have seen, heard and read that the appellant's instructing attorney acted at all times with and upon proper instructions."

33   The applicant argued before the Court of Appeal that: (i) the sole evidence against him was the alleged statement of February 17th, 2000; (ii) the alleged statement was not reduced to writing and signed by him; and (iii) he had continually and consistently instructed each of his defending counsel that he had not made the alleged statement and that it was a fabrication by the police officers. Accordingly, he argued that the failure of his trial lawyers properly to put his case to the court had denied him a fair trial.

34   On April 12th, 2002, the court dismissed the appeal. It refused permission for *viva voce* evidence to be heard from the applicant to supplement his affidavit, noting (2002 CILR 197, at para. 57) that "he had filed no affidavit in response to those from his former attorneys, although there was an opportunity for him to do so had he so wished."

35   As to the applicant's decision not to give oral evidence at trial, the court considered that as a matter of best practice, lawyers should record in

writing their clients' wish not to testify in the proceedings. However, where no record was available, the court could nonetheless come to a decision as to whether the defendant in question was given advice from counsel and whether, after such advice, he had decided of his own free will not to testify. In the applicant's case, the court noted (*ibid.*, at para. 62) that—

> "Ebanks was being represented by experienced attorneys. Mr. McGrath has sworn that Ebanks gave clear instructions from the inception of the case that he would not give evidence at any stage of the proceedings, and that he conveyed those instructions to Mr. Stevens. Both Mr. McGrath and Mr. Stevens have sworn that they over and over again gave detailed advice to Ebanks as to the ramifications of his decision not to give evidence and of the possible consequences and that Ebanks understood those instructions. Mr. McGrath said that he met with Ebanks several times in his cell and Mr. Stevens said that his first conference with Ebanks was a week before the trial commenced. This was not a case in which the defendant did not have access to his counsel and only saw them briefly before his trial. On the affidavits before us, we are completely satisfied that Ebanks took a deliberate, constant and continuous decision not to give evidence and instructed his counsel accordingly."

36   As to the failure of the applicant's lawyers to put forward a positive defence to the effect that the applicant disputed making the alleged confession, it held (*ibid.*, at para. 63):

> "It would have been most improper for defence counsel to have suggested to [the police officers] that they were lying and had fabricated the account that they were giving unless defence counsel were prepared to call Ebanks as a witness. This much would have been clear to Ebanks and that is why his defence was conducted in a way that no positive case was put forward on his behalf."

### (c) *The proceedings before the Privy Council*

37   The applicant subsequently appealed to the Privy Council. On March 27th, 2006, the Board dismissed the appeal by a majority of three judges to two. Delivering the leading judgment for the majority, Lord Rodger of Earlsferry stated (2006 CILR 198, at para. 16) that—

> "... while Mr. McGrath specifically acknowledges that from the outset the appellant's position was that he disputed making the statement to the police officers, Mr. St. John Stevens does not address that issue. To that extent there could be said to be a difference between the two principal affidavits for the trial lawyers. The significance of that difference is less than might at first sight be thought, however, since, according to Mr. McGrath, even though that

214

was the appellant's position, he was equally adamant from the outset that at no stage in the proceedings would he give evidence. In that situation, according to Mr. McGrath, while it is correct to say that no positive case was ever put in relation to the allegation that he had not made the statement, this was upon the appellant's instructions. This is consistent with Mr. St. John Stevens' position that the appellant's instructions were that no positive case would be put over and above the issue of the voluntariness of the confession."

38    Lord Rodger emphasized that a decision by an accused not to give evidence at his trial was "of such potential importance" that it should be recorded in writing. However, Lord Rodger declined to find that the failure of the applicant's solicitors to produce a written record of the applicant's decision meant that the court should give the applicant the benefit of the doubt and accept his version of events. He considered that in some cases, the appeal court may wish to hear evidence from the parties but that there may be cases where the court felt able to resolve the dispute without hearing evidence.

39    In the present case, he concluded (*ibid.*, at para. 22) that—

"so far as the matter of Mr. Ebanks not giving evidence is concerned, the only question is whether counsel in effect forced him, against his will, not to go into the witness box. Their Lordships notice that there is nothing to suggest that Mr. Ebanks made any protest about this during the trial. Nor is there anything to suggest that, even shortly after the trial, he complained to any court official, prison officer, or fellow prisoner. The first time that such a complaint emerges is some nine months later in his amended grounds of appeal dated October 24th, 2001 and in his affidavit dated two days earlier. Of course, the delay in making the complaint does not show that it is unsound, but it is a factor to be taken into account. An appeal court must always bear in mind the distinct possibility that such a complaint may be fabricated—indeed, that is precisely why there should be a contemporaneous written record of the decision that the defendant is not to give evidence.

40    Referring to the record of the trial proceedings, he highlighted the care taken by Mr. St. John Stevens throughout the trial to ensure that the applicant understood the proceedings, noting the following (*ibid.*, at paras. 23–25):

"23    More importantly, however, the appellant's allegation is really that, on this critical matter, as well as on the matter of cross-examining the police witnesses, counsel overrode his instructions. That allegation, however, is wholly inconsistent with the picture which emerges from the record of the trial itself where on several occasions Mr. St. John Stevens took time to ensure that the appellant

215

understood and agreed to the step which was being taken on his behalf. In para. 8 of this judgment their Lordships have already drawn attention to one such occasion when, at the conclusion of the second *voir dire*, Mr. St. John Stevens took time to explain to Mr. Ebanks that the cross-examination in the *voir dire* would, in effect, be held repeated in the main trial. Earlier, during the evidence of Julie Harris, Mr. St. John Stevens had asked for a break of five minutes to seek clarification of a point—although this is not said explicitly, it appears likely that the clarification was to come from his client.

. . .

25   On another occasion, when prosecuting counsel announced that his next witness was going to be Colin Pryce, Mr. St. John Stevens asked whether he might take instructions from his client, and was allowed to do so. Later on, after the appellant's brother, Dwene Ebanks, had given his evidence-in-chief and had apparently dealt with certain matters which had not been mentioned in his statement, counsel for Powell asked for a moment to consult his client and Mr. St. John Stevens asked if he could take instructions at the same time. It is also noticeable that when the judge reserved his judgment and proposed to give it at a time after Mr. St. John Stevens was due to fly back to the United Kingdom, Mr. St. John Stevens nonetheless recognized that he should be present. In the event, he was indeed present at the short hearing even though, of course, there was little which he could say on behalf of Mr. Ebanks when he was convicted of murder."

41   He concluded (*ibid.*, at para. 26):

"These passages in the record suggest that, so far from being uncaring or cavalier about Mr. Ebanks' views, instructions and interests, Mr. St. John Stevens was careful to consult his client whenever appropriate. It would make absolutely no sense to suppose that when he had taken care in these relatively minor matters, he had simultaneously been riding roughshod over Mr. Ebanks' views as to whether he should give evidence. Moreover, it is extremely difficult to see why counsel would have deliberately flouted a desire on Mr. Ebanks' part to give evidence when the lack of any evidence from him was likely to cause potential difficulties, especially in the *voir dires*. In these circumstances their Lordships are satisfied that, although counsel culpably failed to have the matter recorded at the time, they can accept the evidence of Mr. McGrath and Mr. St. John Stevens that they were following Mr. Ebanks' instructions in not calling him to give evidence."

42   As to the second complaint, regarding the failure of the applicant's

lawyers to put his denial that he made the statement to the police officers, the Board disagreed with the Court of Appeal and the trial court and found that it was counsel's duty to put the defendant's case, even where he did not intend to call evidence to support it. Lord Rodger noted (*ibid.*, at paras. 31–32) that—

> "31 . . . If . . . the police officers have indeed been lying, then there can be no proper objection to cross-examination which successfully exposes those lies, even if the defendant does not subsequently go into the witness box to give positive evidence about those lies. On the other hand, the reality is that, if the police officers robustly reject the imputations against them, such allegations will usually carry little weight with the jury unless the defendant backs them up by giving evidence and, as Waller, L.J. pointed out, if the defendant fails to do so, the judge will be fully entitled to make a strong comment on that failure . . .
>
> 32 . . . Even if Mr. Ebanks had said all along that he would not give evidence that would not, of itself, have been a reason why counsel could not have cross-examined the police officers to the effect that he had not made the statement if Mr. Ebanks' instructions were that counsel should do so. Indeed, as a matter of proper professional practice, he would still have been bound to do so."

43    However, he concluded (*ibid.*, at para. 33) that—

> "the point does not actually arise in this case, however, since there is nothing in the affidavits of counsel to suggest that Mr. St. John Stevens proceeded as he did because he thought that it would have been professionally improper to suggest to the police witnesses that Mr. Ebanks had not made the statement when Mr. Ebanks was not going to give evidence to back it up. The Court of Appeal therefore really proceeded on a basis for which there is no foundation in the attorneys' affidavits. In fact, the position taken by Mr. McGrath and Mr. St. John Stevens in their affidavits is simply that the allegation was not advanced because Mr. Ebanks instructed that it should not be."

44    Considering the applicant's allegation that counsel had defied his instructions in not challenging the evidence of the police officers, Lord Rodger preferred the evidence of the trial lawyers (*ibid.*, at para. 34):

> "Again, their Lordships note that this allegation did not surface until some eight months after the trial, and, again, the Board notes that the allegation is hard to square with the obvious care taken by Mr. St. John Stevens to obtain his client's instructions at various points throughout the trial. Moreover, Mr. Ebanks advances no reason why counsel should have chosen to flout his instructions on this matter,

which by no means simplified the presentation of the defence case, especially in the *voir dires*. On the other hand, the line which counsel adopted in the *voir dires* was consistent with the instructions which they say that he had given them: standing those instructions, the only thing that they could try to do was to have the statement excluded on the grounds which Mr. St. John Stevens advanced and argued with great care, as is obvious from the transcript of the submissions made to the judge."

45   Lord Rodger concluded (*ibid.*, at para. 35):

"It is not possible to say why Mr. Ebanks decided not to give evidence and to limit the scope of counsel's attack on the police evidence. It may be that he was not confident of withstanding cross-examination by prosecuting counsel. It may be that he thought it better tactically not to challenge the evidence of the police officers head-on. It may be, as Mr. Perry suggested, that his overall strategy was to keep as low a profile as possible and to rely on Powell's evidence that Ebanks was not present when he killed Curtis Seymour. This would be consistent with the way in which counsel for Powell went first in cross-examination, even though Mr. Ebanks was named first on the indictment. Whatever the reasons may be, their Lordships are satisfied that Mr. St. John Stevens acted in accordance with his client's instructions at the time. Having been convicted, Mr. Ebanks may now have come to believe that his instructions were different, but there is no adequate basis for holding that counsel acted improperly. On the contrary, the record suggests that, as the judge considered, like the other counsel Mr. St. John Stevens had paid diligent attention to the preparation of the case."

46   In his dissenting judgment, Lord Steyn considered the Court of Appeal's decision to refuse *viva voce* evidence on the ground that the applicant had not lodged a response to the affidavits of his former solicitors to be "astonishing." He noted that Mr. McGrath's affidavit was served eight days before the appeal hearing, and Mr. St. John Stevens' only two days before the appeal hearing. He found (*ibid.*, at para. 39) that—

"in any event, at the very least on the affidavit evidence there was a clear dispute of fact. So far as there was ambiguity, it was due to the fact that Mr. St. John Stevens (unlike Mr. McGrath) did not directly address the core point in the appellant's affidavit, *i.e.* that he told the attorneys that he never made any confession. In these circumstances, the Court of Appeal erred in refusing to hear *viva voce* evidence, and the decision of the Court of Appeal should be quashed for failure to accord the appellant due process."

47   As to the question whether the Court of Appeal could have declined

to hear oral evidence on the ground that it would make no difference, Lord Steyn said (*ibid.*, at paras. 41–42):

> "41 . . . To have decided the case on such a basis would have been unfair and contrary to due process. After all, it is entirely possible (and even likely) that Mr. St. John Stevens would have made the same core concession that Mr. McGrath made, *viz.* that the appellant insisted that he made no confession to the police.
>
> 42 It is necessary to consider the consequence of the hypothesis that the appellant's core allegation in his affidavit (that he told counsel that he did not make the confession) is or may be correct. On this basis, trial counsel should have cross-examined the police to this effect despite the fact that it had been decided not to call the appellant to give evidence. Again, Mr. McGrath's evidence supports this critical point."

48 Lord Steyn concluded (*ibid.*, at para. 44) that—

> "legal principle dictates that counsel's duty is to put the defendant's case, whether or not he intends to call evidence to support. The misunderstanding by the Court of Appeal may well have been widespread in Caribbean countries. That this 'would have been clear to Ebanks,' as the Court of Appeal observed, is absurd, but the Court of Appeal clearly thought that counsel did not put it to the police that they fabricated their version because he considered that it would have been improper to do so. Indeed, that is what Rowe, J.A. said. The Court of Appeal would have been in a position to have a local view of counsel's perceptions of an advocate's duty (mistaken as it was) in the given situation. In any event this explains why counsel did not cross-examine the police appropriately. The failure to do so (when it was required) amounts in the circumstances to a material irregularity. It potentially prejudiced the appellant's defence, and it is impossible to say that, absent the irregularity, the jury would inevitably have convicted."

## 2. Relevant domestic law and practice

### (i) Cayman Islands

49 The Cayman Islands is a British overseas territory. The United Kingdom is responsible for its international relations. Under art. 56 of the Convention, the United Kingdom has made a declaration extending the application of the Convention to the Cayman Islands.

50 The Cayman Islands has its own government, with the power to make its own laws, and its own justiciary under its Constitution, established by the Cayman Islands (Constitution) Order 1972. Its legal system is based

on English common law and the Judicial Committee of the Privy Council is the court of final appeal under the Cayman Islands (Appeals to Privy Council) Order 1984.

### (ii) Recording of defendant's wish not to testify

51    In *R.* v. *Bevan* (12), Watkins, L.J. considered the position as regards the decision of a defendant not to testify. He noted (98 Cr. App. R. at 358) that—

> "one criticism has, however, to be levelled at learned counsel. It is to be hoped that all counsel will heed what we now say. When the decision is taken by a defendant not to go into the witness-box, it should be the invariable practice of counsel to have that decision recorded and to cause the defendant to sign the record, giving a clear indication that (1) he has by his own will decided not to give evidence and (2) that he has so decided bearing in mind the advice, if any, given to him by his counsel. That certainly was the practice in the days when the members of this Court were practising at the Bar. It should never have been departed from. It is our firm view that if the practice has fallen by the wayside, it should be restored to its former prominence and become invariable once again."

52    Subsequently, in *R.* v. *Chatroodi* (14), Pitchford, J. reiterated the importance of ensuring a written record of the defendant's decision ([2001] EWCA Crim 585, at paras. 39–40):

> "[39]    As long ago as 1993 Watkins, L.J., giving the judgment of this Court in *R.* v. *Bevan*, 98 Cr. App. R. 354, said that it should be the invariable practice of counsel to record any decision of a defendant not to give evidence, signed by the defendant himself, indicating, clearly, that the decision had been made of his own free will, and that in reaching that decision [he] has borne in mind advice tendered by counsel. We are bound to express some dismay at the knowledge that comparatively senior counsel, advising a client not to give evidence . . . was unaware of this obligation.

> [40]    While we would not expect counsel to record every detail of every conference between himself and his client, we would expect some written record of a conversation relevant to the important question whether it was in the defendant's interests to give evidence at his trial. This Court suffers the disadvantage, in the absence of such a record, of being required to evaluate the recollections of counsel, on the one hand, and the appellant on the other."

53    The Privy Council ruled that the practice of recording a defendant's decision not to testify was also desirable in the Caribbean jurisdictions in *Bethel* v. *State* (3). There, the appellant had alleged that his counsel had

acted improperly in several respects, including in not permitting him to give evidence. Lord Hoffmann recorded that their Lordships felt bound to say that (55 W.I.R. at 398)—

> "they are surprised that in a capital case no witness statement was taken from the petitioner or other memorandum made of his instructions. In view of the prevalence of allegations such as those now made, they think that defending counsel should as a matter of course make and preserve a written record of the instructions he receives. If this appeal serves no other purpose, it should remind counsel of the absolute necessity of protecting themselves from such allegations in the future."

### (iii) Counsel's duty to put defendant's case

54   It was previously thought to be improper to make a charge against a witness at trial which was not supported by testimony from the defendant. In *R.* v. *O'Neill* (15), having referred to the defence allegation that the alleged statement had been beaten out of the defendant, Lord Goddard, C.J. said (34 Cr. App. R. at 110–111):

> "However, what the Court desires to call attention to is this: *having suggested this in cross-examination to the police, and having repeated the suggestion before the jury, counsel did not call his client to support what he had been instructed to say, and the Court has no hesitation in saying that that is not the proper practice* . . . It is quite wrong and improper conduct on the part of counsel to make a charge against the police or against any other witness by way of defence— because, of course, it would have been a defence if the statements which were the principal evidence against the applicants had been extracted from them by improper means—if he does not intend to call his client to give evidence to support the charge.
>
> . . . *It is* . . . *entirely wrong to make such suggestions as were made in this case, namely that the police beat the prisoners until they made confessions, and then, when there is the chance for the prisoners to substantiate what has been said by going into the box, for counsel not to call them.* The Court hopes that notice will be taken of this, and that counsel will refrain, if they do not intend to call their clients, from making charges which, if true, form a defence but which, if there is nothing to support them, ought not to be pursued." [Emphasis supplied.]

55   In *R.* v. *Callaghan* (13), Waller, L.J. in the Court of Appeal endorsed the passage from *O'Neill* and added (69 Cr. App. R. at 92): "This Court entirely agrees with those observations. It does not seem to us there has been any change in circumstances since that decision was made which would justify some different ruling being made."

221

56   However, Waller, L.J. subsequently made a statement relating to his judgment in *Callaghan* (*The Times*, February 20th, 1980, at 10, "Challenging Police Evidence"). According to the report:

> "His Lordship said that it appeared that there was an aspect of the problem which did not then occur to him. That had been brought to his attention by the professional conduct committee of the Bar. From time to time there might be a case where a client required a challenge to be made to a police officer but at the same time refused to go into the witness box to support that challenge because of his very bad record. Such a case should be wholly exceptional.
>
> In such circumstances counsel had a difficult decision. He must warn his client that the judge would probably make a very strong comment on his client's failure to support the suggestions on oath in the witness box. If nevertheless the client, having been warned, insisted, then counsel must carry out his instructions even though he was aware that his client would not support his cross-examination. His client could not complain if a strong comment was made from the Bench.
>
> His Lordship was making a statement now, but at some future time, when a suitable case occurred, it would be possible to modify the *dictum* which he made in *R.* v. *Callaghan.*"

57   Referring to this statement, the current edition of *Phipson on Evidence*, 16th ed., para. 12–30, at 330 (2005) comments: "It is submitted that now, as then, counsel's duty is to put the defendant's case, whether or not he intends to call evidence to support it."

58   As outlined above, the view of Waller, L.J. in his statement of February 1980 was endorsed by the Privy Council in the applicant's case.

## C. THE LAW

### 1. Alleged violation of art. 6(1) in conjunction with art. 6(3)(c) of the Convention

59   The applicant complained that the failure of his original lawyers to ensure that his case was put before the court in the trial proceedings and to act in accordance with his instructions, and the subsequent failure of the Court of Appeal and the Privy Council to remedy that failure, breached his rights under art. 6(1) taken together with art. 6(3)(c) of the Convention, which read as follows:

> "1.   In the determination of . . . any criminal charge against him, everyone is entitled to a fair . . . hearing . . . by [a] . . . tribunal . . .

222

. . .

> 3.   Everyone charged with a criminal offence has the following minimum rights:
>
> . . .
>
>    (c)   to defend himself in person or through legal assistance of his own choosing or, if he has not sufficient means to pay for legal assistance, to be given it free when the interests of justice so require; . . ."

The Government contested that argument.

### (i) Admissibility

60   The court notes that the application is not manifestly ill-founded within the meaning of art. 35(3) of the Convention. It further notes that it is not inadmissible on any other grounds. It must therefore be declared admissible.

### (ii) Merits

### (a) *The parties' submissions*

(i) *The applicant*

61   The applicant disputed that the evidence of the lawyers in their affidavits was "clear and unequivocal" such that *viva voce* evidence was not required. He pointed to Lord Steyn's observation that Mr. St. John Stevens did not directly address the applicant's allegation that he told his lawyers that he had not made the alleged confession. He also disputed that his lawyers had at all times acted in accordance with his instructions, alleging that they had failed to put forward his defence at trial. He claimed that although he wanted to expose the fabrication of the police officers' account, he was "discouraged and talked out of" doing so by his counsel.

62   The applicant further submitted that the lack of a written record of his decision not to give evidence was a serious impropriety which prevented him from having a fair trial.

63   The refusal to hear *viva voce* evidence had a significant detrimental effect on the determination not only of whether the applicant had made the alleged confession but also of whether he had genuinely decided of his own free will not to give evidence.

(ii) *The Government*

64   The Government emphasized that the applicant was represented by experienced leading counsel, junior counsel and two attorneys. During the course of the trial, leading counsel made every effort to comply with the

applicant's instructions and to defend him in the most appropriate and effective manner. The Government relied on the record of the proceedings which showed that counsel sought regularly to obtain the applicant's instructions on matters concerning the conduct of the trial. Further, the clear and unequivocal evidence given in the applicant's lawyers' affidavits was that the trial was conducted in accordance with the applicant's express instructions. The Government concluded that the applicant's instructions to his lawyers that they were not to suggest that the police officers had fabricated his statement were for tactical reasons: a challenge to the police officers' integrity would have allowed the prosecution to adduce evidence of the applicant's previous bad character. Moreover, the applicant sought to rely on Mr. Powell's evidence that he, Mr. Powell, had killed the victim acting alone, even though this account of events was inconsistent with the other evidence in the case.

65    The Government considered that the determination of the criminal charge against the applicant was in all respects fair and in accordance with the requirements of art. 6. They relied on the fact that the domestic courts had found that the applicant instructed his counsel to challenge the admissibility of the evidence given by the police officers on grounds of unfairness, oppression and omission to administer a full caution and that the applicant's counsel had made every effort to comply with the applicant's instructions and conduct his defence in an appropriate and effective manner. They emphasized that the trial judge had conducted the trial in a careful manner giving well-reasoned and entirely persuasive rulings as to the admissibility of the evidence; that the trial judge had made clear before giving his rulings and in the presence of the applicant himself that the defence case was weak in the absence of evidence from the applicant; that at no stage did the applicant voice any complaint about the conduct of proceedings and the record of proceedings demonstrates the care of his lawyers in advancing an effective and appropriate defence; that the first time the applicant asserted that his counsel had acted in defiance of his instructions was nine months after the conclusion of his trial; that the clear and unequivocal evidence given in the applicant's lawyers' affidavits was that the trial was conducted in accordance with the applicant's express instructions; that there were sound tactical reasons for the applicant to instruct his lawyers not to deny that he had made the statement; and that the Privy Council considered the applicant's complaint in detail and reached the same conclusion as the Court of Appeal. It was significant to note that the Privy Council had the benefit of a full transcript of the trial proceedings.

66    As to the alleged failure of the applicant's lawyers to put his denial that he had ever made the alleged statement before the court, the Government pointed to Mr. St. John Stevens' affidavit in which he stated that the applicant's instructions were that he would not give evidence and

224

that the prosecution should be required to prove that the confession statement was made voluntarily. That these were the applicant's instructions was supported by the evidence of Mr. McGrath. Evidence of other lawyers involved in the case did not contradict this position. Both the Court of Appeal and the Privy Council found that the applicant's lawyers had complied with his instructions. In doing so, the courts had examined the credibility of the applicant's allegation carefully and had rejected it in a highly persuasive manner. Relying on *Klaas* v. *Germany* (10) (18 E.H.R.R. 305, at paras. 29–31) and *Edwards* v. *United Kingdom* (6) (15 E.H.R.R. 417, at para. 34), the Government contended that there was no basis for the court to proceed to make a new assessment of the facts as found by the domestic courts as their conclusions were neither arbitrary nor unfair. The Government therefore invited the court to accept the findings of fact made by the domestic courts.

67   The Government disputed the suggestion that defence counsel at trial had proceeded on the basis that it would have been improper to have suggested that the police officers were lying unless the applicant was prepared to give evidence to that effect. They argued that there was no evidence to suggest this and that the point did not arise directly for consideration in the appeal to the Privy Council.

68   As to the failure of the applicant's counsel to record in writing the applicant's decision not to give evidence, the Government highlighted that the Court of Appeal had considered the matter with some care and took note of the experience of the applicant's counsel, the sworn evidence of the lawyers involved and the fact that they had made sufficient efforts to meet with the applicant regularly. Although the failure to record the applicant's decision in writing did not accord with best practice, this shortcoming could be remedied by a factual determination of the question whether the applicant wished to remain silent. In this regard, it was significant that at no stage during the trial had the applicant indicated that he wished to give evidence. There was nothing in the record of proceedings to support his allegation. On the contrary, the record of the *voir dire* hearings showed that the trial judge had positively encouraged the applicant to give evidence. After taking instructions, counsel for the applicant had informed the court that no evidence would be called. Accordingly, on the factual question, the domestic courts found that the applicant's account was not credible. The Government argued that it was not the role of the court to act as a fourth instance tribunal. The failure to keep a written record did not of itself render the trial unfair.

69   Regarding the refusal of the Court of Appeal to hear *viva voce* evidence, the Government contended that the Court of Appeal was satisfied that it could reach a decision on the basis of the available evidence. Moreover, the position was considered afresh in the Privy Council, where it was reiterated by Lord Rodger that a court may feel able

225

to resolve such a dispute without hearing evidence. The Government insisted that this must be the correct approach as an appeal court could not be required invariably to hear evidence where a factual dispute arose between the parties. Furthermore, rules on admissibility of evidence were primarily a matter for regulation under national law (referring to *Schenk v. Switzerland* (17)).

### (b) *The court's assessment*

70   The applicant alleged that he did not have a fair trial and complained of a violation of art. 6(1) and (3)(c) of the Convention. The court first notes that the guarantees in art. 6(3) are specific aspects of the right to a fair trial in criminal proceedings as set forth in para. (1) of the same article. Accordingly, the applicant's complaint will be examined under these provisions taken together (see among other authorities, *Benham v. United Kingdom* (2) (22 E.H.R.R. 293, at para. 52) and *Kulikowski v. Poland* (11) ([2009] ECHR 18353/03, at para. 55)).

71   The court observes that the responsibility of the contracting parties is incurred by the actions of their organs. A lawyer, even if officially appointed, cannot be considered to be an organ of the State. Given the independence of the legal profession from the State, the conduct of the case is essentially a matter between the defendant and his or her counsel, whether counsel be appointed under a legal aid scheme or be privately financed, and, as such, cannot, other than in special circumstances, incur the State's liability under the Convention (see *Artico v. Italy* (1) (30 E.H.R.R., at para. 36); *Daud v. Portugal* (5) (30 E.H.R.R. 400, at para. 38); *Tuzinski v. Poland* (20); *Rutkowski v. Poland* (16); and *Cuscani v. United Kingdom* (4) (36 E.H.R.R. 2, at para. 39)).

72   Nevertheless, assigning counsel to represent a party to the proceedings does not in itself ensure the effectiveness of the assistance (see *Imbrioscia v. Switzerland* (9) ([1993] ECHR 13972/88, at para. 38)). There may be occasions when the State should act and not remain passive when problems of legal representation are brought to the attention of the competent authorities. It will depend on the circumstances of the case whether, taking the proceedings as a whole, the legal representation may be regarded as practical and effective (see, *mutatis mutandis, Artico v. Italy* (1) (3 E.H.R.R. 1, at para. 33); *Goddi v. Italy* (7) (6 E.H.R.R. 457, at para. 27); *Rutkowski v. Poland*; *Staroszczyk v. Poland* (19) (50 E.H.R.R. 6, at paras. 121–122); and *Sialkowska v. Poland* (18) (22 BHRC 695, at paras. 99–100)).

73   In considering whether the trial proceedings were fair within the meaning of art. 6, the court must consider the proceedings as a whole, including the decision of the appellate courts. Moreover, it is not for the court to substitute its own assessment of the facts (see, *inter alia, Klaas v. Germany* (10) (18 E.H.R.R. 305, at para. 29)). As a general rule, it is for

the national courts to assess the evidence before them as well as the relevance of the evidence which defendants seek to adduce and the court will only interfere where the assessment of the evidence or establishment of the facts by the domestic courts can be impeached on the ground that they were manifestly unreasonable or in any other way arbitrary (*IJL* v. *United Kingdom* (8) ([2002] BCC 380, at para. 99)). Similarly, the decision as to whether in a particular case it is appropriate to call witnesses to testify is one for the domestic courts (see *Vidal* v. *Belgium* (21) ([1992] ECHR 12351/86, at para. 33)). The court's task is to ascertain whether the proceedings in their entirety, including the way in which evidence was heard, were fair (see *Edwards* v. *United Kingdom* (6) (15 E.H.R.R. 417, at para. 34)).

74   The court observes that the applicant's allegations of unfairness in respect of the first instance trial proceedings centred on two factual disputes: the first concerning his decision not to give evidence at trial; and the second regarding his instructions to his lawyers at trial as to whether to put before the court his denial that he made a statement to the police. The applicant complained that, in reaching its decision on these matters, the Court of Appeal ought to have heard *viva voce* evidence.

75   As its starting point, the court agrees with the Government that an appeal court cannot be required invariably to hear oral evidence where a factual dispute arises on appeal. To impose such a duty on appellate courts would excessively curtail their discretion to deal with the cases before them in an appropriate and proportionate manner. Where a factual dispute arises, the court is entitled to consider whether it is able to resolve the dispute on the basis of any affidavits and other material placed before it or whether fairness requires that oral evidence be heard. In deciding upon the correct course of action in a given case, the court is entitled to have regard to the strength of the evidence contained in the written materials as well as to the potential clarifications which oral evidence would bring as regards the factual dispute in question. However, where the written material before the appeal court is ambiguous or unclear in respect of details relevant to the ground of appeal raised, fairness may require the appeal court to hear oral evidence in order to seek to clarify the positions of the parties.

76   As regards the applicant's complaint that he was prevented from giving oral evidence at trial, the court emphasizes at the outset that it is clearly unfortunate that the applicant's desire not to give evidence was not recorded in writing. However, in the absence of such a record, the question whether the applicant chose to remain silent of his own free will was a question of fact to be resolved on the basis of the evidence available. In the present case, the court notes that the Court of Appeal had the benefit of affidavits from the applicant and his trial counsel. The clear picture which emerged from the affidavits of counsel was a denial of the allegation contained in the applicant's affidavit that he had failed to understand the

implications of not giving evidence. The Court of Appeal also considered it significant that the applicant's counsel were experienced lawyers and had met with him regularly before the trial to discuss his case (see para. 35 above). Further, the court observes that Lord Rodger, on behalf of the majority in the Privy Council, examined the applicant's complaint afresh. With the benefit of a full transcript of the trial proceedings, he noted that the applicant had not raised this complaint at any time during trial and that it was first made some nine months after the conclusion of the trial (see para. 39 above). He further emphasized that the record of the trial showed the time and care taken by Mr. St. John Stevens to ensure that the applicant understood the proceedings and agreed to the steps taken on his behalf, citing specific examples (see para. 40 above). Finally, he pointed out that, given the difficulties that the applicant's refusal to give evidence was likely to create for counsel's presentation of his defence, it was hard to see why counsel would have "deliberately flouted" the applicant's wish to give evidence (see para. 41 above).

77   The court agrees with the findings of the domestic courts that, on the question of the failure of the applicant to give oral evidence at trial, the contents of the affidavits were clear. In these circumstances, fairness did not require the hearing of *viva voce* evidence on this issue. As to the conclusions of the domestic courts, the court considers that it was not unreasonable for the Court of Appeal and the Privy Council to conclude, on the basis of the affidavit evidence and the verbatim record of the trial as well as the general context of the applicant's case, that counsel had acted in accordance with the applicant's instructions and that the applicant had genuinely decided of his own free will not to give evidence in his defence. There are therefore no grounds for the court to interfere with the domestic court's assessment of the facts on this matter.

78   As regards the failure of counsel to challenge the police officers' evidence that the applicant had made a statement, the court notes that the Court of Appeal dismissed the applicant's appeal on the mistaken under-standing that it would only be possible to challenge such evidence where the applicant gave oral evidence in support of that challenge. The court having found that the applicant's decision not to give evidence was freely made, it necessarily followed that he could not claim any unfairness from the failure of his counsel to present a positive case (see para. 36 above). The court considers that if the applicant's counsel wrongly advised him that, in the light of his decision not to give evidence, they were unable to dispute the making of the statement, then this error was so fundamental that it deprived the applicant of a fair trial. However, the question arises whether, in the present case, any such mistaken advice was given to the applicant by counsel.

