EXECUTION VERSION

## EXHIBIT A

## DEFINITIONS

For purposes of this Agreement, the following terms have the following meanings:

"Accrued Retirement Benefits" means the Liability as of the Closing Date to pay employees or former employees of the UK Subsidiary or any STB Employees upon retirement, any retirement benefits that are funded from payments that were withheld or set aside or contributed to by such employees or former employees prior to the Closing Date or required to be funded by the employer to the extent Purchaser agrees to assume a rollover of accrued participant account balances or otherwise assumes the Liabilities to pay retirement benefits as scheduled on Section 5.9(f) of the Disclosure Schedule..

"Accrued Severance Benefits" means the Liability as of the Closing Date to pay employees or former employees of the UK Subsidiary or any STB Employees any severance upon employment termination, including without limitation, the Liability disclosed in Section ___ of the Disclosure Schedule.

"Affiliate" means, with respect to a particular Person, (i) any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person, and (ii) any of such Person's spouse, siblings (by law or marriage) or children (biological or adoptive) and (iii) any trust for the primary benefit of such Person or any of the foregoing. The term "control" means possession, direct or indirect, of the power to direct or cause the direction of the management and policies of another Person, whether through the ownership of voting securities or equity interests, by contract or otherwise.

"Agreement" is defined in the preamble to this Agreement.

"Allocation" is defined in Section 1.12.

"Anti-Corruption Laws" shall mean the Foreign Corrupt Practices Act of 1977, as amended, the Anti-Kickback Act of 1986, as amended, the UK Bribery Act of 2012, and the Anti-Bribery Laws of the People's Republic of China or any applicable Laws of similar effect, and the related regulations and published interpretations thereunder.

"Arbitrating Accountant" means (a) a nationally recognized certified public accounting firm jointly selected by Purchaser and the Company that is not then engaged to perform accounting, tax or auditing services for the Company or Purchaser or (b) if the Company and Purchaser are unable to agree on an accountant, then a nationally recognized certified public accounting firm jointly selected by the Company's accounting firm and Purchaser's accounting firm.

"Assignment and Assumption Agreement" is defined in Section 2.4(h).

"Assumed Contracts" is defined in Section 3.17(a)(i).

"Assumed Liabilities" is defined in Section 1.3.

"Assumed PTO" is defined in Section 1.3.

"Auction" means the public sale of the Purchased Assets contemplated by the Bid Procedures Order.

"Auction Date" means February 3, 2012, provided that such date may be extended as necessary as mutually agreed to by the Parties in their reasonable discretion.

"Audio Business" means the Company's business, existing as of the date of this Agreement, of designing, developing, manufacturing, marketing, selling, distributing, refurbishing, and servicing integrated circuit components, software and hardware for Audio Devices (as defined in the License Agreement).

"Bankruptcy Court" means the United States Bankruptcy Court, District of Delaware.

"Bankruptcy and Equity Exceptions" means the laws of general application relating to bankruptcy, insolvency, moratorium, and the relief of debtors and similar generally applicable Laws regarding creditors' rights and rules of law governing specific performance, injunctive relief, or other equitable remedies.

"Basis" means any past or present activity, event, fact, circumstance, condition or transaction that causes, results in or would reasonably be anticipated to cause or, result in any specified consequence.

"Basket" is defined in Section 8.2(b).

"Bid Procedures Motion" means a motion in form and substance satisfactory to Purchaser, seeking approval by the Bankruptcy Court of the Bid Procedures Order.

"Bid Procedures Order" means the order of the Bankruptcy Court in form and substance acceptable to Purchaser, (i) fixing the date, time and location of the hearing to approve consummation of the sale of the Purchased Assets, (ii) fixing the time, date and location of an auction in New York, New York, (iii) approving the Break-up Fee and the Expense Reimbursement, (iv) approving the form and manner of sale notice and bid procedures notice, (v) approving procedures for the assumption and, if necessary, assignment of executory contracts and unexpired leases and for the resolution of and payment by the Company of, Cure Costs, (vi) containing such other appropriate buyer protections as may be reasonably requested by Purchaser, and (vii) otherwise approving the Bid Procedures substantially in the form of Exhibit J hereto (the "*Bid Procedures*").

"Break-Up Fees" is defined in Section 6.3.

"Business Day" means a day that is not a Saturday, Sunday or legal holiday on which banks are authorized or required to be closed in New York, New York.

"Carve-Out Financial Statements" is defined in Section 3.7.

"Cash Amount" is defined in Section 1.8.

2

"Cayman Court" means the Grand Court of the Cayman Islands.

"Cayman Insolvency Case" means the petition in form and substance acceptable to the Purchaser, seeking the appointment of provisional liquidators to Trident Microsystems (Far East) Ltd pursuant to section 104 of the Cayman Companies Law (2011 Revision).

"Cayman Sale Motion" means a motion in form and substance acceptable to Purchaser seeking approval by the Cayman Court of the Cayman Sale Order.

"Cayman Sale Order" means an order of the Cayman Court, in form and substance acceptable to Purchaser, approving the sale of the Purchased Assets to Purchaser.

"Chapter 11 Case" means the chapter 11 proceeding commenced by the Company and Trident Microsystems (Far East), Ltd in the United States Bankruptcy Court for the District of Delaware.

"Claim Notice" is defined in Section 8.9.

"Closing" is defined in Section 2.1.

"Closing Date" is defined in Section 2.1.

"Closing Trade Payables" means any and all trade payables of the STB Business arising in the Ordinary Course of Business from and after the Petition Date in connection with the manufacturing, warehousing and distribution of Products and accrued or incurred by the Company or any Seller Subsidiary on or prior to the Closing Date.

"Closing Working Capital" is defined in Section 1.9(a).

"COBRA" is defined in Section 3.18(f).

"Code" means the Internal Revenue Code of 1986, 26 U.S.C. § 1, *et. seq.*, as amended from time to time.

"Company" is defined in the preamble to this Agreement.

"Company Retention Bonus Liability" means the sum of (a) $175,000 and (b) that portion of the aggregate potential retention bonuses of $1,231,000 offered by the Company to certain STB Employees (excluding the head of the Company's STB Business unit) in exchange for remaining actively employed in the STB Business for three months following the Closing determined by multiplying two months of each such STB Employee's base salary (or in the case of the head of the STB Business, $50,000) by a fraction, the numerator of which is the number of days from November 17, 2011 until the Closing (the "*Pre-Closing Period*") and the denominator of which is the sum of the Pre-Closing Period and ninety (90).

"Company Terminating Breach" is defined in Section 6.1(c).

"Competing Transaction" is defined in Section 5.8.

"Confidentiality Agreement" means that certain Mutual Confidentiality Agreement, dated as of March 31, 2011 between Purchaser and the Company.

"Confidential Information" means any and all information, data and technology disclosed, made available and/or provided by any of the Company or one of its Subsidiaries, or Purchaser, or any of their respective Affiliates, as applicable, or otherwise obtained by or accessed under this Agreement, the Transaction Documents, the STB Business, or the Contemplated Transactions and disclosures contemplated hereby or thereby, including, without limitation, any and all methods and/or materials used in the business of the Company or one of its Subsidiaries (including the STB Business) or Purchaser, as applicable, technical information, technologies, systems, processes, procedures, know-how, data, trade secrets (as such are determined under applicable Law), samples, inventions (whether patentable or unpatentable), improvements, Intellectual Property, methods, compositions, devices, formulae, illustrations, patent applications, products, works of authorship, compilations, programs, schematics, designs, drawings, technical plans, prototypes, production and manufacturing processes and techniques, research, development activities and plans, specifications, computer programs, object and source code, databases, passwords, log on identifiers, algorithms, derivative works, reports, mask works, business and financial data, business plans, skills and compensation of employees and consultants, pricing, financial and operational information, information regarding litigation or other regulatory actions or complaints, marketing plans, customer and supplier information (including, without limitation, actual or potential customers or suppliers, customer or supplier lists, and customer or supplier requirements), including any of the foregoing related or with respect to the Purchased Assets, Purchased Assets, STB Business, and/or Excluded Assets, regardless of the form in which such information appears, or by which it is communicated whether in tangible or intangible form, whether or not marked as confidential or otherwise identified as confidential, and whether or not stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, as well as all documents and other information which contain or reflect or are generated from any of the foregoing. Notwithstanding the foregoing, Confidential Information does not include: (i) any information, data or technology that the receiving party (whether the Company or one of its Subsidiaries or Purchaser, as applicable) can demonstrate by competent evidence is, at the time of the disclosure, through no wrongful act or omission of the receiving party a part of the public domain; provided that information shall not be deemed to be a part of the public domain on the ground only that: (a) the general principle is in the public domain or known to the Company or one of its Subsidiaries or Purchaser, or their respective directors, officers, employees, agents, contractors, or Affiliates, as the receiving party, if the particular practice is not public domain or so known, or (b) it constitutes a combination, conclusion or finding of or drawn from information which is in the public domain or known to the Company or one of its Subsidiaries or Purchaser, or their respective directors, officers, employees, agents, contractors, or Affiliates, as applicable; (ii) to the extent such information was or becomes available to Company or one of its Subsidiaries or Purchaser, as the receiving party, on a non-confidential basis from a source other than the disclosing party, be it the Company, one of its Subsidiaries or Purchaser, or their respective directors, officers, employees, agents, contractors, or Affiliates; and (iii) to the extent such information was developed by the Company or one of its Subsidiaries or Purchaser, as applicable, without access to the Confidential Information of the other parties, respectively.

