## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| Trident Microsystems, Inc., *et al.*,[1] | : Case No. 12-10069 (CSS) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |

: **Objection Deadline: May 8, 2012 at 4:00 p.m.**
x **(Extended to May 9, 2012 at 4:00 p.m. for NXP)**
**Hearing Date: May 15, 2012 at 10:00 a.m.**

-----------------------------------------------------------

**RESPONSE OF NXP B.V. AND NXP SEMICONDUCTORS NETHERLANDS B.V. TO THE MOTION OF THE STATUTORY COMMITTEE OF EQUITY SECURITY HOLDERS FOR THE EXAMINATION OF NXP B.V., NXP SEMICONDUCTORS NETHERLANDS B.V. AND NXP-APPOINTED DIRECTORS OR, IN THE ALTERNATIVE, FOR AUTHORITY TO ISSUE LETTERS OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION**

NXP B.V. and NXP Semiconductors Netherlands B.V. ("NXP Semiconductors") (collectively, "NXP"), by and through their undersigned counsel, hereby submit this response to the Motion of the Statutory Committee of Equity Security Holders (the "Equity Committee") for the examination of NXP B.V., NXP Semiconductors and NXP-appointed Directors or, in the alternative, for authority to issue letters of request for international judicial assistance pursuant to

---

[1]     The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd. The mailing address of each of the Debtors, solely for purposes of notices and communications, is 1170 Kifer Road, Sunnyvale, California 94086.

the Hague Convention (the "Motion").[2]   In support thereof, NXP respectfully represents as follows:

### PRELIMINARY STATEMENT

1.      The Motion is premature and a blatantly improper attempt to assert negotiating leverage against non-debtors NXP B.V. and NXP Semiconductors, Dutch *Besloten Vennootschaps* whose documents and custodians are located primarily in The Netherlands.  The Motion should be denied for three independent reasons.

2.      *First*, Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004") "may not be used for purposes of abuse or harassment and it cannot stray into matters which are not relevant to the basic inquiry." *In re Wash. Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (quotations omitted).   Yet, this is precisely what the Equity Committee seeks to do with its procedurally defective, overly broad and unduly burdensome discovery.  Although the Equity Committee may have a right to discovery, that right is not unfettered. As the Equity Committee admits, most, if not all, of the discovery it seeks from NXP is available from the Debtors. (*See, e.g.*, Mot. ¶ 1 ("Examination therefore is warranted into NXP's relations and dealings *with the Debtors* in order to unearth facts which may give rise to claims and causes of action." (emphasis added)).)  Accordingly, the Equity Committee should begin its examination with them.  Indeed, this course of action would also be consistent with the Court's statement that the Debtors should be the first recourse for any discovery. (*See infra* ¶ 38.)

---

[2]      Although the Motion purports to request relief against "NXP-Appointed Directors," the Equity Committee has provided no evidence that either former director was served with a copy of the Motion as required by Del. Bankr. L. R. 2004-1(c).  If the Court believes that a response from these directors is warranted,  it would be appropriate for the directors to be given the required notice and reasonable time to respond. And like NXP, all of the directors' rights to object to discovery once issued must be preserved..

3.      In its Motion, the Equity Committee claims that NXP sold its set-top box ("STB") and digital television ("DTV") businesses to Trident Microsystems, Inc. ("TMI") (together with Trident Microsystems (Far East) Ltd. ("TMFE"), "Trident") in an elaborate conspiracy to misappropriate millions of dollars from Trident. (*See, e.g.*, Mot. ¶¶ 2-3.) Under the Equity Committee's purported theory, NXP forced Trident to enter into unprofitable agreements with NXP, started to bleed Trident of all its cash, and then, when Trident was at death's door, required Trident to rebuff multiple, lucrative purchase offers for its STB and DTV businesses and instead to operate those businesses until its last dollar was spent. The Equity Committee's potential causes of action against NXP are, by its own admission, limited to those sounding in breach of fiduciary duties.[3] The Equity Committee desperately distorts the facts and ignores the law in its bid to unearth evidence to support such claims.

4.      What is missing from the Motion are key facts that have been publicly disclosed in these proceedings and SEC filings:

- Contrary to obtaining any windfall from the sale of the STB and DTV businesses to Trident (which cannot be challenged on fiduciary duty grounds in any event), NXP contributed these businesses to Trident *along with* $45 million in cash *to Trident* in exchange for a 60% equity interest in Trident. NXP's interests were aligned with Trident's going forward and, indeed, NXP made a sizeable "new" investment in these businesses. NXP did not receive *any* cash compensation for

---

[3]      The Equity Committee admits that any possible claims against service providers based upon fraudulent conveyance or preference law were sold by Trident. (*See, e.g.*, Mot. ¶¶ 2, 18-19.) Thus, the claims the Equity Committee carved out from the transfer were "any claim for recharacterization, subordination, or breach of fiduciary duty or aiding and abetting same." (STB Sale Order, Dkt. No. 319, Ex. A-Definitions, Third Amendment to Asset Purchase Agreement ("Third Amendment to Asset Purchase Agreement") §1.1(r).)

the sales. (*See infra at* ¶ 10.) NXP had every interest that Trident succeed; indeed, that would be the *only* source of profit for NXP on its investment.

- Contrary to being a windfall for NXP, the initial Manufacturing Servicing Agreement ("MSA") (which, again, cannot be challenged on fiduciary duty grounds) was a fully negotiated, arms'-length agreement by sophisticated parties, represented by counsel, which enabled Trident to continue operating the STB and DTV businesses. While Trident paid millions during the course of the MSA, it also received millions in goods, and NXP was still owed millions at the time these bankruptcy proceedings were initiated.[4] In light of Trident's outstanding obligations and the risk of additional non-payments going forward, NXP was forced to exercise its rights under the MSA and suspend production until a business accommodation was reached—a valid business decision NXP owed to its shareholders.[5] (*See infra at* ¶¶ 32, 52.)

- Neither the original sale to Trident nor the MSA can be characterized as favorable deals *for NXP*. At the time of the sale and execution of the MSA, NXP did not

---

[4]    The Equity Committee is correct that $12 million was paid to NXP following TMI's and TMFE's bankruptcy filings. (Mot. ¶ 20.) As discussed, *infra* at ¶¶ 31-32, this money was not paid by either of the two Debtors. And, had it not been paid by other parties, it would have been paid by Debtors as part of the required "cure" for assuming and assigning the MSA. This arrangement was, therefore, to Trident's benefit.

[5]    In an incomplete recitation of a statement from a recent Entropic Earnings Call, the Equity Committee distorts Entropic's supportive statements on this subject into a criticism of NXP. (Mot. ¶ 16.) This could not be further from what was in fact said. (Entropic Communications, Inc., Q1 2012 Earnings Call (April 24, 2012) at 3 ("Unaudited revenue in Q1 2012 was significantly impacted by supply constraints across the entire supply chain as suppliers, who became creditors . . . halted order processing through much of January and February."); *see also id.* at 7 ("[A]s creditors, of course, you don't want to ship anything while you're trying to get whatever liability back to you."); *id.* at 11 ("I think the supply constraint issue is a separate issue related to NXP trying to protect themselves, so kind of a natural reaction.").)

owe any fiduciary duties to Trident.  *See, e.g.*, *Binks* v. *DSL.net, Inc.*, 2010 WL 1713629, at *11 & n.79 (Del. Ch. Apr. 29, 2010).  Therefore, any criticism of these transactions is entirely misplaced.  (*See infra* at ¶ 52.)

- When NXP and the directors it appointed arguably would have owed fiduciary duties to Trident, NXP made financial and control accommodations to Trident for Trident's sole benefit through amendments to the Stockholder Agreement and the MSA.  (*See infra* at ¶¶ 14-15, 51.)

- NXP had little, if any, involvement in or knowledge about the STB or DTV sales, both pre- and post-petition.  (*Contrast with* Mot. ¶¶ 17, 30.)  The Equity Committee's theories concerning NXP's purported knowledge about these sales has already been raised (and refuted) in the Equity Committee's prior motion to compel, and the Court declined to order NXP to produce any discovery on these topics.  It bears repeating that NXP was only aware of one buyer, Entropic, for one of the business lines, the STB business, and both Trident and Entropic went "radio silent" immediately thereafter.  NXP did not hear anything further until TMI and TMFE filed their bankruptcy petitions, after which it became known that Trident and Entropic had entered into an Asset Purchase Agreement (the "STB APA") which NXP had no role in negotiating, drafting or reviewing.  (*See infra* at ¶¶ 21-25, 54-55.)

