# Exhibit 1

**(Asset Purchase Agreement)**

**Execution Version**

---

## MASTER PURCHASE AND SALE AGREEMENT

### Dated as of June __, 2012

### By and Between

### SIGMA DESIGNS TECHNOLOGY NETHERLANDS B.V.

### as Purchaser,

### and

### TRIDENT MICROSYSTEMS, INC.

### TRIDENT MICROSYSTEMS (FAR EAST) LTD.

### TRIDENT MICROSYSTEMS (NEDERLAND) B.V.

### as Sellers.

---

# TABLE OF CONTENTS

| | | |
|---|---|---|
| Article I | Transfer of Employees; Acknowledgement, Discharge and Release of Certain Obligations; Purchase and Sale of the Purchased Assets; Assumption of Assumed Liabilities; | 1 |
| 1.1 | Transfer of Employees | 1 |
| 1.2 | Purchase and Sale of the Purchased Assets | 1 |
| 1.3 | Assumption of Liabilities | 2 |
| Article II | Consideration; Payment | 2 |
| 2.1 | Consideration | 2 |
| 2.2 | Payment | 2 |
| Article III | Closing and Termination | 3 |
| 3.1 | Closing | 3 |
| 3.2 | Closing Deliveries by Sellers | 3 |
| 3.3 | Closing Deliveries by Purchasers | 3 |
| 3.4 | Termination of Agreement | 3 |
| 3.5 | Effect of Termination | 4 |
| Article IV | Representations and Warranties of the Sellers | 4 |
| 4.1 | Organization and Qualification | 4 |
| 4.2 | Authorization of Agreement | 4 |
| 4.3 | Conflicts; Consents; Compliance with Law | 5 |
| 4.4 | Title to Purchased Assets; Sufficiency and Condition of Assets | 5 |
| 4.5 | Employees | 5 |
| Article V | Representations and Warranties of Purchasers | 5 |
| 5.1 | Organization and Qualification | 5 |
| 5.2 | Authority | 5 |
| 5.3 | Conflicts; Consents | 6 |
| Article VI | Covenants and Agreements | 6 |
| 6.1 | Reasonable Efforts; Cooperation | 6 |
| 6.2 | Further Assurances | 6 |
| 6.3 | Deletion/Destruction of Confidential Information | 6 |
| Article VII | Conditions to Closing | 6 |
| 7.1 | Conditions Precedent to the Obligations of the Purchaser and Sellers | 6 |
| 7.2 | Conditions Precedent to the Obligations of Sellers | 6 |

**Execution Version**

| | | |
|---|---|---|
| 7.3 | Conditions Precedent to the Obligations of the Purchaser | 7 |
| Article VIII | Miscellaneous | 7 |
| 8.1 | Payment of Expenses | 7 |
| 8.2 | Survival of Representations and Warranties; Survival of Confidentiality | 7 |
| 8.3 | Entire Agreement; Amendments and Waivers | 7 |
| 8.4 | Execution of Agreement; Counterparts; Electronic Signatures | 7 |
| 8.5 | Governing Law; Jurisdiction; Waiver of Jury Trial | 8 |
| 8.6 | Notices | 8 |

Execution Version

# INDEX OF EXHIBITS

EXHIBIT A          DEFINITIONS

EXHIBIT B          BILL OF SALE

EXHIBIT C          ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT D          FACILITY USE AGREEMENT

EXHIBIT E          ENTROPIC ASSIGNMENT AND ASSUMPTION AGREEMENT

EXHIBIT F          EMPLOYEE TRANSFER LETTER

EXHIBIT G          FORM OF EMPLOYEE RELEASE

Execution Version

## MASTER PURCHASE AND SALE AGREEMENT

This MASTER PURCHASE AND SALE AGREEMENT (this "*Agreement*"), dated as of June [●], 2012 (the "*Agreement Date*"), by and among SIGMA DESIGNS TECHNOLOGY NETHERLANDS B.V. ("*Purchaser*"), and TRIDENT MICROSYSTEMS, INC.("*TMI*"), TRIDENT MICROSYSTEMS (FAR EAST) LTD. ("*TMFE*") and TRIDENT MICROSYSTEMS (NEDERLAND) B.V. ( "*Trident Nederland*" and, with TMI and TMFE, the "*Sellers*"). Purchaser and the Sellers are collectively referred to herein as the "*Parties*" and individually as a "*Party*". For the purposes of this Agreement, capitalized terms used in herein shall have the meanings set forth in EXHIBIT A.

### RECITALS

WHEREAS, the Parties desire to make certain agreements and representations and warranties, subject to the terms and conditions set forth herein.

Whereas, on January 4, 2012, TMI and TMFE filed voluntary petitions (the "*Chapter 11 Petition*") for relief under Chapter 11 of the United States Bankruptcy Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"), initiating their respective Chapter 11 bankruptcy cases (the "*Bankruptcy Cases*");

Whereas, on January 5, 2012, TMFE filed for protection in the Cayman Islands in the Grand Court of the Cayman Islands (the "*Cayman Court*");

Whereas, the Debtors continue to manage their properties and operate their businesses as "*debtors-in-possession*" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code;

Whereas, Debtors' direct and indirect subsidiaries in other jurisdictions are not included in the U.S. or Cayman bankruptcy filings and no bankruptcy, insolvency, or similar proceedings have been initiated with respect to any other subsidiaries;

Whereas, Purchaser desires to purchase the Purchased Assets (as hereinafter defined) and assume the Assumed Liabilities from the Sellers and the Sellers desire to sell, convey, assign and transfer to Purchaser the Purchased Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code; and

Whereas, the Purchased Assets and Assumed Liabilities shall be purchased and assumed by Purchaser pursuant to the Sale Order approving such sale, free and clear of all Claims and Encumbrances (other than Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which order will include the authorization for the assumption by Sellers and assignment to Purchaser of the Assigned Contracts and the liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, each of the Parties hereby agree as follows:

## ARTICLE I

TRANSFER OF EMPLOYEES; PURCHASE AND SALE OF THE PURCHASED ASSETS; ASSUMPTION OF ASSUMED LIABILITIES; EXCLUDED LIABILITIES

1.1    Transfer of Employees.

(a)    Purchaser and Sellers each acknowledge and agree that under sections 7:662-666 of the Dutch Civil Code the employment contracts of the employees dedicated to the Trident Demod Business (the "*Demod Employees*") and all related employment liabilities will transfer to Purchaser by operation of law with effect from the Closing. In case any Demod Employees refuses to transfer, Sellers bears all costs related to such employee, if any, including but not limited to any costs for the termination of such employee. Any potential liabilities with regard to employment matters prior to the date each of the Demod Employees transfers will be borne by Sellers. A list of the Demod Employees is set forth on **Schedule 1.1(a)** hereto.

