## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                    :
In re:                              :   Chapter 11
                                    :
Trident Microsystems, Inc., et al.,[1]  :   Case No. 12-10069 (CSS)
                                    :
            Debtors.                :   (Jointly Administered)
                                    :
                                    :
------------------------------------------------------------x
```

### DISCLOSURE STATEMENT FOR DEBTORS' FIRST AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**DLA PIPER LLP (US)**
Stuart M. Brown (DE 4050)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341

　　-and-

Richard A. Chesley (IL 6240877)
Kimberly D. Newmarch (DE 4340)
Chun I. Jang (DE 4790)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516

*Attorneys for Debtors and Debtors in Possession*

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT, BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.

---

[1]　　The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd.  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 5201 Great America Parkway, Suite 320, Santa Clara, California 95054.

# TABLE OF CONTENTS

**Page**

ARTICLE I.        INTRODUCTION ...................................................................................2

    A.        HOLDERS OF CLAIMS ENTITLED TO VOTE ...............................................2

    B.        VOTING PROCEDURES...................................................................................3

    C.        CONFIRMATION HEARING...........................................................................5

ARTICLE II.       OVERVIEW OF THE PLAN ..............................................................6

ARTICLE III.      GENERAL INFORMATION ............................................................13

    A.        OVERVIEW OF BANKRUPTCY LAW..........................................................13

    B.        OVERVIEW OF CAYMAN INSOLVENCY LAW .........................................13

    C.        OVERVIEW OF THE DEBTORS AND THEIR PRINCIPAL ASSETS ..........15

    D.        PREPETITION INDEBTEDNESS AND THE INTERCOMPANY
             AGREEMENTS ..................................................................................................20

         1.        Unsecured Claims Other Than Intercompany Claims.............................21

         2.        The Intercompany Agreements ...............................................................21

         3.        Economics of the Intercompany Agreements...........................................22

    E.        RECENT FINANCIAL INFORMATION .........................................................25

ARTICLE IV.      KEY EVENTS LEADING TO THE  COMMENCEMENT OF THE
                 CHAPTER 11 CASES .......................................................................................26

    A.        FINANCIAL CHALLENGES ...........................................................................26

    B.        OUT-OF-COURT RESTRUCTURING EFFORTS ...........................................26

ARTICLE V.       SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES...............27

    A.        RETENTION OF PROFESSIONALS BY THE DEBTORS .............................27

    B.        CAYMAN PROCEEDINGS..............................................................................27

    C.        FORMATION OF THE CREDITORS COMMITTEE ......................................28

    D.        FORMATION OF THE EQUITY COMMITTEE..............................................29

    E.        "FIRST DAY" RELIEF .....................................................................................29

         1.        Joint Administration ................................................................................29

         2.        Cash Management ....................................................................................29

         3.        Employee Wages ......................................................................................29

         4.        Critical Vendors.......................................................................................30

         5.        Retention of KCC as Claims and Noticing Agent....................................30

    F.        OTHER SIGNIFICANT MOTIONS .................................................................30

EAST\51327434.7

# TABLE OF CONTENTS
### (continued)

**Page**

| | | | |
|---|---|---|---|
| | 1. | Ordinary Course Professionals | 30 |
| | 2. | Performance-Based Incentives for Key Employees | 30 |
| | 3. | Vacation and Severance Pay | 31 |
| | 4. | 2004 Motion | 31 |
| | 5. | 505 Motion | 31 |
| G. | | THE DEBTORS' ASSET SALES AND REMAINING ASSETS | 32 |
| | 1. | STB Business | 32 |
| | 2. | TV Business | 34 |
| | 3. | Audio Business | 34 |
| | 4. | Demod Business | 35 |
| | 5. | Analog Business | 35 |
| | 6. | Remaining Assets | 35 |
| | 7. | Transition Service Agreements | 35 |
| | 8. | Last Time Buys | 36 |
| H. | | WIND-DOWN OF NON-DEBTORS | 36 |
| I. | | SETTLEMENT BETWEEN THE DEBTORS, the Cayman LIQUIDATORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE | 36 |
| J. | | NEW JOINT PROTOCOL IN SUPPORT OF CONFIRMATION | 37 |
| ARTICLE VI. | | THE JOINT PLAN OF LIQUIDATION | 37 |
| A. | | INTRODUCTION | 37 |
| B. | | CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE JOINT PLAN OF LIQUIDATION | 38 |
| | 1. | Unclassified | 39 |
| | 2. | Classified | 42 |
| | 3. | Special Provision Governing Unimpaired Claims and Equity Interests | 44 |
| | 4. | Separate Plans of Liquidation | 44 |
| | 5. | Nonconsensual Confirmation | 45 |
| C. | | MEANS FOR IMPLEMENTATION OF THE PLAN | 45 |
| | 1. | Creation of the TMI Trust | 45 |
| | 2. | Purpose of the TMI Trust | 45 |

EAST\51327434.7

# TABLE OF CONTENTS
(continued)

**Page**

3.    Cayman Liquidators as Plan Administrator.............................45

4.    TMI Trust Assets and Assets of TMFE.................................46

5.    TMI Trust Taking Assignment of TMI's Contracts ..................46

6.    Governance of the TMI Trust ...........................................46

7.    The TMI Trustee and the Plan Administrator ........................46

8.    Role of the TMI Trustee and the Plan Administrator..............46

9.    TMI Trustee's and the Plan Administrator's Tax Powers........48

10.   Nontransferability of the TMI Trust Beneficial Interests.........49

11.   Cash ............................................................................49

12.   Costs and Expenses of the TMI Trust and Liquidation of TMFE...........49

13.   Compensation of the Plan Administrator and the TMI Trustee ..............50

14.   Retention of Professionals by the Plan Administrator and the TMI
      Trustee .........................................................................50

15.   Federal Income Tax Treatment of the TMI Trust....................50

16.   Tax Reporting ................................................................50

17.   Dissolution ....................................................................52

18.   Indemnification of the Plan Administrator and the TMI Trustee............52

19.   Operations of the Debtors Between the Confirmation Date and the
      Effective Date ................................................................53

20.   Term of Injunctions or Stays ............................................53

21.   The Committees..............................................................54

22.   Books and Records.........................................................54

D.    ADJUDICATION OF CLAIMS AGAINST TMFE BY THE PLAN
      ADMINISTRATOR .............................................................55

E.    PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS....................57

1.    Voting of Claims ............................................................57

2.    Distribution Dates...........................................................57

3.    Disbursing Agents ..........................................................58

4.    Record Date for Distributions............................................58

5.    Delivery of Distributions .................................................59

6.    Undeliverable and Unclaimed Distributions ..........................59

7.    Manner of Cash Payments Under the Plan............................59

EAST\51327434.7

# TABLE OF CONTENTS
### (continued)

Page

|   |   |   |
|---|---|---|
| | 8. | Compliance with Tax Requirements ........................................................60 |
| | 9. | No Payments of Fractional Dollars .........................................................60 |
| | 10. | Interest on Claims .................................................................................60 |
| | 11. | No Distribution in Excess of Allowed Amount of Claim .......................61 |
| | 12. | Setoff and Recoupment .........................................................................61 |
| | 13. | De Minimis Distributions; Charitable Donation ...................................61 |
| | 14. | United States Trustee Fees ....................................................................61 |
| F. | DISPUTED CLAIMS .........................................................................................61 |
| | 1. | Disputed Claim Reserves ......................................................................61 |
| | 2. | Resolution of Disputed Claims..............................................................62 |
| | 3. | Objection Deadline ................................................................................62 |
| | 4. | Estimation of Claims .............................................................................62 |
| | 5. | No Distributions Pending Allowance .....................................................63 |
| | 6. | Resolution of Claims .............................................................................63 |
| G. | TREATMENT OF EXECUTORY CONTRACTS...............................................63 |
| | 1. | Assumption or Rejection of Executory Contracts ..................................63 |
| | 2. | Approval of Assumption or Rejection of Executory Contracts...............64 |
| | 3. | Inclusiveness..........................................................................................64 |
| | 4. | Cure of Defaults ....................................................................................64 |
| | 5. | Claims Based on Rejection of Executory Contracts................................65 |
| | 6. | Indemnification and Reimbursement......................................................65 |
| | 7. | D&O Insurance Policies .........................................................................65 |
| | 8. | Certain Insurance Policy Matters ...........................................................66 |
| H. | CONDITIONS PRECEDENT............................................................................66 |
| | 1. | Conditions Precedent to the Confirmation Date.....................................66 |
| | 2. | Conditions Precedent to the Effective Date............................................67 |
| | 3. | Waiver ....................................................................................................67 |
| I. | INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS...................................................................................................67 |
| | 1. | Compromise and Settlement....................................................................67 |
| | 2. | Releases ..................................................................................................68 |

EAST\51327434.7

## TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| | 3. | Exculpation | 69 |
| | 4. | Preservation of Causes of Action | 69 |
| | 5. | Injunction | 70 |
| | 6. | Releases of Liens | 71 |
| J. | | RETENTION OF JURISDICTION | 72 |
| K. | | MISCELLANEOUS PROVISIONS | 73 |
| | 1. | Modification of Plan | 73 |
| | 2. | Revocation of Plan | 73 |
| | 3. | Binding Effect | 74 |
| | 4. | Successors and Assigns | 74 |
| | 5. | Governing Law | 74 |
| | 6. | Reservation of Rights | 74 |
| | 7. | Article 1146 Exemption | 74 |
| | 8. | Section 1125(e) Good Faith Compliance | 74 |
| | 9. | Further Assurances | 75 |
| | 10. | Service of Documents | 75 |
| | 11. | Filing of Additional Documents | 75 |
| | 12. | No Stay of Confirmation Order | 75 |
| ARTICLE VII. | | CERTAIN FACTORS AFFECTING THE DEBTORS | 76 |
| A. | | CERTAIN BANKRUPTCY LAW CONSIDERATIONS | 76 |
| | 1. | Risk of Non-Confirmation of the Joint Plan of Liquidation | 76 |
| | 2. | Risk of Non-Confirmation of the New Joint Protocol | 76 |
| | 3. | Non-Consensual Confirmation | 76 |
| | 4. | Risk of Delay in Confirmation of the Plan | 76 |
| | 5. | Adjudication and Distribution by Cayman Liquidators | 76 |
| B. | | ADDITIONAL FACTORS TO BE CONSIDERED | 77 |
| | 1. | The Debtors Have No Duty to Update | 77 |
| | 2. | No Representations Outside This Disclosure Statement Are Authorized | 77 |
| | 3. | Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary | 77 |

# TABLE OF CONTENTS
## (continued)

Page

4.    Debtors Could Withdraw the Plan............................................................77

5.    No Legal or Tax Advice Is Provided to You by This Disclosure Statement ..................................................................................................77

6.    No Admission Made ..............................................................................78

ARTICLE VIII.    CONFIRMATION OF THE PLAN OF LIQUIDATION ..............................78

A.    CONFIRMATION HEARING...................................................................78

B.    REQUIREMENTS FOR CONFIRMATION OF THE JOINT PLAN OF LIQUIDATION .....................................................................................78

1.    Requirements of Section 1129(a) of the Bankruptcy Code ....................78

2.    Requirements of Section 1129(b) of the Bankruptcy Code ....................82

ARTICLE IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF  THE JOINT PLAN OF LIQUIDATION .................................................83

A.    LIQUIDATION UNDER CHAPTER 7 ......................................................83

B.    ALTERNATIVE PLAN OF REORGANIZATION .........................................83

ARTICLE X.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN..................................................................................................83

A.    GENERAL CONSEQUENCES TO U.S. HOLDERS OF CLAIMS AND EQUITY INTERESTS ..........................................................................85

1.    Realization and Recognition of Gain or Loss, In General........................85

2.    Holders of Claims in All Classes Except Class 3 ...................................86

3.    Allocation of Consideration to Interest .................................................86

4.    Market Discount ..................................................................................87

5.    Bad Debt Deduction and Worthless Securities Deduction.......................87

6.    Limitation on Use of Capital Losses .....................................................87

B.    TAX TREATMENT OF TMI TRUST AND U.S. HOLDERS OF TMI TRUST BENEFICIAL INTERESTS ..........................................................88

1.    Classification of the TMI Trust .............................................................88

2.    General Tax Reporting by the TMI Trust and TMI Trust Beneficiaries ......................................................................................88

C.    INFORMATION REPORTING AND WITHHOLDING ..................................90

D.    GENERAL CONSEQUENCES TO NON-U.S. HOLDERS OF CLAIMS AND EQUITY INTERESTS...................................................................91

1.    Tax Consequences to Non-U.S. Holders Under the Plan ........................91

EAST\51327434.7

# TABLE OF CONTENTS
(continued)

| | | | Page |
|---|---|---|---|
| | 2. | Non-U.S. Holders of TMI Trust Interests | 91 |
| | 3. | Effectively Connected Income and Loss | 92 |
| ARTICLE XI. | | DEFINITIONS AND INTERPRETATION | 92 |
| A. | | DEFINITIONS | 92 |
| B. | | OTHER TERMS | 103 |
| C. | | EXHIBITS | 103 |
| ARTICLE XII. | | CONCLUSION | 103 |

EAST\51327434.7

# SUMMARY

The following is a summary of the Debtors' First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated as of September 17, 2012 (as the same may be amended or modified, the "Plan")[2], of Trident Microsystems, Inc. ("TMI") and Trident Microsystems (Far East) Ltd. ("TMFE" and together with TMI, the "Debtors"), the debtors and debtors in possession in these chapter 11 cases. This Disclosure Statement describes the Plan and the distributions contemplated thereunder for each of the Debtors. Unless the context requires otherwise, reference to "we," "our," and "us" are to TMI and all of its Debtor and non-Debtor subsidiaries (collectively, "Trident" or the "Company").

The Debtors commenced the Chapter 11 Cases on January 4, 2012. The Plan, which is attached hereto as Exhibit A, constitutes a separate chapter 11 plan of liquidation for each of the Debtors. The Plan provides for the formation and creation of the TMI Trust, which will hold, directly or indirectly, the TMI Trust Beneficial Interests for the sole purpose of liquidating and distributing the assets of TMI. The Plan further provides for the appointment of the Plan Administrator to liquidate and distribute the assets of TMFE.

The Debtors, the Cayman Liquidators, the Equity Committee and the Creditors Committee are pleased to propose a Plan that has the support of all of the Debtors' Creditor constituents. Confirmation of the Plan is supported by the Cayman Liquidators, the Equity Committee and the Creditors Committee. All Creditors and holders of Equity Interests entitled to vote to accept or reject the Plan are urged to affirmatively vote to accept the Plan.

Since the commencement of these Chapter 11 Cases, the Debtors and the Cayman Liquidators (and previously, the JPLs) have engaged in efforts to solicit a plan of liquidation that would be agreeable to all of the Debtors' Creditors and holders of Equity Interests and bring about consensus on certain contentious issues relating to the formulation and consummation of the Plan. Owing to these extensive efforts, the Debtors, the Cayman Liquidators, the Creditors Committee and the Equity Committee have entered into the Plan Support Agreement, the terms of which resolve for, or carve-out, all material litigation issues, eliminate the uncertainty, time delay and substantial costs that may be posed by litigating these complex, cross-border issues and, most critically, provide the Class 2.A. Creditors (the General Unsecured Creditors of TMFE not including the Debtors' Affiliates) with a substantially enhanced recovery than they would be entitled to under the Bankruptcy Code's priority of payment regime. Thus, the Plan and this accompanying Disclosure Statement encompasses the terms of the Plan Support Agreement, which the Debtors believe will provide the most efficient, cost-effective and equitable liquidation of the Debtors and their Estates.

**THE DEBTORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE THEM TO**

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 THROUGH A TIMELY, EFFICIENT AND COST-EFFECTIVE LIQUIDATION AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE CAYMAN LIQUIDATORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF TMFE AND ITS CREDITORS. THE DEBTORS, THE CAYMAN LIQUIDATORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE URGE ALL CREDITORS AND EQUITY INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.**

## ARTICLE I.

## <u>INTRODUCTION</u>

The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the Bankruptcy Code to holders of Equity Interests in and Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan filed by the Debtors with the Bankruptcy Court and (ii) the Confirmation Hearing scheduled for [_____], 2012 at _:00 _.m. (prevailing Eastern Time).

A ballot ("<u>Ballot</u>") for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement mailed to the holders of Claims and Equity Interests that the Debtors believe may be entitled to vote to accept or reject the Plan.

On [_____], 2012, after notice and a hearing, the Bankruptcy Court signed the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, a copy of which is annexed hereto as <u>Exhibit B</u>, sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A.    HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected the proposed plan are entitled to vote to accept or reject a proposed plan.

Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Article VI.B of this Disclosure Statement.

Claims in Class 2.A. (General Unsecured Claims Against TMFE not held by Debtors' Affiliates), Class 2.B. (General Unsecured Claims Against TMFE held by Debtors' Affiliates as Intercompany Claims), Class 3 (Equity Interests in TMFE) and Class 6 (Equity Interests in TMI) of the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims will receive distributions under the Plan. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan. If and to the extent any other Class identified as being unimpaired is impaired (whether as a result of the terms of the Plan or any modification or amendment thereto), upon such determination, such Class shall then be entitled to vote to accept or reject the Plan.

Claims in Class 1 (Secured Claims against TMFE), Class 4 (Secured Claims Against TMI) and Class 5 (General Unsecured Claims Against TMI) are unimpaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, Classes 1, 4 and 5 are therefore conclusively presumed to have accepted the Plan and the votes of holders of Claims in Classes 1, 4 and 5 will therefore not be solicited.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. For a more detailed description of the requirements for confirmation of the Plan, see Article VIII of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the rejection of the plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article VIII.B.2 of this Disclosure Statement.

**THE DEBTORS, THE CAYMAN LIQUIDATORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 2.A., 2.B., 3, AND 6 VOTE TO ACCEPT THE PLAN.**

## B.    VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims. The Debtors, with the approval of the Bankruptcy Court, have engaged Kurtzman Carson Consultants LLC ("<u>KCC</u>") to serve as the voting agent with respect to

Claims in Classes that are entitled to vote on the Plan. The voting agent will assist in the solicitation process by, among other things, answering questions, providing additional copies of all solicitation materials, and generally overseeing the solicitation process for Claims. The voting agent will also process and tabulate ballots for each of the respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

Ballots should be returned to:

Trident Microsystems, Inc. Voting
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

**If the return envelope provided with your Ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote the Voting Deadline (4:00 p.m. prevailing Pacific Time, _____, 2012).**

**Do not return your notes, securities, or any other documents with your Ballot.**

MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN. TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> BY NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON _____, 2012 (THE "<u>VOTING DEADLINE</u>"). ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

Any Claim in an impaired Class as to which an objection or request for estimation is pending is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan. Additionally, any Claim in an impaired Class that is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has timely filed a proof of claim and no objection has been filed to such proof of claim or if an objection is filed with respect to such proof of claim (a) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order of the Bankruptcy Court is entered temporarily allowing such claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the holder of such Claim and the Debtors resolving the objection and allowing such claim in an agreed upon amount; (d) a stipulation or other agreement is executed between the holder of such claim and the Debtors temporarily allowing the holder of such claim to vote its claim in an agreed upon amount; or (e) the pending objection to such claim is voluntarily withdrawn by the Debtors (each, a "<u>Resolution Event</u>"); provided, however, that if the Debtors object to a claim on a reduced and allowed basis the claimant may, absent a Resolution Event, vote such claim at the amount asserted by the Debtors.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set _____, 2012 as the Record Date for holders of Claims entitled to vote on the Plan. Accordingly, only holders of record as of the applicable record date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

The Plan constitutes a separate chapter 11 plan of liquidation for each Debtor. Accordingly, holders of Claims against TMI will vote on the Plan in respect of TMI and holders of Claims against TMFE will vote on the Plan in respect of TMFE. Votes of holders of Claims against TMI will not be counted for or against the TMFE Plan and vice versa.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Kurtzman Carson Consultants LLC at (888) 647-1715.

## C.    CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2012 at _:00 a.m. (prevailing Eastern Time) before the Honorable Christopher S. Sontchi, Courtroom #6, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before _____, 2012 at 4:00 p.m. (prevailing Eastern Time) in the manner described below in Article VIII.A of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. CERTAIN OF THE STATEMENTS

CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE VII OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY, REFERENCE TO THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE DEBTORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 THROUGH A TIMELY, EFFICIENT AND COST-EFFECTIVE LIQUIDATION AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE CAYMAN LIQUIDATORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF TMFE AND ITS CREDITORS. THE DEBTORS, THE CAYMAN LIQUIDATORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE URGE ALL CREDITORS AND EQUITY INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## ARTICLE II.

## OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Administrative Expense Claims, Claims and Equity Interests under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount | Approximate Percentage Recovery |
|---|---|---|---|---|
| -- | Administrative Expense Claims: Non-Professional Fee Claims | Paid in full, in Cash, without interest (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (3) at such time and upon such terms as may be agreed upon by such holder and the TMI Trustee or Plan Administrator; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that, at the discretion of the Plan Administrator or the TMI Trustee, as applicable, Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date. | Undetermined | 100% |
| -- | Administrative Expense Claims: Professional Compensation and Reimbursement Claims | Paid in full, in Cash, without interest. | Undetermined | 100% |
| -- | Priority Tax Claims | Paid in full, in Cash, without interest at the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. | Undetermined | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount | Approximate Percentage Recovery |
|---|---|---|---|---|
| 1 | Secured Claims Against TMFE | Not impaired. To the extent that any Secured Claims against TMFE exist, except to the extent that a holder of an Allowed Secured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMFE shall receive from TMFE, in full satisfaction of such Claim, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed. | $0 | 100% |

| 2.A | General Unsecured Claims Against TMFE got held by Debtors' Affiliates | Impaired.  After payment of the TMFE Secured Claims in Class 1; except to the extent that a holder of a General Unsecured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMFE not held by Debtors' Affiliates, in Class 2.A, including any holder of a Stipulated Additional Allowed Claim, in full and final satisfaction of such Claim shall receive a 90% recovery on account of the Allowed Amount of such Claims, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed. | $16,500,000 to $17,500,000 | 90% |

| 2.B | General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims | Impaired.  After (i) payment of the TMFE Secured Claims in Class 1, (ii) payment of the General Unsecured Claims against TMFE not held by Debtors' Affiliates in Class 2.A. in accordance with this Article III.B (iii) reservation of sufficient funds necessary (a) to satisfy the Disputed Claims Reserve with respect to Disputed Claims against TMFE, (b) for the Plan Administrator to carry out its duties and for the fees and expenses of the Cayman Proceedings, (c) to pay outstanding Administrative Claims in full and (d) to pay any unclaimed or undeliverable Distributions to holders of Class 2.A Claims; except to the extent that a holder of a General Unsecured Claim against TMFE held by Debtors' Affiliates has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMFE held by Debtors' Affiliates in Class 2.B., in full and final satisfaction of such Claim shall receive the remaining assets of TMFE, which shall include, without limitation, the TMFE IP Assets and Causes of Action of TMFE, and which such remaining assets of TMFE shall constitute TMI Trust Assets, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed; provided, however, that in no event shall the cash recovery (on a percentage basis) on account of Class 2.B. Claims be greater than the recovery (on a percentage basis) on account of Class 2.A. Claims. | $96,445,296 | 78% - 81% |

| 3 | Equity Interests in TMFE | No Distribution. Holders of Equity Interests in TMFE in Class 3 shall receive no Distribution under the Plan. | $0 | 0% |
| 4 | Secured Claims Against TMI | Not impaired. To the extent that any Secured Claims against TMI exist, except to the extent that a holder of an Allowed Secured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMI shall receive from TMI, in full satisfaction of such Claim, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed. | $0 | 100% |

| 5 | General Unsecured Claims Against TMI | Not impaired.  After: (i) the reservation of sufficient funds necessary for the TMI Trustee to carry out its duties and to pay outstanding Administrative Claims against TMI in full, (ii) payment of the TMI Secured Claims in Class 4, and (iii) reservation of sufficient funds necessary to satisfy all Disputed Claims against TMI in full; except to the extent that a holder of a General Unsecured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMI shall receive from the TMI Trust, in full satisfaction of such Claim, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed. | $5,500,000 to $8,000,000 | 100% |
| 6 | Equity Interests in TMI | Impaired.  After: (i) the reservation of sufficient funds necessary for the TMI Trustee to carry out its duties and to pay outstanding Administrative Claims against TMI in full, (ii) payment of the TMI Secured Claims in Class 4 and (iii) payment of the TMI General Unsecured Claims in Class 5; holders of Equity Interests in TMI in Class 6, in final and full satisfaction of such Equity Interests shall receive a Pro Rata share of the remaining TMI Trust Assets, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Equity Interest becomes Allowed. | Undetermined | Undetermined |

## ARTICLE III.

## GENERAL INFORMATION

### A.    OVERVIEW OF BANKRUPTCY LAW

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation or liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Petition Date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare, and obtain bankruptcy court approval of, a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against and equity interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

### B.    OVERVIEW OF CAYMAN INSOLVENCY LAW

TMFE is an exempted company incorporated in the Cayman Islands with limited liability.  Accordingly, in addition to the filing of the Bankruptcy cases under chapter 11 of the Bankruptcy Code, on January 4, 2012, TMFE filed a winding up petition with the Cayman Court, pursuant to section 94 of the Cayman Islands Companies Law (2011 Revision) and on January 11, 2012 obtained the appointment of joint provisional liquidators ("JPLs").  As there is no Cayman Islands equivalent to the US Chapter 11 process, a provisional liquidation is commonly used to implement the restructuring of an insolvent company in the Cayman Islands and in support of US Bankruptcy proceedings.  During the course of the provisional liquidation of TMFE, the JPLs and the Debtors worked together to ensure the efficient administration of the Cayman Proceedings in conjunction with the Chapter 11 Cases.  In this regard, to facilitate the Debtors' efforts towards maximizing value of their estates in light of the international nature of Trident's business and the dual insolvency proceedings of TMFE before the Cayman Court and the Bankruptcy Court, the Cayman Court and the Bankruptcy Court agreed upon the Joint

Provisional Liquidation Protocol between the Debtors and the JPLs which had the following objectives: (i) reducing the total costs incurred by the JPLs in protecting the interests of creditors by avoiding duplication of efforts; (ii) avoiding any potential conflict between the Cayman Proceedings and the Chapter 11 Cases; (iii) ensuring transparency and accountability in the conduct of the proceedings in the United States and the Cayman Islands; and (iv) providing a framework for protecting the interests of, and maximizing returns to, all creditors including by way of exploring a plan of compromise or arrangement with the creditors of TMFE.