79   The court's starting point is the opinion of Lord Rodger in the Privy Council, in which he found that the Court of Appeal was wrong to

conclude that a positive challenge to the making of the statement could not be made in the absence of oral evidence from the applicant and emphasized that it was the duty of counsel to present the defence case, even where the defendant refused to give evidence (see para. 42 above). However, Lord Rodger concluded that the point did not arise on the facts of the applicant's case as the Court of Appeal had proceeded on a basis for which there was no foundation in the lawyers' affidavits (see para. 43 above). Like Lord Rodger, the court considers that there was nothing in the affidavit evidence to suggest that Mr. St. John Stevens had proceeded as he did because he thought it would be professionally improper to put to the police officers that the applicant had not made the statement when he was not going to give evidence in support of the submission (see paras. 28 and 31–32). The Court of Appeal did not find that counsel had advised the applicant thus (see para. 36 above). Further, the applicant himself did not allege, either in his affidavit or in his written submissions to this court, that he had been advised that it was improper for counsel to challenge the statement in the light of his refusal to give evidence. Instead, he claimed that he was "discouraged and talked out of" challenging the credibility of the officers (see para. 61 above). In the circumstances, the court considers that it was not unreasonable for the Privy Council to conclude that the Court of Appeal's conclusion on this issue was irrelevant to the disposal of the case and to proceed to deal with the applicant's complaint based on the written material before it.

80    In dismissing the ground of appeal, Lord Rodger referred again to the delay in making the complaint and to the obvious care taken by Mr. St. John Stevens to obtain the applicant's instructions during trial. He pointed out that the decision not to challenge the credibility of the police officers "by no means simplified the presentation of the defence case," particularly in the *voir dires* (see para. 44 above). He also highlighted that there may have been tactical reasons for the decisions made by the applicant in the presentation of his defence (see para. 45 above).

81    The court recognizes that in the context of any criminal proceedings, decisions must be made as to how best to present an accused's defence at trial. In many cases several options will be available and it is the responsibility of the accused to select, with the advice of counsel, the defence which he wishes to put before the court. Any defendant subsequently convicted will naturally feel aggrieved if he had an alternative defence which was not, in the event, pursued. He may convince himself, often unrealistically, that the alternative defence would have been successful where the actual defence forwarded was not. However, it is not in the interests of justice to allow a defendant to seek to advance such alternative defence after his conviction unless there are special circumstances which give rise to a real concern that the legal representation at trial was defective in a fundamental respect.

82    In the present case, the court notes that the allegations as to counsel's failure to comply with the applicant's instructions were first made some nine months after the conclusion of the trial and not, as might reasonably be expected, immediately or at least very shortly after. The court further notes that the verbatim transcript of the trial, which was available to the Privy Council in its consideration of the case, provides strong evidence of the attentiveness of counsel to the wishes and instructions of the applicant. Both Mr. McGrath and Mr. St. John Stevens were clear in their affidavits as to the content of the applicant's instructions and the fact that they had acted in accordance with those instructions (see paras. 31–32 above). In the circumstances, the court does not consider the conclusions of the Privy Council to be manifestly unreasonable or arbitrary.

83    As to whether the domestic courts ought to have heard *viva voce* evidence, the court acknowledges that the statement of Mr. St. John Stevens did not address directly the question whether the applicant had consistently denied making the alleged confession. However, the relevant question for the applicant's appeal was not whether he denied making the confession but whether he instructed his solicitors to present a positive case to that effect at trial. As noted above, the lawyers' affidavits were clear on this point. Mr. McGrath noted that—

> "whilst it is correct to say that no positive case was ever put in relation to [the applicant's denial that he made a statement] this was upon the appellant's instructions . . . Because he would not give evidence the appellant chose not to put his case about not making the confession to the police officers in the course of the trial proper [see para. 31 above]."

Mr. St. John Stevens said:

> "The appellant's instructions were that the Crown should be put to proof as to establishing that the confession in issue was made voluntarily and that no positive case would be put over and above this issue . . . I am satisfied that the appellant's case was presented in accordance with and upon clear and unequivocal instructions [see para. 32 above]."

The position of counsel was, in this respect, unambiguous and there was therefore no requirement for the court to hear *viva voce* evidence on the matter.

84    There has accordingly been no violation of art. 6(1) in conjunction with art. 6(3)(c) of the Convention.

### D. ORDER

85    For these reasons, the court unanimously—

GRAND CT.                    IN RE BERNARD MADOFF INV. SECS.

(i) declares the application admissible; and

(ii) holds that there has been no violation of art. 6(1) of the Convention in conjunction with art. 6(3)(c)

*Application dismissed.*

Attorneys: *Appleby* for the applicant; *Govt. Legal Dept.*

---

**[2010 (1) CILR 231]**

## IN THE MATTER OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC

GRAND COURT, FINANCIAL SERVICES DIVISION (Jones, J.):
February 5th, 2010

*Companies—liquidators—recognition of foreign liquidator—recognition under Companies Law (2009 Revision), s.241(1)(a) convenient way of establishing foreign liquidator's sole right to act generally for foreign company in Cayman Islands, if validly appointed under law of place of company's incorporation*

The petitioner sought a declaration recognizing his right to act in the Cayman Islands on behalf of Bernard L. Madoff Investment Securities LLC ("BLMIS").

The petitioner was appointed trustee for the liquidation of BLMIS in a US bankruptcy court. He commenced proceedings against a Cayman company, and it was likely that he would wish to commence further proceedings against other Cayman entities.

The petitioner applied for a declaration under s.241(1)(a) of the Companies Law (2009 Revision) recognizing him as the sole person having the right to act on behalf of BLMIS in the Cayman Islands.

**Held,** granting the application:
The court would make the declaration sought under s.241(1)(a) of the Companies Law (2009 Revision). Given that the petitioner had already commenced proceedings against one Cayman entity and it was likely that more would follow, such a declaration would be appropriate since the purpose of the provision was to provide a foreign bankruptcy trustee or liquidator with a convenient way of establishing his right to act on behalf of a debtor universally within the Cayman jurisdiction (rather than on a

[2006 CILR 198]

## EBANKS (K.F.) v. R.

JUDICIAL COMMITTEE OF THE PRIVY COUNCIL (Lord Rodger of
Earlsferry, Lord Steyn, Lord Carswell, Lord Mance and Sir
Swinton Thomas): March 27th, 2006

*Criminal Procedure—defence—testimony of accused—accused's unwill-
ingness to testify at trial to be recorded in writing by attorney, stating that
accused's free decision in light of legal advice (if any), giving reasons and
signed by accused—failure to adopt procedure improper but not
necessarily fatal to prosecution*

*Criminal Procedure—defence—testimony of accused—if accused refuses
to testify about alleged confession to police, remains open to attorney to
question truth of police evidence—accused to be warned that attack on
police credibility may be rejected*

*Criminal Procedure—appeals—matters of fact—if conflicting affidavits of
accused and attorney regarding instructions for conduct of trial, appeal
court may make own judgment by comparison of affidavits in context, or
may call viva voce evidence to resolve conflict*

The appellant was charged in the Grand Court with murder.

The appellant and his co-accused, P, were alleged to have committed a
robbery and later murdered the victim in his taxi. P confessed to stabbing
the victim, but claimed that he was alone in the taxi with him at the time.
The appellant denied being involved in the murder. The court accepted
P's confession, but not his testimony that the appellant was not present
during the murder. The appellant was also convicted of murder, on the
basis of the testimony of police officers who claimed that he had admitted
to them that he took part in the robbery and had passed a knife to P which
had then been used to stab the victim. In a series of *voir dires* (reported at
2001 CILR 24), counsel for the appellant had challenged the admissibility
of the officers' evidence, claiming that they had kept the appellant in
custody for too long, and the statement he made was not voluntary, but
these arguments were not accepted. He did not cross-examine the officers
on the content of the appellant's alleged confession nor call him to give
evidence in rebuttal of the officers' testimony.

Nine months after his initial conviction, the appellant instructed a new
attorney, and swore an affidavit claiming that at his original trial he had
told his attorney and counsel that the police were lying as he did not make

198

P.C.                                                EBANKS V. R.

the statement they described, and wanted to testify to that effect, but the attorney had persuaded him for tactical reasons not to give evidence, claiming that it would be better to dispute the officers' testimony on the ground of oppressive conduct. The original attorney and counsel filed affidavit evidence in response, stating that the appellant had denied making the statement, but did not want them to cross-examine the police officers to that effect and was himself unwilling to give evidence. The Court of Appeal (Zacca, P., Rowe and Taylor, JJ.A.) concluded, on the basis of the affidavits, that it was satisfied that the appellant took a deliberate and constant decision not to give evidence, and further stated that it would have been improper for the appellant's counsel to suggest to the police officers that they had fabricated the account they were giving, unless he was prepared to call the appellant as a witness. Despite the conflict between the affidavits, the Court of Appeal rejected the appellant's application to hear *viva voce* evidence to resolve the conflict and dismissed his appeal.

On further appeal, the appellant submitted that (a) he had wanted to give evidence that the police officers were lying about the statement they said he had made, and have them cross-examined to that effect, but been talked out of it by his attorney and counsel; (b) as they had failed to follow the rule of practice that required the keeping of a written record of his refusal to testify, he should be given the benefit of the doubt and the court should proceed on his version of events; and (c) even if the court believed that he had refused to testify, his counsel should have followed his instructions and cross-examined the police officers, regardless of whether he was willing to testify.

The Crown submitted in reply that (a) the attorney's and counsel's affidavits claimed that the appellant refused to testify, and they ought to be believed rather than the appellant as they had clearly taken care to ensure that he was informed about the details of the procedure in the case, which conflicted with the idea that they would ignore his wishes to give evidence, especially as it was harder for them to present his case without his testimony; (b) the fact that the appellant did not complain to anyone about the conduct of his legal representatives until nine months after his trial ought to cast doubt on his claims; (c) although his representatives had breached the rule of practice by failing to record in writing his refusal to testify, the conviction should still stand as, based on the available evidence, it was likely that their affidavits gave a more honest picture of the situation and therefore the appellant's conviction was safe and did not need to be set aside; and (d) the appellant had instructed the attorneys not to cross-examine the police officers on the basis of his allegations; if the court did not accept that submission, then in any case the verdict should not be set aside as it would have been improper for the attorneys to suggest in their cross examination that the police officers had fabricated the appellant's confession without calling him to support this claim.

**Held,** dismissing the appeal:

199

(1) Whilst, based on the surrounding evidence, the court was inclined to believe the affidavits of the attorney and counsel rather than that of the appellant, they had nonetheless acted improperly in failing to record in writing his refusal to give evidence by his own decision, together with his reasons for doing so and have that record endorsed by him. This failure did not automatically mean, however, that the conviction would be set aside (paras. 18–19; paras. 46–47).

(2) Although there was a clear conflict between the affidavits, it was open to both the Court of Appeal and the Judicial Committee to consider the detail of the affidavits in the light of all the circumstances and without taking further *viva voce* evidence. Having done so, the court concluded that the appellant's legal representatives had not in fact acted against his instructions or otherwise behaved improperly and was not persuaded that the initial verdict was unsafe (paras. 14–15; paras. 18–20; paras. 22–26; paras. 33–36; Lord Steyn and Sir Swinton Thomas dissenting, para. 39; para. 46).

(3) Additionally, the Court of Appeal had been wrong to conclude that the appellant's refusal to testify meant that it would be improper for his counsel to cross-examine the police officers as to the truth of their statements. Although it was unlikely that the judge would believe that the police officers had been lying if the appellant refused to give evidence in support of his allegations, having made the appellant aware of this fact it was the attorney's and counsel's duty to carry out their client's instructions in this regard. However, as the court was inclined to believe the affidavits of the attorneys, the conviction would not be set aside on this basis (paras. 30–34; Lord Steyn and Sir Swinton Thomas dissenting, para. 44; para. 46).

**Cases cited:**
(1) *Bethel* v. *State* (1998), 55 W.I.R. 394; [1998] UKPC 51, considered.
(2) *Boodram* v. *State*, [2002] 1 Cr. App. R. 103; [2001] UKPC 20, referred to.
(3) *R.* v. *Bevan* (1993), 98 Cr. App. R. 354, considered.
(4) *R.* v. *Callaghan* (1979), 69 Cr. App. R. 88, not followed.
(5) *R.* v. *Chatroodi*, [2001] EWCA Crim. 585; [2001] All E.R. (D.) 259, considered.
(6) *R.* v. *Clinton*, [1993] 1 W.L.R. 1181; [1993] 2 All E.R. 998; (1993), 97 Cr. App. R. 320, referred to.
(7) *R.* v. *O'Neill* (1950), 34 Cr. App. R. 108, not followed.
(8) *R.* v. *Pendleton*, [2002] 1 W.L.R. 72; [2002] 1 All E.R. 524; [2002] 1 Cr. App. R. 34; [2002] Crim. L.R. 398; [2001] UKHL 66, applied.

*S.M. Froomkin, Q.C.* for the appellant;
*D. Perry, Q.C.* and *C. Walker* for the Crown.

1   **LORD RODGER OF EARLSFERRY,** delivering the opinion of the majority: On the morning of January 18th, 2000 the body of Curtis

P.C.                          EBANKS V. R. (Lord Rodger of Earslferry)

Seymour was found in a refuse disposal area near the Flowers Apartment complex off Walkers Road in George Town. He had been stabbed to death. In due course the appellant, Kurt Fabian Ebanks, and his co-defendant, Bryan Roland Powell, were tried for his murder before Henderson, Ag. J. sitting without a jury in the Grand Court. Both defendants were convicted on January 26th, 2001 and were sentenced to life imprisonment. Both appealed to the Cayman Court of Appeal and on April 12th, 2002 the court (Zacca, P., Rowe and Taylor, JJ.A.) dismissed the appeals in a judgment delivered by Rowe, J.A. On July 27th, 2004 the Board granted the appellant special leave to appeal as a poor person.

2    At the hearing before the Board, Mr. Froomkin, Q.C., counsel for the appellant, argued a single ground of appeal, that the appellant had been denied a fair trial by reason of the conduct of counsel who represented him at the trial (his barrister, Mr. Philip St. John Stevens, and his attorneys, Mr. David Thomas McGrath, Mr. Gregory Link and Mr. Neville W. Levy). In fact, as their Lordships go on to explain, there were really two interrelated aspects to the ground of appeal.

3    At the trial, the only evidence against the appellant came from a statement which he was alleged to have made to W.P.C. Angela Campbell and D.C. Wayne Powell on February 17th, 2000. In order to appreciate the significance of that statement, it is necessary to look briefly at how the issues presented themselves at the trial. The Crown proceeded on the basis that on the night in question both the defendants had participated in a jointly planned robbery of Curtis Seymour and that both had participated in stabbing him to death in his taxi in the early hours of January 18th, 2000.

4    At the trial, Powell admitted that he had stabbed Seymour, but in evidence claimed that, at the time when the stabbing occurred, he had been alone in the taxi with Seymour. According to Powell, they drove to the Flowers Apartments, ostensibly to get some drugs. When they got there, Seymour asked him for money which Powell owed him for drugs that had been stolen from him before he could sell them. Powell had no money and Seymour drew a knife. In the ensuing fight Powell stabbed Seymour in self-defence. For reasons which he explained in his judgment, Henderson, Ag. J. accepted Powell's admission that he had stabbed Seymour and caused his death, but rejected the rest of the account which he had given in evidence. The judge accordingly convicted him of murdering Seymour.

5    If the judge had accepted the version of events given by Powell at the trial, it would have exonerated the appellant Ebanks since on that version he was not even present in the taxi when Seymour was killed. Not surprisingly, therefore, at the trial counsel for Ebanks did not cross-examine Powell when he gave evidence. In the result, however, since the

201

judge disbelieved Powell, his evidence was of no assistance to Ebanks. Equally, of course, the rejection of the account given by Powell in evidence did not prejudice the position of Ebanks. It was still necessary for the Crown to prove its case against Ebanks on evidence which was admissible against him. The only such evidence came from the statement which W.P.C. Campbell and D.C. Wayne Powell said that he had made to them on February 17th, 2000.

6   At the trial, the admissibility of their evidence about the alleged statement was challenged, first, in a *voir dire* on January 15th–16th, 2001, in which defence counsel "put the Crown to proof as to the voluntariness of the . . . remarks recorded by" the officers in question. The police officers gave evidence and were cross-examined. In the course of their evidence they spoke to the terms of the statement which they said that Mr. Ebanks had made. After they had given their evidence and had been cross-examined, the judge asked Mr. St. John Stevens whether he was calling any evidence on the *voir dire* and he replied "My Lord, I am not. Thank you." Mr. Ebanks was present when he said this. The judge heard legal submissions on the admissibility of the evidence on January 17th, 2001. In particular, counsel argued that the evidence had been obtained by an inducement. The judge rejected that argument and also rejected certain other arguments presented on behalf of the appellant, including an argument that the appellant should have been given a further caution before the statement was taken, and an argument that the confession should be excluded because it had been obtained unfairly.

7   After the trial judge had given judgment to this effect, Mr. St. John Stevens indicated that he did not accept that, in these circumstances, the evidence of the statement should be admitted. He wished to raise a further matter as to the circumstances in which Mr. Ebanks had been arrested and held in custody. In effect, he asked for a further *voir dire* on that point. The judge pointed out that it was unusual, to say the least, for there to be a further *voir dire* in relation to a statement which he had already ruled should be admitted in evidence, but in view of the serious nature of the charge and the importance of the evidence, the judge declared a further *voir dire* and heard evidence from two police officers in relation to that matter. Again, at the conclusion of the Crown evidence, and in the presence of Mr. Ebanks, his counsel announced that he was not calling any evidence. Having considered the evidence given on the *voir dire*, the judge again held that the evidence of the statement taken by W.P.C. Campbell and D.C. Wayne Powell was admissible.

8   Counsel for the Crown and for the defence agreed that the evidence given in the *voir dire* need not be repeated and the evidence-in-chief and the cross-examination became part of the evidence in the main trial. The judge gave counsel for the defence an opportunity to ask additional

questions. Counsel for Powell did so, but when his turn came, Mr. St. John Stevens took a moment to make sure that Mr. Ebanks understood that counsel were adopting the cross-examination from earlier. In the light of that, he then announced that he had no further questions.

9   According to the police witnesses, in his statement Mr. Ebanks accepted that he had taken part in a joint robbery of Curtis Seymour and, in particular, that at one point he had passed a knife to Powell which Powell had then used to stab Seymour. While recognizing the dangers of accepting Mr. Ebanks' confession because of the way it was taken, Henderson, Ag. J. was sure that it was true. In particular, he was satisfied beyond a reasonable doubt that Mr. Ebanks did hand Powell the knife knowing that it would be used by Powell to kill Seymour and thus eliminate him as a witness to their robbery. On that basis, the judge held that Mr. Ebanks had aided and abetted Powell in the killing of Seymour and convicted him of murder. In the hearing of the appeal before the Board, it was not disputed that the judge had been entitled to convict Mr. Ebanks in this way if he admitted and accepted the relevant part of his alleged confession.

10   On February 9th, 2001, the agents who had conducted the trial on his behalf gave notice of an application for leave to appeal against conviction on the ground that the conviction was unsafe and unsatisfactory, and indicated that full written grounds would follow. At some point after that, however, Mr. Ebanks instructed another attorney, Mr. Schofield, to act for him and, on October 22nd, 2001, Mr. Ebanks swore an affidavit about the conduct of counsel at this trial. On October 24th, 2001, Mr. Schofield gave notice that Mr. Ebanks was applying to the Court of Appeal to have his affidavit received in evidence. At the same time he lodged amended grounds of appeal alleging in particular that Mr. Ebanks had "continually and consistently instructed each of his defending counsel that he had not made the alleged statement and that it was a fabrication by the police officers." Failure to call him to testify on the *voir dire* proceedings, therefore, in defiance of or without proper instructions, "was a failure of judgment so fundamental in nature that the appellant was deprived of due process of law and did not receive a fair trial." On November 2nd, 2001, he lodged amended grounds of appeal in which he alleged that the conduct of counsel discouraged, impeded and prevented him from testifying that he did not make the statement, resulting in a material irregularity in the course of his trial. Thereafter, Mr. Ebanks having waived confidentiality, the attorneys who had acted for him at his trial swore affidavits which were lodged with the Court of Appeal shortly before the hearing of the appeal on November 23rd, 2001.

11   In his affidavit the appellant said that he did not give the statement to which the police officers had testified at his trial, claiming that they both lied to the court. He continued:

203

"When the *voir dire* started concerning my statement, I was expecting Mr. St. John Stevens to charge right at the two police officers who were lying and try to discredit them. But he didn't, and he kept telling me: 'This way is better. They gave you a truncated form of your rights.' He also kept saying to me: 'You've told me that you did not make the statement, but I'm going to attack it this way. They kept you in custody too long without charging you. I'll get the statement thrown out because of oppressive conduct.' Never once did he put to the officers the fact that I didn't make the statement at all. I sat in the court and listened to the two officers' lies and kept thinking that I would have my chance to talk later. At all times I wanted to testify and tell the judge under oath what I have stated in this affidavit. Then the time came and I was talked out of it by the two lawyers. They made me think that they knew best and so I put all my trust in them.

During the testimony of Angela Campbell, when I heard her lying about a number of things, I got upset and I raised my hand and said: 'I want to testify. I want to tell my side of the story.' Mr. Stevens jumped up and rushed back to me and said: 'Be careful what you're doing, Kurt. They haven't proved anything against you. They're not hurting you, they're not hurting you, so relax and behave and keep quiet, and don't put yourself in the stand and give them a chance to cross-examine you.' I told him: 'I don't have any problem going on the stand. I'm not guilty of anything. I don't have anything to hide.' He told me that if I took the stand and rebutted whatever the officers were saying the judge would more than likely believe them over me and in doing so my ground of appeal 'would be thrown out the window.' If I didn't testify, they would have a chance for an argument on the appeal. Mr. Stevens said that was the best way to approach the case.

At lunchtime on that day, Mr. McGrath came to see me about taking the stand. Mr. McGrath did not actually play much part in my trial. He was not in court every day and it was Mr. St. John Stevens who conducted my defence. On this day, Mr. McGrath gave me the impression that Mr. Stevens had sent him to talk to me. He said: 'This is the turning point in your case. We have to make a tactical decision. I know you were adamant from Day 1 that you gave no statement to the police officers.' I said: 'Yes, sir.' Then he said: 'It will be better to approach the case this way since nothing is damaging you.' He just talked and talked and I got confused and thought, 'Well, he's the lawyer,' and he talked me out of testifying. Because of that, the judge never got to hear what was the most important thing and that was that those two police officers fabricated a statement that I never made to them. Because of that statement, I

204

have been convicted of a murder I did not commit and had nothing to do with."

12   In his affidavit in reply, Mr. McGrath said:

"From a very early stage the appellant's instructions were firm and unequivocal in a number of regards:

(i) he would contest the allegation;

(ii) he would elect trial by judge alone;

(iii) he disputed the making of the alleged confession; and

(iv) at no stage in the proceedings would he give evidence.

The appellant alleges that his case was presented in defiance of his instructions. This is untrue. The conduct of the case at trial was entirely consistent with the appellant's particular instructions. Whilst it is correct to say that no positive case was ever put in relation to (iii) above, this was upon the appellant's instructions.

The appellant's instructions that he would not give evidence in the proceedings remained a central tenet of his position throughout.

The consequences of his not giving evidence were discussed in great detail with the appellant, both prior to the arrival of leading counsel and in the presence of leading counsel. The decision not to give evidence in the trial created tactical considerations and decisions for the appellant.

I explained to the appellant and advised him how this decision might affect his trial. I was present when leading counsel advised the appellant how this might affect his trial. I am satisfied that the appellant understood the advice and that he understood the implications of his decision not to give evidence.

The appellant chose to challenge the alleged confession on the basis of its admissibility. Upon instructions it was argued on the *voir dire* that the Crown could not satisfy the tribunal to the requisite criminal standard that what the police officers alleged had been said had been said voluntarily. I am satisfied that the appellant understood the advice offered and the instructions he was providing in relation to the conduct of the *voir dire.*

On the *voir dire* the learned trial judge ruled against the appellant and in favour of the Crown in relation to the submission that the alleged confession should be excluded. The potential consequences of such a ruling had been discussed and were discussed with the appellant before and during the trial. Because he would not give evidence the appellant chose not to put his case about not making

205

the confession to the police officers in the course of the trial proper. This was a topic which was discussed with him in some detail. I am satisfied that the appellant was aware that, having provided such instructions, the only triable issue for him would be the admissibility of the alleged confession."

In relation to Mr. Ebanks' affidavit, Mr. McGrath said this:

"Mr. St. John Stevens was instructed to challenge the admissibility of the alleged admission on the *voir dire*. At no stage did the appellant indicate to me any desire to testify in the proceedings. I did not 'talk him out of it.' I explained to the appellant on many occasions that the decision whether to give evidence or not was his and his alone. I explained that he could not be compelled to give evidence, neither could anyone stop him from giving evidence. Mr. St. John Stevens did not, as far as I am able to say, put any undue influence or pressure upon the appellant not to give evidence."

Finally, Mr. McGrath said:

"I did have many conversations with the appellant in the cells during the course of his trial. Mr. St. John Stevens did communicate to me that the appellant had become upset in the dock during the proceedings and there had been a short adjournment. The words which the appellant attributes to me in his affidavit are inaccurate in detail and in substance. At no stage did I say or would I have said 'we have a tactical decision to make.' I made it clear at all stages that the decision about testifying, as well as other substantial decisions were matters for the appellant and not matters for me or for leading counsel. I did not talk the appellant out of testifying. There was never any change of instructions in relation to the appellant's decision not to give evidence, nor in relation to the way he wished his case to be conducted."

13   In his affidavit in reply, Mr. St. John Stevens explained the general position in this way:

"I was instructed by Mr. David McGrath of Quin & Hampson. Mr. McGrath informed me that, *inter alia*, the appellant was contesting the matter, he did not wish to, indeed would not, give evidence and that he would elect a 'judge alone' trial. In the week before the trial commenced I conducted a conference at H.M.P. Northward with the appellant and Mr. McGrath. I confirmed the instructions that the appellant would not give evidence at any stage. I explained fully the ramification of not giving evidence, the tactical considerations and how he wished his trial to be run."

In relation to the allegation that the defence had been presented in defiance of, or without, proper instructions, Mr. St. John Stevens said:

"The appellant's case was presented in accordance with and upon clear and unequivocal instructions.

I am satisfied that at each material stage both before and during the trial the appellant's instructions that he would not himself give evidence were unequivocal.

I am satisfied that those instructions were given and confirmed after the ramifications of not giving evidence, whether it be during the *voir dire* or the trial, had been explained in detail by myself and David McGrath both together and independently, and that the appellant fully understood that advice.

The ramifications of not giving evidence were discussed and advice given in the context of the *voir dire,* the trial, and potential grounds of appeal.

The appellant's instructions were that the Crown should be put to proof as to establishing that the confession in issue was made voluntarily and that no positive case would be put over and above this issue."

In conclusion Mr. St. John Stevens said:

"These 'bedrock' instructions did not change. Up to the time of verdict, the learned judge 'retired' for three days to consider his judgment, the appellant was quite satisfied with the conduct of his defence and understood the avenue of appeal.

I am satisfied that the appellant's case was presented in accordance with and upon clear and unequivocal instructions.

I am satisfied that the instructions were given upon careful consideration both before and during the trial and that advice was fully understood.

I am satisfied from all I have seen, heard and read that the appellant's instructing attorney acted at all times with and upon proper instructions."

Mr. Link was not able to add much, but confirmed that it was his understanding that the appellant instructed Mr. McGrath and Mr. St. John Stevens that he would not give evidence at his trial and that he was not aware of any change in the appellant's instructions in relation to his giving evidence.

14   The affidavit made by Mr. Ebanks shows that he really complains about two separate but inter-related features of the conduct of his counsel at the trial. The first is that, although he wanted to give evidence in order to say, in particular, that he had not made the statement attributed to him

207

by the police witnesses, counsel in effect prevented him from doing so. The second is that counsel did not cross-examine the two police witnesses to the effect that they were lying and that the appellant did not make the statement to which they spoke in evidence. On behalf of the Crown, Mr. Perry did not dispute that, if counsel had defied Mr. Ebanks' instructions in either way, he would have been guilty of professional misconduct which would in effect have led to a denial of due process, with the result that the verdict would have to be quashed: see *R. v. Clinton* (6) ([1993] 1 W.L.R. at 1187–1188, *per* Rougier, J.) and *Boodram v. State* (2) ([2002] 1 Cr. App. R. 103, at paras. 38–40, *per* Lord Steyn).

15   The courts have stressed that cases where counsel has failed in this way are likely to be rare. Moreover, it is important to remember that, as Lord Hobhouse of Woodborough said in *R v. Pendleton* (8) ([2002] 1 All E.R. 524, at para. 36):

> "Unless and until the Court of Appeal has been persuaded that the verdict of the jury is unsafe, the verdict must stand. Nothing less will suffice to displace it. A mere risk that it is unsafe does not suffice: the appellant has to discharge a burden of persuasion and persuade the Court of Appeal that the conviction *is* unsafe."

On this basis, the Board turns to consider the position in this case.

16   As Mr. Froomkin emphasized, while Mr. McGrath specifically acknowledges that from the outset the appellant's position was that he disputed making the statement to the police officers, Mr. St. John Stevens does not address that issue. To that extent there could be said to be a difference between the two principal affidavits for the trial lawyers. The significance of that difference is less than might at first sight be thought, however, since, according to Mr. McGrath, even though that was the appellant's position, he was equally adamant from the outset that at no stage in the proceedings would he give evidence. In that situation, according to Mr. McGrath, while it is correct to say that no positive case was ever put in relation to the allegation that he had not made the statement, this was upon the appellant's instructions. This is consistent with Mr. St. John Stevens' position that the appellant's instructions were that no positive case would be put over and above the issue of the voluntariness of the confession.

17   Their Lordships note from Mr. Ebanks' affidavit that his contention is that he had wanted to give evidence to say that he had never given any statement to the police, but had been talked out of it by his counsel who advised him that it was preferable for him not to expose himself to cross-examination and to rely on the approach which they were adopting. Nonetheless, he accepts that at the trial his ultimate position was that he would not give evidence in the *voir dire*. The evidence of Mr. McGrath

P.C.                    EBANKS V. R. (Lord Rodger of Earslferry)

and Mr. St. John Stevens is, of course, also that Mr. Ebanks' instructions were that he would not give evidence in the *voir dire* or indeed at any other stage in the trial. To that extent, therefore, there is common ground between Mr. Ebanks and his counsel. The difference between them is that, according to Mr. Ebanks, his underlying position was that he wanted to give evidence but was persuaded not to, whereas Mr. McGrath and Mr. St. John Stevens say that, from the very outset, Mr. Ebanks insisted that he would not give evidence and that, even though the matter was fully discussed with him, this remained his position. It was a given of the situation that the trial had to be conducted on the basis that Mr. Ebanks would not give evidence.

18   It is unfortunate that there should be any room for doubt about the position. The decision whether or not to give evidence is always ultimately one for the defendant himself after receiving appropriate advice from counsel (see Bar of England & Wales, *Code of Conduct,* 8th ed., *Section 3: Written Standards for the Conduct of Professional Work*, at para. 11.4 (2004)) but the decision not to give evidence is one of such potential importance that it has long been recognized that it should be recorded in writing. In *R. v. Bevan* (3), Watkins, L.J. explained the position in this way (98 Cr. App. R. at 358):

> "One criticism has, however, to be levelled at learned counsel. It is to be hoped that all counsel will heed what we now say. When the decision is taken by a defendant not to go into the witness-box, it should be the invariable practice of counsel to have that decision recorded and to cause the defendant to sign the record, giving a clear indication that (1) he has by his own will decided not to give evidence and (2) that he has so decided bearing in mind the advice, if any, given to him by his counsel. That certainly was the practice in the days when the members of this Court were practising at the Bar. It should never have been departed from. It is our firm view that if the practice has fallen by the wayside, it should be restored to its former prominence and become invariable once again."

More recently, in *R. v. Chatroodi* (5), Pitchford, J. repeated the warning ([2001] EWCA Crim. 585, at paras. 39–40):

> "As long ago as 1993 Watkins L.J., giving the judgment of this Court in *R v Bevan* (1993) 98 Cr App R 354, said that it should be the invariable practice of counsel to record any decision of a defendant not to give evidence, signed by the defendant himself, indicating, clearly, that the decision has been made of his own free will, and that in reaching that decision [he] has borne in mind advice tendered by counsel. We are bound to express some dismay at the knowledge that comparatively senior counsel, advising a client not to give evidence, notwithstanding the provisions of s.35 of the

209

Criminal Justice and Public Order Act 1994, was unaware of this obligation.