"Consents" is defined in Section 7.8.

"Contemplated Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

"Contract" means any agreement, contract, obligation, promise, commitment, grant, cooperative agreement or undertaking (whether written or oral and whether express or implied).

"Cure Costs" is defined in Section 7.9.

"Current Assets" is defined in Section 1.9(a).

"Current Liabilities" is defined in Section 1.9(a).

"Damages" is defined in Section 8.1.

"Data Audit" is defined in Section 7.12.

"Dataroom" means the DataSite Project Spiced Latte maintained by Company at https://datasite.merrillcorp.com on the day that is two Business Days prior to the date of execution of this Agreement.

"Disclosure Schedule" is defined in the preamble to Article III.

"Disclosure Schedule Update" is defined in Section 5.5(b).

"Dispute Notice" means a notice delivered by the Company to Purchaser in which the Company (a) disputes the calculation of Closing Working Capital included in the Working Capital Statement and (b) provides the basis of such dispute in reasonable detail.

"DTV Business" means the Company's business existing as of the date of this Agreement of designing, developing, manufacturing, marketing, selling, distributing, refurbishing, and servicing integrated circuit components, software and hardware for use in the DTV Field of Use (as defined in the License Agreement).

"Encumbrance" means any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, license or other restriction, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"End Date" means June 2, 2012.

"Engagement Date" is defined in Section 1.10(b).

"Environmental Laws" shall mean all Laws and Orders that pertain to the regulation, protection or preservation of the environment (including indoor and ambient air, soil, sediment, surface water, ground water, wetlands, land or subsurface strata), natural resources, the health and safety of any Person, or that pertain to the handling, use, manufacturing, processing, storage, treatment, transportation, discharge, Release, emission, disposal, re-use, recycling, or other management, contact or involvement with Hazardous Materials.

735819 v8/SD

"ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.*

"ERISA Affiliate" means any of the Company's Affiliates, to the extent such Affiliate is described in Code § 414(b), (c), (m) or (o) and corresponding Treasury Regulations.

"Estimated Working Capital" is defined in Section 1.9(a).

"Estimated Working Capital Statement" is defined in Section 1.9(a).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Assets" is defined in Section 1.2.

"Excluded Licensed Intellectual Property Assets" is defined in Section 1.2(c).

"Excluded Royalties" is defined in Section 1.1(g).

"Exclusivity Period" is defined in Section 5.8.

"Expense Reimbursement" means the aggregate amount of the reasonable charges, costs, fees, payments, and expenses (including, without limitation, all reasonable fees, expenses and disbursements of any representatives of Purchaser and its Affiliates) paid or incurred by or on behalf of Purchaser or its Affiliates relating to or in connection with (i) the purchase of the Purchased Assets (and STB Business) including the Contemplated Transactions and any documents or agreements related hereto, (ii) the negotiation, preparation, execution or performance of agreements relating to the purchase of the Purchased Assets (and STB Business), including this Agreement, and certain documents or agreements related thereto, (iii) business, financial, legal, accounting, tax, and other due diligence relating to the Purchased Assets (and STB Business), (iv) the Chapter 11 Case, and (v) the diligence, analysis, negotiation, preparation, or execution of any contracts or arrangements with any current or prospective lessors, vendors, agents, or payees of the Company and Seller Subsidiaries and the STB Business. The Expense Reimbursement shall be subject to reasonable documentation, which documentation shall be provided to the Company and the Office of the United States Trustee. Notwithstanding the foregoing, the Expense Reimbursement cap shall not apply following a breach by the Company or the Seller Subsidiaries of any condition, covenant or other term set forth in this Agreement.

"Export Approvals" means all export licenses, license exceptions and other consents, notices, waivers, approvals, orders, authorizations, registrations, declarations, classifications and filings with any Governmental Authority required for the export and re export of Products, commodities, services, Software, technical data and technologies and releases of technologies, technical data and Software to non-U.S. nationals located in the United States and abroad.

"Facility Use Agreements" is defined in Section 2.4(j).

735819 v8/SD

"Final Order" shall mean an order of the Bankruptcy Court (a) as to which the time to appeal or reconsider shall have expired and as to which no appeal or motion to reconsider shall then be pending, or (b) if an appeal or motion for reconsideration shall have been filed or sought, either (i) no stay of the order shall be in effect or (ii) if such a stay shall have been granted by the Bankruptcy Court, then (A) the stay shall have been dissolved or (B) a final order of the district court having jurisdiction to hear such appeal shall have affirmed the order and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible, and if a timely appeal of such district court order or timely motion to seek review or rehearing of such order shall have been made, any court of appeals having jurisdiction to hear such appeal or motion (or any subsequent appeal or motion to seek review or rehearing) shall have affirmed the district court's (or lower appellate court's) order upholding the order of the Bankruptcy Court and the time allowed to appeal from such affirmance or to seek review or rehearing thereof shall have expired and the taking or granting of any further hearing, appeal or petition for certiorari shall not be permissible; provided, however, that Purchaser in its sole discretion may treat as not being a Final Order, any order for which an appeal, motion to seek review, motion to seek rehearing, or any similar motion is pending notwithstanding that such order is not then subject to stay.

"Final Working Capital" is defined in Section 1.10(a).

"Foreign Assets" is defined in Section 1.7.

"Foreign Employee Benefit Plan" shall mean any employee benefit plan, program or arrangements maintained or contributed to by the Company or any Subsidiary that has been established, maintained, or sponsored by the Company or any of its Subsidiaries or to which any of the Company or any Subsidiary has contributed, or into which any of the Company or Subsidiary has entered solely for the benefit of non-U.S. active, retired or former employees or directors of the Company or any Subsidiary.

"Fraud" means an intentional false representation of a material fact upon which one reasonably relies to his or her detriment.

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governing Documents" means, with respect to a particular entity Person, (i) if a corporation, the articles or certificate of incorporation and bylaws, (ii) if a general partnership, the partnership agreement and any statement of partnership, (iii) if a limited partnership, the limited partnership agreement and certificate of limited partnership, (iv) if a limited liability company, the articles or certificate of organization or formation and any limited liability company or operating agreement, (v) if another type of Person, all other charter and similar documents adopted or filed in connection with the creation, formation or organization of the Person, (vi) all equityholders' agreements, voting agreements, voting trust agreements, joint venture agreements, registration rights agreements and other agreements  and documents relating either to the organization, management or operation of any Person or to the rights, duties and

7

obligations of such Person's equityholders and (vii) all amendments or supplements to any of the foregoing.

"Governmental Authority" means any foreign or United States federal, state or local government agency, division, subdivision thereof or any regulatory body, agency, authority or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, any court or tribunal (or any department, bureau or division thereof).

"Government Official" shall mean (a) any officer or employee of any Governmental Authority, (b) any person acting in an official capacity on behalf of a Governmental Authority, (c) any officer or employee of a Person that is majority or wholly owned by a Governmental Authority, (d) any officer or employee of a public international organization, such as the World Bank or the United Nations, (e) any officer or employee of a political party or any person acting in an official capacity on behalf of a political party or (f) any candidate for political office.

"Grants" is defined in Section 1.1(o).