- The STB APA initially filed with the Court included, among the assets Trident would be selling, Trident's preference and avoidance claims relating to the STB business.  (Mot. ¶ 18.)  Surprisingly, the Equity Committee ascribes the inclusion of that provision to NXP, despite knowing that the STB APA *predated* NXP's

involvement and that the sale of these claims was insisted upon by *both* bidders to the STB business. (*See infra* at ¶¶ 23-24, 54.)[6]

5.      As these facts demonstrate, there is no merit to the Equity Committee's insinuations and accusations of misconduct, malfeasance and conspiracy. Moreover, there is no need to resort to such scurrilous allegations in order to explain Trident's decline and ultimate failure. The true cause of Trident's financial performance is clear from Trident's filings with the United States Securities and Exchange Commission ("SEC") and this Court: In the face of a broad economic decline and a highly competitive market, Trident lost sales to major Original Equipment Manufacturers ("OEMs") and lost market share in Asia, which caused a precipitous drop in revenues and a corresponding spike in net losses. (*See infra* at ¶¶ 16-20.)

6.      *Second*, even if the Court concludes that some discovery is warranted, the Equity Committee's argument for why the procedures under Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention") should not be followed is unavailing. Putting aside the fact that the Motion is improper in the first instance,[7] should the Court decide to consider the issue, the Hague Convention is not an unnecessary

---

[6]     It is also surprising that the Equity Committee asserts that the sale of these claims "ostensibly does not benefit the Debtors' estates." (Mot. ¶ 32.) As the Equity Committee is fully aware, Trident received substantial value for the sale of these insubstantial claims. Indeed, the Equity Committee reviewed this very calculus with Trident. (*See* 3-2-12 Hrg. Trans. 19:4-8 (Trident: "[W]e have now gone through with the Equity Committee and the Creditor's Committee and their advisors the Debtors' analysis of what those claims are, if any, and the relative de minimis nature of those and compare those to the value achieved here.").)

[7]     The Equity Committee improperly seeks to avoid the process contemplated in Rule 2004 by appending draft subpoenas to the Motion and seeking an order directing compliance with them. Under Rule 2004, the Court may order that the Equity Committee has the authority to issue the subpoenas. Fed. Bankr. R. 2004(c). NXP may then object to any issued discovery on all grounds available to them, including under Federal Rule of Bankruptcy Procedure 9016 which incorporates Federal Rule of Civil Procedure 45. NXP reserves all rights to do so.

hassle, as the Equity Committee would have the Court treat it. (Mot. ¶ 39.) Each factor of the comity analysis employed by courts in determining whether the Hague Convention must be utilized overwhelmingly mandate its application here. (*See infra* at ¶¶ 59-69.) As NXP has always maintained, they are willing to work with the Equity Committee to produce a limited subset of documents, in compliance with the European Union Privacy Directive ("E.U. Privacy Laws"). *See Astrazeneca* v. *Ranbaxy Pharma., Inc.*, 2008 WL 314627, *4 (D.N.J. Jan. 29, 2008) (authorizing use of the Hague Convention process "in case the witnesses do not end up agreeing to provide discovery voluntarily").

7.    *Finally*, the Equity Committee has not complied with its obligation to engage in a meaningful meet-and-confer conference with NXP as required by Local Rule for the U.S. Bankruptcy Court for the District of Delaware 2004-1 ("Local Rule 2004-1). Nor does the Equity Committee's motion suggest why it should be allowed to side step the meet-and-confer process. NXP has never refused to ever participate in any discovery. In fact, shortly after receiving the Equity Committee's draft subpoenas, NXP's counsel participated in a conference call with the Equity Committee's counsel in which NXP unambiguously agreed to comply with some measured discovery after the critical Bankruptcy Court-approved sales closed. During that conversation, NXP's counsel also (i) raised its concerns about the breadth of the draft discovery requests; (ii) noted that NXP B.V. and NXP Semiconductors are Dutch companies that must comply with E.U. Privacy Laws; and (iii) agreed to address the scope of discovery after the conclusion of the sales of the STB and DTV business, which were not only imminent, but would also yield significant value to the estates. Apparently, this call for calm was at odds with the Equity Committee's scorched earth approach to discovery and its strategy of exerting unnecessary pressure on NXP.

8.      Without the benefit of the meet-and-confer process, the Motion strongly suggests that the Equity Committee's requests are nothing more than a premature and wasteful attempt to impose sheer burden for burden's sake, which should not be countenanced, particularly at this stage of the case.  The Motion should therefore be denied and the parties should be directed to meet and confer about the appropriate scope and conditions of discovery.

## FACTUAL BACKGROUND[8]

### A.      NXP's 2010 Sale of the STB and DTV Businesses to Trident

9.      NXP Semiconductors is a privately held, limited liability company organized under the laws of The Netherlands and is a subsidiary of NXP B.V., a Dutch private company with limited liability that is wholly owned by NXP Semiconductors N.V., a Dutch public company with limited liability.  With operations in more than twenty-five (25) countries, NXP designs and manufactures High-Performance Mixed-Signal and Standard Products semiconductor solutions for a broad array of applications.  These innovations include the design and production of semiconductor devices ("Wafers").

10.      TMI, TMFE and NXP B.V. entered into a Share Exchange Agreement on October 4, 2009 (the "SEA"), which was completed on February 8, 2010 (the "2010 Transaction").  (*See* Declaration of Richard S. Cobb ("Cobb Decl.") ¶ 2 & Ex. A)  Pursuant to the SEA, NXP contributed two business lines to Trident—their STB and DTV businesses—*and* infused an additional $45 million in cash.  (SEA §§ 2.1-2.3.)  In exchange, NXP received a 60%

---

[8]      Many if not all of the facts not in the public record are known and can be verified by Trident.  For example, Trident has knowledge of NXP's lack of control over Trident, the parties' negotiation of the SEA, MSA, and any amendments thereto, NXP's late and limited involvement in a possible sale of the STB business prior to Trident's bankruptcy filings, Entropic's and the other STB bidder's insistence on the purchase of the Preference and Avoidance Claims, and the January 17, 2012 Agreement, all described *infra*.

equity interest in TMI. (*Id.*) NXP did not receive any cash or other compensation for the sale and cash infusion.

11.     As part of the 2010 Transaction, the parties executed the Stockholder Agreement. (*See id.* ¶ 3 & Ex. B.) The Stockholder Agreement, dated February 8, 2010, granted NXP the right to elect only four of the nine directors of TMI's Board. (Stockholder Agreement §1.1(a).) At least two of the NXP-designated directors had to be independent, and at least two of the NXP-designated directors had to have "substantial operating or industry experience." (*Id.* at (d).)   At all times, the Board of Directors was required to have a majority of independent directors. (*Id.* at (a)(i).) As to the election of directors and most other matters, NXP could only vote its common stock either in favor of the recommendations of the Board of Directors or in exact proportion with the votes of the non-NXP stockholders.   And although NXP did have discretion with respect to changes of control and amendments to Trident's bylaws or certificate of incorporation (*see id.* § 1.3), NXP never exercised this discretion.

12.     NXP designated Richard Clemmer, David Kerko, Philippe Geyres and A.C. D'Augustine as directors.  (*See id.* ¶ 4, Ex. C.)  When appointed to the Trident Board of Directors, Mr. Clemmer served as the President and Chief Executive Officer ("CEO") of NXP and Mr. Kerko served as a director of Kohlbreg Kravis Roberts & Co. L.P., one of NXP's major investors.  (*See id.*)  In contrast, Messrs. Geyres and D'Augustine had no affiliation with NXP prior to their appointment to the Trident Board of Directors.  In previous years, Mr. Geyres had served as CEO of Oberthur Card Systems and Executive Vice President of ST Microelectronics, and Mr. D'Augustine had served as a private investment company manager and chairman of Syntricity Corp.  (*See id.*)  Mr. Clemmer's term expired after the annual meeting on June 16, 2011, Mr. Kerko resigned on October 26, 2011 and Mr. D'Augustine resigned on April 20, 2012.