(b)    Sellers shall be responsible for any and all liabilities arising out of or attributable to claims of employees located at or in any other manner attributable to the Nijmegen Facility who is not a Demod Employee and is claiming employment with Purchaser in connection with the transfer of the Trident Demod Business to Purchaser, including but not limited to severance costs, termination costs, salary payments, legal costs.

(c)    Demod Employees who commence employment with Purchaser pursuant to Section 1.1(a) above shall be referred to herein as "*Transferred Employees*."

(d)    Effective as of the Closing, Purchaser shall be responsible for any and all liabilities of Sellers arising out of or attributable to the Transferred Employees, the payment and satisfaction of any and all Liabilities of the Sellers related to seniority in respect of the Transferred Employees, and all obligations to credit to all Transferred Employees all vacation or other paid time off accrued or vested for each such Transferred Employee as of the Closing Date ("*Assumed Employee Liabilities*").

(e)    Sellers shall remain responsible and liable for any and all Liabilities arising out of or attributable to any employee of Sellers who does not become a Transferred Employee (whether arising prior to, at the time of, or subsequent to Closing).

(f)    Sellers shall pay all payroll expenses in May and June 2012 related to the Demod Employees in the ordinary course (the "*Payroll Expenses*"). Upon Closing, Purchaser shall reimburse Sellers, up to $150,000, for Payroll Expenses paid by Sellers to the Demod Employees in May and June 2012 (the "*Payroll Expense Amount*").

(g)    Notwithstanding the provision set forth in paragraph (f) above, if Sellers have satisfied all conditions to Closing, except those that are solely within Purchaser's authority to complete, but the Closing has not yet occurred by the End Date, then Purchaser shall pay to Sellers all the Payroll

Expenses related to the Transferred Employees. However, if the Closing does not occur by the End Date through no fault of Purchaser, Purchaser will not be under an obligation to pay the Payroll Expenses.

(h)    Purchaser and Sellers shall comply with all obligations either under the Transfer Regulations or other applicable Laws to notify and/or consult with the Demod Employees or employee representatives, unions, works councils or other employee representative bodies, if any, and shall provide such information to the other Party as is reasonably required by that Party to comply with its notification and/or consultation obligations. Any Liability resulting from the failure by one Party to comply with such obligations shall be borne by such Party.

1.2    Purchase and Sale of the Purchased Assets.

(a)    Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth herein, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Sellers, all of Sellers' right, title and interest in, to and under the Purchased Assets free and clear of all Claims and Encumbrances (except Permitted Encumbrances). Upon providing notice to the Sellers, Purchaser may assign its rights to purchase any of the Purchased Assets or assume any of the Assumed Liabilities to any Affiliate of Purchaser, but such assignment shall in no manner reduce or otherwise affect Purchaser's obligations under this Agreement or any Ancillary Document. As used herein, the term "*Purchased Assets*" shall mean and include:

(i)    substantially all the demodulator business assets of Sellers (the "*Trident Demod Business*"), as listed in **Schedule 1.2(a)(i)** to this Agreement;

(ii)    all products of the Trident Demod Business, including any products under development, together with any masks (the "*Products*");

(iii)    all Inventory used or held for use in the operation of the Trident Demod Business ("*Inventory*");

(iv)    to the extent related to the Trident Demod Business, all trade accounts receivable of Sellers with Persons that are not Affiliates of Sellers (the "*Accounts Receivable*");

(v)    all prepaid expenses, including Prepaid Inventory deposits and advance payments of the Sellers with respect to the Trident Demod Business and all rights of the Sellers to receive discounts, refunds, reimbursements, rebates, awards and other similar benefits, in each case, with respect to the Trident Demod Business;

(vi)    all goodwill payment intangibles and rights of Sellers to the extent associated with the Trident Demod Business;

(vii)    an assignment of the Entropic License Agreement, as amended pursuant to Section 8.7(b)(iii) of the Entropic License Agreement for use with "Terrestrial Demod Products" as such term is defined in the Entropic License Agreement;

(viii)    to the extent assignable pursuant to Section 365 of the Bankruptcy Code or other applicable law, all Contracts exclusively relating to the Trident Demod Business listed on **Schedule 1.2(a)(viii)** (collectively, the "*Assigned Contracts*");

(ix)    certain tangible assets used in or otherwise related to the operations of the Transferred Employees and located in Nijmegen, The Netherlands, as listed in **Schedule 1.2(a)(ix)(A)** to this Agreement; provided, that if a tangible asset is related to the operations of the Transferred Employees and located in the Nijmegen Facility and has not otherwise been transferred by Sellers to a third party prior to the date of this Agreement, such tangible assets shall be included in the Purchased Assets irrespective of whether such tangible assets are set forth on **Schedule 1.2(a)(ix)(A)** except for those assets listed on **Schedule 1.2(a)(ix)(B)**; and

(x)    to the extent permitted by applicable Law, all books, files and records owned by Sellers that relate to the Transferred Employees, including, without limitation, books, files and records that are related to medical history, medical insurance or other medical matters and to workers' compensation and to the evaluation, appraisal or performance of such Transferred Employees.

(b)    Sellers shall not conduct a "last time buy" program for Sellers's demodulator products.

1.3    <u>Assumption of Liabilities</u>.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, and effective as of the Closing, the Purchaser shall assume from the Sellers (and thereafter pay, perform, discharge or otherwise satisfy in accordance with their respective terms), and the Sellers shall irrevocably convey, transfer and assign to Purchaser, the following Liabilities (collectively, the "*Assumed Liabilities*"):

(a)    all liabilities of Sellers arising out of or attributable to the Transferred Employees;

(b)    all liabilities arising after the Closing Date out of or attributable to the Purchased Assets;

(c)    all liabilities arising out of or for taxes attributable to the Transferred Employees that are due and payable from and after the Closing Date;

(d)    all liabilities arising out of or attributable to ownership of the Purchased Assets, from and after the Closing Date;

(e)    all liabilities of Sellers any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities;

(f)    all liabilities relating to amounts required to be paid by Purchaser under this Agreement; and

(g)    in the event that the Closing Date has not occurred by the End Date and the Sellers have satisfied and continue to satisfy all of the conditions to Closing by and as of the End Date, then Purchaser agrees that it will fund the payroll for the Transferred Employees for the payroll period commencing immediately following the End Date, and will continue to fund such payrolls until the earlier of the Closing Date, August 31, 2012, or the date that this Agreement is terminated in accordance with Section 3.4 below.