On August 8, 2012, the Cayman Court heard the winding up petition and TMFE was placed into official liquidation. The JPLs were appointed as official liquidators. The Cayman Liquidators continue to work with the Debtors to ensure the efficient administration of the Cayman Proceedings in conjunction with the Chapter 11 Cases.

Upon the commencement of the official liquidation of TMFE, the Joint Provisional Liquidation Protocol was of no further effect. Accordingly, on September 12, 2012, the Bankruptcy Court and the Cayman Court agreed upon the Joint Protocol to be implemented between the Debtors, the Cayman Liquidators and Mr. Andrew Hinkelman for the orderly administration of the Bankruptcy Proceedings and the official liquidation of TMFE.

On the appointment of the Cayman Liquidators, the powers of the directors of the company ceased and instead, the company became subject to the control of the Cayman Liquidators. The Cayman Liquidators are officers of the Cayman Court and are agents of the company. They owe fiduciary duties to the company to act for proper purposes, in good faith and in the interests of the company as a whole. The interests of the company as a whole are represented by the interests of the unsecured creditors of the company where the company is insolvent, the unsecured creditors and shareholders where the company is of doubtful solvency, or the shareholders where the company is solvent. They do not represent any creditor or class of creditors or any shareholder or class of shareholders; they are required to be independent of the management of the company and its creditors and are required to behave in an even-handed fashion between creditors or groups of creditors amongst themselves.

It is a fundamental function and duty of the Cayman Liquidators to realize the company's unsecured assets, identify the company's unsecured creditors and adjudicate upon the validity and the amounts of their claims and to distribute the proceeds of realization of the company's unsecured assets (net of expenses and claims of priority creditors) to the company's unsecured creditors pro rata, and after the creditors have been paid in full to the company's shareholders in accordance with the provisions of the company's articles of association.

In this regard, pursuant to the terms of the Plan, the Cayman Liquidators will be appointed as the Plan Administrator for TMFE. The Cayman Liquidators will adjudicate Claims asserted against TMFE in accordance with Cayman Islands law and procedure and subject to the jurisdiction of the Cayman Court as set out further at Article VI.D below. The Cayman Liquidators will make Distributions pursuant to the Plan in accordance with United States Bankruptcy Law including as to the priorities set out therein and in the Plan.

## C.      OVERVIEW OF THE DEBTORS AND THEIR PRINCIPAL ASSETS

TMI was incorporated in California in 1987 and reincorporated in Delaware in 1992. TMI is the direct parent company of TMFE, which, is the direct or indirect parent of subsidiary entities organized under the laws of various foreign countries (the "Foreign Subsidiaries"). When originally incorporated, the Company focused its operations on the development and manufacture of microchips for the PC graphic design industry.  Although the Company thrived for a number of years in this industry, the Company ultimately did not succeed as this market consolidated into a few suppliers and, as a result, the Company sold the PC microchip business in early 2000.  At the same time, it redirected its focus to the new Digital TV market.  Once again the Company thrived in this market and was a market leader in video controller components until 2008 when the industry combined video and audio technology into a single microchip.  As the need for stand-alone video chips waned, the Company looked to expand into other microchip markets to become competitive again.  To that end, in May 2009, Trident acquired certain frame rate converter, demodulator and audio decoder products from Micronas Semiconductor Holding, AG.

On October 4, 2009, the Debtors entered into a Share Exchange Agreement with NXP B.V., pursuant to which Trident and TMFE agreed to acquire selected assets and liabilities of NXP's television systems and in exchange for the issuance to NXP of such number of shares of Trident common stock equal to 60% of the outstanding shares, after giving effect to the share issuance to NXP.  On February 8, 2010, the parties completed the acquisition and Trident received cash proceeds of $44 million in exchange for the issuance of 104,204,348 new shares of Trident common stock.  Additionally, Trident issued to NXP four shares of Trident's Series B Preferred Stock.  The Series B Preferred Stock were issued pursuant to an Amended and Restated Certificate of Designation of Series B Preferred Stock that TMI filed with the Secretary of State of Delaware in February, 2010.  The holder of the Series B Preferred Stock had the right to designate four nominees to TMI's Board of Directors.  In February 2010, Trident then completed the acquisition of the television and set-top box business lines from NXP Semiconductor NV.  As a result of the completion of this acquisition, Trident acquired the STB and TV Businesses from NXP, and NXP was issued approximately 60% of the common voting stock in TMI, together with four shares of Series B Preferred Stock.

In connection with the acquisition from NXP and due to NXP's exclusive production capacity, TMFE entered into a Manufacturing Services Agreement (the "MSA") with NXP, pursuant to which, NXP would provide for the manufacturing and sale of wafers and the provision of services related thereto by NXP as ordered by the Debtors and certain of their affiliates.  The MSA also contained certain minimum purchasing requirements that declined over the life of the contracts.  The services provided by NXP under the terms of the MSA included, among other things (i) the manufacturing of wafers up to the process control module electrical test and any other services performed before a wafer leaves the manufacturing facility; (ii) any operation performed on a wafer after it has left the wafer manufacturing site, including, but not limited to, wafer testing, grinding, sawing, assembly, final test, marking and packing; and (iii) certain customer services, order fulfillment, test and product engineering and business reporting.

With the acquisitions of the Micronas and NXP business, the majority of the Company's operations then focused on the set-top box and television business lines, with its remaining

operations focused on the audio and demodulator product lines.  Prior to the commencement of these Chapter 11 Cases, Trident designed, developed, and marketed integrated circuits and related software for processing, displaying, and transmitting high quality audio, graphics, and images in home consumer electronics applications such as digital TVs, PC-TV, and analog TVs, and set-top boxes. Trident's product line included system-on-a-chip semiconductors that provided completely integrated solutions for processing and optimizing video, audio, and broadcast and satellite signals to produce high-quality and realistic images and sound.  Trident's products also included frame rate converter, demodulator, audio decoder products, interface devices, and media processors.  Trident's customers have included many of the world's leading manufacturers of consumer electronics, computer display, and set-top box products including Samsung, LG, Sony, Sharp, Philips, Comcast, and DirecTV.

TMI served as the corporate head of the Company and provided the corporate oversight and administrative services necessary for the Company's operations.  TMFE served as the manufacturing procurement hub and primary accounts payable center for the Company.  TMFE held most of the Company's intellectual property assets and contracts with all suppliers for use of the intellectual property and the production of finished goods.  Pursuant to a distribution and supply agreement between TMFE and non-debtor Trident Microsystems (Hong Kong) Limited ("TMHK"), TMFE sold such finished goods to TMHK for re-sale to the Company's customers.  TMFE also served as the Company's primary accounts payable processor and processes payments due to suppliers as well as payments to the non-revenue generating Foreign Subsidiaries that provide research and development, sales and marketing services for the Company.

The Debtors' principal executive offices were located in Sunnyvale, California.  The Company had research and development facilities in Beijing and Shanghai, China; Freiburg, Germany; Eindhoven and Nijmegen, The Netherlands; Belfast, United Kingdom; Bangalore and Hyderabad, India; Austin, Texas; and Sunnyvale, California.  The Company had sales offices in Seoul, South Korea; Tokyo, Japan; Hong Kong and Shenzhen, China; Taipei, Taiwan; San Diego, California; Mumbai, India; and Suresnes, France.  The Company also had operations facilities in Taipei and Kaoshiung, Taiwan; and Hong Kong, China.  The following organizational chart highlights the Company's corporate structure:



Trident Microsystems, Inc. [US]
Trident Microsystems (Far East) Ltd. [Cayman Islands]
Non-Debtor Corporation
Debtor Corporation
Non-Debtor Branch/Rep Office
Liquidation/Termination Proceedings Ongoing or Planned
Trident Microsystems Holding B.V. [Netherlands]
Trident Microsystems (Europe) GmbH [Germany]
Trident Microsystems (Europe) B.V. [Netherlands]
Trident Microsystems (Korea), Limited [Korea]
Trident Microsystems (Hong Kong) Limited [Hong Kong]
Trident Microsystems (Singapore) Pte. Ltd. [Singapore]
Trident Microsystems (Beijing) Co., Ltd. [China]
Trident Multimedia Technologies (Shanghai) Co., Ltd. [China]
Trident Microelectronics Ltd. [Taiwan]
Trident Microsystems (Taiwan) Ltd. [Taiwan]
Trident Microsystems (Nederland) B.V. [Netherlands]
TMT - Shenzhen Branch [China]
TMBV - France Branch [France]
Trident Microsystems (Israel) Ltd. [Israel]
Trident Microsystems (Japan) GK [Japan]
Trident Digital Systems (UK) Ltd [UK]
Trident Microsystems (India) Pvt. Ltd. [India]
Trident Microsystems (Europe) B.V. Korea Branch [Korea]
Trident Microsystems (Europe) B.V. H.K. Branch [Hong Kong]

The key functions of Trident's businesses have been:

### Research and Development and Intellectual Property

TMFE is the economic and legal owner of all economically valuable and non routine Trident IP, including but not limited to patents, copyrights, product IP, trademarks, trade names, certain marketing intangibles and trade secrets.  At no time did TMFE have any employees or physical facilities, and thus, it contracted with other Trident affiliates to perform research and development ("R&D") on its behalf.  The Debtors had R&D operations in Austin, Texas, Sunnyvale, California and San Diego, California.  Developing products based on advanced technological concepts was essential to Trident's ability to compete effectively in the digital media market, and the extensive team of R&D staff (which comprised 1,128 people and total expenditures of $175 million in fiscal year 2010) was at the forefront of these developments.

The R&D department was responsible for the research and design of Trident products. The department was structured into three areas:  1) Intellectual Property Development, 2) Software, and 3) System on a Chip ("SoC").  Each of these areas had application, middleware, and hardware engineers that focused on some of the following activities:

- Application engineering;
- Demodulator engineering;
- SoC engineering;
- Software engineering;
- STB engineering;
- STB software creation;
- System architecture; and
- Video R&D.

### Sales

Trident's sales organization consisted of sales and field application staff or other support personnel located throughout the world.  The sales organization was geographically aligned into six regions:

- Americas  including North America and Brazil;
- Europe;
- Korea;
- Japan;
- Greater China and Taiwan; and
- South Asia Pacific.

Since July 1, 2009, the majority of Trident's sales have been handled by direct sales teams in Asia, with TMI providing sales, marketing and support services to these teams.  From 2006 through 2009, TMI performed the support services (including sales and marketing) for the benefit of TMFE, on behalf of its branch, TMHK.  Since that time, such services have been provided directly to TMHK, a wholly owned subsidiary of TMFE.  TMI's sales and marketing

support activities primarily consisted of marketing research, industry trend analysis, and next generation product marketing.  Subsequent to the acquisition of the TV and STB business lines from NXP in early 2010, TMI increased its STB sales activities in the U.S. due to the location of the key STB customers.

### *Marketing*

At all relevant times Trident had a global, yet centralized marketing and communications team that was tasked with determining the messaging strategies for Trident's business goals.  These messaging strategies were used in the following:

- • Media;
- • Industry analysts;
- • Investor relations;
- • Trade shows and events;
- • Website; and
- • Employee communications.

While all marketing efforts were coordinated by TMI, global marketing strategies were outsourced to a third party provider.  Local marketing assistance was brought in as needed and additional marketing assistance was provided at the business unit level to determine marketing strategies.

### *Information Technology ("IT") Operations*

The Trident IT department oversaw and managed the IT solutions Trident employed to operate its business.  IT operations and management personnel were located worldwide with a majority working out of the Sunnyvale and Shanghai offices and providing IT services to TMFE.  The IT operations department managed the following operations on a global basis with specialists located worldwide:

- • Business applications including office applications, engineering applications, and computer aided design applications;
- • IT workstations including laptops and desktops;
- • IT network systems including servers, computer farms and data centers;
- • Software licensing;
- • Company email; and
- • Data security.

### *Human Resources ("HR")*

Operating out of Sunnyvale (with staff in various offices), Trident's Human Resources Department was focused on the following activities:

- • Determining the structure of compensation and benefits;
- • Setting global processes and policies;
- • International benefits and mobility;
- • Implementing HR systems;

- Corporate communications and building morale; and
- Facilities.

### Accounting and Finance

The Accounting & Finance Department based at TMI's Sunnyvale headquarters, handled corporate affairs including investor relations, press releases for financial information, Section 404 compliance, SEC reporting, company restructure planning, tax planning, TMI financial planning, agreement review, and special assignments from management.  It was also responsible for TMI's accounts receivable, accounts payable, fixed assets, inventory, payroll and general ledger.

### Operations

As Trident historically outsourced the manufacture of its products, the operations department was a global department responsible for managing a stable supply chain for TMFE and TMHK.  These activities took place mainly in Taiwan and Hong Kong and consisted of the following activities:

- Product planning, including qualifying vendors and placing orders with vendors;
- Product quality control and testing;
- Warehousing and distribution, managed by Trident, but outsourced to DHL;
- Customer service; and
- Technical support activities, including resolving technical issues at manufacturing sites in coordination with the specific business units (TV or STB).

TMI's operations provided support to the sales and marketing support teams, procurement services, supply chain management and tests and ensured product quality in advance of distribution.

### Executive Office

Located in Sunnyvale, the Executive Office included the CEO/President, who along with senior staff, concentrated on corporate affairs, the Company's overall direction, investment, investor and public relations as well as additional personnel who managed business integration and corporate quality.  In addition, the Office of the General Counsel continues to provide legal services all of the Trident entities.

## D.   PREPETITION INDEBTEDNESS AND THE INTERCOMPANY AGREEMENTS

The Debtors do not have any secured debt or outstanding bonds.  The Debtors' debt is primarily owed either to various trade vendors that provide goods and services to TMFE, or on account of various intercompany payables.

1.      ***Unsecured Claims Other Than Intercompany Claims***

Based upon those proofs of claim that were timely filed prior to the Bar Date[3], approximately $5,500,000 to $8,000,000 General Unsecured Claims were filed against TMI, approximately $16,500,000 to $17,500,000 General Unsecured Claims were filed against TMFE (not including the TMI Claim), and approximately $73,000,000 General Unsecured Claim were filed by TMI against TMFE.

2.      ***The Intercompany Agreements***

For various business reasons, including, but not limited to, U.S. and foreign tax considerations, it is common in many industries, including the semiconductor industry, for companies to enter into contractual agreements with respect to service being provided among the related parent, subsidiary and sister entities.  As far back as 2006, Trident entered into certain intercompany agreements (i) by and between TMI and TMFE, (ii) between each of TMI and TMFE and certain non-Debtor Foreign Subsidiaries (with respect to the intercompany agreements with at least one Debtor as a party, the "Debtor Intercompany Agreements"), and (iii) between non Debtor Foreign Subsidiaries only (the "Non Debtor Intercompany Agreements," and together with the Debtor Intercompany Agreements, the "Intercompany Agreements").  The Intercompany Agreements can generally be described as falling into one of the following three categories:  (x) Non Exclusive Sales and Marketing Agreement, (y) Support Services Agreement, or (z) Research and Development Services Agreement.   Of special importance are the following four Debtor Intercompany Agreements:

- • Support Services Agreement entered into on September 1, 2006 by and between Trident Microsystems (Far East), Ltd. and Trident Microsystems, Inc. (and the Amendment thereto) (the "Support Services Agreement");

- • Research and Development Services Agreement entered into on September 1, 2006 by and between TMFE and TMI (collectively with the foregoing, the "TMFE TMI Agreements");

- • Distribution and Supply Agreement entered into on June 1, 2009 by and between TMFE and Trident Microsystems (Hong Kong) Ltd. (the "TMFE TMHK Agreement"); and

- • Non-exclusive International Distribution Agreement entered into on February 5, 2010, by and between Trident Microsystems (Hong Kong) Ltd., and TMI (the "TMI-TMHK Agreement").

In short, the Support Services Agreement provided that in exchange for a "Support Services Fee," TMI shall perform "Support Services" for the benefit of TMFE, which included, but was not limited to, (a) general and administrative services (including finance, human

---

[3]      The Debtors have not completed their review of the Proofs of Claim filed in this case and, therefore, reserve any and all rights to reduce, reclassify or otherwise object to such Proofs of Claim, and nothing herein shall constitute a waiver of such rights.

resources, legal and IT support); (b) support for marketing activities; or (c) other such services that TMFE may have requested from time to time. Overall, under the Support Services Agreement TMI provided (i) management, general and administrative, (ii) sales and marketing support services, and (iii) technical services to its foreign affiliates. In exchange for its services, TMI received a fixed service fee which includes costs plus a percentage mark up. TMI utilized its office premises, staff, equipment and computers for the purpose of providing these services.

Similarly, the Research and Development Services Agreement provided that in exchange for a "R&D Services Fee," TMI shall provide all research and development services that TMFE may request. As discussed above, TMFE was the economic and legal owner of all economically valuable and non routine Trident intellectual property, including but not limited to patents, copyrights, product IP, trademarks, trade names, certain marketing intangibles, and trade secrets. As noted above, TMFE did not perform any R&D on its own, but rather, contracted with Trident affiliates, including TMI, to perform R&D services on its behalf. The Trident R&D department historically had R&D sites located throughout the world performing R&D services on behalf of TMFE. These contractual agreements between TMFE and the contract R&D providers guaranteed the R&D providers payment of their costs plus a mark up on costs. Relying upon their extensive R&D infrastructure, the development of products based on advanced technological concepts had been essential to Trident's ability to compete effectively in the digital media market.

Finally, the TMFE-TMHK and TMI-TMHK Agreements provided that TMHK is each entity's non exclusive distributor for the purpose of promoting, marketing, distributing and selling products.

In order to support the Intercompany Agreements, the Company implemented a formalized practice of accounting for intercompany charges pursuant to an official policy of the Company. In addition, the Company engaged PWC to complete annual transfer pricing analyses dating back to 2008, with the Company having performed such analyses for 2006 and 2007. The transfer pricing analyses by the Company in 2006 and 2007, and PWC from 2008 to 2011, found TMI's pricing of the Intercompany Agreements fall within appropriate ranges.

### 3.    _Economics of the Intercompany Agreements_

Based upon the terms of the Intercompany Agreements, both prior to and following the Petition Date, the Debtors and the Foreign Subsidiaries have incurred substantial amounts on account of the Intercompany Agreements. The chart below indicates the intercompany claims (both Debtor and non-Debtor) paid since 2010.

**Intercompany Claims Paid by the Debtors Since 2010**

| Company Name | Paid by TMI (USD) | | Paid by TMFE (USD) | |
|---|---|---|---|---|
| Trident Microsystems, Inc. | *n/a* | $ | | 115,351,007 |
| Trident Microsystems India Pvt. Limited | - | | | 29,822,280 |
| Trident Microsystems (Europe) GmbH | 38,151 | | | 14,714,987 |
| Trident Microsystems (Nederland) B.V. | 160,244 | | | 4,354,670 |
| Trident Microsystems (Singapore) Pte. Ltd. | - | | | - |
| Trident Digital Systems (UK) Limited | 68,135 | | | 14,856,732 |
| Trident Microsystems (Nederland) B.V. France Branch | - | | | 448,436 |
| Trident Microsystems ( Europe) B.V. | 438,953 | | | 14,359,997 |
| Trident Microsystems (Haifa) Ltd. | 108,060 | | | 6,035,952 |
| Trident Microsystems (Hong Kong) Limited | 9,591,351 | | | 4,257,732 |
| Trident Microsystems (Europe) B.V. Taiwan Branch | - | | | - |
| Trident Microsystems (Japan) GK | - | | | - |
| Trident Microsystems (Europe) B.V. Korea Branch | - | | | - |
| Trident Microsystems (Far East) Limited (HK Branch) | - | | | - |
| Trident Microsystems (Far East), Ltd. | 232,500 | | | *n/a* |
| Trident Microelectronics Ltd. | 46,457 | | | - |
| Trident Technologies, Inc. | - | | | - |
| Trident Microsystems (Taiwan), Ltd. | - | | | 13,043,670 |
| Trident Microsystems (Korea) Limited | 15,546 | | | - |
| Trident Multimedia Systems, Inc. | - | | | - |
| Trident Microsystems (Beijing) Co. Ltd. | - | | | 1,181,543 |
| Trident Multimedia Technologies (Shanghai) Co. Ltd. | 643,855 | | | 32,260,894 |
| Total | $ | 11,343,251 | $ | 250,687,900 |

Over $200 million of intercompany payables remain outstanding. The below chart indicates the receivables that, as of the Petition Date, are unpaid.

| Affiliate Receivable Balances as of the Petition Date | | |
|---|---|---|
| Company Name | | Amount (USD) |
| Trident Microsystems, Inc. | $ | 87,272,253 |
| Trident Microsystems India Pvt. Limited | | 2,514,670 |
| Trident Microsystems (Europe) GmbH | | 4,809,042 |
| Trident Microsystems (Nederland) B.V. | | 2,447,376 |
| Trident Microsystems (Singapore) Pte. Ltd. | | - |
| Trident Digital Systems (UK) Limited | | 3,505,717 |
| Trident Microsystems (Nederland) B.V. France Branch | | 1,444,558 |
| Trident Microsystems ( Europe) B.V. | | 21,001,493 |
| Trident Microsystems (Haifa) Ltd. | | 696,953 |
| Trident Microsystems (Hong Kong) Limited | | 10,573,139 |
| Trident Microsystems (Europe) B.V. Taiwan Branch | | - |
| Trident Microsystems (Japan) GK | | 355,289 |
| Trident Microsystems (Europe) B.V. Korea Branch | | - |
| Trident Microsystems (Far East) Limited (HK Branch) | | 1,896,900 |
| Trident Microsystems (Far East), Ltd. | | 43,295,725 |
| Trident Microelectronics Ltd. | | 1,219,597 |
| Trident Technologies, Inc. | | - |
| Trident Microsystems (Taiwan), Ltd. | | 42,922 |
| Trident Microsystems (Korea) Limited | | - |
| Trident Multimedia Systems, Inc. | | - |
| Trident Microsystems (Beijing) Co. Ltd. | | 70,386 |
| Trident Multimedia Technologies (Shanghai) Co. Ltd. | | 19,751,661 |
| Total | $ | 200,897,682 |

In addition to the Intercompany Agreements, there are several intercompany loan agreements that are attributable to severance and restructuring costs incurred by the Foreign Subsidiaries prior to the Petition Date that could not be paid without additional funding by TMFE. Trident took the position that these costs were not associated with support or other services and that such amounts could not be paid through an arm's length transaction between two unrelated parties. The aggregate amount of the intercompany loans as of March 31, 2012, was $37.7 million, with nearly $22 million owed to TMFE by two of its European subsidiaries. TMI is not a party to any such intercompany loan.