While we would not expect counsel to record every detail of every conference between himself and his client, we would expect some written record of a conversation relevant to the important question whether it was in the defendant's interests to give evidence at his trial. This Court suffers the disadvantage, in the absence of such a record, of being required to evaluate the recollections of counsel, on the one hand, and the appellant on the other."

19   The reasons which make the practice desirable apply with equal force in the Caribbean jurisdictions, as the Board made clear in *Bethel* v. *State* (1). The appellant had alleged that his counsel had acted improperly in several respects, including not permitting him to give evidence. Lord Hoffmann (55 W.I.R. at 398) recorded that their Lordships felt bound to say that—

". . . they are surprised that in a capital case no witness statement was taken from the petitioner or other memorandum made of his instructions. In view of the prevalence of allegations such as those now made, they think that defending counsel should as a matter of course make and preserve a written record of the instructions he receives. If this appeal serves no other purpose, it should remind counsel of the absolute necessity of protecting themselves from such allegations in the future."

Although there the Board was dealing with a capital case, the practice is equally desirable in non-capital cases. Since it appears that even experienced counsel are still failing to follow the practice, their Lordships wish to emphasize yet again that, where it is decided that the defendant will not give evidence, this should be recorded in writing along with a brief summary of the reasons for that decision. Wherever possible, the record should be endorsed by the defendant.

20   Mr. Froomkin submitted that the rule of practice was so important that, where it had not been followed, the appellant should be given the benefit of the doubt and an appeal court should proceed on the basis of his version of events. Their Lordships would not accept that submission. Rather, in the absence of any written record, an appeal court has to consider the respective accounts of the appellant and of his former counsel and evaluate them in the light of the other relevant circumstances.

21   In carrying out that exercise, the appeal court may well find it desirable to hear evidence from those concerned. The Court of Appeal declined to do so in this case. One submission made on behalf of the appellant was, accordingly, that the appeal should be allowed and the case remitted to the Court of Appeal to hear evidence before reconsidering the

210

grounds of appeal. There may, however, be cases where, having regard to the surrounding circumstances, the court feels able to resolve the dispute without hearing evidence. The question is whether, without hearing such evidence, the appeal court can be satisfied that the verdict is safe.

22   So far as the matter of Mr. Ebanks not giving evidence is concerned, the only question is whether counsel in effect forced him, against his will, not to go into the witness box. Their Lordships notice that there is nothing to suggest that Mr. Ebanks made any protest about this during the trial. Nor is there anything to suggest that, even shortly after the trial, he complained to any court official, prison officer, or fellow prisoner. The first time that such a complaint emerges is some nine months later in his amended grounds of appeal dated October 24th, 2001 and in his affidavit dated two days earlier. Of course, the delay in making the complaint does not show that it is unsound, but it is a factor to be taken into account. An appeal court must always bear in mind the distinct possibility that such a complaint may be fabricated—indeed, that is precisely why there should be a contemporaneous written record of the decision that the defendant is not to give evidence.

23   More importantly, however, the appellant's allegation is really that, on this critical matter, as well as on the matter of cross-examining the police witnesses, counsel overrode his instructions. That allegation, however, is wholly inconsistent with the picture which emerges from the record of the trial itself where on several occasions Mr. St. John Stevens took time to ensure that the appellant understood and agreed to the step which was being taken on his behalf. In para. 8 of this judgment their Lordships have already drawn attention to one such occasion when, at the conclusion of the second *voir dire*, Mr. St. John Stevens took time to explain to Mr. Ebanks that the cross-examination in the *voir dire* would, in effect, be held repeated in the main trial. Earlier, during the evidence of Julie Harris, Mr. St. John Stevens had asked for a break of five minutes to seek clarification of a point—although this is not said explicitly, it appears likely that the clarification was to come from his client.

24   At a slightly later point in the trial an issue arose as to whether the pastor to the Revd. Dee Dee Haines could remain in court during her evidence when she was likely to be asked about what Mr. Ebanks had said to her. The judge said that, since the confidentiality interest was enjoyed by Mr. Ebanks, he would allow the pastor to remain if Mr. Ebanks consented to it. Mr. St. John Stevens asked to be allowed to take Mr. Ebanks' specific instructions on the point and then indicated that he had no objection to that course. When the Revd. Haines eventually felt free to speak about what Mr. Ebanks had said to her, her counsel said that he understood that Mr. Ebanks consented to the disclosure of the conversation. Mr. St. John Stevens then said that, while he understood that to be the position, in the light of the proceedings he would invite the judge to

have Mr. Ebanks in court and he, from his own lips, would waive that privilege. The judge then had Mr. Ebanks and Mr. Powell brought into court and followed a procedure in which Mr. Ebanks himself indicated that he consented to the Revd. Haines answering questions about his discussions with her.

25   On another occasion, when prosecuting counsel announced that his next witness was going to be Colin Pryce, Mr. St. John Stevens asked whether he might take instructions from his client, and was allowed to do so. Later on, after the appellant's brother, Dwene Ebanks, had given his evidence-in-chief and had apparently dealt with certain matters which had not been mentioned in his statement, counsel for Powell asked for a moment to consult his client and Mr. St. John Stevens asked if he could take instructions at the same time. It is also noticeable that when the judge reserved his judgment and proposed to give it at a time after Mr. St. John Stevens was due to fly back to the United Kingdom, Mr. St. John Stevens nonetheless recognized that he should be present. In the event, he was indeed present at the short hearing even though, of course, there was little which he could say on behalf of Mr. Ebanks when he was convicted of murder.

26   These passages in the record suggest that, so far from being uncaring or cavalier about Mr. Ebanks' views, instructions and interests, Mr. St. John Stevens was careful to consult his client whenever appropriate. It would make absolutely no sense to suppose that when he had taken care in these relatively minor matters, he had simultaneously been riding roughshod over Mr. Ebanks' views as to whether he should give evidence. Moreover, it is extremely difficult to see why counsel would have deliberately flouted a desire on Mr. Ebanks' part to give evidence when the lack of any evidence from him was likely to cause potential difficulties, especially in the *voir dires*. In these circumstances their Lordships are satisfied that, although counsel culpably failed to have the matter recorded at the time, they can accept the evidence of Mr. McGrath and Mr. St. John Stevens that they were following Mr. Ebanks' instructions in not calling him to give evidence.

27   The second, and related, allegation is that counsel failed to put to the police officers in the *voir dire* Mr. Ebanks' contention that he had never made the alleged statement and so deprived him of the essence of a fair trial of the case against him. The Court of Appeal rejected that allegation on the following basis:

"It would have been most improper for defence counsel to have suggested to prosecution witnesses W.P.C. Campbell and D.C. Powell that they were lying and had fabricated the account that they were giving unless defence counsel were prepared to call Ebanks as a witness. This much would have been clear to Ebanks and that is

212

P.C.                                EBANKS v. R. (Lord Rodger of Earslferry)

why his defence was conducted in a way that no positive case was put forward on his behalf."

28    The idea that it is wrong for counsel to put an allegation to a police officer or other witness that he or she is fabricating a statement allegedly given by the defendant unless counsel intends to call the defendant to give evidence to back up the allegation finds support in the older authorities. In *R. v. O'Neill* (7), having referred to the defence allegation that the alleged statement had been pummelled and beaten out of the defendant, Lord Goddard, C.J. (34 Cr. App. R. at 110–111) said:

> "However, what the Court desires to call attention to is this: having suggested this in cross-examination to the police, and having repeated the suggestion before the jury, counsel did not call his client to support what he had been instructed to say, and the Court has no hesitation in saying that that is not the proper practice. It is one thing to cross-examine a witness about credit, in which case one is bound by the answer of the witness. It is quite wrong and improper conduct on the part of counsel to make a charge against the police or against any other witness by way of defence—because, of course, it would have been a defence if the statements which were the principal evidence against the applicants had been extracted from them by improper means—if he does not intend to call his client to give evidence to support the charge.
>
> In this case, a violent attack was made on the police. It was suggested that they had done improper things, and indeed, Ackers repeats that suggestion in his notice of appeal. The applicants had the opportunity of going into the box at the trial and explaining and supporting what they had instructed their counsel to say. They did not dare to go into the box, and, therefore, counsel, who knew that they were not going into the box, ought not to have made these suggestions against the police. It is one thing to cross-examine properly and temperately with regard to credit, though it is very dangerous to do so unless you have material on which to cross-examine, and with which you can confront the witness. It is, however, entirely wrong to make such suggestions as were made in this case, namely that the police beat the prisoners until they made confessions, and then, when there is the chance for the prisoners to substantiate what has been said by going into the box, for counsel not to call them. The Court hopes that notice will be taken of this, and that counsel will refrain, if they do not intend to call their clients, from making charges which, if true, form a defence but which, if there is nothing to support them, ought not to be pursued."

29    In *R. v. Callaghan* (4), Waller, L.J., giving the judgment of the Court of Appeal, singled out the case of an attack on the police and attacking

213

68

the admissibility of a statement as being one which is directly made as between the defendant and the officer and "it ought not to be made unless evidence is going to be called to support it." He quoted the above passage from *O'Neill* and added (69 Cr. App. R. at 92):

> "This Court entirely agrees with those observations. It does not seem to us there has been any change in circumstances since that decision was made which would justify some different ruling being made. We would entirely agree with them . . ."

30   Very unusually, however, about a year later, Waller, L.J., sitting in the Court of Appeal, Criminal Division, made a statement relating to his judgment in *R.* v. *Callaghan* (*The Times*, February 20th, 1980, at 10, "Challenging Police Evidence"). According to the report:

> "His Lordship said that it appeared that there was an aspect of the problem which did not then occur to him. That had been brought to his attention by the professional conduct committee of the Bar. From time to time there might be a case where a client required a challenge to be made to a police officer but at the same time refused to go into the witness box to support that challenge because of his very bad record. Such a case should be wholly exceptional.

> In such circumstances counsel had a difficult decision. He must warn his client that the judge would probably make a very strong comment on his client's failure to support the suggestions on oath in the witness box. If nevertheless the client, having been warned, insisted, then counsel must carry out his instructions even though he was aware that his client would not support his cross-examination. His client could not complain if a strong comment was made from the Bench.

> His Lordship was making a statement now, but at some future time, when a suitable case occurred, it would be possible to modify the dictum which he made in *R* v *Callaghan*."

Referring to this statement, *Phipson on Evidence*, 16th ed., para.12-30, at 330 (2005) comments: "It is submitted that now, as then, counsel's duty is to put the defendant's case, whether or not he intends to call evidence to support it." See also *Blackstone's Criminal Practice* (2006 ed.), para. F7.10, at 2285.

31   Their Lordships have no doubt that, having regard not only to the basic duties of counsel towards his client but also to counsel's responsibilities to the court, Waller, L.J.'s statement in February 1980 correctly describes the position. Plainly, the statements in *R.* v. *O'Neill* (7) and *R.* v. *Callaghan* (4) proceeded, in part at least, from a fear that counsel for defendants might inflict severe damage on critical prosecution witnesses

214

while the defendants themselves remained out of the witness box and so avoided the risks of cross-examination by prosecuting counsel. If, however, the police officers have indeed been lying, then there can be no proper objection to cross-examination which successfully exposes those lies, even if the defendant does not subsequently go into the witness box to give positive evidence about those lies. On the other hand, the reality is that, if the police officers robustly reject the imputations against them, such allegations will usually carry little weight with the jury unless the defendant backs them up by giving evidence and, as Waller, L.J. pointed out, if the defendant fails to do so, the judge will be fully entitled to make a strong comment on that failure. In this way, the law balances the interests of the defendant, in having his case put to the witnesses, and the interests of the public in ensuring that, when considering their verdict, the jury are fully aware of the factors relevant to assessing the evidence of the police officers and any challenges to that evidence.

32   On behalf of the Crown, Mr. Perry did not suggest that there were any social, professional or other factors which meant that the position in the Cayman Islands should be different from that in England; indeed their Lordships are unable to see any reason why it should be. In these circumstances Mr. Perry did not support the approach adopted by the Court of Appeal. Their Lordships are equally unable to endorse that approach. Even if Mr. Ebanks had said all along that he would not give evidence that would not, of itself, have been a reason why counsel could not have cross-examined the police officers to the effect that he had not made the statement if Mr. Ebanks' instructions were that counsel should do so. Indeed, as a matter of proper professional practice, he would still have been bound to do so.

33   The point does not actually arise in this case, however, since there is nothing in the affidavits of counsel to suggest that Mr. St. John Stevens proceeded as he did because he thought that it would have been professionally improper to suggest to the police witnesses that Mr. Ebanks had not made the statement when Mr. Ebanks was not going to give evidence to back it up. The Court of Appeal therefore really proceeded on a basis for which there is no foundation in the attorneys' affidavits. In fact, the position taken by Mr. McGrath and Mr. St. John Stevens in their affidavits is simply that the allegation was not advanced because Mr. Ebanks instructed that it should not be. According to counsel, Mr. St. John Stevens was instructed to go no further than he did in cross-examining the police officers: in particular, he was not to suggest that the police officers were lying when they said that he had made the alleged statement. Mr. Ebanks says that, on the contrary, he expected counsel to go on the attack and to confront the witnesses with his contention that they were lying and had invented the statement. On his version of events, counsel defied his instructions.

215

34   Again, their Lordships note that this allegation did not surface until some eight months after the trial, and, again, the Board notes that the allegation is hard to square with the obvious care taken by Mr. St. John Stevens to obtain his client's instructions at various points throughout the trial. Moreover, Mr. Ebanks advances no reason why counsel should have chosen to flout his instructions on this matter, which by no means simplified the presentation of the defence case, especially in the *voir dires*. On the other hand, the line which counsel adopted in the *voir dires* was consistent with the instructions which they say that he had given them: standing those instructions, the only thing that they could try to do was to have the statement excluded on the grounds which Mr. St. John Stevens advanced and argued with great care, as is obvious from the transcript of the submissions made to the judge.

35   It is not possible to say why Mr. Ebanks decided not to give evidence and to limit the scope of counsel's attack on the police evidence. It may be that he was not confident of withstanding cross-examination by prosecuting counsel. It may be that he thought it better tactically not to challenge the evidence of the police officers head-on. It may be, as Mr. Perry suggested, that his overall strategy was to keep as low a profile as possible and to rely on Powell's evidence that Ebanks was not present when he killed Curtis Seymour. This would be consistent with the way in which counsel for Powell went first in cross-examination, even though Mr. Ebanks was named first on the indictment. Whatever the reasons may be, their Lordships are satisfied that Mr. St. John Stevens acted in accordance with his client's instructions at the time. Having been convicted, Mr. Ebanks may now have come to believe that his instructions were different, but there is no adequate basis for holding that counsel acted improperly. On the contrary, the record suggests that, as the judge considered, like the other counsel Mr. St. John Stevens had paid diligent attention to the preparation of the case.

36   For these reasons, even although there is a conflict on the affidavits, even without any further evidence being taken, their Lordships have been able to satisfy themselves that the verdict of the trial court is safe. They accordingly dismiss the appeal.

37   **LORD STEYN:** The Court of Appeal was faced with a single ground of appeal on behalf of the appellant Ebanks, who was represented by new counsel. That ground was to the effect that the appellant had been denied a fair trial by the conduct of counsel who represented him at trial. There was no complaint directed at the conduct of the trial by the judge. The ground of appeal was based on an affidavit sworn on October 22nd, 2001, in which the appellant stated quite unambiguously that he told his trial counsel that the police fabricated evidence against him to the effect that he admitted complicity in the murder. In his affidavit he denied ever

making such a statement. Despite what he told his counsel, it was never put to the police witnesses that they fabricated evidence against the appellant.

38   If the appellant's version of what transpired between him and counsel was true, or might have been true, his trial was not properly conducted and the appeal had to succeed, about that there can be no doubt. However, there was conflicting affidavit evidence. On November 15th and November 21st, 2001, Mr. McGrath and Mr. St. John Stevens, who were trial attorneys, swore affidavits in which they asserted that they acted in all respects in accordance with the appellant's instructions. Mr. McGrath did, however, specifically state that "[the appellant] disputed the making of the alleged confession." That was, of course, consistent with the core allegation in the affidavit of the appellant. On the other hand, Mr. St. John Stevens did not directly address this point in his affidavit.

39   In the judgment of the Court of Appeal, Rowe, J.A. stated:

> "The Court did not permit *viva voce* evidence from Ebanks to supplement his affidavit. He had filed no affidavit in response to those from his former attorneys although there was opportunity for him to do so had he so wished".

That is the sole ground upon which the Court of Appeal rejected an application to hear *viva voce* evidence. This was an astonishing ground upon which to refuse to hear *viva voce* evidence in this case. After all, Mr. McGrath's affidavit was only served eight days before the Court of Appeal hearing, and Mr. St. John Stevens' was served a mere two days before the hearing. It is also to be noted that decision of the Court of Appeal was only delivered on April 12th, 2002, more than four months after the affidavits were filed. In any event, at the very least on the affidavit evidence there was a clear dispute of fact. So far as there was ambiguity, it was due to the fact that Mr. St. John Stevens (unlike Mr. McGrath) did not directly address the core point in the appellant's affidavit, *i.e.* that he told the attorneys that he never made any confession. In these circumstances, the Court of Appeal erred in refusing to hear *viva voce* evidence, and the decision of the Court of Appeal should be quashed for failure to accord the appellant due process.

40   The Court of Appeal did not refuse the application to hear *viva voce* evidence on the ground that oral evidence could not have altered the position. Nevertheless, I will consider this aspect. *Mutatis mutandis*, the following observations of Wade & Forsyth, *Administrative Law*, 9th ed., at 506–508 (2005), are pertinent:

> "*Where a fair hearing 'would make no difference'*
>
> Procedural objections are often raised by unmeritorious parties. Judges may then be tempted to refuse relief on the ground that a fair

217

hearing could have made no difference to the result. But in principle it is vital that the procedure and the merits should be kept strictly apart, since otherwise the merits may be prejudged unfairly. Lord Wright once said:

> 'If the principles of natural justice are violated in respect of any decision it is, indeed, immaterial whether the same decision would have been arrived at in the absence of the departure from the essential principles of justice. The decision must be declared to be no decision.'

The dangers were vividly expressed by Megarry J, criticising the contention that 'the result is obvious from the start':

> 'As everybody who has anything to do with the law well knows, the path of the law is strewn with examples of open and shut cases which, somehow, were not; of unanswerable charges which, in the event, were completely answered; of inexplicable conduct which was fully explained; of fixed and unalterable determinations that, by discussion, suffered a change.'

> . . .

> Judges are naturally inclined to use their discretion when a plea of breach of natural justice is used as the last refuge of a claimant with a bad case. But that should not be allowed to weaken the basic principle that fair procedure comes first, and that it is only after hearing both sides that the merits can be properly considered."

41   Although made in the administrative law context, these observations are also germane to the question whether the Court of Appeal could have declined to hear oral evidence on the ground that it would make no difference. To have decided the case on such a basis would have been unfair and contrary to due process. After all, it is entirely possible (and even likely) that Mr. St. John Stevens would have made the same core concession that Mr. McGrath made, *viz.* that the appellant insisted that he made no confession to the police.

42   It is necessary to consider the consequence of the hypothesis that the appellant's core allegation in his affidavit (that he told counsel that he did not make the confession) is or may be correct. On this basis, trial counsel should have cross-examined the police to this effect despite the fact that it had been decided not to call the appellant to give evidence. Again, Mr. McGrath's evidence supports this critical point.

43   How then did the Court of Appeal address this issue? The Court of Appeal observed:

> "On the affidavits before us we are completely satisfied that Ebanks took a deliberate, constant and continuous decision not to give

218

P.C.                                    EBANKS v. R. (Sir Swinton Thomas)

evidence and instructed his counsel accordingly. *It would have been most improper for the defence counsel to have suggested to prosecution witnesses W.P.C. Campbell and D.C. Powell that they were lying and had fabricated the account that they were giving unless defence counsel were prepared to call Ebanks as a witness. This much would have been clear to Ebanks and that is why his defence was conducted in a way that no positive case was put forward on his behalf.* He had decided to put the Crown to proof and notwithstanding full and appropriate legal advice, maintained that position throughout.

We were not persuaded that defence counsel for Ebanks failed to call him as a witness on the voir dire in defiance of or without proper instructions and accordingly we found no merit in his appeal." [Emphasis supplied.]

44   It is now common ground that the Court of Appeal erred in law. Legal principle dictates that counsel's duty is to put the defendant's case, whether or not he intends to call evidence to support. The misunderstanding by the Court of Appeal may well have been widespread in Caribbean countries. That this "would have been clear to Ebanks," as the Court of Appeal observed, is absurd, but the Court of Appeal clearly thought that counsel did not put it to the police that they fabricated their version because he considered that it would have been improper to do so. Indeed, that is what Rowe, J.A. said. The Court of Appeal would have been in a position to have a local view of counsel's perceptions of an advocate's duty (mistaken as it was) in the given situation. In any event this explains why counsel did not cross-examine the police appropriately. The failure to do so (when it was required) amounts in the circumstances to a material irregularity. It potentially prejudiced the appellant's defence, and it is impossible to say that, absent the irregularity, the jury would inevitably have convicted.

45   For these reasons, as well as the additional reasons given by Sir Swinton Thomas, I feel compelled to dissent in this matter. I would quash the conviction and order a retrial or, alternatively, order a remission for the reconsideration of the issue by the Court of Appeal.

46   **SIR SWINTON THOMAS:** I entirely agree with the dissenting judgment of Lord Steyn. I would like to add two further points which, in my view, strengthen the case that the Cayman Court of Appeal was wholly wrong in refusing to hear *viva voce* evidence in this case:

(i) No written statement from the defendant or any defence witness was produced before the Court of Appeal despite the defendant's waiver of privilege. Accordingly, neither they nor we had any written document setting out his case or his instructions in the case. We do not even know

219

whether a statement was taken from him. It would certainly be very extraordinary indeed if, in a murder case, no statement was taken from the defendant. It is true that in the hearing before the Privy Council, Mr. Perry told us that a quantity of papers in the offices of the defendant's solicitors in Grand Cayman had been destroyed in a hurricane, but we were not told that any statement from the defendant had been so destroyed and there was certainly no such evidence before the Court of Appeal.

(ii) In their affidavits the defendants' main attorney, Mr. McGrath, and his counsel, Mr. St. John Stevens, both stated that the defendant had given firm and clear instructions to them that he did not wish to give evidence. There is no written record to this effect and no signed disclaimer by the defendant. I find this very extraordinary, particularly in a murder case. I note that Mr. St. John Stevens is an experienced criminal practitioner practising from one of the leading sets of criminal chambers in London. It is certainly my belief that it is one of the basic tenets of criminal practice always to obtain a signed disclaimer from a defendant who does not wish to give evidence, and this is certainly in accordance with the law.

47    In *R.* v. *Bevan* (3), Watkins, L.J. said (98 Cr. App. R. at 358):

> "One criticism has, however, to be levelled at learned counsel. It is to be hoped that all counsel will heed what we now say. When the decision is taken by a defendant not to go into the witness box, it should be the invariable practice of counsel to have that decision recorded and to cause the defendant to sign the record, giving a clear indication that (1) he has by his own will decided not to give evidence and (2) that he has so decided bearing in mind the advice, if any, given to him by his counsel."

In *R.* v. *Chatroodi* (5), Pitchford, J. giving the judgment of the court ([2001] EWCA Crim. 585, at paras. 39–40) said:

> "As long ago as 1993 Watkins L.J., giving the judgment of this Court in *R v Bevan* (1993) 98 Cr. App. R. 354, said that it should be the invariable practice of counsel to record any decision of a defendant not to give evidence, signed by the defendant himself, indicating, clearly, that the decision has been made of his own free will, and that in reaching that decision [he] has borne in mind advice tendered by counsel. We are bound to express some dismay at the knowledge that comparatively senior counsel, advising a client not to give evidence, notwithstanding the provisions of s.35 of the Criminal Justice and Public Order Act 1994, was unaware of this obligation.

> While we would not expect counsel to record every detail of every conference between himself and his client, we would expect some

220

P.C.                                   EBANKS v. R. (Sir Swinton Thomas)

> written record of a conversation relevant to the important question whether it was in the defendant's interests to give evidence at his trial."

In the absence of such documentation it was essential that the Court of Appeal should test the position by hearing oral evidence. I should make it clear that I am not in any way suggesting that Mr. McGrath or Mr. St. John Stevens was not telling the truth in their affidavit evidence. It would be quite wrong to do so when the evidence is untested. It was also, in my view, quite wrong for the Court of Appeal to reject the defendant's evidence out of hand without giving him the opportunity of having his case tested.

48   For these reasons, in addition to the reasons given by Lord Steyn, I think that there is a real risk that there has been a miscarriage of justice in this case. Accordingly I would also quash the conviction and order a retrial or, alternatively, remit this issue to the Court of Appeal.

*Appeal dismissed.*

Attorneys: *Simons Muirhead & Burton,* instructed by *Appleby Hunter Bailhache,* for the appellant; *Treasury Solicitor,* instructed by *Government Legal Dept.,* for the Crown.

———————————

221

**LIQUIDATORS—remuneration**

The court may defer approval of a claim by liquidators for their fees and expenses pending the creation of a creditors' committee to oversee the liquidation and scrutinize the claim, particularly if the expenses to date amount to a significant proportion of the assets recovered so far in the liquidation. When the liquidators have been funding the proceedings themselves, however, the court may in its discretion approve the payment of outgoings without such scrutiny and approve a percentage of the fees in principle subject to confirmation by the creditors.

*In re Combined Asset Management Ltd. and Six Others* (Grand Ct.: Smellie, C.J.), July 14th, 2000.

Attorneys: *Hunter & Hunter* for the liquidators.

**PROVISIONAL LIQUIDATION—principles**

The holding company for an international group filed a winding-up petition in the Grand Court in order to achieve refinancing as a debtor in possession of its assets, pledging its subsidiaries' shares as security for the debt. Provisional liquidators were appointed to oversee the company's business and the refinancing process, under the control of the board of directors and the supervision of the court. The court expressly approved the refinancing package and granted an injunction under s.99 of the Companies Law (1998 Revision) restraining all proceedings against the company until further order. The final hearing of the petition was adjourned with liberty to restore it. The applicants sought an order for the continuation of the process, since the company's financial position was improving under the arrangements in place.

**Held:** Since there were no specific statutory powers enabling the court to make administration orders over companies, the court could use its wide discretion under s.99 to allow the company to restructure and refinance itself for the benefit of creditors and shareholders (*Re English & American Ins. Co. Ltd.*, [1994] 1 BCLC 649, *dicta* of Harman, J. applied). A protective order could not be used to allow a hopelessly insolvent company to continue to trade, but in this case the provisional liquidation would be ordered to continue until further order, since (i) the liquidators believed that the refinancing or sale of the company as a going concern was likely to benefit creditors more than realizing the group's assets on liquidation; (ii) there was a real prospect of achieving one of these; and (iii) in the circumstances, that would be in the creditors' best interests.

*In re Fruit of the Loom Ltd.* (Grand Ct.: Smellie, C.J.), October 30th, 2000.

Attorneys: *Walkers* for the provisional liquidators; *Truman Bodden & Co.* for the company.

由此

CACV 207/2005 AND CACV 210/2005

CACV 207/2005

# IN THE HIGH COURT OF THE

# HONG KONG SPECIAL ADMINISTRATIVE REGION

# COURT OF APPEAL

CIVIL APPEAL NO. 207 OF 2005

(ON APPEAL FROM HCCW NO. 1139 OF 2004)

---

IN THE MATTER of LEGEND
INTERNATIONAL RESORTS
LIMITED

and

IN THE MATTER of the Companies
Ordinance, Cap. 32

---

CACV 210/2005

# IN THE HIGH COURT OF THE

# HONG KONG SPECIAL ADMINISTRATIVE REGION

# COURT OF APPEAL

CIVIL APPEAL NO. 210 OF 2005

(ON APPEAL FROM HCCW NO. 1139 OF 2004)

---

IN THE MATTER of LEGEND
INTERNATIONAL RESORTS
LIMITED

and

IN THE MATTER of the Companies
Ordinance, Cap. 32

---

- 2 -

Before: Hon Rogers VP and Le Pichon JA in Court

Date of Hearing: 7-9 February 2006

Date of Handing Down Judgment: 1 March 2006

---

## JUDGMENT

---

Hon Rogers VP:

1.        This is an appeal from a judgment of Kwan J given on 6 June 2005. The judge had before her two applications.    The first was an application on the part of the petitioning creditor, Morgan Stanley Emerging Markets Inc. ("the petitioner") for the appointment of the provisional liquidators of Legend International Resorts Ltd ("the Company").    The second application was a summons issued by the Company to strike out the winding-up petition on the grounds that it disclosed no reasonable cause of action, it was scandalous, frivolous or vexatious or an abuse of the process of the court.

2.        The judge dismissed the application to strike out the petition but refused the appointment of provisional liquidators.    At the conclusion of the hearing of this appeal, judgment was reserved which we now give.

*Background*

3.        The Company is a Hong Kong company with nominal capital of HK$120 million and a paid-up capital of HK$115,954,000.    Almost 60% of the shares of the Company are held by Metroplex Berhad ("Metroplex"), a Malaysian company which is listed on the Kuala Lumpur stock exchange. 40% of the Companies' shares are held by Sinophil Corporation, which is incorporated in the Philippines and listed on the Philippine Stock Exchange. Metroplex holds 22% of Sinophil.    As recorded in the judgment steps are being put in train for Metroplex to take over the shareholding held by Sinophil.

- 3 -

4.      The Company's business consists of the operation of a casino in Subic Bay in the Philippines.   The premises are leased from the Subic Bay Municipal Authority ("SBMA").   According to the audited accounts of the Company, the Company has made losses in each of the last six years commencing with the year ended 31 January 2000.   Those losses have been in excess, and in some years greatly in excess, of HK$100 million per year.

5.      The operation of the casino in Subic Bay is under a licence from the Philippine Amusement and Gaming Corporation ("Pagcor").   It is the Company's position that it holds an exclusive licence to operate such a casino.

6.      In July 1997 the Company entered into a Facility Agreement. The Société Générale Asia (Singapore) Ltd was the coordinating arranger and agent of what was in effect a syndicated loan.   There were a number of financial institutions that were the lenders.   The Facility Agreement provided for a revolving credit facility of up to an aggregated principal amount of US$33 million.   A year later, in July 1998, the Company defaulted on the repayment of advances under the Facility Agreement and in respect of the interest which had accrued and other outstanding amounts.   Naturally, this constituted an event of default under the terms of the Facility Agreement.   In December 1999 Société Générale Asia served a written demand for payment within ten days of the total amount then owing, which was US$26,375,450.93. This was, but one symptom of the financial difficulties into which the Company and Metroplex had fallen.

7.      In December 2000 Metroplex had sought assistance from the Corporate Debt Restructuring Committee in Malaysia but, eventually, that route had proved to be unfruitful.   As set out in the judgment below Metroplex endeavoured to solve its financial difficulties by seeking an order for a scheme of arrangement.   In the course of the applications in Malaysia to restructure

A

B   Metroplex draft scheme documents in respect of the Company were exhibited as

    part of that endeavour.    That endeavour also seems to have proved unfruitful

C   and the majority of the creditors did not support the proposed scheme.    One

    matter which emerged from the scheme documents was that Metroplex owed

D   the Company some US$151,708,107.

E

F   8.        The petitioning creditor is a Delaware company incorporated under

    the provisions of the General Corporations Law of Delaware.    It would seem

G   that its business comprises of, or includes in a major respect, the acquisition of

    distressed debt in the secondary debt market.    Although the law of Delaware

H   does not prevent it from lending money for its corporate purposes, section 126

I   of the General Corporations Law of Delaware provides that:

J           "Banking power denied.

K           (a) No corporation organized under this chapter shall possess the
                power of issuing bills, notes, or other evidences of debt for
                circulation as money, or the power of carrying on the business of
L               receiving deposits of money.

M           (b) Corporations organized under this chapter to buy, sell and
                otherwise dealing notes, open accounts and other similar evidences
                of debt, or to loan money and take notes, open accounts and other
                similar evidences of debt as collateral security therefore, shall not
N               be deemed to be engaging in the business of banking."

O   9.        The petitioner has filed specific evidence that it does make loans

    and buy and sell loans and, as such, contends that it is indeed a financial

P   institution conducting what is commonly referred to as investment banking.

Q

R   10.       As part of its ordinary business the petitioner had, prior to the

    presentation of the petition, acquired the debt previously owed to Keppel Bank

S   of Singapore Ltd which was part of the syndicated loan referred to above.