"Hazardous Materials" means any material, chemical, compound, substance, mixture, waste or by-product (regardless of physical form or concentration) that (a) is hazardous, toxic, infectious, explosive, radioactive, carcinogenic, ignitable, corrosive, reactive, or otherwise harmful to living things or the environment, (b) is or becomes identified, defined, designated, listed, restricted or otherwise regulated under Environmental Laws, or (c) could pose a hazard to the environment or the health and safety of any Person or impair the use or value of any portion of the Real Estate or any other property. The term "Hazardous Materials" shall include without limitation pollutants, contaminants, pesticides, biological agents, biohazardous materials, etiologic agents, petroleum, petroleum products and by-products, radioactive substances, solid wastes, hazardous wastes, hazardous substances, extremely hazardous, special, dangerous or toxic wastes, substances, chemicals or materials within the meaning of any Environmental Law, including any "hazardous substance" as defined, listed, designated or regulated under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Section 9601, et seq., as amended ("CERCLA"), any "hazardous wastes" or "solid wastes" as defined, listed, designated or regulated under Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended ("RCRA").

"Holdback" is defined in Section 1.11.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a, et. seq.

"Implementation Manager" means the individual identified by Purchaser to the Company as Purchaser's "implementation manager" with responsibility for coordinating and implementing the transition of the STB Business from the Company to Purchaser pursuant to this Agreement.

"Indebtedness" shall mean, with respect to any Person, without duplication, (a) all obligations of such Person for borrowed money or issued in substitution for or exchange of obligations for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, or upon which interest payments are customarily made,

735819 v8/SD

(c) indebtedness of the type described in (a) or (b) above guaranteed, directly or indirectly, by such Person, (d) any indebtedness for the deferred purchase price of property or services, (e) obligations under capital leases, (f) any indebtedness secured by an Encumbrance, (g) any letter of credit arrangements, (h) any and all accrued interest and other amounts payable with respect to the foregoing, and (i) any prepayment or other similar fees, expenses or penalties on or relating to the repayment or assumption of any of the foregoing.

"Indemnification Expiration Time" is defined in Section 8.10(a).

"Indemnified Parties" is defined in Section 8.4.

"Indemnifying Parties" is defined in Section 8.4.

"Intellectual Property" means on a worldwide basis: (i) all patents, patent applications, patent disclosures and all related re-issuances, continuations, continuations-in-part, renewals, substitutions, refiles, divisions, revisions, extensions, reexaminations and counterparts thereof, all industrial designs, industrial models and utility models, certificates of invention, plant patents and design patents, as well as the rights to file for, and to claim priority to, any such patent rights (collectively, *"Patent Rights"*), (ii) all registered and unregistered trademarks, service marks, domain names, trade dress and product configurations, logos, trade names, together with all translations, adaptations, modifications, derivations and combinations thereof and including all goodwill associated therewith and all applications, registrations, renewals and extensions in connection therewith, (iii) all registered and unregistered copyrights in both published and unpublished works and all moral rights, and all applications, registrations, renewals and extensions in connection therewith, together with all translations, adaptations, modifications, derivations, combinations and derivative works thereof, (iv) all internet domain names and registration rights, uniform resource locators, internet or worldwide web sites or protocol addresses, and all related content and programming, and related security passwords or codes, (v) all inventions, developments, discoveries and concepts (whether or not patentable and whether or not reduced to practice), all methods and/or materials, technical information, technologies, systems, processes, procedures, know-how, data, trade secrets (as such are determined under applicable law), samples, compositions, devices, formulae, illustrations, works of authorship, compilations, programs, schematics, designs, drawings, technical plans, prototypes, production and manufacturing processes and techniques, research, development activities and plans, specifications, computer programs, object and source code, databases, passwords, log on identifiers, algorithms and mask works, (vi) all other proprietary rights relating to any of the foregoing, (vii) all of the foregoing contained or embodied in or with respect to any Software, (viii) all copies and tangible embodiments thereof (in whatever form or medium), (ix) and the right to sue and recover for past, present or future infringements, misappropriations, dilution, unauthorized use or disclosure, or other conflict with any of the foregoing intellectual property.

"Interim Financial Statements" means the Carve-Out Financial Statements for the period from January 1, 2011 through September 30, 2011 and the carve-out balance sheet as of September 30, 2011.

"Inventory Contingency Accrual" is defined in Section 1.4(f).

735819 v8/SD

"IP Assignment and Assumption Agreement" is defined in Section 2.4(q).

"IRS" means the United States Internal Revenue Service.

"Key Employee" means the following employees of the STB Business set forth on the document titled "Key Employees" and made available in the Dataroom at least two (2) Business Days prior to the date of the Agreement.

"Knowledge" means, with respect to the Company, the actual knowledge of the Knowledge Individuals of a particular activity, event, fact, circumstance or condition, in each case after due inquiry (including of direct reports) or, if due inquiry has not been made, such knowledge that a prudent Person would be expected to have after due inquiry (including of direct reports). Knowledge Individuals are those individuals listed on the attached schedule. With respect to matters involving Intellectual Property and Intellectual Property Rights, Knowledge does not require that the Knowledge Individuals have conducted, obtain or have obtained any freedom-to-operate opinions; *provided, that,* any such opinions that have been conducted or obtained prior to the date of this Agreement will not be excluded from the term "Knowledge" based on this sentence.

"Labor Organization" means trade union, labor organization, work council, employee committee, employee representative body or other similar body.

"Later Discovered Contracts" is defined in Section 5.1(b).

"Law" means any federal, state, local, municipal, foreign, international, multinational or other constitution, statute, law, rule, regulation, ordinance, code, principle of common law or treaty.

"Lease Assignments" mean the assignments of the Transferred Leases from the Company or Seller Subsidiary to Purchaser or its applicable Subsidiary in form and substance satisfactory to the Parties thereto.

"Leased Real Estate" means all real property that is leased or subleased by the Company or any Subsidiary that is used or held for use in the STB Business.

"Liability" means any obligation or liability (direct or indirect, matured or unmatured, absolute, accrued, contingent or otherwise), whether or not required by GAAP to be provided or reserved against on a balance sheet.

"License Agreement" is defined in Section 2.4(b).

"Licensed Intellectual Property Assets" is defined in Section 1.1(h).

"Local Asset Transfer Agreements" is defined in Section 1.7.

"Manufacturing Agreement" means the Manufacturing Services Agreement dated February 8, 2010 by and between Trident Microsystems (Far East) Ltd., a Cayman Islands Company, and NXP Semiconductor Netherlands B.V., a private company with limited liability

incorporated under the laws of The Netherlands, together with all amendments, supplements or change orders thereto (*"NXP"*).

"Material Adverse Change" or "Material Adverse Effect" means any change or effect that has (or could be reasonably expected to have) a material adverse effect on (i) the STB Business, the Purchased Assets or the business, assets, prospects, liabilities, condition (financial or otherwise), operating results or operations of the Company and the Seller Subsidiaries, taken as a whole (regardless of whether or not such adverse effect or change can be or has been cured at any time or whether Purchaser has Knowledge of such effect or change on the date hereof), or (ii) the Company's ability to consummate the Contemplated Transactions, unless such change or effect results from (a) the announcement of this Agreement or the pendency or consummation of the Contemplated Transactions, (b) changes in GAAP or any applicable Law or Order, (c) changes in the industry in which the STB Business is operated, (d) any attack, escalation of hostilities, act of terrorism or outbreak involving the United States of America, any declaration of war by Congress or any other national or international calamity, or (e) changes in general economic conditions or the financial or securities markets generally; provided, however, that any change or effect described in clauses (b), (c), (d) or (e) does not specifically relate to or disproportionately impact the STB Business, the Purchased Assets or the business, assets, liabilities, condition (financial or otherwise), operating results or operations of the Company and its Subsidiaries, taken as a whole. Notwithstanding the foregoing, the filing of the Chapter 11 Case and the commencement of the Cayman Insolvency Case shall not, individually or together, in and of themselves, be deemed to constitute or give rise to a Material Adverse Effect.

"Miscellaneous Office Supplies" means office, mailroom and copy center supplies, including paper, notebooks and paper pads, toner and ink cartridges for printers or photocopiers, writing instruments (such as pens, pencils, highlighters and erasers), binding or fastening devices (such as staplers and staples, velobinders and three-ring binders, paper clips and glue), cleaning supplies, bathroom supplies, kitchen supplies, kitchen utensils and kitchen small appliances and other tangible supplies used in common areas of the applicable facilities.