(*See id.* ¶ 5, Ex. D.)  Mr. Geyres remains on TMI's Board of Directors as an independent, NXP-designee.  (*See id.*)  Pursuant to a subsequent amendment to the Stockholder Agreement (described *infra* at ¶ 14), NXP did not replace Messrs. Clemmer and Kerko when they vacated their seats and has not replaced Mr. D'Augustine.

13.    Trident has never had the facilities to manufacture the Wafers utilized in the STB and DTV businesses, and therefore had to outsource this work.  As part of the 2010 Transaction, the parties entered into the MSA on February 8, 2010.  (*See* Cobb Decl. ¶ 6, Ex. E.) The MSA was a fully negotiated at arms'-length agreement entered into by sophisticated parties represented by counsel and arranged as an accommodation to Trident in order to enable it to maintain the STB and DTV businesses.  The services provided by NXP under the terms of the MSA included, among other things (i) the manufacturing of Wafers up to the process control module electrical test and any other services performed before a Wafer leaves the manufacturing facility; (ii) any operation performed on a Wafer after it has left the Wafer manufacturing site, including, but not limited to, Wafer testing, grinding, sawing, assembly, final testing, marking and packing; and (iii) certain customer services, order fulfillment, test and product engineering and business reporting (referred to as "Front End Services," "Back End Services," and "Purchasing and Supply Chain Services," respectively).  (*See* MSA §§ 2.1-2.7.)  The MSA also contained certain minimum purchasing requirements that declined over the life of the contract. (*Id.* § 5.1.)

B.    **Amendments Following the 2010 Transaction**

14.    The Stockholder Agreement was amended on April 28, 2011.  (*See id.* ¶¶ 7, Ex. F ("Amended Stockholder Agreement").)  Pursuant to that amendment, Trident's Board of Directors could be comprised of between seven and nine individuals (Amended Stockholder

Agreement § 1.1(a)(i)), of which NXP was only permitted to elect two directors, both of whom were required to have "substantial operating or industry experience" and to be independent. (*Id.* at (a)(ii), (d).) The remaining directors were to be elected by the stockholders. (*See id.* at (a)(ii).) In addition, NXP no longer had the right to appoint one of its directors to a Board committee. (*See id.* § 1.2 (deleting provisions on committee composition).) Moreover, NXP-designated directors were not permitted to serve on any Board committees. (*See id.* at (c) (providing mechanism for appointing at-large directors to committees, but no such mechanism for NXP-designated directors).)

        15.    Under the original terms of the MSA, NXP was to provide goods and services through June 30, 2011 (the "Finished Goods Period"). (*See* MSA § 2.1.) It was anticipated that by the close of the Finished Goods Period, Trident would have its own facilities that could accommodate the Wafer manufacturing and Trident would purchase remaining raw materials (the "Remaining Inventory") from NXP at the unadjusted "GAAP" book value. (*See id.* §§ 2.1, 2.5.) Going forward, NXP would continue to provide goods and services of a more limited nature through the expiration of the agreement on January 1, 2013. (*See id.* § 2.2.) The first amendment to the MSA, on March 29, 2011, reduced the price at which Trident was required to buy the Remaining Inventory at the expiration of the Finished Goods Period by $2.3 million. (*See id.* ¶ 8, Ex. G (the "March Amendment") § 2.) The second amendment to the MSA, which had an effective date of July 1, 2011, but was executed on November 8, 2011, made a number of changes to the MSA, including (i) extending the Finished Goods Period through January 1, 2013; (ii) deferring Trident's obligation to purchase the Remaining Inventory or undertake its own manufacturing processes; (iii) allowing Trident to pay invoices for work completed in a current month in prior months (instead of the current month); and (iv) extending

payment due dates to 90 days after being invoiced instead of 45. (*See id.* ¶ 9, Ex. H (the "July Amendment") §§ 2.1, 5.1, 5.2.)

C.    **Trident's Financial Performance**

16.    In the years preceding the acquisition of the STB and DTV businesses, Trident's performance varied wildly. For instance, in its fiscal year (i) 2005, Trident had a net loss of $30.2 million on revenues of $69 million; (ii) 2006, Trident had a net income of $26.2 million on revenues of $171.4 million; (iii) 2007, Trident had a net income of $30.1 million on revenues of $270.8 million; (iv) 2008, it had a net income of $10.2 million on revenues of $257.9 million; and (v) 2009, it had a net loss of $70.2 million on revenues of $75.8 million. (*See id.* ¶ 9, Ex. I ("2007 Form 10-K") at 23; *id.* ¶ 10, Ex. J ("2008 Form 10-K") at 26; *id.* ¶ 11, Ex. K ("2009 Form 10-K") at 27.) Trident's stated reason for the volatility was the nature of the business and its business model. (*See, e.g.,* 2009 Form 10-K at 17-18; *see also id.* at 12-21 (identifying lack of "long-term commitments from [its] customers," "dependence on sales to distributors," "intense competition [] in the market," and reliance on a "small number of large customers for a significant portion of [its] sales" as risk factors).) Over the years, Trident had relied upon strong sales to OEMs in Asia to generate the vast majority of its revenues:

- In its fiscal year 2005, approximately 46% of Trident's revenues were from sales to large purchasers, including Midoriya (a Sony distributor) (22%) and Samsung (10%), and over 97% percent of its sales were to Asia. (*See* 2007 Form 10-K at 7, 61-62.)

- In its fiscal year 2006, approximately 61% of Trident's revenues were from sales to large purchasers, including Samsung (31%) and Midoriya (a Sony distributor)

(30%), and approximately 95% of its revenues were from sales to Asia. (*See* 2008 Form 10-K at 31-32.)

- In its fiscal year 2007, approximately 66% of its revenues were from sales to large purchasers, including Samsung (41%) and Midoriya (a Sony distributor) (25%) and approximately 93% of its revenues were from sales to Asia. (*Id.*)

- In its fiscal year 2008, approximately 76% of its revenues were from sales to large purchasers, including Samsung (29%), Midoriya (a Sony distributor) (28%) and Philips (through contract manufacturers) (19%) and approximately 79% of its revenues were from sales to Asia. (*Id.*)

- In its fiscal year 2009, approximately 64% of its revenues were from sales to large purchasers, including Samsung (5%), Midoriya (a Sony distributor) (38%), Philips (10%) and Sharp (11%) and approximately 80% of its revenues were from sales to Asia. (2009 Form 10-K at 29, 34)

17.    As Trident disclosed in its 2009 Form 10-K:

Sales to our largest customers have fluctuated significantly from period to period primarily due to the timing and number of design wins with each customer and will likely continue to fluctuate significantly in the future.

Accordingly, a reduction in purchases of our products by any of these customers could cause our revenues to decline during the period and have a material adverse impact on our financial results. We may be unable to replace any such lost revenues by sales to any new customers or increased sales to existing customers. Our operating results in the foreseeable future will continue to depend on sales to a relatively small number of customers, as well as the ability of these customers to sell products that incorporate our products. In the future, these customers may decide not to purchase our products at all, purchase fewer products than they did in the past, or alter their purchasing patterns in some other way, particularly because: [i] substantially all of our sales are made on a purchase order basis, which permits our customers to cancel, change or delay product purchase commitments with little or no notice to us and without penalty; [ii] our customers may purchase integrated circuits from our competitors; [iii] our

customers may develop and manufacture their own solutions; or [iv] our customers may discontinue sales or lose market share in the markets for which they purchase our products.

(2009 Form 10-K at 12-13.)

18.     Following the 2010 Transaction, these risks and concerns were only exacerbated as the company ventured into new markets, grew significantly in size and the global recession persisted. (*See id.* ¶ 13, Ex. L ("2010 Form 10-K") at 12-24.). Trident reported that Samsung, its largest customer over the preceding three years, had decided to shift design and production in-house. (*See* 2010 Form 10-K at 42.) Trident further reported that it was encountering difficulties "winning new design sockets with many of the largest global TV OEMs" and was being harmed by "weak economic growth in many global markets [that] ha[d] reduced demand for [its] customers' products," resulting in slower product roll outs. (*See id.* ¶ 14, Ex. M ("Q3 2011 Form 10-Q") at 27.)