1.4    <u>Excluded Liabilities</u>.  Notwithstanding any provision in this Agreement to the contrary, the Purchaser is assuming only the Assumed Liabilities and is not assuming, and shall not be deemed to have assumed, any Liabilities of Sellers of whatever nature (whether arising prior to, at the time of, or

subsequent to Closing) unless expressly assumed, and the Sellers shall be solely and exclusively liable for any and all such Liabilities, including those relating to, arising out of or in connection with (a) the Purchased Assets at any time prior to the Closing Date and (b) any employee of Sellers who does not become a Transferred Employee.

# ARTICLE II

## CONSIDERATION; PAYMENT

2.1     Consideration.  The aggregate consideration (collectively, the "*Purchase Price*") to be paid for the purchase of the Purchased Assets shall be the Cash Payment, plus the assumption of all liabilities for the Transferred Employees upon Closing and the assumption of the Assumed Liabilities. To the extent the Accounts Receivable balance on the Closing Date is less than $75,000, there will be a dollar-for-dollar reduction in the Purchase Price.

2.2     Payment.  On the Closing Date, the Purchaser shall deliver a cash payment of $1,200,000 plus up to $150,000 for reimbursement of the Payroll Expense Amount (the "*Cash Payment*"). The Cash Payment shall be delivered by Purchaser on the Closing Date in cash by wire transfer of immediately available funds to such bank account as shall be designated in writing by the Sellers.

2.3     Deposit.  Purchaser shall make an earnest money deposit (the "*Deposit*") in the amount of $600,000 to Sellers within one business day of the Agreement Date. The Deposit shall be applied against payment of the Cash Payment on the Closing Date. If this Agreement shall be terminated pursuant to Section 3.4(a), 3.4(b), 3.4(c), 3.4(d), 3.4(e), or 3.4(g), or in the event that a party other than Purchaser or an Affiliate of Purchaser purchases all or a significant portion of the Purchased Assets, then Sellers shall return the Deposit to Purchaser within five (5) business days after Sellers' receipt of Purchaser's written request therefore. If this Agreement shall be terminated pursuant to Section 3.4(f), then Sellers shall retain the Deposit. The Parties agree that Sellers' right to retain the Deposit, as set forth herein, is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Sellers for their respective efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

2.4     Taxes.  The Sellers and Purchaser agree that the Purchase Price is exclusive of any VAT. To the extent that VAT would become chargeable then Purchaser shall, in addition to any amount expressed in the Agreement to be payable by Purchaser, pay to Sellers such VAT.

(a)     Notwithstanding the aforementioned, Trident Microsystems Nederland BV and Purchaser will treat the transactions contemplated by this Agreement and to the extent that assets are transferred by Trident Microsystems Nederland BV, for VAT purposes, as a Transfer of Going Concern within the meaning of Article 37d of the Dutch VAT Act and are therefore considered by Trident Microsystems Nederland BV and Purchaser to be out of scope. Trident Microsystems Nederland BV shall not charge any (Dutch) VAT.

(b)     If requested by Purchaser at any time (including any time prior to the applicable closing), Trident Microsystems Nederland BV, to the extent it is still in existence, will seek a ruling from the relevant Taxing Authority as to whether VAT is chargeable on the transfer of any assets and the correct rate at which VAT is chargeable on each asset type to be transferred.

(c)    If at any date after the Closing the relevant taxation authority indicates that any transaction contemplated pursuant to this Agreement must be treated as a supply of goods or a supply of services for VAT purposes, or does not qualify for relief or exemption from VAT or is otherwise subject to VAT, Purchaser shall (against production of a VAT invoice by the Sellers). Pay any such amounts in cleared funds within thirty days after receiving the aforementioned VAT invoice.

(d)    Should a request by Purchaser for a VAT refund or deduction of VAT be denied due to an invalid invoice, Sellers shall cooperate to ensure that Purchaser will be provided with a valid invoice by Sellers.

# ARTICLE III

## CLOSING AND TERMINATION

3.1    <u>Closing</u>. The closing of the purchase and sale of the Purchased Assets, the delivery of the Cash Payment, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "*Closing*") shall occur as soon as practicable following the satisfaction or waiver by the appropriate party of the conditions set forth in this **ARTICLE III** (other than those conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions). The Closing shall take place at the offices of DLA Piper LLP (US), 2000 University Avenue, East Palo Alto, California 94303 or at such other place as the Parties may agree. Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of Sellers in the Purchased Assets to be acquired by Purchaser hereunder shall be deemed to have passed to Purchaser and the assumption of all of the Assumed Liabilities shall be deemed to have occurred as of 12:01 a.m. Eastern Time on the Closing Date.

3.2    <u>Closing Deliveries by Sellers</u>. At or prior to the Closing, the Sellers shall deliver to the Purchaser:

(a)    bill of sale substantially in the form of **EXHIBIT B** (the "*Bill of Sale*") duly executed by the Sellers;

(b)    assignment and assumption agreement substantially in the form of **Exhibit C** (the "*Assignment and Assumption Agreement*") duly executed by each of the Sellers;

(c)    reasonable evidence of 100% of the consents to assignment of the Assigned Contracts, to the extent required by such Assigned Contracts, set forth in **Schedule 3.2(c)**;

(d)    a facility sharing agreement between the Sellers and Purchaser for a portion of the Nijmegen Facility in the form of **Exhibit D** (the "*Facility Use Agreement*");

(e)    Assignment and Assumption Agreements in the form of **Exhibit E** for assignment of the Entropic License Agreement (the "*Entropic Assignment and Assumption Agreement*"), executed by Sellers and each applicable Affiliate of Sellers;

(f)    TMI and TMFE shall have secured approval of the Bankruptcy Court to the assignment of the Assigned Contracts, as necessary, and the Entropic License Agreement by Trident Microsystems, Inc.;