Prior to the Bar Date, certain of the Debtor and non-Debtor subsidiaries filed proofs of claim against the Debtors, as described below.

($Actual)

| Claim # | Claimant | Claim Amount |
|---|---|---|
| *Intercompany Claims Filed Against TMFE* | | |
| 147 | Trident Digital Systems (UK) Limited | $ 3,477,851 |
| 150 | Trident Microsystems (Beijing) Co. Ltd. | 62,091 |
| 96 | Trident Microsystems (Haifa) LTD. | 696,953 |
| 146 | Trident Microsystems (Nederland) B.V. France Branch | 39,795 |
| 151 | Trident Microsystems (Taiwan), Ltd. | 42,922 |
| 152 | Trident Microsystems India Pvt. Limited | 1,084,016 |
| 182 | Trident Microsystems, Inc. | 73,215,368 |
| 144 | Trident Multimedia Technologies (Shanghai) Co. Ltd. | 17,826,300 |
| | | $ 96,445,296 |
| | | |
| *Intercompany Claims Filed Against TMI* | | |
| 132 | Trident Multimedia Technologies (Shanghai) Co. Ltd. | $ 18,685 |
| 145 | Trident Microsystems (Nederland) B.V. | 6,506 |
| | | $ 25,191 |

With respect to the Claims asserted by Trident Digital Systems (UK) Limited, Trident Microsystems (Beijing) Co. Ltd., Trident Microsystems (Nederland) B.V. France Branch, Trident Microsystems (Taiwan), Ltd., Trident Microsystems India Pvt. Limited, Trident Multimedia Technologies (Shanghai) Co. Ltd. and Trident Microsystems (Nederland) B.V., the non-debtors expressly reserved their rights to modify, amend or withdraw such proofs of Claim to the extent that the non-Debtor entity has adequate resources to satisfy all of its outstanding obligations, including, but not limited to, those of employees, governmental entities or other creditors. It is currently contemplated that all of the non-Debtor entities will be able to satisfy their obligations, except for Trident Microsystems (Haifa) LTD., Trident Microsystems (Nederland) B.V. France Branch and Trident Microsystems (Nederland) B.V.

In addition, on July 30, 2012, PWC completed its transfer pricing analysis and report in connection with the Intercompany Agreements for the fiscal year ended December 31, 2011. As a result of such analysis, on August 17, 2012, TMI amended the TMI Claim to reflect an amended claim amount of $73,215,368.

On August 8, 2012, the Creditors Committee filed an objection to the TMI Claim seeking entry of an order disallowing the TMI Claim in part or in whole, or recharacterizing the TMI Claim as an equity interest [D.I. 827]. On the same day, the Creditors Committee filed an adversary complaint requesting equitable subordination of the TMI Claim to claims of non-insider unsecured creditors pursuant to section 510(c) of the Bankruptcy Code. The Plan provides for the Creditors Committee withdrawal, with prejudice, of both the TMI Claim objection and the adversary complaint on the Effective Date.

## E.    RECENT FINANCIAL INFORMATION

For the six months ending June 30, 2012, the Company had total net revenues of $67.1 million and total net losses of $61.4 million excluding reorganization expenses.

## ARTICLE IV.

## KEY EVENTS LEADING TO THE
## COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    FINANCIAL CHALLENGES

Like many technology based industries, the set-top box and television industries in which the Company focused its operations have been undergoing rapid changes which have made it difficult for the Company to operate profitably.  The Company has faced increased pricing pressure from Taiwanese system on a chip (SoC) suppliers who have recently made great inroads in penetrating the market.  Additionally, industry semiconductor inventory levels are currently elevated due to slowdown in consumer electronics markets primarily driven by overall slowdown in Western economies, which has forced all market participants, including the Company, to further adjust pricing to manage inventory levels.  These pricing pressures have been compounded by set-top box manufacturers who have been slower than anticipated in launching new products.  As a result, suppliers have been straddled with higher than anticipated inventory levels and high development costs that cannot be offset by next generation product sales.  In addition to these pricing and inventory pressures, there has also been a shift in the industry's supply chain dominated by Asian original equipment manufacturers and TV manufacturers who are increasingly depending on manufacturing system on a chip and frame rate converter components for high-end TVs in-house, reducing the need to look to outside suppliers for products.

As a result of the above events, the Company experienced continued operating losses which resulted in declining cash in the year prior to the filing of these Chapter 11 Cases.  The deteriorated value of the outstanding common stock and the termination of a line of credit restricted the Company's ability to raise money through traditional means.  The combination of lower margins and sale volumes, high employee costs and limited access to new capital significantly affected the Company's liquidity and ability to pay its debts as they become due.

### B.    OUT-OF-COURT RESTRUCTURING EFFORTS

Prior to filing these Chapter 11 Cases, the Debtors undertook a marketing effort to identify a potential purchaser of their set-top box business line.  In June of 2011, Entropic Communications, Inc. ("Entropic") expressed strong interest in the STB Business.  At that time, however, the Company had been approached by another party regarding an overarching sale of the Company and was having ongoing discussions with other prospective purchasers.  As 2011 progressed, the sale of the STB Business became the preferred alternative, and the Debtors' financial advisors assessed the likelihood of completing a sale with various potential purchasers of the STB Business among a small group of likely purchasers.  At that point, Entropic appeared the most viable purchaser of these assets, and the Company subsequently entered into an exclusivity agreement with Entropic.  In an attempt to right-size the business, on September 21, 2011, the Board of Directors approved a workforce reduction plan, which was designed to take the number of employees from 1,275 down to approximately 1,000.  Despite the reduction in work force, the Company continued to suffer declining revenue and losses and experienced a continuous decline in its cash balances.  During this time, a confluence of factors, including the

Company's liquidity, made it clear that the sale of the STB Business could only be accomplished under chapter 11 of the Bankruptcy Code.  The Debtors believed that a rapid sale of the STB Business as well as the Company's other key businesses would allow them to immediately stop the drain on cash balances and afford them an opportunity to determine such other steps necessary to reorganize their remaining operations and maximize the return to the Debtors' Creditors.  Accordingly, the Company determined that it was necessary to file these Chapter 11 Cases in order to restructure its operations.

## ARTICLE V.

## SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

### A.    RETENTION OF PROFESSIONALS BY THE DEBTORS

On January 31, 2012, the Court authorized the Debtors to retain DLA Piper LLP (US) as their attorneys pursuant to section 327(a) of the Bankruptcy Code in connection with these Chapter 11 Cases [D.I. 146].  Additionally, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, the Court authorized the Debtors to retain PricewaterhouseCoopers ("PWC") as tax services provider and independent auditor [D.I. 127 & 597], as well as Union Square Advisors LLC as the Debtors' Investment Banker [D.I. 136].  The Court also authorized the Debtors to retain Epping Hermann Fischer Patentanwaltsgesellschaft mbH as Special Counsel for Foreign IP Matters [D.I. 180].  Finally, the Court authorized the Debtors to retain Andrew Hinkelman as Chief Restructuring Officer, supported by additional personnel from FTI Consulting, Inc. to provide critical management services [D.I. 129 & 247] and also authorized the Debtors to expand the scope of employment of FTI Consulting, Inc. such that Andrew Hinkelman would serve in the role of the Debtors' CEO upon the resignation of Bami Bastani [D.I. 491].

### B.    CAYMAN PROCEEDINGS

In addition to the filing of the Bankruptcy cases under chapter 11 of the Bankruptcy Code, on January 5, 2012, TMFE, an exempted company incorporated in the Cayman Islands with limited liability, filed a winding up petition with the Cayman Court pursuant to section 94 of the Cayman Islands Companies Law (2011 Revision).  On January 11, 2012, the Cayman Court appointed Gordon MacRae and Eleanor Fisher of Zolfo Cooper (Cayman) Limited as the JPLs.  On January 24, 2012, the JPLs wrote to all creditors of TMFE informing them of the Cayman Proceedings, and inviting the creditors to attend a meeting February 15, 2012, at which the Cayman Provisional Committee was formed.

During the course of the provisional liquidation, the JPLs and the Debtors have worked together to ensure the efficient administration of the Cayman Proceedings in conjunction with the Chapter 11 Cases. In this regard, to facilitate the Debtors' efforts towards maximizing value of their estates in light of the international nature of Trident's business and the dual insolvency proceedings of TMFE before the Cayman Court and the Bankruptcy Court, the Cayman Court and the Bankruptcy Court agreed upon the Joint Provisional Liquidation Protocol between the Debtors and the JPLs which had the following objectives: (i) reducing the total costs incurred by the JPLs in protecting the interests of creditors by avoiding duplication of efforts; (ii) avoiding

any potential conflict between the Cayman Proceedings and the Chapter 11 Cases; (iii) ensuring transparency and accountability in the conduct of the proceedings in the United States and the Cayman Islands; and (iv) providing a framework for protecting the interests of, and maximizing returns to, all creditors including by way of exploring a plan of compromise or arrangement with the creditors of TMFE. The Joint Provisional Liquidation Protocol was subsequently supplemented and amended on June 8, 2012 to include procedures for the submission of creditor claims.

The winding up petition was first listed for hearing before the Cayman Court on February 16, 2012. At this time the hearing was adjourned until July 3, 2012 to allow the JPLs and the Debtors to continue to explore restructuring proposals for the Company. As the assets sales referred to below progressed, it became evident that a restructuring of the Company as a going concern would not be possible. Accordingly, the hearing of the winding up petition was brought forward to May 28, 2012 to canvas the views of the creditors as to whether the provisional liquidation should continue. At the hearing on May 28, 2012, the Cayman Court made one further adjournment of the hearing of the winding up petition to August 8, 2012, following an application from TMFE that it remain in provisional liquidation. The provisional liquidation was extended because the agreements negotiated for the sale of the STB Business and the TV Business included transition service agreements, which required ongoing assistance from the Debtors to the purchasers following the closing of the sales transactions. Placing TMFE into official liquidation in the Cayman Proceeding at that time would have caused substantial disruption to the provision of services under such transition service agreements, which could have left TMFE open to indemnity or alleged breach claims from the purchasers or other third parties.

On August 8, 2012, the Cayman Court heard the winding up petition and TMFE was placed into official liquidation. The JPLs were appointed as official liquidators. The Cayman Liquidators continue to work with the Debtors to ensure the efficient administration of the Cayman Proceedings in conjunction with the Chapter 11 Cases.

On September 12, 2012, the Cayman Court and the Bankruptcy Court approved the implementation of the Joint Protocol for the purpose of the orderly conduct of the official liquidation in conjunction with the Chapter 11 Cases.

Upon confirmation of the Plan, it is proposed that the New Joint Protocol will be implemented which, among other things, will set out the process by which the Cayman Liquidators will adjudicate upon Claims against TMFE in accordance with Cayman Islands Law and make Distributions pursuant to the Plan in accordance with, and subject to the priorities of, United States Bankruptcy Law. The Plan is conditioned upon the Bankruptcy Court and the Cayman Court approving the New Joint Protocol.

## C.    FORMATION OF THE CREDITORS COMMITTEE

The Office of the United States Trustee formed the Official Committee of Unsecured Creditors of TMI on January 18, 2012 [D.I. 75], which such appointments were amended on July 2, 2012 and July 6, 2012. Currently, the Creditors Committee is comprised of the following members: (i) United Microelectronics Corporation, (ii) Cisco Systems, Inc. and (iii) Cadence

Design Systems BV (Netherlands).  These same members also made up the Cayman Provisional Committee.  The Creditors Committee has retained Pachulski Stang Ziehl & Jones LLP as their counsel [D.I. 361] and Imperial Capital, LLC as their investment banker and financial advisor [D.I. 512].  The Cayman Provisional Committee has retained Solomon Harris as their counsel for the purpose of participating in the Cayman Proceedings.

## D.    FORMATION OF THE EQUITY COMMITTEE

The Office of the United States Trustee formed the Statutory Committee of Equity Security Holders of Trident Microsystems, Inc. on February 14, 2012 [D.I. 190].  The Equity Committee has retained Proskauer Rose LLP and Bayard, P.A. as counsel [D.I. 372 & 747], Quinn Emanuel Urquhart & Sullivan, LLP as conflicts counsel [D.I. 374], Alvarez & Marsal North America, LLC as financial advisor [D.I. 375] and Campbells as counsel in the Cayman Proceedings [D.I. 762].

## E.    "FIRST DAY" RELIEF

As in many large chapter 11 cases, the Debtors filed a variety of customary motions on the Petition Date which were designed to facilitate their smooth transition into bankruptcy.

### 1.    *Joint Administration*

On January 5, 2012, the Bankruptcy Court entered a final order allowing the joint administration of these Chapter 11 Cases solely for procedural purposes to reduce the financial and other resources spent on administering the Chapter 11 Cases [D.I. 24].

### 2.    *Cash Management*

The Bankruptcy Court entered an interim order on December 15, 2012 [D.I. 27], and a final order on January 30, 2012 [D.I. 133], authorizing the Debtors to continue using their established cash management system, bank accounts, and documents related to the bank accounts in lieu of closing existing accounts and establishing an entirely new post-petition cash management system, to avoid disruption.  On September 12, 2012, the Bankruptcy Court also approved an order amending the cash management order to, among other things, ensure that the cash management order does not conflict with the powers and obligations of the Cayman Liquidators.

### 3.    *Employee Wages*

As of the Petition Date, the Debtors and their non-Debtor subsidiaries had approximately 1,100 employees.  The Debtors believed that it was critical for them to retain their employees as their knowledge and understanding of the Debtors' operations was essential for the Debtors to continue to operate during the Chapter 11 Cases.  Any delay in paying pre-petition or post-petition compensation or benefits to the Debtors' employees would have destroyed the Debtors' relationship with their employees and would have irreparably harmed employee morale at a time when the dedication, confidence and cooperation of the Debtors' employees was most critical.  On January 5, 2012, the Bankruptcy Court entered an interim order granting the Debtors the authority to pay pre-petition compensation and continue benefits provided to employees

(including, but not limited to, paid time off, health insurance and other benefits) in the ordinary course of the Debtors' businesses [D.I. 26] and, on January 30, 2012, the Bankruptcy Court entered a final order approving the same [D.I. 131].

### 4. *Critical Vendors*

The Bankruptcy Court entered an order on January 5, 2012, authorizing the Debtors to pay certain claims of service providers and suppliers that provide the Debtors with essential goods and services that are critical to the Debtors' operations [D.I. 29].  The Bankruptcy Court authorized such prepetition payments in an aggregate amount not to exceed $2,000,000.  To date, the Debtors have only made such prepetition payments to the critical vendors in the amount of $644,580.

### 5. *Retention of KCC as Claims and Noticing Agent*

The Bankruptcy Court entered an order on January 6, 2012, authorizing the Debtors to retain KCC to perform certain claims, noticing and balloting functions in the Chapter 11 Cases. The order retaining KCC further provided that the fees and expenses incurred pursuant to KCC's provision of services would be treated as administrative expenses of the Debtors' estates.

## F. OTHER SIGNIFICANT MOTIONS

### 1. *Ordinary Course Professionals*

The Debtors have a number of professionals that provide financial, real estate, technology, legal, tax and other services in the ordinary course of the Debtors' business.  As these ordinary course professionals are already familiar with the Debtors and their business, the Debtors requested authority to continue paying each such professional for services rendered and disbursements actually incurred.  The Bankruptcy Court entered an order on January 30, 2012 authorizing such payments to professionals, up to a cap of $35,000 per month per professional, without further approval of the Bankruptcy Court and also procedures for approval and payment of fees in excess of the $35,000 limit [D.I. 138].

### 2. *Performance-Based Incentives for Key Employees*

The Debtors had a number of key employees whose full dedication, the Debtors believed, would be imperative to maintain the full dedication of these key employees in connection with the Debtors' efforts to complete their asset sales and/or liquidate the Company.  Accordingly, on January 5, 2012, January 30, 2012, June 21 and July 10, the Bankruptcy Court entered orders granting the Debtors the authority to (i) implement a performance-based key employee incentive plan (the "KEIP"), (ii) provide performance-based incentives for certain additional key employees, (iii) implement a wind-down retention plan and (iv) provide supplemental performance-based incentives for certain additional key employees.  [D.I. 134, 250, 708 and 763].  With respect to the seven key officers that were entitled to receive payments under the KEIP, all but David Teichmann have resigned from the Debtors' employ, including most critically, Bami Bastani as Chief Executive Officer on May 4, 2012.

3.    *Vacation and Severance Pay*

The Debtors requested authority to pay employees' prepetition accrued vacation and sick or personal days, as well as severance benefits when employees left the Debtors' employ.  On January 30, 2012, the Bankruptcy Court granted the Debtors authority to pay employees' prepetition accrued vacation and sick or personal days, not subject to the $11,725 cap in section 507(a)(4) of the Bankruptcy Code and also authorized the Debtors to make severance payments to their rank and file employees terminated without cause after the Petition Date in accordance with their past practices, not subject to the $11,725 cap in section 507(a)(4) of the Bankruptcy Code; provided, however, that the total of severance payments made by the Debtors was not to exceed a cap of $3,300,000 in the aggregate [D.I. 132].  Furthermore, on February 24, 2012, the Bankruptcy Court approved the continued payment of certain retention bonuses payments and other incentive plans that were instituted by the Debtors to certain of their rank and file employees prior to the Petition Date [D.I. 251].   These payments were necessary to maintain good workplace morale at the time of the commencement of the Chapter 11 Cases.

4.    *2004 Motion*

On April 27, 2012, the Equity Committee filed a motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, requesting the examination of (i) NXP B.V., (ii) NXP Semiconductors Netherlands B.V. and (iii) Richard Clemmer, David Kerko, Philippe Geyres and A.C. D'Augustine, as former directors of NXP [D.I. 524] (the "2004 Motion").  The 2004 Motion sought discovery due to NXP's roles as (i) the entity which sold the Debtors the STB Business approximately two years prior to the Petition Date; (ii) the Debtors' controlling stockholder; and (iii) the Debtors' largest supplier and creditor.  Following the hearing on the 2004 Motion, the Debtors, NXP and the Equity Committee reached an agreement in principle resolving the Motion and, on May 25, 2012, the Bankruptcy Court entered an Agreed Order with respect to the 2004 Motion [D.I. 631].  The Agreed Order provided, among other things, that NXP and the Debtors shall produce materials (subject to withholding documents based on the attorney-client privilege and/or work product doctrine) that are responsive to such document requests.  Both NXP and the Debtors have, pursuant to the Agreed Order, begun producing documents to the Equity Committee on a rolling basis, and such discovery is ongoing.

5.    *505 Motion*

Transfer pricing is a term used to describe all aspects of intercompany pricing arrangements between related business entities, and commonly applies to intercompany transfers of tangible and intangible property.   Any time related parties on different sides of international borders conduct business, the taxing authorities from both countries will insist on taxing their share of the income.  The IRS will scrutinize the cost regardless of whether it is either a U.S. subsidiary of a foreign parent or a U.S. parent of a foreign subsidiary.

On March 23, 2012, Trident received a notice from the IRS (the "IRS Notice"), effectively contending that an additional $36.9 million of expenses should have been charged by TMI to TMFE under the Intercompany Agreements for the 2008 and 2009 tax years. Specifically, the IRS stated that TMI had over-estimated the stewardship costs and as a result did

not charge sufficient amounts to TMFE. Secondly, the IRS claimed that the extensive expenses incurred with respect to TMI's stock option should have been charged to TMFE.

In response, on April 23, 2012, on behalf of the Company, PWC provided a letter response to the IRS Notice. Specifically, the PWC response centered around certain expenses relating to stock-based compensation that had been the subject of considerable discussion between the IRS and the Company. To this end, on behalf of TMI, PWC disagreed with the IRS' proposed adjustments and maintained that the tax positions taken with respect to the 2008 and 2009 transfer pricing studies were correct. PWC also refuted the IRS' assessment of a substantial penalty, contending that "TMI's workpapers supporting the exclusion of the . . . [e]xpense were in existence at the time of filing, and all of TMI's tax return positions had a reasonable basis."

At that time, TMI also submitted a request that the IRS agree to "fast track" mediation in an attempt to resolve this issue, which while having little direct economic consequence to TMI, has potentially dramatic impact to the Intercompany Claims. The IRS refused this request. TMI attempted to engage the IRS once more, in its Supplement to the TMI Response dated June 21, 2012 (the "Supplemental Letter"). Again, the IRS provided no response, nor evinced any desire to promptly resolve this dispute.

As a result, on August 17, 2012, the Debtors filed the 505 Motion in an effort to allow prompt administration of the tax liability raised in the IRS Letter. The 505 Motion is currently pending before the Bankruptcy Court; however, the Debtors and the IRS continue to negotiate a consensual settlement that would render the 505 Motion moot.

## G.    THE DEBTORS' ASSET SALES AND REMAINING ASSETS

Beginning prior to the Petition Date, and continuing since the commencement of these Chapter 11 Cases, the Debtors have been engaged in a process to monetize their assets. Such efforts have been successful and have resulted in the divestment of nearly all of its business operations.

### 1.    *STB Business*

Prior to the Petition Date, the Debtors and their professionals undertook an extensive marketing effort to identify a potential purchaser of their STB Business, as the Debtors believed that identifying a purchaser willing to consummate a rapid sale of the STB Business would allow the Debtors to immediately stop the drain on cash balances and further afford them an opportunity to determine which, if any, of the Debtors' other business lines should be marketed for sale. Through these marketing efforts, the Debtors identified Entropic Communications, Inc. as a prospective purchaser most interested in the Debtors' STB Business.

On January 3, 2012, the Debtors and Entropic entered into an asset purchase agreement, pursuant to which Entropic agreed to serve as a stalking horse purchaser to purchase the Debtors' STB Business and assume certain liabilities in exchange for a cash payment of $55,000,000, subject to certain adjustments. On January 18, 2012, the Bankruptcy Court entered an order approving certain procedures in connection with the sale [D.I. 72], which such order was modified on February 7, 2012 [D.I. 178]. In connection therewith, the Debtors held an auction

on February 23, 2012.  Following several rounds of bidding, Entropic submitted a bid of $75.9 million (including assumed liabilities) which represented the successful bid at the auction and also represented a significant improvement from the stalking horse bid.

Accordingly, on March 9, 2012, the Bankruptcy Court entered an order approving, among other things, the sale of the STB Business to Entropic [D.I. 319].  Paragraph 13 of the order provided that neither the Debtors nor their estates, nor any person or entity (including, but not limited to any chapter 11 trustee, creditor, equity holder, party-in-interest or official committee of the Debtors) claiming by, through or on behalf of the Debtors or their estates (including, but not limited to by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute, commence, assert or file any fraudulent conveyance, preference or avoidance claims, or assert or use any such claims for defensive purposes of the Company and certain Debtor subsidiaries arising under (i) Sections 544, 547, 548, 549 and 550 of Chapter 5 of the Bankruptcy Code, (ii) the law of any foreign jurisdiction in which the Sellers operate or are domiciled, or (iii) state law, including all rights, claims and causes of action arising out of any post-petition payment by the Company or any of the seller subsidiaries for goods or services relating to: (x) vendors or service providers used in the STB Business; (y) assumed contracts and transferred leases, including that certain Manufacturing Services Agreement, as amended, dated as of February 8, 2010 between TMFE and NXP and (z) transferred employees.  On March 14, 2012, the Cayman Court entered an order approving the sale of the STB Business to Entropic.

Recognizing the critical importance of NXP's supply of products to the Debtors' STB Business, the asset purchase agreement between the Debtors and Entropic expressly provided that, as a condition to closing, the purchaser shall have entered into an MSA with NXP. Accordingly, on March 1, 2012 the Debtors' filed a motion to approve the assumption and assignment of an amended and restated MSA [D.I. 270], which required a cure payment to NXP in the approximate amount of $10.4 million.  The Bankruptcy Court entered an order approving such assumption and assignment on March 6, 2012 [D.I. 323].  The amended and restated MSA also provided for the cure payment to be made by offsetting the amount owed by NXP against that certain Promissory Note executed February 8, 2012 in connection with the Original MSA (the "WIP Note").

In addition, to account for certain of the Debtors' outstanding obligations under the MSA, the parties entered into a Support Agreement whereby Entropic purchased from NXP all raw materials and work in progress in NXP's possession.  The Support Agreement also provided that Entropic would release NXP, their affiliates, and current and former directors, officers and employees of, among other things, certain preference and avoidance claims.