T   11.       This petition was presented on 3 November 2004.    Two days later

U   the Company filed a petition in the local court in the Philippines for corporate

V

由此

- 5 -

rehabilitation, that has been referred to as the Rehab Petition.   The Rehab Plan annexed to the Rehab Petition closely followed the draft scheme document which had been exhibited to affidavits in Malaysia.   As part of the proposal for reconstruction, it dealt with the debt owed by the Company to Metroplex and the debt owed as part of the syndicated loan.   It did not deal with either of the debts which were owed to SBMA or Pagcor.   The allegation is that the Company owes SBMA an amount which is equivalent to more than the US$13 million and Pagcor an amount which is equivalent to more than US$4 million.

12.     When the petition was presented, the petitioner sought the appointment of provisional liquidators.   The application for the appointment of provisional liquidators was expressed to be in conjunction with an application in Malaysia for appointment of provisional liquidators in respect of Metroplex. In relation to those proceedings it need only be said that the petitioner had presented a petition to wind up Metroplex but that petition has not been pursued.

13.     The basis upon which the application for the appointment of provisional liquidators was made was that they should be empowered to explore a restructuring scheme for the Company.   It was said that although the business of the Company was such that there was scope for producing value to the creditors it was not in the best interests of the creditors that the restructuring process should remain in the hands of the then current management.   Although it was suggested that the amount which the Company's casino derived as revenue based on the number of seats at the gaming tables and slot machines was considerably less than might be expected and also that there had been dealings with other companies all of which could be the subject of investigations by the provisional liquidators, it was not overtly suggested or said

- 6 -

that the assets of the Company were in jeopardy.    Certainly that was not the basis on which the application for appointment was made.

*The hearing of the applications in the court below*

14.    On the hearing of the applications in the court below the Company sought to strike out the petition on the basis that the petitioner was not a creditor of the Company since it was not entitled to take an assignment of the loans under the syndicated loan.    The point which was raised was that the petitioner did not come within the meaning of an "Eligible Transferee" as used in the Facility Agreement and defined in Clause 1.01 thereof.    The judge dismissed that contention and held that the petitioner did have locus to present a winding-up petition.

15.    The second basis for seeking to strike out the petition was that it was said that the presentation of the winding-up petition was an abuse of the process because the petitioner's predominant purpose was to be able to obtain control of the Company's administration.    It was also said that the petition had been presented not to achieve a winding-up but in order to have provisional liquidators appointed with a view to proferring a scheme of arrangement.    The judge was not satisfied that there had been any abuse of the winding-up procedure, remarking that the petition should only be struck out in plain and obvious cases.

16.    With regard to the appointment of provisional liquidators the judge observed that she did not consider that the protection of assets basis for the appointment of provisional liquidators had been made out.    Indeed, it would appear that the application for the appointment of provisional liquidators had initially been put, not upon the basis that there was a requirement for the protection of the assets which might be in jeopardy but that the provisional

由此

- 7 -

A

B     liquidators should be appointed for the purpose of exploring, formulating and

B     pursuing a corporate rescue.   In this respect, although the judge said at

C     paragraph 92 that the court had jurisdiction to appoint provisional liquidators to

D     explore, formulate and pursue a corporate rescue, she went on to hold that the

      circumstances did not warrant such an application at that time, although the

E     judge clearly left open the possibility of a further application being made at a

F     later time.

G     *This appeal*

H     17.        On this appeal Mr Barlow, who appeared on behalf of the

      Company, argued that the petition should be struck out for the same reasons as

I     he had argued in the court below.    At the hearing, this court indicated that it

J     did not consider that the petition should be struck out albeit no order was made

K     immediately.

L     18.        The argument that the petitioner was incompetent to present a

      creditor's winding-up petition was on the basis that it could not take a valid

M     assignment of the rights of a lender under the Facility Agreement.    The point at

N     issue was whether the petitioner could bring itself within the definition of

O     "Eligible Transferee".    In the Facility Agreement that was defined as meaning

      "any bank, deposit taking company or other financial institution, wherever

P     incorporated, duly authorised to carry on its business and to participate in the

Q     Facility".

R     19.        The substance of the point was that the Facility Agreement was a

      "revolving credit" facility.    The Company was entitled to request the making

S     of an advance during the period of the agreement and even if money were

T     repaid the Company was entitled to request further advances.    It was thus said

      that the identity of any lender was of significance because the lender had to be

U

V

- 8 -

in a position whereby it could provide the various loan amounts as and when required.   The argument thus ran that the definition of Eligible Transferee had to be read in the context of the Transferee being in the nature of a bank.

20.   In this regard reliance was placed by Mr Barlow on the decision of Steel J in *The Argo Fund Limited v Essar Steel Ltd* [2004] EWHC 128. However that was a decision on a summary judgment application where, of course, the court had to be satisfied that there was no viable argument.   That case had been tried later by Aikens J.   His decision is reported in [2005] EWHC 600.   In my view, considerable care has to be taken in considering the judgment in relation to the present case.   Whereas "Transferee" was defined in the relevant agreement as meaning a bank or other financial institution and Aikens J held after a trial that the plaintiff in that case did constitute a financial institution, it must still be borne in mind that he did so in the context of the particular contract which he was considering.   His reasoning turned upon the fact that financial institution in the terms of that contract meant an entity which was capable of lending money.   In doing so he rejected the argument that in that case the requirement was that the principle activity of the transferee had to be the provision of finance in the primary lending market.

21.   In my view, the assistance to be derived from the reasoning in that case as regards this case is the importance of considering the terms of the particular contract and the significance of the provision.   It was emphasised that the definition in the present contract was that the Transferee should be a bank, deposit taking company or other financial institution and it was said that the words financial institution should be restricted to an entity which was similar to a bank or deposit taking company.   In my view, the words financial institution still should be given their ordinary meaning.   There is no apparent reason emerging from a consideration of the Facility Agreement why the financial institution involved should be restricted to a bank or deposit taking

- 9 -

company.    It would have to be an entity which was capable of lending money of the appropriate amount.    Over and above that I see no warrant for restricting the term Eligible Transferee any further.

22.        On the evidence filed in this case, it is clear that the petitioner does lend money in the ordinary course of its business and although it is primarily involved with buying distressed debt in the secondary debt market, it is capable of and does lend money.    The fact that it is not entitled under the laws of the state of its incorporation, namely Delaware, to conduct banking business, does not prevent it from lending money and on the basis of the evidence and arguments that have been presented to-date, I have no doubt that the petitioner does come within the definition of Eligible Transferee.

23.        This court was made fully aware that some two months, or slightly more, after the presentation of the petition the Company issued proceedings in the Commercial Court in London seeking a declaration that there had been no effective transfer by way of novation of the debt to the petitioner.    In doing so, the Company relied upon the fact that the facility agreement was to be governed by and construed in accordance with the laws of England although under Clause 23.02 of the Facility Agreement the parties irrevocably submitted to the non-exclusive jurisdiction of the courts of Hong Kong and England.    The commencement of those proceedings could hardly be suggested to lead to an acceleration of the resolution of the challenge to the ability of the petitioner to present the petition.    Rather, the commencement of those proceedings and the refusal of the petitioner to accept service of those proceedings without formal orders, has, if anything, led to yet further prolongation of the litigation of the disputes between the parties.

24.        With regard to the case presented on the basis that the petition was an abuse of process, it would seem that there are arguments which could be

- 10 -

made.   The ultimate question must nevertheless be as to whether the petitioner indeed seeks a winding-up order.   The fact that a petitioner might be content with a reconstruction of the Company or some other arrangement does not mean that, if all else fails, the petitioner will not seek a winding-up order.   If it were the intention of the petitioner never to seek a winding-up order then the matter of abuse would be of significance.   It would seem, however, that if a petitioner chooses not pursue to seek a winding-up order when the time comes, the ultimate outcome would be that the petition would be dismissed with costs against the petitioner.   The net effect is similar, therefore, to that if the petition is struck out at an early stage.   The major difference is one of timing.

*The appointment of provisional liquidators*

25.        The power to appoint liquidators is contained in section 192 of the Companies Ordinance Cap. 32.   That provides:

> "For the purpose of conducting the proceedings in winding up a company and performing such duties in reference thereto as the court may impose, the court may appoint a liquidator or liquidators, provisionally or otherwise, in accordance with sections 193 and 194."

26.        Section 193 relates to the appointment and powers of provisional liquidators and section 194(1) relates to the appointment of liquidators but where a winding-up order is made.   Section 193(1) provides that the court can appoint a liquidator provisionally at any time after the presentation of a petition and subsection (2) provides that the appointment may be made at any time before the making of a winding-up order.   Subsection (3) gives the court power to limit or restrict the powers of the provisional liquidator in the order appointing him.   That, no doubt, is a reference to the powers of the liquidator which are dealt with generally in section 199.   Those powers are specifically made subject to section 193(3).   Generally speaking the powers under section 199 are directed to an orderly winding-up of the Company and the

由此

- 11 -

A

B eventual dissolution of the business.    There is a power given under

section 199(1)(b) for the liquidator to carry on the business of the Company, but
C even then there is a specific limitation that that may only be done in so far as it

may be necessary for the beneficial winding-up the Company.
D
Section 199(1)(e) provides that the liquidator may compromise or make an
E arrangement with creditors or persons claiming to be paid as creditors and taken

together with the provisions of section 166 it is clear that the liquidator is given
F
power to apply to the court for a scheme of arrangement.
G

27.        Traditionally the primary object of appointing a provisional
H
liquidator has been regarded as the need to maintain the status quo and to
I prevent anybody from obtaining priority over other creditors.    The

appointment was not only provisional but contingent.    The appointment was
J
made where it was clearly shown that the Company was insolvent, either by
K admission by the Company itself or upon other evidence.    The purpose of the

appointment was to protect the assets of the Company and hence some danger
L
to the assets, not limited to malfeasance, had to be shown.
M

28.        Recently there has developed a practice in England that provisional
N
liquidators could be appointed in respect of insurance companies even if it could
O not be shown that there was jeopardy to the assets.    The reason for the

development of that practice lay in the fact that the insurance policies
P
themselves might have otherwise lapsed.    Whilst holders of insurance policies
Q might not be creditors, they were in a position when they might become

creditors.
R

29.        In Hong Kong Madam Justice Yuen in the case of *Re Keview*
S
*Technology (BVI) Limited* [2002] 2 HKLRD 290 extended the powers of the
T provisional liquidators in order to enable a corporate rescue to be explored.    It

is important to note, however, that the provisional liquidators had been
U

V

由此

- 12 -

appointed, in the first place, because there was a threat of disruption of the factory and seizure of stock by unpaid employees and other creditors.   There is thus no doubt that the traditional basis for the appointment of provisional liquidators had been made out.   The judge said in paragraph 19:

> "It might be thought paradoxical to extend powers to provisional liquidators to attempt to save the company, when they were appointed upon the presentation of a petition to wind it up.   However, the Court retains a discretion whether to order a company to be wound-up, and so long as the Petitioner did have *locus* to present the petition and intends to seek a winding-up order if the rescue attempt should fail, I do not see any jurisprudential objection to empowering provisional liquidators to proceed along rescue lines at least in a case such as the present."

30.        In doing so the judge observed that it was not the role of the court to legislate and the court could only operate within the existing framework of the law.   That approach was adopted by this court in the case of *Re Luen Cheong Tai International Holdings Ltd* judgment 23 January 2003.   In that case at first instance the judge had observed at paragraph 29:

> "In *Keview*, it was held by Yuen J (as she then was) that there is no jurisprudential objection in extending the powers of provisional liquidators appointed under section 193 of Cap. 32 to carry out a corporate rescue role.   It seems to me a logical extension of *Keview* that if provisional liquidators may be empowered by the court to facilitate a restructuring proposal, this recognised function of the provisional liquidators could provide the rationale for appointing them in the first place."

31.        It was in that context that this court whilst dismissing the appeal felt it necessary to say in paragraph 12:

> "The judge below referred to decisions in which similar orders had been made in circumstances where administration orders were not available.   In particular, the judge referred to the decision in *Re Keview Technology (BVI) Limited* [2002] 2 HKLRD 290 where the application had the support of 100% of the company's outside creditors. In that case Yuen J (as she then was) held (at paragraph 19) that there was no jurisprudential objection to extending the powers of provisional liquidators in order to enable a corporate rescue to take place provided that a winding up order would be sought should the rescue attempt fail. Once it has *been established* that the grounds for the appointment of

由此

- 13 -

A

B

C

D

E

> provisional liquidators exist on the basis that it is likely that a winding up order would be made *and that circumstances exist which justify the making of the appointment on the basis of the protection of assets*, the fact that the applicant for the appointment wishes that the provisional liquidators be granted powers to facilitate a restructuring of the company can be no bar to the appointment and is not intrinsically objectionable.   Whether such powers should be granted and the scope of those powers including any restrictions would depend on the particular circumstances such as the support of the creditors."
> (*emphasis added*)

F

G

32.      In the meantime, it appears that before the appeal in the *Re Luen Cheong Tai International Holdings Ltd* had been heard, other courts at first instance had, at least indicated, that appointment of provisional liquidators could be made on the basis that that a corporate rescue should be explored without reference to the question as to whether the assets were in jeopardy. This ultimately led to the bald statement in paragraph 92 of the judgment below which was as follows:

H

I

J

K

> "I hold that it is within the jurisdiction of the court to appoint provisional liquidators to explore, formulate and pursue a corporate rescue."

L

M

33.      In my view, the court should not attempt to extend the statutory law albeit for expediency.   The appointment of provisional liquidators is a statutory power given to the court.   It is not a common law power which can be extended, as in the case of the development of the law in relation to *Mareva* injunctions and *Anton Piller* orders.   As Madam Justice Yuen observed in the *Keview* case it is not the function of the court to legislate.   In the Report on Corporate Rescue and Insolvent Trading by the Law Reform Commission of Hong Kong published in October 1996, recommendation was made for the introduction of a law which would enable corporate rescues to take place far more conveniently than at present.   Even now, nearly 10 years later, no such law has been enacted.   It is not appropriate for this court to examine the reasons why no such law has been introduced.   The fact of the non-introduction is, nevertheless, indicative that it is not a straight forward

N

O

P

Q

R

S

T

U

V

由此

- 14 -

matter in respect of which there are no differences of views as to its desirability or what the provisions of any such law should be.

34.        The rationale of corporate rescues is that, if successful, there is almost certainly likely to be a better return to creditors and also shareholders than if the particular company went into liquidation.    Overseas, there have been a number of successful corporate rescues but there have been an equal or perhaps greater number when rescue has failed.    In Hong Kong, there have also been some very high profile successful corporate rescues.    Nevertheless, whether a law should be introduced remains a matter of policy for the administration and the legislature.    Amongst other things, any such law has to cater for the rights of secured creditors, in respect of both fixed and floating charges; it normally has to cater for the need for there to be further borrowing, in practice thus necessitating giving the lenders in respect of any new loans what has been called super priority.    The position of directors also needs to be catered for.    Major difficulties can arise in respect of insolvent trading and the liability of the relevant person(s), namely, for example the provisional supervisor has to be limited.    Some of the relevant matters dealt with in the Report and in overseas corporate rescue legislation are matters of policy.    Not least amongst these are the rights of the employees and the effect introduction of a corporate rescue regime would have on their rights both under contract and under other legislation.

35.        The law on the appointment of provisional liquidators at present is contained in section 192 and the following sections and it is clear on the wording of those sections that the appointment of a provisional liquidator must be for the purposes of the winding-up.    Provided that those purposes exist there is no objection to extra powers being given to the provisional liquidator(s), for example those that would enable the presentation of an application under section 166.    There is, nevertheless, a significant difference between the

- 15 -

appointment of provisional liquidators on the basis that the Company is insolvent and that the assets are in jeopardy and the appointment of the provisional liquidators solely for the purpose of enabling a corporate rescue to take place.    The difference, may, in most cases, be merely a matter of emphasis, but in the final analysis the difference exists.

36.        Another way of putting the same point is that a scheme of arrangement may well be a viable alternative to winding-up.    If it proves to be so, the winding-up will cease and the scheme will take effect.    The power of the court under section 192 is to appoint a liquidator or liquidators for the purposes of the winding-up not for the purposes of avoiding the winding-up. Whatever benefits may be said to arise and however convenient it may be said to be for the court to be able to appoint provisional liquidators for other purposes it seems to me that primary purpose of appointing provisional liquidators must always be the purposes of the winding-up.    Restructuring a company is an alternative to a winding-up.

37.        I would only make one further observation in this respect that is in relation to the case of *SFC v. Mandarin Resources Corporation Ltd.*    This case is reported on appeal at [1997] HKLRD 405.    It is suggested in the written submissions of the petitioner that that case is authority for the proposition that provisional liquidators may be appointed to investigate the affairs of a company. Having re-read my own decision at first instance and that of the Court of Appeal I find it difficult to understand how it can be suggested that the appointment of provisional liquidators in that case was other than to protect the assets which were shown to be likely to be in real jeopardy.

38.        In the judgment below in this case, the judge came to the conclusion, as already observed, that the protection of assets basis for the appointment of provisional liquidators had not been made out.    She did so on

- 16 -

the basis that there had been appointed a rehabilitation receiver in the Philippines who, every three months, was required to report to the court there on the general condition of the Company.    In the context of the situation which existed at the date of the hearing of the application before the judge below, it appeared that the Rehab proceedings were not merely on going but were potentially viable.    Furthermore the court was presented with a situation where none of the other creditors had supported the application for the appointment of provisional liquidators.    On this appeal evidence was admitted as to what had taken place since the hearing in the court below.    Amongst other matters it now appears that all the debts comprised under the loans of the Facility Agreement are now either owed to the petitioner or Avenue Asia Special Situations Fund III, L. P. ("Avenue Asia").    The fact that Avenue Asia might be taking over some of those loans apparently became known to the judge after the hearing in the court below and before the written decision was handed down. Nevertheless, at that stage there had been no confirmation that the transfer had taken place.

39.        The appeal was presented primarily on the ground that it was necessary to appoint provisional liquidators for the purpose of entering into discussions with relevant parties, particularly the petitioner and Avenue Asia and the other remaining creditor under the Facility Agreement, Ta Chong Bank Limited, Taiwan, to explore the feasibility of restructuring Company pursuant to a scheme of arrangement under section 166.    It may be noted that it was only after counsel had been questioned by the court as to whether the petitioner's case was that provisional liquidators were necessary for the purpose of preservation of assets that Mr Crystal QC, who appeared on behalf of the petitioner, began to argue a case on that point in his reply speech.

40.        When asked as to the exact terms of the order which was sought, Mr Crystal later produced a proposed draft order.    The first order was limited

- 17 -

to the provisional liquidators taking possession of the assets and property of the Company in Hong Kong. It may be noted that it has not been shown that there are any other assets in Hong Kong other than the statutory books and records, assuming those are here.

41.     In addition to calling an informal meeting of creditors and formulating a scheme, the draft order also included giving power to the provisional liquidators to take such steps as they may be advised in the Philippines whether in the court or with the Rehab Receiver but only after further leave from the court had been obtained.

42.     On the basis of the matter as it was before the judge I do not consider that there are grounds for disturbing her decision. The judge came to the conclusion that the assets of the Company were not in jeopardy and although it was considered that there was power in the court to appoint provisional liquidators simply for the purpose of pursuing a corporate rescue, the judge considered it was not then appropriate particularly in the light of the proceedings than being undertaken in the Philippines.

43.     On the basis of the evidence before the judge and the circumstances that existed at the time, I do not consider that it can be said that the judge fell into error. In those circumstances this court must be extremely wary of interfering. The judge was exercising her discretion. Unless there are grounds for holding that the discretion was exercised wrongly, this court cannot interfere simply because it might have exercised the discretion another way. Moreover, if circumstances have changed since the hearing below, that may be grounds for the making of a new application to the judge but not for allowing an appeal. As already noted, however, the judge specifically had in mind that the circumstances might change and that then there might be grounds for appointing provisional liquidators.

由此

- 18 -

44.        This court was informed that the matter would be referred back to the judge within two weeks of the judgment of this court.    It appears to me that it is far more suitable for the judge to be able to reconsider the matter than for this court to do so, even if it were open to this court to interfere with the exercise of the judge's discretion whether to appoint provisional liquidators.

45.        In the first place it seems to me that this court would be asked to act on a different factual basis to that which the judge addressed.    To that extent Mr Barlow's point that this court was being asked to exercise first instance jurisdiction has validity.    It is particularly undesirable for this court to be asked to appoint provisional liquidators in a situation where it is clearly envisaged that there will have to be substantial monitoring of the role of the liquidators.    This is all the more so where the appointment of the provisional liquidators is very much a matter of discretion based upon the court's assessment of what is achievable and what is not.    Part of the reason for seeking the appointment of provisional liquidators is that it will give the provisional liquidators status to apply to the courts in the Philippines and to deal with the Rehab Receiver.    No evidence has yet been given that those ends would be accomplished even if provisional liquidators were appointed.

46.        If a new application were to be made to the judge, there would appear to be grounds for suggesting that there have been material changes in the circumstances.    In particular, it would appear that the proposed rehabilitation plan presented on 4 November 2004 was now no longer viable.    The proposed plan appears to have envisaged two schemes of arrangement.    They are expressed to have been under section 166A of the Ordinance but that was probably a mistake for section 166.    Nevertheless, Mr Barlow argued that the reduction of capital could be effected under section 58 of the Ordinance and that approval of creditors was not required and creditors could not have opposed under the terms of section 59.    That may be correct but the proposed reduction

- 19 -

in what was termed the Scheme B whereby the creditors under the Facility Agreement would have their loans restructured in a major way would no longer appear to be viable.

47.     On the assumption of the applicability of the rules relating to the proposed Rehab Plan, which both parties appeared on this appeal to accept as being the relevant rules, any modification of the proposed Rehab Plan had to be submitted to the court not later than one year after the date of the initial hearing. That date has passed and, indeed, the 18-month period, which appears to be non-extendable, for approving of disapproving the rehabilitation plan is fast approaching in May.

48.     The Company appears still to be running at a loss, despite the optimistic view of the Rehab Receiver that, if the bulk of the expenses of the Company are ignored, there may have been a surplus over the last six months. What is perhaps particularly relevant is that the audited accounts which have been obtained in respect of the last two years have been so heavily qualified by the accountants that they could scarcely be said to be worth the paper they are written on.   That is so even taking into account that they show that the Company was running at a loss.   Once it is appreciated that the Company is running the casino on a day-to-day basis there are, probably, grounds for suggesting that some creditors may be being preferred to others.   There, thus, may well be legitimate grounds for arguing that the assets of the Company are in jeopardy.

49.     Even if it were established that the assets of the Company were in jeopardy it would be necessary for the court to consider whether the appointment of provisional liquidators would serve any useful purpose.   From the point of view of the protection of assets the difficulty arises that there is a Rehab Receiver in place still in the Philippines and it is no by no means clear as

- 20 -

to what effective steps can be taken by provisional liquidators in respect of those assets.    To-date neither the Rehab Receiver nor the court in the Philippines has acknowledged the rights of the petitioner.    It may well be that even after this judgment, they may not be prepared to deal with the petitioner, or anybody appointed on the petitioner's application, unless and until the matter has been resolved in the Commercial Court.    In this context, it is also relevant that the order sought in this court did not encompass giving the provisional liquidators any power or authority over the assets of the Company, other than the normal assets, namely, the books and records of the Company.

50.    If the appointment of provisional liquidators cannot be shown to be likely to achieve any beneficial effect as regards the preservation of the assets of the Company the purpose of appointing provisional liquidators becomes problematic.

51.    I would also add that it is by no means clear as to what scheme could be proposed by provisional liquidators.    Without the cooperation of Metroplex, the financial creditors, namely, primarily the petitioner and Avenue Asia, would appear unlikely to be able to propose any plan which could save the Company.    In those circumstances it may well be that the only viable course is for the petitioner to press for a winding up.    Indeed, it would appear to be rather surprising that the petition has been allowed to linger for so long.    There is no doubt as to the insolvency.    On the face of the evidence which is now before the court, the petitioner's locus appears clear.    It is by no means apparent as to what evidence in that respect the Company can now adduce.    In my view, as in all other cases of winding up petitions, the court should take control of the proceedings and not permit adjournments and delays unless strictly necessary.

- 21 -

Hon Le Pichon JA:

52.        I agree.

Hon Rogers VP:

53.        The appeals are therefore dismissed with an order *nisi* of costs in favour of the respondents to the respective appeals.


(Anthony Rogers)              (Doreen Le Pichon)
Vice-President                  Justice of Appeal

Mr Michael Crystal QC & Mr Charles Manzoni, instructed by Messrs White & Case, for the Petitioner/Appellant in CACV 207/2005

Mr Barrie Barlow & Mr William Wong, instructed by Messrs Richards Butler, for the Company/Appellant in CACV 210/2005

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

The Hon Mr Justice Andrew J. Jones QC
In Chambers on 8th June and 7th July
And in open court on 22nd July 2011

Cause No. FSD 83 of 2011 (AJJ)

IN THE MATTER OF THE COMPANIES LAW (2010 REVISION) (AS AMENDED)

AND IN THE MATTER OF CHINA MILK PRODUCTS GROUP LIMITED

**Appearances:**  Mrs Sandie Corbett and Mr Barnaby Gowrie of Walkers for the Company

Mr Ross McDonough and Ms Kirsten Haughton of Campbells for the Majority Bondholders (as defined)

Ms. Rachel Baxendale of Maples and Calder for Silkwood Enterprisers Ltd, (the Beneficial owner of shares registered in the name of a custodian)

## RULING

INTRODUCTION AND FACUAL BACKGROUND

1. China Milk Product Group Ltd is an investment holding company which was incorporated on 20th September 2005. Its shares were listed on the Singapore Stock Exchange. Its sole asset is its investment in a subsidiary called Daqing Yinlou Dairy Co Ltd ("Yinlou"), the shares of which are held through an intermediate holding company

incorporated in the British Virgin Islands. Yinlou is incorporated in the Peoples' Republic of China and carries on a dairy business in Heilongjiang Province. It has a herd of some 22,000 cows with an annual production capacity of about 150,000 tons of milk products. It also produces pedigree bull semen and dairy cow embryos.

2. On 5th January 2007 China Milk raised finance through the issue of zero coupon convertible bonds in the aggregate principal amount of US$150 million (which was subsequently reduced to US$146.2 million as a result of a repurchase concluded in March 2009). The Bonds are also listed on the Singapore Stock Exchange. The Bonds are convertible at the option of the bondholders into fully paid ordinary shares at an initial conversion price of S$2.00 per share. The terms of the bond issue also provide for the Bondholders to have an option, exercisable on or after 5th January 2010, whereby they can require China Milk to redeem some or all of their Bonds at 116.82% of their principal amount. For reasons explained in the next paragraph, valid early redemption requests were received from all of the Bondholders on or about 5th January 2010, with the result that China Milk became indebted to them in the total amount of US$170.56 million.[1] China Milk was unable to pay although, initially, it only received formal demand for immediate payment in respect of about 64% of the outstanding debt.

3. The evidence of Mr Liu Hailong, China Milk's chief executive officer, is that a principal cause of the group's financial difficulties is what has been described as the "melamine contamination scandal". In September 2008 it was revealed that certain Chinese producers of raw cow milk and milk derivative products, such as milk powder formula for babies, had been found guilty of supplementing their products with melamine. This lead to a nation-wide recall of those products and a collapse in consumer confidence in the industry generally which, combined with the adverse effect of other macro-economic factors, led to a sharp decline in gross revenues and profit. A detailed analysis of China Milk's financial difficulties is contained in the notes to its unaudited financial statements for the half year ended 31st March 2010 and does not need to be repeated for the purposes of this Ruling.

4. Following lengthy discussions with various Bondholders and their lawyers, China Milk's directors eventually decided in April of this year that they should present a winding up petition in the name of the company on grounds of insolvency and then apply for the appointment of provisional liquidators who would be charged with the duty of attempting to formulate a restructuring of the company's debt, thus enabling it to continue as a going

---

[1] The Bonds are actually held by DB trustees (Hong Kong) Ltd in its capacity as trustee for the Bondholders. It follows that the creditor is the trustee, but it acts in the interests of the Bondholders in accordance with the terms of the Trust Deed executed on 5th January 2007. For present purposes it is convenient to refer to the Bondholders as if they were the actual creditors.

concern.  The winding up petition was presented on 6th May 2011. It is admitted that China Milk is insolvent. As at the date of the petition its liability to the Bondholders is about US\$171 million. In addition, about \$3.3 million is owed to ordinary trade creditors.

5.  China Milk's summons for the appointment of provisional liquidators came before the Court on 8th June 2011 when it was supported by counsel for the Majority Bondholders representing approximately 60% of the bonds by value. [2] It was adjourned for two reasons. First, I directed that the hearing of the petition and summons be advertised in an English language newspaper having a circulation in Singapore.[3] Second, I was not satisfied that the directors have power to present a winding up petition unless authorized to do so by an ordinary resolution of the shareholders passed in general meeting and I wanted to give counsel a further opportunity to address me about the meaning and effect of section 94(2) of the Companies Law (2010 Revision).

6.  The matter came before the Court for a second time on 7th July 2011, having been duly advertised. However, I adjourned that matter again in order to give counsel for China Milk more time in which to consider their argument about the proper interpretation of s.94(2) and possible alternative methods of achieving the result sought by the directors and supported by the Majority Bondholders.

DIRECTORS' STANDING TO PRESENT A WINDING UP PETITION PRIOR TO 1st MARCH 2009

7.  By section 94(1)(a) of the Companies Law (2010 Revision) a company is entitled to present a winding up petition in respect of itself on any of the grounds specified in section 92, including the ground of insolvency. This provision has existed in the law since it was originally enacted as Law 3 of 1961 which came into force almost 50 years ago. It is relevant to observe that the whole of Part V of the Companies Law, as originally

---

[2]  The expression "Majority Bondholders" is defined to mean the BlackRock Global Allocation Team (in its capacity as manager of various accounts and Funds that hold bonds), Old Westbury Global Opportunities Fund, Deutsche Bank AG, Singapore Branch who together hold or manage an aggregate of 59.8% of outstanding bonds. My understanding is that CQS Convertible Quantitative Strategies Master Fund (which owns an additional 4% of the outstanding bonds) has participated in discussions with China Milk's management but was not represented at the hearing.

[3]  Although the CWR O.4, r6(2) permits an application made by the company itself for the appointment of provisional liquidators to be made *ex parte* in an appropriate case, there was no evidence which would justify adopting such a course in this case.  In principle, all the creditors should have an opportunity to be heard on the questions (i) whether a provisional order should be made for the purpose of facilitating some form of compromise or restructuring of the company's debt, as opposed to an immediate winding up order and, in either event (ii) who should be appointed as liquidators. In fact, almost a third of Bondholders and all of the ordinary trade creditors had been left out of the consultation process and apparently had no notice of the hearing. For these reasons, I directed that it be advertised.

enacted, was a direct reproduction of the corresponding part of the Jamaican Companies Law, Cap.69 which was itself a reproduction of the English Companies Act 1862. What is now s.94(1)(a) can be traced back to the 1862 Act. Whether or not this provision enabled the directors to present a petition in the name of the company without the authority of an express power in the articles and/or an ordinary resolution passed by its shareholders in general meeting has been the subject of some debate in several Commonwealth jurisdictions whose law is similarly derived from the English 1862 Act. In *Re Galway and Salthill Tramways Co* [1918] 1 I.R. 62 the Irish Court of Appeal held that the power to present a winding up petition in the name of the company cannot be delegated to its directors by the company's articles of association, with the result that it will always be essential for an ordinary resolution to be passed at a general meeting of the shareholders for the purpose of authorizing the directors to present the a petition in the name of the company. The argument is that the decision to terminate a company's business and put it into liquidation is reserved to its members and that a general power of management given to its directors does not include the power to terminate its affairs by presenting a winding up petition. This decision was the subject of adverse comment by the contemporary editors of *Palmer's Companies Law,* the 12th (1924) edition of which says that "there seems to be no justification for this ruling in the words of the Act and it has not been followed in the English cases".  A different approach has been adopted in Australia. In *Re Interchase Management Services Pty Ltd* the presentation of a petition in the name of the company by its directors was upheld on the basis that they were empowered to do so by a provision in the articles that the directors "may exercise all such powers of the company as are not hereby or by statute required to be exercised by the company in general meeting".  In *Re Emmadart Ltd* [1979] 1 Ch. 540 Brightman J (as he then was) conducted an extensive review of the English and Commonwealth authorities on this subject.  He concluded (at page 547) that "The practice which seems to have grown up [in England], under which a board of directors of an insolvent company presents a petition in the name of the company where this seems to the board to be the sensible course, but without reference to the shareholders, is in my judgment wrong and ought no longer to be pursued, unless the articles confer the requisite authority, which article 80 of Table A does not." [4] The decision in *Re Emmadart Ltd* has been followed and applied in this jurisdiction.