"Non-Competition Agreement" is defined in Section 2.4(c).

"NXP Manufacturing Services Agreement Term Sheet" means the term sheet dated December 16, 2011 between NXP and Purchaser set forth on Exhibit K.

"NXP Note" is defined in Section 1.1(c).

"NXP Purchase Orders" is defined in Section 1.1(b).

"Open Source Code" means any software code that is distributed as "free software" or "open source software" or is otherwise distributed publicly in source code form under terms that permit modification and redistribution of such software.

"Order" means any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority.

735819 v8/SD

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency) of the Company and the Subsidiaries in connection with the STB Business.

"Owned Intellectual Property Assets" means any and all Intellectual Property that is owned or co-owned by the Company or any of its Subsidiaries.

"Owned Inventory" is defined in Section 1.1(b).

"Parties" is defined in the preamble to this Agreement.

"Patents" is defined in Section 1.1(g).

"Patent Rights" is defined in the definition of Intellectual Property.

"PC TV Business" means the Company's business existing as of the date of this Agreement of designing, developing, manufacturing, marketing, selling, distributing, refurbishing, and servicing integrated circuit components, software and hardware for use in PC TV Products (as defined in the License Agreement).

"Permits" means (i) all licenses, permits, rights, registrations, agreements, accreditations, certifications and governmental or other approvals of any Governmental Authority applied for, pending by, issued or given to (a) any Subsidiary or (b) the Company or any Subsidiary that is used in the STB Business, and (ii) all agreements with any Governmental Authority entered into by (a) any Subsidiary or (b) the Company or any Subsidiary that is used in or related to the STB Business, and, with respect to any of the items referenced in the foregoing clauses (i) and (ii), that are in effect, have been applied for or are pending.

"Permitted Encumbrances" means (i) statutory liens, charges or assessments for Taxes not yet due or the amount for which is being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (ii) statutory liens of landlords, carriers, warehousemen, mechanics and materialmen incurred in the Ordinary Course of Business for sums not yet due, (iii) liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security, (iv) applicable zoning, subdivision, building and other land use Laws and other land use restrictions that do not impair the present use of the subject real property, and (v) licenses under Purchased Intellectual Property Assets that are included in the Seller Contracts and disclosed in Section 3.21 of the Disclosure Schedule.

"Person" means any natural individual, corporation, partnership, limited liability company, joint venture, association, bank, trust company, trust or other entity, whether or not legal entities, or any Governmental Authority.

"Personal Data" means mean a natural person's name, street address, telephone or cell phone number, e-mail address, photograph, social security number, driver's license number, passport number, or customer or account number, or any other piece of information that allows the identification of a natural person.

12

"Personal Productivity Tools" means the personal computers (whether desktop, laptop or tablet), desktop printer, desk, cubicle, table, bookcase, chair and other office furniture, whiteboards, bulletin boards, books and other reference manuals not included in the STB Owned Intellectual Property, telephones, cell phones, smart phones and other personal assistance devices and any Miscellaneous Office Supplies located in the desks or other work areas of all of the Transferred Employees (or the vacant offices or workspaces assigned to any STB Employee who does not become a Transferred Employee).

"Petition Date" means the date on which the Chapter 11 Case is commenced.

"Preference Avoidance Claims" is defined in Section 1.1(r).

"Purchase Price" is defined in Section 1.8.

"Purchased Assets" is defined in Section 1.1.

"Purchased Intellectual Property Assets" means (i) all Patent Rights owned or co-owned by the Company or any Subsidiary and (ii) all other Intellectual Property that is owned or co-owned by Company or any of the Subsidiaries.

"Purchaser" is defined in the preamble to this Agreement.

"Purchaser Documents" is defined in Section 4.2.

"Purchaser Indemnitees" is defined in Section 8.1.

"Purchaser Terminating Breach" is defined in Section 6.1(b).

"Receivables" is defined in Section 1.1(c).

"Records" is defined in Section 1.1(n).

"Registered IP" shall mean all Intellectual Property that is registered, filed, or issued under the authority of any Governmental Authority, including all patents, registered copyrights, registered mask works, and registered trademarks and all applications for any of the foregoing.

"Release" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching (whether active or passive), dumping or disposing into or through the environment, whether or not notification or reporting to any governmental agency was or is required, including any Release which is subject to Environmental Laws.

"Required Action" is defined in Section 3.21(a).

"Required Cash" is defined in Section 1.1(k).

"Required Consent" is defined in Section 2.3(h).

"Response" is defined in Section 8.9.

13

"Retained Employees" means any former or current employee of the Company or any of its Subsidiaries who is not a Transferred Employee as of the Closing Date.

"Retained Contracts" means any Contracts that Purchaser decides not to assume pursuant to Section 1.1(h) or Section 1.1(i), Contracts listed on Schedule 1.2(c) and Contracts Purchaser causes the Company to reject pursuant to Section 7.9.

"Retained Liabilities" is defined in Section 1.4.

"Sale Orders" means the Cayman Sale Order and the US Sale Order.

"Sale Proceeds Sharing Agreement" is defined in Section 7.14

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller Contract" means any Contract (including any insurance policy) under which the Company or any Subsidiary has or may acquire any rights, or by which the Company or any Subsidiary or any of its assets is or may become bound, in each case, that is used in or related to the STB Business or any Purchased Asset, including, without limitation, any Licensed Intellectual Property Assets and any Software Contracts; *provided, however,* that the Seller Contracts shall not include the Retained Contracts.

"Seller Documents" is defined in Section 3.2.

"Seller Employee Benefit Plan" means any pension, retirement or savings plan, any medical, hospital, health, dental, life, death benefit or disability plan, any group insurance plan, any profit sharing, deferred compensation, stock option, stock purchase, bonus or incentive plan (including any equity or equity-based plan), and any fringe benefit, vacation pay, holiday pay, sick leave, service awards, tuition reimbursement, moving expense reimbursement, severance pay, or other employee benefit plan, trust, agreement, contract, policy or commitment (including, but not limited to, any pension plan, as defined in ERISA §3(2), and any "welfare plan," as defined in ERISA § 3(1)), whether any of the foregoing is funded, insured or self-funded, written or oral, (i) sponsored or maintained by the Company or any ERISA Affiliate and covering the Company's or any ERISA Affiliate's active or former employees (or their beneficiaries), (ii) to which the Company or any ERISA Affiliates is a party or bound, or (iii) with respect to which the Company or any ERISA Affiliate has made any payments, contributions or commitments or may otherwise have any Liability (whether or not such Seller Employee Benefit Plan is still maintained) with respect to services performed in relation to the STB Business. Seller Employee Benefit Plans shall include, without limitation, any Foreign Employee Benefit Plans.

"Seller Employer" is defined in Section 3.18(a).

"Seller Intellectual Property Assets" means any and all Licensed Intellectual Property Assets and Purchased Intellectual Property Assets.

735819 v8/SD

"Seller Indemnitees" is defined in Section 8.3.

"Seller Party" is defined in Section 7.7.

"Seller Software" is defined in Section 1.1(f).

"Seller Subsidiaries" is defined in Section 3.2.

"Software" means all computer software, the tangible media on which it is recorded (in any form) and all supporting documentation, including, without limitation, input and output format, program listings, narrative descriptions, source code, object code, executable code, algorithms, logic and development tools, bug lists and tools or procedures for tracking and fixing bugs, operating instructions, construction and design specifications, training materials and user manuals, and data and databases, including those pertaining to the design, operation, maintenance, support, development, performance, and configuration of such software, together with all translations, adaptations, modifications, derivations, combinations and derivative works thereof.

"Software Contract" means any Contract which conveys or grants Company or any of its Subsidiaries rights to use Software.

"Specified Prepaid Expenses" is defined in Section 1.9(a).

"STB Employee" is defined in Section 3.18(a).

"STB Former Employees" means former employees who provided services to the STB Business.

"STB GAAP Revenue" means revenue from the sale of Products as recognized under GAAP.

"STB Service Providers" is defined in Section 3.18(b).

"STB (U.S.) Employee" is defined in Section 3.18(e).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general

735819 v8/SD

partner of such business entity (other than a corporation). The term *"Subsidiary"* shall include all Subsidiaries of such Subsidiary.

"Systems" is defined in Section 3.25.

"Tangible Personal Property" is defined in Section 1.1(e).

"Target Working Capital" means an amount equal to $11.6 million.