19.     These difficulties proved insurmountable for Trident on account of its inability to develop European and American markets and to quickly and cost effectively respond in the face of changing demand. (*See generally* 2010 Form 10-K at 12-24 (discussing risk factors).) In its fiscal year 2010, Trident had a $172 million net loss on revenues of $557.2 million. (*See* 2010 Form 10-K at 31). In marked contrast to the previous years, a significantly smaller portion of Trident's revenue was now being derived from sales to large OEMs and to the Asian market. Indeed, only 40% of its revenues were from sales to large purchasers, including Samsung (21%), Philips (13%) and a third manufacturer (6%) and only 68% of its revenues were from sales to Asia. (*See id.* at 9, 92-93.) In the first nine months of 2011, as Trident's distress was becoming more acute, its revenues from sales to large purchasers dropped to under 35%, including sales to Philips (13%) and Arrow Electronics (12%), and sales to Asia dropped to

under 55%. (Q3 2011 Form 10-Q at 25-26.) Over the same period, Trident reported a net loss of

$106 million on revenues of $238 million. (*Id.* at 3.)

20.     As Trident represented in bankruptcy filings:

> [T]he set-top box and television industries in which Trident focuses its
> operations have been undergoing rapid changes which have made it
> difficult for Trident to operate profitably. Trident has faced increased
> pricing pressure from Taiwanese SoC suppliers who have recently made
> great inroads in penetrating the market. Additionally, industry
> semiconductor inventory levels are currently elevated due to a slowdown
> in consumer electronics markets primarily driven by a slowdown in the
> Western economies, which has forced all market participants, including
> Trident, to further adjust pricing to manage inventory levels. These
> pricing pressures have been compounded by set-top box manufacturers
> who have been slower than anticipated in launching new products. As a
> result, suppliers have been straddled with higher than anticipated
> inventory levels and high development costs that cannot be offset by next
> generation product sales. In addition to these pricing and inventory
> pressures, there has also been a shift in the industry's supply chain
> dominated by Asian OEMs (original equipment manufacturers) and TV
> manufacturers are increasingly depending on manufacturing SoC and
> FRC (frame rate converter) components for high-end TVs in-house,
> reducing the need to look to outside suppliers for products.

(Debtors' Motion For Order Approving Assumption of Manufacturing Services Agreement, Dkt.

No. 270, at 3-4.)

### D.     Trident's STB and DTV Sales and the Bankruptcy Petitions

21.     The Equity Committee claims that "as early as the Spring 2011, Trident

undertook a marketing effort to identify a potential purchaser of the STB Business." (Mot. ¶ 17.)

NXP has no knowledge as to the accuracy of this statement. NXP was simply not aware of any

efforts to sell the STB business until November 2011. Moreover, even then, the only potential

purchaser disclosed to NXP was Entropic. At that time, NXP and Entropic entered into a

nondisclosure agreement and engaged in preliminary discussions concerning the potential sale.

The discussions between Trident and Entropic apparently stalled, as NXP did not hear anything

further from either Entropic or Trident as to a sale until after the bankruptcy filing.

22.    On January 4, 2012 (the "Petition Date"), TMI and TMFE each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

23.    On this same date, Trident filed the STB sale motion seeking, *inter alia*, to sell substantially all of their assets related to the STB business to Entropic, pursuant to an already executed STB APA between Trident and Entropic. (Debtors' Sale Motion, Dkt. No. 14.)  This is the first NXP heard about a sale of the STB business since December of the preceding year. NXP was not privy to, and played no role in, the execution of the STB APA.

24.    Included in the STB APA was Section 1.1(r), which provided for the purchase of "all preference and avoidance claims and actions of the Company arising under Section 544, 547, 548, 549, and 550 of the Bankruptcy Code relating to the Purchased Assets and/or Assumed Liabilities, including all actions relating to vendors and service providers used in the STB Business, counterparties to Assumed Contracts and Transferred Leases and Transferred Employees" (the "STB Preference Avoidance Actions").  (Debtors' Sale Motion, Dkt. No. 14, Ex. B, STB APA.)  As Trident represented to the Court:

> With respect to the issue of the sale of avoidance actions, that has been in the asset purchase agreement.  This was Entropic driven provision that was not an NXP only.  This is for everybody that . . . they're doing business with.  They don't want them subject to fraudulent conveyance or preference action which is not an atypical provision.  It's been in there from the beginning.  Entropic was adamant that this was a term and condition of the sale, as was the alternative bidder when they submitted their asset purchase agreement.

(Cobb Decl. ¶ 20, Ex. Q (March 2, 2012 Hearing Transcript on Equity Committee's Motion to Compel ("3-2-12 Hrg. Trans.")) at 18:16-19:8; *see also id.* at 42:11-42:23 ("[Trident] negotiated very hard with Entropic to carve this out, to limit this provision.  This was a dead stop issue for [Entropic] as we negotiated price and other matters."); *id.* at 52:22-53:2 ("And it is Entropic that, you know, demanded with the APA and demanded on the record at the auction that the issues

with respect to buying the avoidance claims and the preference claims with respect to everybody they do business with was non-negotiable.")

25.     Also included in the STB APA was the condition precedent that the purchaser enter into a manufacturing services agreement with NXP.  (STB APA § 2.3(l).)  As Trident represented to the Court, "NXP did not hold a veto.  It was for the buyer of the asset.  If the buyer wanted to deal with NXP because of their unique role in the Semiconductor business then they had to reach an appropriate arrangement with NXP.  If a buyer of the Set-Top Box asset had no need for NXP's supply of goods and services, NXP had no role in the process." (*See* 3-2-12 Hrg. Trans. 20:15-20:22.)

26.     In the second week of February 2012, Entropic reached out to NXP to begin negotiating a manufacturing servicing agreement.  From that date, through the date of the auction on February 23, 2012, NXP had robust and time-consuming negotiations with both Entropic and the other bidder for the STB business.  (*id.* at 20:22-25) (Trident: "[W]ith respect to what NXP did and how they did it, all the Debtors can advise the Court is, you know, we brought multiple bidders in.  NXP was ready, willing and able to negotiate with any of those bidders.").)

27.     On February 23, 2012, Trident conducted an auction for the assets related to the STB business.  At the conclusion of the auction, Entropic was named as having submitted the highest and best bid for the STB business assets.

28.     On March 15, 2012, Trident filed the DTV sale motion seeking, *inter alia*, to sell substantially all of their assets related to the DTV business to Sigma Designs, Inc.

("Sigma"),[9] pursuant to the DTV Asset Purchase Agreement ("DTV APA"). (Debtors' Sale

Motion, Dkt. No. 334.)  Like the STB APA, included in the DTV APA was the condition

precedent that:  "Sellers shall have entered into a Manufacturing Services Agreement with NXP

applicable to the Business [], in form and substance reasonably satisfactory to Purchasers and

Sellers shall have assigned the NXP MSA to Purchaser." (*Id.* Ex. B, DTV APA § 10.3(e).)

Again, NXP played no part in negotiating, drafting or reviewing this provision.

   29. No other bidder emerged for the DTV business and no auction was

conducted.  (Cobb Decl. ¶ 22.)

   30. Following the STB auction, NXP continued its negotiations with Entropic

for a manufacturing services agreement.  At the same time, NXP was negotiating with Trident a

manufacturing services agreement that would govern the remaining DTV business (the "DTV

MSA").  The STB sale closed on April 12, 2012.  As part of the STB sale, NXP and Trident

entered into an amended and restated manufacturing services agreement relating to the STB

business that was assumed by Trident and assigned to Entropic.  At this time, NXP and Trident

also entered into a DTV MSA that for the most part replicated the existing arrangement between

the two parties.

   31. After the STB sale closed, NXP and Sigma began negotiating the DTV

MSA, which had to be amended.  The DTV sale closed on May 4, 2012, and a manufacturing

services agreement is expected to be entered into between NXP and Sigma by May 11, 2012.

---

[9] Originally, a redacted version removing the purchaser's identity was filed with the Court.
On March 21, 2012, a revised APA was filed disclosing Sigma as the purchaser.  (Notice
of Filing of Revised TV Stalking Horse Agreement, Dkt. No. 366, Ex. A.)