(g)    a copy of the Sale Order in form and substance reasonably satisfactory to Purchaser that has been entered by the Bankruptcy Court and is a Final Order (the "*Sale Order*");

(h)   a copy of an order of the Cayman Court approving and authorizing the sale of the Purchased Assets in accordance with the provisions of this Agreement ("*Cayman Sale Order*") which is a Final Order;

(i)   an officers' certificate, dated as of the Closing Date, executed by a duly authorized officer of Sellers certifying that the conditions set forth in Section 8.3 have been satisfied;

(j)   all other certificates, agreements and other documents required by this Agreement (or as Purchaser may reasonably request) to be delivered by Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement; and

(k)   copies of all instruments, certificates, documents and other filings (if applicable) necessary to release the Purchased Assets from all Encumbrances, including any applicable UCC termination statements and releases of mortgages, all in a form reasonably satisfactory to the Purchaser.

3.3   Closing Deliveries by Purchasers. At the Closing, Purchaser shall deliver to (or at the direction of) Sellers:

(a)   the Cash Payment plus the Payroll Expense Amount minus the Deposit;

(b)   an officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the Purchaser, certifying that the conditions set forth in Sections 8.2(a) and 8.2(b) have been satisfied; and

(c)   all other certificates, agreements and other documents required by this Agreement (or as the Sellers may reasonably request) to be delivered by Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.4   Termination of Agreement. This Agreement may be terminated only in accordance with this Section 3.4. This Agreement may be terminated at any time prior to the Closing, as follows:

(a)   by the mutual written consent of the Sellers and Purchaser;

(b)   by written notice from Purchaser to the Sellers, if the Closing has not occurred on or prior to July 31, 2012 (the "*End Date*") and Sellers shall not have satisfied all of its conditions to Closing by the End Date or if, at any time before the End Date, the Bankruptcy Court affirmatively rejects a request for permission for TMI and TMFE to enter into the Entropic Assignment and Assumption Agreement;

(c)   by written notice from the Purchaser to the Sellers, if the Bankruptcy Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the Trident Demod Business or the reorganization of Sellers is appointed in any Bankruptcy Cases;

(d)   automatically if the Sale Order shall not have been approved by the Bankruptcy Court by the close of business on the End Date;

(e)   by written notice from the Purchaser to Sellers if, following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of the Purchaser and such failure shall continue through the Outside Date provided, however, that the right to terminate this Agreement under this Section 3.4(e) shall

not be available to the Purchaser if Purchaser's failure to fulfill any covenant or obligation under this Agreement has been the cause of, or resulted in, the failure of such order to meet these requirements on or before such date;

      (f)    by written notice from the Sellers to Purchaser, if Purchaser breaches or fails to perform in any respect any of their representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in ARTICLE VII, (ii) cannot be or has not been cured by the earlier of (x) thirty (30) days following delivery of notice to Purchaser of such breach or failure to perform and (y) the fifth (5th) day prior to the End Date and (iii) has not been waived by Sellers; provided, however, that Sellers shall not be permitted to terminate this Agreement pursuant to this Section 3.4(c) if the Sellers are then in material breach of the terms of this Agreement; or

      (g)    by written notice from Purchaser to the Sellers, if Sellers breach or fail to perform in any respect any of its representations, warranties or covenants contained in this Agreement and such breach or failure to perform: (i) would give rise to the failure of a condition set forth in **ARTICLE VII**, (ii) cannot be or has not been cured by the earlier of (x) thirty (30) days following delivery of notice to the Sellers of such breach or failure to perform and (y) the fifth (5th) day prior to the End Date and (iii) has not been waived by Purchaser; provided, however, that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 3.4(d) if Purchaser is then in material breach of the terms of this Agreement.

      3.5    Effect of Termination.  In the event of termination of this Agreement pursuant to Section 3.4, this Agreement shall forthwith become void, and there shall be no liability on the part of any Party or any of its partners, officers, directors or shareholders; provided, however, that this Section 3.5 and **ARTICLE VIII (MISCELLANEOUS)** shall survive any such termination.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF THE SELLERS

      The Sellers represents and warrants to Purchaser as follows, as of the date hereof and as of the Closing Date:

      4.1    Organization and Qualification.  Sellers is a corporation duly incorporated or organized and validly existing under the Laws of the jurisdiction of its incorporation. Sellers has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.  Sellers has previously delivered to the Purchaser complete and correct copies of its Organizational Documents, as amended and in effect on the Agreement Date.

      4.2    Authorization of Agreement.  Sellers has all requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each of the Ancillary Documents to which it is a party, the performance by Sellers of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Sellers. This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by Sellers and (assuming the due authorization, execution and delivery by the other Parties) this Agreement constitutes, and each Ancillary Document to which it is a party when so executed and delivered

(assuming the due authorization, execution and delivery by the other parties thereto) will constitute, legal, valid and binding obligations of Sellers, enforceable against Sellers in accordance with its terms.

4.3    <u>Conflicts; Consents; Compliance with Law.</u>

(a)    The execution, delivery and performance by Sellers of this Agreement or any Ancillary Document to which it is a party, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby and the taking by Sellers of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its respective Organizational Documents.

4.4    <u>Title to Purchased Assets; Sufficiency and Condition of Assets.</u>   The Sellers has, and shall convey to the Purchaser at the Closing, good, valid, transferable and marketable title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Encumbrances, except for Permitted Encumbrances.   To the Knowledge of Sellers, the Purchased Assets constitute all of the properties, assets and rights (whether real, personal or mixed and whether tangible or intangible) necessary and sufficient to permit the Purchaser to conduct the Trident Demod Business after the Closing in accordance with Sellers' past practices and as presently planned to be conducted. To the Knowledge of the Sellers, each of the Purchased Assets is in good operating condition and repair, reasonable wear and tear excepted, and is capable of being used in the Ordinary Course of Business in the manner necessary to operate the Trident Demod Business.

4.5    <u>Intellectual Property.</u>

(a)    **Schedule 4.5(a)** sets forth an accurate and complete list of all licenses, sublicenses and other agreements, that have not previously been assigned to Purchaser or its Affiliates, pursuant to which the Sellers or any of its Affiliates is authorized or licensed to use any third party Intellectual Property that is used in connection with the Business as currently conducted, except for so-called "shrink-wrap" or "click-wrap" license agreements relating to off-the-shelf computer software licensed in the ordinary course of business.