After certain purchase price reconciliation, the Debtors received approximately $54.2 million in cash proceeds from the sale of the STB Business.  Substantially all of the purchased assets have been transferred to Entropic, and Entropic has successfully transferred (or expects to soon transfer) more than 400 of Trident's employees.

The closing of the STB Business occurred on April 13, 2012.

2.      _TV Business_

As of the Petition Date, the Debtors' TV Business was incurring significant losses and required funding of approximately $2.5 million per week from Trident.  As a result of its losses and the uncertainty of whether the sale of the STB Business would be sufficient to allow the Debtors to reorganize, the Debtors in conjunction with their advisors, had begun actively and extensively marketing the TV Business for sale since October 2011.  The Debtors identified Sigma Designs, Inc. ("Sigma") as a stalking horse bidder and submitted proposed bid procedures to the Bankruptcy Court.  On March 23, 2012, the Bankruptcy Court entered an order approving certain procedures in connection with the sale of the Debtors' TV Business, whereby Sigma would serve as the stalking horse bidder [D.I. 384].  In accordance with such approved bid procedures, the Debtors and their advisors contacted a number of interested parties that had previously expressed an interest in the Debtors' TV Business; however, no additional qualified bid was received as of the bid deadline.  Thus, no auction was conducted and Sigma was deemed the successful bidder.

Accordingly, on April 5, 2012, the Bankruptcy Court entered an order approving, among other things, the sale of the TV Business to Sigma.  Paragraph 14 of the order provided that neither the Debtors nor their estates, nor any person or entity (including, but not limited to any chapter 11 trustee, creditor, equity holder, party-in-interest or official committee of the Debtors) claiming by, through or on behalf of the Debtors or their estates (including, but not limited to by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute, commence, assert or file any fraudulent conveyance, preference or avoidance claims, or assert or use any such claims for defensive purposes of the Company and certain Debtor subsidiaries arising under (i) Sections 544, 547, 548, 549 and 550 of Chapter 5 of the Bankruptcy Code, (ii) the law of any foreign jurisdiction in which the Sellers operate or are domiciled, or (iii) state law, including all rights, claims and causes of action arising out of any post-petition payment by the Company or any of the seller subsidiaries for goods or services relating to: (x) vendors or service providers used in the TV Business; (y) assumed contracts and transferred leases and (z) transferred employees.  On April 12, 2012, the Cayman Court entered an order approving the sale of the TV Business to Sigma.

The Debtors received approximately $30.5 million in cash proceeds from the sale of the TV Business.  Substantially all of the purchased assets have been transferred to Sigma, and Sigma has successfully transferred in excess of 300 of Trident's employees.  In addition, TMFE and Sigma entered into an Assignment and Assumption Agreement whereby TMFE agreed to assign and transfer the MSA (as amended in connection with the STB Sale) to Sigma.

The closing of the TV Business sale occurred on May 4, 2012.

3.      _Audio Business_

As a standalone business, the Audio Business was not economically viable and, therefore, following the sale of the Debtors' STB Business and TV Business, the Debtors determined that it would also sell its Audio Business.  On May 8, 2012, the Debtors filed a motion seeking authorization to sell the Debtors' assets relating to their Audio Business to Cambridge Silicon Radio Limited ("Cambridge") [D.I. 546].  On May 16, 2012, the Bankruptcy Court entered an

order approving, among other things, the sale of the Audio Business to Cambridge [D.I. 598]. On May 17, 2012, the Cayman Court entered an order approving the sale of the Audio Business to Cambridge.

The closing of the Audio Business sale occurred on June 4, 2012. The purchase price was $900,000, with approximately $350,000 paid to the Debtors and the balance to be paid to the Debtors' German subsidiary.

### 4.    *Demod Business*

The Debtors' Demod Business designed and sold chips that demodulated audio channels off a carrier signal. Thus, following the sale of the STB Business and TV Business, the Debtors determined that they would also sell the Demod Business. On July 10, 2012, the Bankruptcy Court entered an order approving the sale of the Debtors' Demod Business to Sigma [D.I. 766]. On July 11, 2012, the Cayman Court entered an order approving the sale of the Debtors' Demod Business to Sigma. The closing of the Demod Business sale occurred on July 19, 2012. The transaction also provided for Sigma's assumption of the employment contracts of at least 70% of the Demod employees. The purchase price was $1.2 million.

### 5.    *Analog Business*

On June 1, 2012, non-Debtor Trident Microsystems (Europe) GmbH entered into a Master Purchase and Sale Agreement whereby Sigma would purchase certain assets, transfer certain employees and assume certain liabilities related to Trident's Analog business. The purchase price was $337,500. The transaction closed on June 4, 2012.

### 6.    *Remaining Assets*

Following the various asset sales as described above, the following assets of the Debtors still remain:

- ▪ Payments due from Entropic and Sigma, of approximately $15 million, pursuant to the TSAs;

- ▪ The Debtors' current cash on hand as of June 30, 2012, of approximately 84,000,000;

- ▪ 25 MEMC patents which were ultimately excluded from the Entropic sale, which have a total aggregate appraised value of $10 million.

### 7.    *Transition Service Agreements*

The asset purchase agreements with respect to the Debtors' sales of the STB Business, the TV Business and the Audio Business included transition service agreements ("TSAs"), which require the ongoing assistance from the Debtors to the respective purchasers following the closing of the sales transactions. The services provided under the TSAs included accounting and tax services, human resource services, information technology services, legal services, sales services, supply chain operation services, transport and delivery support services and security services. The majority of services required under the TSAs have now been completed; however,

both Entropic and Sigma do require certain additional limited services to be provided by the Debtors, including, with respect to the TV Business, the Debtors acting on behalf to try and collect accounts receivable totaling approximately $11.8 million on behalf of Sigma.

### 8.   *Last Time Buys*

Prior to the sale of the Audio Business to Cambridge, the Debtors offered customers a final opportunity to purchase inventory.  The last time buy is anticipated to add approximately $3 million in net value to the Debtors' estates.

## H.   WIND-DOWN OF NON-DEBTORS

The Debtors, in conjunction with their advisors, have identified strategies to wind-down each of their non-debtor subsidiaries under applicable law in their respective jurisdictions.  These entities are each in the process of terminating lease obligations, resolving remaining liabilities and complying with required reporting obligations.   The following non-debtor entities are expected to have sufficient cash to wind-down locally without the need for further insolvency proceedings: (i) Trident Microsystems India Pvt. Limited; (ii) Trident Microsystems (Nederland) B.V. France Branch; (iii) Trident Microsystems (Hong Kong) Limited (iv) Trident Microelectronics Ltd.; (v) Trident Microsystems (Taiwan), Ltd.; (vi) Trident Microsystems (Korea) Limited; (vii) Trident Multimedia Technologies (Shanghai) Co. Ltd; (viii) Trident Microsystems (Europe) GmbH; (ix) Trident Microsystems (Nederland) B.V. (x) Trident Microsystems (Europe) B.V.; and (xi) Trident Microsystems (Beijing) Co. Ltd. Trident Microsystems (Japan) GK) is not expected to have sufficient cash to wind-down locally and, accordingly, will likely be filing for insolvency proceedings.[4]

## I.   SETTLEMENT BETWEEN THE DEBTORS, THE CAYMAN LIQUIDATORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE

Since the commencement of these Bankruptcy Cases, the Debtors have sought to maximize and preserve the significant value in the Debtors for the benefit of the Debtors' Creditors and holders of Equity Interests, while simultaneously seeking to bring about a consensual resolution on, most critically, the TMI Claim, the IRS Claim and the 2004 Motion. Recognizing the critical need for a resolution on these three issues, the Debtors, with the support of the Cayman Liquidators, have worked with both the Creditors Committee and the Equity Committee to determine if an agreement could be reached to avoid a protracted, uncertain and costly litigation process.   After extensive settlement discussions, the Debtors, the Cayman Liquidators, the Creditors Committee and the Equity Committee forged consensus on a settlement.   As a result, those parties entered into the Plan Support Agreement which the Debtors, the Cayman Liquidators, the Creditors Committee and the Equity Committee believe resolves all material issues and, among other things, provides a recovery of 90% to the holders of Class 2.A. Claims, all while eliminating the uncertainty, time delay and substantial costs that are

---

[4]     The Debtors and the non-Debtor subsidiaries, along with their respective advisors, continue to review the wind-down strategies with respect to each of these entities, and accordingly, such analyses are subject to change.

posed by litigating these complex, cross-border issues.  The Plan Support Agreement further provides, among other things, that the Cayman Liquidators shall not adjudicate the Claim of TMI against TMFE, and all objections and defenses to such Claims, including but not limited to those set forth in the Creditors Committee's objection [D.I. 827] and adversary proceeding [D.I. 828] are preserved.  The Plan Support Agreement provides that the Creditors Committee shall withdraw, with prejudice, the TMI Claim objection and related adversary proceeding only upon the Effective Date and, until such time, they shall be adjourned and suspended, as needed to preserve the status quo.  By its terms, the Plan Support Agreement shall automatically terminate if, among other things, (i) the Bankruptcy Court denies confirmation of the Plan, (ii) the Disclosure Statement has not been approved pursuant to an order in form and substance consistent with the Plan Support Agreement and the Plan and otherwise acceptable to the parties by no later than October 31, 2012, (iii) the Bankruptcy Court has not entered the Confirmation Order by December 15, 2012, (iv) the Bankruptcy Court or the Cayman Court refuses to confirm the New Joint Protocol or (v) any of the conditions to confirmation stated in the term sheet, annexed to the Plan Support Agreement, or the Plan are not satisfied prior to the entry of the Confirmation Order and the Equity Committee fails to waive the satisfaction of such condition or conditions within five Business Days written notice from the Debtors, the Cayman Liquidators or the Creditors Committee.

**J.      NEW JOINT PROTOCOL IN SUPPORT OF CONFIRMATION**

On or prior to the Confirmation Date, TMI and the Cayman Liquidators will seek to obtain the approval of the Bankruptcy Court and the Cayman Court of the New Joint Protocol. The proposed form of the New Joint Protocol is annexed hereto as Exhibit C. The New Joint Protocol will, among other things, set out the process by which the Cayman Liquidators will adjudicate upon Claims against TMFE in accordance with Cayman Islands Law and make Distributions pursuant to the Plan in accordance with, and subject to the priorities of, United States Bankruptcy Law.

<div align="center">

**ARTICLE VI.**

**THE JOINT PLAN OF LIQUIDATION**

</div>

**A.      INTRODUCTION**

The Debtors believe that (i) through the Plan, holders of Allowed Claims will receive a greater recovery from the estates of the Debtors than the recovery that they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the Plan will afford the Debtors the opportunity and ability to liquidate its businesses in a timely and efficient manner to preserve value for the Estates.

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

## B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE JOINT PLAN OF LIQUIDATION

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines (or, with respect to TMFE, that the Plan Administrator or the Cayman Court determines), that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the applicable Debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement. Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

For an overview as to how Claims against TMFE will be adjudicated upon by the Cayman Liquidators under Cayman Islands law in order to be considered "allowed" for the purpose of Distributions, see Article VI.D below.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which gives rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the

commencement of the case or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable and contractual rights.  Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable.  Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan.  Accordingly, their votes are not solicited.  Under the Debtors' Plan, the Claims in Class 1 (Secured Claims Against TMFE), Class 4 (Secured Claims Against TMI) and Class 5 (General Unsecured Claims Against TMI) are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization.  For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests.

Consistent with these requirements, the Plan divides the Allowed Claims against, and Interests in, the Debtors into the following Classes:

| **Class** | **Claim** | **Status** | **Voting Rights** |
|---|---|---|---|
| 1 | Secured Claims against TMFE | Paid in full | Deemed to Accept |
| 2.A. | General Unsecured Claims against TMFE not held by Debtors' Affiliates | Impaired | Entitled to Vote |
| 2.B. | General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims | Impaired | Entitled to Vote |
| 3 | Equity Interests in TMFE | Impaired | Deemed to Reject |
| 4 | Secured Claims against TMI | Paid in full | Deemed to Accept |
| 5 | General Unsecured Claims against TMI | Paid in full | Deemed to Accept |
| 6 | Equity Interests in TMI | Impaired | Entitled to Vote |

1.  ***Unclassified***

a.    Administrative Claims

Administrative Claims are the actual and necessary costs and expenses of the Debtors' Chapter 11 Cases that are allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code.  Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtors' estates, actual and necessary costs and expenses of operating the Debtors' businesses, indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases and compensation for professional services rendered and reimbursement of expenses incurred.  Specifically excluded from Administrative Claims are any fees or charges assessed against the estates of the Debtors under § 1930 of chapter 123 of title 28 of the United States Code, which fees or charges, if any, will be paid in accordance with Article V.N of the Plan.

b.      Non-Professional Fee Claims

The TMI Trustee and the Plan Administrator (as applicable) shall pay each holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (3) at such time and upon such terms as may be agreed upon by such holder and the TMI Trustee or Plan Administrator; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, *however*, that, at the discretion of the Plan Administrator or the TMI Trustee, as applicable, Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date.

c.      Administrative Claims and Administrative Expense Request Deadline

Except as otherwise provided herein, on or before 5:00 p.m., prevailing Eastern time, on the Administrative Claims Bar Date, each holder of an Administrative Claim shall file with the Claims Agent a request for payment of Administrative Claim by mailing, hand delivering or delivering by courier service such request for payment of Administrative Claim to the Claims Agent at Trident Microsytems Claims Processing c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, Attention: Trident Claims Processing Center.  The request for payment of an Administrative Claim will be timely filed only if it is ***actually received*** by the Claims Agent by 5:00 p.m., prevailing Eastern time, on the Administrative Claims Bar Date.  Requests for payment of Administrative Claims may **not** be delivered by facsimiles, telecopy, or electronic mail transmission.  Notwithstanding anything herein, the Debtors' and the Committees' Professionals shall not be required to file a request for payment of any Administrative Claim on or before the Administrative Claims Bar Date for fees and expenses arising under sections 330, 331 or 503(b)(2-5) of the Bankruptcy Code, as such Professionals will instead file final fee applications as required by the Bankruptcy Code, Bankruptcy Rules and the Confirmation Order.

d.      Professional Fee Claims

The TMI Trustee and the Plan Administrator (as applicable) shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from each of the Debtors' Estates pursuant to sections 327-330 and 503(b)(2) - (b)(6) of the Bankruptcy Code, in Cash, in the amount awarded to such Professionals by the interim fee application order or by Final Order of the Bankruptcy Court, as soon as practicable after the later of the Effective Date and the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Cases, and after application of any retainer received by the Professionals.

The deadline for submission by Professionals for Bankruptcy Court approval of Accrued Professional Compensation shall be forty-five (45) days after the Effective Date. All Professionals employed by the Debtors, the Creditors' Committee, the Equity Committee or the Cayman Liquidators shall provide to the Debtors and the Cayman Liquidators an estimate of their Accrued Professional Compensation through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) before the Effective Date.

With respect to legal fees incurred by TMFE and TMI in the Chapter 11 Cases, such fees will be subject to the approval of the Bankruptcy Court in accordance with the Bankruptcy Code and the procedures ordered by the Bankruptcy Court. TMFE and TMI will file an allocation motion with the Bankruptcy Court to confirm the appropriate allocation of legal fees between TMFE and TMI. The Creditors Committee, the Cayman Committee, the Equity Committee and the Cayman Liquidators shall all be afforded an opportunity to object and be heard with respect to any objections regarding allocation of such fees amongst TMI and TMFE.

The Cayman Liquidators will need to satisfy the Cayman Court that all disbursements incurred by TMFE, including legal or professional fees incurred by or allocated to TMFE in the Chapter 11 Cases, were properly incurred. In this regard, in accordance with the terms of the Joint Protocol and/or the New Joint Protocol, the parties may request that the Cayman Court and the Bankruptcy Court hold joint hearings where appropriate including a joint hearing in respect of the application for the allocation of Professional fees as between TMI and TMFE.

The fees, costs and expenses incurred by TMFE, the Cayman Liquidators, the JPLs and the Cayman Committee in the Cayman Proceedings, including legal or professional fees for attorneys or other professionals engaged in the Cayman Proceedings, will be subject to the approval of the Cayman Court pursuant to section 109 or 104(5) of the Cayman Companies Law. Reservation shall be made for all such fees, costs and expenses before any Distribution is paid to the Class 2.B. creditors.

e.      Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

The TMI Trustee and the Plan Administrator (as applicable) shall pay each holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash,

on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

      f.      Other Priority Claims

On or as soon as practicable after the Effective Date, the TMI Trustee and the Plan Administrator (as applicable) shall pay each holder of an Allowed Other Priority Claim, in full and final satisfaction of such Allowed Other Priority Claim the full unpaid amount of such Allowed Other Priority Claim in Cash.

      **2.**      ***Classified***

      a.      Class 1 (Secured Claims Against TMFE) **–** *Not Impaired*

Class 1 consists of Secured Claims against TMFE.

Class 1 is Unimpaired and, therefore, holders of Secured Claims against TMFE in Class 1 are deemed to have accepted the Plan.

To the extent that any Secured Claims against TMFE exist, except to the extent that a holder of an Allowed Secured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMFE shall receive from TMFE, in full satisfaction of such Claim, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed.

      b.      Class 2.A. (General Unsecured Claims Against TMFE not held by Debtors**'** Affiliates) **–** *Impaired*

Class 2.A. consists of General Unsecured Claims against TMFE not held by Debtors' Affiliates.

Class 2.A. is Impaired and, therefore, holders of General Unsecured Claims against TMFE not held by Debtors' Affiliates in Class 2.A are entitled to vote to accept or reject the Plan.

After payment of the TMFE Secured Claims in Class 1; except to the extent that a holder of a General Unsecured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMFE not held by Debtors' Affiliates, in Class 2.A, including any holder of a Stipulated Additional Allowed Claim, in full and final satisfaction of such Claim shall receive a 90% recovery on account of the Allowed Amount of such Claims, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed.

      c.      Class 2.B. (General Unsecured Claims Against TMFE held by Debtors**'** Affiliates as Intercompany Claims) **–** *Impaired*

Class 2.B. consists of General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims.

Class 2.B. is Impaired and, therefore, holders of General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims in Class 2.B. are entitled to vote to accept or reject the Plan.

After (i) payment of the TMFE Secured Claims in Class 1, (ii) payment of the General Unsecured Claims against TMFE not held by Debtors' Affiliates in Class 2.A. in accordance with this Article III.B (iii) reservation of sufficient funds necessary (a) to satisfy the Disputed Claims Reserve with respect to Disputed Claims against TMFE, (b) for the Plan Administrator to carry out its duties and for the fees, costs and expenses incurred in the Cayman Proceedings, (c) to pay outstanding Administrative Claims in full and (d) to pay any unclaimed or undeliverable Distributions to holders of Class 2.A Claims; except to the extent that a holder of a General Unsecured Claim against TMFE held by Debtors' Affiliates has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMFE held by Debtors' Affiliates in Class 2.B., in full and final satisfaction of such Claim shall receive the remaining assets of TMFE, which shall include, without limitation, the TMFE IP Assets and Causes of Action of TMFE, and which such remaining assets of TMFE shall constitute TMI Trust Assets, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed; provided, however, that in no event shall the cash recovery (on a percentage basis) on account of Class 2.B. Claims be greater than the recovery (on a percentage basis) on account of Class 2.A. Claims..

d.      Class 3 (Equity Interests in TMFE) – *Impaired*

Class 3 consists of Equity Interests in TMFE.

Class 3 will receive no Distribution under the Plan and therefore, holders of Equity Interests in TMFE in Class 3 are deemed to have rejected the Plan.

Class 3 will receive no Distribution under the Plan and therefore, holders of Equity Interests in TMFE in Class 3 are deemed to have rejected the Plan and are not entitled to vote on the Plan.

e.      Class 4 (Secured Claims Against TMI) – *Not Impaired*

Class 4 consists of Secured Claims against TMI.

Class 4 is Unimpaired and, therefore, holders of Secured Claims against TMI in Class 4 are deemed to have accepted the Plan.

To the extent that any Secured Claims against TMI exist, except to the extent that a holder of an Allowed Secured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMI shall receive from TMI, in full satisfaction of such Claim, Cash in

the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed.

   f.      Class 5 (General Unsecured Claims Against TMI) - *Not Impaired*

Class 5 consists of General Unsecured Claims against TMI.

Class 5 is Unimpaired and, therefore, holders of General Unsecured Claims against TMI in Class 5 are conclusively presumed to have accepted the Plan.

After: (i) the reservation of sufficient funds necessary for the TMI Trustee to carry out its duties and to pay outstanding Administrative Claims against TMI in full, (ii) payment of the TMI Secured Claims in Class 4, and (iii) reservation of sufficient funds necessary to satisfy all Disputed Claims against TMI in full; except to the extent that a holder of General Unsecured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMI shall receive from the TMI Trust, in full satisfaction of such Claim, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed.

   g.      Class 6 (Equity Interests in TMI) – *Impaired*

Class 6 consists of Equity Interests in TMI.

Class 6 is Impaired and, therefore, holders of Equity Interests in TMI in Class 6 are entitled to vote to accept or reject the Plan.

After: (i) the reservation of sufficient funds necessary for the TMI Trustee to carry out its duties and to pay outstanding Administrative Claims against TMI in full, (ii) payment of the TMI Secured Claims in Class 4 and (iii) payment of the TMI General Unsecured Claims in Class 5; holders of Equity Interests in TMI in Class 6, in final and full satisfaction of such Equity Interests shall receive a Pro Rata share of the remaining TMI Trust Assets, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Equity Interest becomes Allowed.

   **3.      _Special Provision Governing Unimpaired Claims and Equity Interests_**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights with respect to any Unimpaired Claim or Equity Interest, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim or Equity Interest.

   **4.      _Separate Plans of Liquidation_**

The Plan constitutes a separate chapter 11 plan of liquidation for each Debtor.

5.    *Nonconsensual Confirmation*

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126 of the Bankruptcy Code, the Debtors reserve the right to amend the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both. With respect to impaired Classes that are deemed to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by such Class of Claims.

## C.    MEANS FOR IMPLEMENTATION OF THE PLAN

The Debtors propose to implement and consummate the Plan on and after the Effective Date. Prior to the Effective Date, the Debtors shall continue to operate their businesses subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.

1.    *Creation of the TMI Trust*

On or before the Effective Date, the TMI Trust Agreement shall be executed by TMI and the TMI Trustee (with the consent of the Equity Committee), and all other necessary steps shall be taken to establish the TMI Trust and the TMI Trust Beneficial Interests therein which shall be for the benefit of the TMI Trust Beneficiaries, as provided in Article III.B. of the Plan. The TMI Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent such powers, duties and authorities do not affect the status of the TMI Trust as a liquidating trust for United States federal income tax purposes. In the event of any inconsistencies between the TMI Trust Agreement and the Plan, the terms and provisions of the Plan shall control.

2.    *Purpose of the TMI Trust*

The TMI Trust shall be established for the sole purpose of liquidating and distributing their assets in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

3.    *Cayman Liquidators as Plan Administrator*

Pursuant to the terms of the New Joint Protocol, unless otherwise ordered by the Bankruptcy Court and the Cayman Court after notice and a hearing, the assets of TMFE shall be administered and adjudicated by the Plan Administrator pursuant to Cayman law and subject to the jurisdiction of the Cayman Court (as further described in Article VI.D, below), *provided*, *however*, that the priority and classification of Claims shall be determined and adjudicated pursuant to United States law, including without limitation, sections 507 (Priorities), 509 (Claims of Codebtors) 510 (Subordination) of the Bankruptcy Code and in accordance with the priorities stated in this Plan. The costs of the Plan Administrator shall be paid from the assets of TMFE. The Plan Administrator shall have all of the powers and authority granted under this Plan and under the laws of the Cayman Islands as a liquidator appointed by the Cayman Court. Notwithstanding anything to the contrary herein, the Plan Administrator shall not transfer funds out of the TMFE bank accounts currently held in the United States except for purposes of

Distribution or for payment of expenses of the Plan Administrator pursuant to the provisions of the Plan.  On the Effective Date, the Cayman Liquidators shall be appointed as the Plan Administrator.

4.      *TMI Trust Assets and Assets of TMFE*

On the Effective Date, TMI and/or TMFE shall transfer the TMI Trust Assets to the TMI Trust subject to all Allowed Claims payable pursuant to Article II and Article III of the Plan.  In accordance with section 1146(a) of the Bankruptcy Code, such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax.  In connection with the transfer of the TMI Trust Assets to the TMI Trust, such assets, including, without limitation, the TMFE IP Assets, rights and Causes of Action and all Books and Privileges relating to the TMI Trust Assets, shall vest in the TMI Trustee solely in his capacity as such.  The Debtors and the TMI Trustee are authorized to take all necessary actions to effectuate the transfer of such Books and Privileges.  TMFE shall remain in existence on and after the Effective Date until an application for dissolution is made as provided in Article IV.Q of the Plan.