8. *Re Global Opportunity Fund Ltd* [1997] CILR Note-7 was a case in which the directors of a solvent company were authorized by an ordinary resolution of shareholders to present a winding up petition on the just and equitable ground. The case is not reported in

---

[4]  The model articles of association contained in Table A of the First Schedule to the Companies Law (2010 Revision) do not expressly confer any power upon the directors to present a winding up petition on behalf of and in the name of the company without shareholder approval. Article 66 of Table A in the Cayman Islands Law is exactly the same as Article 80 of Table A in the English 1948 Act to which Brightman J. was referring.

full but it appears that there must have been some issue about their power to do present this petition. In any event, the Note records that *In Re Emmadart Ltd* was applied. The following year the point was fully addressed by Smellie CJ in *Banco Economico SA –v– Allied Leasing and Finance Corporation* [1998] CILR 102. In this case the winding up petition was presented by a creditor, Banco Economico SA, on grounds of insolvency. The petitioner had secured the appointment of provisional liquidators and the company, acting by its (alleged) sole director, applied to set aside the *ex parte* order and discharge the provisional appointment. The petitioner challenged the authority of the director to act on behalf of the company. Firstly, it was said that he was not in fact the sole director and that he was not acting with the authority of the board as a whole. Secondly, even if he was the sole director, it was argued that he would have no *locus standi* to present a petition on the company's behalf without the authority of a shareholders' resolution and therefore had no power to apply for the appointment or discharge of provisional liquidators.[5] Smellie CJ reviewed the English authorities and held that the Cayman Islands law as it then existed was the same as the pre-1985 English law. He specifically held that the rule in *Re Emmadart Ltd* constituted good law in this jurisdiction, although it is clear from his comments at page 109 (lines 38-45) that he reached this conclusion somewhat reluctantly.

AMENDMENT OF PART V OF THE COMPANIES LAW

9. Part V of the Companies Law has been the subject of a major policy review lasting over several years. It was reviewed by a private sector committee sponsored by the Law Society, whose report was, in large part, adopted by the newly created Law Reform Commission.[6] The ultimate result of this review was the enactment of the Companies (Amendment) Law 2007. The provision establishing the Insolvency Rules Committee came into force immediately and the remainder the Law was brought into force on 1st March 2009 together with the Companies Winding Up Rules and the Insolvency Practitioners' Regulations. The rule in *Re Emmadart Ltd* was one of many matters to which consideration was given as part of this policy review. It was generally agreed that, in principle, the directors of a solvent company should not have the power to present a winding up petition in the name of the company on the just and equitable ground unless authorized to do so either by an express provision in the articles of association or an ordinary resolution passed by the shareholders in general meeting. In other words, it was felt that the rule in *Re Emmadart Ltd* should be restricted to circumstances in which the directors of a solvent company seek to present a winding up petition on the just and equitable ground, as was the case in *Re Global Opportunity Fund Ltd*. However, it was

---

[5] This surprising argument rested upon a highly artificial application of the English Insolvency Rules, rr.4.25(1) and 4.31(1) which have no application in this jurisdiction today.

[6] The private sector committee's report was delivered to the Law Reform Commission in September 2005 and the Law Reform Commission's own report was delivered to the Attorney General in April 2006.

103

generally accepted that different considerations come into play if a company is insolvent or of doubtful solvency.

10. In my view, there are sound policy reasons why the board of directors of an insolvent company should be allowed to present a winding up petition (either on behalf of and in the name of the company or in their own right) whether or not they are empowered to do so by the articles of association or an ordinary resolution passed by the shareholders in general meeting. When a company becomes insolvent, its shareholders cease to have any economic interest and the directors must act in the interests of its creditors. In my view it is wrong in principle that the directors' ability to commence an insolvency proceeding and seek the protection of the automatic stay imposed by section 97 should be dependent upon the terms of the company's articles of association or the co-operation of shareholders who no longer have any economic interest. For these reasons, it was proposed by the review committee that the rule in *Re Emmadart Ltd* should be abolished, at least in so far as it capable of preventing the directors of an insolvent company from presenting a winding up petition in the name of the company. As Smellie CJ observed in *Banco Economic SA —v- Allied Leasing and Finance Corporation,* the position in England was subsequently changed by s.124(1) of the Insolvency Act 1986 which empowered the directors to present a petition on grounds of insolvency in their own right, which is another way of producing the same result.

11. The contrary argument was made by capital markets lawyers who pointed out that countless transactions have been conducted through Cayman Islands incorporated companies on the basis that their directors would have no power to present a petition on grounds of insolvency and that the law should not be changed in this regard with retrospective effect. It is relevant to understand that this argument was made in relation to companies incorporated for the sole purpose of entering into conventional off balance sheet bond issue transactions. Invariably, such companies are owned by a charitable trust, the trustee of which is a licensed trust corporation which specializes in this type of work. In such cases the power to present a winding up petition is vested in (a) the bondholders as creditors (usually acting through a trustee) and (b) the trustee of the special purpose charitable trust as sole shareholder (which will be a licensed trust corporation). In these particular circumstances there may be sensible commercial reasons for restricting the directors' right to present a winding up petition (or some other form of insolvency proceeding in a foreign jurisdiction) on their own initiative and it was said that the rating agencies took this factor into account when rating Cayman Islands bond issues. However, it should be noted that China Milk is not a special purpose bond issuing vehicle of this type.

104

12. It was proposed by the review committee that these conflicting arguments should be resolved by amending the law in following way. First, it would be amended to empower the directors of all the companies then in existence to present a winding up petition on behalf of and in the name of the company on grounds of insolvency, whether or not authorized to do so by their articles of association. Second, new companies incorporated after the amendment Law came into force  would  have the ability to adopt articles of association which expressly reserve to the shareholders the right to present a winding up petition (or any other kind of insolvency proceeding in any other jurisdiction) on grounds of insolvency. Companies would have no power to amend their articles in this way. Only newly incorporated companies would be able to adopt articles in this form. A review of the Memorandum of Objects and Reasons contained in the Companies (Amendment) Bill suggests that this recommendation was accepted by Government, but the language of what became s.94(2) does not, by itself, come close to enacting the intention stated in the Bill.[7]  However, when read with sections 91-95, section 104 and Order 4, Part II of the Companies Winding Up Rules, I think that the overall intention of what was actually enacted by the Legislature becomes clear.

INTERPRETAION OF SECTIONS 94(1)(a) and 94(2)

13. Section 94(2) of the Companies Law (2010 Revision) states :-

"Where expressly provided for in the articles of association of a company, the directors of a company incorporated after the commencement of this Law have the authority to present a winding up petition on its behalf without the sanction of a resolution passed at a general meeting".

I was referred by counsel to various extracts from Francis Bennion's *Statutory Interpretation* (4th Edition). I remind myself that the basic rule of statutory interpretation is that it is taken to be the Legislature's intention that a statute will be construed in accordance with the general guides to legislative intention laid down by law.

---

[7]  It states that "Subsection (2) provides that the directors of a company incorporated after the commencement of this Law have authority to present a winding up petition on its behalf without the sanction of a resolution passed at a general meeting, unless the company's articles of association expressly reserve this power to the company's shareholders. The rating agencies normally require that special purpose vehicles have at least one independent director. Historically, this re1quirement has not applied to Caymanian companies because their directors had no power to present a winding up petition. The ability to exclude this power in the articles will prevent Caymanian companies being put at a competitive disadvantage in the capital markets business. In order to avoid any adverse effect upon existing transactions, this amendment will only apply to companies incorporated after the commencement of the new law." Clause 94(2) of the Bill is inconsistent with this objective.

14. At the first hearing, counsel for China Milk submitted that the phrase "incorporated after the commencement of this Law" referred to the commencement of the principal Law on 1st December 1961, rather than the commencement of the amendment Law on 1st March 2009. Some confusion may have arisen because of the way in which statutes are "revised". It is important to understand that "revision" is an administrative exercise conducted by the Law Revision Commissioner without reference to the Legislature. He has no power to make substantive amendments to statutes. He merely consolidates frequently amended laws and re-publishes them in what is intended to be a more user friendly format. The result of the 2009 revision is that the Companies (Amendment) Law 2007 (referred to as "the Law") was consolidated into the Companies Law (2007 Revision) (referred to as "the principal Law") and published as a single document referred to as the 2009 Revision. By this process section 94(2) of the Companies (Amendment) Law is transformed into section 94(2) of the Companies Law (2009 Revision) but its meaning and effect remains unchanged. Counsel originally submitted that I should interpret the words "after the commencement of this Law" to mean after 1st December 1961, being the date on which the Companies Law, Cap.22 originally came into force. In my judgment, this interpretation is not open to me for two obvious reasons. First, it would have the effect of treating an administrative revision done by a civil servant as if it was a substantive amendment passed by the Legislature. Second, this interpretation would make section 94(2) practically meaningless. It was not possible to incorporate a company under the law of the Cayman Islands prior to 1 December 1961. At that time, this country was a dependency of Jamaica. Anyone wishing to incorporate a company had to incorporate it pursuant to the Jamaican Companies Law, Cap.69. If such a company was to carry on business in the Cayman Islands, it had to be recorded with the Registrar General. There was of course no Register of Companies at that time. If there are any such companies still in existence, which I very much doubt, they are referred to in the legislation as "existing companies". It is perfectly clear that the Legislature was not attempting to distinguish between any remaining "existing companies" incorporated in or before 1961 and the hundreds of thousands of companies which have been incorporated in the past 50 years. At the second hearing, counsel for China Milk changed his mind and accepted, rightly in my view, that the words "after the commencement of this Law" mean after the commencement of the amendment Law on 1st March 2009.

15. I must consider section 94(2) in its proper context and seek to avoid an interpretation which produces an unworkable or impractical result, which is inherently unlikely to have been intended by the Legislature. As I have already explained, section 94(2) was enacted as part of a wide ranging review and amendment of this country's corporate insolvency law and practice. Indeed, it was the first and only such a review ever to have been conducted. For present purposes, it is relevant to note that the law was amended in the

following way as a result of this review. First, the Court's jurisdiction to make winding up orders is enlarged by s.91(d) to include foreign companies. Second, the provisions of Part V of the Companies Law and the Companies Winding Up Rules applies to exempted limited partnerships.[8] It follows that the general partner can present a winding up petition on behalf of and in the name of an exempted limited partnership on grounds of insolvency pursuant to Part V of the Companies Law. Third, those having standing to present winding up petitions is enlarged by s.94(1)(b) and (d) to contingent or prospective creditors and the Monetary Authority. By s.94(3) the Monetary Authority may present a winding up petition against any company or exempted limited partnership which is licensed to carry on a regulated business or in fact carrying on such a business without a license. Fourth, the right of contributories to present a winding up petition on just and equitable grounds is restricted by s.94(3), the principal purpose of which is to curtail the scope for the presentation of opportunistic petitions by "vulture funds". Fifth, the remedies available to the Court in connection with contributory's petitions are enlarged by s.95(3). Sixth, s.104 sets out two quite different regimes for the appointment of provisional liquidators, which is largely (but not entirely) intended to codify the Court's previous practice. This section has to be read with CWR Order 4. Finally, and perhaps most importantly, Part V has been amended so that the distinction between solvent and insolvent liquidations would be formally recognized in the legislation.

16. Having regard to this overall legislative objective, it is clear that the Legislature must have intended to abolish or circumscribe the rule in *Re Emmadart Ltd* because it does not distinguish appropriately between solvent and insolvent companies. As I have already said in paragraph 9 above, it is wrong in principle that the ability of the directors of an insolvent company to present a winding up petition on grounds of insolvency should vary according to the language of its articles of association or be dependent upon the co-operation of shareholders whose economic interest has disappeared. I remind myself of the rule that the Court should seek to avoid a construction of statute that produces an unworkable or impracticable result, since this is unlikely to have been intended by the Legislature.[9] The difficulties which have arisen both in this case and in the recent case of *In Re Xinhua Sports & Entertainment Limited* (FSD #48 of 2011-AJJ) demonstrate only too clearly how such a result would be unworkable and impracticable. The Court should also seek to avoid a construction that causes unjustifiable inconvenience to persons who

---

[8]  See section 15(4) of the Exempted Limited Partnership Law (2010 Revision) which came into force shortly after the Companies (Amendment) Law 2007 and the Companies Winding Up Rules.  References in Part V to a "company" include references to a limited partnership. Limited partners are treated as if they were shareholders of a company and references in Part V to "contributories" in clues general partners and references to "directors" includes general partners.

[9]  See Francis Bennion's *Statutory Interpretation* (Fourth Edition), Section 313, pages 832-9.

are subject to the statute, since this is unlikely to have been intended by the Legislature.[10] Bearing in mind that the directors of an insolvent company and the general partner of an insolvent exempted limited partnership owe duties to safeguard the interests of creditors (whereas the shareholders and limited partners do not), the Legislature cannot have intended to inconvenience their ability to seek the protections which flow from the presentation of a winding up petition. In my judgment, upon the true interpretation of s.94(1)(a) the directors of an insolvent company and general partner of an insolvent exempted limited partnership are entitled to present a winding up petition on behalf and in the name of the company/partnership without reference to the shareholders/limited partners and irrespective of the terms of the articles of association/partnership deed. The directors of China Milk were empowered to present this petition.

17. My interpretation of s.94(1) is entirely consistent with Part II of CWR Order 4 which deals with the power of a company to apply by summons for the appointment of provisional liquidators for the reasons of the kind relied upon by the directors of China Milk. If the Insolvency Rules Committee had thought that the rule in *Re Emmadart Ltd* had survived the amendment Law, CWR O.4, r.6(3) would have required the directors' supporting affidavit to contain the evidence necessary to prove that they were empowered to present the petition and summons by the company's articles and/or an ordinary resolution of its shareholders. No such provision is contained in Rule 6(3) because these matters are now irrelevant. Article 162(1) China Milk's articles of association does in fact empower its directors in the name of and on behalf of the company to present a winding up petition, but this power is unnecessary in the case of a petition on grounds of insolvency and I would have made the same order if no such power had been included in these articles.

---

[10] See Francis Bennion's *Statutory Interpretation* (Forth Edition), Section 314, pages 839-45.

18. Finally, I turn back to the interpretation of s.94(2). In my judgment it is clear that the Legislature must have intended that this section apply only to solvent companies. It means that the directors of a solvent company which was incorporated before 1st March 2009 cannot present a winding up petition in the name of the company on the just and equitable ground without the approval of an ordinary resolution passed by the shareholders in general meeting. In the case of a company incorporated after 1st March 2009, such a petition can be presented by the directors without the authority of an ordinary resolution if they are expressly authorised to do so by its articles of association. It follows that s.94(2) has no relevance or application in this case.

## MERITS OF THE APPLICATION FOR APPOINTMENT OF PROVISIONAL LIQUIDATORS

19. By the directors' own admission, China Milk has been in default of its obligation to redeem the Bonds since 5th January 2010. It follows that it is unable to pay its debts and is insolvent. On the basis of the evidence contained in the first and second affirmations of its chief executive officer, I am satisfied that the criteria contain in section 104(3) are made out. It follows that I have a discretion to appoint provisional liquidators and adjourn the hearing of the petition for the purpose of investigating the financial affairs of the company and exploring the possibility of restructuring its debt so that it might continue as a going concern to the advantage of all its creditors.

20. The application for the appointment of provisional liquidators was originally made *ex parte.* Although the rules permit applications of this sort to be made *ex parte,* there was in fact no urgency or other good reason for making an order without giving all the creditors an opportunity to be heard. They are entitled to be heard on the principal issue whether (a) a stay should be imposed and official liquidators appointed with a view to promoting a scheme of arrangement or (b) an immediate winding up order should be made. They are also entitled to be heard on the secondary issue which arises in either event, namely who should be appointed as official liquidators. The Majority Bondholders have been represented at every stage of this proceeding and support the appointment of Messrs Krys, Borrelli and Kardachi as provisional liquidators. At least one other Bondholder has been consulted, but the evidence was that none of the ordinary trade creditors and about 35% of the Bondholders had not been consulted or at least had not participated in the discussions with the directors. I therefore gave a direction that the hearing of the summons be advertised in an English language newspaper having a circulation in Singapore. The advertisement was duly published in *The Straits Times* on 29th June. No Bondholder or trade creditor has come forward to contest the application. In these circumstances I am satisfied that I can properly appoint provisional liquidators and adjourn the further hearing of the winding up petition until 26th October 2011. The

precise terms of the Order and directions to be given to the provisional liquidators will be settled in Chambers.

21. Those nominated for appointment as official liquidators have both sworn affidavits complying with the requirements of CWR O.3, r.4. Mr. Kenneth Krys of Krys Global, Governors Square, Building 6, 2nd Floor, PO Box 31237, Grand Cayman KY1-1205 is a qualified insolvency practitioner resident in this jurisdiction. His affidavit states that he and his firm comply with the independence and insurance requirements of Regulations 6 and 7 of the Insolvency Practitioners' Regulations. It is proposed that he be appointed jointly with Mr. Cosimo Borrelli of Borrelli Walsh Limited, Level 17, Tower 1, Admiralty Centre, Harcourt Road, Hong and also jointly with Mr Jason Kardachi, of Borrelli Walsh Pte Limited, 1404 City House, Robinson Road, Singapore. Messrs Borrelli and Kardachi have sworn affidavits attesting to their professional qualifications and experience and I am satisfied that they are eligible to be appointed jointly with Mr. Kenneth Krys. Their appointment is supported by the Majority Bondholders. No other Bondholder or trade creditor has nominated any alternative insolvency practitioners for appointment. I am therefore satisfied that Messrs Krys, Borrelli and Kaqrdachi should be appointed.

22. Order accordingly.

DATED this 22nd day of July 2011

The Hon Mr Justice Andrew J. Jones QC

**[2010 (1) CILR 52]**

## IN THE MATTER OF XL CAPITAL LIMITED

GRAND COURT, FINANCIAL SERVICES DIVISION (Smellie, C.J.):
March 5th, 2010

*Companies—arrangements and reconstructions—confirmation by court—court may order shareholders' meeting, under Companies Law (2009 Revision), s.86(1), if satisfied directors fully disclosed reasons for arrangement in supporting materials (as required under Grand Court Rules, O.102, r.20)—to allow shareholders to make own enquiries and reach properly informed decision—no requirement to detail reasons exhaustively—shareholders to be aware company's reasons not endorsed by court and to be able to reach own conclusions*

The petitioner company sought an order, under s.86 of the Companies Law (2009 Revision), to convene shareholders' meetings for the purpose of approving a scheme of arrangement.

The scheme of arrangement proposed to relocate the ultimate holding company of a group of companies from the Cayman Islands to Ireland by the incorporation of a new company in Ireland of which the petitioner would become a wholly-owned subsidiary. The board of directors of the petitioner had approved the scheme and, in a supporting proxy statement provided to shareholders, explained that the proposed scheme was intended to improve the company's reputation by avoiding the negative publicity attached to companies incorporated in offshore jurisdictions and to reduce its potential future tax liability. The petitioner applied to convene meetings of its shareholders to consider the proposed scheme.

The court considered whether, on the basis of the supporting material including proxy statement and shareholders' circular, it would permit the petitioner to convene the proposed meetings of its shareholders.

**Held,** ordering the shareholders' meeting to be convened:

The court would permit the petitioner to convene meetings of its shareholders for the purpose of approving the proposed scheme of arrangement. Having established that (i) the articles of association permitted the proposed scheme; (ii) the scheme constituted an "arrangement" under s.86(1) of the Companies Law (2009 Revision); (iii) the scheme would not defeat the statutory priority of creditors; and (iv) the relevant classes of shareholders had been ascertained, the court would need to be satisfied that—in accordance with the Grand Court Rules, O.102, r.20 and s.3.4 of Practice Direction No. 1/2002, Schemes of Arrangement and

Compromise under the Companies Law, s.86—the directors had made a full and fair disclosure of all matters within their knowledge in the proxy statement and circular to the shareholders so as to enable them to make any further inquiries they wished and a properly informed decision on the merits of the scheme. The directors would not be required to detail exhaustively the reasons relied upon for proposing the scheme but the objective of the scheme would have to be transparently sensible and supported in the summons by credible evidence—though it would not be for the court to supplant the commercial judgment of the directors. Further, the court emphasized that the perceived benefits of the scheme, while accepted as reasonable by the court, were the perceptions of the directors and not necessarily court-endorsed and, consequently, the statements would need to contain sufficient information about the basis of the perceptions to enable the shareholders to reach their own conclusions (in this case, further information on government tax policy might be required). Given that the court was satisfied that sufficient supporting information had been presented, it would order the meetings to be convened (paras. 8–9; paras. 11–14; paras. 16–20).

## Cases cited:

(1) *Euro Bank Corp., In re*, 2003 CILR 205, referred to.

(2) *General Oriental Invs. Ltd., In re*, 1997 CILR N [6], referred to.

(3) *N.F.U. Dev. Trust Ltd., In re*, [1972] 1 W.L.R. 1548; [1973] 1 All E.R. 135, referred to.

(4) *National Bank, In re*, [1966] 1 W.L.R. 819; [1966] 1 All E.R. 1006; (1966), 110 Sol. Jo. 226, referred to.

(5) *Orient Petroleum Intl. Inc., In re*, 2009 CILR 689, referred to.

(6) *RAC Motoring Services Ltd., In re*, [2000] 1 BCLC 307, *dicta* of Neuberger, J. applied.

(7) *SIIC Medical Science & Technology Ltd., In re*, 2003 CILR 355, referred to.

## Legislation construed:

Companies Law (2009 Revision), s.86(1): The relevant terms of this sub-section are set out at para. 2.

s.86(2): The relevant terms of this sub-section are set out at para. 3.

Grand Court Rules, 1995, O.102, r.21: The relevant terms of this rule are set out at para. 10 and at para. 15.

*C.D. McKie, Ms. C. Moran* and *R.J. Webb* for the petitioner.

1 **SMELLIE, C.J.:** On March 3rd, 2010, I heard and granted the petitioner's *ex parte* application for an order pursuant to s.86 of the Companies Law (2009 Revision) that it be at liberty to convene meetings between itself and the three separate classes of its shareholders for the purpose of considering and, if thought fit, approving a proposed scheme of arrangement. I then promised to provide a brief ruling giving reasons for

53

that order, for the benefit of the directors and shareholders upon their contemplation of the scheme. These are those reasons.

2   Section 86 of the Companies Law (2009 Revision) vests in the court a discretion whether or not to order a meeting of a company's creditors and shareholders (or of any class of them) for the purpose of considering a compromise or arrangement as between them and the company. Section 86(1) does so in these terms (relevant to the present circumstances involving not creditors but only shareholders):

> "Where a compromise or arrangement is proposed between a company and its . . . members or any class of them, the Court may, on the application of the company . . . or member of the company . . . order a meeting of the . . . members of the company or class of members, as the case may be, to be summoned in such manner as the Court directs."

3   The section goes on in sub-s. (2) to explain that if at a court-directed meeting a majority in number, representing at least—

> "seventy-five per cent in value of the . . . members or class of members . . . present and voting either in person or by proxy . . . agree to any compromise or arrangement, that compromise or arrangement shall, if sanctioned by the court, be binding on all the . . . members or class of members, as the case may be, and also on the company . . . "

4   The meetings proposed to be convened will be of the following three separate classes of shareholders:

(a) the holders of the Class A ordinary shares issued by the petitioner with a par value of US$0.01 per share;

(b) the holders of the Series C preference ordinary shares issued by the petitioner with a par value of US$0.01 per share; and

(c) the holders of the Series E preference ordinary shares issued by the petitioner with a par value of US$0.01 per share.

**Objects and reasons for the scheme**

5   As stated in the affidavit of Kirstin Romann Gould, the general counsel and secretary to the petitioner, the principal object of the scheme is to change the location of the ultimate holding company of the XL Capital Group from the Cayman Islands to Ireland and for the petitioner to become a subsidiary of XL Group plc ("XL-Ireland"), a new public limited company that will be incorporated under the laws of Ireland. This object will be achieved by the exchange by shareholders of their shares in the petitioner for shares in XL-Ireland, commensurate with each class.

6   The board of directors of the petitioner has approved the scheme, and considers that it is in the best interests of the XL Capital Group, the

54

petitioner and its shareholders to change the place of incorporation of the ultimate holding company of the group to Ireland. The reason for this and that which has prompted the court to provide this ruling is ultimately one of perception as set out in the proxy statement to shareholders:

> "Like many companies, we continually explore ways to optimize our corporate structure, including with respect to the jurisdiction of incorporation of our parent holding company. After conducting a thorough review with the help of outside advisers, our board has determined that a change in place of incorporation is in the best interests of XL and its shareholders.

> We are subject to reputational, political, tax and other risks because of negative publicity regarding companies that are incorporated in jurisdictions, including the Cayman Islands, whose economies have low rates of, or no, direct taxation or which do not have a substantial network of double taxation (or similar) treaties with the United States, the European Union or other members of the OECD. Our board believes that changing our place of incorporation will reduce these risks and offer the opportunity to reinforce our reputation, which is one of our key assets, and to better support our legal and business platforms.

> Additionally, there have been, and could be in the future, legislative or regulatory proposals that could increase taxes for companies incorporated in jurisdictions such as the Cayman Islands. Although we do not believe that any proposals under current legislative or regulatory consideration would directly impact us if enacted, our board believes that the incorporation of our parent holding company in the Cayman Islands increases the risk that legislative or regulatory proposals that might be enacted in the future could materially and adversely affect us.

> After considering a number of locations, our board ultimately selected Ireland as the best available alternative based on many factors, including . . .

> [then follows a description of five areas of perceived advantages to be obtained by relocating to Ireland]."

7   Before granting an order for the convening of a scheme meeting, the court must be satisfied about a number of matters contemplated by the law and rules of court, which are now fully explained in the case law. These are different from, but related to, the considerations which must be satisfied if and when the matter returns to court for its sanction, the scheme meetings having been held (as to which see s.86(2) and *In re National Bank* (4)).

8   As I stated at the outset of the hearing, having read the papers in advance, I was immediately satisfied about a number of matters:

(a) The articles of association of the petitioner permit the kind of compromise and arrangement proposed in the scheme: here the exchange of shares in the petitioner for shares in XL-Ireland. The resolution of the company is a necessary prerequisite (see *In re General Oriental Invs. Ltd.* (2)).

(b) The scheme is an "arrangement" within the meaning of s.86(1) of the Companies Law (2009 Revision) and so the court's jurisdiction to grant the order is established. The term "arrangement" is to be construed broadly covering almost every type of legal transaction and the scheme will be so classified so long as it involves an element of "give and take," having the approval of the company either by its board or (as is proposed here) by a resolution of its members (see *In re SIIC Medical Science & Technology Ltd.* (7); *In re N.F.U. Dev. Trust Ltd.* (3) ([1972] 1 W.L.R. at 1555); and *In re National Bank* (4)). I accept that the proposed exchange of shares in the petitioner in return for shares in XL-Ireland would clearly be an arrangement within the meaning described in those cases.

(c) As the scheme would be a shareholder scheme involving a share-for-share exchange, the scheme will not involve any compromise or reduction in respect of the assets or liabilities of the petitioner or of the XL Capital Group as a whole. This consideration addresses the implicit obligation of the court to ensure that its approval is not given to an arrangement that could be used to defeat the statutory priority given to the interests of creditors of a company. I am satisfied that no such concern arises here.

(d) The relevant class (or classes)—here of shareholders—to be affected by the scheme are ascertained and, if there are differently constituted classes, different meetings are to be convened for each class with the composition of each class properly defined (see *In re Euro Bank Corp.* (1); *In re General Oriental Invs. Ltd.* (2); and the Grand Court Rules, O.102, r.21(3)(b)).

9   A fifth issue, about which I was also satisfied subject to the discussion that follows, is very helpfully framed by Mr. McKie in his written submissions in these terms: Do the scheme materials which are intended to be dispatched to the shareholders for use at the court meetings—which comprise (i) in the case of the ordinary shareholders, the proxy statement, the meeting notices and the relevant form of proxy; and (ii) in the case of the preference shareholders, the preference shareholders' circular, the meeting notices and the relevant forms of proxy—conform with the Grand Court Rules, O.102, r.21 and Practice Direction No. 1/2002, Schemes of Arrangement and Compromise under the Companies Law, s.86?

10   The Grand Court Rules, O.102, r.21 and Practice Direction No.

56

GRAND CT.                       IN RE XL CAPITAL (Smellie, C.J.)

1/2002 requirements are those about which I remain concerned, so I made the orders with the caveat that the concerns of the court as expressed in these reasons are brought to the attention of the meetings. O.102, r.21(4)(e) is to the effect that the proxy statement shall provide ". . . shareholders . . . with all the information reasonably necessary to enable them to make an informed decision about the merits of the proposed scheme." Section 3.4 of Practice Direction No. 1/2002 is to similar effect.

11   These are not requirements that the proxy statement or shareholders' circular shall give every minute detail of the reasons relied upon by the directors for proposing the scheme. Such a requirement in a typical case would be unnecessarily onerous and unreasonable. Given the already extensive nature of the documentation generated for the scheme, a requirement to provide all the details of the information relied upon by the directors would also obviously result in increased and wasted costs.

12   Rather, I think that the true requirements of r.21(4)(e) are as explained by Neuberger, J. in *In re RAC Motoring Services Ltd.* (6), in words which I adopt ([2000] 1 BCLC at 328) (the judge himself relying on *dicta* from earlier cases):

"'. . . [I]t is unnecessary for the directors to give to shareholders in a notice convening a meeting of this kind every piece of information which might conceivably affect their voting . . . It is sufficient if directors make a full and fair disclosure of all matters within the knowledge of the directors which would enable shareholders to make a properly informed judgment on the matters intended to be submitted to them.' . . . it should be sufficient to enable a person to make further inquiries."

13   While I do not criticize the sufficiency of the information provided by the board in the proxy statement or shareholders' circular, the reasons primarily given for the relocation from this jurisdiction are matters inherently of perception. As such they may, arguably, be regarded as matters which are not given to being conclusively demonstrated. This consideration in turn gives rise, in my view, to at least two distinct concerns about the manner in which matters of perception, such as these, may be taken by a meeting of shareholders (or, for that matter, creditors), convened by an order of the court, who are at such a meeting presented with a proposed scheme of arrangement for their approval.

14   The first is whether and to what extent these matters of perception may be viewed as carrying the imprimatur of the court as being sound and proper reasons for a proposed scheme. It is certainly true that the policy behind the scheme remains that of the directors, who are responsible for the management and direction of the company. It is also true that the reasons for their policy are in this (as in the typical case) *par excellence* commercial reasons in respect of which the court should not seek to

57

second guess or supplant the commercial judgment of the directors with its own.

15   Nonetheless, by its endorsement of the policy (and the reasons behind it) as being fit to be presented to a court-convened meeting, the court will be regarded as implicitly having accepted it as being, at least *ex facie*, soundly premised on the basis presented by the directors. Indeed, if it were otherwise in the usual case, the court should not grant the order at all. This is at least implicit in O.102, r.21(3)(c) which requires that the affidavit(s) filed in support of the summons for directions for the convening of the court meeting(s) shall contain "such information as may be necessary to enable the court to determine *whether* it should convene the meeting(s)." [Emphasis supplied.] The need for acceptance by the court of the scheme as being, at least *prima facie*, soundly based is also implicit in the use of the word "may" in s.86(1) of the Companies Law (2009 Revision) in explaining the discretionary nature of the powers of the court.

16   For these reasons, a summons in support of a petition for a scheme which is not supported by credible evidence will be dismissed. Indeed, where it appears from the defective state of the evidence presented in support of the summons that the petition itself will be unsustainable, the petition will also be dismissed at the earlier stage of the summons without being allowed a full hearing. This was demonstrated in the recent case of *In re Orient Petroleum Intl. Inc.* (5). Simply put, the objective of the scheme must be transparently sensible and this can be shown only by credible evidence in support.

17   Against that background of the discussion of the nature of its jurisdiction, in allowing this scheme to be presented to shareholders premised, as it is, evidentially on matters inherently of perception, I believe the court must be astute to emphasize—when it is the case as I so regard it here—that these perceptions are those of the directors and not those of the court and are not to be regarded as having been accepted by the court as being correct. This, I believe, is an appropriate caveat to lay down in this case, even while acknowledging that the perceptions, having regard to the factors on which they are based, are such as might nonetheless be regarded as reasonably held by the directors.

18   The second concern is the related and obvious concern whether the shareholders will be provided with sufficient information by the proxy statements or circulars as presently framed to enable them to arrive at their own informed decisions on these matters of perception. I concluded that this concern about the sufficiency of the documents was in itself an insufficient basis for denying the summons for the convening of the meetings, primarily because the shareholders will certainly be well enough informed to be able to debate the issues and, if they wish, to press

GRAND CT.                              IN RE XL CAPITAL (Smellie, C.J.)

for further information from the directors or to obtain further information elsewhere themselves.