"Tax" means any federal, state, local, foreign and other net income, gross income, gross receipts, sales, estimated, use, ad valorem, transfer, franchise, profits, license, lease, service, service use, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property (including personal property), windfall profits, customs, duties or other tax, fee, assessment or charge, together with any interest, penalties, additions to tax or additional amounts with respect thereto.

"Tax Return" means any federal, state, local or foreign return, declaration, report, statement and other documents or filings required to be filed in respect of any Tax.

"Term Sheet" means that certain Term Sheet, dated as of October 28, 2011, by and between the Company and Purchaser.

"Terrestrial Demod Products Business" means the Company's business, existing as of the date of this Agreement, of designing, developing, manufacturing, marketing, selling, distributing, refurbishing, and servicing Terrestrial Demod Products (as defined in the License Agreement).

"Third Party" means any Person other than any of the Parties and their respective Affiliates.

"Third-Party Claim" is defined in Section 8.4.

"Transaction Documents" means this Agreement and the other agreements, instruments and documents being delivered by the Parties at the Closing pursuant to either Section 2.4 or Section 2.5.

"Transfer Offer" is defined in Section 5.9(b).

"Transferred Employees" is defined in Section 5.9(a).

"Transferred Leases" is defined in Section 1.1(d).

"Transition Agreement" is defined in Section 2.4(a).

"Trident Microsystems Marks" is defined in Section 7.11.

"TUPE" means the Acquired Rights Directive and any Laws promulgated in order to give effect to the Acquired Rights Directive, including the Transfer of Undertakings (Protection of Employment) directive and all similar Laws promulgated in accordance with TUPE.

735819 v8/SD

"UK Subsidiary" means Trident Digital Systems (UK) Ltd.

"Updated Carve-Out Financial Statements" is defined in Section 2.3(k).

"US Orders" means the US Sale Order and the Bid Procedures Order.

"US Sale Motion" means a motion, in form and substance acceptable to Purchaser, seeking approval of the US Sale Order by the Bankruptcy Court.

"US Sale Order" means one or more orders of the Bankruptcy Court, in form and substance acceptable to Purchaser, among other things, (i) approving the sale of Purchased Assets to Purchaser (free and clear of all Claims and Encumbrances pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code), (ii) approving the assumption by and assignment to Purchaser of the Seller Contracts pursuant to Section 365 of the Bankruptcy Code, (iii) containing findings of fact and conclusions of law that Purchaser is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and that Purchaser is not a successor to the Company or any Subsidiary and shall not be liable under any theory of successor liability, (iv) providing for the assumption by Sellers, and the assignment by Sellers to Purchaser, of each of the Seller Contracts pursuant to Section 365 of the Bankruptcy Code, and further providing that any and all Cure Costs associated with any such agreements shall be paid by the Company, without any offset or deduction from the Purchase Price, at or prior to the effective date of the assumption of such agreements by the Company, and (v) conditioning the sale of the Excluded Assets relating to the digital television business upon the purchaser thereof executing and delivering the Non-Competition Agreement, and prohibiting Sellers from selling any such assets to any party who has not entered into such agreement.

"User Data" means any Personal Data or other data or information collected by or on behalf of the Company or any Subsidiary from users of the Products.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. § 2101, *et. seq.*

"Working Capital Statement" is defined in Section 1.9(b).

735819 v8/SD

EXECUTION VERSION

## EXHIBIT B

### PURCHASE PRICE ALLOCATION

The Parties will allocate the Purchase Price and Assumed Liabilities among the Purchased Assets in the manner stated below, consistent with the requirements of Code § 1060. All references to book value and fair market value are to the book value or fair market value of the Purchased Assets as of the Closing Date, immediately after consummation of Contemplated Transactions.

I.    Allocation Among Company and Seller Subsidiaries.

The approximate fair market value of Consideration as determined at signing is $_____ which shall be allocated among the Company and Seller Subsidiaries as follows:

Company                          $_____ (FMV) allocated to such entity

TMFE (Cayman)                    $_____ (FMV) allocated to such entity

   *- List of entities to be provided*

II.    Allocation Among Assets for each Entity set forth at Section I above.

| | Asset Class | Allocation Method |
|---|---|---|
| I. | Cash and General Deposit Accounts | Fair market value |
| II. | Actively Traded Securities | Fair market value |
| III. | Prepaids, Deposits and Receivables | Fair market value, which for Receivables will be calculated as face value minus applicable reserves for doubtful accounts and for allowances and discounts |
| IV. | Inventory | Fair market value |
| V. | Tangible Personal Property | Fair market value for Tangible Personal Property |
| VI. | Intangible Assets other than Goodwill | Fair market value |
| VII. | Goodwill | The difference between (a) the sum of the Purchase Price and the Assumed Liabilities, minus (b) the sum of the amounts allocated to the other Purchased Assets pursuant to Asset Classes I through VI above. |

1

735819 v8/SD

EXECUTION VERSION

## AMENDMENT TO ASSET PURCHASE AGREEMENT

THIS AMENDMENT TO ASSET PURCHASE AGREEMENT (this *"Amendment"*) dated January 18, 2012 is by and between ENTROPIC COMMUNICATIONS, INC., a Delaware corporation (*"Purchaser"*), and TRIDENT MICROSYSTEMS, INC., a Delaware corporation (the *"Company"*), and each of its Subsidiaries that owns Purchased Assets (the *"Seller Subsidiaries"*). Purchaser, the Company and Seller Subsidiaries are collectively referred to herein as the *"Parties"* and individually as a *"Party"*. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Purchase Agreement (defined below).

### RECITALS

The Parties have agreed on a form of Asset Purchase Agreement (*"Purchase Agreement"*) that was filed with the United States Bankruptcy Court for the District of Delaware in the Company's case under Chapter 11 of the United States Bankruptcy Code commenced on January 4, 2012 (Case No. 12-10060 (CSS)) (the *"Case"*) and the Parties desire to modify the form of Purchase Agreement in accordance with this Amendment.

### AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.      **Treatment of Certain Employment Liabilities.**

A.      **Amendment of Definition of Company Retention Bonus Liability.** The definition of Company Retention Bonus Liability is hereby amended and restated in its entirety to read as follows:

"Company Retention Bonus Liability" means the sum of (a) that portion of the aggregate potential retention bonuses of $1,231,317.24 ( the *"Program Bonus"*) offered by the Company to certain STB Employees (excluding the head of the Company's STB Business unit and any other STB Employee who is party to a KEIP Participation Agreement with the Company) in exchange for remaining actively employed in the STB Business for three months following the Closing determined by multiplying two months of each such STB Employee's base salary by a fraction, the numerator of which is the number of days from November 17, 2011 until the Closing (the *"Pre-Closing Period"*) and the denominator of which is the sum of the Pre-Closing Period and ninety (90), (b) that portion of the aggregate potential unique retention bonuses of $358,589.96 ( the *"Unique Bonus"*) offered by the Company to certain STB Employees under individual Contracts listed on Schedule 3.18(e) and Schedule 3.18(g) to the Agreement determining by multiplying the total retention payment for each Contract by a fraction, the numerator of which is the total number of days between the date of the Contract and the Closing (the *"Contract Pre-Closing Period"*) and the denominator of which is the sum of Contract Pre-Closing Period and the specified time period following the Closing that the STB Employee is required to work following the Closing in order to earn the retention bonus,

1.

and (c) only in the event that the Bankruptcy Court fails to approve the Company's Key Employee Plan ("*KEIP*") or determines that the KEIP is invalid, unenforceable or avoidable, and the KEIP Participation Agreements shall be null and void for the STB Employees (including the head of the STB Business unit), $175,000. The Company Retention Bonus Liability shall not include, and Purchaser assumes no Liability for, any payments due under the KEIP or any KEIP Participation Agreement, including any payments due to the head of the Company's STB Business unit.