E.    **Amounts Outstanding Owed to NXP**

32.    At the time of Trident's bankruptcy petitions, Trident and their affiliates owed NXP nearly $23 million for goods and services provided pursuant to the MSA.  As a result of the bankruptcy filings and the outstanding amounts owed, NXP ceased supplying Trident with goods and services, as did other Trident suppliers-turned-creditors.  (*See* Cobb Decl. ¶ 15, Ex. N ("Entropic Q1 2012 Earnings Call") at 3 ("Unaudited revenue in Q1 2012 was significantly impacted by supply constraints across the entire supply chain as suppliers, who became creditors . . . halted order processing through much of January and February."); *see also id.* at 7 ("[A]s creditors, of course, you don't want to ship anything while you're trying to get whatever liability back to you."); *id.* at 11 ("I think the supply constraint issue is . . . kind of a natural reaction.").)

33.    To meet Trident's needs to maintain supply, customers and the value of their businesses for the anticipated sales, NXP and Trident entered into an agreement on January 17, 2012 that enabled Trident to continue operating under the MSA through prepayments for goods and services as well as a $12 million payment to NXP by two non-debtor entities:  one a TMI subsidiary and one a TMI customer.  (*See* Cobb Decl. ¶ 16, Ex. O (the "January 17, 2012 Agreement").)  These were given in partial satisfaction of Trident's outstanding obligations to NXP.  (*See id.*)  Had it not been for these third-party payments, the entire $23 million (instead of just less than half) would have been paid by Trident as "cure" since it assumed and assigned the MSA to Entropic.[10]

---

[10]    The Equity Committee's quibbles over these payments are all the more baffling, given that it never even objected to the amendment, assumption, cure or assignment.  (*See* Cobb Decl. ¶ 21, Ex. R.)

F.    **The Equity Committee**

34.    On February 14, 2012, the Equity Committee was formed. (Cobb Decl. ¶ 17.)

35.    On February 24 and 27, 2012, the Equity Committee propounded subpoenas duces tecum on NXP B.V. and NXP Semiconductors in an attempt to hold the STB sale hostage. (Cobb Decl. ¶ 18, Ex. P.) The requests for documents and topics for examination broadly included "all facts and circumstances" related to (i) the Debtors' sale of the STB business, including actions by Trident's Board; (ii) the negotiation of ancillary agreements, such as the MSA; (iii) payments received by NXP from the Debtors in the two years prior to the Petition Date; (iv) the treatment of the WIP Note between NXP and Trident that represented the value of the Remaining Inventory held for Trident by NXP; (v) any claim NXP may assert against the Debtors; and (vi) the purchase and sale of Trident's stock. (*See id.*)

36.    NXP understands that similar discovery was sought from Trident. (*Id.* ¶ 18.) However, Trident and the Equity Committee limited Trident's production of documents to the following two categories:  (i) documents related to NXP's participation in the corporate governance of either TMI or TMFE with respect to the sale of assets by Trident to Entropic or any competing bidder; and (ii) communications related to NXP's participation, if any, in the exercise of Trident's business judgment with respect to any transaction to dispose of Trident's STB business or DTV business within the past twelve months. (*Id.* ¶ 19; Equity Committee's Motion to Compel, Dkt. No. 269, at 2; *see also* 3-2-12 Hrg. Trans. 15:3-15:11, 54:19-54:25.)[11]

---

[11]    It appears that the Equity Committee has not sought any further information, either by document or witness, from Trident. (*See* Mot. ¶ 23.)

37.     As described above, at the time the Equity Committee propounded its first set of subpoenas, NXP was dedicating significant resources to assist Trident and interested STB bidders in negotiating a manufacturing services agreement and other ancillary documents. (*See supra* ¶¶ 26-30) To exert leverage, the Equity Committee filed an emergency motion to compel discovery against NXP. (Cobb Decl. ¶ 20.)

38.     The Court denied the motion, stating that "[t]he Debtor has responded to discovery. Now it may not be exactly what the Equity Committee would like, but the Equity Committee is in a position to, if appropriate, negotiate with the Debtors. The Debtors probably are going to want to satisfy the Equity Committee to the extent that they can because they need the sale and they're here." (3-2-12 Hrg. Trans. 59:7-14; *see also id.* 60:1-5 ("[The Equity Committee] has been put in dialogue with the entity that has the highest incentive to produce documents [referring to Trident]. And also has the greatest ability to produce documents.").)

39.     On March 21, 2012, the Equity Committee provided NXP with examination topics and document requests it intended to seek pursuant to Rule 2004 from NXP B.V., NXP Semiconductors and Mr. Clemmer. (*See* Cobb Decl. ¶ 23, Ex. S (the "March 2012 Discovery").[12]

40.     On March 27, 2012, NXP's counsel discussed the March 2012 Discovery with counsel for the Equity Committee. (*See id.* ¶ 24.) With the close of the STB business sale to Entropic looming, and the identification of Sigma as a buyer for the DTV business, NXP was pressed negotiating manufacturing servicing agreements with each of these buyers as well as Trident. In addition, NXP was working on ancillary issues relating to these agreements, such as

---

[12]     By way of its Motion, the Equity Committee further expands its overreaching, seeking the discovery from all four NXP-appointed directors and not just Mr. Clemmer.

intellectual property and assignment concerns.    NXP's counsel identified these serious constraints to the Equity Committee's counsel, represented that they would discuss the March 2012 Requests once the sales closed and made clear that NXP would comply with some discovery at that time, taking into account applicable privacy laws as the NXP entities are Dutch companies. (*Id.*) NXP's counsel also raised concerns that the discovery appeared overly broad. (*Id.*)

41.    Rather than engaging in a meaningful meet-and-confer process, on April 27, 2012, with the DTV sale pressing forward, the Equity Committee filed the instant Motion.

## ARGUMENT

### A.    Standard on a Rule 2004 Motion

42.    Rule 2004 permits discovery "relate[d] only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. R. Bankr. P. 2004(b).  "The purpose of the examination is to enable the trustee to discover the nature and extent of the bankruptcy estate." *In re Wash. Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (citing *In re Drexel Burnham Lambert Grp., Inc.*, 123 B.R. 702, 708 (Bankr. S.D.N.Y. 1991)).

43.    Legitimate goals of Rule 2004 examinations include "discovering assets, examining transactions, and determining whether wrongdoing has occurred." *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (quotations omitted).  Although it has in passing been compared to a "fishing expedition," Rule 2004 does have limits:  it "may not be used for purposes of abuse or harassment and it cannot stray into matters which are not relevant to the basic inquiry." *In re Wash. Mut.*, 408 B.R. at 49 (quotations omitted).

44.     Prior to filing a motion pursuant to Rule 2004, the moving party must meet and confer with the proposed examinee to reach an agreement on, *inter alia*, the scope of the examination and production.[13]   The Equity Committee has failed to do so in a meaningful way.

**B.**     **The Motion Is Premature and Should Be Denied.**

45.     There can be no doubt that the Motion is premature.  NXP is amenable to responding to reasonably tailored discovery on a reasonable timeline, and already has expressed this position to the Equity Committee.  The Equity Committee has, however, refused to engage in further conversations without justification, professing instead that "[t]his is the quintessential case for discovery pursuant to Bankruptcy Rule 2004."  (Mot. ¶ 1.)  The meet-and-confer requirement is not simply an empty procedural hurdle.  Local Rule 2004-1 requires the parties to participate in meet-and-confer discussions for a reason:  further discussions with NXP could

---

[13]    Local Rule 2004-1 provides:

(a) Conference Required.  Prior to filing a motion for examination or for production of documents under Fed. R. Bankr. P. 2004, counsel for the moving party shall attempt to confer (in person or telephonically) with the proposed examinee or the examinee's counsel (if represented by counsel) to arrange for a mutually agreeable date, time, place and scope of an examination or production. If an agreement is reached, no motion shall be required, but a notice setting forth the identity of the examinee, and the date, time, place and scope of the examination or production shall be filed and served in accordance with this Local Rule.

(b) Certification of Conference Required.  All motions for examination or production under this Local Rule shall include a certification of counsel that either (i) a conference was held as required and no agreement was reached or (ii) a conference was not held and an explanation as to why no conference was held.

Del. Bankr. L.R. 2004-1.

have obviated the filing of the Motion and conserved judicial resources.[14]  Because the Equity

Committee has propounded overbroad and highly burdensome discovery, the meet-and-confer

process is vital to ensure that any search for responsive documents and information would be

limited to matters that are relevant to its possible inquiries in order to avoid undue burden on

NXP.

> 46.    The Equity Committee's attempt to end-run the meet-and-confer process

is particularly troubling given that this Court has already stated that Trident should be the Equity

Committee's first resort for the requested information.  (*See* 3-2-12 Hrg. Trans. 59:8-14, 60:1-5.)