(b)    Except as set forth on **Schedule 4.5(b)**, neither Sellers nor any of its Affiliates have, to the Sellers' Knowledge (but without any duty of Sellers to perform patent searches), interfered with, infringed upon, misappropriated, diluted, violated or otherwise come into conflict with the Intellectual Property of any other Person or engaged in any act of unlawful use or unfair competition, and no written, or, to Sellers' Knowledge, oral, claims have been asserted by any Person alleging such interference, infringement, misappropriation, dilution, violation, conflict, act of unlawful use or act of unfair competition.

(c)    Except as set forth in **Schedule 4.5(c)**, no claims are pending or, to the Sellers's knowledge, threatened, against the Sellers or any of its Affiliates by any person with respect to the ownership, validity (excluding administrative actions received in the Ordinary Course of Business in connection with pending patent applications), enforceability or use in the Business of any Sellers Intellectual Property.

(d)    Except as set forth on **Schedule 4.5(d)**, neither Sellers nor any Sellers Subsidiary has notified any Person that it believes that such Person is interfering with, infringing upon, misappropriating, diluting, violating or otherwise acting in conflict with any Sellers Intellectual Property, or engaging in any act of unlawful use or unfair competition, or has done any of the foregoing and, to the Knowledge of the Sellers, no Person is interfering with, infringing upon, misappropriating, diluting, violating or otherwise acting in conflict with any Sellers Intellectual Property.

(e)     Neither the execution and delivery of this Agreement by the Sellers nor any of the licenses provided herein will result in the Purchaser being obligated to pay any royalties or other amounts to any third party in excess of those payable by the Sellers prior to the Closing.

(f)     There is no Intellectual Property developed by any shareholder, director, officer, consultant or employee of any of the Sellers that is used by the Business and that has not been transferred to the Sellers, or is not owned by the Sellers free and clear of any Encumbrances, other than Permitted Encumbrances.

4.6     Litigation.  Neither the Sellers nor any Sellers Affiliate is a party to or bound by any order (or any agreement entered into in any administrative, judicial or arbitration proceeding with any third party or governmental or other authority) with respect to the Purchased Assets or the Trident Demod Business.  **Schedule 4.6** contains a complete and accurate list of each action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator, (i) against the Sellers, any Sellers Affiliate or any of their respective directors, officers and stockholders that is related to the Trident Demod Business, (ii) with respect to or affecting (a) the Purchased Assets or Assumed Liabilities or (b) the operations, assets, business or financial condition of the Trident Demod Business, or (iii) related to the consummation of the transactions contemplated hereby.

4.7     Inventory.  **Schedule 1.2(a)(iii)** contains a complete and accurate list of all Inventory. All Inventory consists of items of a quantity and quality historically useable and/or saleable in the Ordinary Course of Business.  All Inventory is free from defects in materials and workmanship (normal wear and tear excepted) except for immaterial defects and deficiencies. The Inventory is not excessive in kind or amount, or slow moving, in light of the Business as currently conducted. All Inventory is located at the location(s) listed on **Schedule 1.2(a)(iii)** or is in transit to such locations from the Sellers's or any of its Affiliate's manufacturer.

4.8     Contracts.

(a)     **Schedule 4.8(a)** sets forth a complete list of all material contracts that relate to the Trident Demod Business;

(b)     the Sellers or the applicable Sellers Affiliate is not in material breach of or default under any Assigned Contract, and no event has occurred that with the passage of time or giving of notice or both would constitute such a breach or default, result in a loss of material rights, result in the payment of any damages or penalties or result in the creation of an Encumbrance thereunder or pursuant thereto;

(c)     the Seller or the applicable Seller Subsidiary is not currently in possession of any written notice or, to the Knowledge of the Seller, other communication, in each case, regarding any actual, alleged, or potential violation or breach of, or default under, any of the Assigned Contracts and to the Knowledge of the Sellers, there are no pending renegotiations of any of the Assigned Contracts and the Sellers or the applicable Sellers Affiliate has not received written notice from any Person party to any Assigned Contract regarding the termination, cancellation, or material change to the terms of, any such Assigned Contract.

4.9     Taxes.  Except as set forth in **Schedule 4.9**:

(a)     All Tax Returns required to have been filed by Sellers have been duly filed and are true, correct and complete in all material respects, and no material fact has been omitted therefrom.

(b)    All Taxes due and payable by Sellers (whether or not shown on any Tax Return) have been paid in full.

(c)    The Sellers has withheld and paid all Taxes required to have been withheld and paid by them to the appropriate Government Body in connection with amounts paid or owing to any employee, independent contractor, creditor or shareholder thereof or other third party.

4.10    Employees.

(a)    **Schedule 1.1(a)** hereto contains a true, complete and correct list of the Demod Employees as of the Agreement Date, specifying their position, annual salary, date of hire, accrued paid time off and the amount of any employee benefit or cash compensation that is to be assumed by Purchasers pursuant to the terms of this Agreement, with reference to each such Demod Employee's employment agreement with Sellers, if applicable (collectively, the *"Employment Agreements"*).

(b)    For all periods up to and including the Closing Date, full payment has been timely made of all amounts which the Sellers or any of its respective Affiliates is required to make under applicable Law or under any agreement to which any of them is a party, in each case, related to Liabilities in respect of the Transferred Employees.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Sellers as follows as of the date hereof and as of the Closing Date:

5.1    Organization and Qualification.  The Purchaser is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  The Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business (including the Trident Demod Business) as it is now being conducted, except as would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchaser's ability to consummate the transactions contemplated hereby.

5.2    Authority.  The Purchaser has the requisite power and authority to execute and deliver this Agreement and each of the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder, to consummate the transactions contemplated hereby and thereby and to assume and perform the Assumed Liabilities.  The execution and delivery of this Agreement by the Purchaser and each of the Ancillary Documents to which it is a party, the performance by the Purchaser of its obligations hereunder and thereunder, the consummation of the transactions contemplated hereby and thereby and the assumption and performance of the Assumed Liabilities have been duly and validly authorized by all necessary actions on the part of the Purchaser.  This Agreement has been, and at or prior to the Closing, each of the Ancillary Documents to which it is a party will be, duly and validly executed and delivered by the Purchaser.  Assuming the due authorization, execution and delivery of this Agreement and the Ancillary Documents by the Sellers, this Agreement constitutes, and each Ancillary Document to which Purchaser is a party when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with its terms.