5.      *TMI Trust Taking Assignment of TMI's Contracts*

Upon consent of the Equity Committee and the TMI Trustee, the TMI Trust shall take assignment of contracts listed on Schedule 7.1 entered into by TMI.  Upon consent of the Equity Committee and the TMI Trustee, TMFE shall assume contracts listed on Schedule 7.1 entered into by TMFE.  As such, counterparties to any such contracts assumed pursuant to the Plan, and counterparties to any subcontracts related to such contracts, shall be prohibited from terminating or otherwise altering the terms of such contract as a result of the assumption and/or assignment of such contract pursuant to the Plan.

6.      *Governance of the TMI Trust*

The TMI Trust shall be governed by the TMI Trustee according to the applicable TMI Trust Agreement.

7.      *The TMI Trustee and the Plan Administrator*

The TMI Trustee shall be designated by the Equity Committee.  In the event the TMI Trustee dies, is terminated or resigns for any reason, the Trust Advisory Board for the TMI Trust shall designate a successor TMI Trustee pursuant to the TMI Trust Agreement.  The Plan Administrator (with respect to TMFE) and the TMI Trustee (with respect to TMI) shall be deemed to have been appointed as the respective Estates' representative by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The initial Trust Advisory Board for TMI shall be designated by the Equity Committee.  The TMI Trustee shall be entitled to retain counsel and other professionals to carry out its duties.

8.      *Role of the TMI Trustee and the Plan Administrator*

In furtherance of and consistent with the purpose of the TMI Trust and the Plan, the TMI Trustee shall, among other things, have the rights, powers and duties, subject to the limitations set forth in the TMI Trust Agreement: (i) to hold, manage, dispose of, sell, convert to Cash, and

distribute the TMI Trust Assets, including investigating, prosecuting and resolving the Causes of Action belonging to the TMI Trust; (ii) to hold the TMI Trust Assets for the benefit of the TMI Trust Beneficiaries that are entitled to Distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date; (iii) in the TMI Trustee's reasonable business judgment, to investigate, prosecute, settle, liquidate, dispose of, and/or abandon the TMI Trust Assets, including rights, Causes of Action or litigation of the TMI Trust; (iv) to monitor and enforce the implementation of the Plan; (v) to file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to the TMI Trust; (vi) in the TMI Trustee's reasonable business judgment, to reconcile and object to Claims and Equity Interests against TMI or the TMI Trust, and manage, control, prosecute and/or settle on behalf of the Estate of TMI and/or the TMI Trust objections to Claims and Equity Interests on account of which the TMI Trustee (as Disbursing Agent) will be responsible (if Allowed) for making Distributions under the Plan, (vii) to take all actions necessary, and create any documents necessary, to wind up the affairs and effect a dissolution of TMI and implement the Plan; (viii) to hold, manage, and distribute Cash or non-Cash TMI Trust Assets obtained through the exercise of its power and authority; (ix) to act as a signatory of TMI and for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of TMI's assets; (x) to dispose of the books and records transferred to the TMI Trustee in a manner deemed appropriate by the TMI Trustee; provided, however, that the TMI Trustee shall not dispose of any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party without further order of the Bankruptcy Court; (xi) to take all necessary action and file all appropriate motions to obtain an order closing the Chapter 11 Case of TMI; (xii) to enter into and exercise rights under contracts that are necessary or desirable to the administration of the TMI Trust and execute any documents or pleadings related to the liquidation of the TMI Trust Assets or other matters related to the TMI Trust; (xiii) to establish and maintain bank accounts and terminate such accounts as the TMI Trustee deems appropriate; (xiv) to set off amounts owed to the TMI against Distributions to the TMI Trust Beneficiaries; (xv) to bring suits or defend itself against such suits, if any, as the TMI Trustee determines in connection with any matter arising from or related to the Plan or the TMI Trust Agreement that affects in any way the rights or obligations of the TMI Trust, the TMI Trustee or the TMI Trust Beneficiaries; (xvi) to obtain and maintain insurance coverage with respect to the liabilities and obligations of the TMI Trustee and the Trust Advisory Board and its members in accordance with the TMI Trust Agreement; (xvii) to take all actions necessary and appropriate to minimize any adverse state or federal tax consequences to the TMI Trust Beneficiaries provided such actions do not result in an adverse tax consequence to the TMI Trust and are consistent with and are not contrary to the treatment of the TMI Trust as a "grantor trust" for United States federal income tax purposes; and (xviii) to take such other and further actions as are permitted by the Plan and are not inconsistent with the Plan and the TMI Trust Agreement.  In all circumstances, the TMI Trustee shall act in the best interests of all beneficiaries of the TMI Trust and in furtherance of the purpose of the TMI Trust.

In furtherance of and consistent with the purpose of the Plan, the Plan Administrator shall, among other things, have the rights, powers and duties, subject to the limitations under the laws of the Cayman Islands, including the requirement to obtain the approval of the Cayman Court where applicable:  (i) to take possession of, collect, get in, manage, dispose of, sell, convert to Cash, and distribute the assets of TMFE; (ii) to take possession of the assets of TMFE for the benefit of the Creditors of TMFE that are entitled to Distributions therefrom under the

Plan, whether their Claims are Allowed on or after the Effective Date; (iii) in the Plan Administrator's reasonable business judgment, to investigate, prosecute, settle, liquidate, dispose of, and/or abandon the assets of TMFE, including rights, Causes of Action or litigation of TMFE; (iv) to monitor and enforce the implementation of the Plan; (v) to file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to TMFE; (vi) in the Plan Administrator's reasonable business judgment, to reconcile and determine Claims against TMFE, and to the extent necessary, manage, control, prosecute and/or settle on behalf of the Estate of TMFE objections to Claims on account of which the Plan Administrator (as Disbursing Agent) will be responsible (if Allowed) for making Distributions under the Plan, (vii) to take all actions necessary, and create any documents necessary, to wind up the affairs of the TMFE and implement the Plan; (viii) to take possession of, collect, get in, manage, and distribute Cash or non-Cash assets of TMFE obtained through the exercise of its power and authority; (ix) to act as a signatory of TMFE and for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of TMFE's assets; (x) to take possession and control of the books and records of TMFE, including those maintained in electronic form and keep them in safe custody until the Plan Administrator is authorized or directed to destroy them in accordance with an order of the Cayman Court; provided, however, that the Plan Administrator shall not dispose of any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party without further order of the Cayman Court; (xi) to take all necessary action and file all appropriate motions to obtain an order closing the Chapter 11 Case of TMFE and the Cayman Proceedings; (xii) to enter into and exercise rights under contracts that are necessary or desirable to the administration of the Estate of TMFE and execute any documents or pleadings related to the liquidation of the TMFE assets; (xiii) to establish and maintain bank accounts and terminate such accounts as the Plan Administrator deems appropriate; (xiv) to exercise such rights of set off as TMFE may have against the Creditors of TMFE; (xv) to bring suits or defend itself against such suits, if any, as the Plan Administrator determines in connection with any matter arising from or related to the Plan that affects in any way the rights or obligations of TMFE, the Plan Administrator or the Creditors of TMFE; (xvi) to obtain and maintain insurance coverage with respect to the liabilities and obligations of the Plan Administrator; (xvii) to take all actions necessary and appropriate to minimize any adverse state or federal tax consequences to Creditors of TMFE provided such actions do not result in an adverse tax consequence to the TMFE. In all circumstances, the Plan Administrator shall act in the best interests of the Estate of TMFE.

In furtherance thereof, each of the Debtors shall execute on or prior to the Effective Date a power of attorney authorizing the TMI Trustee or the Plan Administrator (as applicable) to take actions consistent with the Article IV.H of the Plan to the same extent as if the TMI Trustee or the Plan Administrator were the Debtor, including the payment of the non-classified Claims on or about the Effective Date from the TMI accounts to the extent bank accounts for the TMI Trust cannot be established in a timely fashion.

## 9.    *TMI Trustee's and the Plan Administrator's Tax Powers*

Following the Effective Date, the Plan Administrator and the TMI Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the applicable Debtor all Tax Returns

required to be filed or that the Plan Administrator and the TMI Trustee otherwise deem appropriate, including the filing of amended Tax Returns or requests for refunds.

For all taxable periods ending on or prior to the Effective Date, the Plan Administrator and the TMI Trustee shall have full and exclusive authority in respect of all taxes of the Debtors to the same extent as if the Plan Administrator and the TMI Trustee were the debtors in possession.

Following the Effective Date, the TMI Trust and the Plan Administrator shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes (i) of the applicable Debtor(s) to the same extent as the applicable Debtor would otherwise be entitled with respect to any taxable period ending on or prior to the Effective Date and (ii) of the applicable Debtor(s) to the same extent as the applicable Debtor would otherwise be entitled with respect to any taxable period ending after the Effective Date.

The Plan Administrator, the TMI Trustee and the Debtors shall reasonably cooperate with each other, and shall cause their respective officers, employees, agents, auditors and other Representatives to reasonably cooperate, in preparing and filing all Tax Returns (including amended Tax Returns and claims for refunds) and in resolving all disputes and audits with respect to all taxable periods relating to the Debtors.  Any information obtained under this Article IV.I of the Plan shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refunds or in conducting an audit or other proceeding.

10.   *Nontransferability of the TMI Trust Beneficial Interests*

The TMI Trust Beneficial Interests shall not be certificated and shall not be transferable or assignable except by will, intestate succession or operation of law.

11.   *Cash*

The TMI Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in any manner permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

12.   *Costs and Expenses of the TMI Trust and Liquidation of TMFE*

The costs and expenses of the TMI Trust and the costs and expenses of the liquidation of TMFE, including the reasonable fees and expenses of the Plan Administrator and the TMI Trustee, the members of the Trust Advisory Board, and each of their respective retained professionals, and the fees and expenses of maintaining the Disputed Claims Reserves, shall be paid out of the TMI Trust Assets and the assets of TMFE (as applicable).  Such amounts for fees and expenses shall be estimated and provided to the Debtors and the Cayman Liquidators before the Effective Date.

13.    *Compensation of the Plan Administrator and the TMI Trustee*

The TMI Trustee shall be entitled to reasonable compensation approved by the Trust Advisory Board in an amount consistent with that of similar functionaries in similar roles. The Plan Administrator shall be entitled to compensation in accordance with section 109 of the Cayman Companies Law and the Insolvency Practitioners Regulations 2008 (as amended).

14.    *Retention of Professionals by the Plan Administrator and the TMI Trustee*

The Plan Administrator and the TMI Trustee may retain and compensate attorneys and other professionals to assist in their duties as Plan Administrator or the TMI Trustee (as applicable) on such terms (including on a contingency or hourly basis) as such Plan Administrator or the TMI Trustee deem appropriate without Bankruptcy Court approval.

15.    *Federal Income Tax Treatment of the TMI Trust*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the TMI Trustee and the TMI Trust Beneficiaries) shall treat the transfer of the TMI Trust Assets to the TMI Trust as:

a.    a transfer of the respective TMI Trust Assets (subject to any obligations relating to those assets) directly to those holders of Allowed Claims and Equity Interests receiving TMI Trust Beneficial Interests relating thereto and, to the extent the TMI Trust Assets are allocable to Disputed Claims, to the applicable Disputed Claims Reserve, followed by

b.    the transfer by such beneficiaries to the TMI Trust of the TMI Trust Assets (other than the TMI Trust Assets allocable to the applicable Disputed Claims Reserve) in exchange for the TMI Beneficial Interests.

Accordingly, those holders of Allowed Claims and Equity Interests receiving TMI Trust Beneficial Interests shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the TMI Trust Assets (other than such TMI Trust Assets as are allocable to the Disputed Claims Reserve). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

16.    *Tax Reporting*

The TMI Trustee shall file returns (including United States federal returns) for the TMI Trust treating the TMI Trust as grantor trusts pursuant to Treasury Regulations section 1.671-4(a) and in accordance with Article IV.P of the Plan. The TMI Trustee shall also annually (but not later than sixty (60) days following the end of each calendar year) send to each holder of a TMI Trust Beneficial Interest a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their United States federal income Tax Returns or to forward the appropriate information to their respective beneficial holders with instructions to report such items on their United States federal income Tax Returns.

The Plan Administrator and the TMI Trustee shall file (or cause to be filed) any statements, returns or disclosures relating to TMFE or the TMI Trust (as applicable) that are required by any governmental unit.

In furtherance of the provisions of Article IV.P of this Plan, allocations of the TMI Trust's taxable income among the TMI Trust Beneficiaries (other than taxable income allocable to the Disputed Claims Reserves) shall be determined in good faith by the TMI Trustee by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the TMI Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to each of the applicable Disputed Claims Reserves) to the holders of the TMI Trust Beneficial Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the TMI Trust.  Similarly, taxable loss of the TMI Trust shall be allocated in good faith by the TMI Trustee by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining TMI Trust Assets.  The tax book value of the TMI Trust Assets for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements, as determined in good faith by the TMI Trustee.

Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the TMI Trustee of a private letter ruling if the TMI Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the TMI Trustee), the TMI Trustee shall (A) timely elect to treat any TMI Trust Assets allocable to the applicable Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the TMI Trustee, TMI and the TMI Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

The Plan Administrator and the TMI Trustee shall be responsible for payment, out of the TMI Trust Assets or the assets of TMFE (as applicable), of any taxes imposed on the trust or or TMFE or their respective assets, including the applicable Disputed Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the applicable Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Plan Administrator and the TMI Trustee (as applicable) as a result of the resolution of such Disputed Claims.

The TMI Trustee or the Plan Administrator may request an expedited determination of taxes of the TMI Trust or TMFE, including the applicable Disputed Claims Reserve, or the applicable Debtor(s) under section 505(b) of the Bankruptcy Code for all returns filed for, or on

behalf of, the TMI Trust or the applicable Debtor(s) for all taxable periods through the dissolution of TMI Trust or TMFE.

### 17.  *Dissolution*

The TMI Trust shall be dissolved (even if the TMI Trust Beneficiaries have not been paid in full) at the earlier of: (i) all of the TMI Trust Assets having been distributed pursuant to the Plan and the TMI Trust Agreement or (ii) the TMI Trustee determining, in its sole discretion, that the administration of the TMI Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit; provided, however, that in no event shall the TMI Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six (6) months prior to the third anniversary of the Effective Date (or at least six (6) months prior to the end of an extension period), determines that a fixed-period extension (not to exceed two extensions, each extension not to exceed eighteen months, and without the need for a favorable private letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the TMI Trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the TMI Trust Assets.  If at any time the TMI Trustee determines, in reliance upon such professionals as the TMI Trustee may retain, that the expense of administering the TMI Trust, including the making of a final Distribution to its beneficiaries, is likely to exceed the value of the assets remaining in the TMI Trust, the TMI Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to dissolve the TMI Trust, (ii) donate any balance to a charitable organization or a charitable trust that is unrelated to the Debtors, the TMI Trust, and any insider of the TMI Trustee, and (iii) dissolve the TMI Trust.

At the TMI Trustee's sole discretion, the TMI Trustee may take any reasonable actions to dissolve TMI if the TMI Trustee reasonably believes that the continued existence of TMI is no longer necessary.

The Plan Administrator shall make an application to the Cayman Court to dissolve TMFE at the earlier of: (i) all of the assets of TMFE having been distributed pursuant to the Plan and the affairs of TMFE having been completely wound up or (ii) the Plan Administrator determining, in its sole discretion, that further administration of the remaining assets of TMFE is not likely to yield sufficient additional proceeds to justify further pursuit and in all other respects the affairs of TMFE have been completely wound up.  If at any time the Plan Administrator determines, in reliance upon such professionals as the Plan Administrator may retain, that the expense of administering the assets of TMFE, including the making of a final Distribution to holder of Claims against TMFE, is likely to exceed the value of the assets remaining in TMFE, the Plan Administrator may apply to the Cayman Court for authority to (i) reserve any amounts necessary to dissolve TMFE and (ii) donate any balance to a charitable organization or a charitable trust that is unrelated to the Debtors or the Plan Administrator.

### 18.  *Indemnification of the Plan Administrator and the TMI Trustee*

The Indemnified Persons shall be held harmless and shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the Plan Administrator or the TMI Trustee, except those acts that are determined by Final Order to have arisen out of their own intentional fraud,

willful misconduct or gross negligence, and each shall be entitled to be indemnified, held harmless, and reimbursed for fees and expenses including, without limitation, reasonable attorney's fees, which such Persons and Entities may incur or may become subject to or in connection with any action, suit, proceeding or investigation that is brought or threatened against such Persons or Entities in respect of that Person's or Entity's or the Plan Administrator's and the TMI Trustee's actions or inactions regarding the implementation or administration of this Plan, or the discharge of their duties hereunder, except for any actions or inactions that are determined by Final Order to have arisen from intentional fraud, willful misconduct or gross negligence.  Any Claim of the Indemnified Persons to be indemnified, held harmless, or reimbursed shall be satisfied solely from the TMI Trust Assets or assets of TMFE (as applicable) or any applicable insurance coverage.  Each Indemnified Person shall be entitled to an advance of their reasonable attorneys' fees and other costs and expenses from TMFE or the TMI Trust Assets (as applicable) incurred in connection with the defense of any action, suit, proceeding or investigation involving such Indemnified Person for which indemnity will or could be sought.  In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to TMFE or the TMI Trust Assets (as applicable) if it shall be determined by final judgment or other final adjudication that such Indemnified Person that such Indemnified Person was not entitled to indemnification pursuant to this Article.  If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to TMFE or the TMI Trust Assets (as applicable) (without interest) by the Indemnified Person.  The Plan Administrator and the TMI Trustee shall be entitled to rely, in good faith, on the advice of their retained professionals regardless of whether such advice is provided in writing.  Notwithstanding the foregoing, the Plan Administrator and the TMI Trustee shall not be under any obligation to consult with their retained professionals, and their determination not to do so shall not result in the imposition of liability on the Plan Administrator or the TMI Trustee unless such determination is based on willful misconduct, gross negligence, or intentional fraud.

19.    ***Operations of the Debtors Between the Confirmation Date and the Effective Date***

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date.  The retention and employment of the Professionals retained by the Debtors shall terminate as of the Effective Date, *provided, however*, that the Debtors shall exist, and their Professionals shall be retained, after such date with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order and (c) such other matters as may be determined by the Debtors or Plan Administrator, including without limitation, the filing and prosecuting of objections to Claims solely with respect to Claims against TMI and Administrative Claims against TMFE.

20.    ***Term of Injunctions or Stays***

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or section 97 of the Cayman Companies

Law or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed and with respect to TMFE, until the Cayman Proceedings are concluded.

### 21.    *The Committees*

Upon the Effective Date, the Creditors' Committee and the Equity Committee shall dissolve, and their members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Cases.  The retention and employment of the Professionals retained by the Creditors' Committee and the Equity Committee shall terminate as of the Effective Date, *provided*, *however*, that the Creditors' Committee and the Equity Committee shall exist, and their Professionals shall be retained, after such date with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order and (c) with respect to the Creditors Committee only, the filing and prosecuting of objections to Claims at TMFE; *provided*, *however,* nothing herein shall be deemed an admission or waiver regarding the standing of the Equity Committee to object to Claims at TMFE.  For the avoidance of doubt, the Cayman Committee, appointed for the purpose of the official liquidation of TMFE, and its retention and employment of its Professionals shall continue for the duration of the Cayman Proceedings.

### 22.    *Books and Records*

As part of the transfer and vesting of assets from TMI and its Estate to the TMI Trust on the Effective Date, TMI shall transfer dominion and control over those books and records necessary to prosecute any remaining Causes of Action or to reconcile any Disputed Claims to the TMI Trustee.  TMI shall transfer such books and records in whatever form, manner or media, including, without limitation, the specific provision and presentation to the TMI Trustee of all passcodes for security systems and computers, keys, keycards, and notice letters to landlords, warehousemen or other relevant parties.  TMI may abandon all other books and records of the TMI Estate on or after ninety (90) days from the Effective Date; *provided, however*, that the TMI Trustee shall not dispose or abandon any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party without further order of the Bankruptcy Court.  Pursuant to section 554 of the Bankruptcy Code, Article IV. of the Plan shall constitute motion and notice, so that no further notice or Bankruptcy Court filings are required to effectuate the aforementioned abandonment of the books and records of the TMI Estate.

As part of the appointment of the Plan Administrator, to the extent not already transferred on the Effective Date, TMFE shall transfer dominion and control over all books and records to the Plan Administrator in whatever form, manner or media, including, without limitation, the specific provision and presentation to the Plan Administrator of all passcodes for security systems and computers, keys, keycards and notice letters to landlords, warehousemen or other relevant parties.

**D.    ADJUDICATION OF CLAIMS AGAINST TMFE BY THE PLAN ADMINISTRATOR**

Pursuant to the Plan and the terms of the New Joint Protocol, the Plan Administrator will adjudicate Claims asserted against TMFE in accordance with Cayman Islands Law and procedure.  However, as the assets of TMFE are located in the United States, the Plan Administrator will then make Distributions in accordance with the provisions of United States bankruptcy law, including without limitation, provisions relating to priority of Distribution.  Any appeals against the determination of the Plan Administrator shall be subject to the exclusive jurisdiction of the Cayman Court.

As a matter of Cayman Islands Law, it is the duty of the Plan Administrator as Cayman Liquidators, to adjudicate upon Claims against TMFE for which purpose he acts in a quasi-judicial capacity.  The exercise by the Cayman Liquidators of these powers, however, remains subject to the control of the Cayman Court and either the Plan Administrator or the holder of a Claim against TMFE may apply to the Cayman Court with respect to the exercise or proposed exercise of those powers.

The Plan Administrator may admit a Claim either for the whole or part of the amount claimed.  Where the Plan Administrator admits a Claim in full, he is required to notify the holder of the Claim.  Where the Plan Administrator rejects a Claim, or admits it only in part, he is also required to notify the holder of the Claim and include a statement of reasons for rejecting the whole or part of the claim; and a statement of the claimant's right to apply to the Cayman Court to seek to have the decision reversed or varied.

The Cayman Liquidators have determined that United States dollars will be the currency of the liquidation.  Any foreign currency Claims made against TMFE will be converted to United States dollars as at the mid-market exchange rates prevailing on August 8, 2012 (being the date upon which the Cayman Court ordered that TMFE be wound up) in accordance with section 150(2)(b) of the Cayman Companies Law.

A Creditor who has a contractual right to claim interest against TMFE, will only be Allowed for the amount of the interest accrued up to the date of the presentation of the winding up petition (i.e. January 5, 2012).

Future debts may be Allowed by the Plan Administrator even if they were not yet due on January 5, 2012.  If a Distribution is to be paid by TMFE before the date on which the debt would have fallen due, the amount of the Distribution shall be discounted for accelerated payment using the rate of interest prescribed by the Judgment Debts (Rates of Interest) Rules (currently set at between 2⅛% and 3% depending on the currency involved).

In respect of contingent liabilities, the Plan Administrator may estimate the value of the debt for the purpose of admitting it for payment and he may revise his estimate if circumstances change or new information becomes available.  Where the Plan Administrator puts an estimated value on a contingent claim he must notify the creditor of this stating:

(a)    the basis upon which the estimate has been made;

(b)     the fact that the creditor has a right to submit a varied proof if circumstances change;

(c)     the fact that the Plan Administrator may vary his estimate having regard to changed circumstances; and

(d)     the Plan Administrator agrees to extend generally the creditor's time for appealing his decision to the Cayman Court.

By virtue of section 140(2) of the Companies Law subordination agreements and contractual rights of set-off or netting of claims are enforceable by and against TMFE. Such agreements will be taken into account when quantifying the amount of a creditor's claim against TMFE. In the absence of a contractual right of set-off, there is a common law right of set-off where there are mutual credits, mutual debts or other mutual dealings between TMFE and any creditor. Whether a Claim is capable of being set-off will depend on the particular circumstances of the Claim.

If a creditor is dissatisfied with the Plan Administrator's decision with respect to his Claim, including any decision on the question of priority, he has a right of appeal to the Cayman Court for the decision to be reversed or varied.

An appeal must be made within 21 days of the date upon which the creditor received notice of the Plan Administrator's decision and must be served on the Plan Administrator. The appeal is a de novo reconsideration of the creditor's Claim and as part of the appeal the creditor may rely upon evidence in support of his Claim which he did not previously submit to the Plan Administrator.