19   Nonetheless, an obvious avenue of inquiry which, it seemed to me, has not been explored is the official position of the Cayman Islands Government on the various reputational, political and tax issues about which the directors themselves have already perceived the risks to the petitioner that motivate the directors' policy decision. These are issues already in the public domain and about which it seems the "negative publicity" mentioned in the proxy statement has been or is being generated. Given those circumstances, the official position of the Cayman Islands Government, if it can be ascertained, may well prove to be of interest to the court meetings. It may provide possible countervailing considerations to the negative publicity and to those other factors which have already so heavily influenced the thinking of the directors.

20   I raised this issue with counsel at the hearing, suggesting that the official position might be ascertained, but did not see that consideration as necessitating the postponement of the order. Rather, the time available between now and the meetings to be convened on April 30th, 2010 should allow for the official position to be ascertained if the matter is of interest to the Cayman Islands Government, as I would think it is bound to be. The order was granted accordingly.

*Order accordingly.*

Attorneys: *Maples & Calder* for the petitioner.

---

a

# Re British Aviation Insurance Co Ltd

### [2005] EWHC 1621 (Ch)

b

CHANCERY DIVISION (COMPANIES COURT)
LEWISON J
7, 11, 13, 21 JULY 2005

c
*Scheme of arrangement – Solvent company – Whether meeting validly held – Creditors treated differently under scheme for distribution purposes – Whether more than one class of creditors – Whether court should approve scheme – Companies Act 1985, s 425.*

Three major insurance companies owned directly or indirectly a private
d company which had carried on business as an aviation underwriter at
Lloyds. At the end of 2001 the company ceased to write new business and
went into run-off. Its main liabilities were actual and potential claims in the
United States arising out of exposure to asbestos, pollution and other health
hazards (AHP liabilities) insured under product and general liability
'occurrence' policies which could lead to long-tail claims maturing many
e years after a claimant's latent exposure to an insured hazard. Such claims
fell into three categories: (i) unsettled paid claims, where the amount of the
claim had been ascertained and the company was liable to indemnify a
policyholder; (ii) outstanding losses, where a claim had been reported to a
policyholder but neither liability nor quantum had been established; and
f (iii) 'incurred but not reported' claims (IBNR claims), ie potential claims
where the event giving rise to the policyholder's liability (eg asbestos
exposure) had already taken place but no claim had yet been made against
the policyholder or reported to the company. The company's AHP liabilities
were estimated to amount to £53.5m but the 2004 balance sheet showed
that assets exceeded total liabilities by more than £100m. The company's
g shareholders wished to release all or part of the net assets by putting in
place a 'cut-off' scheme which would enable the company's AHP liabilities
in the United States to be settled forthwith without waiting for actual claims
to mature. The terms of the proposed scheme included: (i) creditors having
AHP claims, whether liquidated or unliquidated and whether present or
future, were required to submit claims by a specified date, after which such
h claims would be valued at nil and deemed to have been paid in full; (ii)
notification of claims had to be accompanied by documents and
information in accordance with the scheme's 'estimation methodology',
which set out the kind of evidence that a creditor was expected to supply in
support of a claim; (iii) claims would be accepted or rejected by the scheme
manager; (iv) claimants would be paid a valuation (or estimate) of the
i present value of their future contingent indemnity; and (v) disputes would
be referred to the scheme adjudicator whose decision would be final and
binding. It was intended that the company would remain in conventional
solvent run-off in respect of business which did not fall within the scheme.
Following an application to the court for directions, the company traced the

addresses of 17,500 policyholders, which represented an estimated 32% of    a
the policyholders thought to be affected, and notification of the scheme was
sent to those addresses. At a meeting of creditors, 44 or 61% of the number
present, representing 85% of the value of the claims, voted in favour of the
scheme; 28 or 39% of the number present, representing 15% of the value of
the claims, voted against. A number of policyholders who voted against the
proposed scheme had their IBNR claims valued at $1 or nil for voting        b
purposes. Following the meeting the company applied for the sanction of
the court for a scheme of arrangement. The scheme was opposed by 18 US
corporations who were directly insured by the company under occurrence
policies and who each had potentially large IBNR claims. The opposing
creditors contended (i) that notification of the applications both for
directions and for the sanction of the court were inadequate, (ii) that the   c
court did not have jurisdiction to sanction the scheme, because the meeting
of creditors had not been properly constituted as the scheme creditors had
been treated as a single class when there were in fact separate classes, and
(iii) that the court ought to exercise its discretion not to sanction the scheme
because it was unfair.                                                       d

Held – (1) When giving directions as to the summoning of a meeting or
meetings of creditors to consider a proposed scheme of arrangement the
function of the court was primarily to decide whether there should be one
meeting or more than one, and to give directions as to the manner in which
the meeting or meetings should be summoned and conducted. The extent of   e
notification of an application to the court for directions did not need to be
as extensive as notification of the meeting or meetings which the court
might order to be undertaken. Moreover, the requirement of notification
was not absolute and did not apply if there were good reasons, such as time
and expense, why it should not apply. In the circumstances the company
had taken reasonable steps to notify those policyholders it was aware of    f
and to advertise the application for directions and the meeting of creditors.
(See paras [54]–[56], [77]–[81] post.) *Re Hawk Insurance Co Ltd* [2001]
2 BCLC 480 considered.
    (2) In deciding whether all the creditors affected by a scheme of
arrangement formed a single class the starting point was to identify the
appropriate comparator. Because the proposed scheme of arrangement        g
related to a solvent, rather than insolvent, company a voluntary liquidation
was not a realistic alternative to the scheme and therefore the appropriate
comparator was that of a continuing run-off based on the assumption that
the company remained solvent. When the effect of the scheme and a
continuing run-off on the three classes of AHP liabilities was compared the   h
interests of the affected policyholders were sufficiently different for them
not to be able sensibly to consult together 'in their common interest' and in
fact policyholders with accrued claims and those with IBNR claims had no
common interest at all. Under both the scheme and a solvent run-off
policyholders with unsettled paid claims would be entitled to have their
claims paid in full and therefore would not be disadvantaged in any way by   i
the scheme but, by contrast, policyholders with IBNR claims would be
entitled in a solvent run-off to a full indemnity against claims if and when
they materialised but would receive a cash sum under the scheme which
might be greater or smaller than the liabilities that eventually materialised,

a  and they were likely to be disadvantaged to the extent that the risk of inadequate resources to meet such liabilities was transferred from the insurers back to them. Accordingly, the three classes of AHP policyholders ought to have been treated as separate classes and given separate meetings. However, both direct insureds and reinsureds constituted a single class of unsecured creditors, each of whom had the same right of indemnity against

b  the company in respect of insured risks and therefore reinsurers who were also reinsureds did not constitute a separate class. Since the single scheme meeting had not been properly constituted approval of the scheme would be refused for want of jurisdiction. (See paras [88]–[97] post.) Dicta of James LJ in *Re Albert Life Assurance Co* (1871) 6 Ch App 381 at 386, of Bowen LJ in *Sovereign Life Assurance Co v Dodd* [1892] 2 QB 573 at

c  582–583, of Lindley LJ in *Re English Scottish and Australian Chartered Bank* [1893] 3 Ch 385 at 406 and 409, of Chadwick LJ in *Re BTR plc* [2000] 1 BCLC 740 at 747 and in *Re Hawk Insurance Co Ltd* [2001] 2 BCLC 480 at [23], [29]–[30], of Lord Millett in *Re UDL Holdings Ltd* [2002] 1 HKC 172 at 184 considered.

d    (3) In any event, even if the court had jurisdiction approval would have been refused, as a matter of discretion, for the following reasons: (i) the votes permitted to be cast at the scheme meeting did not fairly represent the creditors (and in particular the direct insureds) with substantial IBNR claims since those claims had been valued at $1; (ii) the estimation methodology did not provide a clear basis for treating all creditors alike and

e  resulted in uncertainty; (iii) the company's power to revert to run-off at its 'absolute discretion' if it considered that the scheme was no longer of any benefit to it was too wide; (iv) the supposed benefits of the scheme were mainly benefits to the company and its shareholders; and (v) the scheme would unfairly transfer the risk of exposure to asbestos claims back to manufacturers who had bought insurance policies designed to protect them

f  from such claims. (See paras [107]–[112], [124]–[125], [128], [137], [141]–[142] post.)
    *Per curiam.* There is nothing inherently objectionable about a company which is promoting a scheme of arrangement reaching an agreement with some of its creditors under which they undertake to vote in favour of the scheme. (See para [103] post.)

g

**Cases referred to in judgment**
*Albert Life Assurance Co, Re* (1871) 6 Ch App 381.
*Axa Equity and Law Life Assurance Society plc, Re* [2001] 2 BCLC 447.
*BTR plc, Re* [2000] 1 BCLC 740.

h  *Canning Jarrah Timber Co (Western Australia) Ltd, Re* [1900] 1 Ch 708.
*English Scottish and Australian Chartered Bank, Re* [1893] 3 Ch 385.
*Equitable Life Assurance Society, Re* [2002] 2 BCLC 510.
*Hawk Insurance Co Ltd, Re* [2001] 2 BCLC 480.
*Pan Atlantic Insurance Co Ltd, Re* [2003] 2 BCLC 678.

i  *Sovereign Life Assurance Co v Dodd* [1892] 2 QB 573.
*Telewest Communications plc (No 1), Re, Re Telewest Finance (Jersey) Ltd (No 1)* [2004] EWHC 924 (Ch), [2005] BCLC 752.
*Telewest Telecommunications plc (No 2), Re, Re Telewest Finance (Jersey) Ltd (No 2)* [2004] EWHC 1466 (Ch), [2005] 1 BCLC 772.
*UDL Holdings Ltd, Re* [2002] 1 HKC 172, HK CA.

**Petition**

$a$

The British Aviation Insurance Co Ltd presented a petition seeking the sanction of the court to a scheme of arrangement under s 425 of the Companies Act 1985. The petition was opposed by 18 United States corporations who were directly insured by the company under occurrence policies. The facts are set out in the judgment.

$b$

*Gabriel Moss QC* and *Daniel Bayfield* (instructed by *Herbert Smith*) for the petitioner.

*Richard Sheldon QC* and *Hilary Stonefrost* (instructed by *Covington and Burling*) for the opposing creditors.

*Rosalind Nicholson* (instructed by *Edwin Coe*) for United Technologies Corp and others.

$c$

*Cur adv vult*

21 July 2005. The following judgment was delivered.

$d$

## LEWISON J.

INTRODUCTION

[1] The British Aviation Insurance Co Ltd (the company) was incorporated in 1930. As its name suggests, it writes insurance and reinsurance in the aviation sector. Since 1 January 2002 it has ceased to write any new business; and has been in run-off. The company is a private company, owned directly or indirectly by three major insurance companies: Royal & Sun Alliance Insurance Group plc (57.10%); AVIVA plc (38.14%) and AXA Investment Managers UK Holdings Ltd (4.76%).

$e$

[2] The company applies to the court for the sanction of a scheme of arrangement which it proposes to make with some of its creditors, in relation to certain classes of insurance and reinsurance business. The proposed scheme does not encompass the whole of the company's business. The scheme has been notified to the Financial Services Authority, which raises no objection from a regulatory point of view. The scheme is opposed by a number of creditors. I am told that this is the first case in which a scheme of this kind, in relation to a solvent insurer, has been opposed. The grounds of opposition are directed both at the court's jurisdiction to sanction the scheme; and at the merits (or lack of them) of the scheme itself which, it is said, should persuade the court, as a matter of discretion, to refuse to sanction the scheme.

$f$

$g$

$h$

THE COMPANY AND ITS BUSINESS

[3] The company wrote mainly aviation direct business or facultative reinsurance and was a recognised lead underwriter in the aviation risks in which it participated. The categories of risk underwritten by the company (both directly and as reinsurer) included the following: hull; war risks; liability for passengers; third parties and baggage/cargo; airport liabilities; product liability cover; personal accident cover; loss of licence and cargo all risks insurance. The company's main potential liabilities affected by the scheme are claims and potential claims by policyholders in the United States of America under product liability and general liability insurance covering

$i$

*a*  potential exposure to claims arising out of exposure to asbestos, pollution and other health hazards.

[4] The company also underwrote business through a Canadian branch from 1942 until the branch went into run-off on 1 January 2002. Although the company issued some 9,500 policies to Canadian residents after 1985, it is likely that there are currently only two Canadian resident creditors likely *b*  to be affected by the scheme; with known claims arising under business written by the Canadian branch with an aggregate reserve of $C360,000.

[5] The evidence in support of the petition includes a table of the company's estimated liabilities:

| Claim type | Estimated liability before reinsurance (£m) | % of total |
|---|---|---|
| Pollution | 22·3 | 41·68 |
| Asbestos | 27·7 | 51·78 |
| Hull and liability | 2·6 | 4·86 |
| Health hazard and other | 0·7 | 1·31 |
| Canada | 0·2 | 0·37 |
| Total | 53·5 | 100·00 |

[6] The company says that about 92% of its asbestos liabilities are owed to direct insureds, all of whom are resident in the USA. The remaining 8% *e*  of these liabilities arise under reinsurance policies issued by the company. Mr Cracknell (a director of the company) says that the company has 'current claims' arising under scheme business from 459 policyholders, the majority of which are in the USA and the UK, most of whom will have more than one claim.

*f*  [7] The company is solvent. Its audited balance sheet as at 31 December 2004 shows total assets of £227,136,000 as against total liabilities to third parties of £125,997,000. The company's total net assets in respect of all its business, including scheme business, were more than £100m. This is just under double its estimated liabilities for scheme business.

[8] The insurance and reinsurance policies underwritten by or on behalf *g*  of the company for the USA and Canadian aviation industry that comprise the scheme business were primarily policies of a kind called 'occurrence' policies. This type of policy provides unlimited prospective coverage against claims relating to the risks covered by the policy (for example, asbestos, chemical and product liability) as long as the underlying act or omission happened during the relevant policy period. These claims (known as *h*  long-tail claims) typically arise and are asserted years or even decades after the claimant's latent exposure to the allegedly hazardous substance. This kind of policy is to be contrasted with a 'claims made' policy, which covers only claims made during the period covered by the policy. An 'occurrence' policy is a particularly valuable kind of policy, for which policyholders are prepared to pay (and did pay) a higher premium.

*i*  [9] The kind of business covered by the scheme is principally related to the amounts claimed in the USA from US policyholders and others under product liability and general liability insurance in respect of potential exposures to various environmental type liabilities such as asbestos, pollution and related health hazard (AHP liabilities). These potential claims

are covered under occurrence policies.                                                    *a*

[10] Occurrence policies (at least for these kinds of claims) are no longer available in the market at any price.

[11] Claims under insurance or reinsurance contracts of this kind may fall into one of three classes:

(i) 'unsettled paid claims': these are losses for which the company would be liable to indemnify a policyholder under an insurance or reinsurance    *b* contract, where the amount of the claim has already been ascertained, and the liabilities both of the policyholder to the claimant and of the company to the policyholder have been established;

(ii) 'outstanding losses': these are claims that have been reported to a policyholder and for which the company may be liable to indemnify the policyholder under a contract of insurance or reinsurance, but where there    *c* is not yet any established liability; and neither the quantum of the claim nor the company's liability to indemnify the policyholder has yet been agreed; and

(iii) 'incurred but not reported' claims (IBNR claims): these are potential claims where the event giving rise to the policyholder's liability (eg exposure    *d* to asbestos) has already taken place, but where no claim has yet been made against the policyholder or reported to the company.

[12] The company has met and continues to meet its contractual liabilities in full. If the scheme is not sanctioned, there is no reason to suppose that it would not continue to do so in the future. The company has promoted the scheme on the basis that it is solvent and is able to meet all its liabilities in    *e* full. Its estimated liabilities in relation to business covered by the scheme are some £53m ($93m).

[13] It is an important consideration that the scheme does not include the whole of the business written by the company. As regards business excluded from the scheme, the company will remain in conventional solvent run-off.    *f*

POLLUTION AND ASBESTOS CLAIMS

[14] It is common ground that asbestos related injuries are often latent for long periods before their existence becomes known; and the most serious asbestos related diseases, mesothelioma and lung cancer, usually do not appear until 30 or 40 years after exposure. In the aviation sector, the    *g* products which are typically alleged to have caused asbestos related diseases are brakes and other friction products, together with gaskets. Exposure to asbestos in aircraft hangars can also give rise to claims. The majority of claims are made by aviation mechanics who have been exposed to these products; although family members, who have been exposed to contact with a mechanic's clothing, also make claims.    *h*

[15] According to Dr Rabinovitz, the expert for the opposing creditors, aviation equipment manufacturers were not made defendants in the first or even the second wave of asbestos litigation that dates back to the 1970s. New asbestos claims, caused by exposures from the 1940s to the 1970s, are expected to continue to arise until about 2049; and aviation asbestos claims    *i* are expected to extend yet further into the future because asbestos continued to be used in aviation products into the 1980s, long after asbestos had been banned in other products. While the manufacturers of aviation products were not among the 'traditional' primary asbestos defendants (most of whom are now bankrupt), the first non-traditional

a defendants were sued in the 1980s; and companies in the aviation industry are now being named in potentially very large and expensive claims and lawsuits. She characterises these claims as 'an immature mass tort'. Mr Sanders, the company's expert, disagrees. He considers that there is a limited pool of potential claimants; and that it is obvious that, if a claim is brought, it will be brought against a well-known manufacturer of aviation
b products, such as Boeing, McDonnell Douglas, Lockheed, Honeywell or Goodyear. It is common ground that there was a surge of such claims in 2003. Dr Rabinovitz considers that claims of this nature are likely to increase in frequency, whereas Mr Sanders thinks that the surge was 'one-off' and that an actuary, measuring probabilities, can take account of this in a number of different technical ways.

c     [16] Dr Rabinovitz points to widely varying expressions of expert opinion presented to the US courts in asbestos cases. Whereas Dr Rabinovitz considers that the claims history in the aviation sector is too short and too small to allow reliable estimates of future liability to be made, Mr Sanders disagrees.

d     [17] It is, however, important to note the extent of his disagreement. Mr Sanders accepts that the valuation of future claims involves a degree of uncertainty; and that the uncertainty will be greater in the case of claims that do not have a lengthy claims history. Claims of this kind go back to 1998. However, he says that the level of uncertainty relating to asbestos claims is decreasing, because of a lengthening claims history. He also says
e that, because of the limited pool of claimants in the aviation sector, the uncertainties are reduced on that account too. His conclusion is that the uncertainty may be estimated by applying stochastic or simulation techniques. By this approach a range of outcomes can be estimated. He considers that the range of outcomes for asbestos claims arising out of product liability in the aviation sector is unlikely to be significantly greater
f than the range of estimates for other asbestos liabilities.

    [18] Mr Powell, the actuary who was the 'principal architect' of the estimation methodology for which the scheme provides, said:

g     'Estimation of asbestos related IBNR claims involves a valuation of future contingent liabilities and is, therefore, inherently uncertain. The degree of uncertainty will depend upon the impact of various external factors and I accept that wide variations might be experienced. However, the existence of such uncertainty does not render any estimation unusable, unreasonable or unfair. Where the estimation is based on legitimate assumptions which are fair and reasonable, and can be supported by evidence, fair and reasonable conclusions can be
h     drawn. It is accepted that, with the benefit of hindsight, an estimation may be shown to undervalue or overvalue a liability.'

    [19] None of these witnesses was cross-examined. I cannot choose between them. It seems to me that I should approach the decision that I have to make on the basis that each of them has expressed a reasonable and
i tenable view.

THE SCHEME
    [20] The following description of the scheme is largely taken from the explanatory memorandum which accompanied it.
    [21] The business covered by the scheme (scheme business) is insurance

and reinsurance business underwritten by the company during the period  *a*
24 February 1930 to 31 December 1990; and by its Canadian branch up to
and including 31 December 1991. The scheme will bind all scheme creditors
of the company in respect of any claim against the company arising under
or out of an insurance contract written by the company as part of scheme
business. This includes liquidated and unliquidated claims; both present and
future. The claims will be valued as at 31 December 2004 (the  *b*
ascertainment date).

[22] Scheme creditors must notify their claims within 120 days after the
scheme comes into operation (the bar date). If they do not, their claims will
be valued at nil; and will be deemed to have been paid in full. Each scheme
creditor must submit a claim form in support of a claim. The claim form
must be accompanied by documents and information of a kind set out in  *c*
the 'estimation methodology' annexed to the scheme. Scheme creditors
must:
(i) identify each insurance contract, together with broker details, under or in
relation to which its claim in relation to a scheme liability arises;
(ii) specify the amount of each scheme liability arising under or in relation  *d*
to each insurance contract;
(iii) supply documents and other information in accordance with the
estimation methodology; identify and specify details of any security interest,
letter of credit, trust, set-off or counter-claim and any other sums owed to
the company which will be set-off under the scheme in reduction of the
scheme liabilities of that scheme creditor.  *e*

[23] Scheme creditors are also required to provide values, estimates and
supporting information relating to their scheme liabilities as at the
ascertainment date.

[24] The claim will be considered by the scheme manager. The scheme
manager will review each claim form in accordance with the scheme and the
estimation methodology. If the scheme manager agrees with the information  *f*
given in a claim form and any supporting documentation, including
amounts in relation to set-off, it will notify the relevant scheme creditor in
writing to that effect as soon as is reasonably practicable.

[25] If the scheme manager does not agree with all or part of the
information given in a claim form or requires further information, it will
notify the relevant scheme creditor in writing, specifying the matters which  *g*
are not agreed, the reasons for failing to agree such matters and any
additional information or documentation required. If a scheme creditor fails
to provide the additional information requested by the scheme manager, the
scheme manager can make a determination about the scheme creditor's
scheme liabilities based on the information it has available.  *h*

[26] The scheme manager will consider, amongst other things, the
company's books and records, and whether there are any estimates relating
to future or contingent scheme liabilities are reasonable; and whether there
are any amounts owing (whether actual, future or contingent) by that
scheme creditor to the company.

[27] In case of dispute the dispute is to be referred to the scheme  *i*
adjudicator. The scheme adjudicator will review the scheme manager's
review of the disputed claim or matter and where relevant may apply the
estimation methodology to determine what constitutes a reasonable
estimate of the scheme creditor's scheme liability. The scheme adjudicator is

*a*    an independent actuary, well-known in this field. The scheme adjudicator may request additional information where required from the scheme creditor, the scheme manager, the company and/or the company's actuaries; or may require the scheme creditor or scheme manager and/or the company's advisors/actuaries to appear before him to address him on such matters as he determines.

*b*    [28] A final determination in respect of each disputed scheme liability will then be made in accordance with the dispute resolution procedure contained in the scheme and the scheme adjudicator's decision will be final and binding in so far as the law allows.

[29] Once all scheme liabilities of a scheme creditor have been determined (whether through agreement or adjudication) and, after the application of *c*    any right of set-off, counterclaim or deduction as provided for by the scheme, those net scheme liabilities will become the established liability of that scheme creditor which will be payable in full to that scheme creditor. A discount for the time value of money will be applied to payments made under the scheme. This will be calculated by applying a discount rate to the *d*    expected future payment pattern associated with the scheme liability under consideration. This process may be simplified by using an average time to payment as appropriate.

[30] A typical discount rate for net present value calculations would ordinarily be based on the long term bond rate. The company will however use a lower rate which may be advantageous to scheme creditors who will *e*    benefit from the difference between a commercial discount rate and the actual rate applied by the company.

[31] The scheme also contains a prohibition on the bringing of any legal proceedings against the company. Accordingly, the evaluation and payment of the claim under the scheme replaces all the policyholders' existing legal rights.

*f*    [32] If, at any time before the company makes any payment in respect of an established liability, the company believes that the scheme is no longer beneficial to it, the company may send notice to all scheme creditors of whom it is aware that the scheme will terminate.

[33] In the event of such notice being given, no payments will be made under the scheme and scheme business will revert back to being run off in *g*    the manner as it was prior to the effective date.


PROCEDURAL HISTORY

*Ascertaining policyholders*

*h*    [34] The company has information about policyholders, derived from a number of sources. These include some 300,000 index cards; and a computerised database. The former contain basic details such as the name of the insured and the amount of premium paid. The latter contains details of some 37,000 claims against the company, of which claims from 459 policyholders are still extant. Over a period of some 18 weeks a team of *i*    personnel seconded from PriceWaterhouseCoopers (PWC) logged policy details and searched for addresses of policyholders. They managed to find 17,500 addresses of policyholders (not all of which were up to date). PWC estimated that these addresses constituted 32% of policyholders. By extrapolation, this means that there must have been about 35,000

policyholders for whom the company has no address, making some 50,000 *a* policyholders in all.

[35] Although the company estimates that over 90% of its potential exposure to claims relates to policyholders resident in the USA, it in fact has over 2,000 policyholders worldwide from Afghanistan to Zimbabwe; or, as Dr Johnson would have said, 'from China to Peru'.

[36] Notification of the scheme was sent to the 17,500 addresses that the *b* company had ascertained. Advertisements were also placed in the Financial Times and the Times (in both cases in the UK and international editions); in the Wall Street Journal and newspapers circulating in Canada; and in specialist aviation publications. The company also wrote to 30 insurance brokers who had placed scheme business, asking for the names and *c* addresses of policyholders. After some chasing, eight replied; some of whom gave details of some policyholders.

[37] The company intended to apply to the court on 11 January 2005 for permission to convene a meeting for the purpose of approving the scheme. Notification of the application was sent to the 17,500 addresses on 20 December 2004, just before the Christmas holiday. The advertisements *d* were placed on the same day.

### The meeting is summoned

[38] The company in fact appeared before Mr Registrar Nicholls on 18 January 2005. No scheme creditor was present or represented at that hearing. The registrar made an order that: *e*
(i) the company do convene a meeting of its scheme creditors, to be held on 15 March 2005 at 2.30pm at the offices of Herbert Smith, for the purpose of considering and, if thought fit, approving (with or without modification) the scheme;
(ii) the scheme documentation (comprising a covering letter, the Notice of *f* Meeting, the short-form explanatory statement and the proxy and voting forms) be sent to all scheme creditors, not less than 45 days before the scheme meeting;
(iii) advertisements be placed in 9 publications, notifying scheme creditors of the scheme meeting and the availability of the scheme documentation; and *g*
(iv) the voting procedure proposed by the company be approved.
The proposal (incorporated into the order) was that scheme creditors would be invited to provide supporting evidence for claims estimation which would enable the company to consider the reasonableness of claims for voting purposes. The order incorporated the description of the process for resolving disputes in the company's evidence, which was: *h*

> 'Scheme creditors whose claims are disputed by the company will still be eligible to vote at the scheme meeting. The decision as to the value to be placed on such claims for voting purposes will be made by the chairman of the scheme meeting. In the event that the company does not agree with a scheme creditor's estimate of the value of its claim, the *i* chairman of the scheme meeting will consider whether or not such estimate is reasonable before admitting it for voting purposes.'

[39] The chairman of the meeting was to be Mr Cracknell, one of the company's directors. The order did not contain any liberty to apply. No

*a*  scheme creditor has sought to have that order set aside.

[40] The company duly complied with the registrar's order about notification of the time and place of the meeting.

*The meeting*

*b*  [41] The meeting, chaired by Mr Cracknell, took place on 15 March 2005 as ordered; 77 policyholders tried to vote at the meeting; 72 of them were admitted to vote. Of those 72, 46 voted in favour of the scheme (63%) and 27 (37%) voted against. The value of the claims in favour of the scheme was £36,784,826 (78.5%) and the value of claims against was £10,057,695 (21.5%).

*c*  [42] The chairman's report recorded that of the creditors who were admitted to vote, a number of votes required review. These fell into two categories:
(i) those which contained errors; and
(ii) those which were based on estimated claims, which the company considered to be unreasonable for voting purposes.

*d*  [43] Following review and adjustment, the revised voting figures were:

|            | FOR    |            | AGAINST |            |
| ---------- | ------ | ---------- | ------- | ---------- |
|            | Number | Value (£)  | Number  | Value (£)  |
| Total      | 44     | 21,171,971 | 28      | 3,627,674  |
| Percentage | 61%    | 85%        | 39%     | 15%        |

*e*  [44] The opposing creditors asked for more information about the voting and the adjustment of claims, which was provided. This further information shows that:
(i) those creditors who voted consisted of 38 insureds and 34 reinsureds;
(ii) 11 of the insureds voted for the scheme and 27 against. Of the 34 *f* reinsureds, 33 voted in favour of the scheme and one against.
(iii) of the insureds who voted for the scheme, one of the largest claimants (United Airlines) had no IBNR claim; and two (Honeywell and Viacom) did not split their claims between accrued claims and IBNR claims, but were admitted to vote their unsplit claims in full;
(iv) 16 of the reinsureds (all of whom voted in favour of the scheme) are *g* also reinsurers of the company;
(v) the majority of reinsureds had no or only modest IBNR claims;
(vi) those insureds who had IBNR claims, and who voted *for* the scheme, were (with two exceptions) admitted to vote those claims in full;
(vii) those insureds with IBNR claims, and who voted *against* the scheme, were admitted to vote substantially reduced IBNR claims, and in six cases *h* their IBNR claims were disallowed completely.

THE OPPOSING POLICYHOLDERS AND THEIR OBJECTIONS

*The opposing policyholders*

*i*  [45] The scheme is opposed by 18 companies all of which are, I think, US corporations who are directly insured by the company under occurrence policies. Each of them has potentially large IBNR claims. Mr Sheldon QC and Ms Stonefrost appeared for eleven of them, and Miss Nicholson for the twelfth. Seven more creditors have written to support the opposing creditors. Mr Moss QC and Mr Bayfield appeared for the company.

*The grounds of opposition*    a

[46] The grounds of opposition can be grouped under a number of heads. Like Mr Moss QC, I shall list them in chronological procedural order, rather than the order in which they are pleaded.

[47] First, the process of notification of the initial hearing for directions on 18 January 2005 and of the proposed scheme itself is fundamentally flawed. In particular:    b

(i) The company has identified addresses for only some one third of its creditors to whom notices have been sent.

(ii) Even where the addresses have been identified, addresses used were out of date and notices did not properly specify the intended recipient.

(iii) As regards the majority of the creditors who were not sent notices, there are potentially thousands of creditors worldwide who will have their contractual rights affected and in all likelihood extinguished without their knowledge if the scheme comes into effect.    c

(iv) The advertisements placed were wholly inadequate.

[48] Second, the information provided to the scheme creditors was inadequate. In particular:    d

(i) The company's assertion that all creditors will be paid 'in full' is misleading.

(ii) The statement that the proposed scheme 'will establish a method of valuation' is misleading.

(iii) The provision entitling the company in its absolute discretion to revert to run-off is inadequately explained and the statement that one of the advantages to creditors of the proposed scheme would be 'certainty and finality' is wrong.    e

(iv) The risk that the proposed scheme might not be effective in the United States if the orders sought under s 304 of the US Bankruptcy Code were not obtained is inadequately explained.

(v) The disadvantages of the proposed scheme are inadequately explained.    f

(vi) The notice of the initial hearing for directions did not give any information about the date or place of the hearing, failed adequately to inform scheme creditors of the consequences to them of the proposed scheme or the importance of that hearing and failed to give scheme creditors adequate time to respond.

[49] Third, the court does not have jurisdiction to sanction the scheme because the company has failed properly to constitute the classes of its creditors. The company has treated its scheme creditors as falling into a single class, whereas the opposing creditors argue that separate classes should have been constituted.    g

[50] Fourth, the court should not sanction the proposed solvent scheme on the basis of the 'tiny minority of the company's creditors who voted in favour'.    h

In addition:

(i) The claims of opposing creditors for voting purposes were incorrectly adjusted downwards (and the company has yet to respond to the opposing creditors' objections to the downward adjustments).    i

(ii) Those who voted in favour of the proposed scheme had special interests which were not representative of those in the position of the creditors who opposed the proposed scheme.

[51] Fifth, the scheme is unfair. In particular:

*a*   (i) The company, which is solvent and able to meet its contractual obligations as they fall due, would plainly benefit from the proposed scheme: it would achieve certainty and finality by permanently extinguishing its contractual obligations to pay its policyholders' long-tail liabilities thereby enabling the surplus to be released to its shareholder, Royal & Sun Alliance, to the detriment of scheme creditors.

*b*   (ii) The insurance and reinsurance creditors of the company also have an interest in the extinction of long-tail liabilities.

(iii) By contrast, the effect of the proposed solvent scheme on the opposing creditors and other long-tail policyholders is that their valuable and irreplaceable insurance cover would be extinguished at a time when asbestos and other latent injury claims under the policies are beginning to

*c*   materialise. The proposed scheme involves the re-writing of contracts freely entered into by the company and the withdrawal of the cover the policyholders bargained for. It forces upon such policyholders a commutation of their policies without their agreement and on terms that are more favourable to the company than could be achieved by negotiation.

*d*   Contrary to the company's assertion, it is impossible to ascertain whether policyholders with long-tail claims such as those of the opposing creditors will be paid 'in full' under the proposed scheme.