B.    For the sake of clarity, Section 1.3 is hereby amended to add clause (*v*), such that,

"and (v) the obligation to pay to Transferred Employees any Program Bonus or Unique Bonus to the extent earned after the Closing by such Transferred Employees;"

2.    Section 1.7 Foreign Assets is amended by adding the following:

Purchaser shall use commercially reasonable efforts to prior to the Closing Date establish such foreign subsidiaries necessary to effect the sale of all of the Purchased Assets held outside of the United States. To the extent that Purchaser has been unable to complete the formation of any new subsidiaries required to operate in any such jurisdiction by the Closing Date, Purchaser shall have the right to delay closing the transfer of any assets under any of the Local Asset Transfer Agreements beyond the Closing Date; *provided, however,* that from and after the Closing Date, Purchaser shall pay directly or reimburse Company for all direct operating costs related to such Purchased Assets, including lease payments for the subject facility, and shall enter into a secundment agreement with the Company or its applicable Seller Subsidiary pursuant to which Purchaser shall pay the salary and benefits of the subject STB Employees located in such jurisdiction. Between the Closing Date and the date of the closing under each Local Asset Transfer Agreement, the Company and each Seller Subsidiary shall (i) provide access to Purchaser and its Subsidiaries to the Purchased Assets subject to such Local Asset Transfer Agreement, and (ii) allow Purchaser to conduct business in such jurisdiction using such Purchased Assets as part of the Transition Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be executed as of the day, month and year first above written.

**COMPANY:**

TRIDENT MICROSYSTEMS, INC.

By: _____
Name: _____
Title: _____

**SELLER SUBSIDIARIES:**

TRIDENT DIGITAL SYSTEMS (UK) LTD.

By: _Pete J. Mangan_
Name: _Peter T. Mangan_
Title: _Director_

TRIDENT MICROELECTRONICS, LTD.

By: _____
Name: _Gaurav Snestan_
Title: _Chairman_

TRIDENT MICROSYSTEMS (FAR EAST) LTD.

By: _Pete J. Mangan_
Name: _Peter T. Mangan_
Title: _President_

736828 v5/SD

3.

TRIDENT MICROSYSTEMS (INDIA) PVT. LTD.

By: _Peter J. Mangan_
Name: _PETER J. MANGAN_
Title: _DIRECTOR_

TRIDENT MICROSYSTEMS (JAPAN) GK

By: _Peter J. Mangan_
Name: _PETER J. MANGAN_
Title: _DIRECTOR_

TRIDENT MICROSYSTEMS (KOREA) LIMITED

By: _Peter J. Mangan_
Name: _PETER J. MANGAN_
Title: _REPRESENTATIVE DIRECTOR_

TRIDENT MICROSYSTEMS (NEDERLAND) B.V.
FRANCE BRANCH OFFICE

By: _____
Name: _Paul Sandberg_
Title: _Representative_

TRIDENT MICROSYSTEMS (TAIWAN) LTD.

By: _____
Name: _BAMDAD BAKTASH_
Title: _CHAIRMAN_

TRIDENT    MULTIMEDIA    TECHNOLOGIES
(SHANGHAI) CO., LTD.

By: _____
Name: _____
Title: _____


TRIDENT    MULTIMEDIA    TECHNOLOGIES
(SHANGHAI) CO., LTD. SHENZHEN BRANCH

By: _____
Name: _____
Title: _____


**PURCHASER:**

ENTROPIC COMMUNICATIONS, INC.


By: _____
Name: _____
Title: _____


736828 v5/SD

5.

TRIDENT    MULTIMEDIA    TECHNOLOGIES
(SHANGHAI) CO., LTD.

By: _____
Name: _____
Title: _____


TRIDENT    MULTIMEDIA    TECHNOLOGIES
(SHANGHAI) CO., LTD. SHENZHEN BRANCH

By: _____
Name: _____
Title: _____


**PURCHASER:**

ENTROPIC COMMUNICATIONS, INC.

By: _____
Name: _____
Title: _____

736828 v5/SD

EXECUTION VERSION

## SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT

**THIS SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT** (this *"Amendment"*) dated February __, 2012 is by and between ENTROPIC COMMUNICATIONS, INC., a Delaware corporation (*"Purchaser"*), and TRIDENT MICROSYSTEMS, INC., a Delaware corporation (the *"Company"*), and each of its Subsidiaries that owns Purchased Assets (the *"Seller Subsidiaries"*). Purchaser, the Company and Seller Subsidiaries are collectively referred to herein as the *"Parties"* and individually as a *"Party"*. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Purchase Agreement (defined below).

## RECITALS

The Parties have entered into an Asset Purchase Agreement dated January 18, 2012, as amended by the Amendment to Asset Purchase Agreement dated January 18, 2012 (collectively, the "*Purchase Agreement*") in connection with the Company's case under Chapter 11 of the United States Bankruptcy Code commenced on January 4, 2012 (Case No. 12-10060 (CSS)) in the United States Bankruptcy Court for the District of Delaware and the Parties desire to amend the Purchase Agreement in accordance with this Amendment.

## AGREEMENTS

**NOW, THEREFORE,** in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.  **Definition of Accrued Severance Benefits**. The definition of Accrued Severance Benefits is hereby amended and restated in its entirety to read as follows:

    "Accrued Severance Benefits" means the Liability as of the Closing Date to pay employees or former employees of the UK Subsidiary or any STB Employees any severance or termination pay upon employment termination, but only to the extent that such Liability is accrued or required to be accrued, provided for or reserved against on a balance sheet under GAAP.

2.  **Carve-Out Financial Statements.** Section 2.3(k) is hereby amended and restated in its entirety to read as follows:

    **Carve-Out Financial Statements.** The Company shall have delivered to Purchaser updated Carve-Out Financial Statements that include balance sheets as of December 31, 2010, December 31, 2011, and as of the last day of the month prior to the calendar month during which the Closing Date occurs (provided that the Closing Date is at least 25 days after the preceding calendar month) and a statement of operations and statement of cash flows for the period from February 8, 2010 through December 31, 2010, from January 1, 2011 through December 31, 2011, and from January 1, 2012 through the last day of the month prior to the calendar month during which the Closing Date occurs (provided that

the Closing Date is at least 25 days after the preceding calendar month) ("*Updated Carve-Out Financial Statements*") and Purchaser shall have determined that the audit of the Updated Carve-Out Financial Statements shall be completed as required by <u>Section 7.10</u>, provided, however, that for purposes of <u>Section 7.10</u> audited Updated Carve-Out Financial Statements for 2012 shall be for the period from January 1, 2012 through the Closing Date.

3.   **New Section 5.10(h).**  Section 5.10(h) is hereby added to the Purchase Agreement as follows:

    (h)  The Company and the Seller Subsidiaries agree to provide to Purchaser reasonably in advance of execution a copy of the final draft of each definitive agreement, with exhibits and schedules, for the sale or license of assets of the DTV Business.

4.   **Section 7.10. Audits of Carve-Out Financial Statements.**  Section 7.10 is hereby amended and restated in its entirety to read as follows:

**Audits of Carve-Out Financial Statements.**  The Company shall deliver, or cause to be delivered to Purchaser within 70 days following the Closing, audited Updated Carve-Out Financial Statements through the Closing Date that conform in all material respects to the published rules and regulations of the SEC applicable to acquired company financial statements for each of the periods that Purchaser is required to file with the SEC under such published rules and regulations and shall cause the auditing firm or firms to deliver any consents required in order for the Purchaser to file the Updated Carve-Out Financial Statements with the SEC or to incorporate the Updated Carve-Out Financial Statements into any registration statement of Purchaser or its parent under the Securities Act. If prior to Closing, the Company revises any of the Carve-Out Financial Statements delivered at or prior to signing of this Agreement, then the Company shall promptly notify Purchaser and deliver to Purchaser a copy of the revised Carve-Out Financial Statements.

5.   **Section 7.12 Deletion/Destruction of Confidential Information.**  Section 7.12 is hereby amended by adding at the end of Section 7.12 the following:

Until the Company and its Subsidiaries complete the deletion or destruction of all Confidential Information in accordance with this <u>Section 7.12</u>, including any Confidential Information identified through the Data Audit ("<u>Destruction Completion Date</u>"), the Company and its Subsidiaries shall not transfer or provide access to any of their respective information technology systems, servers, computers, other computer equipment or any of its backup storage devices to any Third Party. Until the Destruction Completion Date, the Company and the Seller Subsidiaries agree to provide to Purchaser, (i) concurrent with delivery to a Third Party (if such delivery occurs prior to the Closing Date), or (ii) at least five Business Days in advance of delivery to a Third Party (if such delivery occurs on or after the Closing Date), a complete copy of the Intellectual Property and Intellectual Property rights to be delivered to such Third Party (which in the case of Registered IP can be a list of the Registered IP and in the case of a Contract relating to

2

Licensed Intellectual Property Asset can be a list of the Contracts but in the case of any Seller Software, IP blocks, copyrights, trade secrets, know-how or Licensed Midas Technology (as defined in the License Agreement) shall be a copy of the items to be delivered). Within five Business Days following notice that the Company has completed its obligations under this <u>Section 7.12</u>, Purchaser shall begin the 15-day period to conduct the Data Audit.