*Cf.* 11 U.S.C. § 343 (requiring *debtor* to submit to examination at initial meeting of creditors); *In*

*re Duratech Indus., Inc.*, 241 B.R. 283 (E.D.N.Y. 1999) (denying Rule 2004 motion where

information sought was available from public sources).  It cannot be denied that Trident would

have most, if not all, the information the Equity Committee seeks.  (*See, e.g.*, 3-2-12 Hrg. Trans.

60:1-5.)  To be sure, the Equity Committee admits as much.  (Mot. ¶ 4.)  Yet, the Equity

Committee prefers to spare Trident and instead squeeze NXP.  (*Id.* ¶ 23 ("Mindful of

administrative expense burn . . . the Requested Examination is narrow in the first instance.  By

way of example, the Equity Committee has not sought approval to propound discovery on the

Debtors, their officers, or the non-NXP Directors.").)  The Equity Committee's refusal to comply

with Local Rule 2004-1 would justify this Court exercising its discretion to deny the Motion.  *Cf.*

*In re Rhodes Cos.*, 2012 WL 1512509, at *6 (D. Nev. Apr. 30, 2012) (denying motion for

---

[14]    As the Equity Committee is undoubtedly aware, the DTV sale was to close the week
before the instant opposition was due and two weeks before the Court's hearing on the
Motion.  As NXP indicated, it would be available to discuss a reasonable course at that
time.  That the Equity Committee elected a different course to ensure that NXP would
have to file unnecessary briefing at a time when it knew NXP would be negotiating issues
critical to closing the DTV sale only demonstrates the Equity Committee's lack of good
faith.

protective order where counsel failed to meet and confer as required by local bankruptcy rule); *Flom* v. *Tharaldson Prop. Mgmt.*, 2003 WL 23696040, at * 1 (Bankr. D. Del. Aug. 29, 2003) (denying motion for protective order where counsel failed to meet and confer as required by local rules).

C.    **The Motion is Designed for Purposes of Abuse and Harassment and Should Be Denied.**

47.    The Equity Committee cannot plausibly claim that the discovery it seeks is "narrow in the first instance" or tethered to any "basic inquiry" concerning the bankruptcy as Rule 2004 requires. The discovery expansively seeks "all information" or "all documents" from NXP and the four NXP-appointed directors concerning topics as broad as the 2010 Transaction, the MSA, and amendments thereto. In addition, the subpoenas address topics not even discussed in the Motion, such as the Transition Services Agreement and NXP's purchase or sale of shares of TMI stock. In both respects then—breadth of each request and topics—the discovery goes well beyond what is permissible under Rule 2004. *See, e.g., In re GHR Energy Corp.*, 33 B.R. 451, 455 (Bankr. D. Mass. 1983), ("A Rule 2004 examination is not intended to provide the *debtors* unlimited access to the internal affairs of its creditors and those employed by its creditors." (emphasis in original)).

48.    There can be no doubt that the Equity Committee's Motion is intended for harassment purposes alone. The Equity Committee is well aware that there is no basis in fact for its theories as made clear below:

i.    "Cash Dissipation" (Mot. ¶¶ 26-28.)

49.    The Equity Committee's suggestions that NXP abused its "control" over Trident by forcing Trident to continue to operate at a loss are completely baseless. (*See, e.g.,* Mot. ¶¶ 2-3, 14-17, 28, 30.) NXP was never in a position to control Trident and force it to take

actions not in its best interest. Although NXP was Trident's majority owner, NXP was subject to significant restrictions under the terms of the Stockholder Agreement and did not have unfettered control over Trident. (*See supra* ¶¶ 11-12, 14 (discussing restrictions on board composition and voting rights).) Given the restrictions of the Stockholder Agreement, it is no wonder that the Equity Committee resorts to obfuscation and dissembling. The Equity Committee points to the facts that for (i) less than a year a *former* NXP employee served as an executive, (ii) less than a year one of the *independent* directors selected by NXP served as interim CEO, and (iii) a little over a year one of the directors selected by NXP also served as NXP's CEO. (See Mot. ¶¶ 2, 12.) But that is all.[15] None of these facts suggest that NXP had the ability to control Trident's business decisions and operations. In any event, Trident surely has information in its possession that will disprove this theory.

       50.     Even setting that aside, there is no rational basis for assuming that NXP would have exercised its control to destroy a company in which it was so completely invested. It is difficult to see how NXP would benefit from having its equity stake in Trident—the sole value it received in exchange from the sale of its STB and DTV businesses—eviscerated in bankruptcy or how it benefits from receiving only a fraction of the amounts it was owed under the MSA (and its amendments) and sharing the bankruptcy estate with other creditors. The Equity Committee certainly does not offer any explanation, because there is no credible reason why NXP would act to its and Trident's detriment.

---

[15]    The discussion concerning the appointment of Philippe Geyres, a widely respected businessman with no apparent ties to NXP, as interim CEO following the departure of Summers Couder is indicative of the Equity Committee's grasping at imaginary straws of malfeasance. (*See* Mot. ¶ 12.)

51.    In actuality, the MSA reflected market terms, as it was the product of arms'-length negotiation by sophisticated parties, who were represented by counsel. (*See supra* ¶ 13.)  And during the course of Trident's businesses, NXP worked with Trident to provide it with greater flexibility and control, including through amendments to the Stockholder Agreement and the MSA. (*Id.* ¶¶ 14-15.)  As a result of these amendments, NXP *reduced* its position on the Board of Directors and ceded even greater autonomy to Trident. (*Id.*)  NXP also reduced the price at which Trident was required to purchase the NXP inventory by $2.3 million and postponed the date on which the purchase was required to occur by eighteen months. (*Id.* ¶ 15.)  Moreover, NXP extended the time frames by when Trident would be required to pay for completed work. (*Id.*)

52.    While these were significant accommodations for Trident's benefit, apparently the Equity Committee does not believe that these efforts were sufficient.  What the Equity Committee ignores, however, is the dispositive fact that the SEA and the various ancillary agreements, including the MSA, were negotiated well *before* NXP acquired its majority interest in TMI.  Each of these agreements represents the product of arms'-length negotiations at which time NXP owed no fiduciary duties to Trident.  *See, e.g., Binks* v. *DSL.net, Inc.*, 2010 WL 1713629, at *11 & n.79 (Del. Ch. Apr. 29, 2010) ("Binks's assertions that MegaPath owed DSL shareholders fiduciary duties prior to obtaining a controlling position '[b]y virtue of its ability to control the future of DSL' and that 'MegaPath's fiduciary duties began when it affirmatively sought to control DSL's fate' misstate Delaware law."); *see also In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 47-49 (Del. 2006) (noting a corporate officer does not have fiduciary duties prior to becoming corporate officer).  Under the terms of the MSA, NXP had the right to certain payments in exchange for the provision of goods and services.  NXP was not required to waive

its contractual rights to satisfy any fiduciary duties.  *See Mendel* v. *Carroll*, 651 A.2d 297, 306 (Del. Ch. 1994) (noting a controlling stockholder does not breach fiduciary duties simply by acting in its own interest); *see also Odyssey Partners, L.P.* v. *Fleming Cos.*, 735 A.2d 386, 415 (Del. Ch. 1999) (stating fiduciary duty does not require self-sacrifice); *Jedwab* v. *MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) (same).  In fact, NXP could have been liable to its own shareholders for excusing Trident from its contractual obligations.

53.    The Equity Committee also ignores the fact that at the time of TMI's and TMFE's filing of their bankruptcy petitions, *they owed NXP* close to $23 million for unpaid goods and services under the MSA.  (*See supra* ¶ 32.)

ii.    Prepetition Marketing Process (Mot. ¶¶ 29-30.)[16]

54.    NXP was first informed of a possible sale of the STB business to Entropic in November 2011 (*see supra* ¶ 21), not in the Spring 2011.  (Mot. ¶ 17.)  On November 16, 2011, NXP entered into a nondisclosure agreement with Entropic, and the companies shared a term sheet for a manufacturing services agreement.  However, NXP did not hear any further from either Trident or Entropic about the proposed sale until early February, 2012.  (*See supra* ¶¶ 21-23.)  NXP could therefore have no "undue influence over the decision not to sell the STB Business prepetition."  (Mot. ¶ 30.)