5.3    Conflicts; Consents.  The execution, delivery and performance by such Party of this Agreement or any Ancillary Document to which it is a party, the compliance by such Party with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby

and the taking by such Party of any other action contemplated hereby or thereby, do not and will not contravene, violate or conflict with any term or provision of its Organizational Documents.

5.4    Adequate Assurances Regarding Assigned Contracts.  As of the Closing, Purchaser will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

## ARTICLE VI.

### BANKRUPTCY COURT MATTERS

6.1    Sale Order.  The Sale Order shall be entered by the Bankruptcy Court.  The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by Sellers of this Agreement, (B) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (C) the performance by Sellers of their respective obligations under this Agreement; (ii) authorize and empower Sellers to assume and assign to the Purchaser the Assigned Contracts; and (iii) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant the Purchaser the protections of Section 363(m) of the Bankruptcy Code.  The Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.  In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, Sellers shall use reasonable efforts to defend such appeal.

6.2    Cayman Sale Order.  The Cayman Sale Order shall be entered by the Cayman Court.

## ARTICLE VII

### COVENANTS AND AGREEMENTS

7.1    Reasonable Efforts; Cooperation.  Subject to the other provisions hereof, each Party shall use its commercially reasonable efforts to perform its obligations hereunder and to take, or cause to be taken, and do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the transactions contemplated herein to be effected as soon as practicable, in accordance with the terms hereof and shall cooperate fully with each other Party and its representatives in connection with any step required to be taken as a part of its obligations hereunder.

7.2    Further Assurances.  Each Party shall execute and cause to be delivered to each other Party such instruments and other documents, and shall take such other actions, as such other Party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

7.3    Deletion/Destruction of Confidential Information.  Prior to the delivery of the Purchased Assets, Sellers shall transfer out, delete or destroy all Confidential Information included in the Purchased Assets, including all books and records in electronic form, including databases, e-mails and backups retained for archival and disaster recovery purposes, except for any Confidential Information used in or otherwise related to the TV Business of Purchaser or its Affiliates and any Confidential Information

required to be disclosed to Purchaser to enable it or any of its Affiliates to perform any transition services to Sellers or any of Sellers's assigns and which transition services Purchaser or any of its Affiliates agrees to perform. As part of this process, the Sellers shall inform all Transferred Employees and consultants of the obligation to delete such Confidential Information from employee desktops, notebooks, files or databases maintained by such Transferred Employees.

7.4    Payment of Receivables. If the Sellers or any of its Affiliates receives any payment relating to any Account Receivable after the Closing, such Person will promptly endorse (where necessary) and deliver to Purchaser all cash, checks and other documents received on account of such Receivable and will advise Purchaser (promptly upon the discovery or awareness of the Sellers or its Affiliate) of any counterclaims or off-sets that may arise after the Closing with respect to such receivable.

7.5    Assignability of Contracts. To the extent that the assignment to the Purchaser of any Assigned Contract pursuant to this Agreement is not permitted without the consent of a third party, then this Agreement will not be deemed to constitute an assignment of or attempt to assign such Contract or any right or interest therein unless and until such consent is obtained; provided, however, that the Parties will use their commercially reasonable efforts, before the Closing, to obtain all such consents; provided, further, that if any such consents are not obtained prior to the Closing Date, Sellers and the Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide the Purchaser with the benefits and obligations of any such Contract and the Purchaser shall be responsible for performing all obligations under such Contract required to be performed by Sellers on or after the Closing Date to the extent set forth in this Agreement. Once such consent or waiver is obtained, the Sellers shall, or shall cause its Sellers Affiliates to, sell, assign, transfer, convey and license such Purchased Asset to Purchaser for no additional consideration.

7.6    Conduct of Sellers. During the period between the Agreement Date and the earlier of the Closing or the date that this Agreement is terminated in accordance with Section 3.4 above, except (a) as required by applicable Law, (b) as otherwise expressly contemplated by this Agreement or (c) with the prior written consent of the Purchaser (which consent shall not be unreasonably withheld), Sellers shall:

(i)    operate the Trident Demod Business in the Ordinary Course of Business;

(ii)    not sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any of the Purchased Assets;

(iii)    comply with all applicable Laws;

(iv)    not, with respect to Trident Nederland (A) file a petition seeking relief under any applicable federal, state or foreign bankruptcy, insolvency or other similar law; or (B) consent to the institution of proceedings thereunder or to the filing of any such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee or sequestrator (or similar official) of Trident Nederland or of any substantial part of its properties; and

(v)    not increase the compensation payable to, or to become payable to, or grant any new bonus, service, award or other like benefit to, any of the Demod Employees.

7.7    Limited Trademark License. TMI hereby grants Purchaser and its Affiliates a nonexclusive, nontransferable, royalty free, worldwide license to use the TMI's trademark, trade name, and service marks "*Trident Microsystems*" and the *Trident Microsystems* logo, alone or in combination with any other words or terms or variation of such words or terms (the "*Trident Microsystems Marks*") to

the same extent and with the same scope as used by the Sellers in the Trident Demod Business prior to the Closing until all Products manufactured with the Trident Microsystems Marks are sold.

## ARTICLE VIII

### CONDITIONS TO CLOSING

8.1     <u>Conditions Precedent to the Obligations of the Purchaser and Sellers</u>.  The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the condition that there shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Body of competent jurisdiction, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Documents.

8.2     <u>Conditions Precedent to the Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Sellers in its sole discretion:

(a)     Purchasers shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchasers on or prior to the Closing Date; and

(b)     Purchasers shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 3.3.

8.3     <u>Conditions Precedent to the Obligations of the Purchaser</u>.  The obligations of Purchasers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Purchasers in their sole discretion:

(a)     the representations and warranties made by Sellers in this Agreement or in any Ancillary Document shall be true and correct in all material respects, in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date);

(b)     Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date;

(c)     assignment to Purchaser of that portion of the License Agreement (the "*Entropic License Agreement*") dated April 12, 2012 by and between Entropic Communications, Inc. and Trident Microsystems, Inc., as amended, that relates specifically to the Trident Demod Business, in accordance with section 8.7 thereof, together with evidence of transfer of all other tangible and intangible assets needed to operate the Trident Demod Business;

(d)     Seller shall have provided each Demod Employee with a transfer letter in form and substance reasonably satisfactory to Purchaser and substantially in the form of **EXHIBIT F**.