The Plan Administrator has the right to be heard on every appeal and it is his duty to attend and to assist the Cayman Court in respect of the appeal. Any other creditor of TMFE can also be heard on the appeal.

The Plan Administrator's costs of the appeal are paid as an expense of the liquidation out of the assets of TMFE. The creditor's costs of a successful appeal against a liquidator's decision rejecting a Claim are also usually ordered to be paid as an expense of the liquidation. Where a creditor's appeal is unsuccessful the creditor may be ordered to pay the liquidator's costs of the appeal. Where a creditor's appeal is successful and another creditor has participated in the hearing to oppose the appeal, the latter may be ordered to pay some or all of the successful creditor's costs. If however the appeal is unsuccessful, the creditor which participated in the hearing to oppose the appeal may not receive an award of costs in its favor from the unsuccessful creditor where the former's submissions merely duplicate those of the liquidator.

There is a possibility of exercising further rights of appeal from a decision of the Cayman Court to the Cayman Islands Court of Appeal and thereafter to the Judicial Committee of the Privy Council.

Where it appears to the Plan Administrator on the basis of information not available to him at the time of his adjudication of a proof of debt that it ought not to have been admitted, or ought to have been admitted for a lesser amount, the Plan Administrator may apply to the

Cayman Court to expunge a proof of debt which has been admitted or reduce the amount in respect of which it has been admitted.

A creditor who is dissatisfied with the Plan Administrator's decision to admit the whole or part of a creditor's proof for an amount exceeding US$100,000 or 5% of TMFE's total liabilities (whichever is less) may also apply to expunge the proof on the ground that it should not have been admitted.

An application to expunge a proof of debt must be made promptly and, in any event, not later than the date upon which a Distribution is paid in respect of it. Notice of the application to expunge must be served on the Plan Administrator and the creditor in respect of which it is sought to expunge the claim. The procedure is substantially the same as that already described above for a creditor who seeks to appeal against the rejection of his proof of debt.

Full details of the adjudication procedure that will be followed by the Cayman Liquidators are set out in the New Joint Protocol, a copy of which is attached hereto as <u>Exhibit C</u>.

## E.    PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

### 1.    *<u>Voting of Claims</u>*

Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article II and Article III of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

### 2.    *<u>Distribution Dates</u>*

Distributions to holders of Claims and Equity Interests shall be made as provided in Articles II and III of the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Subject in all respects to the provisions of Article III hereof, prior to making any Distribution, as a matter of Cayman Islands Law, the Plan Administrator will publish a notice in respect of TMFE giving notice of his intention to make a Distribution. The Plan Administrator will fix a date, being a date not less than 30 or 60 days from the publication of the notice (depending on whether the Distribution is an interim or final Distribution), by which any outstanding Claims against TMFE must be submitted. The Plan Administrator may consult with the TMI Trustee, and the TMI Trustee may consult with the Plan Administrator regarding allowance of Claims at TMFE. Any creditor of TMFE who lodges his proof of Claim after the date specified in the notice will be excluded from the Distribution and is not entitled to disturb it on the basis that he has not participated. Such creditor will not be excluded from any subsequent Distribution by TMFE and is entitled to be paid the amount of the prior Distribution to the extent any assets would remain available before the payment of any further Distribution to

the other holders of Allowed Claims.  In the event, however, that a Creditor fails to timely file a proof of Claim before the date set by the Cayman Liquidators for a final Distribution, then the Cayman Liquidators have no obligation to adjudicate such proof of Claim.  Any Creditor who has already timely filed a proof of Claim against TMFE in the Chapter 11 Cases is not required to file any further proof of Claim in the Cayman Proceedings.

### 3.  *Disbursing Agents*

All Distributions under the Plan by the Plan Administrator or the TMI Trustee shall be made by the Plan Administrator or the TMI Trustee as Disbursing Agent or such other entity designated by the Plan Administrator or the TMI Trustee as Disbursing Agent.

The Disbursing Agents shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform their duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent them with respect to their responsibilities and, (d) exercise such other powers as may be vested in the Disbursing Agents by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agents to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agents shall only be required to act and make Distributions in accordance with the terms of the Plan and shall have no (x) liability for actions taken in accordance with the Plan or in reliance upon information provided to them in accordance with the Plan or (y) obligation or liability for Distributions under the Plan to any party who does not hold an Allowed Claim at the time of Distribution or who does not otherwise comply with the terms of the Plan.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agents (including, without limitation, taxes and reasonable attorneys fees and expenses) on or after the Effective Date shall be paid in Cash by the TMI Trust and TMFE (as applicable) in the ordinary course of business.

### 4.  *Record Date for Distributions*

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date.  The Debtors, the Plan Administrator (subject to Order 18 r.19 of the Companies Winding Up Rules) and the TMI Trustee shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  In making any Distribution with respect to any Claim, the Debtors, the Plan Administrator (subject to Order 18 r.19 of the Companies Winding Up Rules) and the TMI Trustee shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that are known to the Debtors, the Plan Administrator or the TMI Trustee (as applicable) as of the Record Date.

5.      *Delivery of Distributions*

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Disbursing Agents at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Debtors or the Plan Administrator or the TMI Trustee have been notified in writing of a change of address.

6.      *Undeliverable and Unclaimed Distributions*

In the event that any Distribution to any holder of an Allowed Claim against TMI is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder; *provided, however*, that all Distributions to holders of Allowed Claims against TMI under the Plan that are unclaimed for a period of one (1) year after Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the TMI Trust and any entitlement of any holder of any Claims to such Distributions shall be extinguished and forever barred.  The TMI Trustee shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim may receive future Distributions on account of such Claim by contacting the TMI Trustee at some point prior to the final Distribution.

In the event that any Distribution to any holder of an Allowed Claim against TMFE is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder.  In the event the Distribution remains unclaimed upon the dissolution of TMFE, the unclaimed Distributions shall be held by the Plan Administrator on trust for the benefit of the claimant to whom such funds are owed.  To this end, the Plan Administrator will establish an interest bearing bank account into which all funds representing unclaimed Distributions shall be transferred.  At the end of one (1) year after the dissolution of TMFE, any monies still held on trust shall be transferred to the Financial Secretary of the Cayman Islands who shall manage them in accordance with Part VIII of the Cayman Islands Public Management and Finance Law (2010 Revision).

For the avoidance of doubt, the Plan Administrator and the TMI Trustee shall not be required to retain an outside investigator to determine the current address of any holders of an Allowed Claim whose Distribution is returned as undeliverable.

7.      *Manner of Cash Payments Under the Plan*

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Plan Administrator or TMI Trustee or by wire transfer from a domestic bank, at the option of the Plan Administrator or TMI Trustee.

8.    *__Compliance with Tax Requirements__*

The Plan Administrator or TMI Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution to the holders of the TMI Trust Beneficial Interests or Claims against TMFE. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims against TMFE and TMI Trust Beneficial Interests. The Plan Administrator and TMI Trustee shall be authorized to collect such tax information from the holders of the TMI Trust Beneficial Interests and Claims against TMFE (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan. In order to receive Distributions under the Plan, all holders of the TMI Trust Beneficial Interests and Claims against TMFE will need to identify themselves to the Plan Administrator and TMI Trustee (as applicable) and provide tax information and the specifics of their holdings, to the extent the TMI Trustee and Plan Administrator deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder). The Plan Administrator and TMI Trustee may refuse to make a Distribution to any holder of a TMI Trust Beneficial Interest or Claim against TMFE that fails to furnish such information in a timely fashion, until such information is delivered; *provided, however*, that, upon the delivery of such information by a holder of a TMI Trust Beneficial Interest or Claim against TMFE, the Plan Administrator and TMI Trustee (as applicable) shall make such Distribution to which the holder of the TMI Trust Beneficial Interest or Claim against TMFE is entitled, without interest; and, *provided further* that, if the holder fails to comply with such a request within one (1) year, such Distribution shall be deemed an unclaimed Distribution, and, *provided further* that, if the Plan Administrator or TMI Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and such Plan Administrator or TMI Trustee is later held liable for the amount of such withholding, such holder shall reimburse such Plan Administrator or TMI Trustee for such liability.

9.    *__No Payments of Fractional Dollars__*

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

10.    *__Interest on Claims__*

Except as specifically provided for in this Plan or the Confirmation Order or required by the Bankruptcy Code, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. Interest shall not accrue or be paid on any General Unsecured Claim that is a Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim. Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or other similar charges.

11.    *No Distribution in Excess of Allowed Amount of Claim*

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

12.    *Setoff and Recoupment*

The Plan Administrator and TMI Trustee may setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that any of the Debtors or the Estates may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Estates of any right of setoff or recoupment that any of them may have against the holder of any Claim.

13.    *De Minimis Distributions; Charitable Donation*

Notwithstanding anything to the contrary therein, the Plan Administrator and the TMI Trustee shall not be required to make a Distribution to any Creditor if the dollar amount of the Distribution is less than $5 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution.  On or about the time that the final Distribution is made, the Plan Administrator or the TMI Trustee may make a charitable donation with undistributed funds if, in the reasonable judgment of such Plan Administrator or the TMI Trustee, the cost of calculating and making the final Distribution of the remaining funds is excessive in relation to the benefits to the TMI Trust Beneficiaries or holders of Claims against TMFE who would otherwise be entitled to such Distributions.

14.    *United States Trustee Fees*

All outstanding amounts due under 28 U.S.C. § 1930 that have not been paid shall be paid by the Debtors on or before the Effective Date.  Thereafter, the Plan Administrator and the TMI Trustee shall pay any statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) and such fees shall be paid until entry of a Final Decree or an order converting or dismissing the Chapter 11 Cases.

F.    **DISPUTED CLAIMS**

1.    *Disputed Claim Reserves*

After the Effective Date, the Disputed Claims Reserve shall be managed by the TMI Trustee and Plan Administrator (as applicable) for the treatment of Disputed Claims and Disputed Equity Interests.  On each Distribution date after the Effective Date in which any of the Liquidating Trustee and/or the Plan Administrator makes Cash Distributions to holders of TMI Trust Beneficial Interests or Claims against TMFE, the TMI Trustee and/or the Plan Administrator (as applicable) shall retain on account of Disputed Claims an amount the Plan Administrator or TMI Trustee (as applicable) estimates is necessary to fund the Pro Rata Share of such Distributions to holders of Disputed Claims if such Claims were Allowed.  Cash retained on account of Disputed Claims shall be retained in the applicable Disputed Claims Reserve for

the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan.  If any Disputed Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained on account of such Disputed Claim, then the Plan Administrator or TMI Trustee (as applicable) shall within sixty (60) days after such disallowance or allowance return the assets that exceed the Allowed amount of such Claim to the TMI Trust or the TMFE Estate (as applicable).

### 2.      *Resolution of Disputed Claims*

Pursuant to the Plan and the terms of the Joint Protocol and the New Joint Protocol, the Plan Administrator will adjudicate Claims asserted against TMFE in accordance with Cayman Islands Law and procedure.  However, as the assets of TMFE are located in the United States, the Plan Administrator will then make Distributions in accordance with the provisions of this Plan and the United States Bankruptcy Code, including without limitation, provisions relating to priority of Distribution.  The Plan Administrator may consult with the TMI Trustee, and the TMI Trustee may consult with the Plan Administrator, regarding allowance of Claims at TMFE.  Any appeals against the determination of the Plan Administrator shall be subject to the exclusive jurisdiction of the Cayman Court and any such appeals shall be filed within twenty-one (21) days following notification by the Plan Administrator to such Creditor of its Claim adjudication.  The costs of the Plan Administrator shall be paid from the Estate of TMFE.

The TMI Trustee shall have the right to make and file objections to Claims against and Equity Interest in TMI in the Bankruptcy Court.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims or Equity Interests against TMI shall be subject to the exclusive jurisdiction of the Bankruptcy Court.  The costs of pursuing objections to Claims against and Equity Interest in TMI shall be paid from the TMI Trust.

### 3.      *Objection Deadline*

All objections to Disputed Claims against TMI or Disputed Equity Interests against TMI shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court and the Cayman Court after notice and a hearing; provided, however, that all Claims and Equity Interests held by NXP shall be deemed Disputed as of the Effective Date.

### 4.      *Estimation of Claims*

At any time, TMI or the TMI Trustee may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether TMI or the TMI Trustee have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, TMI or the TMI Trustee may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation and

resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

The Plan Administrator may estimate the value of any contingent, unliquidated or other Claim against TMFE which for any other reason does not bear a certain value regardless of whether TMFE has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Plan Administrator may revise any estimate previously made, if the Plan Administrator reasonably believes such change is warranted as a result of a change in circumstances or to newly acquired information.  Upon the Plan Administrator estimating a Claim, the Plan Administrator shall provide reasonable notification to the holder of the Claim and the holder of the Claim may appeal to the Cayman Court to dispute the estimate of the Plan Administrator.  The Plan Administrator may also apply to the Cayman Court for directions with respect to any contingent or unliquidated Claims.

5.      *No Distributions Pending Allowance*

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim or Equity Interest been allowed on the Effective Date.

6.      *Resolution of Claims*

On and after the Effective Date, the Plan Administrator and the TMI Trustee shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims against the Estates of TMFE and TMI, respectively, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Claims relating to compensation of professionals, in accordance with the TMI Trust Agreement and the laws of the Cayman Islands (as applicable), provided, however, that the Plan Administrator shall require the approval of the Cayman Court to compromise any Claims.

## G.      TREATMENT OF EXECUTORY CONTRACTS

1.      *Assumption or Rejection of Executory Contracts*

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts that exist between the Debtors and any Person shall be deemed rejected by the Debtors as of immediately prior to the Confirmation Date, except for any executory contract (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court or the Cayman Court entered prior to the Confirmation Date, (ii) as to which a motion for approval of the assumption of such executory contract has been filed and served prior to the Confirmation Date, (iii) that is specifically designated as a contract to be assumed on Schedule 7.1 upon consent of the Equity

Committee and TMI Trustee, which Schedule shall be contained in the Plan Supplement; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 7.1 to delete any executory contract therefrom, or no later than 20 days prior to the Confirmation Date, add any executory contract, in which event such executory contract(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date.  The Debtors shall provide notice of Schedule 7.1 to the Plan and any amendments to Schedule 7.1 to the parties to the executory contracts affected thereby.  The listing of a document on Schedule 7.1 shall not constitute an admission by the Debtors that such document is an executory contract or that the Debtors have any liability thereunder.

## 2.    *Approval of Assumption or Rejection of Executory Contracts*

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date and subject to the Debtors' right to Article VII.D. of the Plan to reject any executory contract that is subject to a dispute over a cure amount, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts assumed pursuant to Article VII.A. of the Plan, and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts rejected pursuant to Article VII.A. of the Plan.

## 3.    *Inclusiveness*

Unless otherwise specified on Schedule 7.1, each executory contract listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract, without regard to whether such agreement, instrument or other document is listed on Schedule 7.1.

## 4.    *Cure of Defaults*

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract to be assumed pursuant to Article VII.A of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts to be assumed pursuant to Article VII.A of the Plan, an Assumption Notice, which shall list the cure amount as to each executory contract to be assumed.  The parties to such executory contracts to be assumed or assumed and assigned by the Debtors shall have twenty (20) days from the date of service of the Assumption Notice to file and serve any objection to assumption or the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court shall hear the objections at the Confirmation Hearing or on such other date as may be set by the Bankruptcy Court.  Notwithstanding Article VII.A of the Plan, the Debtors shall retain their rights to reject any of their executory contracts that are subject to a dispute concerning amounts necessary to cure any defaults through the Confirmation Date.

5. ***Claims Based on Rejection of Executory Contracts***

Claims created by the rejection of executory contracts pursuant to Article VII.A of the Plan, or termination of any executory contract after the entry of the Confirmation Order, but prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtors, the Plan Administrator and/or the TMI Trustee no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an executory contract pursuant to Article VII.A of the Plan for which proofs of Claim against TMI are not timely filed within that time period will be forever barred from assertion against the TMI, the TMI Estate, the TMI Trustee, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein and, in the case of Claims against TMFE, may be disallowed. All such Claims against TMI (and with respect to TMFE, such Claims against TMFE as are disallowed) shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.E of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

6. ***Indemnification and Reimbursement***

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtors for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtors against any Claims, costs, liabilities or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (i) paid only to the extent of any applicable insurance coverage, and (ii) to the extent a proof of Claim has been timely filed and is Allowed, treated as Allowed General Unsecured Claims to the extent such Claims are not covered by any applicable insurance, including deductibles. Nothing contained herein shall affect the rights of directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtors, the TMI Trustee, the Plan Administrator or the Debtors' Estates to object to, seek to subordinate or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtors pursuant to this Article VII.F. of the Plan or otherwise. Notwithstanding any other order of the Bankruptcy Court or anything in this Plan to the contrary, a liquidated, non-contingent proof of Claim for indemnification, defense, reimbursement, or limitation of liability directors, officers, or employees of the Debtors may be asserted against TMFE or the TMI Trust at any time prior to the dissolution of the TMI Trust or TMFE; provided, however, that such Claims shall be subject to the TMI Trustee or the Plan Administrator's opportunity to object, contest, challenge, subordinate or dispute such Claims pursuant to the Plan.

7. ***D&O Insurance Policies***

No prepaid D&O Insurance Policy shall be cancelled, and the Debtors' directors, officers and employees who have valid claims against the D&O Insurance Policies for indemnification, defense, reimbursement, or limitation of liability may be paid from the D&O Insurance Policies

to the extent of the coverage provided by the D&O Insurance Policies. As such, and notwithstanding anything in the Plan to the contrary, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract providing for such is determined to be an executory contract, shall be deemed assumed by the Debtors and, in the case of TMI, transferred to the TMI Trust pursuant to Article IV.D of the Plan.

### 8.    *Certain Insurance Policy Matters*

Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable or contractual rights and defenses, if any, of the insureds, the Debtors or any insurer with respect to any insurance policies or related agreements. The rights and obligations of the insureds, the Debtors, the Plan Administrator, the TMI Trust and insurers shall be determined under the insurance policies or related agreements, including all terms, conditions, limitations and exclusions thereof, which shall remain in full force and effect, and under applicable non-bankruptcy law. Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way (i) limit a Debtor, the Plan Administrator, the TMI Trustee or their assignees from asserting a right or claim to the proceeds of any insurance policy that insures any such Debtor, was issued to any such Debtor or was transferred to the TMI Trust Trustee, the TMI Trust or the Plan Administrator by operation of the Plan, nor (ii) limit any right of any other party to challenge such right or claim.

## H.    CONDITIONS PRECEDENT

### 1.    *Conditions Precedent to the Confirmation Date*

The following are conditions precedent to the Confirmation Date that must be satisfied or waived:

a.    The aggregate amount of Allowed Claims in Class 2.A. is not in excess of $16,800,000 (or the amount as adjusted upward to account for the Stipulated Additional Allowed Claims). Notwithstanding anything to the contrary herein, in the event that the aggregate amount of Allowed Claims in Class 2.A. is in excess of $16,800,000 (or the amount as adjusted upward to account for the Stipulated Additional Allowed Claims) and such condition to confirmation of the Plan is not waived or otherwise satisfied, the Debtors, Creditors' Committee and the Cayman Liquidators may continue to support an alternative plan of liquidation on terms and conditions comparable to the Plan, and the Equity Committee shall reserve all rights to object to the alternative plan of liquidation.

b.    The IRS Claim shall be resolved for no greater than $500,000 in Cash.

c.    The Confirmation Date shall be not later than December 15, 2012.

d.    The Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Creditors Committee and the Equity Committee.

2.      *__Conditions Precedent to the Effective Date__*

The following are conditions precedent to the Effective Date that must be satisfied or waived:

a.      The Effective Date shall be not later than December 31, 2012.

b.      The Bankruptcy Court shall have entered the Confirmation Order

c.      The Confirmation Order has become a Final Order, which such Confirmation Order shall contain full standard and customary releases provided by both TMI and TMFE.

d.      The Confirmation Order shall be in full force and effect.

e.      All agreements and instruments that are exhibits to the Plan or included in the Plan Supplement shall be in a form reasonably acceptable to the Debtors, the Creditors Committee and the Equity Committee, and have been duly executed and delivered; provided, however, that no party to any such agreements and instruments may unreasonably withhold its execution and delivery of such documents to prevent this condition precedent from occurring.

f.      The approval of the New Joint Protocol by the Bankruptcy Court and the Cayman Court.

g.      The appointment of the TMI Trustee and the Plan Administrator shall have been confirmed by order of the Bankruptcy Court.

3.      *__Waiver__*

Notwithstanding the foregoing conditions in Article VIII.A and B of the Plan, the Debtors, with the written consent of the Equity Committee and the Creditors Committee, reserve, in their sole discretion, the right to waive the occurrence of any condition precedent or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than the written consent of the Equity Committee and the Creditors Committee and proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

I.      **INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS**

1.      *__Compromise and Settlement__*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the

Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Equity Interests.

2.    *Releases*

**Releases by the Debtors.  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties; each of the Debtors shall be deemed to provide a full discharge and release to the Released Parties (and each such Released Party so released shall be deemed released and discharged by the Debtors) from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Chapter 11 Cases or the Plan; *provided, however,* that the foregoing provisions shall not release or otherwise affect any objection that has been or may be filed against any Claim asserted by a Released Party; *provided, further,* that the foregoing provisions shall not operate to waive or release any Causes of Action of the Debtors against their non-Debtor subsidiaries; *provided, further,* that the foregoing provisions shall not operate to waive or release any Causes of Action accrued by the Debtors in the ordinary course of business against holders of General Unsecured Claims; *provided, further* that the foregoing provisions shall not operate to waive, extinguish or release any Intercompany Claims; *provided, further* that the foregoing provisions shall not operate to waive, extinguish or release any Claim, suit, or cause of action that the Debtors have, may have or ever had against NXP or any TMI directors appointed by NXP, that were not released or extinguished as a matter of law as of the Effective Date.**

**Releases by Holders of Claims and Equity Interests.  Except as otherwise provided in this Plan, each Person, other than either of the Debtors, who votes to accept the Plan, or who, directly or indirectly, is entitled to receive a Distribution under the Plan, shall be deemed to forever release, waive and discharge the Released Parties, the JPLs and the Cayman Liquidators of and from any and all Claims and Causes of Action relating to the Debtors, their subsidiaries or their Representatives existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct, derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise, provided, however that the foregoing provisions shall not operate to waive, extinguish or release any Intercompany Claims.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article IX.B. of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing**

**a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or Releasing Parties asserting any Claim or Cause of Action thereby released.**

3.     *Exculpation*

**Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all Claims and Causes of Action arising after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases; *provided, however*, that the foregoing provisions of Article IX.C. of the Plan shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided, further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents; *provided, further*, that the foregoing provisions shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or any defenses thereto.**

4.     *Preservation of Causes of Action*

a.     Vesting of Causes of Action

Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that TMI or its Estate may hold against any Entity shall vest upon the Effective Date in the TMI Trustee.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the TMI Trustee shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Causes of Action that were held by TMI or its Estate, in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

For the avoidance of doubt, any Causes of Action that TMFE or its Estate may hold against any Entity shall remain with TMFE on and after the Effective Date; provided, however, that any Causes of Action that TMFE or its Estate may hold against NXP, NXP's Representatives or NXP's Affiliates shall be preserved and shall be transferred on the Effective Date to the TMI Trust.

The aforementioned Causes of Action being transferred to the TMI Trust and any recoveries therefrom shall constitute TMI Trust Assets.

Notwithstanding anything to the contrary herein, on or before the Effective Date, any objection against Class 2.B. Claims asserted by the Creditors' Committee, whether in the form of a Claims Objection or an adversary proceeding, shall be dismissed with prejudice.

b.      Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors and/or their Estates expressly reserve such Cause of Action for later adjudication or administration by the TMI Trustee and the Plan Administrator (as applicable) (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article IX.B.1 of the Plan) or any other Final Order (including the Confirmation Order).  In addition, the Debtors and their Estates expressly reserve the right of the TMI Trustee and the Plan Administrator (as applicable) to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.  The Debtors and their Estates expressly reserve the right of the TMI Trustee and the Plan Administrator (as applicable) to pursue any Cause of Action against NXP, or any TMI directors appointed by NXP.

Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the TMI Trustee or the Plan Administrator (as applicable) subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors as disputed, contingent or unliquidated.