(iv) There is no methodology set out in the proposed scheme for valuing claims, and in particular IBNR claims.

(v) The provisions of the proposed scheme—and in particular the scheme

*e*   adjudication process—unfairly deprive the scheme creditors of their rights of access to the courts; of having their rights determined by an independent and impartial tribunal; and deprive the policyholders of the forum to which they are contractually entitled to have disputes determined.

(vi) The process of the administration of the proposed scheme is shrouded in secrecy and cannot be effectively policed.

*f*   (vii) There are provisions of the proposed scheme—such as the company's right in its absolute discretion to revert to run-off, the bar date, the company's ability to continue to commute claims, the company's ability to make early payments and the scheme adjudicator's ability to impose costs on creditors—which are one-sided and are likely to result in the unfair treatment of creditors.

*g*   [52] Sixth, the company has failed to make full and frank disclosure. In particular there has been inadequate disclosure of agreements and arrangements made between the company and creditors who were prepared to support the scheme.

*h*

THE LEGAL FRAMEWORK

*The statutory provisions*

[53] Section 425 of the Companies Act 1985 says:

*i*        '(1) Where a compromise or arrangement is proposed between a company and its creditors, or any class of them, or between the company and its members, or any class of them, the court may on the application of the company or any creditor or member of it or, in the case of a company being wound up, or an administration order being in force in relation to a company, of the liquidator or administrator, order

a meeting of the creditors or class of creditors, or of the members of the
company or class of members (as the case may be), to be summoned in
such manner as the court directs.

(2) If a majority in number representing three-fourths in value of the
creditors or class of creditors or members or class of members (as the
case may be), present and voting either in person or by proxy at the
meeting, agree to any compromise or arrangement, the compromise or
arrangement, if sanctioned by the court, is binding on all creditors or
the class of creditors or on the members or class of members (as the
case may be), and also on the company or, in the case of a company in
the course of being wound up, on the liquidator and contributories of
the company'.

*Overview*

[54] As Chadwick LJ pointed out in *Re Hawk Insurance Co Ltd* [2001]
2 BCLC 480, the approval of a scheme of arrangement is a three-stage
process. Since the opposing creditors make criticisms of each stage, it is
necessary to set them out. First, there must be an application to the court
under s 425(1) of the 1985 Act for an order that a meeting or meetings be
summoned. It is at that stage that a decision needs to be taken as to whether
or not to summon more than one meeting; and, if so, who should be
summoned to which meeting. Second, the scheme proposals are put to the
meeting or meetings held in accordance with the order that has been made;
and are approved (or not) by the requisite majority in number and value of
those present and voting in person or by proxy. Third, if approved at the
meeting or meetings, there must be a further application to the court under
s 425(2) of the 1985 Act to obtain the court's sanction to the compromise
or arrangement. Each of those stages serves a distinct purpose. At the first
stage the court directs how the meeting or meetings are to be summoned. It
is concerned, at that stage, to ensure that those who are to be affected by
the compromise or arrangement proposed have a proper opportunity of
being present (in person or by proxy) at the meeting or meetings at which
the proposals are to be considered and voted upon. The second stage
ensures that the proposals are acceptable to at least a majority in number,
representing three-fourths in value, of those who take the opportunity of
being present (in person or by proxy) at the meeting or meetings. At the
third stage the court is concerned (i) to ensure that the meeting or meetings
have been summoned and held in accordance with its previous order, (ii) to
ensure that the proposals have been approved by the requisite majority of
those present at the meeting or meetings and (iii) to ensure that the views
and interests of those who have not approved the proposals at the meeting
or meetings (either because they were not present or, being present, did not
vote in favour of the proposals) receive impartial consideration.

*The first stage: summoning the meeting*

[55] In the light of deficiencies in the practice that Chadwick LJ identified
in *Re Hawk Insurance Co Ltd, Practice Statement* (*Companies: Schemes of
Arrangement*) [2002] 3 All ER 96, [2002] 1 WLR 1345 was issued by
Sir Andrew Morritt V-C on 15 April 2002. The *Practice Statement* included
the following:

*a*

'4. It is the responsibility of the applicant by evidence in support of the application or otherwise to draw to the attention of the court as soon as possible any issue which may arise as to the constitution of meetings of creditors or which otherwise affect the conduct of those meetings (creditor issues). For this purpose unless there are good reasons for not doing so the applicant should take all steps reasonably open to it to notify any person affected by the scheme that it is being promoted, the purpose which the scheme is designed to achieve, the meetings of creditors which the applicant considers will be required and their composition.

*b*

5. In considering whether or not to order meetings of creditors (a meetings order) the court will consider whether more than one meeting of creditors is required and if so what is the appropriate composition of those meetings.

*c*

6. Where a creditor issue has been drawn to the attention of the court it will also consider whether to give directions for the resolution of that issue including if necessary directions for the postponement of meetings of creditors until that resolution has been achieved.

*d*

7. Directions for the resolution of creditor issues may include orders giving anyone affected by a meetings order a limited time in which to apply to vary or discharge that order with the creditors meetings to take place in default of any such application within the time prescribed. While creditors who consider that they have been unfairly treated will still be able to appear and raise objections on the hearing of the petition to sanction the scheme, the court will expect them to show good reason why they did not raise a creditor issue at an earlier stage.'

*e*

[56] The function of the court at the first stage is 'emphatically not' to consider the merits or fairness of the proposed scheme: *Re Telewest Communications plc (No 1)* [2004] EWHC 924 (Ch), [2005] 1 BCLC 752 at [14] (per David Richards J). It is primarily to decide whether there should be one meeting, or more than one; and to decide the manner in which that meeting should be summoned and conducted. The requirement in the *Practice Statement* that the company 'take all steps reasonably open to it to notify any person affected by the scheme that it is being promoted' must be read in that context. Thus, in my judgment, the extent of the notification of the application to the court at the first stage need not be as extensive as the notification that the court may order on the application at that stage. Moreover, the requirement of notification is not absolute. It applies 'unless there are good reasons for not doing so'. Time and expense are, in my judgment, capable of being good reasons.

*f*

*g*

*h*

## What is a class?

[57] The question what is a 'class' of creditors was dealt with by Chadwick LJ in *Re Hawk Insurance Co Ltd* [2001] 2 BCLC 480 at [23]. He said:

*i*

'[T]he relevant question at the outset is: between whom is it proposed that a compromise or arrangement is to be made? Are the rights of those who are to be affected by the scheme proposed such that the scheme can be seen as a single arrangement; or ought the scheme to be

regarded, on a true analysis, as a number of linked arrangements? The   *a*
question may be easy to state; but, as the cases show, it is not always
easy to answer.'

[58] However, he sounded a note of warning. It is necessary to ensure not
only that those whose rights really are so dissimilar that they cannot consult
together with a view to a common interest should be treated as parties to   *b*
distinct arrangements—so that· they should have their own separate
meetings—but also that those whose rights are sufficiently similar to the
rights of others that they can properly consult together should be required
to do so; lest by ordering separate meetings the court gives a veto to a
minority group. The safeguard against majority oppression is that the court
is not bound by the decision of the meeting. It is important that the test   *c*
should not be applied in such a way that it becomes an instrument of
oppression by a minority.

[59] In the *Hawk Insurance* case itself, the question was whether
policyholders who had contingent claims (ie IBNR claims) fell into the same
class as those who had accrued claims. Chadwick LJ analysed closely the
leading case of *Sovereign Life Assurance Co v Dodd* [1892] 2 QB 573, and   *d*
summarised his analysis as follows (at [29]):

'On its facts the case is authority for the proposition that, in relation
to the terms of the scheme in that case, a person with an existing right
to set off moneys due to him under a policy which had matured against
moneys owed by him to the company was not in the same class of   *e*
creditors as those who had no such right. It may well be said, also, that
this court would have found, had it been necessary for it to do so, that,
the terms of the scheme in that case did lead to the conclusion that
those whose policies had matured constituted a different class of
creditors from those whose policies had not matured; but that is
because the terms of the scheme substituted for rights under policies   *f*
which had matured during the life of the policyholder the rights which
those policyholders would have had on death if the policies had not
matured.'

[60] Chadwick LJ continued (at [30]):

'But it will not necessarily follow, in every case, that the treatment   *g*
under the scheme of vested and contingent rights, or the rights under
matured and current policies, will be so dissimilar that the holders of
those rights must be regarded as persons in different classes in the
context of the question "with whom is the compromise or arrangement
made". In each case the answer to that question will depend upon   *h*
analysis (i) of the rights which are to be released or varied under the
scheme and (ii) of the new rights (if any) which the scheme gives, by
way of compromise or arrangement, to those whose rights are to be
released or varied. It is in the light of that analysis that the test
formulated by Bowen LJ in order to determine which creditors fall into
a separate class—that is to say, that a class "must be confined to those   *i*
persons whose rights are not so dissimilar as to make it impossible for
them to consult together with a view to their common interest"—has to
be applied.'

[61] The *Hawk Insurance* case was a case of an insolvent company. So

*a*  Chadwick LJ compared the rights that the contingent creditors had under the scheme, and the rights that they would have had in an insolvent liquidation. Having referred to the duty of a liquidator to get in and realise the company's assets, and to distribute them, Chadwick LJ went on to explain that the rights of non-insurance creditors, insurance creditors with unsettled paid claims, insurance creditors with outstanding losses and

*b*  insurance creditors with IBNR losses are the same in this respect: that in the context of a winding up of the company they will all be entitled to submit claims in the winding up and to have those claims admitted or rejected. The difference between the position of non-insurance creditors and insurance creditors with unsettled paid claims (on the one hand) and insurance creditors with outstanding losses or IBNR losses (on the other hand) is that,

*c*  in the case of the latter, their claims are in respect of debts which by reason of their 'being subject to any contingency or for any other reason' do not bear a certain value and so must be the subject of an estimate. But that does not lead to the conclusion that the rights of, say, non-insurance creditors and insurance creditors with IBNR losses are different. Thus, he held, all

*d*  the unsecured creditors fell into a single class for the purposes of the scheme under consideration. Chadwick LJ's analysis of the *Sovereign Life* case is important; because it seems to me that in considering whether one type of creditor is in the same class as another type of creditor, Chadwick LJ recognised that rights of set-off can be taken into account. In other words, it is not simply a person's rights as creditor of the company that are

*e*  relevant, but also his obligations as debtor; at least if the one can be set off against the other.

    [62] In *Re Telewest Communications plc (No 1)* [2005] 1 BCLC 752 at [29] David Richards J considered whether certain bondholders should form a separate class. Although the company was not then in liquidation, David Richards J said that 'the reality is that they will not be able to enforce

*f*  [their contractual] rights and that in the absence of the scheme or other arrangement their rights against the company will be those arising in an insolvent liquidation.' Thus the appropriate comparator was an insolvent liquidation, rather than the theoretical possibility that the company might remain solvent.

*g*    [63] Mr Sheldon says that although the question of classes of creditors arises, logically, at the first stage, an opposing creditor can raise 'class issues' at the third stage, even though he did not raise them at the first stage, if he has a good reason for doing so. Mr Moss agreed that there was no estoppel arising out of a failure to raise a class issue at the first stage. He said that although the court discourages the taking of technical points at the

*h*  third stage, the opposing creditors are entitled to raise them since, potentially, they go to the court's jurisdiction to approve a scheme.

    [64] In *Re UDL Holdings Ltd* [2002] 1 HKC 172 at 184 Lord Millett, sitting as a judge of the Court of Final Appeal in Hong Kong, gave an overview of the court's approach as follows:

*i*    '(1) It is the responsibility of the company putting forward the scheme to decide whether to summon a single meeting or more than one meeting. If the meeting or meetings are improperly constituted, objection should be taken on the application for sanction and the company bears the risk that the application will be dismissed.

(2) Persons whose rights are so dissimilar that they cannot sensibly *a* consult together with a view to their common interest must be given separate meetings. Persons whose rights are sufficiently similar that they can consult together with a view to their common interest should be summoned to a single meeting.

(3) The test is based on similarity or dissimilarity of legal rights against the company, not on similarity or dissimilarity of interests not *b* derived from such legal rights. The fact that individuals may hold divergent views based on their private interests not derived from their legal rights against the company is not a ground for calling separate meetings.

(4) The question is whether the rights which are to be released or varied under the scheme or the new rights which the scheme gives in *c* their place are so different that the scheme must be treated as a compromise or arrangement with more than one class.

(5) The Court has no jurisdiction to sanction a scheme which does not have the approval of the requisite majority of creditors voting at meetings properly constituted in accordance with these principles. Even *d* if it has jurisdiction to sanction a scheme, however, the Court is not bound to do so.

(6) The Court will decline to sanction a scheme unless it is satisfied, not only that the meetings were properly constituted and that the proposals were approved by the requisite majorities, but that the result of each meeting fairly reflected the views of the creditors concerned. To *e* this end it may discount or disregard altogether the votes of those who, though entitled to vote at a meeting as a member of the class concerned, have such personal or special interests in supporting the proposals that their views cannot be regarded as fairly representative of the class in question.'

*f*

### The second stage: the scheme meeting

[65] Section 425 (1) requires the meeting to be summoned in such manner as the court directs. If, therefore, the meeting is summoned in the manner directed by the court, it would seem on the face of it, that s 425 (1) has been complied with. However, the conduct of and outcome of the meeting *g* are still relevant at the third stage, as the passage I have quoted from Lord Millett demonstrates.

[66] The opposing creditors criticise the conduct of the meeting; and in particular the valuation that the chairman placed, for voting purposes, upon the IBNR claims of the direct insureds who voted against the scheme. This raises the question: on what grounds (if any) can the chairman's decision be *h* impeached? Mr Moss accepts that the decision can be impeached if the chairman did not act honestly; or if he acted perversely (that is, he reached a decision which no reasonable chairman could have reached).

[67] It also seems to me that if the chairman did not conduct the meeting substantially in accordance with the procedure laid down by the court on the hearing at the first stage, that is an additional ground on which the vote *i* can be impugned.

[68] Mr Sheldon also submitted that if the claims of creditors could not be valued, the court could not be satisfied that the statutory majority of creditors by value had been attained. He relied on the judgment of James LJ

a  in *Re Albert Life Assurance Co* (1871) 6 Ch App 381 at 386, in which the Lord Justice said:

> 'That Act says that there shall be a power in the majority to bind the minority. But that majority must be a majority of creditors of each company which is compromising, and in order to enable the majority to
b  bind the minority the Court must be satisfied that there is a meeting of creditors the amount of whose debts can be estimated, and that there are three-fourths of the creditors who have assented, before it will interfere to enforce that which the large majority think the most beneficial way for them to get their claims satisfied—merely applying to a winding-up in this Court the same principles as are applied in
c  Bankruptcy to dealings between a bankrupt and his creditors. But here the Court really has no data by which it can be at all ascertained what the claims of the creditors are.'

### The third stage: sanctioning the scheme

d  [69] The third stage does not arise unless the meeting has been held; and the statutory majority (in number and by value) of creditors have voted in favour of the scheme. So the starting point at this stage is that a majority of the company's creditors want the scheme to be sanctioned. But even so, the cases emphasise that the court is not a rubber stamp. It has what has been described as an unfettered discretion to refuse to sanction the scheme. In *Re*
e  *BTR plc* [2000] 1 BCLC 740 at 747 Chadwick LJ said:

> '[T]he court is not bound by the decision of the meeting. A favourable resolution at the meeting represents a threshold which must be surmounted before the sanction of the court can be sought. But if the court is satisfied that the meeting is unrepresentative, or that those
f  voting at the meeting have done so with a special interest to promote which differs from the interest of the ordinary independent and objective shareholder, then the vote in favour of the resolution is not to be given effect by the sanction of the court.'

[70] In the *Hawk Insurance* case Chadwick LJ observed that the court should be careful not to allow a minority of creditors to frustrate the wishes
g  of the majority, by an overzealous dissection of the creditors into classes. On the other hand in *Sovereign Life Assurance Co v Dodd* [1892] 2 QB 573 at 582–583, Bowen LJ said of the predecessor of s 425:

> 'It makes the majority of the creditors or of a class of creditors bind the minority; it exercises a most formidable compulsion upon
h  dissentient, or would-be dissentient, creditors; and it therefore requires to be construed with care, so as not to place in the hands of some of the creditors the means and opportunity of forcing dissentients to do that which it is unreasonable to require them to do, or of making a mere jest of the interests of the minority.'

i  [71] Mr Sheldon submitted that the court should not sanction a scheme if there is inherent unfairness in the scheme: *Re Telewest Telecommunications plc (No 2)* [2004] EWHC 1466 (Ch), [2005] 1 BCLC 772. In determining whether a scheme is unfair, a comparison should be made between the contractual rights and reasonable expectations of the

policyholders in the absence of the scheme and their rights and expectations   *a*
if the scheme is sanctioned. In support of this submission he relied by
analogy on the decision of Evans-Lombe J in *Re Axa Equity and Law Life
Assurance Society plc* [2001] 2 BCLC 447 at 468 (a case of transfer of
business by an insurance company under the Financial Services and Markets
Act 2000). Although this submission overlapped with his submissions on
the identification of the relevant classes of creditors at the first stage,   *b*
Mr Sheldon submitted that the same considerations could do double duty at
both the first and third stages.

[72] In *Re English Scottish and Australian Chartered Bank* [1893]
3 Ch 385 at 406 Lindley LJ said:

> 'We start with this, that the creditors ought to be paid 20s. in the   *c*
> pound. If it is there for them to have, they ought to have it at the
> expense of the shareholders; there is no question at all about that. But
> can they get it? If they cannot get it, then it becomes necessary to
> consider and decide upon some alternative scheme for giving them less
> than that to which they are entitled ... But I do not think that it is just
> to say that this is a mere scheme to resuscitate the bank and not pay the   *d*
> creditors. If I thought that was the scheme, I should negative it without
> the slightest hesitation; but I think the true view of it is this, that it is a
> scheme for paying the creditors by resuscitating the bank, and I do not
> believe the creditors can get paid in any other way.'

[73] In the same case Lindley LJ said (at 409):   *e*

> 'The court does not simply register the resolution come to by the
> creditors or the shareholders, as the case may be. If the creditors are
> acting on sufficient information and with time to consider what they are
> about, and are acting honestly, they are, I apprehend, much better
> judges of what is to their commercial advantage than the court can be.   *f*
> I do not say it is conclusive, because there might be some blot on a
> scheme which had passed that had been unobserved and which was
> pointed out later. While, therefore, I protest that we are not to register
> their decisions, but to see that they have been properly consulted, and
> have considered the matter from a proper point of view, that is, with a
> view to the interests of the class to which they belong and are   *g*
> empowered to bind, the court ought to be slow to differ from them. It
> should do so without hesitation if there is anything wrong; but it ought
> not to do so, in my judgment, unless something is brought to the
> attention of the court to show that there has been some material
> oversight or miscarriage.'
>   *h*

[74] The test that is stated in *Buckley on the Companies Act* (and which
has been approved many times) is that the court should normally sanction a
scheme if:

> 'the arrangement is such as an intelligent and honest man, a member
> of the class concerned and acting in respect of his interest, might   *i*
> reasonably approve.'

[75] Thus stated, the test is not whether the opposing creditors have
reasonable objections to the scheme. A creditor may be equally reasonable
in voting for or against the scheme. In such a case Mr Moss submitted that

*a*   creditor democracy should prevail. Where, as here, those who voted in favour of the scheme are large and sophisticated corporations, the rigid application of this test as the sole criterion would rarely, I think, enable the court to refuse to sanction a scheme. It is also not entirely clear to me how the rigid application of this test sits with statements that the court has an unfettered discretion.

*b*   [76] Be that as it may, none of the very experienced counsel in the case was able to show me a case in this jurisdiction in which the court, having decided that it had jurisdiction to sanction a scheme, nevertheless refused, as a matter of discretion, to do so. There is one possible exception in the shape of *Re Canning Jarrah Timber Co (Western Australia) Ltd* [1900]

*c*   1 Ch 708 where Cozens-Hardy J refused to sanction a scheme; but after the scheme had been amended it was ultimately sanctioned by the Court of Appeal.

WAS ADEQUATE NOTICE OF THE FIRST-STAGE APPLICATION GIVEN?

[77] The first-stage application is purely procedural, and regulates the
*d*   manner in which the scheme is to be presented to creditors for approval. Although it is desirable for points about separate classes to be taken at that stage, it is not essential; since they can be (and are) taken at the third stage. It remains the company's responsibility to identify the classes correctly; and to show the court that the manner in which the meeting (or meetings) will be summoned and conducted is acceptable. It seems to me therefore, that
*e*   whatever deficiencies there may be in notification of the first-stage hearing, they go neither to the jurisdiction of the court to sanction a scheme; nor, save in exceptional circumstances, will they be critical to the exercise of the court's discretion at the third stage.

[78] Nevertheless, I should deal briefly with Mr Sheldon's criticisms of the
*f*   notification of the first-stage hearing. First he said that the company had not notified enough policyholders. There are, I think, two answers to this criticism. First, the policyholders whose details were in the company's records included details of all the policies it had ever issued. Many of these would have been hull cover for aircraft that had long since been scrapped, or insurance for cargo that had long since been shipped. Second, if the
*g*   company had no addresses for policyholders, what could it reasonably have been expected to do at that stage? In my judgment, no more than it did. Mr Sheldon's second criticism was that the company did not check that the addresses it had for policyholders were up to date. Some of the opposing creditors received notification of the application by roundabout means. Nor did the company ascertain who was the relevant contact person to whom to
*h*   send notification, unless this was already known. The reason given was that it would have been too time-consuming. In the context of a first stage application, these complaints seem to me to be counsels of perfection. The sending of letters also has to be seen against the backdrop that the application was also advertised in national, international, and specialist press. I am not prepared to say that, in the absence of taking these steps, the
*i*   company failed to take reasonable steps, without good reason, to notify those who might be affected by the scheme.

[79] Mr Sheldon's third criticism was that the company failed to advertise in newspapers circulating in the various countries in which known policyholders resided. However, it did advertise in national, international,

and specialist press; and in my judgment that was enough at that stage.    *a*

[80] Mr Sheldon's final criticism was that the written notification of the first-stage hearing was sent out on 20 December 2004 (just before Christmas) and asked for responses by 11 January 2005; and it did not give a date for the first stage hearing. The timing of the letter was, I agree, tight, bearing in mind the holiday season; but even allowing for that there were at least 14 working days. At the date when the letter was sent, the date of the  *b* hearing was not known; and even if it were, it might have had to have been changed if any creditor had raised class objections.

[81] I do not regard these criticisms as carrying any real weight.

WERE THE CLASSES OF CREDITORS CORRECTLY IDENTIFIED?         *c*

[82] Although Mr Sheldon did not quarrel with the formulation of the relevant questions in the *Hawk Insurance* case, he stressed that the *Hawk Insurance* case involved an *insolvent* company (a feature that Chadwick LJ said was 'essential'). He submitted that the comparison that the court must make was a comparison between the rights that creditors would acquire under the scheme (if approved); and the rights that they would enjoy if it  *d* were not. In the latter case the court should consider (and consider only) realistic alternatives. If the company in question was insolvent, then the obvious realistic alternative was an insolvent liquidation. But if the company is solvent, then that is an inappropriate comparator. In some cases, an appropriate comparator might be a members' voluntary liquidation. But that could only be appropriate if it was a realistic  *e* possibility. In the present case, a solvent liquidation has never been put forward as a realistic alternative, although the possibility was canvassed by Mr Moss in argument. Mr Sheldon pointed out that the scheme does not encompass the whole of the company's business; so that it will remain in being even if the scheme is approved. The business excluded from the  *f* scheme itself includes long-tail insurance written after 1990 but before 2002, so the company will remain in solvent run-off for many years. He also submitted that, since the company was a subsidiary of three well-known insurers, it was unlikely that, for reasons connected with their reputation and standing in the insurance market, they would put the company into liquidation, still less allow it to go into insolvent liquidation.  *g* Since a liquidation of the company must be a liquidation of the company as a whole, the rights of creditors in a liquidation is not an appropriate comparator.

[83] Under the scheme, a policyholder with an accrued claim will have that claim paid in full. If the scheme is not approved, he will still have his claim paid in full. The measure of the claim will be the amount for which he  *h* is entitled to indemnity under the policy in respect of the known claim. By contrast, the position of a policyholder with an IBNR claim is different. Under the scheme he will be entitled to have his contingent claim valued. He will then be entitled to be paid the full amount of the valuation (less a discount for the time cost of money). Although a valuation of a future (and contingent claim) can be made, and may even be described as a fair  *i* valuation, it is only a valuation. It is not an indemnity. Indeed, whatever else one may be able to say about a valuation of a future contingent claim the one thing that one can say with near certainty is that, barring a miracle, the valuation will *not* be the same amount as the indemnity. If, on the other

*a*  hand, the scheme is not approved, the company will remain in run-off. It will pay claims as and when they arise; and the measure of the payment will be the full indemnity to which the policyholder is entitled. It may be that anticipated claims by some policyholders will never arise; in which case the company will not have to pay. But that is what insurance is about. The policyholder bargains for the insurer to bear the risk of a contingency

*b*  materialising. The insurer is in the risk business; and the policyholder is not. Unlike the policyholder with an accrued claim, who knows the extent of his exposure to that claim, the policyholder with an IBNR claim does not. The essence of the scheme is that it retransfers the risk from the insurer (who had contracted to bear it) to the policyholder (who did not). Thus the rights of a policyholder with an IBNR claim are fundamentally different under the

*c*  scheme from the rights that he would have in the absence of the scheme.

[84] Moreover, in the *Hawk Insurance* case Pill LJ (with whom Wright J agreed) said that even in the case of an insolvent insurance company, a creditor whose claims were limited to IBNR claims might be seen as falling into a separate class from creditors whose only claims were accrued claims.

*d*  This reasoning, Mr Sheldon said, applied with greater force to the case of a solvent insurer. According to Mr Dempsey's third witness statement, the company itself divided claims into known claims on the one hand (both unsettled paid claims and outstanding losses) and IBNR claims on the other. This was the rational way to divide creditors, because the payment and estimation of known claims, even if contingent, was relatively

*e*  straightforward, whereas the estimation of IBNR claims was far more speculative, and dependent on a large number of controversial variables. The two categories of creditor could not be regarded as a single class. Mr Sheldon's submissions on this question were supported by Miss Nicholson.

[85] Mr Moss submitted that the appropriate comparator was the rights

*f*  that the policyholders would enjoy in a solvent liquidation. In such a liquidation, they would be entitled to have their contingent claims valued and payment of the valuation in full. Under the scheme they would have the same entitlement. Indeed, they will do better under the scheme because the discount rate that will be adopted to represent the time cost of money will be more generous to the policyholders than that which would be adopted in

*g*  a solvent liquidation.

[86] Mr Moss submitted that, for the following reasons, the scheme creditors were correctly grouped into a single class:
(i) All the scheme creditors are creditors under contracts of insurance and reinsurance entered into by the company.

*h*  (ii) It follows that they all have similar rights against the company arising out of claims in respect of the insurance and reinsurance policies.
(iii) All scheme creditors are to be treated equally under the terms of the scheme.
(iv) Whilst it is true to say that the impact of the early valuation and payment process will vary depending upon the number and quality of the

*i*  contingencies that exist in relation to each claim and that the largest number and most speculative of contingencies will arise in relation to IBNR claims, the variations in impact as between *all* scheme creditors will be infinite and impossible to quantify in advance of the claims actually arising.

(v) Moreover, depending on whether the estimated contingencies ever arise, *a* the impact of the early valuation process be on a particular creditor may be either beneficial or detrimental. It is again impossible to know in advance of the contingencies actually arising which it will be.

(vi) The vast majority of scheme creditors, given that the policies all relate to long-tail business that has been in run-off, will have (at least potentially) IBNR claims. Mr Dempsey's evidence is that there are approximately 400 *b* policyholders who have 'actual or pending' claims against the company. (I was told that the phrase 'actual or pending' claims included IBNR claims, although this is not immediately apparent from the language. It contrasts with Mr Cracknell's evidence that there are 459 policyholders with 'current' claims. It seems to me that Mr Dempsey has understated the number of claims by 59, and must have been referring to the same claims that *c* Mr Cracknell described as 'current'. Moreover, the very nature of an IBNR claim, as Mr Sheldon pointed out, is that it has not yet been reported to insurers.) Mr Dempsey also says that of: 'all the scheme creditors whose votes were taken into account at the scheme Meeting by the chairman, I believe that all such scheme creditors have or could have IBNR claims'. The *d* nature of the policies written is such that, on any view, many of the scheme creditors will have both IBNR claims and non-IBNR claims. The mere fact that a scheme creditor has submitted one or more claims already is no indicator that it will not submit claims in the future. This substantial overlap between scheme creditors with actual and potential claims makes it impossible, in practice, to identify cleanly a separate 'class' of scheme *e* creditors with potential claims from those with actual claims. Further, the fact that most scheme creditors fall into both categories emphasises the fact that they are capable of consulting together in their common interest.

(vii) Accordingly, notwithstanding the different impact the early valuation process might have on different types of scheme claim, this is insufficient to render the scheme creditors unable to consult together with a view to their *f* common interest, given the features of the scheme claims and the treatment of them, that are shared by all scheme creditors.

[87] Mr Moss accepted that if the scheme is sanctioned, scheme creditors would have different rights under the scheme from the rights that they would have had in a 'no scheme world'. But although their rights would be different, it would be the same difference for all of them. Accordingly, there *g* was no need to separate them into different classes.

[88] In my judgment the starting point is to identify the appropriate comparator. This is critical to deciding whether all the policyholders form a single class. In the *Hawk Insurance* case the appropriate comparator was an insolvent liquidation because the company was insolvent. In the *Telewest* *h* case it was also an insolvent liquidation because that was the real alternative to the scheme. On that basis, the rights to which policyholders with IBNR claims would be entitled are the right to have their claims valued; and the right to a dividend based on the value of the claim. Those with accrued claims would be entitled to the same dividend. The same may well be true in a solvent liquidation, although Mr Sheldon said that in a *i* solvent liquidation there is no compulsion on a liquidator to make an early distribution. But this is not, in my judgment, a case in which a realistic alternative to the scheme is a voluntary (solvent) liquidation. The only realistic alternative to the scheme, as things stand, is a continuing solvent

*a*  run-off. In my judgment that is the appropriate comparator.

[89] In a solvent run-off, policyholders with unsettled paid claims will be entitled to have their claims paid in full. They will have exactly the same right under the scheme. The risk against which they insured has materialised and the extent of the liability has been quantified; and all they have to do is to collect the insurance proceeds. They incur no further risk.

*b*  So the scheme does not disadvantage them in any way. For them the so-called compromise is not much of a compromise, if it is a compromise at all. Policyholders with outstanding losses are in a slightly different position. There is no need to estimate the probability of a claim arising; that is already known. Their right in a solvent run-off is to wait until the quantum of the claim had been determined; and then to claim indemnity from the

*c*  insurers. Under the scheme they will have to accept an estimate of that quantum instead; but they will not have to accept any estimate of the likelihood of a claim being made at all. This removes one of the greatest of the uncertainties from the process of estimation. There is some risk that an estimate will prove to be inaccurate; but it is a small one.

*d*  [90] So far as policyholders with IBNR claims are concerned, their right in a solvent run-off is to wait and see whether a claim materialises, and if it does, to have a full indemnity against the claim. They have already paid their premiums for the insurance cover, so they are at risk of no further expenditure in relation to a valid claim. Under the scheme they will receive cash up front. It may be an amount that is greater than or smaller than the

*e*  liabilities that eventually materialise, but it will not be the same. The risk of inadequate resources to meet such liabilities is re-transferred from the insurers to them. So the scheme may well disadvantage them.

[91] I do not consider that the fact (if it is a fact) that policyholders may have both accrued claims and IBNR claims is of any great moment. The evidence is directed only at those policyholders who actually voted at the

*f*  meeting. Mr Dempsey's evidence goes no further than to say that all those who voted 'could have' both accrued claims and IBNR claims. At least one of the direct insureds who voted in favour of the scheme (United Airlines) had substantial accrued claims, but no IBNR claims. An examination of the votes allowed also shows that some creditors had very modest accrued claims but substantial IBNR claims. So although they may be as important

*g*  numerically when considering the statutory majority of creditors by number, whether there is one meeting or two; they may have greater influence when considering the majority of creditors by value, if separate meetings of policyholders with accrued claims and creditors with IBNR claims are held. Moreover, an analysis of the votes cast at the meeting by

*h*  some 15% of policyholders with known claims is not an adequate basis for safely concluding that there are no creditors who only have IBNR claims. A known claim is, after all, a reported claim, whereas an IBNR claim is not. The fact that a creditor may fall into more than one than one class does not, in my judgment, mean that separate classes are inappropriate.