6.   **New Section 7.15.** Section 7.15 is added to the Purchase Agreement as follows:

   **Section 7.15 Third Party Contracts.** The Company and the Seller Subsidiaries agree that in any Contract they enter relating to the transfer, sale or license of any assets of the DTV Business, the Company or the Seller Subsidiary as applicable, shall include, in addition to any confidentiality provisions required to be included in a sublicense under the License Agreement, a confidentiality covenant that provides that the counter party to the Contract shall not use or disclose any confidential information of any third party that is not part of the intellectual property rights included in the sublicense under the License Agreement without the prior written consent of such third party. The confidentiality covenant shall also provide that the counter party shall return or destroy such third party confidential information upon the request of the Company or Seller Subsidiary, as applicable, or the third party owner of such confidential information. The confidentiality covenant shall also provide that the third party owner of such confidential information shall be the intended third party beneficiary of such covenant, with a right to enforce the covenant.

7.   **New Section 7.16.** Section 7.16 is added to the Purchase Agreement as follows:

   **Section 7.16 Performance of Transition Agreement.** The Company and the Seller Subsidiaries agree that to the extent that any assets of the Company or any Subsidiary are being transferred to a Third Party or any employees of the Company or any Subsidiary are being transferred as employees or consultants to such Third Party and such assets or personnel are necessary to enable the Company and the Seller Subsidiaries to perform their obligations to Purchaser under the Transition Agreement, then the Company and Seller Subsidiaries shall make appropriate arrangements with such Third Party or otherwise to enable the Company and Seller Subsidiaries to perform fully their obligations under the Transition Agreement.

8.   **No Other Amendments.** Except for the amendments set forth in this Amendment, the Purchase Agreement remains in full force and effect without any modification or waiver of any provision.

   IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be executed as of the day, month and year first above written.

3

**COMPANY:**

TRIDENT MICROSYSTEMS, INC.

By: _____
Name: _____
Title: _____

**SELLER SUBSIDIARIES:**

TRIDENT DIGITAL SYSTEMS (UK) LTD.

By: _____
Name: _____
Title: _____

4

**TRIDENT MICROELECTRONICS, LTD.**

By: _____
Name: _____
Title: _____

**TRIDENT MICROSYSTEMS (FAR EAST) LTD.**

By: _____
Name: _____
Title: _____

**TRIDENT MICROSYSTEMS (INDIA) PVT. LTD.**

By: _____
Name: _____
Title: _____

**TRIDENT MICROSYSTEMS (JAPAN) GK**

By: _____
Name: _____
Title: _____

**TRIDENT MICROSYSTEMS (KOREA) LIMITED**

By: _____
Name: _____
Title: _____

5

TRIDENT MICROSYSTEMS (NEDERLAND) B.V.
FRANCE BRANCH OFFICE

By: _____
Name: _____
Title: _____

TRIDENT MICROSYSTEMS (TAIWAN) LTD.

By: _____
Name: _____
Title: _____

TRIDENT MULTIMEDIA TECHNOLOGIES
(SHANGHAI) CO., LTD.

By: _____
Name: _____
Title: _____

TRIDENT MULTIMEDIA TECHNOLOGIES
(SHANGHAI) CO., LTD. SHENZHEN BRANCH

BY: _____
Name: _____
Title: _____

6

**<u>PURCHASER</u>:**

ENTROPIC COMMUNICATIONS, INC.

By: _____
Name: _____
Title:

7

EXECUTION VERSION

## THIRD AMENDMENT TO ASSET PURCHASE AGREEMENT

**THIS THIRD AMENDMENT TO ASSET PURCHASE AGREEMENT** (this *"Third Amendment"*) dated March __, 2012 is by and between ENTROPIC COMMUNICATIONS, INC., a Delaware corporation (*"Purchaser"*), and TRIDENT MICROSYSTEMS, INC., a Delaware corporation (the *"Company"*), and each of its Subsidiaries that owns Purchased Assets (the *"Seller Subsidiaries"*). Purchaser, the Company and Seller Subsidiaries are collectively referred to herein as the *"Parties"* and individually as a *"Party"*. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Purchase Agreement (defined below).

### RECITALS

The Parties have entered into that certain Asset Purchase Agreement dated January 18, 2012 (as amended by Amendment to Asset Purchase Agreement, executed and delivered on January 18, 2012, and by Second Amendment to Asset Purchase Agreement, executed and delivered on February 6, 2012, collectively, the *"Purchase Agreement"*) in connection with the Company's case under Chapter 11 of the United States Bankruptcy Code commenced on January 4, 2012 (Case No. 12-10060 (CSS)) in the United States Bankruptcy Court for the District of Delaware and the Parties desire to amend the Purchase Agreement in accordance with this Amendment.

### AGREEMENTS

**NOW, THEREFORE,** in consideration of the foregoing recitals, the representations, warranties and covenants set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

1.   **Section 1.1(r). Purchased Assets.** Section 1.1(r) is hereby amended and restated in its entirety to read as follows:

(r)   All fraudulent conveyance, preference and avoidance claims (whether or not asserted as of the Closing) of the Company and the Seller Subsidiaries arising under (i) Sections 544, 547, 548, 549, and 550 of Chapter 5 of the Bankruptcy Code, and to the maximum extent allowable under applicable law (ii) the law of any foreign jurisdiction in which the Sellers operate or are domiciled, including the Cayman Islands, or (iii) applicable state law, including all rights, claims and causes of action arising out of any post-petition payment by the Company or any of the Seller Subsidiaries for goods or services, relating to: (x) vendors or service providers used in the STB Business; (y) the Assumed Contracts and Transferred Leases, including that certain Manufacturing Services Agreement, as amended, dated as of February 8, 2010 between Trident Microsystems (Far East) Ltd. and NXP (the "MSA"); and (z) Transferred Employees (all such claims and causes of action described in this Section 1.1(r) are defined as the "Preference Avoidance Claims"); provided, however, the Preference Avoidance Claims shall not include any claims or transfers among or between the Company and Seller Subsidiaries, or any claim for recharacterization, subordination, or breach of fiduciary

duty or aiding and abetting same. The Company shall use their commercially reasonable efforts to obtain an undertaking from the Joint Provisional Liquidators in the Cayman Insolvency Case that in the event that they are appointed Official liquidators in the Cayman Insolvency Case, they will not support pursuing the Preference Avoidance Actions.

2. **Section 1.2. Excluded Assets.** Section 1.2 is hereby amended by adding new subsection (l) as follows:

(l)     the Retained Patents;

3. **Section 1.8 Purchase Price.** Section 1.8 is hereby amended and restated in its entirety to read as follows:

1.8     **Purchase Price.**

(a)     The purchase price for the sale, assignment and delivery of the Purchased Assets, and subject to adjustment in accordance with <u>Section 1.9</u> below, shall consist of (i) the assumption of Assumed Liabilities and (ii) a cash payment *"Cash Amount"*) calculated as (a) Sixty-Five Million Dollars ($65,000,000.00) *plus* (b) the amount, if any, by which the Estimated Working Capital exceeds the Target Working Capital, *minus* (c) the amount, if any, by which the Target Working Capital exceeds the Estimated Working Capital. The Cash Amount as adjusted pursuant to <u>Section 1.9</u> below shall be referred to herein as the *"Purchase Price."* At the Closing, Purchaser shall pay the Cash Amount, by wire transfer of immediately available funds to an account that has been designated by the Company.

(b)     Notwithstanding any other provision of this Agreement (except for <u>Section 1.8(c)</u> below, which shall not be modified or affected by this <u>Section 1.8(b)</u> and except for actions for specific performance), except in the case of Fraud or knowing or intentional breaches of this Agreement, the Company's aggregate obligations and liabilities to Purchaser under all provisions of this Agreement shall not exceed Six Million Dollars ($6,000,000.00).

(c)     The limitation in <u>Section 1.8(b)</u> shall not apply to the Company's and the Seller Subsidiaries' obligation to deliver Required Cash or to pay or discharge (i) Excluded Liabilities, (ii) Cure Costs, (iii) the Company's payment obligations under <u>Section 5.4(c)</u>(other than for out-of-pocket fees and expenses relating to chain of title patent recordation issues), or (v) any liability or obligation of the Company under the License Agreement, the Transition Agreement, any Facilities Use Agreement or the Non-Competition Agreement.