55.    The Equity Committee is well aware of this impossibility.  As Trident represented to both the Court and the Equity Committee:  "NXP had no role in the Debtors governance and have not for the better part of the last seven months.  They stepped off the board and had no role what so ever.  We produced the board minutes as [the Equity Committee]

---

[16]    The fact that NXP did not exercise control over Trident (*supra* ¶ 49) also undermines the Equity Committee's claims with respect to the "Prepetition Marketing Process" (Mot. ¶¶ 29-30) and the "Postpetition Sale Process and Postpetition Transfers." ( Mot. ¶¶ 31-34.)

requested and had no involvement what so ever from an equity or fiduciary standpoint with respect to the Debtors' decisions to proceed here." (3-2-12 Hrg. Trans. 20:4-20:10.)

56.    In addition, the two document requests Trident responded to sought (i) documents relating to NXP's participation in the corporate governance of either TMI or TMFE with respect to the sale of assets by Trident to Entropic or any competing bidder; and (ii) communications related to NXP's participation, if any, concerning the exercise of Trident's business judgment with respect to any transaction to dispose of Trident's STB Business or DTV business within the past twelve (12) months. (Equity Committee's Motion to Compel, Dkt. No. 269, at 2-3; *see also* 3-2-12 Hrg. Trans. 15:3-15:11, 54:19-54:25.) The Equity Committee admits Trident had no responsive documents on these topics. (*See* 3-2-12 Hrg. Trans. 15:9-15:11, 28:15-28:17.)

iii.    <u>Postpetition Sale Process and Postpetition Transfers (Mot. ¶¶ 31-34.)</u>

57.    With respect to the "postpetition sale process," the Equity Committee identifies two areas for inquiry: NXP's participation in the negotiation of the STB APA and the STB Preference Avoidance Actions conveyed through the STB APA. (Mot. ¶¶ 31-32.) Of course, these are one and the same, since the only criticism the Equity Committee launches against NXP with respect to the STB business sale is the transfer of these potential actions. Yet, again, these purported areas for inquiry are at fundamental odds with the facts: The APA was executed without NXP's participation or involvement; and the sale of the STB Preference and Avoidance Actions was insisted upon by both bidders to the STB business—an entirely expected and unremarkable requirement in the bankruptcy sale context where a critical vendor has a supply contract with the debtors which is needed by the purchaser post-sale. (*See supra* ¶¶ 32-33.)

58.    With respect to the so-called "postpetition transfers," NXP was owed nearly $23 million dollars at the time of Trident's bankruptcy filings. (*See supra* ¶ 32.) Because of these outstanding obligations and the risk of additional non-payments going forward, NXP exercised its rights under the MSA and suspended production. (*Id.*) Trident and its nondebtor affiliates desired to alleviate these supply constraints in order to preserve the value of the businesses Trident planned to sell. (*Id.* at 33)  To address these concerns, NXP and Trident entered into the January 17, 2012 Agreement, pursuant to which Trident made prepayments for goods and services going forward—an arrangement expressly permitted by the Bankruptcy Code. *See* 11 U.S.C. § 363(c)(1).  Moreover, $12 million was paid to NXP on account of the antecedent debt, by two nondebtor entities:  a Trident nondebtor subsidiary and a Trident customer. (*See supra* ¶ 33.)  No claims by Trident against NXP can be maintained on these facts.  As a threshold matter, the payments on antecedent debt were made by nondebtors and assisted the estate by maintaining the value of Trident's assets and partially satisfying a claim that would otherwise be asserted against the estate.  *Second*, Trident would have been responsible for the entire $23 million (including the $12 million paid by third parties) since it assumed and assigned the MSA and therefore was immediately responsible for the entire "cure." Trident did in fact pay the remaining "cure," without any objection by the Equity Committee. (Cobb Decl. ¶ 21 & Ex. R at 7:5-7:10.)  *Third*, the financial accommodation that provided for prepayments assisted Trident by ensuring continued access to goods and services.  Contrary to reflecting a breach of fiduciary duties owed to Trident as a possible controlling shareholder (which NXP was not (*see supra* ¶ 49)), the January 17, 2012 Agreement was for Trident's benefit.

C.      **The Equity Committee Cannot Avoid the Procedures of the Hague Convention.**

59.     The Supreme Court has instructed that courts must undertake a "comity analysis" to determine whether the Hague Convention should be used for obtaining documents and other information located within the territory of a foreign signatory. *Societe Nationale Industrielle Aerospatiale* v. *U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 544 & n.28 (1987). The Supreme Court enunciated a list of factors courts should weigh in engaging in such a "comity analysis": (1) the importance of the documents or information requested to the litigation; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the requests would undermine important interests of the state where the information is located. *See Aerospatiale*, 482 U.S. at 544 n.28. Bankruptcy courts construing the holding in *Aerospatiale* have articulated two additional factors for consideration: (6) the good faith of the party resisting discovery; and (7) the hardship of compliance on the party or witness from whom discovery is sought. *See In re Global Power Equip. Grp. Inc*, 418 B.R. 833, 847 (Bankr. D. Del. 2009); *see also Trueposition, Inc.* v. *LM Ericsson Tel. Co.*, 2012 WL 707012, at *2 (E.D. Pa. Mar. 6, 2012); *Strauss* v. *Credit Lyonnais, S.A.*, 249 F.R.D. 429, 435, 454-56 (E.D.N.Y. 2008).

60.     Although the Supreme Court referred to the Hague Convention as a "permissive supplement" in *Aerospatiale*, it did not intend to "create a system that allows litigants to obtain discovery under the Federal Rules as of right" or "discard the treaty as an unnecessary hassle." *See S.E.C.* v. *Stanford Int'l Bank, Ltd.,* 776 F. Supp. 2d 323, 327-28 (N.D. Tex. 2011) (denying request to obtain discovery under Federal Rules out of deference to Hague

Convention); *see also In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 306 (3d Cir. 2004) (Roth, J., concurring) ("The service provisions of the Hague Convention were adopted by the President and approved by a unanimous vote of the Senate in 1972.  The provisions then became the 'law of the land,' coexisting with other federal law such as the Federal Rules of Civil Procedure.").  Instead, it cautioned that courts "should exercise special vigilance to protect foreign litigants from the danger [of] unnecessary, or unduly burdensome" discovery. *Aerospatiale*, 482 U.S. at 546.

61.    In this case, each of the *Aerospatiale* factors weighs in favor of requiring that the Equity Committee proceed through the Hague Convention:

62.    *First*, the documents or information to be obtained pursuant to the subpoenas are purely exploratory.  (Mot. ¶ 1 ("Examination therefore is warranted into NXP's relations and dealings with the Debtors in order to unearth facts which may give rise to claims and causes of action . . . ."), ¶ 38 ("The can be no question that NXP had dealings with the Debtors and/or their representatives.  As such, they are subject to examination under Bankruptcy Rule 2004 particularly in order to unearth potential estate claims and causes of action.").) Despite having a number of the central documents and access to more through Trident,[17] the Equity Committee has not pointed to a single document that would support its supposed need for unfettered and unbridled discovery at this stage of the case.  Instead, all the facts highlight that such claims cannot lie. (*See supra* ¶¶ 49-58.)

---

[17]    These include Trident's Board Minutes for the relevant time period and any documents Trident has related to (i) NXP's participation in the corporate governance of either TMI or TMFE with respect to the sale of assets by Trident to Entropic or any competing bidder; and (ii) communications related to NXP's participation, if any, in the exercise of Trident's business judgment with respect to any transaction to dispose of Trident's STB business or DTV business within the past twelve (12) months.

63.     *Second*, the discovery is anything but specific.  It is unduly broad in every respect:  the scope of each request; the expansive topics included that are not even mentioned in the Motion; and the two entities and four individuals they are propounded against.  (*See supra* ¶¶ 47.)

64.     *Third*, nearly all, if not all, of the information is located in The Netherlands.  NXP B.V. and NXP Semiconductors are Dutch companies.  Nearly all, if not all, of the individuals that participated in the 2010 Transaction, the MSA, the amendments to the MSA, the negotiations with Entropic and Sigma, as well as the negotiation of the January 17, 2012 Agreement (each of which are the subjects of the Equity Committee's inquiries), are located in The Netherlands and (to a limited extent) in Asia.  Nearly all of the information is, therefore, located abroad.  (Declaration of James Casey in Support of NXP's Response ("Casey Decl.") ¶¶ 2-3); *Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d at 333-34 (finding fact that requested information originated in Switzerland weighed against the party requesting discovery).