(e)     Seller shall have entered into a valid and enforceable settlement agreement within the meaning of Section 7:900 of the Dutch Civil Code and release in form and substance reasonably satisfactory to Purchaser and substantially in the form of EXHIBIT G, executed by each of the employees located at or in any other manner attributable to the Nijmegen Facility who is not deemed a Transferred Employee;

(f)     At least 70% of the Demod Employees shall not have resigned their employment prior to the Closing and shall become Transferred Employees as of the Closing;

(g)     Sellers having continued to operate the Trident Demod Business in the Ordinary Course of Business and meet its respective payment obligations when due;

(h)     Purchaser having had full access to Trident Nederland's assets, offices and operations for purposes of due diligence and business progression planning related to the Trident Demod Business, meaning that Purchaser may conduct customary due diligence investigations by Purchaser's employees, attorneys and accountants, which investigation may include, among other things, review of past and current Trident Nederland operations, assets, conditions (financial and otherwise), including, without limitation, past and current contracts, leases, and arrangements with suppliers, customers, distributors and affiliates relevant to the Transferred Employees, the assets to be purchased, and the liabilities to be assumed pursuant to the Agreement; and

(i)     Sellers shall have delivered, or caused to be delivered, to Purchasers all of the items set forth in Section 3.2.

## ARTICLE IX

### MISCELLANEOUS

9.1     <u>Payment of Expenses</u>.  Except as otherwise provided in this Agreement, and whether or not the transactions contemplated hereby are consummated, Sellers and the Purchaser shall bear their own expenses incurred or to be incurred in connection with the negotiation and execution of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

9.2     <u>Survival of Representations and Warranties; Survival of Confidentiality</u>.  The Parties agree that the representations and warranties contained in this Agreement shall survive the Closing and expire sixty (60) days from the Closing Date.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

9.3     <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement and the Ancillary Documents, represents the entire understanding and agreement between the Parties with respect to the subject matter hereof.  This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

9.4     <u>Execution of Agreement; Counterparts; Electronic Signatures</u>.  This Agreement may be executed in any number of counterparts and all of such counterparts shall together constitute one and the same instrument.  This Agreement may be executed by signature(s) transmitted by facsimile or electronic PDF signatures and such facsimile and electronic signatures shall be binding for all purposes.

9.5    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT FOR ANY LAWS OF THAT STATE WHICH WOULD RENDER SUCH CHOICE OF LAWS INEFFECTIVE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THE COURTS OF THE STATE OF DELAWARE AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN WILMINGTON, DELAWARE WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY. EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

9.6    <u>Notices</u>. Unless otherwise set forth herein, any notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) sent by facsimile or e-mail, in each case, if sent during the normal business hours of the recipient, with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in the case of each of clauses (a) and (b), to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a Party may designate by notice to the other Parties):

If to Sellers, to:

        Trident Microsystems, Inc.
        Address: 1170 Kifer Road
        Sunnyvale, California 94086
        Fax no.: (408) 991-9309
        Attention: David L. Teichmann
        E-mail address: David.Teichmann@tridentmicro.com

With a copy (which shall not constitute effective notice) to:

        DLA Piper LLP (US)
        Address:  203 North LaSalle Street
        Suite 1900
        Chicago, IL 60601
        Fax no.: (312) 630-5330
        Attention:    Richard Chesley
                      Ann Lawrence
        E-mail address: Richard.Chesley@dlapiper.com
                             Ann.Lawrence@dlapiper.com

If to the Purchaser, to:

> Sigma Designs Technology Netherlands B.V.
> 1778 McCarthy Blvd.
> Milpitas, California, 95035
> Attention: Thinh Tran
> Fax no: (408) 262-9003

With a copy (which shall not constitute effective notice) to:

> Pillsbury Winthrop Shaw Pittman LLP
> Address: 2475 Hanover Street
> Palo Alto, California 94304
> Attention: James J. Masetti
> Fax no.: (650) 233-4545
> E-mail address: jim.masetti@pillsburylaw.com

Binding Effect; Assignment. This Agreement shall be binding upon the Purchaser and Sellers, and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by Sellers or the Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without such required consents shall be void.

Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision or portion of any provision, there will be added automatically as a part of this Agreement a valid legal and enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

**[Remainder of page intentionally left blank]**

**Execution Version**

    **IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**SELLERS**:

**TRIDENT MICROSYSTEMS, INC.**

By:   _____
      Name:
      Title:

**TRIDENT MICROSYSTEMS (FAR EAST) LTD.**

By:   _____
      Name:
      Title:

**TRIDENT MICROSYSTEMS (NEDERLAND) B.V.**

By:   _____
      Name:
      Title:

Execution Version

PURCHASER:

SIGMA DESIGNS TECHNOLOGY NETHERLANDS B.V.


By: _____
     Name:
     Title:

## Exhibit A

### DEFINITIONS

Definitions.  As used herein:

"*Accounts Receivable*" shall have the meaning set forth in Section 1.2(a)(iv).

"*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"*Agreement*" shall have the meaning set forth in the preamble.

"*Agreement Date*" shall have the meaning set forth in the preamble.

"*Ancillary Documents*" means any certificate, agreement, document or other instrument (other than this Agreement) to be executed and delivered by a Party in connection with the consummation of the transactions contemplated this Agreement.

"*Assigned Contracts*" shall have the meaning set forth in Section 1.2(a)(viii).

"*Assignment and Assumption Agreement*" shall have the meaning set forth in Section 3.2(b).

"*Assumed Employee Liabilities*" shall have the meaning set forth in Section 1.1(c).

"*Assumed Liabilities*" shall have the meaning set forth in Section 1.3(a).

"*Bankruptcy Cases*" shall have the meaning set forth in the Recitals.

"*Bankruptcy Code*" shall have the meaning set forth in the Recitals.

"*Bankruptcy Court*" shall have the meaning set forth in the Recitals.

"*Bankruptcy Rules*" shall have the meaning set forth in the Recitals.

1

*"Bill of Sale"* shall have the meaning set forth in Section 3.2(b).