5.      _**Injunction**_

**From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of**

**Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.**

**Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Debtors in Possession, the Estates, their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.**

**The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests of any nature whatsoever, against the Debtors or any of their assets or properties. On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.**

**Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby, from:**

**(a) commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, their successors and assigns and their assets and properties;**

**(b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, their successors and assigns and their assets and properties;**

**(c) creating, perfecting or enforcing any encumbrance of any kind against any Debtor or the property or estate of any Debtor;**

**(d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Debtor or against the property or estate of any Debtor, except to the extent a right to setoff, recoupment or subrogation is asserted with respect to a timely filed proof of claim; or**

**(e) commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.**

**6.**    *Releases of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estates shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtors.

## J.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, the TMI Trust and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest against TMI, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests, *provided, however*, Disputed Claims against TMFE shall be subject to the jurisdiction of to the Cayman Court in accordance with Articles IV and VI of the Plan;

2.    grant, deny or otherwise resolve any and all applications of professionals or Persons retained in the Chapter 11 Cases by the Debtors or the Committees for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.    resolve any matters related to the assumption, assignment or rejection of any executory contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.    ensure that Distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

5.    decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Plan Administrator and/or the TMI Trustee after the Effective Date, provided, however, that the Debtors and their Estates and, following the Effective Date, the TMI Trustee and the Plan Administrator, shall reserve the right to commence actions in all appropriate jurisdictions;

6.    enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

7.    resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.    issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.    enforce Article IX.A, Article IX.B, Article IX.C and Article IX.D. of the Plan;

10.    enforce the Injunction set forth in Article IX.E of the Plan;

11.    resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

12.    enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.    resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.    enter an order and/or the decree contemplated in Federal Rule of Bankruptcy Procedure 3022 concluding the Chapter 11 Cases.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Cayman Court shall, after the Effective Date, retain such jurisdiction over TMFE with respect to all matters related to the Cayman Proceeding, TMFE, the assets of TMFE and the Plan as is legally permissible and in accordance with this Plan, the Joint Protocol and the New Joint Protocol, including, without limitation, approval of the expenses of the Plan Administrator pursuant to the Plan.

## K.    MISCELLANEOUS PROVISIONS

### 1.    *Modification of Plan*

Subject to the limitations contained in the Plan: (1) the Debtors, with the consent of the Equity Committee and the Creditors Committee, reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors, the Plan Administrator or the TMI Trustee may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 2.    *Revocation of Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans, with the consent of the Creditors Committee and Equity Committee.  If the Debtors revoke or withdraw the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a

waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

3.    ***Binding Effect***

On the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, a Debtor and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

4.    ***Successors and Assigns***

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

5.    ***Governing Law***

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the principles of conflict of laws thereof.

6.    ***Reservation of Rights***

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

7.    ***Article 1146 Exemption***

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

8.    ***Section 1125(e) Good Faith Compliance***

The Debtors and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

9.      *Further Assurances*

The Debtors, the Plan Administrator, the TMI Trustee, all holders of Claims and Equity Interests receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

10.     *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by first class U.S. mail, postage prepaid as follows:

To the Debtors:

> **Trident Microsystems, Inc.**
> 5201 Great America Parkway, Suite 320
> Santa Clara, CA 95054
> Attn.:  David L. Teichmann
>
> *with a copy to:*
>
> **DLA Piper, LLP (US)**
> 203 N. LaSalle Street, Suite 1900
> Chicago, Illinois  60601
> Attn: Richard A. Chesley
> Kimberly D. Newmarch
> Chun I. Jang
>
> and
>
> **DLA Piper, LLP (US)**
> 919 North Market Street, Suite 1500
> Wilmington, Delaware 19801
> Attn:  Stuart M. Brown

11.     *Filing of Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

12.     *No Stay of Confirmation Order*

The Debtors shall request that the Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e) and 6004(h).

## ARTICLE VII.

## CERTAIN FACTORS AFFECTING THE DEBTORS

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

#### 1.    *Risk of Non-Confirmation of the Joint Plan of Liquidation*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

#### 2.    *Risk of Non-Confirmation of the New Joint Protocol*

Although the Debtors believe the New Joint Protocol will be approved by the Bankruptcy Court and the Cayman Court, there can be no assurance that the Bankruptcy Court and the Cayman Court will reach the same conclusion.  Unless the Bankruptcy Court and the Cayman Court approve the New Joint Protocol thereby permitting the Debtors and the Cayman Liquidators to implement the Plan, the Plan cannot become effective.

#### 3.    *Non-Consensual Confirmation*

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.  Because Class 3 (Equity Interests in TMFE) is deemed to reject the Plan, these requirements must be satisfied with respect to such Class.  The Debtors believe that the Plan satisfies these requirements.

#### 4.    *Risk of Delay in Confirmation of the Plan*

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.  In addition, as with any judicial proceeding, there are risks of unavoidable delay with a chapter 11 proceeding and there are risks of objections from certain stakeholders.  Any material delay in the confirmation of the Plan, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

#### 5.    *Adjudication and Distribution by Cayman Liquidators*

In the event that the Plan is not confirmed with respect to TMFE, the Cayman Liquidators may seek to proceed with the adjudication of Claims against TMFE pursuant to Cayman laws and procedure in any event and with the distribution of TMFE's assets.  There is no requirement

for a Plan to be in place in order for the Cayman Liquidators to do so as a matter of Cayman Islands law.

## B.   ADDITIONAL FACTORS TO BE CONSIDERED

### 1.   *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.   The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 2.   *No Representations Outside This Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.   Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

### 3.   *Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary*

Certain of the information contained in this Disclosure Statement is, by nature, forward looking and contains estimates and assumptions which might ultimately prove to be incorrect and projections which may be materially different from actual future experiences.   There are uncertainties associated with any projections and estimates, and the projections and estimates herein should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### 4.   *Debtors Could Withdraw the Plan*

Under the Plan, the Debtors could withdraw the Plan with respect to any Debtor and proceed with confirmation of the Plan with respect to the other Debtor.

### 5.   *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.   Each creditor or equity interest holder should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or equity interest.

This Disclosure Statement is not legal advice to you.   This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

6.      *No Admission Made*

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

## ARTICLE VIII.

### CONFIRMATION OF THE PLAN OF LIQUIDATION

**A.      CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of liquidation.  The Bankruptcy Court has scheduled the confirmation hearing for _____, 2012.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtors' estate(s) or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (a) counsel to the Debtors: DLA Piper LLP (US), 203 N. LaSalle Street, Suite 1900, Chicago, IL 60601 (Fax: 312-236-7516) (Attn: Richard A. Chesley, Esq. (richard.chesley@dlapiper.com)) and DLA Piper LLP (US), 919 N. Market Street, Suite 1500, Wilmington, DE 19801 (Fax: 302-394-2341) (Attn: Stuart M. Brown, Esq. (stuart.brown@dlapiper.com)); (b) counsel to the Official Committee of Unsecured Creditors:  Pachulski Stang Ziehl & Jones, LLP,  150 California Street, 15th Floor, San Francisco, California 94111 (Attn: John Fiero, Esq. (jfiero@pszjlaw.com)); (c) counsel to the Statutory Committee of Equity Holders:  Proskauer Rose LLP, Eleven Times Square, New York, New      York 10036-8299      (Attn: Martin      J.      Bienenstock,      Esq. (mbienenstock@proskauer.com)); and (d) the Office of the United States Trustee: US Trustee, 844 King Street, Suite 2207, Lockbox #35, Wilmington, Delaware, 19899-0035 (Fax: 302-573-6497) (Attn:  Juliet Sarkessian, Esq. (Juliet.M.Sarkessian@usdoj.gov)), so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on _____, 2012.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.      REQUIREMENTS FOR CONFIRMATION OF THE JOINT PLAN OF LIQUIDATION**

1.      *Requirements of Section 1129(a) of the Bankruptcy Code*

a.      General Requirements

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means proscribed by law.

4.      Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

6.      With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

7.      Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

9.      At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

10.     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the

Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

11.    The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits, if any.

b.    Best Interests Test

Each holder of a Claim or Equity Interest in an Impaired Class must either (i) accept the Plan or (ii) receive or retain under the Plan Cash or property of a value, as of the Effective Date of the Plan, that is not less than the value such holder of a Claim or Equity Interest would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.    The Bankruptcy Court will determine whether the Cash and property issued under the Plan to each Class equals or exceeds the value that would be allocated to such holders of Claims or Equity Interests in a liquidation under chapter 7 of the Bankruptcy Code.    The Debtors believe the holders of Claims against and Equity Interests in the Debtors will have an equal or greater recovery as a result of the liquidation of the Debtors' assets as discussed herein and under the Plan than could be realized in a chapter 7 liquidation for the following reasons.

The Plan is a liquidating plan and, therefore, is not seeking to require Creditors to accept non-cash consideration so that the Estates could pursue going concern value.  Accordingly, the only question is whether the Creditors will have recovered more (or at least as much) under the Plan than they would recover through an asset liquidation by a chapter 7 trustee.

To determine the value that a holder of a Claim or Equity Interest in an Impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' assets if the Debtors' Chapter 11 Cases had been converted to a chapter 7 liquidation case and the Debtors' assets were liquidated by a chapter 7 trustee.  The liquidation value would consist of the net proceeds from the disposition of the Debtors' assets, augmented by Cash held by the Debtors and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 reorganization case.

As explained below, the liquidation value available for satisfaction of Claims and Equity Interests in the Debtors would be reduced by:  (a) the costs, fees and expenses of the liquidation under chapter 7, which would include disposition expenses and the compensation of a trustee and his or her counsel and other professionals retained, (b) the fees of the chapter 7 trustee and (c) certain other costs arising from conversion of the Chapter 11 Cases to chapter 7.  Furthermore, the Plan is premised on coordination with the Cayman Liquidators for the liquidation and distribution of the assets of TMFE.  Conversion to chapter 7 would likely cause additional delay and confusion on the role of a chapter 7 trustee with respect to TMFE.

The Debtors believe that Creditors have and will continue to clearly benefit from the liquidation by the Debtors.  Had the assets been liquidated by a chapter 7 trustee, the Debtors

project that the maximum recovery would have been substantially less. The Debtors have realized a greater return than a chapter 7 trustee would have obtained on the sale of their assets, specifically due to the Debtors' familiarity with the assets, the ability to retain employees that were essential to such sales, and their ability to negotiate the highest and best price for the sale thereof. The Debtors have already reduced the significant majority of their assets to Cash through auction or private sales approved by the Bankruptcy Court. Therefore, the Debtors have already established systems and protocols for the efficient disposition of the assets of the Estates and are in the process of liquidating their limited remaining assets.

In addition, converting the Chapter 11 Cases to a chapter 7 liquidation at this stage of the winddown would result in an immense waste of the Debtors' resources that were already expended in connection with the sale of the assets and would delay converting the remaining assets to Cash. It would also result in substantial additional claims against the Estates.

Moreover, under the Plan, the Debtors will avoid the increased costs and expenses of a chapter 7 liquidation, including the fees payable to a chapter 7 trustee and his or her professionals. Although the Debtors have already incurred many of the expenses associated with generating the proceeds, the Cash to be distributed to Creditors would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee. Bankruptcy Code section 326(a) permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors.[5] The chapter 7 trustee's professionals, including legal counsel and accountants, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtors. Moreover, these chapter 7 trustee fees would reduce the assets available for distribution to the Estates' Creditors from additional recoveries such as preferential payments, expunged administrative claims and the proceeds of successful Estate litigation or settlement. In contrast, the TMI Trustee and the Plan Administrator will be highly familiar with the Debtors' operations and the issues pertaining thereto and, therefore, the Estates will avoid the significant administrative burden associated with the familiarization process of a chapter 7 trustee and his or her legal and accounting professionals.

It is also anticipated that a chapter 7 liquidation would result in a significant delay in payments being made to creditors. Bankruptcy Rule 3002(c) provides that conversion of chapter 11 cases to chapter 7 will trigger a new bar date for filing claims against the Estates, and that the new bar date will be more than 90 days after the chapter 11 cases convert. Not only would a chapter 7 liquidation delay distribution to creditors, but it is possible that additional claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Estates. The Debtors have received and are analyzing late-filed claims and may file claims objections in the near future. Reopening the bar date in connection with conversion to chapter 7 would provide these and other claimants an additional opportunity to timely file claims against the

---

[5]     Bankruptcy Code § 326(a) permits a chapter 7 trustee to receive 25% of the first $5,000 distributed to creditors, 10% of additional amounts up to $50,000, 5% of additional distributions up to $1 million and reasonable compensation up to 3% of distributions in excess of $1 million.

Estates.  Moreover, the Debtors would lose the benefit of having an established Administrative Claims Bar Date.

For the reasons set forth above, the Debtors believe that the Plan provides a superior recovery for holders of Claims and Equity Interests, and the Plan meets the requirements of the Best Interest Test.

       c.        Feasibility

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder.  These projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court, and for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place on _____, 2012.  The Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

### 2.      *Requirements of Section 1129(b) of the Bankruptcy Code*

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

*No Unfair Discrimination*.  This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

*Fair and Equitable Test*.  This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

*Unsecured Claims*.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

*Equity Interests*.  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement, notwithstanding that Class 3 will likely receive no

Distribution, because as to such Classes, there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

## ARTICLE IX.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE JOINT PLAN OF LIQUIDATION

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

### A.    LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.   The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.   Furthermore, as explained above, the Plan is premised on coordination with the Cayman Liquidators for the liquidation and distribution of the assets of TMFE.  Conversion to chapter 7 would likely cause additional delay and confusion on the role of a chapter 7 trustee with respect to TMFE.

### B.    ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different chapter 11 plan of reorganization.  Such a plan of reorganization might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets under chapter 11.   With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan.   The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances.

## ARTICLE X.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to certain holders of Claims and Equity Interests. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations thereunder, and

administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. Events occurring after the date of the Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences described herein. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims or Equity Interests that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who receive their Claims or Equity Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Equity Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

For purposes of this summary, a "U.S. Holder" means a holder of Claims or Equity Interests that, in any case, is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust (x) if a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust or (y) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. A "Non-US. Holder" means a holder of Claims that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds Claims, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the entity's ownership or disposition of Claims.

The U.S. federal income tax consequences of the Plan are complex. The following

summary is for information purposes only and is not a substitute for careful tax planning and advice based on the particular circumstances of each holder of a Claim or Equity Interest. Each holder of a Claim or Equity Interest is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, upon implementation of the Plan.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. THE TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR

A.    **GENERAL CONSEQUENCES TO U.S. HOLDERS OF CLAIMS AND EQUITY INTERESTS**

1.    _**Realization and Recognition of Gain or Loss, In General**_

The federal income tax consequences of the implementation of the Plan to a U.S. Holder of a Claim or Equity Interest will depend, among other things, upon the origin of the holder's Claim, when the holder receives payment in respect of such Claim or Equity Interest, whether the U.S. Holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Claim at a discount, and whether the U.S. Holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Equity Interest. A U.S. Holder of an Equity Interest should consult its tax advisor regarding the timing and amount of any potential worthless stock loss.

Generally, a U.S. Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property (including any TMI Trust Beneficial Interests), in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the U.S. Holder, including, as discussed below, any TMI Trust Beneficial Interests (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, see section X.A.3 — "Allocation of Consideration to Interest" below.

When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the U.S. Holder and has been held for more than one year. Each U.S. Holder of an Allowed Claim or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such

holder.

As discussed below (see section X.C.1 —"Tax Treatment of TMI Trust and Holders of TMI Trust Beneficial Interests–Classification of the TMI Trust"), each U.S. Holder of an Allowed Claim that receives a beneficial interest in TMI Trust (if and when established) will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the TMI Trust Assets (consistent with its economic rights in the trust). Pursuant to the Plan, the TMI Trustee will in good faith value the assets transferred to the TMI Trust, and all parties to the TMI Trust (including holders of Claims and Equity Interests receiving the TMI Trust Beneficial Interests) must consistently use such valuation for all U.S. federal income tax purposes.

A U.S. Holder's share of any proceeds received by the TMI Trust upon the sale or other disposition of the assets of the TMI Trust (other than any such amounts received as a result of the subsequent disallowance of Disputed Claims or the reallocation amount holders of Allowed Claims of undeliverable Plan distributions) should not be included, for federal income tax purposes, in the U.S. Holder's amount realized of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interests in the underlying assets of the TMI Trust. See section X.C. -- "Tax Treatment of TMI Trust and Holders of TMI Trust Beneficial Interests" below.

A U.S. Holder's tax basis in its respective share of the TMI Trust Assets will equal the fair market value of such interest, and the holder's holding period generally will begin the day following the establishment of TMI Trust.

## 2.   *Holders of Claims in All Classes Except Class 3*

Except for Class 3, the Plan provides, in certain circumstances, for a distribution of Cash, as distributed from time to time (but in no instance to exceed the amount of the Allowed Claim) to each Allowed Claim against the Debtors. A U.S. Holder of an Allowed Claim in the foregoing Classes generally will realize gain or loss in an amount equal to the difference, if any, between (a) the amount of Cash and the fair market value of any other property received in the exchange (other than amounts allocable to accrued but unpaid interest) and (b) the U.S. Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). It is possible that any loss, or a portion of any gain, realized by a holder of a Claim may have to be deferred until all of the distributions to such holder are received.

As discussed in the next section, the amount of Cash or other property received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a U.S. Holder under such holder's method of tax accounting.

## 3.   *Allocation of Consideration to Interest*

All distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim). However, there is no assurance that such allocation would be

respected by the IRS for federal income tax purposes. In general, to the extent any amount received by a U.S. Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each U.S. Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### 4. *Market Discount*

A U.S. Holder will be considered to have acquired a Claim at a market discount if its tax basis in the Claim immediately after acquisition is less than the sum of all amounts payable thereon (other than payments of qualified stated interest, as defined in the Tax Code) after the acquisition date, subject to a statutorily-defined "de minimis" exception. Market discount generally accrues on a straight line basis from the acquisition date over the remaining term of the obligation or, at the U.S. Holder's election, under a constant yield method. A U.S. Holder that acquired a Claim at a market discount previously may have elected to include the market discount in income as it accrued over the term of the Claim.

A U.S. Holder that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income (instead of capital gain) to the extent of accrued market discount not previously included in gross income by the holder.

### 5. *Bad Debt Deduction and Worthless Securities Deduction*

A U.S. Holder of an Allowed Claim that is not a security for purposes of section 165(g) of the Tax Code who receives, pursuant to the Plan, an amount less than such holder's tax basis in that Allowed Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction under section 166(a) of the Tax Code or may be entitled to a loss under section 165(a) in the year of receipt. A U.S. Holder of a security, the Allowed Claim with respect to which is wholly worthless, may be entitled to a worthless securities deduction under sections 165(g) and 165(a) of the Tax Code. A worthless securities deduction is generally treated as a loss from the sale or exchange of a capital asset. U.S. Holders should consult their own tax advisers as to the appropriate tax year in which to claim a worthless securities deduction. The rules governing the timing and amount of deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a loss or deduction is claimed. Such loss or deduction would be limited to the U.S. Holder's adjusted tax basis in the indebtedness underlying its Allowed Claim. U.S. Holders of Allowed Claims are urged to consult their own tax advisors with respect to their ability to take any loss or deduction described above.

### 6. *Limitation on Use of Capital Losses*

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan or as a result of a deduction described in the preceding paragraph will be subject to limits on the use of such capital losses. For a non-corporate holder, capital losses may be used

to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year, but may carry over unused capital losses for the five years following the capital loss year

## B.    TAX TREATMENT OF TMI TRUST AND U.S. HOLDERS OF TMI TRUST BENEFICIAL INTERESTS

### 1.    *Classification of the TMI Trust*

The TMI Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the liquidating trust beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The TMI Trust will be structured to comply with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the TMI Trustee, holders of Allowed Claims and Equity Interests, and the TMI Trust Beneficiaries) will be required to treat, for U.S. federal income tax purposes, the TMI Trust as a grantor trust of which the TMI Trust Beneficiaries are the owners and grantors. The following discussion assumes that the TMI Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the TMI Trustee may or may not obtain a ruling from the IRS, concerning the tax status of the TMI Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of the TMI Trust, the U.S. federal income tax consequences to the TMI Trust and the TMI Trust Beneficiaries could vary from those discussed herein (including the potential for an entity-level tax on income of the TMI Trust).

### 2.    *General Tax Reporting by the TMI Trust and TMI Trust Beneficiaries*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the TMI Trustee, holders of Allowed Claims and Equity Interests and the TMI Trust Beneficiaries) shall treat the transfer of the TMI Trust Assets to the TMI Trust in accordance with the terms of the Plan. Pursuant to the Plan, the TMI Trust Assets (other than assets allocable to Disputed Claims) shall be treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims or Equity Interests receiving TMI Trust Beneficial Interests (with each holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the holders of such assets to the TMI Trust in exchange for the TMI Trust Beneficial Interests. Accordingly, all parties shall treat the TMI Trust as a grantor trust of which the holders of TMI Trust Beneficial Interests are the owners and grantors, and

treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the TMI Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims) among the TMI Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the TMI Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to Disputed Claims) to the TMI Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the TMI Trust. Similarly, taxable loss of the TMI Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining TMI Trust Assets. The tax book value of the TMI Trust Assets for this purpose shall equal their fair market value on the date of the transfer of the TMI Trust Assets to the TMI Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the TMI Trust Assets to the TMI Trust, the TMI Trustee shall make a good faith valuation of the TMI Trust Assets. All parties to the TMI Trust (including, without limitation, the Debtors, holders of Allowed Claims and Equity Interests, and the TMI Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a TMI Trust Beneficiary will be treated as income or loss with respect to such TMI Trust Beneficiary's undivided interest in the TMI Trust Assets, and not as income or loss with respect to its prior Allowed Claim or Equity Interest. The character of any income and the character and ability to use any loss will depend on the particular situation of the TMI Trust Beneficiary.

The U.S. federal income tax obligations of a U.S. Holder with respect to its TMI Trust Beneficial Interest are not dependent on the TMI Trust distributing any cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of the TMI Trust's income even if the TMI Trust does not make a concurrent distribution to the holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of cash by the TMI Trust will not be separately taxable to a TMI Trust Beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the TMI Trust). Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of any subsequent distributions of cash originally retained by the TMI Trust on account of Disputed Claims.

The TMI Trustee will file with the IRS tax returns for the TMI Trust consistent with its

classification as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). Except as discussed below with respect to any reserve for Disputed Claims, the TMI Trustee also will send annually to each holder of a TMI Trust Beneficial Interest a separate statement regarding the receipts and expenditures of the TMI Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

In the case of the TMI Beneficial Interests reserved for holders of Disputed Claims,  such TMI Beneficial Interests will be deemed transferred to a reserve for such holders of Disputed Claims, and the TMI Trustee will make an election pursuant to U.S. Treasury Regulations Section 1.468B-9(c) to treat such reserve as "disputed ownership fund" (the **"TMI DOF"**).  The TMI DOF and not the holders of Disputed Claims will be treated as the owner of the TMI Beneficial Interests reserved for Disputed Claims.  The TMI DOF will be treated for United States federal income tax purposes as a taxable entity separate from the holders of Disputed Claims.  The TMI DOF will be responsible for the payment of any taxes (including by way of withholding) resulting from the transfer or holding of TMI Beneficial Interests, but the only source of payment therefor will be the allocable proceeds of such TMI Beneficial Interests and any funds transferred to the TMI DOF by holders of the Disputed Claims, if any.

## C.    INFORMATION REPORTING AND WITHHOLDING

Distributions under the Plan are subject to applicable tax reporting and withholding. Under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at then applicable rates (currently 28%).  Backup withholding generally applies if the U.S. Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN it provided is correct and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax, provided the required information is timely provided to the IRS.  Certain persons are exempt from backup withholding, including, in most circumstances, corporations and financial institutions.

Treasury Regulations generally require a taxpayer to disclose certain transactions on its federal income tax return, including, among others, certain transactions that result in a taxpayer claiming a loss in excess of a specified threshold.  Holders are urged to consult their tax advisors as to whether the transactions contemplated by the Plan would be subject to these or other disclosure or information reporting requirements. The foregoing summary is provided for informational purposes only.  U.S. Holders of Claims are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences of the Plan.

### D. GENERAL CONSEQUENCES TO NON-U.S. HOLDERS OF CLAIMS AND EQUITY INTERESTS

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. Each Non-U.S. Holder should consult with its own tax advisor to determine the effect of U.S. federal, state, local and foreign income tax laws, as well as treaties, with regard to its participation in the transactions contemplated by the Plan, and its ownership of Claims and TMI Trust Beneficial Interests.