[92] In my judgment in the particular circumstances of a solvent scheme,

*i*  where a solvent liquidation is not a realistic alternative, those with accrued claims and those with IBNR claims have interests which are sufficiently different as not to make it possible for them sensibly to consult together 'in their common interest'. In truth, they do not have a common interest at all.

[93] As I have said the company's insurance contracts were both contracts

of insurance and contracts of reinsurance. But Mr Sheldon said that some of      *a*
the *reinsureds* are also *reinsurers* of the company. As reinsurers, they have a
clear interest to cap their own liabilities to the company under their own
reinsurance contracts. Thus they are in a position of conflict (or at least
neutrality, since the cap on their entitlement as reinsured will be matched by
a cap on their liability as reinsurers); whereas a direct insured who caps his
entitlement against the company will remain exposed to uncapped liability      *b*
at the suit of one who makes a claim for personal injury. So also will a
reinsured who is not also a reinsurer. Moreover any payment made under
the scheme will be made after taking into account set-off. Thus it is not just
a question of different economic interests; it is a case of direct impact on
legal rights. Those reinsureds who were also reinsurers ought to have been
constituted as a separate class. Miss Nicholson did not support      *c*
Mr Sheldon's submission on this point.

[94] Mr Moss submitted that, legally, both direct insureds and reinsureds
constituted a single class of unsecured creditors, each of whom had the
same right of indemnity against the company in respect of insured risks. It
is true that set-off will be applied to those reinsured who are also reinsurers;      *d*
but it is only those reinsureds who, after the application of set-off, were
adjudged to be net creditors of the company at the time of the scheme
meeting who were admitted to vote. As net creditors of the company, it did
not matter how the net position arose. They also had the same economic
balance to make as the direct insureds. In each case it was a question of
choice between certain cash now and uncertain cash later. If the reinsureds      *e*
choose cash now (as overwhelmingly they did), they will recognise that they
are losing their reinsurance cover.

[95] I have found this a difficult question, but in the end I have been
persuaded by Mr Moss that a separate class for reinsurers could not be
justified, for the reasons that he gave. But the fact that some members of a
class have personal or special interests in supporting the proposals may be      *f*
relevant at the third stage, when the court exercises its discretion in
sanctioning (or refusing to sanction) the scheme.

[96] Mr Sheldon also submitted that the exclusion from the scheme of
certain parts of the company's business was arbitrary and irrational; and for
that reason also the scheme meeting had not been properly convened.
However, it is for the company to choose the creditors with whom it wishes      *g*
to enter into a compromise or arrangement; and the evidence shows that
they had rational reasons for selecting the categories of business to include
within the scheme. The company's evidence has not been challenged; and in
those circumstances, this criticism fails.

[97] I conclude nevertheless that the single scheme meeting was not      *h*
properly constituted. It follows, therefore, that I must hold that I have no
jurisdiction to sanction the scheme. However, in case I am wrong, I must go
on to consider the other grounds of objection.

WAS ADEQUATE NOTICE OF THE SECOND STAGE (SCHEME MEETING) GIVEN?

[98] As I have said the requirement of the Act is that the meeting be      *i*
summoned in such manner as the court may direct. It was. It follows, in my
judgment, that no criticism of the steps taken to publicise the meeting can
deprive the court of jurisdiction to sanction a scheme. However, any
perceived deficiencies in the publicising of the meeting can, I think, be taken

*a* into account at the third stage. If, for example, creditors are to be notified by post; and there is a lengthy postal strike, that must be something that the court can take into account in considering whether to sanction the scheme.

*b* DID THE EXPLANATORY MEMORANDUM ADEQUATELY EXPLAIN THE CONTENTS OF THE SCHEME?

[99] Mr Sheldon directed his initial criticisms at the circular letter of 20 December 2004 announcing the proposal for the scheme. This criticism seems to me to be misplaced. The requirement to send an explanatory *c* memorandum arises under s 426(2) of the Act. That applies to the notice summoning the meeting for which the court has given directions at stage one. It does not apply to an advance notification before stage one is even reached. I think that Mr Sheldon ultimately agreed with this.

[100] So far as the explanatory statement itself is concerned, Mr Sheldon submitted that it was flawed. He said that although it stated that one of the *d* advantages of the proposed scheme for scheme creditors would be 'certainty and finality' that was wrong. The scheme gives the company a right, to be exercised at the company's 'absolute discretion' to opt out of the scheme, bring the scheme to an end and to continue with the run-off. Thus whether the sanction of the scheme ends the run-off for all time depends on what the company unilaterally decides to do in the future. However, the explanatory *e* statement does, in my judgment, state clearly that the company may decide to terminate the scheme and revert to run-off. The creditors are assumed to be intelligent, when it comes to the third stage of sanctioning the scheme; and I think that they may be assumed to have had the same intelligence at the preceding stages. Although it may be too much to expect creditors to read the small print of the scheme itself, they can I think be expected to *f* read the explanatory statement as a whole. Had they done so, they would have seen the company's right to terminate the scheme clearly explained.

[101] Mr Sheldon also criticised the statement that creditors would be paid in full. It is accepted on all sides that there is uncertainty in estimating the present value of future contingent claims. The explanatory *g* memorandum itself recognises that a creditor who is bound by the scheme and submits a claim which is valued could ultimately receive a greater or smaller amount in respect of its scheme liabilities than would have been the case had the scheme business been run off in the traditional way. This is highlighted as one of the possible disadvantages of the scheme. There are therefore, in my judgment, two answers to Mr Sheldon's point. First, as I *h* have said, creditors can be expected to read the explanatory statement as a whole. If they had done so, they would have seen that they might not receive as much as they would be entitled to in traditional run-off. Second, what is being paid in full is not the indemnity to which the creditors would be entitled in traditional run-off, but the estimate (or valuation) of the present value of the future contingent indemnity. As Mr Moss submitted, *i* future claims will be estimated and payment in full will be made of the value of the claim as estimated. That this is so would be clear to the scheme creditors and it is difficult to see how the statement could be misunderstood. In addition, creditors with accrued claims would, indeed, be paid in full.

WAS THE MEETING PROPERLY AND FAIRLY CONDUCTED?

[102] The opposing creditors' principal complaint under this head was that their IBNR claims were unfairly valued at nominal amounts. Allied to this is a separate complaint that the company gave favourable treatment to those creditors who were prepared to vote in favour of the scheme.

[103] Mr Sheldon's main attack in relation to preferential treatment of supporting creditors was on the treatment of Honeywell (which voted an unsplit claim of £11m in favour of the scheme). There is nothing inherently objectionable about a company promoting a scheme from reaching agreement with some of its creditors under which they undertake to vote in favour of the scheme. But Mr Sheldon submitted that the treatment of Honeywell's claims was different from that of other creditors who were required to provide a breakdown of the claims between accrued claims and IBNR claims; and whose claims were closely scrutinised. Honeywell was not required to provide the kind of information in support of its claim that the company required others to provide. The evidence shows that the company agreed Honeywell's claim on 10 March 2005, five days in advance of the meeting. It appears from the evidence that the company gave detailed consideration to the information provided by Honeywell before it informed Honeywell that it considered that Honeywell's claim was 'reasonable'. Much the same process applied to Viacom, which was allowed to vote an IBNR claim of $9m.

[104] Mr Sheldon contrasts the treatment of Honeywell and Viacom with the treatment of other insureds who voted against the scheme. He submits that of the 27 insureds that voted against the proposed scheme, 20 were admitted to vote their claims for $1 and/or had their IBNR claims valued at nil. This is factually correct, but it appears that many of these creditors did not claim more than $1. However Mr Sheldon goes on to say that of the eight insureds who voted against the proposed scheme and who did put a value on their IBNR claims, only one claim was accepted by the chairman (Sabreliner at $10,000). The remaining seven claims were significantly reduced, in particular the claims made by Goodrich and Goodyear. This is also factually correct. Mr Sheldon's ultimate complaint was, I think, that opposing creditors were not given the same opportunity to have pre-meeting discussions with the company in order to arrive at mutually agreed values for their claims. Instead, they were required to submit claims which the company (and ultimately the chairman) considered and rejected, or substantially reduced, without further dialogue.

[105] The reasons given by the company for reducing the opposing creditors' IBNR claims have varied; but have included:

(i) The allocation period over which claims were spread was unreasonable. The opposing creditors say that under the law of Ohio, which governs the policies, the insured is entitled to an 'all sums' basis of allocation. This principle holds that each policy in effect from the time of the allegedly harmful occurrence until the manifestation of the illness covers the entirety of the insured's loss. The decision not to apply this principle to the IBNR claims meant that it was assumed that the opposing creditors would receive contribution from multiple insurers, whereas the 'all sums' doctrine places that burden on insurers. It seems that the company's current position is that the 'all sums' doctrine only applies to liability that has been determined by a court, and does not govern a settlement or its analogue, namely a

a  payment under a scheme of arrangement. I confess that I do not follow the
logic of the company's position, since the object of the scheme is to
determine the company's legal liability to each policyholder, and that must
involve an attempt to predict what would happen if disputes ended up in
court. But even if the company's position is correct, it does not follow that
the opposing creditors' claim was unreasonable: merely that it was wrong.
b  The legal opinion exhibited in support of the company's position does not
go so far as to say that the opposing creditors' view is untenable.
   (ii) Some of the opposing creditors, having no claims history of their own,
relied on the claims history and estimates for associated companies in
estimating IBNR claims. The company rejected these claims as being
   unreliable. However, although the company rejected these claims for voting
c  purposes, and in most cases (although not all) placed a nominal value on
them, it says that claims based on precisely the same material may be
admitted in order to support a claim under the scheme. This is Catch-22.
One of the opposing creditors' complaints about the scheme is that the
estimation of IBNR claims is uncertain and unreliable. When they wish to
d  deploy their IBNR claims in voting against the scheme, the company and
the chairman reject their claims on the ground that they are uncertain and
unreliable. Yet if the scheme is sanctioned, they will be permitted to present
their IBNR claims on the basis of the self-same or similar material, which
has already been castigated as uncertain and unreliable.
   [106] Mr Moss submitted that the admission of the claim was only for
e  voting purposes, and did not mean that when the claim ultimately came to
be valued under the scheme, it would be found to have a nominal value. But
this only compounds the problem. Assuming, as I do, that the admission of
the claim for voting purposes does not in any way bind the company (or for
that matter the creditor) when the claim ultimately comes to be valued
under the scheme; still the purpose of the statutory requirement that a large
f  majority in value of the creditors must support the scheme must be to
ensure that there is a reasonable relationship between the size of the claims
admitted for voting purposes and the size of the claims that will ultimately
be allowed under the scheme. Mr Moss accepted that in an ideal world, this
would be so; but said that in the real world it was an impractical aspiration.
   [107] In the case of a disputed claim the chairman was required by the
g  terms of the order to place a value on the claim. The notion of the chairman
valuing a claim means, to my mind, that the chairman was required to
ascribe a genuine value to the claim. Under the procedure embodied in the
court's order he was not given the luxury of saying that he did not know
what its value was and placing an arbitrary $1 on the claim. Effectively to
h  disallow IBNR claims (by valuing them at a nominal $1) on the basis that
they were uncertain or unreliable is not, to my mind, valuing them at all.
   [108] Mr Moss says that if the IBNR claims of creditors were rejected for
lack of reliable information, the creditors have only themselves to blame.
They have the relevant data within their knowledge (eg the kind of
products they made, and whether they included asbestos; the number of
i  employees they had and so on). Some creditors may legitimately, and for
commercial reasons, choose not to go to the trouble and expense of
submitting an IBNR claim at the voting stage, whereas they will no doubt
do so when there is hard cash available. The difficulty I have with this
submission is that the opposing creditors did ask for more time to formulate

their claims and for the scheme meeting to be adjourned; but the company *a*
refused their request.

[109] Mr Moss also submitted that the valuation of an unliquidated or
uncertain claim at a nominal amount is common practice in schemes of this
kind; and is specifically required in cases of voluntary arrangements by the
Insolvency Rules. In the context of a scheme of arrangement this practice is
beneficial to a creditor because it allows his vote to be counted in assessing *b*
whether the numerical majority of creditors has been reached, even though
his vote may count for little in assessing the majority of creditors by value.
In many cases, this may well be true. But in the context of the present
scheme it is common ground that the 'big numbers' relate to IBNR claims.
These 'big numbers' do not seem to me to have been reflected in the
amounts for which opposing creditors were admitted to vote. The *c*
company's own estimates of its liabilities include amounts allocated on
account of IBNR claims. They appear to have been used in agreeing the
claims of Honeywell and Viacom, who supported the scheme. If an actual
claim by a disease-ridden mechanic materialises against any of the
policyholders who claim to have IBNR claims, it is inconceivable that such *d*
a claim would only be worth $1. The attribution of $1 to IBNR claims
effectively means that the company has treated the probability of an actual
claim arising as being virtually nil. I have a very uneasy feeling that these
IBNR claims were simply brushed aside.

[110] Mr Moss stressed, throughout his submissions, the importance of
creditor democracy. I see the force of this point; but the corollary of a fully *e*
functioning democracy is a fair and free election, where all electors are
treated equally. I emphasise that this is not the normal case of creditors with
ascertained debts owing by the company. Nor is it a case of creditors with
known but contingent claims. The real problem is that the votes of the
policyholders with IBNR claims have to be estimated using sophisticated
and controversial actuarial techniques. In such a case it seems to me that the *f*
court must be especially wary of simply waving through a vote in which so
many of the dissentients have had a nominal value placed on their claims.

[111] Mr Sheldon had two further criticisms of the conduct of the
meeting:

(i) Two companies (Eagle Star Insurance Co and Dowa Fire and Marine)
submitted claims; but the chairman considered that, taking set-off into *g*
account, they were likely to be net debtors of the company; and not
creditors at all. Nevertheless the chairman admitted them to vote, although
he placed a nil value on their claims. Both voted in favour of the scheme.
The effect of this is that these two companies counted in the numerical
majority of creditors, but not in the majority by value. Mr Sheldon *h*
submitted that once the chairman had formed the view that they were not
scheme creditors at all, he should not have admitted their votes. However,
Mr Moss retorted that the chairman's report went no further than to say
that after the application of *future* set-off these two companies were likely
to be net debtors of the company. At the date of the scheme meeting, they
were (or at least were potentially) net creditors of the company. One of the *i*
chairman's functions was to determine whether a person who claimed to be
a scheme creditor should be allowed to vote at all. The chairman decided

a  that these two companies should be allowed to vote; but with a value of $1 attributed to their claims. This was not a perverse decision and was within the chairman's remit. I agree.

(ii) Two other companies (Royal Indemnity Co and Sea Insurance Co) were admitted to vote with claims of $25,000 and $79,696 respectively. Both these companies are subsidiaries of Royal & Sun Alliance Insurance

b  Group plc, which is the majority shareholder of the company. Mr Sheldon submitted that although these two companies did not form a separate class of creditor, nevertheless since their parent stood to receive a substantial return of capital in the event of the outcome of the scheme conforming to expectations, their votes should be discounted. I agree that the special interest of these companies is something that I can and should take into

c  account.

[112] For the above reasons, I am not satisfied that the manner in which the IBNR claims of opposing creditors were treated was truly representative of their interests.

d  DID THE VOTES CAST ADEQUATELY REPRESENT THE VIEWS OF THE CREDITORS?

[113] As the cases make clear, the court may, at the third stage, refuse to endorse the majority vote if it is satisfied that the meeting is unrepresentative; or that those voting at the meeting have done so with a special interest to promote which differs from the interest of the ordinary

e  independent and objective creditor.

*Low turnout*

[114] Mr Sheldon submitted that I should not endorse the majority vote for two main reasons. First, because the number of creditors who voted was 'a minuscule proportion' of the total number of policyholders. Second,

f  because some creditors, particularly those who were both reinsureds and reinsurers, had special interests of their own; and were not representative of the general class of creditors, in whose name they were permitted to vote.

[115] Statistically, the number of creditors who voted can be calculated, by extrapolation, to have been approximately 0.44% of policyholders (72 out of about 50,000). The number of creditors voting in favour was, on the

g  same basis about 0.25%. However, I think I must have in mind Disraeli's warning about statistics. The figure of 50,000 is, I think, the number of policies that the company had issued over its trading life. It may be the number of policyholders to whom the company has issued policies, but the point is the same. The point is that not all policyholders are scheme

h  creditors. Many of them will have taken out, say, hull insurance or personal accident insurance. I have already made this point when dealing with notification of the meeting. So in my judgment this statistical extrapolation is not a sound basis for impugning the meeting. It is partly demonstrated by the fact that out of 9,300 Canadian policyholders, only two are scheme creditors. The company's evidence is, as I have said, that there are about

i  459 policyholders or so who have 'actual or pending' claims. Viewed in this way, the turnout of creditors was some 15% in number; and the aggregate in value of their claims represents just over 50% of the total 'actual and pending' claims against the company.

[116] Mr Moss emphasised that voting was not compulsory. In a creditor

democracy, the majority of those voting may bind the minority; and even if *a*
the majority of those voting are a minority of those entitled to vote, the
result is the same. Even though a British politician might be disappointed at
a turnout of 15%, it was not unusual by the standards of schemes of
arrangement.

[117] I am not persuaded that the low turnout, in itself, is a valid reason
for refusing to endorse the majority vote. However, the size of the turnout is *b*
relevant in considering whether the result of the vote could have been
affected by collateral factors affecting some members of the class (see *Re
Equitable Life Assurance Society* [2002] 2 BCLC 510 at [41] and [68]).
Consequently, the size of the turnout must be viewed in the context of
Mr Sheldon's submissions about special interests; to which I now turn. *c*

*Special interests*

[118] I have already concluded that there ought to have been two
meetings: one of creditors with accrued claims; and one of creditors with *d*
IBNR claims. I must assume that I was wrong in so concluding. I have also
concluded that the fact that some reinsureds were also reinsurers does not
make them a separate class of creditors; but may provide a reason for
caution in endorsing the vote. Mr Moss emphasised that if I ignored or
discounted votes of creditors, I would be effectively disenfranchising them;
and that would be unfair. I agree that I should not pick on individual *e*
creditors and discount their votes. But the question posed by the cases is a
more general one. The third stage of the procedure (the sanction hearing)
cannot arise unless the statutory majority of votes has been cast in favour of
the scheme. This also presupposes that the class (or classes) of creditors has
been correctly identified. Yet the cases emphasise that the court is not
required simply to endorse the majority vote; if it considers that the meeting *f*
is unrepresentative, or that those voting at the meeting have done so with a
special interest to promote which differs from the interest of the ordinary
independent and objective creditor. For as long as the court retains this
power (and some might say duty), the votes of the majority are not
conclusive. Still less are they conclusive where the value attributed to the
votes is dependent on controversial methods of estimating future *g*
probabilities.

[119] Sixteen of the voting creditors were reinsurers of the company. So
far as they are concerned, Mr Sheldon submitted that the interests of these
reinsured creditors (as reinsurers) are directly opposed to the insured
creditors. They have a vested interest in commuting their reinsurance *h*
obligations to the company, because such commutations typically cap the
exposure that they would otherwise have under their treaties and facultative
reinsurance certificates if the company were to continue to run off its
long-tail claims in the normal course. They have a vested interest in
ascribing a low or nil value to future claims because this limits their
exposure as reinsurers. While an identity of economic interest exists *i*
between the company and its reinsurers on this point, this interest cannot be
reconciled with the very different interest of the company's direct insureds,
including the opposing creditors, who purchased decades worth of
'occurrence' coverage to obtain protection against asbestos and other

a long-tail claims as they emerge over time. The court should attach little or no weight to these votes.

[120] Mr Moss's response was that these creditors were net creditors of the company; otherwise they would not have been admitted to vote at all. He concluded from this that their interests are allied with those of the direct insureds. This was, in effect, the same submission that Mr Moss made (and
b which I accepted) in relation to class issues.

[121] However, the question at the third stage is not the same. Unlike the direct insureds, the reinsurers are in the risk business. Given the uncertainties of the extent of potential exposure to asbestos and other long-tail claims, it makes perfect sense for them to be keen to cap their liabilities. If the company's liabilities are capped, so are their liabilities as
c reinsurers. Their mutual liabilities are to be set off under the scheme. This does not apply to the direct insureds, who remain liable to those who contract asbestos-related diseases. Although, in their capacity as reinsured creditors, they have the same legal rights against the company as direct insureds, they have very different economic interests. I also take into
d account that although the overwhelming majority of reinsureds voted in favour of the scheme, they account for only 8% of the company's estimated liabilities in respect of scheme business. I cannot regard them as representative of the class of policyholders as a whole.

[122] I also take into account the fact that two of the votes were cast by subsidiaries of Royal & Sun Alliance Group.
e [123] Mr Sheldon next points to five of the reinsureds who are in insolvency proceedings of one kind or another. He submits that each of these companies will want the cash to pay their own creditors and finalise their own liquidations or schemes. The court should therefore attach little or no weight to these votes. He points also to one creditor (GRC International) which is an arbitrageur of claims; and which therefore has
f every incentive to 'make a turn' on the claims. This creditor too will have had reasons of its own for voting in favour of the scheme. I do not consider that at the third stage the court should scrutinise the individual financial circumstances of creditors. Faced with a choice between certain cash now and uncertain cash later, a creditor may have all sorts of reasons for preferring the former to the latter. Involvement in insolvency proceedings
g may be one of them. But so also may be the desire to invest in new corporate headquarters, or to commit funds to R & D. I do not accept Mr Sheldon's criticism on this score.

*Treatment of IBNR claims*
h [124] I have already expressed considerable misgivings about the way in which the opposing creditors' IBNR claims were devalued. I am not satisfied that their voices have been adequately represented, as compared with the supporting creditors, because of the devaluation of their claims.

[125] For these reasons I am not satisfied that the votes cast adequately
i represented the views of the creditors.

ARE THE TERMS OF THE SCHEME FAIR?
[126] Mr Sheldon had a number of criticisms of the detailed terms of the scheme.

*The bar date*

[127] Allied to Mr Sheldon's complaint that there had been inadequate notification of the scheme Meeting, he said that the bar date (120 days after the scheme came into operation) was too short. A potential creditor who missed the deadline would find that his claim had been extinguished. This might result in creditors losing perfectly valid claims despite being unaware that a scheme had been sanctioned. Mr Moss accepted that if I took the view that the bar date was too early, I could extend time (by a period measured in weeks or months, rather than years) and I could direct more extensive advertising of the existence of the scheme. If I were to sanction the scheme, I would have extended the bar date to one year after the scheme became operative and I would have directed more extensive advertising than proposed.

*Estimation methodology*

[128] The 'estimation liability' is set out in Appendix D of the explanatory statement. Mr Sheldon submits that it is not an estimation methodology at all. It simply sets out the kind of evidence that a scheme creditor is expected to supply in support of his claim. To some extent, the company agrees. Mr Powell, the 'principal architect' of the scheme says that Appendix D would be better described as 'How to Support Your Claim'. Mr Moss submits that the flexible approach which it facilitates is necessary given the nature of the scheme business and it affords the scheme creditors the freedom to support their scheme claims in the manner which they perceive to be most sensible. In fact, he says, this flexibility is in the interests of the creditors, rather than the company. Mr Sheldon's objection is that if the methodology is as flexible as Mr Moss says it is, there is a real danger that the claims of different creditors will be estimated on different bases; and that, following on from this, there is a real danger that creditors will be unequally treated. I see the force of this. However, if a scheme is to work at all, and given the extreme difficulty of estimating IBNR claims, it seems to me that there must be a good measure of flexibility built into the process. If, therefore, the scheme is to be sanctioned at all, the estimation methodology is probably the best that can be achieved. But the dangers to which Mr Sheldon points are, in my judgment, factors that I must bear in mind in deciding whether to sanction the scheme.

*Adjudication process*

[129] A number of points arise under this head. First, Mr Sheldon objects to the identity of the scheme adjudicator, Mr Matthews. Mr Matthews is, as Mr Moss said, the 'top man' in his field, and has considerable experience of schemes such as this (even though, as I understand it, they have resulted in only four contested adjudications). Mr Sheldon does not (quite rightly) impugn Mr Matthews' integrity or competence. What he says is that if Mr Matthews is the scheme adjudicator, there will be an appearance of bias. However, this seems to be based on his contacts with the insurance industry; and the company's refusal to appoint a scheme adjudicator selected by the company and the creditors jointly. I do not consider that this gives rise to any suspicion of bias.

[130] Mr Sheldon's next complaint is that the adjudication procedure purports to lay down a procedure applicable to a determination by an

a  expert, whereas in fact, on examination, what is proposed is an arbitration. He relies on the following features of the procedure which, he says, show that the process is arbitral:

(i) The scheme adjudicator's function is to determine a formulated dispute between a scheme creditor and the scheme manager, rather than to arrive at his own independent estimation of the value of a claim;

b  (ii) Matters within the remit of the scheme adjudicator include matters of construction of documents and other legal issues, including issues of pure law (eg the application of the Ohio 'all sums' doctrine), which are properly the subject of an arbitration, but which cannot be the subject of a binding expert determination;

c  (iii) The scheme envisages that the scheme adjudicator will receive evidence and legal submissions, which is the hallmark of an arbitration;

(iv) The terms of the scheme appear to preclude any action against the scheme adjudicator for negligence and, he submits, preclude any such action even if the scheme adjudicator acts dishonestly.

[131] Mr Sheldon also submitted that the scheme's comprehensive
d  attempt to make the scheme adjudicator's decision immune from challenge in the courts 'so far as the law allows' was contrary to public policy (if the scheme adjudicator was an expert); contrary to the Arbitration Act 1996 (if the scheme adjudicator was an arbitrator); and in any event represented a breach of the creditors' right of access to the courts, as guaranteed by art 6 of the European Convention on Human Rights.

e  [132] I agree with Mr Sheldon that some of the procedures envisaged by the scheme are more akin to an arbitration than to a determination by an expert. But the substance of the complaint, in my judgment, is that which fastens on the lack of access to the courts in order to correct alleged errors by the scheme adjudicator. The scheme does not purport to bar access to the courts completely. It does so only 'as far as the law allows'. In the case of an
f  arbitration, the law does not allow parties to bar access to the courts before a dispute has arisen. In the case of an expert determination there are also grounds on which the court can overturn an expert's decision (although these are limited). I very much doubt whether a clause that bars actions against the scheme adjudicator would bar an action for fraud (and the clause in the present scheme does not expressly purport to do so). Indeed cl
g  7.4.1 of the scheme seems to me to envisage that the scheme adjudicator's immunity from suit applies only where he acts both in good faith and with due care and diligence.

[133] In both the *Hawk Insurance* case (at first instance) and in *Re Pan Atlantic Insurance Co Ltd* [2003] 2 BCLC 678 similar adjudication schemes
h  have been sanctioned by the courts. In both cases it was held that the scheme adjudication process did not involve any breach of art 6. I do not consider that the differences between this case and those should lead to any different conclusion.

*Reversion to run-off*
i  [134] The scheme appears to give the company the right to revert to a conventional solvent run-off at any time before it has made a general settlement with all its scheme creditors if it considers that the scheme is no longer a benefit to it. I say 'appears' because the drafting is not entirely easy to follow. In that event any payment under the scheme to an individual

creditor remains binding on that creditor; and he is not entitled to *a* participate in the run-off.

[135] In addition one possible reading of the scheme is that any former creditor whose claims were barred as a result of a failure to submit them by the bar date remains barred. The company disputed this reading; and said that it was not intended. Had it stood alone, this particular point could, in my judgment, have been clarified by a drafting amendment. *b*

[136] The company's justification for the power to revert to run-off is that it is designed to cater for the possibility that, having estimated its liabilities to scheme creditors, the company is not able to accelerate its reinsurance claims which apply to scheme business and as a result cannot pay claims valued under the scheme in full at that time. This is said to be a most unlikely contingency but one that has to be provided for. I see the force of *c* this point, but it is not what the scheme says. The power to revert to run-off is exercisable at the 'absolute discretion' of the company and the sole criterion is that the company believes that the scheme is 'no longer beneficial to it'. The power is not, therefore, exercisable simply in the event that the company is unable to pay the scheme liabilities as they fall due. In *d* that event, the company might be insolvent anyway; and might not be able simply to revert to run-off. The company is under no obligation to consult its creditors; and has no obligation to consider their interests at all. If, for example, the scheme adjudicator were to award a creditor more than the company thought was proper, the company could avoid similar results arising in relation to other creditors simply by terminating the scheme. The *e* essence of a compromise is that it is binding on both sides; whereas this clause gives the company power to bring the compromise to an end more or less at will.

[137] Mr Moss submitted that although it was possible to construct scenarios under which the company could terminate the scheme, these were fanciful. I should not assume that the company would operate the right to *f* terminate the scheme except in extremis; and that in any event the creditors had voted in favour of the scheme. As to the first of these submissions, it seems to me that I must look at the legal rights that the scheme, if sanctioned, would give the company. Those legal rights are exercisable by it in its own interest alone. The company could not be criticised if, having a right to act in its own interest, it exercised that right. But that, as it seems to *g* me, is a reason for not sanctioning the conferring of that right, rather than leaving it to the company to decide not to exercise it unless the exercise is in the interest of creditors as well. As to the second submission, I have already said that I am not satisfied that the votes cast were a fair reflection of the views of creditors. *h*

*Other criticisms*

[138] Mr Sheldon's remaining criticisms of the scheme were, in my judgment, of less substance. All other things being equal, they are the sort of points where creditor democracy ought to be allowed to prevail.

SHOULD I, AS A MATTER OF DISCRETION, SANCTION THE SCHEME?        *i*

*Jurisdiction*

[139] I have already held that I have no jurisdiction to sanction the scheme. So the question of discretion does not really arise. I will therefore express my view shortly.

*a*  *Benefits of the scheme*

[140] Mr Moss submitted that there were the following advantages to the scheme, such that I should sanction it, if I had jurisdiction to do so:

(i) the run-off of the company's business would, apart from the scheme, not be expected to be completed for many years.

*b*  (ii) the scheme will save the very substantial costs which would be incurred by continuing to run off the business over many years.

(iii) under the scheme all scheme creditors will be paid earlier than would otherwise be the case.

(iv) scheme creditors will have the benefit of a simple independent out of court dispute resolution mechanism.

*c*  (v) scheme creditors will not run the risk of future insolvency if the run-off turns out to be disastrous.

[141] I comment on these supposed advantages as follows:

(i) the benefit of an early conclusion of the run-off seems to me to be a benefit which enures largely to the company. A creditor who wishes to compound the company's liabilities to him is free to do so in the absence of *d*  the scheme. A creditor who wishes to receive the indemnity which he was promised gains no advantage from the early conclusion of run-off;

(ii) the saving in costs is a benefit that enures entirely to the company. There is no suggestion that its assets are insufficient both to meet its liabilities and to pay the administrative costs of run-off;

(iii) early payment is, I accept, a benefit to creditors, but it has to be *e*  balanced against the fact that they will not be indemnified but will be paid an estimate of liability;

(iv) the availability of the dispute resolution procedure is largely necessitated by the scheme itself. If the scheme is not sanctioned, the dispute resolution procedure becomes largely unnecessary;

*f*  (v) the prospect of these shareholders allowing their subsidiary to go into insolvent liquidation is, on the evidence, no more than a remote and theoretical possibility.

*Conclusion*

[142] I appreciate that the court must be slow to differ from the statutory *g*  majority of creditors who have voted in favour of the scheme. But if I had had jurisdiction I would not have sanctioned the scheme. I have already listed a number of reasons why not. To summarise:

(i) the votes allowed to be cast at the scheme meeting did not fairly represent the creditors (and in particular the direct insureds) with substantial IBNR claims;

*h*  (ii) the estimation methodology does not provide a clear basis for treating all creditors alike, and results in uncertainty;

(iii) the company's power to revert to run-off is not circumscribed;

(iv) the supposed benefits of the scheme are largely benefits to the company and its shareholders; or are brought into existence by the exigencies of the scheme itself.

*i*  [143] In the end, though, the most powerful consideration is that it seems to me to be unfair to require the manufacturers who have bought insurance policies designed to cast the risk of exposure to asbestos claims on insurers to have that risk compulsorily re-transferred to them. The company is in the risk business; and they are not. This is not a case of an insolvent company

to which quite different considerations apply. On the evidence presented to *a* me the company is able to meet its liabilities under such policies as and when they fall due. The purpose of the scheme is to allow surplus funds to be returned to shareholders in preference to satisfying the legitimate claims of creditors. No matter how usable and reasonable an estimate may be, the very fact that it is an estimate is likely to make it an inaccurate forecast of the actual liabilities of policyholders. If individual policyholders wish to *b* compound the company's contingent liabilities to them, and to accept payment in full of an estimate of their claims, there is nothing to stop them doing so. But to compel dissentients to do so would, in the words of Bowen LJ, require them to do that which it is unreasonable to require them to do.

[144] I will therefore dismiss the petition.                                      *c*

*Petition dismissed.*

Celia Fox  Barrister.