4. **Section 1.9. Working Capital; Adjustment to Purchase Price.** Section 1.9(a) is hereby amended and restated in its entirety to read as follows:

(a)    At least five (5) Business Days prior to the Closing Date, the Company shall deliver to Purchaser a working capital statement (the **"Estimated Working Capital Statement"**), setting forth the Company's calculation of Closing Working Capital with respect to the STB Business as of the opening of business on the Closing Date (**"Estimated Working Capital"**). For purposes of this Agreement, "Closing Working Capital" shall mean the amount by which (i) Current Assets exceed (ii) Current Liabilities. Closing Working Capital will exclude any and all inter-company receivables, payables or other balances between the Company or any Subsidiary, on the one hand, and the Company or any Subsidiary, on the other hand. To the extent Current Liabilities exceed Current Assets, Estimated Working Capital shall be stated as a negative number and shall be deemed less than Target Working Capital. The term **"Current Assets"** means the Receivables, Owned Inventory, Prepaid Inventory and Specified Prepaid Expenses included in the Purchased Assets. The term **"Specified Prepaid Expenses"** means prepaid royalties, fees or other payments treated under GAAP as a prepaid expense of the STB Business as of the Closing under the Seller Contracts specified on Schedule 1.9(a) to the extent such Seller Contracts are included in the Purchased Assets. The term **"Current Liabilities"** means the total Closing Trade Payables included in the Assumed Liabilities. The Estimated Working Capital Statement shall be prepared in accordance with the same accounting principles, practices, methodologies and policies used to prepare the Carve-Out Financial Statements and, to the extent consistent with the foregoing, in accordance with GAAP. Notwithstanding the foregoing, (A) any assets of the Company or a Subsidiary that are not part of the Purchased Assets shall not under any circumstances be deemed a Current Asset and (B) any Liabilities of the Company or a Subsidiary that are not part of the Assumed Liabilities shall not under any circumstances be deemed a Current Liability.

5.    **Section 1.11.** Section 1.11 is hereby deleted and replaced with "Intentionally Omitted."

6.    **Section 2.3(h).** Section 2.3(h) is hereby amended and restated in its entirety to read as follows:

(h)    **Consents.** The Company shall have obtained and have delivered reasonable evidence of (i) each of the consents to assignment of the Seller Contracts and Transferred Leases set forth in Schedule 2.3(h)(1), in accordance with Schedule 2.3(h)(1), (ii) at least 70% of the consents to assignments of the Seller Contracts set forth on Schedule 2.3(h)(2) (each of (i) and (ii), a "**Required Consent**") and each Required Consent shall be in full force and effect. Purchaser shall not withhold entering into any such Required Consent (other than with respect to any of the Seller Contracts set forth on Schedule 2.3(h)(1)) if the commercial terms offered by the applicable Third Party for such Required Consent are reasonable without material change to the terms of such Seller Contract or Transferred Lease in place as of the date of this Agreement.

7.    Section 2.3(l). Section 2.3(l) is hereby amended and restated in its entirety to read as follows:

(l)    **NXP Agreements.** The Purchaser or applicable Subsidiary shall have entered into with NXP a Manufacturing Services Agreement consistent with the NXP

3

Manufacturing Services Agreement Term Sheet and the Transition Services Agreement with NXP covering related supply chain, product engineering and product support services, and such agreements shall remain in full force and effect. The Company and the Seller Subsidiaries shall have reached an agreement with NXP relating to the scope of Preference Avoidance Claims relating to NXP included in the Purchased Assets, and, if necessary, this Agreement shall be amended to reflect such agreement with NXP.

8.  **Section 2.3(m).**  Section 2.3(m) is hereby amended by adding new subsection (m) as follows:

> (m)  The Company and Trident Microsystems (Far East) Ltd. shall have rejected the Agreement regarding MoCA Development dated November 18, 2010 between Cisco Systems, Inc. and Trident Microsystems (Far East) Ltd. in the Chapter 11 Case and the Cayman Insolvency Case.

9.  **Section 2.4 Closing Deliveries of the Company.**  Section 2.4 is hereby amended by adding new subsection (s) as follows:

> (s)  a reverse transition services agreement in the form of **Exhibit L** (the *"Reverse Transition Services Agreement"*), executed by the Company.

10. **Section 2.5 Closing Deliveries of Purchaser.**  Section 2.5 is hereby amended by adding new subsection (m) as follows:

> (m)  the Reverse Transition Services Agreement, executed by Purchaser.

11. **Section 3.21 Seller Intellectual Property.**  Section 3.21 is hereby amended by adding new subsection (n) as follows:

> (n)  None of the current STB products or any STB products under development would infringe any of the Retained Patents in the absence of Company or any Subsidiary owning or having the right to use, make, have made, import, sell, offer to sell, lease and otherwise dispose of any products or services, or practice any method or process or otherwise commercialize and exploit the Retained Patents and Purchaser shall not infringe any such Retained Patents if Purchaser following Closing makes, has made, imports, sells, offers to sell, leases or otherwise disposes of any of the STB products or any STB products under development without having a license to use or any other rights in the Retained Patents.

12. **Section 7.14 Other Contractual Matter.**  Section 7.14 is hereby deleted and replaced with "Intentionally Omitted."

13. **Section 8.10 Holdback Release.**  Section 8.10 is hereby deleted in its entirety.

14. **Definitions.**

> 14.1 **Holdback.**  The following definition is hereby amended and retained:

"Holdback" is defined as zero dollars.

14.2 **Retained Patents.** The following definition is hereby added to Exhibit A:

"Retained Patents" means the Patents that are the subject of the agreement listed in the attached Retained Patent Schedule.

14.3 **Prepaid Inventory.** The following definition is added to Exhibit A:

"Prepaid Inventory" means all inventory of the STB Business, including any raw materials, work in process, finished goods, consumables, service parts, packing materials and supplies, that Company or any Seller Subsidiary has irrevocably paid for prior to the Closing Date and not yet received by the Company or a Seller Subsidiary. Prepaid Inventory shall not include any inventory included in Owned Inventory.

15.  **Exhibit D Form of License Agreement and Exhibit E Form of Non-Competition Agreement.** Exhibit D Form of License Agreement and Exhibit E Form of Non-Competition Agreement are hereby replaced with the attached Exhibit D and Exhibit E.

16.  **Amendment to the Disclosure Schedule.** The Disclosure Schedule is hereby amended as set forth on the Amendment to Disclosure Schedule attached hereto.

17.  **No Other Amendments.** Except for the amendments set forth in this Amendment, the Purchase Agreement remains in full force and effect without any modification or waiver of any provision.

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be executed as of the day, month and year first above written.

**COMPANY:**

TRIDENT MICROSYSTEMS, INC.

By: _____
Name: _____
Title: _____

**SELLER SUBSIDIARIES:**

TRIDENT DIGITAL SYSTEMS (UK) LTD.

5

By: _____

Name: _____

Title: _____

6

**TRIDENT MICROELECTRONICS, LTD.**

By: _____
Name: _____
Title: _____

**TRIDENT MICROSYSTEMS (FAR EAST) LTD.**

By: _____
Name: _____
Title: _____

**TRIDENT MICROSYSTEMS (INDIA) PVT. LTD.**

By: _____
Name: _____
Title: _____

**TRIDENT MICROSYSTEMS (JAPAN) GK**

By: _____
Name: _____
Title: _____

**TRIDENT MICROSYSTEMS (KOREA) LIMITED**

By: _____
Name: _____
Title: _____

7

TRIDENT MICROSYSTEMS (NEDERLAND) B.V.
FRANCE BRANCH OFFICE

By: _____
Name: _____
Title: _____


TRIDENT MICROSYSTEMS (TAIWAN) LTD.

By: _____
Name: _____
Title: _____


TRIDENT MULTIMEDIA TECHNOLOGIES (SHANGHAI) CO., LTD.

By: _____
Name: _____
Title: _____


TRIDENT MULTIMEDIA TECHNOLOGIES (SHANGHAI) CO., LTD. SHENZHEN BRANCH

By: _____
Name: _____
Title: _____

8

**PURCHASER:**

ENTROPIC COMMUNICATIONS, INC.

By: _____
Name: _____
Title: _____

9