65.     *Fourth*, the substance of the information sought by the Equity Committee is available from parties central to this action—TMI and TMFE.  In addition, NXP represented to the Equity Committee that it will respond to reasonably tailored discovery requests.  The Equity Committee's outright refusal to exhaust these available resources is not a justifiable reason to burden NXP.

66.     *Fifth*, the Motion is nothing short of a litigation tactic to burden NXP and exert some nuisance value from them.  The Equity Committee has pointed to no compelling interests of the United States that would warrant evading the Hague Convention for their purposes.  Instead, the E.U.'s interest in maintaining and enforcing its data protection restrictions (*see infra* ¶ 68) outweighs any overreaching discovery for purely exploratory reasons.  *See, e.g.*,

*Tiffany (NJ) LLC* v. *Qi Andrew*, 276 F.R.D. 143, 156-58 (S.D.N.Y. 2011).  And, in any event, the

Hague Convention "inherently[] and adequately" balances any competing interests.  *Stanford*

*Int'l Bank, Ltd.*, 776 F. Supp. at 330-341.

67.    *Sixth*, as the Equity Committee admits, NXP has acted in good faith.

(Mot. ¶ 45.)

68.    *Seventh*, the hardship to NXP is significant.  Putting aside the expansive

scope of the discovery, NXP confront serious obstacles to any compliance with the proposed

subpoenas, such as E.U. Privacy Laws.  (*See* Casey Decl. ¶ 4.)  Although the Equity Committee

blithely attempts to paint the hardship to NXP as "minimal" (*id.*), NXP's concerns are far from

imaginary.  The E.U. has imposed rigorous data protection laws through Privacy Directive

95/46/EC ("E.U. Privacy Directive")[18] that require E.U. member states (including The

Netherlands) to prevent the transfer of "personal data," broadly defined as "any information

relating to an identified or identifiable natural person" (E.U. Privacy Directive, art. 2(a)), to a

third country unless the third country provides an adequate level of data protection.  *Id.* art.

25(1).  Furthermore, if a specific third country is found to lack adequate data protection, E.U.

member states are required to take affirmative steps to prevent the transfer of personal data to

that country.  *Id.* at 25(4).  The E.U. position is that the United States lacks adequate data

protection standards.  *See* Article 29 Working Party, Opinion 10/2006 on the Processing of

Personal Data by the Society for Worldwide Interbank Financial Telecommunication (SWIFT),

at 21, 01935/06/EN, WP 128 (Nov. 22, 2006).  As a result, effectuating a transfer of data solely

for compliance with U.S. discovery rules requires extra efforts by the E.U. member state,

---

[18]    The Dutch Data Protection Act, *Wet beschermingpersoonsgegevens* (known by its Dutch
initials "WBP") implements Directive 95/46/EC into Dutch law.

including obtaining the consent of each person identifiable in the documents sought. Commission Decision 2000/520/E.C., 2000 (O.J.) (L 215) 7, 47 (E.C.)  This would mean that, for each document responsive to the subpoenas, NXP would have to identify each individual named in that document and obtain consent to its production.  As the Court must certainly appreciate, this is a potentially monumental task given the scope of the subpoenas.  And the risk to noncompliance includes criminal and civil penalties.  (*See*  WBP Articles 65 (ff), 66 75(1)-(2); *see also Tiffany*, 276 F.R.D. at 151-60 (finding that because certain Chinese regulations would potentially subject the responding banks to civil and criminal punishment if they produced customer information, the court concluded that this element weighed in favor of the discovery targets).

69.    Each of the factors courts consider in connection with the comity analysis weighs overwhelmingly in favor of NXP, and the Equity Committee should be required to proceed with discovery through the applicable provisions of the Hague Convention.  *See, e.g.*, *Tiffany*, 276 F.R.D. at 161 (ordering the same where five of the seven factors weighed in favor of discovery targets); *see also, e.g.*, *Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d at 331 (same where "the weightiest factors," including national interests and hardship associated with compliance, weighed in favor of discovery targets).

70.    It also bears emphasis that NXP has not filed a proof of claim in these actions, and has not subjected itself to the general jurisdiction of this Court.   In similar circumstances, courts have not hesitated to order discovery proceed through the Hague Convention.  *See, e.g.*, *Pronova BioPharma Norge AS* v. *Teva Pharma., USA, Inc.*, 708 F. Supp. 2d 450, 453 (D. Del. 2010) ("The parties' briefing makes clear that the inventors and declarants subject to the defendants' motion are not parties to the lawsuit, have not voluntarily subjected

themselves to discovery, are citizens of either Norway or Sweden, and are not otherwise subject to the jurisdiction of this court. Under these circumstances, it is appropriate to turn to the Hague Evidence Convention."); *Abbott Labs.* v. *Impax Labs., Inc.*, 2004 WL 1622223, at *2 (D. Del. July 15, 2004) ("As a threshold matter, I agree with the parties that application of the Hague Convention is appropriate here, as the witnesses are not parties to the lawsuit, have not voluntarily subjected themselves to discovery, are citizens of France, and are not otherwise subject to the jurisdiction of this court."); *Tulip Computers Int'l B.V.* v. *Dell Computer, Corp.*, 254 F. Supp. 2d 469, 474 (D. Del. 2003) ("Resort to the Hague Evidence Convention in this instance is appropriate since both Mr. Duynisveld and Mr. Dietz are not parties to the lawsuit, have not voluntarily subjected themselves to discovery, are citizens of the Netherlands, and are not otherwise subject to the jurisdiction of the Court."); *Orlich* v. *Helm Brothers, Inc.*, 560 N.Y.S.2d 10, 14 (N.Y. App. Div. 1990) ("When discovery is sought from a non-party in a foreign jurisdiction, application of the Hague [Evidence] Convention, which encompasses principles of international comity, is virtually compulsory."). And NXP's forced limited involvement—*i.e.* filing an opposition to the Equity Committee's first motion to compel, appearing for the hearing on that motion, and attending bankruptcy proceedings where the Court set schedules and otherwise determined matters affecting NXP's rights (as counterparties to contracts and expected service providers for the new purchasers)—does not vary this outcome. Otherwise, a debtor or other entity in a bankruptcy (which, unlike typical litigation proceedings, commonly include a panoply of interests) could avoid the Hague Convention by pursuing any meritless relief simply to require a foreign entity to appear. This, of course, is not only inappropriate at the foreign entity level, but also for the expectations of the foreign state that the Hague Convention is meant to protect.

71.    *In re Global Power Equipment Group, Inc.*, 418 B.R. 833 (Bankr. D. Del. 2009), on which the Equity Committee exclusively relies (Mot. ¶¶ 40-46), is inapposite. There, the bankruptcy plan administrator sought discovery from one of the putative creditors of the debtor concerning the nature of its claim against the bankruptcy estate. *Id.* at 838-41. After going through the *Aerospatiale* analysis, the court concluded that discovery could be had through the Federal Rules of Civil Procedure rather than the Hague Convention. *See id.* at 851. However, the court in *Global Power* was considering the discovery requests in the context of a contested matter, to which the Federal Rules of Civil Procedure governing discovery presumptively applied. *See, e.g., id.* at 835 n.1, 836, 839, 840, 841 n.3, 847. That is not the case here.

## CONCLUSION

WHEREFORE, for the foregoing reasons, NXP respectfully requests that the

Court deny the Motion.

Dated: May 9, 2012
       Wilmington, Delaware

Respectfully submitted,

*/s/ Richard S. Cobb*

Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
LANDIS RATH & COBB LLP
919 Market Street Suite 1800
Wilmington, DE 19899
Tel:  (302) 467-4400
Fax:  (302) 467-4450
landis@lrclaw.com
mcguire@lrclaw.com

and

Michael H. Steinberg
Orly Z. Elson
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, California 90067-1725
Tel:  (310) 712-6600
Fax:  (310) 712-8800
steinbergm@sullcrom.com
elsono@sullcrom.com

Tracy Richelle High
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, N.Y. 10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588
hight@sullcrom.com

*Co-counsel for NXP B.V. and NXP*
*Semiconductors Netherlands B.V.*