*"Cash Payment"* shall have the meaning set forth in Section 2.2.

*"Cayman Court"* shall have the meaning set forth in the Recitals.

*"Cayman Sale Order"* shall have the meaning set forth in Section 3.2(h).

*"Cayman Insolvency Case"* means the petition appointing provisional liquidators to Trident Microsystems (Far East) Ltd. pursuant to Section 104 of the Cayman Companies Law (2011 Revision), which was filed on January 5, 2012.

*"Chapter 11 Petition"* shall have the meaning set forth in the Recitals.

*"Closing"* shall have the meaning set forth in Section 3.1.

*"Closing Date"* means the date on which the Closing occurs.

*"Confidential Information"* means those trade secrets, copyrighted material, know-how, software, IP blocks, specifications, documentation, designs, and all other forms of intellectual property (other than patents, patent applications, and patent rights) that consist of unpublished applications, which were purchased pursuant to that certain Asset Purchase Agreement Dated as of January 18, 2012 by and between Entropic Communications, Inc. as Purchaser, and Trident Microsystems, Inc., and all non-public information comprising such property.

*"Contract"* means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, license, understanding, instrument or other agreement, arrangement or commitment that is binding upon a Person or its property, whether express or implied.

*"Demod Employees"* shall have the meaning set for the in Section 1.1(a).

*"Employment Agreements"* shall have the meaning set forth in Section 4.5(a).

*"Encumbrance"* means any lien, encumbrance, claim, right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other

2

impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

"*End Date*" shall have the meaning set forth in Section 3.4(b).

"*Entropic Assignment and Assumption Agreement*" shall have the meaning set forth in Section 3.2(e).

"*Entropic License Agreement*" shall have the meaning set forth in Section 7.3(c).

"*Facility Use Agreement*" shall have the meaning set forth in Section 3.2(d).

"*Final Order*" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in Sellers' Bankruptcy Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

"*Governmental Body*" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

"*Intellectual Property*" means all intellectual property and proprietary rights of any kind, including the following:  (i) trademarks, service marks, trade names, slogans, logos, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) copyrights and copyrightable subject matter (including any registration and applications for any of the foregoing); (iii) trade secrets and other confidential or proprietary

3

business information (including manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, and methodologies; (iv) computer software, computer programs, and databases (whether in source code, object code or other form); and (v) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith.

"*Inventory*" shall have the meaning set for the in Section 1.2(a)(iii).

"*Knowledge*" or ("*Knowledge of Sellers*" or "*Sellers' Knowledge*") means the actual knowledge of those individual set forth in **Schedule Ex-A**, in each case, including facts of which any such individual should be aware in the reasonably prudent exercise of his or her duties.

"*Law*" means any federal, state, local, municipal, foreign or international, multinational or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"*Liability*" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"*Licensed Intellectual Property*" means any Intellectual Property that is licensed to Sellers, and used, or held for use, in connection with the operation of the Trident Demod Business.

"*Nijmegen Facility*" shall mean Sellers's office lease located at Kerkenbos 10-16F in Nijmegen, The Netherlands.

"*Ordinary Course of Business*" means the ordinary and usual course of normal day to day operations of the Trident Demod Business consistent with past practice.

"*Organizational Documents*" means, with respect to a particular entity Person, (i) if a corporation, the articles or certificate of incorporation and bylaws, (ii) if a general partnership, the partnership agreement and any statement of partnership, (iii) if a limited partnership, the limited

4

partnership agreement and certificate of limited partnership, (iv) if a limited liability company, the articles or certificate of organization or formation and any limited liability company or operating agreement, (v) if another type of Person, all other charter and similar documents adopted or filed in connection with the creation, formation or organization of the Person, and (vi) all amendments or supplements to any of the foregoing.

"*Owned Intellectual Property*" means all Intellectual Property owned by any Sellers, and used, or held for use, in connection with the operation of the Trident Demod Business.

"*Party*" or "*Parties*" shall have the meaning set forth in the preamble.

"*Payroll Expenses*" shall have the meaning set forth in Section 1.1(f).

"*Payroll Expense Amount*" shall have the meaning set forth in Section 1.1(f).

"*Permitted Encumbrances*" means (i) Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Trident Demod Business; (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business, (v) licenses granted on a non-exclusive basis, (vi) Encumbrances arising from the transfer of Sellers Intellectual Property pursuant to this Agreement relating to the past acts or prior commitments of Sellers and all previous owners of such Sellers Intellectual Property, (vii) Encumbrances arising from the Assumed Liabilities.

"*Person*" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

"*Products*" shall have the meaning set forth in Section 1.2(a)(ii).

"*Purchased Assets*" shall have the meaning set forth in Section 1.2(a).

"*Purchase Price*" shall have the meaning set forth in Section 2.1.

"*Purchaser*" shall have the meaning set forth in the preamble.

"*Sale Order*" shall have the meaning set forth in Section 3.2(g).

EAST\48498334.12

"*Sellers*" shall have the meaning set forth in the preamble.

"*Sellers Intellectual Property*" means, collectively, the Owned Intellectual Property and the Licensed Intellectual Property.

"*Tax*" and "*Taxes*" mean any and all taxes, charges, fees, tariffs, duties, impositions, levies or other assessments, imposed by any Governmental Body, including any interest, penalties or additional amounts attributable to, or imposed upon, or with respect to, Taxes and any Liability for the Taxes of any other Person as a transferee or successor, by Law, Contract or otherwise.

"*Tax Return*" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

"*Transferred Employee*" shall have the meaning set forth in Section 1.1(a).

"*Transfer Regulations*" means the Council Directive 77/187/EEC of 14 February 1977 on the approximation of the laws of the Member States relating to the safeguarding of employees' rights in the event of transfers of undertakings, businesses or parts of businesses (and its amendments) (collectively, the "Acquired Rights Directive") and the legislation and regulations of any EU Member State implementing such Acquired Rights Directive.

"*Trident Demod Business*" shall have the meaning set forth in Section 1.2(a)(i).

"*TV Business*" shall mean the business that was purchased by Sigma Designs, Inc. and its Affiliates from Trident Microsystems, Inc. and certain of its Subsidiaries pursuant to that certain Asset Purchase Agreement dated March 23, 2012 by and between Sigma Designs, Inc. and Trident Microsystems, Inc. and certain of its Subsidiaries.

6