### 1. *Tax Consequences to Non-U.S. Holders Under the Plan*

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to the receipt of any TMI Trust Beneficial Interests and Cash under the Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

### 2. *Non-U.S. Holders of TMI Trust Interests*

If a Non-U.S. Holder receives TMI Trust Beneficial Interests under the Plan, as discussed above, all parties must treat the TMI Trust as a grantor trust of which the holders of TMI Trust Beneficial Interests are the owners and grantors, and treat the TMI Trust Beneficiaries as the direct owners of an undivided interest in the TMI Trust Assets, consistent with their economic interests therein, for all federal income tax purposes.

As discussed above, a holder of a TMI Trust Beneficial Interest is treated for federal income tax purposes as holding an undivided interest in the underlying assets of the TMI Trust. Accordingly, any amounts received by the TMI Trust, the economic benefit of which inures to a Non-U. S. Holder of a TMI Trust Beneficial Interest on the basis described above with respect to the allocation of income, is treated as received by the TMI Trust Beneficiary in respect of the underlying asset, and not in respect of its Allowed Claim. Thus, in the case of any Non-U.S. Holders of TMI Trust Beneficial Interests, the TMI Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). Thus, for example, the stated interest component of recoveries on TMI Trust Assets may be subject to 30% income tax withholding with respect to a Non-U.S. Holder of a TMI Trust Beneficial Interest.

In order to obtain a reduced rate of U.S. withholding tax under an applicable income tax treaty, a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8BEN certifying its entitlement to benefits under the treaty. If a Non-U.S. Holder is eligible for a reduced rate of U.S. withholding tax under a treaty, the Non-U.S. Holder may obtain a refund or credit of any excess amounts withheld by filing an appropriate claim for a refund with the IRS. Each Non-U.S. Holder should consult its own tax advisor regarding its possible entitlement to benefits under a treaty.

The U.S. federal withholding tax described above will not apply to a Non-U.S. Holder if such income represent U.S. trade or business income for the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed IRS Form W-8ECI certifying that the income is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the U.S. because such amounts are otherwise subject to tax in the U.S. as part of their trade or business income.

**3.**      *Effectively Connected Income and Loss*

If a Non-U.S. Holder is engaged in a trade or business in the U.S. and if income in respect of TMI Trust Beneficial Interests is "effectively connected" with the conduct of such U.S. trade or business, any such income, gain or loss realized by the Non-U.S. Holder will be subject to full net-basis U.S. federal income tax in the same manner as if the Non-U.S. Holder were a U.S. Holder, unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a foreign corporation, the Non-U.S. Holder may also be subject to a "branch profits tax" on earnings and profits effectively connected with such U.S. trade or business (subject to certain adjustments) at a rate of 30%, unless the branch profits tax is reduced or eliminated by an applicable income tax treaty. Even though any such effectively connected income would be subject to income tax, and might also be subject to branch profits tax, it would not be subject to withholding tax if the Non-U.S. Holder satisfied the applicable certification requirements described above. Non-U.S. Holders should discuss the applicability of the "effectively connected" rules with their tax advisors.

## ARTICLE XI.

## DEFINITIONS AND INTERPRETATION

**A.      DEFINITIONS**

Unless the context otherwise requires, the following terms shall have the following

meanings when used in capitalized form herein:

1.      "*505 Motion*" means a motion filed by TMI in the Chapter 11 Cases pursuant to section 505(b) of the Bankruptcy Code requesting an expedited determination of any unpaid tax liability of TMI or its Estate, as determined under applicable tax laws.

2.      "*2004 Motion*" has the meaning set forth in Article V.

3.      "*Accrued Professional Compensation*" means, at any given moment, all accrued and/or unpaid fees and expenses (including, without limitation, fees or expenses allowed or awarded by a Final Order of the Bankruptcy Court, the Cayman Court or any other court of competent jurisdiction) for legal, financial advisory, accounting, liquidation and other professional services and reimbursement of expenses of such professionals that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code or section 109 or 104(5) of the Cayman Companies Law, or otherwise rendered prior to the Effective Date, or thereafter including in connection with (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code; (b) motions seeking the enforcement of the provisions of the Plan or

Confirmation Order, by all Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not previously been paid regardless of whether a fee application has been filed for any such amount; and (c) applications for allowance of Administrative Expenses arising under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(6) of the Bankruptcy Code.  To the extent the Bankruptcy Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Accrued Professional Compensation.

4.      "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days after the Effective Date and is the deadline for a holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Claim in the manner indicated in Article II of the Plan.

5.      "*Administrative Claims*" means Claims that have been timely filed before the Administrative Claims Bar Date, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation: the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises).  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Article V.N. and of the Plan.

6.      "*Affiliate*" means an (a) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; (b) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; (c) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or (d) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement; *provided, however*, that for purposes of this Plan, NXP shall not be considered an Affiliate of the Debtors.

7.      "*Allowed*" means, with respect to any Claim or Equity Interest against a Debtor, except as otherwise provided herein:  (a) a Claim or Equity Interest that has been scheduled by the Debtors in their Schedules filed in the Chapter 11 Cases as other than disputed, contingent or unliquidated and as to which the Debtors or other parties-in-interest have not filed an objection by the Claims Objection Bar Date (in respect of Claims against TMI only) and for which no contrary proof of claim has been filed; (b) a Claim or Equity Interest timely filed in the Chapter

11 Cases and that either is not Disputed or has been allowed by a Final Order; (c) a Claim or Equity Interest otherwise approved by the Plan Administrator and/or the Cayman Court that is not the subject of an appeal or an application to expunge in the Cayman Proceedings; (d) a Claim or Equity Interest that is allowed:  (i) in any stipulation of amount and nature of Claim executed prior to the entry of the Confirmation Order and approved by the Bankruptcy Court; (ii) in any stipulation with Debtors of amount and nature of Claim or Equity Interest executed on or after the entry of the Confirmation Order; or (iii) in or pursuant to any contract, instrument or other agreement entered into or assumed in connection herewith; or (e) a Claim or Equity Interest that is allowed pursuant to the terms hereof.

8.      "*Analog Business*" has the meaning set forth in Article V.

9.      "*Assumption Notice*" means notice provided to counterparties of executory contracts to be assumed pursuant to Article VII of the Plan.

10.     "*Audio Business*" has the meaning set forth in Article V.

11.     "*Ballot*" has the meaning set forth in Article I.

12.     "*Bankruptcy Code*" means Articles 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

13.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

14.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the U.S. Bankruptcy Court for the District of Delaware, the Local Rules of Civil Practice and Procedure of the U.S. District Court for the District of Delaware, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Cases and as amended from time to time.

15.     "*Bar Date*" means July 13, 2012 as the bar date for filing proofs of claim, with only those exceptions permitted by the Bar Date Order.

16.     "*Bar Date Order*" means that certain order of the Bankruptcy Court dated as of June 8, 2012, establishing July 13, 2012 as the general bar date for filing proofs of claim, with only those exceptions permitted thereby.

17.     "*Beneficiaries*" means holders of Allowed Claims and Equity Interests entitled to receive Distributions from the Debtors under the Plan, whether or not such Claims or Equity Interests were Allowed Claims or Allowed Equity Interests on the Effective Date.

18.     "*Books and Privileges*" means, with respect to a particular Debtor or the Debtors, all books and records of such Debtor(s), including, without limitation, all documents and communications of any kind, whether physical or electronic, the right to assert or waive any privilege, including, but not limited to, any attorney-client privilege, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written,

electronic or oral), and rights to direct current or former agents, attorneys, advisors and other professionals of such Debtor(s) to deliver such documents or communications.

19.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Federal Rules of Bankruptcy Procedure 9006(a)).

20.    "*Cambridge*" means Cambridge Silicon Radio Limited.

21.    "*Cash*" means cash and cash equivalents in certified or immediately available funds, including but not limited to bank deposits, checks and similar items.

22.    "*Causes of Action*" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims (including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code) against any Person or Entity (including, without limitation, against NXP or any TMI directors appointed by NXP), based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date.

23.    "*Cayman Committee*" means the official committee of creditors anticipated to be appointed in the Cayman Proceedings on September 25, 2012.

24.    "*Cayman Companies Law*" means the Companies Law (2011 Revision) of the Cayman Islands.

25.    "*Cayman Court*" means the Grand Court of the Cayman Islands.

26.    "*Cayman Liquidators*" means the official liquidator(s) of TMFE appointed in the Cayman Proceedings.

27.    "*Cayman Proceedings*" means the insolvency proceedings of TMFE commenced in the Cayman Court on January 4, 2012, Cause No. FSD 1 of 2012.

28.    "*Cayman Provisional Committee*" means the committee of creditors appointed in the provisional liquidation proceedings of TMFE which such committee was discharged on the commencement of the official liquidation on August 8, 2012 for all purposes except for the purpose of approving the fees of the JPLs.

29.    "*Chapter 11 Cases*" means the chapter 11 cases commenced when the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date and with the following case numbers:  12-10069 (CSS), and 12-10070 (CSS), which are jointly administered under case number 12-10069 (CSS).

30.    "*Claim*" means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed,

legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

31.    "*Claims Agent*" means Kurtzman Carson Consultants LLC, the Bankruptcy Court appointed claims, noticing and balloting agent in these jointly administered Chapter 11 Cases.

32.    "*Claims Objection Bar Date*" means the bar date for objecting to proofs of claim at TMI only, which shall be one hundred twenty (120) days after the Effective Date; *provided*, *however*, that the Debtors, the Plan Administrator or the TMI Trustee may seek additional extensions of this date from the Bankruptcy Court.  A party requesting to extend the Claims Objection Bar Date may specify which entities may benefit from such an extension.

33.    "*Class*" means a category of holders of Claims or Equity Interests as set forth in Article III of the Plan and pursuant to section 1122(a) of the Bankruptcy Code.

34.    "*Committees*" means, collectively, the Cayman Committee, the Creditors' Committee and the Equity Committee.

35.    "*Company*" means TMI and all of its Debtor and non-Debtor subsidiaries.

36.    "*Companies Winding Up Rules*" means the Cayman Islands Companies Winding Up Rules 2008 (as amended).

37.    "*Confirmation Date*" means the date on which the Confirmation Order is entered by the Bankruptcy Court; provided, however, that in no event shall the Confirmation Date be later than December 15, 2012 unless such condition is otherwise waived pursuant to Article VIII.C of the Plan.

38.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code in form and substance satisfactory to the Creditors Committee, Equity Committee and the Cayman Liquidators.

39.    "*Creditor*" shall have the meaning in Bankruptcy Code § 101(10).

40.    "*Creditors Committee*" means the Official Committee of Unsecured Creditors in the case of TMFE appointed by the U.S. Trustee.

41.    "*D&O Insurance Policies*" means all primary and excess insurance policies of the Debtors that provide for, among other things, coverage for liability related to the actions or omissions of the Debtors' directors or officers.

42.    "*Debtor Intercompany Agreements*" has the meaning set forth in Article III.

43.    "*Debtors*" means TMI and TMFE and, where applicable, the Estates thereof.

44.    "*Demod Business*" has the meaning set forth in Article V.

45.    "*Disbursing Agent*" means the person or entity empowered and authorized to make all Distributions pursuant to Article V.C of the Plan.

46.    "*Disclosure Statement*" means this *Disclosure Statement for the Debtors' First Amended Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code*, dated August 17, 2012, prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law, and approved by the Bankruptcy Court, as it is amended, supplemented or modified from time to time, and approved by the Bankruptcy Court.

47.    "*Disclosure Statement Order*" has the meaning set forth in Article I.

48.    "*Disputed*" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, disputed or contingent, unless a proof of Claim has been timely filed; (b) as to which a Debtor, the Plan Administrator, the TMI Trustee or any other party in interest, including, without limitation, the Equity Committee and the Creditors Committee, has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or a request for a sanction order, an order for directions or an expungement order from the Cayman Court; (c) as to which the Plan Administrator  has determined shall not be Allowed or not Allowed in full or (d) as otherwise disputed in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; *provided, however,* that for purposes of Distributions under the  Plan, the TMI Trustee and the Plan Administrator shall have the power, up to and including the Claims Objection Bar Date (such time limite being in respect of Claims against TMI only), to determine a Claim to be Disputed upon review of the claims register and the books and records and may cause the amendment of the Schedules to reflect any such determination

49.    "*Disputed Claims Reserve*" means the reserve funds created pursuant to Article VI.A. of the Plan.

50.    "*Distributions*" means the distributions of Cash to be made in accordance with the Plan.

51.    "*Effective Dat*e" means a Business Day selected by the Debtors that is on or after the date by which all conditions precedent specified in Article VIII of the Plan have been satisfied or waived; *provided*, *however*, that the Effective Date shall not be later than December 31, 2012.  Within five (5) Business Days of the Effective Date, notice of the Effective Date shall be filed in the Bankruptcy Court and the Cayman Court.

52.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

53.    "*Entropic*" means Entropic Communications, Inc.

54.    "*Equity Committee*" shall mean the Statutory Committee of Equity Security Holders of Trident Microsystems, Inc.  appointed by the U.S. Trustee.

55.    "*Equity Interest*" means any equity interest in a Debtor that existed immediately prior to the Petition Date.

56.    "*Estates*" means the TMI and TMFE estates created pursuant to section 541 of the Bankruptcy Code upon the filing of the Chapter 11 Cases.

57.    "*Exculpated Parties*" means, collectively, the Debtors, the Cayman Liquidators, the JPLs, the Committees and the individual members thereof, the Plan Administrator, the TMI Trustee, and each of their current and former respective Representatives (each of the foregoing in its individual capacity as such), but excluding NXP, NXP's Representatives and those individuals chosen by NXP to serve as directors of TMI or TMFE.

58.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

59.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to file an appeal, motion for reconsideration or rehearing, or request for a stay has expired.

60.    "*Foreign Subsidiaries*" has the meaning set forth in Article III.

61.    "*General Bar Date*" means 5:00 p.m. prevailing Eastern Time on July 13, 2012 as established in the Bar Date Order.

62.    "*General Unsecured Claims*" means Claims against any Debtor that are not Administrative Claims, Secured Claims, Priority Tax Claims, Other Priority Claims, or Equity Interests.

63.    "*HR*" has the meaning set forth in Article III.

64.    "*Impaired*" means "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

65.    "*Indemnified Persons*" means the Plan Administrator and the TMI Trustee and the individuals comprising the Plan Administrator and the TMI Trustee, and the Plan Administrator's and the TMI Trustee's employees, officers, directors, agents, Representatives, and Professionals, as the case may be.

66.    "*Initial Distribution Date*" means (a) the date that is as soon as practicable on or after the Effective Date, when Distributions under the Plan shall commence to holders of Allowed Claims and Allowed Equity Interests in all Classes other than Class 2.B. and (b) with respect to Distributions to Class 2.B., the date that is as soon as practicable after the Effective Date and after appropriate reserves have been established in accordance with Article III hereof, including, without limitation, reserves on account of the Disputed Claims Reserve, Administrative Claims, and sufficient funds necessary for the Plan Administrator and TMI Trustee (as applicable) to carry out their respective duties.

67.    "*Intercompany Agreements*" has the meaning set forth in Article III.

68.    "*Intercompany Claims*" means Claims held by a Debtor or Affiliate of the Debtors against another Debtor or Affiliate of the Debtors.

69.    "*IRS Claim*" means the Debtors' liability to the Internal Revenue Service, including but not limited to, any Claim for proposed adjustments as described in the Notice of Proposed Adjustments, dated March 23, 2012 (as amended on or about May 17, 2012, and as further amended) and the Proof of Claim filed by the Internal Revenue Service on or about January 31, 2012 (as amended on or about September 6, 2012, and as further amended).

70.    "*IRS Notice*" has the meaning set forth in Article V.

71.    "*IT*" has the meaning set forth in Article III.

72.    "*Joint Protocol*" means the Cross-Border Insolvency Protocol Stipulation Regarding Trident Microsystems, Inc, and Trident Microsystems (Far East) Ltd. (in official liquidation) (as it may be amended) as approved by the Bankruptcy Court and the Cayman Court on September 12, 2012.

73.    "*Joint Provisional Liquidation Protocol*" means the Cross-Border Insolvency Protocol Stipulation Regarding Trident Microsystems, Inc, and Trident Microsystems (Far East) Ltd. and the JPLs (as amended) as approved by the Bankruptcy Court and the Cayman Court in the provisional liquidation of TMFE on January 25, 2012 as amended and restated on June 8, 2012.

74.    "*JPLs*" means the provisional liquidators appointed in the Cayman Proceedings.

75.    "*KCC*" means Kurtzman Carson Consultants LLC, the Debtors' claims and noticing agent.

76.    "*KEIP*" has the meaning set forth in Article V.

77.    "*Lien*" shall mean any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt or litigation.

78.    "*MSA*" has the meaning set forth in Article III.

79.    "*New Joint Protocol*" means the Cross-Border Insolvency Protocol Stipulation proposed to be implemented between the Debtors, the Cayman Liquidators and Mr. Andrew Hinkelman and the Cayman Liquidators in substantially the form attached as Exhibit C to the Disclosure Statement, and as is ultimately approved by the Bankruptcy Court and the Cayman Court that will become effective on the Effective Date, which, among other things, will set out the process by which the Cayman Liquidators will adjudicate upon Claims against TMFE in accordance with Cayman Islands Law and make Distributions pursuant to the Plan in accordance with, and subject to the priorities of, United States Bankruptcy Law.

80.    "*Non-Debtor Intercompany Agreements*" has the meaning set forth in Article III.

81.     "*NXP*" means NXP B.V., NXP Semiconductors Netherlands B.V. and any Affiliate or Representative of NXP B.V. or NXP Semiconductors Netherlands B.V.  TMI and TMFE shall not be considered an Affiliate of NXP for purposes of this definition.

82.     "*Other Priority Claims*" means Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims.

83.     "*Person*" means an individual, partnership, corporation, limited liability company, cooperative, trust, estate, unincorporated organization, association, joint venture, government unit or agency or political subdivision thereof or any other form of legal entity or enterprise.

84.     "*Petition Date*" means January 4, 2012, the date on which the Debtors filed the Chapter 11 Cases.

85.     "*Plan*" means the Debtors' First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code including exhibits and supplements, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code or the Bankruptcy Rules.

86.     "*Plan Administrator*" means the Cayman Liquidators as the administrator and liquidator of TMFE pursuant to the Plan and the laws of the Cayman Islands.

87.     "*Plan Supplement*" means the supplement(s) to the Plan containing certain documents relevant to the implementation of the Plan.

88.     "*Plan Support Agreement*" means the Plan Support Agreement, dated as of September 12, 2012, by and among (i) TMI and TMFE, (ii) the Cayman Liquidators, (iii) the Creditors Committee and (iv) the Equity Committee.

89.     "*Priority Tax Claims*" means Claims of governmental units of the kind specified in section 507(a)(8) of the Bankruptcy Code.

90.     "*Pro Rata*" shall mean the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims (including Disputed Claims, but excluding disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

91.     "*Professionals*" means any Person employed pursuant to a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to and including the Effective Date pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.

92.     "*PWC*" means PricewaterhouseCoopers LLP.

93.     "*Record Date*" means the date that the Disclosure Statement is approved by the Bankruptcy Court.

94.     "*Released Parties*" means, collectively, the Debtors, the Committees and each of their respective members and current and former Representatives and Professionals (each of the

foregoing in its individual capacity as such), but excluding NXP, its Representatives and those individuals chosen by NXP to serve as directors of TMI or TMFE.

95.      "*Representatives*" means, with regard to an Entity, officers, directors, employees, attorneys, Professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, independent contractors, members and professionals).

96.      "*Resolution Event*" has the meaning set forth in Article I.

97.      "*R&D*" has the meaning set forth in Article III.

98.      "*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

99.      "*Secured Claims*" means Claim(s) against the Debtors that are secured by a Lien on property in which the Estates have an interest, which Liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

100.      "*Sigma*" means Sigma Designs, Inc.

101.      "*SoC*" has the meaning set forth in Article III.

102.      "*STB Business*" has the meaning set forth in Article III.

103.      "*Stipulated Additional Allowed Claims*" means any Administrative Claims, or portions thereof, filed by Holders of Claims in Class 2.A. prior to August 17, 2012, including but not limited to any Claim asserted by Cadence Design Systems, Inc. or its affiliates, that are subsequently reclassified as Allowed General Unsecured Claims.

104.      "*Supplemental Letter*" has the meaning set forth in Article V.

105.      "*Support Services Agreement*" has the meaning set forth in Article III.

106.      "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

107.      "*Tax Returns*" means all tax returns, reports, certificates, forms or similar statements or documents, including amended tax returns or requests for refunds.

108.      "*TMFE*" means Trident Microsystems (Far East) Ltd., one of the Debtors in these jointly administered Chapter 11 Cases, and as applicable, the Estate thereof.

109.   "*TMFE IP Assets*" means all right, title and interest to any and all intellectual property of the Debtors, including, without limitation, the 25 MEMC patents which were ultimately excluded from the Debtors' sale of its set top box business.

110.   "*TMFE TMHK Agreement*" has the meaning set forth in Article III.

111.   "*TMFE TMI Agreements*" has the meaning set forth in Article III.

112.   "*TMHK*" means Trident Microsystems (Hong Kong) Limited.

113.   "*TMI*" means Trident Microsystems, Inc., one of the Debtors in these jointly administered Chapter 11 Cases and as applicable, the Estate thereof.

114.   "*TMI Claim*" means proof of claim number 159 filed by TMI against TMFE on July 13, 2012, as such proof of claim may be amended from time to time.

115.   "*TMI-TMHK Agreement*" has the meaning set forth in Article III.

116.   "*TMI Retained IP Assets*" means all right, title and interest to any and all intellectual property of the Debtors, including, without limitation, the 25 MEMC patents which were ultimately excluded from the Debtors' sale of its set top box business.

117.   "*TMI Trust*" means the liquidating trust established under Article IV.A. of the Plan for the purposes of liquidating and distributing the TMI Trust Assets to holders of TMI Trust Beneficial Interests.

118.   "*TMI Trust Agreement*" means the liquidating trust agreement to be executed by the TMI and the TMI Trustee, in substantially the same form as filed with the Plan or in the Plan Supplement.

119.   "*TMI Trust Assets*" means all assets of TMI as of the Effective Date, including all Cash of the Estate, Causes of Action of TMI, all Books and Privileges of TMI, and which shall include any recovery on behalf of TMI on account of its Class 2.B Claims.

120.   "*TMI Trust Beneficial Interests*" means the beneficial interests of the TMI Trust to be issued to holders of Claims and Equity Interests in TMI pursuant to the Plan and which entitles such holders to receive Distributions from the TMI Trust as set forth in the Plan.

121.   "*TMI Trust Beneficiaries*" means holders of the TMI Trust Beneficial Interests.

122.   "*TMI Trustee*" means the liquidating trustee for the TMI Trust designated as such in accordance with Article IV.H. of the Plan and the TMI Trust Agreement.

123.   "*TV Business*" has the meaning set forth in Article III.

124.   "*Trident*" means TMI and all of its Debtor and non-Debtor subsidiaries.

125.   "*TSAs*" has the meaning set forth in Article V.

126. "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the District of Delaware.

127. "*Unimpaired*" means not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

128. "*Voting Deadline*" means 4:00 p.m. (Prevailing Pacific Time) on _____, 2012.

129. "*WIP Note*" has the meaning set forth in Article V.

## B.    OTHER TERMS

The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan as a whole and not to any particular article, section or clause contained in the Plan. A reference to an "Article" refers to an Article, or referenced portion thereof, of the Plan. A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in or by the Bankruptcy Code. The rules of construction set forth in section 102 of the Bankruptcy Code shall apply in constructing the Plan.

## C.    EXHIBITS

All Exhibits to the Plan and the Plan Supplement are incorporated by reference into and are made a part of the Plan as if set forth in full herein.

## ARTICLE XII.

## <u>CONCLUSION</u>

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of Impaired Claims in Classes 2.A., 2.B. and 6 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 4:00 p.m. (prevailing Pacific Time) on _____, 2012.

Dated:  September 17, 2012

Wilmington, Delaware

Respectfully submitted,

Trident Microsystems, Inc.

By:  /s/ _____
Its: _____

Trident Microsystems (Far East) Ltd.

By:  /s/ _____
Its: _____

**Exhibit A**
**Debtors' Chapter 11 Plan**

A-1

**Exhibit B**
**Disclosure Statement Order**

EAST\51327434.7

**Exhibit C**
**New Joint Protocol**


**(To be filed)**

EAST\51327434.7