# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------x
                                           :
In re:                                     :   Chapter 11
                                           :
Trident Microsystems, Inc., *et al.*,[1]   :   Case No. 12-10069 (CSS)
                                           :
            Debtors.                       :   (Jointly Administered)
                                           :
                                           :
------------------------------------------------------------x
```

### DISCLOSURE STATEMENT FOR DEBTORS' SECOND AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**DLA PIPER LLP (US)**
Stuart M. Brown (DE 4050)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341

-and-

Richard A. Chesley (IL 6240877)
Kimberly D. Newmarch (DE 4340)
Chun I. Jang (DE 4790)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516

*Attorneys for Debtors and Debtors in Possession*

---

[1]    The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd.  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 5201 Great America Parkway, Suite 320, Santa Clara, California 95054.

# TABLE OF CONTENTS

**Page**

ARTICLE I.    INTRODUCTION ........................................................................ 2

   A.    HOLDERS OF CLAIMS ENTITLED TO VOTE ................................ 3

   B.    VOTING PROCEDURES ..................................................................... 4

   C.    CONFIRMATION HEARING .............................................................. 5

ARTICLE II.    OVERVIEW OF THE PLAN ........................................................ 7

ARTICLE III.    GENERAL INFORMATION ...................................................... 13

   A.    OVERVIEW OF BANKRUPTCY LAW ........................................... 13

   B.    OVERVIEW OF CAYMAN INSOLVENCY LAW ........................... 14

   C.    OVERVIEW OF THE DEBTORS AND THEIR PRINCIPAL ASSETS .......... 15

   D.    PREPETITION INDEBTEDNESS AND THE INTERCOMPANY AGREEMENTS .......... 20

      1.    Unsecured Claims Other Than Intercompany Claims ............................ 21

      2.    The Intercompany Agreements ................................................................. 21

      3.    Economics of the Intercompany Agreements .......................................... 22

   E.    RECENT FINANCIAL INFORMATION ......................................... 25

ARTICLE IV.    KEY EVENTS LEADING TO THE  COMMENCEMENT OF THE CHAPTER 11 CASES .......... 26

   A.    FINANCIAL CHALLENGES ............................................................ 26

   B.    OUT-OF-COURT RESTRUCTURING EFFORTS ........................... 26

ARTICLE V.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES ............. 27

   A.    RETENTION OF PROFESSIONALS BY THE DEBTORS .............. 27

   B.    CAYMAN PROCEEDINGS ............................................................... 27

   C.    FORMATION OF THE CREDITORS COMMITTEE ....................... 28

   D.    FORMATION OF THE EQUITY COMMITTEE .............................. 29

   E.    "FIRST DAY" RELIEF ....................................................................... 29

      1.    Joint Administration ................................................................................. 29

      2.    Cash Management ..................................................................................... 29

      3.    Employee Wages ...................................................................................... 29

      4.    Critical Vendors ....................................................................................... 30

      5.    Retention of KCC as Claims and Noticing Agent ................................... 30

   F.    OTHER SIGNIFICANT MOTIONS .................................................. 30

 EAST\51978115.6

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| | 1. | Ordinary Course Professionals ................................................. 30 |
| | 2. | Performance-Based Incentives for Key Employees ................................ 30 |
| | 3. | Vacation and Severance Pay ...................................................... 31 |
| | 4. | 2004 Motion ...................................................................... 31 |
| | 5. | 505 Motion ....................................................................... 31 |
| G. | | THE DEBTORS' ASSET SALES AND REMAINING ASSETS ...................... 32 |
| | 1. | STB Business ..................................................................... 32 |
| | 2. | TV Business ...................................................................... 34 |
| | 3. | Audio Business ................................................................... 35 |
| | 4. | Demod Business .................................................................. 35 |
| | 5. | Analog Business .................................................................. 35 |
| | 6. | Remaining Assets ................................................................. 35 |
| | 7. | Transition Service Agreements .................................................. 36 |
| | 8. | Last Time Buys ................................................................... 36 |
| H. | | WIND-DOWN OF NON-DEBTORS .................................................. 36 |
| I. | | SETTLEMENTS RELATING TO THE TMI CLAIM, THE IRS CLAIM AND THE 2004 MOTION ......................................................... 36 |
| | 1. | Settlement Between The Debtors, The Cayman Liquidators, The Creditors Committee And The Equity Committee Relating To The TMI Claim ....................................................................... 37 |
| | 2. | Settlement Between The Debtors, The Equity Committee and NXP Relating To The 2004 Motion .................................................. 37 |
| | 3. | Settlement Between The Debtors And The IRS Relating To The 505 Motion ....................................................................... 38 |
| J. | | ADJUDICATION OF CLAIMS AGAINST TMFE BY THE TMFE PLAN ADMINISTRATOR ........................................................... 38 |
| K. | | NEW JOINT PROTOCOL IN SUPPORT OF CONFIRMATION .................... 41 |
| ARTICLE VI. | | THE JOINT PLAN OF LIQUIDATION ....................................... 42 |
| A. | | INTRODUCTION ................................................................... 42 |
| B. | | CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE JOINT PLAN OF LIQUIDATION ...................... 42 |
| | 1. | Unclassified ...................................................................... 44 |
| | 2. | Classified ......................................................................... 47 |

# TABLE OF CONTENTS
(continued)

**Page**

3.   Special Provision Governing Unimpaired Claims and Equity
Interests ................................................................................................ 49

4.   Separate Plans of Liquidation ................................................................ 49

5.   Nonconsensual Confirmation.................................................................. 50

C.   MEANS FOR IMPLEMENTATION OF THE PLAN........................................ 50

1.   TMI Responsible Person to Effectuate Distributions ............................. 50

2.   Cayman Liquidators as TMFE Plan Administrator ................................. 50

3.   Assignment of Contracts......................................................................... 50

4.   The TMI Responsible Person and the TMFE Plan Administrator........... 51

5.   Role of the TMI Responsible Person and the TMFE Plan
Administrator .......................................................................................... 51

6.   TMI Responsible Person's and the TMFE Plan Administrator's
Tax Powers.............................................................................................. 54

7.   Cash......................................................................................................... 54

8.   Costs and Expenses of the TMI Responsible Person and
Liquidation of TMFE.............................................................................. 55

9.   Compensation of the TMFE Plan Administrator and the TMI
Responsible Person ................................................................................. 55

10.   Retention of Professionals by the TMFE Plan Administrator and
the TMI Responsible Person.................................................................... 55

11.   Tax Reporting ......................................................................................... 55

12.   Dissolution .............................................................................................. 56

13.   Indemnification of the TMFE Plan Administrator and the TMI
Responsible Person ................................................................................. 56

14.   Operations of the Debtors Between the Confirmation Date and the
Effective Date ......................................................................................... 57

15.   Term of Injunctions or Stays................................................................... 57

16.   The Committees ...................................................................................... 57

17.   Books and Records ................................................................................. 58

D.   PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS .................... 58

1.   Voting of Claims..................................................................................... 58

2.   Distribution Dates ................................................................................... 58

3.   Disbursing Agents................................................................................... 59

EAST\51978115.6

# TABLE OF CONTENTS
(continued)

**Page**

|   |    |   |   |
|---|----|---|---|
| | 4. | Record Date for Distributions | 59 |
| | 5. | Delivery of Distributions | 60 |
| | 6. | Undeliverable and Unclaimed Distributions | 60 |
| | 7. | Manner of Cash Payments Under the Plan | 61 |
| | 8. | Compliance with Tax Requirements | 61 |
| | 9. | No Payments of Fractional Dollars | 61 |
| | 10. | Interest on Claims | 62 |
| | 11. | No Distribution in Excess of Allowed Amount of Claim | 62 |
| | 12. | Setoff and Recoupment | 62 |
| | 13. | De Minimis Distributions; Charitable Donation | 62 |
| | 14. | United States Trustee Fees | 62 |
| E. | | DISPUTED CLAIMS | 63 |
| | 1. | Disputed Claim Reserves | 63 |
| | 2. | Resolution of Disputed Claims | 63 |
| | 3. | Objection Deadline | 64 |
| | 4. | Estimation of Claims | 64 |
| | 5. | No Distributions Pending Allowance | 64 |
| | 6. | Resolution of Claims | 65 |
| F. | | TREATMENT OF EXECUTORY CONTRACTS | 65 |
| | 1. | Assumption or Rejection of Executory Contracts | 65 |
| | 2. | Approval of Assumption or Rejection of Executory Contracts | 65 |
| | 3. | Inclusiveness | 65 |
| | 4. | Cure of Defaults | 66 |
| | 5. | Claims Based on Rejection of Executory Contracts | 66 |
| | 6. | Indemnification and Reimbursement | 66 |
| | 7. | D&O Insurance Policies | 67 |
| | 8. | Certain Insurance Policy Matters | 67 |
| G. | | CONDITIONS PRECEDENT | 68 |
| | 1. | Conditions Precedent to the Confirmation Date | 68 |
| | 2. | Conditions Precedent to the Effective Date | 68 |
| | 3. | Waiver | 69 |

EAST\51978115.6

**TABLE OF CONTENTS**
(continued)

Page

H. INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS ................................................................ 69

 1. Compromise and Settlement ................................. 69

 2. Releases ................................................. 69

 3. Exculpation ............................................. 70

 4. Withdrawal and Release of Certain Claims ............... 71

 5. Preservation of Causes of Action ....................... 71

 6. Injunction ............................................. 72

 7. Releases of Liens ...................................... 73

I. RETENTION OF JURISDICTION ................................. 74

J. MISCELLANEOUS PROVISIONS .................................. 75

 1. Modification of Plan ................................... 75

 2. Revocation of Plan ..................................... 75

 3. Binding Effect ......................................... 76

 4. Successors and Assigns ................................. 76

 5. Governing Law .......................................... 76

 6. Reservation of Rights .................................. 76

 7. Article 1146 Exemption ................................. 76

 8. Section 1125(e) Good Faith Compliance .................. 77

 9. Further Assurances ..................................... 77

 10. Service of Documents .................................. 77

 11. Filing of Additional Documents ........................ 77

 12. No Stay of Confirmation Order ......................... 78

ARTICLE VII. CERTAIN FACTORS AFFECTING THE DEBTORS ............. 78

A. CERTAIN BANKRUPTCY LAW CONSIDERATIONS ..................... 78

 1. Risk of Non-Confirmation of the Joint Plan of Liquidation .................. 78

 2. Risk of Non-Confirmation of the New Joint Protocol ..................... 78

 3. Non-Consensual Confirmation ............................ 78

 4. Risk of Delay in Confirmation of the Plan .............. 78

 5. Adjudication and Distribution by Cayman Liquidators .... 79

 6. Termination of Plan Support Agreement .................. 79

# TABLE OF CONTENTS
(continued)

Page

B.    ADDITIONAL FACTORS TO BE CONSIDERED ........................................... 79

    1.    The Debtors Have No Duty to Update ..................................................... 79

    2.    No Representations Outside This Disclosure Statement Are Authorized .................................................................................................. 79

    3.    Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary ................................................... 79

    4.    Debtors Could Withdraw the Plan ........................................................... 80

    5.    No Legal or Tax Advice Is Provided to You by This Disclosure Statement ................................................................................................. 80

    6.    No Admission Made ................................................................................. 80

ARTICLE VIII.    CONFIRMATION OF THE PLAN OF LIQUIDATION ............................ 80

A.    CONFIRMATION HEARING .......................................................................... 80

B.    REQUIREMENTS FOR CONFIRMATION OF THE JOINT PLAN OF LIQUIDATION ................................................................................................. 81

    1.    Requirements of Section 1129(a) of the Bankruptcy Code .................... 81

    2.    Requirements of Section 1129(b) of the Bankruptcy Code .................... 85

ARTICLE IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE JOINT PLAN OF LIQUIDATION ................................................. 85

A.    LIQUIDATION UNDER CHAPTER 7 ............................................................ 85

B.    ALTERNATIVE PLAN OF REORGANIZATION ........................................... 86

ARTICLE X.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................................................................................................ 86

A.    GENERAL CONSEQUENCES TO U.S. HOLDERS OF CLAIMS AND EQUITY INTERESTS ...................................................................................... 88

    1.    Realization and Recognition of Gain or Loss, In General ...................... 88

    2.    Holders of Claims in All Classes Except Class 3 ................................... 88

    3.    Allocation of Consideration to Interest ................................................... 89

    4.    Market Discount ...................................................................................... 89

    5.    Bad Debt Deduction and Worthless Securities Deduction ..................... 89

    6.    Limitation on Use of Capital Losses ....................................................... 90

B.    INFORMATION REPORTING AND WITHHOLDING .................................. 90

C.    GENERAL CONSEQUENCES TO NON-U.S. HOLDERS OF CLAIMS AND EQUITY INTERESTS ............................................................................. 91

EAST\51978115.6

## TABLE OF CONTENTS
(continued)

**Page**

      1.     Tax Consequences to Non-U.S. Holders Under the Plan ........................ 91

ARTICLE XI.     DEFINITIONS AND INTERPRETATION ................................................... 91

    A.     Definitions ................................................................................................... 91

    B.     Other Terms ............................................................................................... 102

    C.     Exhibits ..................................................................................................... 102

ARTICLE XII.    CONCLUSION ........................................................................................... 102

EAST\51978115.6

# SUMMARY

The following is a summary of the Debtors' Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated as of October 22, 2012 (as the same may be amended or modified, the "Plan")[2], of Trident Microsystems, Inc. ("TMI") and Trident Microsystems (Far East) Ltd. ("TMFE" and together with TMI, the "Debtors"), the debtors and debtors in possession in these chapter 11 cases. This Disclosure Statement describes the Plan and the distributions contemplated thereunder for each of the Debtors. Unless the context requires otherwise, reference to "we," "our," and "us" are to TMI and all of its Debtor and non-Debtor subsidiaries (collectively, "Trident" or the "Company").

The Debtors commenced the Chapter 11 Cases on January 4, 2012. The Plan, which is attached hereto as Exhibit A, constitutes a separate chapter 11 plan of liquidation for each of the Debtors. The Plan provides for the orderly liquidation and distribution of the TMI Assets, through the appointment of the TMI Responsible Person. The Plan further provides for the appointment of the TMFE Plan Administrator to liquidate and distribute the assets of TMFE.

The Debtors, the Cayman Liquidators, the Equity Committee and the Creditors Committee are pleased to propose a Plan that has the support of all of the Debtors' Creditor constituents. Confirmation of the Plan is supported by the Cayman Liquidators, the Equity Committee, the Creditors Committee and NXP. All Creditors and holders of Equity Interests entitled to vote to accept or reject the Plan are urged to affirmatively vote to accept the Plan.

Since the commencement of these Chapter 11 Cases, the Debtors and the Cayman Liquidators (and previously, the JPLs) have engaged in efforts to solicit a plan of liquidation that would be agreeable to all of the Debtors' Creditors and holders of Equity Interests and bring about consensus on certain contentious issues relating to the formulation and consummation of the Plan. Owing to these extensive efforts, the Debtors, the Cayman Liquidators, the Creditors Committee and the Equity Committee have entered into the Plan Support Agreement, the terms of which resolve for all material litigation issues, eliminate the uncertainty, time delay and substantial costs that may be posed by litigating these complex, cross-border issues and, most critically, provide the Class 2.A. Creditors (the General Unsecured Creditors of TMFE not including the Debtors' Affiliates) with a substantially enhanced recovery than they would be entitled to under the Bankruptcy Code's priority of payment regime, while similarly providing the holders of TMI's Equity Interests in Class 6 with a substantial return on account of their Equity Interests. Thus, the Plan and this accompanying Disclosure Statement encompasses the terms of the Plan Support Agreement, which the Debtors believe will provide the most efficient, cost-effective and equitable liquidation of the Debtors and their Estates.

The Disclosure Statement describes the Plan that incorporates a compromise among the Debtors, the Cayman Liquidators, the Creditors Committee, the Equity Committee and NXP,

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

which such parties support in their current form.  In the event the Plan is not confirmed in its current form, or in a form that remains acceptable to such parties, the rights of all parties are reserved.

**THE DEBTORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 THROUGH A TIMELY, EFFICIENT AND COST-EFFECTIVE LIQUIDATION AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.  THE CAYMAN LIQUIDATORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF TMFE AND ITS CREDITORS.  THE DEBTORS, THE CAYMAN LIQUIDATORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE URGE ALL CREDITORS AND EQUITY INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.**

## ARTICLE I.

### INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the Bankruptcy Code to holders of Equity Interests in and Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan filed by the Debtors with the Bankruptcy Court and (ii) the Confirmation Hearing scheduled for December 13, 2012 at 1:00 p.m. (prevailing Eastern Time).

A ballot ("Ballot") for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement mailed to the holders of Claims and Equity Interests that the Debtors believe may be entitled to vote to accept or reject the Plan.

On October 22, 2012, after notice and a hearing, the Bankruptcy Court signed the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the Plan.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, a copy of which is annexed hereto as Exhibit B, sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot.  Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A.     HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected the proposed plan are entitled to vote to accept or reject a proposed plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Article VI.B of this Disclosure Statement.

Claims in Class 2.A. (General Unsecured Claims Against TMFE not held by Debtors' Affiliates), Class 2.B. (General Unsecured Claims Against TMFE held by Debtors' Affiliates as Intercompany Claims), Class 3 (Equity Interests in TMFE) and Class 6 (Equity Interests in TMI) of the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims will receive distributions under the Plan.  As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan.  If and to the extent any other Class identified as being unimpaired is impaired (whether as a result of the terms of the Plan or any modification or amendment thereto), upon such determination, such Class shall then be entitled to vote to accept or reject the Plan.

Claims in Class 1 (Secured Claims against TMFE), Class 4 (Secured Claims Against TMI) and Class 5 (General Unsecured Claims Against TMI) are unimpaired by the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, Classes 1, 4 and 5 are therefore conclusively presumed to have accepted the Plan and the votes of holders of Claims in Classes 1, 4 and 5 will therefore not be solicited.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  For a more detailed description of the requirements for confirmation of the Plan, see Article VIII of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the rejection of the plan by one or more impaired classes of claims or equity interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article VIII.B.2 of this Disclosure Statement.

**THE DEBTORS, THE CAYMAN LIQUIDATORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 2.A., 2.B., 3, AND 6 VOTE TO ACCEPT THE PLAN.**

**B.      VOTING PROCEDURES**

        If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims.  The Debtors, with the approval of the Bankruptcy Court, have engaged Kurtzman Carson Consultants LLC ("KCC") to serve as the voting agent with respect to Claims in Classes that are entitled to vote on the Plan.  The voting agent will assist in the solicitation process by, among other things, answering questions, providing additional copies of all solicitation materials, and generally overseeing the solicitation process for Claims.  The voting agent will also process and tabulate ballots for each of the respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

        Ballots should be returned to:

        Trident Microsystems, Inc. Voting
        c/o Kurtzman Carson Consultants LLC
        2335 Alaska Avenue
        El Segundo, CA 90245

**If the return envelope provided with your Ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote the Voting Deadline (5:00 p.m. (EST) on November 26, 2012).**

**Do not return your notes, securities, or any other documents with your Ballot.**

        MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN.  TO BE COUNTED, YOUR ORIGINAL, SIGNED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN 5:00 P.M. (EST) ON NOVEMBER 26, 2012 (THE "VOTING DEADLINE").  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

        Any Claim in an impaired Class as to which an objection or request for estimation is pending is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.  Additionally, any Claim in an impaired Class that is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has filed a proof of claim and no objection has been filed to such proof of claim or if an objection is filed with respect to such proof of claim (a) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order of the Bankruptcy Court is entered temporarily allowing such claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the holder of such Claim and the Debtors resolving the objection

and allowing such claim in an agreed upon amount; (d) a stipulation or other agreement is executed between the holder of such claim and the Debtors temporarily allowing the holder of such claim to vote its claim in an agreed upon amount; or (e) the pending objection to such claim is voluntarily withdrawn by the Debtors (each, a "Resolution Event"); provided, however, that if the Debtors object to a claim but agree that it shall be allowed in a reduced amount, the claimant may, absent a Resolution Event, vote such claim at such reduced amount.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set October 22, 2012 as the Record Date for holders of Claims entitled to vote on the Plan. Accordingly, only holders of record as of the applicable record date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

The Plan constitutes a separate chapter 11 plan of liquidation for each Debtor. Accordingly, holders of Claims against TMI will vote on the Plan in respect of TMI and holders of Claims against TMFE will vote on the Plan in respect of TMFE. Votes of holders of Claims against TMI will not be counted for or against the TMFE Plan and vice versa.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Kurtzman Carson Consultants LLC at (888) 647-1715 or email TridentInfo@kccllc.com.

C.    **CONFIRMATION HEARING**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on December 13, 2012 at 1:00 p.m. (prevailing Eastern Time) before the Honorable Christopher S. Sontchi, Courtroom #6, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before November 26, 2012 at 4:00 p.m. (prevailing Eastern Time) in the manner described below in Article VIII.A of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THIS DISCLOSURE

STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE VII OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY, REFERENCE TO THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE DEBTORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 THROUGH A TIMELY, EFFICIENT AND COST-EFFECTIVE LIQUIDATION AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.  THE CAYMAN LIQUIDATORS BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF TMFE AND ITS CREDITORS.   THE DEBTORS, THE CAYMAN LIQUIDATORS, THE CREDITORS COMMITTEE AND THE EQUITY COMMITTEE URGE ALL CREDITORS AND EQUITY INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.

**IRS CIRCULAR 230 NOTICE:** TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

# ARTICLE II.

## OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Administrative Expense Claims, Claims and Equity Interests under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount | Approximate Percentage Recovery |
|---|---|---|---|---|
| -- | Administrative Expense Claims: Non-Professional Fee Claims | Paid in full, in Cash, without interest (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (3) at such time and upon such terms as may be agreed upon by such holder and the TMI Responsible Person or TMFE Plan Administrator; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that, at the discretion of the TMFE Plan Administrator or the TMI Responsible Person, as applicable, Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date. | Undetermined | 100% |
| -- | Administrative Expense Claims: Professional Compensation and Reimbursement Claims | Paid in full, in Cash, without interest. | Undetermined | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount | Approximate Percentage Recovery |
|---|---|---|---|---|
| -- | Priority Tax Claims | Paid in full, in Cash, without interest at the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law. | Undetermined | 100% |
| 1 | Secured Claims Against TMFE | Not impaired.  To the extent that any Secured Claims against TMFE exist, except to the extent that a holder of an Allowed Secured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMFE shall receive from TMFE, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed. | $0 | 100% |

| 2.A | General Unsecured Claims Against TMFE not held by Debtors' Affiliates | Impaired.  After (i) reservation of sufficient funds necessary to pay outstanding Administrative Claims against TMFE in full and (ii) payment of Allowed TMFE Secured Claims in Class 1; except to the extent that a holder of a General Unsecured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMFE not held by Debtors' Affiliates, in Class 2.A, including any holder of a Stipulated Additional Allowed Claim, shall receive a 90% recovery on account of the Allowed Amount of such Claims, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed. | $16,600,000 | 90% |

| 2.B | General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims | Impaired.  After (i) payment of Allowed TMFE Secured Claims in Class 1, (ii) payment of Allowed General Unsecured Claims against TMFE not held by Debtors' Affiliates in Class 2.A. (iii) reservation of sufficient funds necessary (a) to satisfy the Disputed Claims Reserve with respect to Disputed Claims against TMFE, (b) for the TMFE Plan Administrator to carry out its duties and for the fees, costs and expenses incurred in the Cayman Proceedings, (c) to pay outstanding Administrative Claims in full and (d) to pay any unclaimed or undeliverable Distributions to holders of Class 2.A Claims; except to the extent that a holder of a General Unsecured Claim against TMFE held by Debtors' Affiliates has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMFE held by Debtors' Affiliates in Class 2.B., shall receive the remaining assets of TMFE, and which such remaining assets of TMFE shall constitute TMI Assets, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed; provided, however, that in no event shall the Cash recovery (on a percentage basis) on account of Class 2.B. Claims be greater than the recovery (on a percentage basis) on account of Class 2.A. Claims. | $96,445,296 | 55% - 81% |
| 3 | Equity Interests in TMFE | No Distribution.  Holders of Equity Interests in TMFE in Class 3 shall receive no Distribution under the Plan. | $0 | 0% |

| 4 | Secured Claims Against TMI | Not impaired.  To the extent that any Secured Claims against TMI exist; except to the extent that a holder of an Allowed Secured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMI shall receive from TMI, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed. | $0 | 100% |
| 5 | General Unsecured Claims Against TMI | Not impaired.  After: (i) the reservation of sufficient funds necessary for the TMI Responsible Person to carry out its duties and to pay outstanding Administrative Claims against TMI in full, (ii) payment of Allowed TMI Secured Claims in Class 4, and (iii) reservation of sufficient funds necessary to satisfy all Disputed Claims against TMI in full; except to the extent that a holder of a General Unsecured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMI shall receive from TMI, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed. | $2,200,000 to $3,200,000 | 100% |
| 6 | Equity Interests in TMI | Impaired.  After: (i) the reservation of sufficient funds necessary for the TMI Responsible Person to carry out | Undetermined | $0 to $.28 per share |

| | | its duties and to pay outstanding Administrative Claims against TMI in full, (ii) payment of Allowed TMI Secured Claims in Class 4 and (iii) payment of Allowed TMI General Unsecured Claims in Class 5 or funding of the Disputed Claims Reserve pursuant to Article VI of the Plan; the TMI Responsible Person shall pay each holder of Equity Interests in TMI in Class 6, a Pro Rata share of the remaining TMI Assets, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Equity Interest becomes Allowed; _provided_, _however_, that pursuant to the settlement negotiated between and among the Debtors, the Equity Committee and NXP, (i) the Distribution to NXP on account of its Class 6 Equity Interests in TMI, which such Equity Interests shall be Allowed in the amount of 104,204,348 shares representing 57.82% of TMI's outstanding stock, shall be (a) reduced in the amount of $2,381,471.40, with such amount being distributed instead, Pro Rata, to non-NXP holders of Equity Interests in TMI in Class 6 (in addition to the Distribution that is otherwise distributable under the Plan), and (b) subject to a $2 million reserve to be held and retained by the TMI Responsible Person pending satisfaction of the Outstanding NXP Receivables; _provided_, _however_, that neither the establishment nor the amount of the reserve shall limit, extend or otherwise affect any party's rights, claims and defenses with respect to such Outstanding | | |

| | | NXP Receivables, including but not limited to any right of setoff and (ii) NXP shall receive all right, title and interest to the TMFE IP Assets free and clear of all liens, claims and encumbrances, except for the Divested Company Agreement between Koninklijke Philips Electronics N.V. and Trident Microsystems (Far East) Ltd., dated May 11, 2011 (effective as of February 8, 2010). | | |
|---|---|---|---|---|

## ARTICLE III.

## GENERAL INFORMATION

### A.    OVERVIEW OF BANKRUPTCY LAW

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation or liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Petition Date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare, and obtain bankruptcy court approval of, a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against and equity interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

**B.      OVERVIEW OF CAYMAN INSOLVENCY LAW**

TMFE is an exempted company incorporated in the Cayman Islands with limited liability.  Accordingly, in addition to the filing of the Bankruptcy cases under chapter 11 of the Bankruptcy Code, on January 4, 2012, TMFE filed a winding up petition with the Cayman Court, pursuant to section 94 of the Cayman Islands Companies Law (2011 Revision) and on January 11, 2012 obtained the appointment of joint provisional liquidators ("JPLs").  As there is no Cayman Islands equivalent to the US Chapter 11 process, a provisional liquidation is commonly used to implement the restructuring of an insolvent company in the Cayman Islands and in support of US Bankruptcy proceedings.  During the course of the provisional liquidation of TMFE, the JPLs and the Debtors worked together to ensure the efficient administration of the Cayman Proceedings in conjunction with the Chapter 11 Cases.  In this regard, to facilitate the Debtors' efforts towards maximizing value of their estates in light of the international nature of Trident's business and the dual insolvency proceedings of TMFE before the Cayman Court and the Bankruptcy Court, the Cayman Court and the Bankruptcy Court agreed upon the Joint Provisional Liquidation Protocol between the Debtors and the JPLs which had the following objectives: (i) reducing the total costs incurred by the JPLs in protecting the interests of creditors by avoiding duplication of efforts; (ii) avoiding any potential conflict between the Cayman Proceedings and the Chapter 11 Cases; (iii) ensuring transparency and accountability in the conduct of the proceedings in the United States and the Cayman Islands; and (iv) providing a framework for protecting the interests of, and maximizing returns to, all creditors including by way of exploring a plan of compromise or arrangement with the creditors of TMFE.

On August 8, 2012, the Cayman Court heard the winding up petition and TMFE was placed into official liquidation.  The JPLs were appointed as official liquidators.  The Cayman Liquidators continue to work with the Debtors to ensure the efficient administration of the Cayman Proceedings in conjunction with the Chapter 11 Cases.

Upon the commencement of the official liquidation of TMFE, the Joint Provisional Liquidation Protocol was of no further effect.  Accordingly, on September 12, 2012, the Bankruptcy Court and the Cayman Court agreed upon the Joint Protocol to be implemented between the Debtors, the Cayman Liquidators and Mr. Andrew Hinkelman for the orderly administration of the Bankruptcy Proceedings and the official liquidation of TMFE.

On the appointment of the Cayman Liquidators, the powers of the directors of the company ceased and instead, the company became subject to the control of the Cayman Liquidators.  The Cayman Liquidators are officers of the Cayman Court and are agents of the company.  They owe fiduciary duties to the company to act for proper purposes, in good faith and in the interests of the company as a whole.  The interests of the company as a whole are represented by the interests of the unsecured creditors of the company where the company is insolvent, the unsecured creditors and shareholders where the company is of doubtful solvency, or the shareholders where the company is solvent.  They do not represent any creditor or class of creditors or any shareholder or class of shareholders; they are required to be independent of the management of the company and its creditors and are required to behave in an even-handed fashion between creditors or groups of creditors amongst themselves.

It is a fundamental function and duty of the Cayman Liquidators to realize the company's unsecured assets, identify the company's unsecured creditors and adjudicate upon the validity and the amounts of their claims and to distribute the proceeds of realization of the company's unsecured assets (net of expenses and claims of priority creditors) to the company's unsecured creditors pro rata, and after the creditors have been paid in full to the company's shareholders in accordance with the provisions of the company's articles of association.

In this regard, pursuant to the terms of the Plan, the Cayman Liquidators will be appointed as the TMFE Plan Administrator for TMFE.  The Cayman Liquidators will adjudicate Claims asserted  against TMFE in accordance with Cayman Islands law and procedure and subject to the jurisdiction of the Cayman Court as set out further at Article VI.D below.  The Cayman Liquidators will make Distributions pursuant to the Plan in accordance with United States Bankruptcy Law including as to the priorities set out therein and in the Plan.

## C.    OVERVIEW OF THE DEBTORS AND THEIR PRINCIPAL ASSETS

TMI was incorporated in California in 1987 and reincorporated in Delaware in 1992.  TMI is the direct parent company of TMFE, which, is the direct or indirect parent of subsidiary entities organized under the laws of various foreign countries (the "Foreign Subsidiaries").  When originally incorporated, the Company focused its operations on the development and manufacture of microchips for the PC graphic design industry.  Although the Company thrived for a number of years in this industry, the Company ultimately did not succeed as this market consolidated into a few suppliers and, as a result, the Company sold the PC microchip business in early 2000.  At the same time, it redirected its focus to the new Digital TV market.  Once again the Company thrived in this market and was a market leader in video controller components until 2008 when the industry combined video and audio technology into a single microchip.  As the need for stand-alone video chips waned, the Company looked to expand into other microchip markets to become competitive again.  To that end, in May 2009, Trident acquired certain frame rate converter, demodulator and audio decoder products from Micronas Semiconductor Holding, AG.

On October 4, 2009, the Debtors entered into a Share Exchange Agreement with NXP B.V., pursuant to which Trident and TMFE agreed to acquire selected assets and liabilities of NXP's television systems and in exchange for the issuance to NXP of such number of shares of Trident common stock equal to 60% of the outstanding shares, after giving effect to the share issuance to NXP.  On February 8, 2010, the parties completed the acquisition and Trident received cash proceeds of $44 million in exchange for the issuance of 104,204,348 new shares of Trident common stock.  Additionally, Trident issued to NXP four shares of Trident's Series B Preferred Stock.  The Series B Preferred Stock were issued pursuant to an Amended and Restated Certificate of Designation of Series B Preferred Stock that TMI filed with the Secretary of State of Delaware in February, 2010.  The holder of the Series B Preferred Stock had the right to designate four nominees to TMI's Board of Directors.  In February 2010, Trident then completed the acquisition of the television and set-top box business lines from NXP Semiconductor NV.  As a result of the completion of this acquisition, Trident acquired the STB and TV Businesses from NXP, and NXP was issued approximately 60% of the common voting stock in TMI, together with four shares of Series B Preferred Stock.

In connection with the acquisition from NXP and due to NXP's exclusive production capacity, TMFE entered into a Manufacturing Services Agreement (the "MSA") with NXP, pursuant to which, NXP would provide for the manufacturing and sale of wafers and the provision of services related thereto by NXP as ordered by the Debtors and certain of their affiliates. The MSA also contained certain minimum purchasing requirements that declined over the life of the contracts. The services provided by NXP under the terms of the MSA included, among other things (i) the manufacturing of wafers up to the process control module electrical test and any other services performed before a wafer leaves the manufacturing facility; (ii) any operation performed on a wafer after it has left the wafer manufacturing site, including, but not limited to, wafer testing, grinding, sawing, assembly, final test, marking and packing; and (iii) certain customer services, order fulfillment, test and product engineering and business reporting.

With the acquisitions of the Micronas and NXP business, the majority of the Company's operations then focused on the set-top box and television business lines, with its remaining operations focused on the audio and demodulator product lines. Prior to the commencement of these Chapter 11 Cases, Trident designed, developed, and marketed integrated circuits and related software for processing, displaying, and transmitting high quality audio, graphics, and images in home consumer electronics applications such as digital TVs, PC-TV, and analog TVs, and set-top boxes. Trident's product line included system-on-a-chip semiconductors that provided completely integrated solutions for processing and optimizing video, audio, and broadcast and satellite signals to produce high-quality and realistic images and sound. Trident's products also included frame rate converter, demodulator, audio decoder products, interface devices, and media processors. Trident's customers have included many of the world's leading manufacturers of consumer electronics, computer display, and set-top box products including Samsung, LG, Sony, Sharp, Philips, Comcast, and DirecTV.

TMI served as the corporate head of the Company and provided the corporate oversight and administrative services necessary for the Company's operations. TMFE served as the manufacturing procurement hub and primary accounts payable center for the Company. TMFE held most of the Company's intellectual property assets and contracts with all suppliers for use of the intellectual property and the production of finished goods. Pursuant to a distribution and supply agreement between TMFE and non-debtor Trident Microsystems (Hong Kong) Limited ("TMHK"), TMFE sold such finished goods to TMHK for re-sale to the Company's customers. TMFE also served as the Company's primary accounts payable processor and processes payments due to suppliers as well as payments to the non-revenue generating Foreign Subsidiaries that provide research and development, sales and marketing services for the Company.

The Debtors' principal executive offices were located in Sunnyvale, California. The Company had research and development facilities in Beijing and Shanghai, China; Freiburg, Germany; Eindhoven and Nijmegen, The Netherlands; Belfast, United Kingdom; Bangalore and Hyderabad, India; Austin, Texas; and Sunnyvale, California. The Company had sales offices in Seoul, South Korea; Tokyo, Japan; Hong Kong and Shenzhen, China; Taipei, Taiwan; San Diego, California; Mumbai, India; and Suresnes, France. The Company also had operations facilities in Taipei and Kaoshiung, Taiwan; and Hong Kong, China. The following organizational chart highlights the Company's corporate structure:



Non-Debtor Corporation
Debtor Corporation
Non-Debtor Branch/Rep Office
Liquidation/Termination Proceedings Ongoing or Planned
Trident Microsystems, Inc. [US]
Trident Microsystems (Far East) Ltd. [Cayman Islands]
Trident Microsystems Holding B.V. [Netherlands]
Trident Microsystems (Nederland) B.V. [Netherlands]
TMBV - France Branch [France]
Trident Microsystems (Europe) GmbH [Germany]
Trident Microsystems (Europe) B.V. [Netherlands]
Trident Microsystems (Korea), Limited [Korea]
Trident Microsystems (Hong Kong) Limited [Hong Kong]
Trident Microsystems (Singapore) Pte. Ltd. [Singapore]
Trident Microsystems (Beijing) Co., Ltd. [China]
Trident Multimedia Technologies (Shanghai) Co., Ltd. [China]
TMT - Shenzhen Branch [China]
Trident Microelectronics Ltd. [Taiwan]
Trident Microsystems (Taiwan) Ltd. [Taiwan]
Trident Microsystems (Israel) Ltd [Israel]
Trident Microsystems (Japan) GK [Japan]
Trident Digital Systems (UK) Ltd [UK]
Trident Microsystems (India) Pvt. Ltd. [India]
Trident Microsystems (Europe) B.V Korea Branch [Korea]
Trident Microsystems (Europe) B.V. H.K. Branch [Hong Kong]

The key functions of Trident's businesses have been:

### *Research and Development and Intellectual Property*

TMFE is the economic and legal owner of all economically valuable and non routine Trident IP, including but not limited to patents, copyrights, product IP, trademarks, trade names, certain marketing intangibles and trade secrets.  At no time did TMFE have any employees or physical facilities, and thus, it contracted with other Trident affiliates to perform research and development ("R&D") on its behalf.  The Debtors had R&D operations in Austin, Texas, Sunnyvale, California and San Diego, California.  Developing products based on advanced technological concepts was essential to Trident's ability to compete effectively in the digital media market, and the extensive team of R&D staff (which comprised 1,128 people and total expenditures of $175 million in fiscal year 2010) was at the forefront of these developments.

The R&D department was responsible for the research and design of Trident products.  The department was structured into three areas:  1) Intellectual Property Development, 2) Software, and 3) System on a Chip ("SoC").  Each of these areas had application, middleware, and hardware engineers that focused on some of the following activities:

- Application engineering;
- Demodulator engineering;
- SoC engineering;
- Software engineering;
- STB engineering;
- STB software creation;
- System architecture; and
- Video R&D.

### *Sales*

Trident's sales organization consisted of sales and field application staff or other support personnel located throughout the world.  The sales organization was geographically aligned into six regions:

- Americas  including North America and Brazil;
- Europe;
- Korea;
- Japan;
- Greater China and Taiwan; and
- South Asia Pacific.

Since July 1, 2009, the majority of Trident's sales have been handled by direct sales teams in Asia, with TMI providing sales, marketing and support services to these teams.  From 2006 through 2009, TMI performed the support services (including sales and marketing) for the benefit of TMFE, on behalf of its branch, TMHK.  Since that time, such services have been provided directly to TMHK, a wholly owned subsidiary of TMFE.  TMI's sales and marketing

support activities primarily consisted of marketing research, industry trend analysis, and next generation product marketing.  Subsequent to the acquisition of the TV and STB business lines from NXP in early 2010, TMI increased its STB sales activities in the U.S. due to the location of the key STB customers.

### Marketing

At all relevant times Trident had a global, yet centralized marketing and communications team that was tasked with determining the messaging strategies for Trident's business goals. These messaging strategies were used in the following:

- Media;
- Industry analysts;
- Investor relations;
- Trade shows and events;
- Website; and
- Employee communications.

While all marketing efforts were coordinated by TMI, global marketing strategies were outsourced to a third party provider.  Local marketing assistance was brought in as needed and additional marketing assistance was provided at the business unit level to determine marketing strategies.

### Information Technology ("IT") Operations

The Trident IT department oversaw and managed the IT solutions Trident employed to operate its business.  IT operations and management personnel were located worldwide with a majority working out of the Sunnyvale and Shanghai offices and providing IT services to TMFE. The IT operations department managed the following operations on a global basis with specialists located worldwide:

- Business applications including office applications, engineering applications, and computer aided design applications;
- IT workstations including laptops and desktops;
- IT network systems including servers, computer farms and data centers;
- Software licensing;
- Company email; and
- Data security.

### Human Resources ("HR")

Operating out of Sunnyvale (with staff in various offices), Trident's Human Resources Department was focused on the following activities:

- Determining the structure of compensation and benefits;
- Setting global processes and policies;
- International benefits and mobility;
- Implementing HR systems;

19

- •     Corporate communications and building morale; and
- •     Facilities.

### *Accounting and Finance*

The Accounting & Finance Department based at TMI's Sunnyvale headquarters, handled corporate affairs including investor relations, press releases for financial information, Section 404 compliance, SEC reporting, company restructure planning, tax planning, TMI financial planning, agreement review, and special assignments from management. It was also responsible for TMI's accounts receivable, accounts payable, fixed assets, inventory, payroll and general ledger.

### *Operations*

As Trident historically outsourced the manufacture of its products, the operations department was a global department responsible for managing a stable supply chain for TMFE and TMHK. These activities took place mainly in Taiwan and Hong Kong and consisted of the following activities:

- •     Product planning, including qualifying vendors and placing orders with vendors;
- •     Product quality control and testing;
- •     Warehousing and distribution, managed by Trident, but outsourced to DHL;
- •     Customer service; and
- •     Technical support activities, including resolving technical issues at manufacturing sites in coordination with the specific business units (TV or STB).

TMI's operations provided support to the sales and marketing support teams, procurement services, supply chain management and tests and ensured product quality in advance of distribution.

### *Executive Office*

Located in Sunnyvale, the Executive Office included the CEO/President, who along with senior staff, concentrated on corporate affairs, the Company's overall direction, investment, investor and public relations as well as additional personnel who managed business integration and corporate quality. In addition, the Office of the General Counsel continues to provide legal services all of the Trident entities.

## D.    PREPETITION INDEBTEDNESS AND THE INTERCOMPANY AGREEMENTS

The Debtors do not have any secured debt or outstanding bonds. The Debtors' debt is primarily owed either to various trade vendors that provide goods and services to TMFE, or on account of various intercompany payables.

1.    *__Unsecured Claims Other Than Intercompany Claims__*

Based upon those proofs of claim that were timely filed prior to the Bar Date[3], approximately $5,500,000 to $8,000,000 General Unsecured Claims were filed against TMI, approximately $16,500,000 to $17,500,000 General Unsecured Claims were filed against TMFE (not including the TMI Claim), and an approximately $73,000,000 General Unsecured Claim were filed by TMI against TMFE.

2.    *__The Intercompany Agreements__*

For various business reasons, including, but not limited to, U.S. and foreign tax considerations, it is common in many industries, including the semiconductor industry, for companies to enter into contractual agreements with respect to service being provided among the related parent, subsidiary and sister entities.  As far back as 2006, Trident entered into certain intercompany agreements (i) by and between TMI and TMFE, (ii) between each of TMI and TMFE and certain non-Debtor Foreign Subsidiaries (with respect to the intercompany agreements with at least one Debtor as a party, the "Debtor Intercompany Agreements"), and (iii) between non Debtor Foreign Subsidiaries only (the "Non Debtor Intercompany Agreements," and together with the Debtor Intercompany Agreements, the "Intercompany Agreements").  The Intercompany Agreements can generally be described as falling into one of the following three categories:  (x) Non Exclusive Sales and Marketing Agreement, (y) Support Services Agreement, or (z) Research and Development Services Agreement.   Of special importance are the following four Debtor Intercompany Agreements:

- Support Services Agreement entered into on September 1, 2006 by and between Trident Microsystems (Far East), Ltd. and Trident Microsystems, Inc. (and the Amendment thereto) (the "Support Services Agreement");

- Research and Development Services Agreement entered into on September 1, 2006 by and between TMFE and TMI (collectively with the foregoing, the "TMFE TMI Agreements");

- Distribution and Supply Agreement entered into on June 1, 2009 by and between TMFE and Trident Microsystems (Hong Kong) Ltd. (the "TMFE TMHK Agreement"); and

- Non-exclusive International Distribution Agreement entered into on February 5, 2010, by and between Trident Microsystems (Hong Kong) Ltd., and TMI (the "TMI-TMHK Agreement").

In short, the Support Services Agreement provided that in exchange for a "Support Services Fee," TMI shall perform "Support Services" for the benefit of TMFE, which included, but was not limited to, (a) general and administrative services (including finance, human

---

[3]    The Debtors have not completed their review of the Proofs of Claim filed in this case and, therefore, reserve any and all rights to reduce, reclassify or otherwise object to such Proofs of Claim, and nothing herein shall constitute a waiver of such rights.

resources, legal and IT support); (b) support for marketing activities; or (c) other such services that TMFE may have requested from time to time. Overall, under the Support Services Agreement TMI provided (i) management, general and administrative, (ii) sales and marketing support services, and (iii) technical services to its foreign affiliates. In exchange for its services, TMI received a fixed service fee which includes costs plus a percentage mark up. TMI utilized its office premises, staff, equipment and computers for the purpose of providing these services.

Similarly, the Research and Development Services Agreement provided that in exchange for a "R&D Services Fee," TMI shall provide all research and development services that TMFE may request. As discussed above, TMFE was the economic and legal owner of all economically valuable and non routine Trident intellectual property, including but not limited to patents, copyrights, product IP, trademarks, trade names, certain marketing intangibles, and trade secrets. As noted above, TMFE did not perform any R&D on its own, but rather, contracted with Trident affiliates, including TMI, to perform R&D services on its behalf. The Trident R&D department historically had R&D sites located throughout the world performing R&D services on behalf of TMFE. These contractual agreements between TMFE and the contract R&D providers guaranteed the R&D providers payment of their costs plus a mark up on costs. Relying upon their extensive R&D infrastructure, the development of products based on advanced technological concepts had been essential to Trident's ability to compete effectively in the digital media market.

Finally, the TMFE-TMHK and TMI-TMHK Agreements provided that TMHK is each entity's non exclusive distributor for the purpose of promoting, marketing, distributing and selling products.

In order to support the Intercompany Agreements, the Company implemented a formalized practice of accounting for intercompany charges pursuant to an official policy of the Company. In addition, the Company engaged PWC to complete annual transfer pricing analyses dating back to 2008, with the Company having performed such analyses for 2006 and 2007. The transfer pricing analyses by the Company in 2006 and 2007, and PWC from 2008 to 2011, found TMI's pricing of the Intercompany Agreements fall within appropriate ranges.

### 3.    *Economics of the Intercompany Agreements*

Based upon the terms of the Intercompany Agreements, both prior to and following the Petition Date, the Debtors and the Foreign Subsidiaries have incurred substantial amounts on account of the Intercompany Agreements. The chart below indicates the intercompany claims (both Debtor and non-Debtor) paid since 2010.

**Intercompany Claims Paid by the Debtors Since 2010**

| Company Name | Paid by TMI (USD) | Paid by TMFE (USD) |
|---|---:|---:|
| Trident Microsystems, Inc. | *n/a* | $ 115,351,007 |
| Trident Microsystems India Pvt. Limited | - | 29,822,280 |
| Trident Microsystems (Europe) GmbH | 38,151 | 14,714,987 |
| Trident Microsystems (Nederland) B.V. | 160,244 | 4,354,670 |
| Trident Microsystems (Singapore) Pte. Ltd. | - | - |
| Trident Digital Systems (UK) Limited | 68,135 | 14,856,732 |
| Trident Microsystems (Nederland) B.V. France Branch | - | 448,436 |
| Trident Microsystems ( Europe) B.V. | 438,953 | 14,359,997 |
| Trident Microsystems (Haifa) Ltd. | 108,060 | 6,035,952 |
| Trident Microsystems (Hong Kong) Limited | 9,591,351 | 4,257,732 |
| Trident Microsystems (Europe) B.V. Taiwan Branch | - | - |
| Trident Microsystems (Japan) GK | - | - |
| Trident Microsystems (Europe) B.V. Korea Branch | - | - |
| Trident Microsystems (Far East) Limited (HK Branch) | - | - |
| Trident Microsystems (Far East), Ltd. | 232,500 | *n/a* |
| Trident Microelectronics Ltd. | 46,457 | - |
| Trident Technologies, Inc. | - | - |
| Trident Microsystems (Taiwan), Ltd. | - | 13,043,670 |
| Trident Microsystems (Korea) Limited | 15,546 | - |
| Trident Multimedia Systems, Inc. | - | - |
| Trident Microsystems (Beijing) Co. Ltd. | - | 1,181,543 |
| Trident Multimedia Technologies (Shanghai) Co. Ltd. | 643,855 | 32,260,894 |
| Total | $ 11,343,251 | $ 250,687,900 |

Over $200 million of intercompany payables remain outstanding. The below chart indicates the receivables that, as of the Petition Date, are unpaid and were due and owing to each entity listed, from all of its affiliates collectively.

| Affiliate Receivable Balances as of the Petition Date | | |
| Company Name | | Amount (USD) |
| --- | --- | --- |
| Trident Microsystems, Inc. | $ | 87,272,253 |
| Trident Microsystems India Pvt. Limited | | 2,514,670 |
| Trident Microsystems (Europe) GmbH | | 4,809,042 |
| Trident Microsystems (Nederland) B.V. | | 2,447,376 |
| Trident Microsystems (Singapore) Pte. Ltd. | | - |
| Trident Digital Systems (UK) Limited | | 3,505,717 |
| Trident Microsystems (Nederland) B.V. France Branch | | 1,444,558 |
| Trident Microsystems ( Europe) B.V. | | 21,001,493 |
| Trident Microsystems (Haifa) Ltd. | | 696,953 |
| Trident Microsystems (Hong Kong) Limited | | 10,573,139 |
| Trident Microsystems (Europe) B.V. Taiwan Branch | | - |
| Trident Microsystems (Japan) GK | | 355,289 |
| Trident Microsystems (Europe) B.V. Korea Branch | | - |
| Trident Microsystems (Far East) Limited (HK Branch) | | 1,896,900 |
| Trident Microsystems (Far East), Ltd. | | 43,295,725 |
| Trident Microelectronics Ltd. | | 1,219,597 |
| Trident Technologies, Inc. | | - |
| Trident Microsystems (Taiwan), Ltd. | | 42,922 |
| Trident Microsystems (Korea) Limited | | - |
| Trident Multimedia Systems, Inc. | | - |
| Trident Microsystems (Beijing) Co. Ltd. | | 70,386 |
| Trident Multimedia Technologies (Shanghai) Co. Ltd. | | 19,751,661 |
| Total | $ | 200,897,682 |

In addition to the Intercompany Agreements, there are several intercompany loan agreements that are attributable to severance and restructuring costs incurred by the Foreign Subsidiaries prior to the Petition Date that could not be paid without additional funding by TMFE. Trident took the position that these costs were not associated with support or other services and that such amounts could not be paid through an arm's length transaction between two unrelated parties. The aggregate amount of the intercompany loans as of March 31, 2012, was $37.7 million, with nearly $22 million owed to TMFE by two of its European subsidiaries. TMI is not a party to any such intercompany loan.

Prior to the Bar Date, certain of the Debtor and non-Debtor subsidiaries filed proofs of claim against the Debtors, as described below.

(*$Actual*)

| Claim # | Claimant | Claim Amount |
|---|---|---|
| *Intercompany Claims Filed Against TMFE* | | |
| 147 | Trident Digital Systems (UK) Limited | $   3,477,851 |
| 150 | Trident Microsystems (Beijing) Co. Ltd. | 62,091 |
| 96 | Trident Microsystems (Haifa) LTD. | 696,953 |
| 146 | Trident Microsystems (Nederland) B.V. France Branch | 39,795 |
| 151 | Trident Microsystems (Taiwan), Ltd. | 42,922 |
| 152 | Trident Microsystems India Pvt. Limited | 1,084,016 |
| 182 | Trident Microsystems, Inc. | 73,215,368 |
| 144 | Trident Multimedia Technologies (Shanghai) Co. Ltd. | 17,826,300 |
| | | $   96,445,296 |
| | | |
| *Intercompany Claims Filed Against TMI* | | |
| 132 | Trident Multimedia Technologies (Shanghai) Co. Ltd. | $        18,685 |
| 145 | Trident Microsystems (Nederland) B.V. | 6,506 |
| | | $        25,191 |

With respect to the Claims asserted by Trident Digital Systems (UK) Limited, Trident Microsystems (Beijing) Co. Ltd., Trident Microsystems (Nederland) B.V. France Branch, Trident Microsystems (Taiwan), Ltd., Trident Microsystems India Pvt. Limited, Trident Multimedia Technologies (Shanghai) Co. Ltd. and Trident Microsystems (Nederland) B.V., the non-debtors expressly reserved their rights to modify, amend or withdraw such proofs of Claim to the extent that the non-Debtor entity has adequate resources to satisfy all of its outstanding obligations, including, but not limited to, those of employees, governmental entities or other creditors. It is currently contemplated that all of the non-Debtor entities will be able to satisfy their obligations, and the Claims of the non-Debtor entities will be withdrawn prior to the Effective Date.

In addition, on July 30, 2012, PWC completed its transfer pricing analysis and report in connection with the Intercompany Agreements for the fiscal year ended December 31, 2011. As a result of such analysis, on August 17, 2012, TMI amended the TMI Claim to reflect an amended claim amount of $73,215,368.

On August 8, 2012, the Creditors Committee filed an objection to the TMI Claim seeking entry of an order disallowing the TMI Claim in part or in whole, or recharacterizing the TMI Claim as an equity interest [D.I. 827]. On the same day, the Creditors Committee filed an adversary complaint requesting equitable subordination of the TMI Claim to claims of non-insider unsecured creditors pursuant to section 510(c) of the Bankruptcy Code. The Plan provides for the Creditors Committee's withdrawal, with prejudice, of both the TMI Claim objection and the adversary complaint on the Effective Date.

## E.    RECENT FINANCIAL INFORMATION

For the six months ending June 30, 2012, the Company had total net revenues of $67.1 million and total net losses of $61.4 million excluding reorganization expenses.

**ARTICLE IV.**

**KEY EVENTS LEADING TO THE
COMMENCEMENT OF THE CHAPTER 11 CASES**

### A.    FINANCIAL CHALLENGES

Like many technology based industries, the set-top box and television industries in which the Company focused its operations have been undergoing rapid changes which have made it difficult for the Company to operate profitably. The Company has faced increased pricing pressure from Taiwanese system on a chip (SoC) suppliers who have recently made great inroads in penetrating the market. Additionally, industry semiconductor inventory levels are currently elevated due to slowdown in consumer electronics markets primarily driven by overall slowdown in Western economies, which has forced all market participants, including the Company, to further adjust pricing to manage inventory levels. These pricing pressures have been compounded by set-top box manufacturers who have been slower than anticipated in launching new products. As a result, suppliers have been straddled with higher than anticipated inventory levels and high development costs that cannot be offset by next generation product sales. In addition to these pricing and inventory pressures, there has also been a shift in the industry's supply chain dominated by Asian original equipment manufacturers and TV manufacturers who are increasingly depending on manufacturing system on a chip and frame rate converter components for high-end TVs in-house, reducing the need to look to outside suppliers for products.

As a result of the above events, the Company experienced continued operating losses which resulted in declining cash in the year prior to the filing of these Chapter 11 Cases. The deteriorated value of the outstanding common stock and the termination of a line of credit restricted the Company's ability to raise money through traditional means. The combination of lower margins and sale volumes, high employee costs and limited access to new capital significantly affected the Company's liquidity and ability to pay its debts as they become due.

### B.    OUT-OF-COURT RESTRUCTURING EFFORTS

Prior to filing these Chapter 11 Cases, the Debtors undertook a marketing effort to identify a potential purchaser of their set-top box business line. In June of 2011, Entropic Communications, Inc. ("Entropic") expressed strong interest in the STB Business. At that time, however, the Company had been approached by another party regarding an overarching sale of the Company and was having ongoing discussions with other prospective purchasers. As 2011 progressed, the sale of the STB Business became the preferred alternative, and the Debtors' financial advisors assessed the likelihood of completing a sale with various potential purchasers of the STB Business among a small group of likely purchasers. At that point, Entropic appeared the most viable purchaser of these assets, and the Company subsequently entered into an exclusivity agreement with Entropic. In an attempt to right-size the business, on September 21, 2011, the Board of Directors approved a workforce reduction plan, which was designed to take the number of employees from 1,275 down to approximately 1,000. Despite the reduction in work force, the Company continued to suffer declining revenue and losses and experienced a continuous decline in its cash balances. During this time, a confluence of factors, including the

Company's liquidity, made it clear that the sale of the STB Business could only be accomplished under chapter 11 of the Bankruptcy Code.  The Debtors believed that a rapid sale of the STB Business as well as the Company's other key businesses would allow them to immediately stop the drain on cash balances and afford them an opportunity to determine such other steps necessary to reorganize their remaining operations and maximize the return to the Debtors' Creditors.  Accordingly, the Company determined that it was necessary to file these Chapter 11 Cases in order to restructure its operations.

<div align="center">

**ARTICLE V.**

**SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES**

</div>

**A.      RETENTION OF PROFESSIONALS BY THE DEBTORS**

On January 31, 2012, the Court authorized the Debtors to retain DLA Piper LLP (US) as their attorneys pursuant to section 327(a) of the Bankruptcy Code in connection with these Chapter 11 Cases [D.I. 146].  Additionally, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, the Court authorized the Debtors to retain PricewaterhouseCoopers ("PWC") as tax services provider and independent auditor [D.I. 127 & 597], as well as Union Square Advisors LLC as the Debtors' Investment Banker [D.I. 136].  The Court also authorized the Debtors to retain Epping Hermann Fischer Patentanwaltsgesellschaft mbH as Special Counsel for Foreign IP Matters [D.I. 180].  Finally, the Court authorized the Debtors to retain Andrew Hinkelman as Chief Restructuring Officer, supported by additional personnel from FTI Consulting, Inc. to provide critical management services [D.I. 129 & 247] and also authorized the Debtors to expand the scope of employment of FTI Consulting, Inc. such that Andrew Hinkelman would serve in the role of the Debtors' CEO upon the resignation of Bami Bastani [D.I. 491].

**B.      CAYMAN PROCEEDINGS**

In addition to the filing of the Bankruptcy cases under chapter 11 of the Bankruptcy Code, on January 5, 2012, TMFE, an exempted company incorporated in the Cayman Islands with limited liability, filed a winding up petition with the Cayman Court pursuant to section 94 of the Cayman Islands Companies Law (2011 Revision).  On January 11, 2012, the Cayman Court appointed Gordon MacRae and Eleanor Fisher of Zolfo Cooper (Cayman) Limited as the JPLs.  On January 24, 2012, the JPLs wrote to all creditors of TMFE informing them of the Cayman Proceedings, and inviting the creditors to attend a meeting February 15, 2012, at which the Cayman Provisional Committee was formed.

During the course of the provisional liquidation, the JPLs and the Debtors have worked together to ensure the efficient administration of the Cayman Proceedings in conjunction with the Chapter 11 Cases.  In this regard, to facilitate the Debtors' efforts towards maximizing value of their estates in light of the international nature of Trident's business and the dual insolvency proceedings of TMFE before the Cayman Court and the Bankruptcy Court, the Cayman Court and the Bankruptcy Court agreed upon the Joint Provisional Liquidation Protocol between the Debtors and the JPLs which had the following objectives: (i) reducing the total costs incurred by the JPLs in protecting the interests of creditors by avoiding duplication of efforts; (ii) avoiding

any potential conflict between the Cayman Proceedings and the Chapter 11 Cases; (iii) ensuring transparency and accountability in the conduct of the proceedings in the United States and the Cayman Islands; and (iv) providing a framework for protecting the interests of, and maximizing returns to, all creditors including by way of exploring a plan of compromise or arrangement with the creditors of TMFE.    The Joint Provisional Liquidation Protocol was subsequently supplemented and amended on June 8, 2012 to include procedures for the submission of creditor claims.

The winding up petition was first listed for hearing before the Cayman Court on February 16, 2012.    At this time the hearing was adjourned until July 3, 2012 to allow the JPLs and the Debtors to continue to explore restructuring proposals for the Company.    As the assets sales referred to below progressed, it became evident that a restructuring of the Company as a going concern would not be possible.    Accordingly, the hearing of the winding up petition was brought forward to May 28, 2012 to canvas the views of the creditors as to whether the provisional liquidation should continue.    At the hearing on May 28, 2012, the Cayman Court made one further adjournment of the hearing of the winding up petition to August 8, 2012, following an application from TMFE that it remain in provisional liquidation.    The provisional liquidation was extended because the agreements negotiated for the sale of the STB Business and the TV Business included transition service agreements, which required ongoing assistance from the Debtors to the purchasers following the closing of the sales transactions.    Placing TMFE into official liquidation in the Cayman Proceeding at that time would have caused substantial disruption to the provision of services under such transition service agreements, which could have left TMFE open to indemnity or alleged breach claims from the purchasers or other third parties.

On August 8, 2012, the Cayman Court heard the winding up petition and TMFE was placed into official liquidation.    The JPLs were appointed as official liquidators.    The Cayman Liquidators continue to work with the Debtors to ensure the efficient administration of the Cayman Proceedings in conjunction with the Chapter 11 Cases.

On September 12, 2012, the Cayman Court and the Bankruptcy Court approved the implementation of the Joint Protocol for the purpose of the orderly conduct of the official liquidation in conjunction with the Chapter 11 Cases.    The Joint Protocol acknowledged that the Cayman Liquidators could immediately commence the adjudication of Claims asserted against TMFE in accordance with Cayman law.

Upon confirmation of the Plan, it is proposed that the New Joint Protocol will be implemented which, among other things, will set out the process pursuant to which Claims asserted against TMFE were adjudicated pursuant to Cayman law and the process pursuant to which the Cayman Liquidators will make Distributions pursuant to the Plan in accordance with, and subject to the priorities of, United States Bankruptcy Law.    The Plan is conditioned upon the Bankruptcy Court and the Cayman Court approving the New Joint Protocol.

## C.    FORMATION OF THE CREDITORS COMMITTEE

The Office of the United States Trustee formed the Official Committee of Unsecured Creditors of TMI on January 18, 2012 [D.I. 75], which such appointments were amended on July

2, 2012 and July 6, 2012.  Currently, the Creditors Committee is comprised of the following members:  (i) United Microelectronics Corporation, (ii) Cisco Systems, Inc. and (iii) Cadence Design Systems BV (Netherlands).  These same members also made up the Cayman Provisional Committee.  The Creditors Committee has retained Pachulski Stang Ziehl & Jones LLP as their counsel [D.I. 361] and Imperial Capital, LLC as their investment banker and financial advisor [D.I. 512].  The Cayman Provisional Committee has retained Solomon Harris as their counsel for the purpose of participating in the Cayman Proceedings.  Later, the Cayman Provisional Committee's members joined the Cayman Committee and again retained Solomon Harris.

**D.    FORMATION OF THE EQUITY COMMITTEE**

The Office of the United States Trustee formed the Statutory Committee of Equity Security Holders of Trident Microsystems, Inc. on February 14, 2012 [D.I. 190].  The Equity Committee has retained Proskauer Rose LLP and Bayard, P.A. as counsel [D.I. 372 & 747], Quinn Emanuel Urquhart & Sullivan, LLP as conflicts counsel [D.I. 374], Alvarez & Marsal North America, LLC as financial advisor [D.I. 375] and Campbells as counsel in the Cayman Proceedings [D.I. 762].

**E.    "FIRST DAY" RELIEF**

As in many large chapter 11 cases, the Debtors filed a variety of customary motions on the Petition Date which were designed to facilitate their smooth transition into bankruptcy.

**1.    _Joint Administration_**

On January 5, 2012, the Bankruptcy Court entered a final order allowing the joint administration of these Chapter 11 Cases solely for procedural purposes to reduce the financial and other resources spent on administering the Chapter 11 Cases [D.I. 24].

**2.    _Cash Management_**

The Bankruptcy Court entered an interim order on December 15, 2012 [D.I. 27], and a final order on January 30, 2012 [D.I. 133], authorizing the Debtors to continue using their established cash management system, bank accounts, and documents related to the bank accounts in lieu of closing existing accounts and establishing an entirely new post-petition cash management system, to avoid disruption.  On September 12, 2012, the Bankruptcy Court also approved an order amending the cash management order to, among other things, ensure that the cash management order does not conflict with the powers and obligations of the Cayman Liquidators.

**3.    _Employee Wages_**

As of the Petition Date, the Debtors and their non-Debtor subsidiaries had approximately 1,100 employees.  The Debtors believed that it was critical for them to retain their employees as their knowledge and understanding of the Debtors' operations was essential for the Debtors to continue to operate during the Chapter 11 Cases.  Any delay in paying pre-petition or post-petition compensation or benefits to the Debtors' employees would have destroyed the Debtors' relationship with their employees and would have irreparably harmed employee morale at a time

when the dedication, confidence and cooperation of the Debtors' employees was most critical. On January 5, 2012, the Bankruptcy Court entered an interim order granting the Debtors the authority to pay pre-petition compensation and continue benefits provided to employees (including, but not limited to, paid time off, health insurance and other benefits) in the ordinary course of the Debtors' businesses [D.I. 26] and, on January 30, 2012, the Bankruptcy Court entered a final order approving the same [D.I. 131].

### 4.    *Critical Vendors*

The Bankruptcy Court entered an order on January 5, 2012, authorizing the Debtors to pay certain claims of service providers and suppliers that provide the Debtors with essential goods and services that are critical to the Debtors' operations [D.I. 29]. The Bankruptcy Court authorized such prepetition payments in an aggregate amount not to exceed $2,000,000. To date, the Debtors have only made such prepetition payments to the critical vendors in the amount of $644,580.

### 5.    *Retention of KCC as Claims and Noticing Agent*

The Bankruptcy Court entered an order on January 6, 2012, authorizing the Debtors to retain KCC to perform certain claims, noticing and balloting functions in the Chapter 11 Cases. The order retaining KCC further provided that the fees and expenses incurred pursuant to KCC's provision of services would be treated as administrative expenses of the Debtors' estates.

## F.    OTHER SIGNIFICANT MOTIONS

### 1.    *Ordinary Course Professionals*

The Debtors have a number of professionals that provide financial, real estate, technology, legal, tax and other services in the ordinary course of the Debtors' business. As these ordinary course professionals are already familiar with the Debtors and their business, the Debtors requested authority to continue paying each such professional for services rendered and disbursements actually incurred. The Bankruptcy Court entered an order on January 30, 2012 authorizing such payments to professionals, up to a cap of $35,000 per month per professional, without further approval of the Bankruptcy Court and also procedures for approval and payment of fees in excess of the $35,000 limit [D.I. 138].

### 2.    *Performance-Based Incentives for Key Employees*

The Debtors had a number of key employees whose full dedication, the Debtors believed, would be imperative to maintain the full dedication of these key employees in connection with the Debtors' efforts to complete their asset sales and/or liquidate the Company. Accordingly, on January 5, 2012, January 30, 2012, June 21 and July 10, the Bankruptcy Court entered orders granting the Debtors the authority to (i) implement a performance-based key employee incentive plan (the "KEIP"), (ii) provide performance-based incentives for certain additional key employees, (iii) implement a wind-down retention plan and (iv) provide supplemental performance-based incentives for certain additional key employees. [D.I. 134, 250, 708 and 763]. With respect to the seven key officers that were entitled to receive payments under the

KEIP, all but David Teichmann have resigned from the Debtors' employ, including most critically, Bami Bastani as Chief Executive Officer on May 4, 2012.

### 3.    *Vacation and Severance Pay*

The Debtors requested authority to pay employees' prepetition accrued vacation and sick or personal days, as well as severance benefits when employees left the Debtors' employ.  On January 30, 2012, the Bankruptcy Court granted the Debtors authority to pay employees' prepetition accrued vacation and sick or personal days, not subject to the $11,725 cap in section 507(a)(4) of the Bankruptcy Code and also authorized the Debtors to make severance payments to their rank and file employees terminated without cause after the Petition Date in accordance with their past practices, not subject to the $11,725 cap in section 507(a)(4) of the Bankruptcy Code; provided, however, that the total of severance payments made by the Debtors was not to exceed a cap of $3,300,000 in the aggregate [D.I. 132].  Furthermore, on February 24, 2012, the Bankruptcy Court approved the continued payment of certain retention bonuses payments and other incentive plans that were instituted by the Debtors to certain of their rank and file employees prior to the Petition Date [D.I. 251].   These payments were necessary to maintain good workplace morale at the time of the commencement of the Chapter 11 Cases.

### 4.    *2004 Motion*

On April 27, 2012, the Equity Committee filed a motion pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, requesting the examination of (i) NXP B.V., (ii) NXP Semiconductors Netherlands B.V. and (iii) Richard Clemmer, David Kerko, Philippe Geyres and A.C. D'Augustine, as former directors of NXP [D.I. 524] (the "2004 Motion").  The 2004 Motion sought discovery due to NXP's roles as (i) the entity which sold the Debtors the STB Business approximately two years prior to the Petition Date; (ii) the Debtors' controlling stockholder; and (iii) the Debtors' largest supplier and creditor.  Following the hearing on the 2004 Motion, the Debtors, NXP and the Equity Committee reached an agreement in principle resolving the Motion and, on May 25, 2012, the Bankruptcy Court entered an Agreed Order with respect to the 2004 Motion [D.I. 631].  The Agreed Order provided, among other things, that NXP and the Debtors produce materials (subject to withholding documents based on the attorney-client privilege and/or work product doctrine) that were responsive to such document requests.  As a result, the Equity Committee, the Debtors and NXP engaged in substantial discovery relating to the 2004 Motion.  The Debtors produced approximately 240,000 pages of documents and NXP produced approximately 16,000 pages of documents.  In addition, former TMI director David Kerko also produced documents.  The Equity Committee conducted the depositions of Philippe Geyres on September 13, 2012, David A. Courtney on September 18, 2012 and Pete J. Mangan on September 19, 2012.  Following this discovery, the Debtors, the Equity Committee and NXP entered into a consensual settlement of all outstanding issues relating to the 2004 Motion, as more fully described below.

### 5.    *505 Motion*

Transfer pricing is a term used to describe all aspects of intercompany pricing arrangements between related business entities, and commonly applies to intercompany transfers of tangible and intangible property.   Any time related parties on different sides of international

borders conduct business, the taxing authorities from both countries will insist on taxing their share of the income.  The IRS will scrutinize the cost regardless of whether it is either a U.S. subsidiary of a foreign parent or a U.S. parent of a foreign subsidiary.

On March 23, 2012, Trident received a notice from the IRS (the "IRS Notice"), effectively contending that an additional $36.9 million of expenses should have been charged by TMI to TMFE under the Intercompany Agreements for the 2008 and 2009 tax years. Specifically, the IRS stated that TMI had over-estimated the stewardship costs and as a result did not charge sufficient amounts to TMFE.  Secondly, the IRS claimed that the extensive expenses incurred with respect to TMI's stock option should have been charged to TMFE.

In response, on April 23, 2012, on behalf of the Company, PWC provided a letter response to the IRS Notice.  Specifically, the PWC response centered around certain expenses relating to stock-based compensation that had been the subject of considerable discussion between the IRS and the Company.  To this end, on behalf of TMI, PWC disagreed with the IRS' proposed adjustments and maintained that the tax positions taken with respect to the 2008 and 2009 transfer pricing studies were correct.  PWC also refuted the IRS' assessment of a substantial penalty, contending that "TMI's workpapers supporting the exclusion of the . . . [e]xpense were in existence at the time of filing, and all of TMI's tax return positions had a reasonable basis."

At that time, TMI also submitted a request that the IRS agree to "fast track" mediation in an attempt to resolve this issue, which while having little direct economic consequence to TMI, has potentially dramatic impact to the Intercompany Claims.  The IRS refused this request.  TMI attempted to engage the IRS once more, in its Supplement to the TMI Response dated June 21, 2012 (the "Supplemental Letter").  Again, the IRS provided no response, nor evinced any desire to promptly resolve this dispute.

As described more fully below, the Debtors and the IRS have finalized a consensual settlement that will result in the withdrawal of the 505 Motion.

## G.    THE DEBTORS' ASSET SALES AND REMAINING ASSETS

Beginning prior to the Petition Date, and continuing since the commencement of these Chapter 11 Cases, the Debtors have been engaged in a process to monetize their assets.  Such efforts have been successful and have resulted in the divestment of nearly all of its business operations.

### 1.    *STB Business*

Prior to the Petition Date, the Debtors and their professionals undertook an extensive marketing effort to identify a potential purchaser of their STB Business, as the Debtors believed that identifying a purchaser willing to consummate a rapid sale of the STB Business would allow the Debtors to immediately stop the drain on cash balances and further afford them an opportunity to determine which, if any, of the Debtors' other business lines should be marketed for sale.  Through these marketing efforts, the Debtors identified Entropic Communications, Inc. as a prospective purchaser most interested in the Debtors' STB Business.

32

On January 3, 2012, the Debtors and Entropic entered into an asset purchase agreement, pursuant to which Entropic agreed to serve as a stalking horse purchaser to purchase the Debtors' STB Business and assume certain liabilities in exchange for a cash payment of $55,000,000, subject to certain adjustments.  On January 18, 2012, the Bankruptcy Court entered an order approving certain procedures in connection with the sale [D.I. 72], which such order was modified on February 7, 2012 [D.I. 178].  In connection therewith, the Debtors held an auction on February 23, 2012.  Following several rounds of bidding, Entropic submitted a bid of $75.9 million (including assumed liabilities) which represented the successful bid at the auction and also represented a significant improvement from the stalking horse bid.

Accordingly, on March 9, 2012, the Bankruptcy Court entered an order approving, among other things, the sale of the STB Business to Entropic [D.I. 319].  Paragraph 13 of the order provided that neither the Debtors nor their estates, nor any person or entity (including, but not limited to any chapter 11 trustee, creditor, equity holder, party-in-interest or official committee of the Debtors) claiming by, through or on behalf of the Debtors or their estates (including, but not limited to by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute, commence, assert or file any fraudulent conveyance, preference or avoidance claims, or assert or use any such claims for defensive purposes of the Company and certain Debtor subsidiaries arising under (i) Sections 544, 547, 548, 549 and 550 of Chapter 5 of the Bankruptcy Code, (ii) the law of any foreign jurisdiction in which the Sellers operate or are domiciled, or (iii) state law, including all rights, claims and causes of action arising out of any post-petition payment by the Company or any of the seller subsidiaries for goods or services relating to: (x) vendors or service providers used in the STB Business; (y) assumed contracts and transferred leases, including that certain Manufacturing Services Agreement, as amended, dated as of February 8, 2010 between TMFE and NXP and (z) transferred employees.  On March 14, 2012, the Cayman Court entered an order approving the sale of the STB Business to Entropic.

Recognizing the critical importance of NXP's supply of products to the Debtors' STB Business, the asset purchase agreement between the Debtors and Entropic expressly provided that, as a condition to closing, the purchaser shall have entered into an MSA with NXP.  Accordingly, on March 1, 2012 the Debtors' filed a motion to approve the assumption and assignment of an amended and restated MSA [D.I. 270], which required a cure payment to NXP in the approximate amount of $10.4 million.  The Bankruptcy Court entered an order approving such assumption and assignment on March 6, 2012 [D.I. 323].  The amended and restated MSA also provided for the cure payment to be made by offsetting the amount owed by NXP against that certain Promissory Note executed February 8, 2012 in connection with the Original MSA (the "WIP Note").

In addition, to account for certain of the Debtors' outstanding obligations under the MSA, the parties entered into a Support Agreement whereby Entropic purchased from NXP all raw materials and work in progress in NXP's possession.  The Support Agreement also provided that Entropic would release NXP, their affiliates, and current and former directors, officers and employees of, among other things, certain preference and avoidance claims.

After certain purchase price reconciliation, the Debtors received approximately $54.2 million in cash proceeds from the sale of the STB Business.  Substantially all of the purchased

assets have been transferred to Entropic, and Entropic has successfully transferred (or expects to soon transfer) more than 400 of Trident's employees.

The closing of the STB Business occurred on April 13, 2012.

**2.    *TV Business***

As of the Petition Date, the Debtors' TV Business was incurring significant losses and required funding of approximately $2.5 million per week from Trident.  As a result of its losses and the uncertainty of whether the sale of the STB Business would be sufficient to allow the Debtors to reorganize, the Debtors in conjunction with their advisors, had begun actively and extensively marketing the TV Business for sale since October 2011.  The Debtors identified Sigma Designs, Inc. ("Sigma") as a stalking horse bidder and submitted proposed bid procedures to the Bankruptcy Court.  On March 23, 2012, the Bankruptcy Court entered an order approving certain procedures in connection with the sale of the Debtors' TV Business, whereby Sigma would serve as the stalking horse bidder [D.I. 384].  In accordance with such approved bid procedures, the Debtors and their advisors contacted a number of interested parties that had previously expressed an interest in the Debtors' TV Business; however, no additional qualified bid was received as of the bid deadline.  Thus, no auction was conducted and Sigma was deemed the successful bidder.

Accordingly, on April 5, 2012, the Bankruptcy Court entered an order approving, among other things, the sale of the TV Business to Sigma.  Paragraph 14 of the order provided that neither the Debtors nor their estates, nor any person or entity (including, but not limited to any chapter 11 trustee, creditor, equity holder, party-in-interest or official committee of the Debtors) claiming by, through or on behalf of the Debtors or their estates (including, but not limited to by operation of law, sale, assignment, conveyance or otherwise) shall pursue, prosecute, litigate, institute, commence, assert or file any fraudulent conveyance, preference or avoidance claims, or assert or use any such claims for defensive purposes of the Company and certain Debtor subsidiaries arising under (i) Sections 544, 547, 548, 549 and 550 of Chapter 5 of the Bankruptcy Code, (ii) the law of any foreign jurisdiction in which the Sellers operate or are domiciled, or (iii) state law, including all rights, claims and causes of action arising out of any post-petition payment by the Company or any of the seller subsidiaries for goods or services relating to: (x) vendors or service providers used in the TV Business; (y) assumed contracts and transferred leases and (z) transferred employees.  On April 12, 2012, the Cayman Court entered an order approving the sale of the TV Business to Sigma.

The Debtors received approximately $30.5 million in cash proceeds from the sale of the TV Business.  Substantially all of the purchased assets have been transferred to Sigma, and Sigma has successfully transferred in excess of 300 of Trident's employees.  In addition, TMFE and Sigma entered into an Assignment and Assumption Agreement whereby TMFE agreed to assign and transfer the MSA (as amended in connection with the STB Sale) to Sigma.

The closing of the TV Business sale occurred on May 4, 2012.

3.      ***Audio Business***

As a standalone business, the Audio Business was not economically viable and, therefore, following the sale of the Debtors' STB Business and TV Business, the Debtors determined that it would also sell its Audio Business.  On May 8, 2012, the Debtors filed a motion seeking authorization to sell the Debtors' assets relating to their Audio Business to Cambridge Silicon Radio Limited ("Cambridge") [D.I. 546].  On May 16, 2012, the Bankruptcy Court entered an order approving, among other things, the sale of the Audio Business to Cambridge [D.I. 598].  On May 17, 2012, the Cayman Court entered an order approving the sale of the Audio Business to Cambridge.

The closing of the Audio Business sale occurred on June 4, 2012.  The purchase price was $900,000, with approximately $350,000 paid to the Debtors and the balance to be paid to the Debtors' German subsidiary.

4.      ***Demod Business***

The Debtors' Demod Business designed and sold chips that demodulated audio channels off a carrier signal.  Thus, following the sale of the STB Business and TV Business, the Debtors determined that they would also sell the Demod Business.  On July 10, 2012, the Bankruptcy Court entered an order approving the sale of the Debtors' Demod Business to Sigma [D.I. 766].  On July 11, 2012, the Cayman Court entered an order approving the sale of the Debtors' Demod Business to Sigma.  The closing of the Demod Business sale occurred on July 19, 2012.  The transaction also provided for Sigma's assumption of the employment contracts of at least 70% of the Demod employees.  The purchase price was $1.2 million.

5.      ***Analog Business***

On June 1, 2012, non-Debtor Trident Microsystems (Europe) GmbH entered into a Master Purchase and Sale Agreement whereby Sigma would purchase certain assets, transfer certain employees and assume certain liabilities related to Trident's Analog business.  The purchase price was $337,500.  The transaction closed on June 4, 2012.

6.      ***Remaining Assets***

Following the various asset sales as described above, the following assets of the Debtors still remain:

- Payments due from Entropic and Sigma, of approximately $8.4 million, pursuant to the TSAs and other holdbacks;

- The Debtors' current cash on hand as of June 30, 2012, of approximately $71 million; and

- 25 MEMC patents which were ultimately excluded from the Entropic sale.

7.      *Transition Service Agreements*

The asset purchase agreements with respect to the Debtors' sales of the STB Business, the TV Business and the Audio Business included transition service agreements ("TSAs"), which require the ongoing assistance from the Debtors to the respective purchasers following the closing of the sales transactions.  The services provided under the TSAs included accounting and tax services, human resource services, information technology services, legal services, sales services, supply chain operation services, transport and delivery support services and security services.  The majority of services required under the TSAs have now been completed; however, both Entropic and Sigma do require certain additional limited services to be provided by the Debtors.

8.      *Last Time Buys*

Prior to the sale of the Audio Business to Cambridge, the Debtors offered customers a final opportunity to purchase inventory.  The last time buy is anticipated to add approximately $3 million in net value to the Debtors' estates.

## H.      WIND-DOWN OF NON-DEBTORS

The Debtors, in conjunction with their advisors, have identified strategies to wind-down each of their non-debtor subsidiaries under applicable law in their respective jurisdictions.  These entities are each in the process of terminating lease obligations, resolving remaining liabilities and complying with required reporting obligations.   The following non-debtor entities are expected to have sufficient cash to wind-down locally without the need for further insolvency proceedings: (i) Trident Microsystems India Pvt. Limited; (ii) Trident Microsystems (Nederland) B.V. France Branch; (iii) Trident Microsystems (Hong Kong) Limited (iv) Trident Microelectronics Ltd.; (v) Trident Microsystems (Taiwan), Ltd.; (vi) Trident Microsystems (Korea) Limited; (vii) Trident Multimedia Technologies (Shanghai) Co. Ltd; (viii) Trident Microsystems (Europe) GmbH; (ix) Trident Microsystems (Nederland) B.V. (x) Trident Microsystems (Europe) B.V.; and (xi) Trident Microsystems (Beijing) Co. Ltd. Trident Microsystems (Japan) GK) is not expected to have sufficient cash to wind-down locally and, accordingly, will likely be filing for insolvency proceedings.[4]

## I.      SETTLEMENTS RELATING TO THE TMI CLAIM, THE IRS CLAIM AND THE 2004 MOTION

Since the commencement of these Bankruptcy Cases, the Debtors have sought to maximize and preserve the significant value in the Debtors for the benefit of the Debtors' Creditors and holders of Equity Interests, while simultaneously seeking to bring about a consensual resolution on, most critically, the TMI Claim, the IRS Claim and the 2004 Motion. Recognizing the critical need for a resolution on these three issues, the Debtors, with the support

---

[4]      The Debtors and the non-Debtor subsidiaries, along with their respective advisors, continue to review the wind-down strategies with respect to each of these entities, and accordingly, such analyses are subject to change.

of the Cayman Liquidators, have worked all interested parties to determine if agreements could be reached to avoid a protracted, uncertain and costly litigation process with respect to each of these three .

### 1. *Settlement Between The Debtors, The Cayman Liquidators, The Creditors Committee And The Equity Committee Relating To The TMI Claim*

After extensive settlement discussions, the Debtors, the Cayman Liquidators, the Creditors Committee and the Equity Committee forged consensus on a settlement.  As a result, those parties entered into the Plan Support Agreement which the Debtors, the Cayman Liquidators, the Creditors Committee and the Equity Committee believe resolves all material issues and, among other things, provides a recovery of 90% to the holders of Class 2.A. Claims, all while eliminating the uncertainty, time delay and substantial costs that are posed by litigating these complex, cross-border issues.  Payment on account of Class 2.A and Class 2.B Claims shall be made after all Allowed Administrative and Priority Claims are paid.  The Plan Support Agreement further provides, among other things, that the Cayman Liquidators shall not adjudicate the Claim of TMI against TMFE, and all objections and defenses to such Claims, including but not limited to those set forth in the Creditors Committee's objection [D.I. 827] and adversary proceeding [D.I. 828] are preserved.  The Plan Support Agreement provides that the Creditors Committee shall withdraw and dismiss, as applicable, with prejudice, the TMI Claim objection and related adversary proceeding only upon the Effective Date and, until such time, they shall be adjourned and suspended, as needed to preserve the status quo.  By its terms, the Plan Support Agreement shall automatically terminate if, among other things, (i) the Bankruptcy Court denies confirmation of the Plan, (ii) the Disclosure Statement has not been approved pursuant to an order in form and substance consistent with the Plan Support Agreement and the Plan and otherwise acceptable to the parties by no later than October 31, 2012, (iii) the Bankruptcy Court has not entered the Confirmation Order by December 15, 2012, (iv) the Bankruptcy Court or the Cayman Court refuses to confirm the New Joint Protocol or (v) any of the conditions to confirmation stated in the term sheet, annexed to the Plan Support Agreement, or the Plan are not satisfied prior to the entry of the Confirmation Order and the Equity Committee fails to waive the satisfaction of such condition or conditions within five Business Days written notice from the Debtors, the Cayman Liquidators or the Creditors Committee, including, without limitation (i) that the aggregate amount of Allowed Claims in Class 2.A is not in excess of $16,800,000 (or the amount as adjusted upward to account for the Stipulated Additional Allowed Claims) and (ii) that the IRS Claim shall be resolved for no greater than $500,000 in Cash.  The Plan Support Agreement further provides, among other things, that the parties to such agreement support the entry of the order approving the Disclosure Statement and the Confirmation Order and not commence any proceeding or prosecute, join in, or otherwise support any action to oppose or object to approval of the Plan, Disclosure Statement or the Confirmation Order.

### 2. *Settlement Between The Debtors, The Equity Committee and NXP Relating To The 2004 Motion*

Following extensive discovery relating to the 2004 Motion, on October 4, the Debtors, the Equity Committee, NXP and former directors of TMI, Richard Clemmer and David Kerko, entered into a Memorandum of Understanding which memorialized their agreements regarding

the settlement of all outstanding issues relating to the 2004 Motion, including all possible claims the Debtors have or may have against NXP, Mr. Clemmer and Mr. Kerko. The Memorandum of Understanding provides, among other things, that (i) all Claims filed by NXP, Mr. Kerko and Mr. Clemmer would be deemed withdrawn with prejudice, (ii) NXP's Distribution on account of its Equity Interests in TMI shall reflect a reduced Distribution in the amount of $2,381,471.40, to be transferred to the minority shareholders of TMI, (iii) NXP shall receive the TMFE IP Assets, which the Confirmation Order shall provide that such transfer was in good faith, (iv) the Confirmation Order and the Plan shall provide for full and complete releases to NXP, Mr. Clemmer and Mr. Kerko from the Debtors, full and complete releases by NXP, Mr. Clemmer and Mr. Kerko to the Debtors and full and complete releases to NXP, Mr. Clemmer and Mr. Kerko from Creditors and holders of Equity Interests; (v) the Distribution to NXP B.V. shall be subject to a reserve of $2 million for any claims or defenses arising from payment of post-petition invoices and other accounts receivable, and neither the establishment nor the amount of the reserve shall limit, extend or otherwise affect any party's rights, claims and defenses with respect to such outstanding receivables, including but not limited to any right of setoff; (vi) no further examinations or discovery shall be taken pursuant to the 2004 Motion; and (vii) the parties shall use their best reasonable efforts to obtain confirmation of the Plan by such a date as to allow for a full and final distribution to NXP on or before December 31, 2012, subject to the reserve of $2 million for the Outstanding NXP Receivables. In the event that the conditions precedent outlined in the Plan are not satisfied or otherwise waived on or before December 31, 2012, the parties to the Memorandum of Understanding have the right to terminate the agreement and declare the agreement null and void, at which time the rights, claims and defenses of all parties thereto shall be restored as if the agreement was never executed.

### 3. *Settlement Between The Debtors And The IRS Relating To The 505 Motion*

After extensive settlement negotiations between the Debtors and the IRS relating to the 505 Motion, on October 18, the Bankruptcy Court entered the *Agreed Order By and Among the Debtors and the Internal Revenue Service Pursuant to Section 505 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019*. The consensual agreement between the Debtors and the IRS provides for, among other things, a total federal income tax liability increase with respect to TMI in the amount of $45,853, with additional assessments of $18,342 in penalties and $8,708.81 in pre-petition interest. The IRS further agreed in a separate letter agreement that it will accept TMI's federal income tax returns for tax years 2010 and 2011 as currently filed, and TMI agreed that any tax attributes (including net operating losses carryforwards and carrybacks) generated in these years will not be available for use in any other tax year by TMI and will not be transferred to or available for use by any other entity, related or unrelated. The stipulation also provides for the IRS to file an amended proof of Claim reflecting the financial terms of the agreement, and the Debtors' withdrawal of the 505 Motion.

## J. ADJUDICATION OF CLAIMS AGAINST TMFE BY THE TMFE PLAN ADMINISTRATOR

As a matter of Cayman Islands Law, it is the duty of the Cayman Liquidators as TMFE Plan Administrator, to adjudicate upon Claims against TMFE for which purpose he acts in a quasi-judicial capacity. The exercise by the Cayman Liquidators of these powers, is subject to the control of the Cayman Court and either the TMFE Plan Administrator or the holder of a

Claim against TMFE may apply to the Cayman Court with respect to the exercise or proposed exercise of those powers.

The Cayman Liquidators have adjudicated those Claims that have been asserted against TMFE in accordance with Cayman Islands Law and procedure described below.  In respect of any outstanding Claims which had not timely filed a proof of Claim against TMFE in the Chapter 11 Cases, on September 12, 2012, the Cayman Liquidators caused to be published in the international editions of the Wall Street Journal a notice of intention to declare a final dividend.  This notice provided that any outstanding Claims against TMFE must be submitted before November 24, 2012.  Any creditor of TMFE who lodges his proof of Claim after the date specified in the notice may be excluded from the Distribution and is not entitled to disturb it on the basis that he has not participated.  Such a creditor will not be excluded from any subsequent Distribution by TMFE and is entitled to be paid the amount of the prior Distribution to the extent any assets remain available before the payment of any further Distribution to the other holders of Allowed Claims.  In the event, however, that a Creditor fails to file a proof of Claim before the final Distribution, then the Cayman Liquidators has no obligation to adjudicate such proof of Claim.  However, any Creditor who has already timely filed a proof of Claim against TMFE in the Chapter 11 Cases is not required to file any further proof of Claim in the Cayman Proceedings.

The Cayman Liquidators may admit a Claim either for the whole or part of the amount claimed.  Where the Cayman Liquidators admit a Claim in full, they are required to notify the holder of the Claim.  Where the Cayman Liquidators reject a Claim, or admit it only in part, they are also required to notify the holder of the Claim and include a statement of reasons for rejecting the whole or part of the Claim; and a statement of the claimant's right to apply to the Cayman Court to seek to have the decision reversed or varied.

In this regard, the Cayman Liquidators have reviewed each of the approximately 115 Claims either filed or scheduled against TMFE and, in consultation with FTI Consulting Inc. and DLA Piper LLP (US), have notified each of the Creditors regarding the admissibility of their Claims.  In doing so, the Cayman Liquidators reviewed the Debtors' books and records and consulted with their advisors on each of the Claims to determine whether to admit a Claim in full, admit a Claim only in part, or to reject a Claim.  Where the Cayman Liquidators rejected a Claim, or admitted it only in part, they notified the holder of the Claim and included a statement of reasons for rejecting the whole or part of the Claim.  The Cayman Liquidators, following careful review and analysis of each of the Claims against TMFE, have allowed 25 Claims in full, admitted 2 Claims only in part and rejected 25 Claims.  In addition, approximately 64 Claims were scheduled by the Debtors as either contingent, disputed or unliquidated, and no proof of claim was filed.  Based upon the information provided by FTI Consulting, Inc. and the Debtors, the Cayman Liquidators found that these scheduled Claims should not be admitted as valid Claims against TMFE.  Based upon the Cayman Liquidators adjudication of the Claims asserted against TMFE, the Cayman Liquidators have Allowed approximately $16.6M in Claims, inclusive of the Stipulated Additional Allowed Claims.

The Cayman Liquidators have determined that United States dollars will be the currency of the liquidation.  Any foreign currency Claims made against TMFE will be converted to United States dollars as at the mid-market exchange rates prevailing on August 8, 2012 (being the date

upon which the Cayman Court ordered that TMFE be wound up) in accordance with section 150(2)(b) of the Cayman Companies Law.

A Creditor who has a contractual right to claim interest against TMFE, will only be Allowed for the amount of the interest accrued up to the date of the presentation of the winding up petition (i.e. January 5, 2012).

Future debts may be Allowed by the Cayman Liquidators even if they were not yet due on January 5, 2012.  If a Distribution is to be paid by TMFE before the date on which the debt would have fallen due, the amount of the Distribution shall be discounted for accelerated payment using the rate of interest prescribed by the Judgment Debts (Rates of Interest) Rules (currently set at between 2⅛% and 3% depending on the currency involved).

In respect of contingent liabilities, the Cayman Liquidators may estimate the value of the debt for the purpose of admitting it for payment and they may revise his estimate if circumstances change or new information becomes available.  Where the Cayman Liquidators puts an estimated value on a contingent claim they must notify the creditor of this stating:

(a)    the basis upon which the estimate has been made;

(b)    the fact that the creditor has a right to submit a varied proof if circumstances change;

(c)    the fact that the Cayman Liquidators may vary their estimate having regard to changed circumstances; and

(d)    the Cayman Liquidators agree to extend generally the creditor's time for appealing their decision to the Cayman Court.

By virtue of section 140(2) of the Companies Law subordination agreements and contractual rights of set-off or netting of claims are enforceable by and against TMFE.  Such agreements will be taken into account when quantifying the amount of a creditor's claim against TMFE.  In the absence of a contractual right of set-off, there is a common law right of set-off where there are mutual credits, mutual debts or other mutual dealings between TMFE and any creditor.  Whether a Claim is capable of being set-off will depend on the particular circumstances of the Claim.

If a creditor is dissatisfied with the Cayman Liquidators' decision with respect to his Claim, including any decision on the question of priority, he has a right of appeal to the Cayman Court for the decision to be reversed or varied.

An appeal must be made within 21 days of the date upon which the creditor receives notice of the Cayman Liquidators' decision and must be served on the Cayman Liquidators.  The appeal is a de novo reconsideration of the creditor's Claim and as part of the appeal the creditor may rely upon evidence in support of his Claim which he did not previously submit to the Cayman Liquidators.

The Cayman Liquidators have the right to be heard on every appeal and it is their duty to attend and to assist the Cayman Court in respect of the appeal. Any other creditor of TMFE can also be heard on the appeal.

The Cayman Liquidators' costs of the appeal are paid as an expense of the liquidation out of the assets of TMFE. The creditor's costs of a successful appeal against a liquidator's decision rejecting a Claim are also usually ordered to be paid as an expense of the liquidation. Where a creditor's appeal is unsuccessful the creditor may be ordered to pay the liquidator's costs of the appeal. Where a creditor's appeal is successful and another creditor has participated in the hearing to oppose the appeal, the latter may be ordered to pay some or all of the successful creditor's costs. If however the appeal is unsuccessful, the creditor which participated in the hearing to oppose the appeal may not receive an award of costs in its favor from the unsuccessful creditor where the former's submissions merely duplicate those of the liquidator.

There is a possibility of exercising further rights of appeal from a decision of the Cayman Court to the Cayman Islands Court of Appeal and thereafter to the Judicial Committee of the Privy Council.

Where it appears to the Cayman Liquidators on the basis of information not available to them at the time of his adjudication of a proof of debt that it ought not to have been admitted, or ought to have been admitted for a lesser amount, the Cayman Liquidators may apply to the Cayman Court to expunge a proof of debt which has been admitted or reduce the amount in respect of which it has been admitted.

A creditor who is dissatisfied with the Cayman Liquidators' decision to admit the whole or part of a creditor's proof for an amount exceeding US$100,000 or 5% of TMFE's total liabilities (whichever is less) may also apply to expunge the proof on the ground that it should not have been admitted.

An application to expunge a proof of debt against another creditor must be made promptly and, in any event, not later than the date upon which a Distribution is paid in respect of it. Notice of the application to expunge must be served on the Cayman Liquidators and the creditor in respect of which it is sought to expunge the claim. The procedure is substantially the same as that already described above for a creditor who seeks to appeal against the rejection of his proof of debt.

Further details of the adjudication procedure that have been followed by the Cayman Liquidators are set out in the New Joint Protocol.

## K.    NEW JOINT PROTOCOL IN SUPPORT OF CONFIRMATION

As the assets of TMFE are located in the United States, the TMFE Plan Administrator will then make Distributions in accordance with the provisions of United States bankruptcy law, including without limitation, provisions relating to priority of Distribution. Any appeals against the determination of the TMFE Plan Administrator shall be subject to the exclusive jurisdiction of the Cayman Court.

Accordingly, on or prior to the Confirmation Date, TMI and the Cayman Liquidators will seek to obtain the approval of the Bankruptcy Court and the Cayman Court of the New Joint Protocol. The proposed form of the New Joint Protocol is annexed hereto as Exhibit C. The New Joint Protocol will, among other things, set out the process pursuant to which Claims against TMFE have been adjudicated by the Cayman Liquidators in accordance with Cayman Islands Law and pursuant to which they will make Distributions pursuant to the Plan in accordance with, and subject to the priorities of, United States Bankruptcy Law.

<div align="center">

**ARTICLE VI.**

**THE JOINT PLAN OF LIQUIDATION**

</div>

A.     **INTRODUCTION**

The Debtors believe that (i) through the Plan, holders of Allowed Claims will receive a greater recovery from the estates of the Debtors than the recovery that they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the Plan will afford the Debtors the opportunity and ability to liquidate its businesses in a timely and efficient manner to preserve value for the Estates.

The Plan is annexed hereto as <u>Exhibit A</u> and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

B.     **CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE JOINT PLAN OF LIQUIDATION**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines (or, with respect to TMFE, that the TMFE Plan Administrator or the Cayman Court determines), that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the applicable Debtor.  Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement.  Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim

<div align="center">42</div>

or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

For an overview as to how Claims against TMFE will be adjudicated upon by the Cayman Liquidators under Cayman Islands law in order to be considered "allowed" for the purpose of Distributions, see Article VI.D below.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which gives rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan. Accordingly, their votes are not solicited. Under the Debtors' Plan, the Claims in Class 1 (Secured Claims Against TMFE), Class 4 (Secured Claims Against TMI) and Class 5 (General Unsecured Claims Against TMI) are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization. For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests.

Consistent with these requirements, the Plan divides the Allowed Claims against, and Interests in, the Debtors into the following Classes:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Secured Claims against TMFE | Paid in full | Deemed to Accept |
| 2.A. | General Unsecured Claims against TMFE not held by Debtors' Affiliates | Impaired | Entitled to Vote |
| 2.B. | General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims | Impaired | Entitled to Vote |
| 3 | Equity Interests in TMFE | Impaired and No Distribution | Deemed to Reject |
| 4 | Secured Claims against TMI | Paid in full | Deemed to Accept |
| 5 | General Unsecured Claims against TMI | Paid in full | Deemed to Accept |
| 6 | Equity Interests in TMI | Impaired | Entitled to Vote |

1. _**Unclassified**_

a.      Administrative Claims

Administrative Claims are the actual and necessary costs and expenses of the Debtors' Chapter 11 Cases that are allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code.  Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtors' estates, actual and necessary costs and expenses of operating the Debtors' businesses, indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases and compensation for professional services rendered and reimbursement of expenses incurred.  Specifically excluded from Administrative Claims are any fees or charges assessed against the estates of the Debtors under § 1930 of chapter 123 of title 28 of the United States Code, which fees or charges, if any, will be paid in accordance with Article V.N of the Plan.

b.      Non-Professional Fee Claims

The TMI Responsible Person and the TMFE Plan Administrator (as applicable) shall pay each holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (3) at such time and upon such terms as may be agreed upon by such holder and the TMI Responsible Person or TMFE Plan Administrator; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, *however*, that Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date, unless the TMI Responsible Person or the TMFE Plan Administrator, as applicable, in their discretion, choose to treat such Claims as Administrative Claims.

       c.      Administrative Claims and Administrative Expense Request Deadline

Except as otherwise provided herein, on or before 5:00 p.m., prevailing Eastern time, on the Administrative Claims Bar Date, each holder of an Administrative Claim shall file with the Claims Agent a request for payment of Administrative Claim by mailing, hand delivering or delivering by courier service such request for payment of Administrative Claim to the Claims Agent at Trident Microsystems Claims Processing c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, Attention: Trident Claims Processing Center.  The request for payment of an Administrative Claim will be timely filed only if it is ***actually received*** by the Claims Agent by 5:00 p.m., prevailing Eastern time, on the Administrative Claims Bar Date.  Requests for payment of Administrative Claims may **not** be delivered by facsimiles, telecopy, or electronic mail transmission.  Notwithstanding anything herein, the Debtors' and the Committees' Professionals shall not be required to file a request for payment of any Administrative Claim on or before the Administrative Claims Bar Date for fees and expenses arising under sections 330, 331 or 503(b)(2-5) of the Bankruptcy Code, as such Professionals will instead file final fee applications as required by the Bankruptcy Code, Bankruptcy Rules and the Confirmation Order.  Notwithstanding anything to the contrary herein, the filing of an Administrative Claim shall not be required in order to receive payment for any tax liability described in sections 503(b)(1)(B) and (C) in accordance with section 503(b)(1)(D) of the Bankruptcy Code.

       d.      Professional Fee Claims

The TMI Responsible Person and the TMFE Plan Administrator (as applicable) shall pay Professionals who are entitled to reimbursement or allowance of fees and expenses from each of the Debtors' Estates pursuant to sections 327-330 and 503(b)(2) - (b)(6) of the Bankruptcy Code, in Cash, in the amount awarded to such Professionals by the interim fee application order or by Final Order of the Bankruptcy Court, as soon as practicable after the later of the Effective Date and the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Cases, and after application of any retainer received by the Professionals.

45

The deadline for submission by Professionals for Bankruptcy Court approval of Accrued Professional Compensation shall be forty-five (45) days after the Effective Date.  All Professionals employed by the Debtors, the Creditors' Committee, the Equity Committee or the Cayman Liquidators shall provide to the Debtors and the Cayman Liquidators an estimate of their Accrued Professional Compensation through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) before the Effective Date.

With respect to legal fees incurred by TMFE and TMI in the Chapter 11 Cases, such fees will be subject to the approval of the Bankruptcy Court in accordance with the Bankruptcy Code and the procedures ordered by the Bankruptcy Court.  Prior to the Confirmation Date, TMFE and TMI intend to file an allocation motion with the Bankruptcy Court to confirm the appropriate allocation of legal fees between TMFE and TMI.  The Creditors Committee, the Cayman Committee, the Equity Committee and the Cayman Liquidators shall all be afforded an opportunity to object and be heard with respect to any objections regarding allocation of such fees amongst TMI and TMFE.

The Cayman Liquidators will need to satisfy the Cayman Court that all disbursements incurred by TMFE, including legal or professional fees incurred by or allocated to TMFE in the Chapter 11 Cases, were properly incurred.  In this regard, in accordance with the terms of the Joint Protocol and/or the New Joint Protocol, the parties may request that the Cayman Court and the Bankruptcy Court hold joint hearings where appropriate including a joint hearing in respect of the application for the allocation of Professional fees as between TMI and TMFE.

The fees, costs and expenses incurred by TMFE, the Cayman Liquidators, the JPLs and the Cayman Committee in the Cayman Proceedings, including legal or professional fees for attorneys or other professionals engaged in the Cayman Proceedings, will be subject to the approval of the Cayman Court pursuant to section 109 or 104(5) of the Cayman Companies Law. Reservation shall be made for all such fees, costs and expenses before any Distribution is paid to the Class 2.B. creditors.

e.    Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

The TMI Responsible Person and the TMFE Plan Administrator (as applicable) shall pay each holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

f.    Other Priority Claims

On or as soon as practicable after the Effective Date, the TMI Responsible Person and the TMFE Plan Administrator (as applicable) shall pay each holder of an Allowed Other Priority Claim, in full and final satisfaction of such Allowed Other Priority Claim the full unpaid amount of such Allowed Other Priority Claim in Cash.

2.      _Classified_

a.      Class 1 (Secured Claims Against TMFE) **–** *Not Impaired*

Class 1 consists of Secured Claims against TMFE.

Class 1 is Unimpaired and, therefore, holders of Secured Claims against TMFE in Class 1 are deemed to have accepted the Plan.

To the extent that any Secured Claims against TMFE exist, except to the extent that a holder of an Allowed Secured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMFE shall receive from TMFE, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed.

b.      Class 2.A. (General Unsecured Claims Against TMFE not held by Debtors**'** Affiliates) **–** *Impaired*

Class 2.A. consists of General Unsecured Claims against TMFE not held by Debtors' Affiliates.

Class 2.A. is Impaired and, therefore, holders of General Unsecured Claims against TMFE not held by Debtors' Affiliates in Class 2.A are entitled to vote to accept or reject the Plan.

After (i) reservation of sufficient funds necessary to pay outstanding Administrative Claims against TMFE in full and (ii) payment of Allowed TMFE Secured Claims in Class 1; except to the extent that a holder of a General Unsecured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMFE not held by Debtors' Affiliates, in Class 2.A, including any holder of a Stipulated Additional Allowed Claim, shall receive a 90% recovery on account of the Allowed Amount of such Claims, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed.

c.      Class 2.B. (General Unsecured Claims Against TMFE held by Debtors**'** Affiliates as Intercompany Claims) **–** *Impaired*

Class 2.B. consists of General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims.

Class 2.B. is Impaired and, therefore, holders of General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims in Class 2.B. are entitled to vote to accept or reject the Plan.

After (i) payment of Allowed TMFE Secured Claims in Class 1, (ii) payment of Allowed General Unsecured Claims against TMFE not held by Debtors' Affiliates in Class 2.A. (iii)

reservation of sufficient funds necessary (a) to satisfy the Disputed Claims Reserve with respect to Disputed Claims against TMFE, (b) for the TMFE Plan Administrator to carry out its duties and for the fees, costs and expenses incurred in the Cayman Proceedings, (c) to pay outstanding Administrative Claims in full and (d) to pay any unclaimed or undeliverable Distributions to holders of Class 2.A Claims; except to the extent that a holder of a General Unsecured Claim against TMFE held by Debtors' Affiliates has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMFE held by Debtors' Affiliates in Class 2.B., shall receive the remaining assets of TMFE, and which such remaining assets of TMFE shall constitute TMI Assets, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed; provided, however, that in no event shall the Cash recovery (on a percentage basis) on account of Class 2.B. Claims be greater than the recovery (on a percentage basis) on account of Class 2.A. Claims.

   d.  Class 3 (Equity Interests in TMFE) – *Impaired*

   Class 3 consists of Equity Interests in TMFE.

   Class 3 will receive no Distribution under the Plan and therefore, holders of Equity Interests in TMFE in Class 3 are deemed to have rejected the Plan.

   Class 3 will receive no Distribution under the Plan and therefore, holders of Equity Interests in TMFE in Class 3 are deemed to have rejected the Plan and are not entitled to vote on the Plan.

   e.  Class 4 (Secured Claims Against TMI) – *Not Impaired*

   Class 4 consists of Secured Claims against TMI.

   Class 4 is Unimpaired and, therefore, holders of Secured Claims against TMI in Class 4 are deemed to have accepted the Plan.

   To the extent that any Secured Claims against TMI exist; except to the extent that a holder of an Allowed Secured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMI shall receive from TMI, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed.

   f.  Class 5 (General Unsecured Claims Against TMI) - *Not Impaired*

   Class 5 consists of General Unsecured Claims against TMI.

   Class 5 is Unimpaired and, therefore, holders of General Unsecured Claims against TMI in Class 5 are conclusively presumed to have accepted the Plan.

   After: (i) the reservation of sufficient funds necessary for the TMI Responsible Person to carry out its duties and to pay outstanding Administrative Claims against TMI in full, (ii)

payment of Allowed TMI Secured Claims in Class 4, and (iii) reservation of sufficient funds necessary to satisfy all Disputed Claims against TMI in full; except to the extent that a holder of a General Unsecured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMI shall receive from TMI, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed.

g.      Class 6 (Equity Interests in TMI) – *Impaired*

Class 6 consists of Equity Interests in TMI.

Class 6 is Impaired and, therefore, holders of Equity Interests in TMI in Class 6 are entitled to vote to accept or reject the Plan.

After: (i) the reservation of sufficient funds necessary for the TMI Responsible Person to carry out its duties and to pay outstanding Administrative Claims against TMI in full, (ii) payment of Allowed TMI Secured Claims in Class 4 and (iii) payment of Allowed TMI General Unsecured Claims in Class 5 or funding of the Disputed Claims Reserve pursuant to Article VI of the Plan; the TMI Responsible Person shall pay each holder of Equity Interests in TMI in Class 6, a Pro Rata share of the remaining TMI Assets, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Equity Interest becomes Allowed; provided, however, that pursuant to the settlement negotiated between and among the Debtors, the Equity Committee and NXP, (i) the Distribution to NXP on account of its Class 6 Equity Interests in TMI, which such Equity Interests shall be Allowed in the amount of 104,204,348 shares representing 57.82% of TMI's outstanding stock, shall be (a) reduced in the amount of $2,381,471.40, with such amount being distributed instead, Pro Rata, to non-NXP holders of Equity Interests in TMI in Class 6 (in addition to the Distribution that is otherwise distributable under the Plan), and (b) subject to a $2 million reserve to be held and retained by the TMI Responsible Person pending satisfaction of the Outstanding NXP Receivables; provided, however, that neither the establishment nor the amount of the reserve shall limit, extend or otherwise affect any party's rights, claims and defenses with respect to such Outstanding NXP Receivables, including but not limited to any right of setoff and (ii) NXP shall receive all right, title and interest to the TMFE IP Assets free and clear of all liens, claims and encumbrances, except for the Divested Company Agreement between Koninklijke Philips Electronics N.V. and Trident Microsystems (Far East) Ltd., dated May 11, 2011 (effective as of February 8, 2010).

## 3.      *Special Provision Governing Unimpaired Claims and Equity Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights with respect to any Unimpaired Claim or Equity Interest, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim or Equity Interest.

## 4.      *Separate Plans of Liquidation*

The Plan constitutes a separate chapter 11 plan of liquidation for each Debtor.

5.     *Nonconsensual Confirmation*

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126 of the Bankruptcy Code, the Debtors reserve the right to amend the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.  With respect to impaired Classes that are deemed to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by such Class of Claims.

## C.     MEANS FOR IMPLEMENTATION OF THE PLAN

The Debtors propose to implement and consummate the Plan on and after the Effective Date.  Prior to the Effective Date, the Debtors shall continue to operate their businesses subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.

1.     *TMI Responsible Person to Effectuate Distributions*

Prior to the filing of the Plan Supplement, a TMI Responsible Person shall be appointed for the sole purpose of liquidating and distributing the TMI Assets and with no objective to continue or engage in the conduct of a trade or business.

2.     *Cayman Liquidators as TMFE Plan Administrator*

Pursuant to the terms of the Joint Protocol and the New Joint Protocol, unless otherwise ordered by the Bankruptcy Court and the Cayman Court after notice and a hearing, the assets of TMFE shall be administered and adjudicated by the TMFE Plan Administrator pursuant to Cayman law and subject to the jurisdiction of the Cayman Court, *provided*, *however*, that the priority and classification of Claims shall be determined and adjudicated pursuant to United States law, including without limitation, sections, 507 (Priorities), 509 (Claims of Codebtors), 510 (Subordination) and 1129 (Absolute Priority) of the Bankruptcy Code and in accordance with the priorities stated in this Plan.  The costs of the TMFE Plan Administrator shall be paid from the assets of TMFE.  The TMFE Plan Administrator shall have all of the powers and authority granted under this Plan and under the laws of the Cayman Islands as a liquidator appointed by the Cayman Court.  Notwithstanding anything to the contrary herein, the TMFE Plan Administrator shall not transfer funds out of the TMFE bank accounts currently held in the United States except for purposes of Distribution or for payment of expenses of the TMFE Plan Administrator pursuant to the provisions of the Plan.  On the Effective Date, the Cayman Liquidators shall be appointed as the TMFE Plan Administrator.  TMFE shall remain in existence on and after the Effective Date until an application for dissolution is made as provided in Article IV.L of the Plan.

3.     *Assignment of Contracts*

Upon consent of the Equity Committee and the TMFE Plan Administrator, TMFE shall assume contracts listed on Schedule 7.1 entered into by TMFE.  As such, counterparties to any such contracts assumed pursuant to the Plan, and counterparties to any subcontracts related to

such contracts, shall be prohibited from terminating or otherwise altering the terms of such contract as a result of the assumption and/or assignment of such contract pursuant to the Plan.

4.  ***The TMI Responsible Person and the TMFE Plan Administrator***

The TMFE Plan Administrator (with respect to TMFE) and the TMI Responsible Person (with respect to TMI) shall be deemed to have been appointed as the respective Estates' representative by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The TMI Responsible Person shall be entitled to retain counsel and other professionals to carry out its duties.  The TMFE Plan Administrator may consult with the TMI Responsible Person, and the TMI Responsible Person may consult with the TMFE Plan Administrator regarding effectuation of the Plan.

5.  ***Role of the TMI Responsible Person and the TMFE Plan Administrator***

In furtherance of and consistent with the purpose of the Plan, the TMI Responsible Person shall, among other things, have the rights, powers and duties, subject to the limitations set forth herein:  (i) to hold, manage, dispose of, sell, convert to Cash, and distribute the TMI Assets, including investigating, prosecuting and resolving the Causes of Action of TMI, if any; (ii) to hold the TMI Assets for the benefit of the TMI Creditors and holders of Equity Interests that are entitled to Distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date; (iii) in the TMI Responsible Person's reasonable business judgment, to investigate, prosecute, settle, liquidate, dispose of, and/or abandon the TMI Assets, including rights, Causes of Action or litigation; (iv) to monitor and enforce the implementation of the Plan; (v) to file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to TMI; (vi) in the TMI Responsible Person's reasonable business judgment, to reconcile and object to Claims and Equity Interests against TMI, and manage, control, prosecute and/or settle on behalf of the Estate of TMI objections to Claims and Equity Interests on account of which the TMI Responsible Person (as Disbursing Agent) will be responsible (if Allowed) for making Distributions under the Plan, (vii) to take all actions necessary, and create any documents necessary, to wind up the affairs and effect a dissolution of TMI and implement the Plan; (viii) to hold, manage, and distribute TMI Assets obtained through the exercise of its power and authority; (ix) to act as a signatory of TMI and for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of TMI Assets; (x) to dispose of the books and records transferred to the TMI Responsible Person in a manner deemed appropriate by the TMI Responsible Person; *provided*, *however*, that the TMI Responsible Person shall not dispose of any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party without further order of the Bankruptcy Court; (xi) to take all necessary action and file all appropriate motions to obtain an order closing the Chapter 11 Case of TMI; (xii) to enter into and exercise rights under contracts that are necessary or desirable to the administration of TMI and execute any documents or pleadings related to the liquidation of the TMI Assets; (xiii) to establish and maintain bank accounts and terminate such accounts as the TMI Responsible Person deems appropriate; (xiv) to set off amounts owed to TMI against Distributions to the Creditors of, or holders of Equity Interests in TMI, which any such determinations may be challenged in Bankruptcy Court or any other court with jurisdiction; (xv) to bring suits or defend itself against such suits, if any, as the TMI Responsible Person

determines in connection with any matter arising from or related to the Plan that affects in any way the rights or obligations of Creditors or holders of Equity Interests in TMI; (xvi) to take such other and further actions as are permitted by the Plan and are not inconsistent with the Plan. In all circumstances, the TMI Responsible Person shall act in the best interests of all beneficiaries of the TMI Assets.

The TMI Responsible Person may resign by giving at least thirty (30) days prior written notice thereof to the Bankruptcy Court. Such resignation shall become effective on the later to occur of (i) the date specified in such written notice and (ii) the effective date of the appointment of a successor TMI Responsible Person in accordance with the terms hereof and such successor's acceptance of such appointment in accordance with the terms hereof.

The TMI Responsible Person may be removed, with cause, and replaced by the Bankruptcy Court upon motion by any holder of TMI Equity Interests duly noticed to the TMI Responsible Person and all holders of TMI Equity Interests, who shall have the right to appear and be heard with respect to such motion. Such removal shall become effective on the date specified in such action by the Bankruptcy Court.

The resignation, removal, incompetency, bankruptcy or insolvency of the TMI Responsible Person shall not operate to revoke any existing agency created pursuant to the terms of the Plan, or the Confirmation Order or invalidate any action theretofore taken by the TMI Responsible Person. All fees and expenses incurred by the TMI Responsible Person prior to the resignation, incompetency or removal shall be paid from the TMI Assets, unless such fees and expenses are disputed by the successor TMI Responsible Person, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor TMI Responsible Person that are subsequently allowed by the Bankruptcy Court shall be paid from the TMI Assets. In the event of the resignation or removal of the TMI Responsible Person, such TMI Responsible Person shall: (a) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor TMI Responsible Person or directed by the Bankruptcy Court to effect the termination of such TMI Responsible Person's capacity under the Plan and Confirmation Order; (b) promptly deliver to the successor TMI Responsible Person all documents, instruments, records and other writings related to the administration of the TMI Assets as may be in the possession of such TMI Responsible Person; provided, however, that such TMI Responsible Person may retain one copy of each of such documents for its purposes, subject to the terms of any joint prosecution and common interest agreement to which the TMI Responsible Person is party; and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor TMI Responsible Person.

Any successor TMI Responsible Person appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and, in case of the TMI Responsible Person's resignation, to the resigning TMI Responsible Person. Thereupon, such successor TMI Responsible Person shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor with like effect as if originally named TMI Responsible Person and shall be deemed appointed pursuant to Bankruptcy Code section 1123(b)(3)(B). The resigning or removed TMI Responsible Person shall duly assign, transfer and deliver to such successor TMI

Responsible Person all property and money held by such resigning or removed TMI Responsible Person hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor TMI Responsible Person, execute and deliver an instrument or instruments conveying and transferring to such successor TMI Responsible Person, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed TMI Responsible Person.

In furtherance of and consistent with the purpose of the Plan, the TMFE Plan Administrator shall, among other things, have the rights, powers and duties, subject to the limitations under the laws of the Cayman Islands, including the requirement to obtain the approval of the Cayman Court where applicable: (i) to take possession of, collect, get in, manage, dispose of, sell, convert to Cash, and distribute the assets of TMFE; (ii) to take possession of the assets of TMFE for the benefit of the Creditors of TMFE that are entitled to Distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date; (iii) in the TMFE Plan Administrator's reasonable business judgment, to investigate, prosecute, settle, liquidate, dispose of, and/or abandon the assets of TMFE, including rights, Causes of Action or litigation of TMFE; (iv) to monitor and enforce the implementation of the Plan; (v) to file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to TMFE; (vi) in the TMFE Plan Administrator's reasonable business judgment, to reconcile and determine Claims against TMFE, and to the extent necessary, manage, control, prosecute and/or settle on behalf of the Estate of TMFE objections to Claims on account of which the TMFE Plan Administrator (as Disbursing Agent) will be responsible (if Allowed) for making Distributions under the Plan, (vii) to take all actions necessary, and create any documents necessary, to wind up the affairs of the TMFE and implement the Plan; (viii) to take possession of, collect, get in, manage, and distribute Cash or non-Cash assets of TMFE obtained through the exercise of its power and authority; (ix) to act as a signatory of TMFE and for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of TMFE's assets; (x) to take possession and control of the books and records of TMFE, including those maintained in electronic form and keep them in safe custody until the TMFE Plan Administrator is authorized or directed to destroy them in accordance with an order of the Cayman Court; provided, however, that the TMFE Plan Administrator shall not dispose of any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party without further order of the Cayman Court; (xi) to take all necessary action and file all appropriate motions to obtain an order closing the Chapter 11 Case of TMFE and the Cayman Proceedings; (xii) to enter into and exercise rights under contracts that are necessary or desirable to the administration of the Estate of TMFE and execute any documents or pleadings related to the liquidation of the TMFE assets; (xiii) to establish and maintain bank accounts and terminate such accounts as the TMFE Plan Administrator deems appropriate; (xiv) to exercise such rights of set off as TMFE may have against the Creditors of TMFE; (xv) to bring suits or defend itself against such suits, if any, as the TMFE Plan Administrator determines in connection with any matter arising from or related to the Plan that affects in any way the rights or obligations of TMFE, the TMFE Plan Administrator or the Creditors of TMFE; (xvi) to obtain and maintain insurance coverage with respect to the liabilities and obligations of the TMFE Plan Administrator; (xvii) to take all actions necessary and appropriate to minimize any adverse state or federal tax consequences to Creditors of TMFE provided such actions do not result in an

adverse tax consequence to the TMFE.  In all circumstances, the TMFE Plan Administrator shall act in the best interests of the Estate of TMFE.

In furtherance thereof, each of the Debtors shall execute on or prior to the Effective Date a power of attorney authorizing the TMI Responsible Person or the TMFE Plan Administrator (as applicable) to take actions consistent with Article IV.E of the Plan to the same extent as if the TMI Responsible Person or the TMFE Plan Administrator were the Debtor.

### 6. *TMI Responsible Person's and the TMFE Plan Administrator's Tax Powers*

Following the Effective Date, the TMFE Plan Administrator and the TMI Responsible Person shall prepare and file (or cause to be prepared and filed), on behalf of the applicable Debtor all Tax Returns required to be filed or that the TMFE Plan Administrator and the TMI Responsible Person otherwise deem appropriate, including the filing of amended Tax Returns or requests for refunds.

For all taxable periods ending on or prior to the Effective Date, the TMFE Plan Administrator and the TMI Responsible Person shall have full and exclusive authority in respect of all taxes of the Debtors to the same extent as if the TMFE Plan Administrator and the TMI Responsible Person were the debtors in possession.

Following the Effective Date, the TMI Responsible Person and the TMFE Plan Administrator shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes (i) of the applicable Debtor(s) to the same extent as the applicable Debtor would otherwise be entitled with respect to any taxable period ending on or prior to the Effective Date and (ii) of the applicable Debtor(s) to the same extent as the applicable Debtor would otherwise be entitled with respect to any taxable period ending after the Effective Date.

The TMFE Plan Administrator, the TMI Responsible Person and the Debtors shall reasonably cooperate with each other, and shall cause their respective officers, employees, agents, auditors and other Representatives to reasonably cooperate, in preparing and filing all Tax Returns (including amended Tax Returns and claims for refunds) and in resolving all disputes and audits with respect to all taxable periods relating to the Debtors.  Any information obtained under Article IV.F of the Plan shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refunds or in conducting an audit or other proceeding.

### 7. *Cash*

The TMI Responsible Person may invest Cash (including any earnings thereon or proceeds therefrom) in any manner permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

8. ___Costs and Expenses of the TMI Responsible Person and Liquidation of TMFE___

The costs and expenses of the TMI Responsible Person and the fees, costs and expenses incurred in the Cayman Proceedings, including the reasonable fees and expenses of the TMFE Plan Administrator and the TMI Responsible Person, and each of their respective retained professionals, and the fees and expenses of maintaining the Disputed Claims Reserves, shall be paid out of the TMI Assets and the assets of TMFE (as applicable), except for the TMFE IP Assets. Such amounts for fees, costs and expenses shall be estimated and provided to the Debtors and the Cayman Liquidators before the Effective Date.

9. ___Compensation of the TMFE Plan Administrator and the TMI Responsible Person___

The TMI Responsible Person shall be entitled to reasonable compensation approved in an amount consistent with that of similar functionaries in similar roles. The TMFE Plan Administrator shall be entitled to compensation in accordance with section 109 of the Cayman Companies Law and the Insolvency Practitioners Regulations 2008 (as amended).

10. ___Retention of Professionals by the TMFE Plan Administrator and the TMI Responsible Person___

The TMFE Plan Administrator and the TMI Responsible Person may retain and compensate attorneys and other professionals to assist in their duties as TMFE Plan Administrator or the TMI Responsible Person (as applicable) on such terms (including on a contingency or hourly basis) as such TMFE Plan Administrator or the TMI Responsible Person deem reasonable and appropriate without Bankruptcy Court approval.

11. ___Tax Reporting___

The TMFE Plan Administrator and the TMI Responsible Person shall file (or cause to be filed) any statements, returns or disclosures relating to TMFE or TMI (as applicable) that are required by any governmental unit.

The TMFE Plan Administrator and the TMI Responsible Person shall be responsible for payment, out of the TMI Assets or the assets of TMFE (as applicable) except for the TMFE IP Assets, of any taxes imposed on TMI or TMFE or their respective assets, including the applicable Disputed Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the applicable Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the TMFE Plan Administrator and the TMI Responsible Person (as applicable) as a result of the resolution of such Disputed Claims.

The TMI Responsible Person or the TMFE Plan Administrator may request an expedited determination of taxes of TMI or TMFE, including the applicable Disputed Claims Reserve, or the applicable Debtor(s) under section 505(b) of the Bankruptcy Code for all returns filed for, or

on behalf of, the applicable Debtor(s) for all taxable periods through the dissolution of TMI or TMFE.

12.     *Dissolution*

TMI shall be dissolved at the earlier of: (i) all of the TMI Assets having been distributed pursuant to the Plan or (ii) the TMI Responsible Person determining, in its sole discretion, that the administration of the TMI Assets is not likely to yield sufficient additional proceeds to justify further pursuit; provided, however, that in no event shall TMI be dissolved later than three (3) years from the Effective Date. If at any time the TMI Responsible Person determines, in reliance upon such professionals as the TMI Responsible Person may retain, that the expense of administering the TMI Assets, including the making of a final Distribution to its Creditors and holders of Equity Interests, is likely to exceed the value of the assets remaining in TMI, the TMI Responsible Person may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to dissolve TMI, (ii) donate any balance, if Distributions to holders of Claims and Equity Interests are complete pursuant to Article III of the Plan, to a charitable organization or a charitable trust that is unrelated to the Debtors, the TMFE Plan Administrator and the TMI Responsible Person, and (iii) dissolve TMI.

The TMFE Plan Administrator shall make an application to the Cayman Court to dissolve TMFE at the earlier of: (i) all of the assets of TMFE having been distributed pursuant to the Plan and the affairs of TMFE having been completely wound up or (ii) the TMFE Plan Administrator determining, in its sole discretion, that further administration of the remaining assets of TMFE is not likely to yield sufficient additional proceeds to justify further pursuit and in all other respects the affairs of TMFE have been completely wound up. If at any time the TMFE Plan Administrator determines, in reliance upon such professionals as the TMFE Plan Administrator may retain, that the expense of administering the assets of TMFE, including the making of a final Distribution to holder of Claims against TMFE, is likely to exceed the value of the assets remaining in TMFE, the TMFE Plan Administrator may apply to the Cayman Court for authority to (i) reserve any amounts necessary to dissolve TMFE and (ii) donate any balance to a charitable organization or a charitable trust that is unrelated to the Debtors, the TMFE Plan Administrator or the TMI Responsible Person. Notwithstanding anything to the contrary herein, the TMFE IP Assets shall be transferred to NXP consistent with Article III.B.6 of the Plan.

13.     *Indemnification of the TMFE Plan Administrator and the TMI Responsible Person*

The Indemnified Persons shall be held harmless and shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the TMFE Plan Administrator or the TMI Responsible Person, except those acts that are determined by Final Order to have arisen out of their own intentional fraud, willful misconduct or gross negligence, and each shall be entitled to be indemnified, held harmless, and reimbursed for fees and expenses including, without limitation, reasonable attorney's fees, which such Persons and Entities may incur or may become subject to or in connection with any action, suit, proceeding or investigation that is brought or threatened against such Persons or Entities in respect of that Person's or Entity's or the TMFE Plan Administrator's and the TMI Responsible Person's actions or inactions regarding the implementation or administration of this Plan, or the discharge of their duties hereunder, except

for any actions or inactions that are determined by Final Order to have arisen from intentional fraud, willful misconduct or gross negligence. Any Claim of the Indemnified Persons to be indemnified, held harmless, or reimbursed shall be satisfied solely from the TMI Assets or assets of TMFE (as applicable) except for the TMFE IP Assets, or any applicable insurance coverage. Each Indemnified Person shall be entitled to an advance of their reasonable attorneys' fees and other costs and expenses from TMFE or TMI (as applicable) incurred in connection with the defense of any action, suit, proceeding or investigation involving such Indemnified Person for which indemnity will or could be sought. In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to TMFE or TMI (as applicable) if it shall be determined by final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification pursuant to this Article. If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to TMFE or TMI (as applicable) (without interest) by the Indemnified Person. Notwithstanding the foregoing, the TMFE Plan Administrator and the TMI Responsible Person shall not be under any obligation to consult with their retained professionals, and their determination not to do so shall not result in the imposition of liability on the TMFE Plan Administrator or the TMI Responsible Person unless such determination is based on willful misconduct, gross negligence, or intentional fraud.

### 14. *Operations of the Debtors Between the Confirmation Date and the Effective Date*

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date. The retention and employment of the Professionals retained by the Debtors shall terminate as of the Effective Date, *provided*, *however*, that the Debtors shall exist, and their Professionals shall be retained, after such date with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order and (c) such other matters as may be determined by the Debtors or TMFE Plan Administrator, including without limitation, the filing and prosecuting of objections to Claims solely with respect to Claims against TMI and Administrative Claims against TMFE.

### 15. *Term of Injunctions or Stays*

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or section 97 of the Cayman Companies Law, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed and with respect to TMFE, until the Cayman Proceedings are concluded.

### 16. *The Committees*

Upon the Effective Date, the Creditors' Committee and the Equity Committee shall dissolve, and their members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Cases. The retention

and employment of the Professionals retained by the Creditors' Committee and the Equity Committee shall terminate as of the Effective Date, provided, however, that the Creditors' Committee and the Equity Committee shall exist, and their Professionals shall be retained, after such date with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order and (c) with respect to the Creditors Committee only, the filing and prosecuting of objections to Claims against TMFE and nothing herein shall be deemed to confer such standing under Cayman Companies Law.   For the avoidance of doubt, the Cayman Committee, appointed for the purpose of the official liquidation of TMFE, and its retention and employment of its professionals shall continue for the duration of the Cayman Proceedings.

## 17.   *Books and Records*

As part of the appointment of the TMI Responsible Person, to the extent not already transferred on the Effective Date, TMI shall transfer dominion and control over all books and records to the TMI Responsible Person in whatever form, manner or media, including, without limitation, the specific provision and presentation to the TMI Responsible Person of all passcodes for security systems and computers, keys, keycards and notice letters to landlords, warehousemen or other relevant parties.   TMI may abandon all other books and records of the TMI Estate on or after ninety (90) days from the Effective Date, *provided*, *however*, that the TMI Responsible Person shall not dispose or abandon any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party without further order of the Bankruptcy Court.   Pursuant to section 554 of the Bankruptcy Code, Article IV.Q of the Plan shall constitute motion and notice, so that no further notice or Bankruptcy Court filings are required to effectuate the aforementioned abandonment of the books and records of the TMI Estate.

As part of the appointment of the TMFE Plan Administrator, to the extent not already transferred on the Effective Date, TMFE shall transfer dominion and control over all books and records to the TMFE Plan Administrator in whatever form, manner or media, including, without limitation, the specific provision and presentation to the TMFE Plan Administrator of all passcodes for security systems and computers, keys, keycards and notice letters to landlords, warehousemen or other relevant parties.

## D.   PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

### 1.   *Voting of Claims*

Each holder of an Allowed Claim or Equity Interest in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article II and Article III of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

### 2.   *Distribution Dates*

Distributions to holders of Claims and Equity Interests shall be made as provided in Articles II and III of the Plan.   In the event that any payment or act under the Plan is required to

be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 3.    *Disbursing Agents*

All Distributions under the Plan by the TMFE Plan Administrator or the TMI Responsible Person shall be made by the TMFE Plan Administrator or the TMI Responsible Person as Disbursing Agent or such other entity designated by the TMFE Plan Administrator or the TMI Responsible Person as Disbursing Agent.

The Disbursing Agents shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform their duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent them with respect to their responsibilities and, (d) exercise such other powers as may be vested in the Disbursing Agents by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agents to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agents shall only be required to act and make Distributions in accordance with the terms of the Plan and shall have no (x) liability for actions taken in accordance with the Plan or in reliance upon information provided to them in accordance with the Plan or (y) obligation or liability for Distributions under the Plan to any party who does not hold an Allowed Claim at the time of Distribution or who does not otherwise comply with the terms of the Plan.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agents (including, without limitation, taxes and reasonable attorneys fees and expenses) on or after the Effective Date shall be paid in Cash by TMI and TMFE (as applicable) in the ordinary course of business.

### 4.    *Record Date for Distributions*

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date.  The Debtors, the TMFE Plan Administrator (subject to Order 18 r.19 of the Companies Winding Up Rules) and the TMI Responsible Person shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  In making any Distribution with respect to any Claim, the Debtors, the TMFE Plan Administrator (subject to Order 18 r.19 of the Companies Winding Up Rules) and the TMI Responsible Person shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that are known to the Debtors, the TMFE Plan Administrator or the TMI Responsible Person (as applicable) as of the Record Date.

5.      *Delivery of Distributions*

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Disbursing Agents at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Debtors or the TMFE Plan Administrator or the TMI Responsible Person have been notified in writing of a change of address; *provided, however*, that Distributions to holders of Equity Interests in TMI shall be issued through participants (including securities brokers and dealers, banks, trust companies, clearing corporations and other financial organizations) of the Depository Trust Company, as depositary.  For as long as the Depository Trust Company serves as depositary for TMI's Equity Interests, the TMI Responsible Person may rely solely on the information and records of the Depository Trust Company to make Distributions and forward communications to the holders of such Equity Interests, and, in doing so, the Debtors and the TMI Responsible Person shall be fully protected and incur no liability to any holder of the TMI Equity Interests, any transferee (or purported transferee) thereof, or any other Entity.

6.      *Undeliverable and Unclaimed Distributions*

In the event that any Distribution to any holder of an Allowed Claim against TMI is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder; *provided, however*, that all Distributions to holders of Allowed Claims against TMI under the Plan that are unclaimed for a period of one (1) year after Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in TMI and any entitlement of any holder of any Claims to such Distributions shall be extinguished and forever barred.  The TMI Responsible Person shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim may receive future Distributions on account of such Claim by contacting the TMI Responsible Person at some point prior to the final Distribution.

In the event that any Distribution to any holder of an Allowed Claim against TMFE is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder.  In the event the Distribution remains unclaimed upon the dissolution of TMFE, the unclaimed Distributions shall be held by the TMFE Plan Administrator on trust for the benefit of the claimant to whom such funds are owed.  To this end, the TMFE Plan Administrator will establish an interest bearing bank account into which all funds representing unclaimed Distributions shall be transferred.  At the end of one (1) year after the dissolution of TMFE, any monies still held on trust shall be transferred to the Financial Secretary of the Cayman Islands who shall manage them in accordance with Part VIII of the Cayman Islands Public Management and Finance Law (2010 Revision).

For the avoidance of doubt, the TMFE Plan Administrator and the TMI Responsible Person shall not be required to retain an outside investigator to determine the current address of any holders of an Allowed Claim whose Distribution is returned as undeliverable.

7. *__Manner of Cash Payments Under the Plan__*

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the TMFE Plan Administrator or TMI Responsible Person or by wire transfer from a domestic bank, at the option of the TMFE Plan Administrator or TMI Responsible Person.

8. *__Compliance with Tax Requirements__*

The TMFE Plan Administrator or TMI Responsible Person may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution on account of Claims against TMI or TMFE. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims against TMFE and TMI. The TMFE Plan Administrator and TMI Responsible Person shall be authorized to collect such tax information from the holders of Claims and Interests against TMFE (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan. In order to receive Distributions under the Plan, all holders of Claims and Equity Interests against TMI or TMFE will need to identify themselves to the TMFE Plan Administrator and TMI Responsible Person (as applicable) and provide tax information and the specifics of their holdings, to the extent the TMI Responsible Person and TMFE Plan Administrator deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder). The TMFE Plan Administrator and TMI Responsible Person may refuse to make a Distribution to any holder of a Claim or Equity Interest against TMI or TMFE that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a holder of a Claim or Equity Interest against TMI or TMFE, the TMFE Plan Administrator and TMI Responsible Person (as applicable) shall make such Distribution to which the holder of the Claim or Equity Interest against TMI or TMFE is entitled, without interest; and, *provided further* that, if the holder fails to comply with such a request within one (1) year, such Distribution shall be deemed an unclaimed Distribution, and, *provided further* that, if the TMFE Plan Administrator or TMI Responsible Person fails to withhold in respect of amounts received or distributable with respect to any such holder and such TMFE Plan Administrator or TMI Responsible Person is later held liable for the amount of such withholding, such holder shall reimburse such TMFE Plan Administrator or TMI Responsible Person for such liability.

9. *__No Payments of Fractional Dollars__*

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

10.    *__Interest on Claims__*

Except as specifically provided for in this Plan or the Confirmation Order or required by the Bankruptcy Code, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest on any Claim accruing on or after the Petition Date.  Interest shall not accrue on any General Unsecured Claim that is a Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim.  Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or similar charges.

11.    *__No Distribution in Excess of Allowed Amount of Claim__*

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

12.    *__Setoff and Recoupment__*

The TMFE Plan Administrator and TMI Responsible Person may setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that any of the Debtors or the Estates may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Estates of any right of setoff or recoupment that any of them may have against the holder of any Claim.  Any such setoffs or recoupments may be challenged in Bankruptcy Court or any other court with jurisdiction.

13.    *__De Minimis Distributions; Charitable Donation__*

Notwithstanding anything to the contrary therein, the TMFE Plan Administrator and the TMI Responsible Person shall not be required to make a Distribution to any Creditor if the dollar amount of the Distribution is less than $5 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution.  On or about the time that the final Distribution is made, the TMFE Plan Administrator or the TMI Responsible Person may make a charitable donation with undistributed funds if, in the reasonable judgment of such TMFE Plan Administrator or the TMI Responsible Person, the cost of calculating and making the final Distribution of the remaining funds is excessive in relation to the benefits to the or holders of Claims or Equity Interests against TMI or TMFE who would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtors, the TMI Responsible Person or the TMFE Plan Administrator.

14.    *__United States Trustee Fees__*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the TMFE Plan Administrator and the TMI Responsible Person shall pay any and all such fees payable by TMFE and TMI, respectively, when due and payable, and shall file with the Bankruptcy Court quarterly

reports for TMFE and TMI, respectively, in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

## E.    DISPUTED CLAIMS

### 1.    *Disputed Claim Reserves*

After the Effective Date, the Disputed Claims Reserve shall be managed by the TMI Responsible Person and TMFE Plan Administrator (as applicable) for the treatment of Disputed Claims and Disputed Equity Interests.  On each Distribution date after the Effective Date in which any of the TMI Responsible Person and/or the TMFE Plan Administrator makes Cash Distributions to holders of Claims or Equity Interests against TMI or TMFE, the TMI Responsible Person and/or the TMFE Plan Administrator (as applicable) shall retain on account of Disputed Claims an amount the TMFE Plan Administrator or TMI Responsible Person (as applicable) estimates is necessary to fund the Pro Rata Share of such Distributions to holders of Disputed Claims if such Claims were Allowed.  Cash retained on account of Disputed Claims shall be retained in the applicable Disputed Claims Reserve for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. If any Disputed Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained on account of such Disputed Claim, then the TMFE Plan Administrator or TMI Responsible Person (as applicable) shall within sixty (60) days after such disallowance or allowance return the assets that exceed the Allowed amount of such Claim to the TMI or the TMFE Estate (as applicable).

### 2.    *Resolution of Disputed Claims*

The TMFE Plan Administrator has adjudicated Claims asserted against TMFE in accordance with Cayman Islands Law and procedure.  However, as the assets of TMFE are located in the United States, the TMFE Plan Administrator will then make Distributions in accordance with the provisions of this Plan and the United States Bankruptcy Code, including without limitation, provisions relating to priority of Distribution.  Any appeals against the determination of the TMFE Plan Administrator shall be subject to the exclusive jurisdiction of the Cayman Court and any such appeals must be filed within twenty-one (21) days following notification by the TMFE Plan Administrator to such Creditor of its Claim adjudication.  The costs of the TMFE Plan Administrator shall be paid from the Estate of TMFE.

The TMI Responsible Person shall have the right to make and file objections to Claims against and Equity Interests in TMI in the Bankruptcy Court.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims or Equity Interests against TMI shall be subject to the exclusive jurisdiction of the Bankruptcy Court.  The costs of pursuing objections to Claims against and Equity Interest in TMI shall be paid from the TMI Assets.

3.      *__Objection Deadline__*

All objections to Disputed Claims against TMI or Disputed Equity Interests against TMI shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court and the Cayman Court after notice and a hearing.

4.      *__Estimation of Claims__*

At any time, TMI or the TMI Responsible Person may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether TMI or the TMI Responsible Person have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, TMI or the TMI Responsible Person may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

The TMFE Plan Administrator may estimate the value of any contingent, unliquidated or other Claim against TMFE which for any other reason does not bear a certain value regardless of whether TMFE has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The TMFE Plan Administrator may revise any estimate previously made, if the TMFE Plan Administrator reasonably believes such change is warranted as a result of a change in circumstances or to newly acquired information.  Upon the TMFE Plan Administrator estimating a Claim, the TMFE Plan Administrator shall provide reasonable notification to the holder of the Claim and the holder of the Claim may appeal to the Cayman Court to dispute the estimate of the TMFE Plan Administrator.  The TMFE Plan Administrator may also apply to the Cayman Court for directions with respect to any contingent or unliquidated Claims.

5.      *__No Distributions Pending Allowance__*

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.   Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim or Equity Interest been allowed on the Effective Date.

6.      *__Resolution of Claims__*

On and after the Effective Date, the TMFE Plan Administrator and the TMI Responsible Person shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims against the Estates of TMFE and TMI, respectively, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Claims relating to compensation of professionals in accordance with the laws of the Cayman Islands (as applicable), provided, however, that the TMFE Plan Administrator shall require the approval of the Cayman Court to compromise any Claims.

F.      **TREATMENT OF EXECUTORY CONTRACTS**

1.      *__Assumption or Rejection of Executory Contracts__*

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts that exist between the Debtors and any Person shall be deemed rejected by the Debtors as of immediately prior to the Confirmation Date, except for any executory contract (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court or the Cayman Court entered prior to the Confirmation Date, (ii) as to which a motion for approval of the assumption of such executory contract has been filed and served prior to the Confirmation Date, (iii) that is specifically designated as a contract to be assumed on Schedule 7.1 upon consent of the Equity Committee, which Schedule shall be contained in the Plan Supplement; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 7.1 to delete any executory contract therefrom, or no later than 20 days prior to the Confirmation Date, or add any executory contract, in which event such executory contract(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date.   The Debtors shall provide prompt notice of Schedule 7.1 and of any amendments to Schedule 7.1 to the parties to the executory contracts affected thereby.   The listing of a document on Schedule 7.1 shall not constitute an admission by the Debtors that such document is an executory contract or that the Debtors have any liability thereunder.

2.      *__Approval of Assumption or Rejection of Executory Contracts__*

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date and subject to the Debtors' right pursuant to Article VII.D. of the Plan to reject any executory contract that is subject to a dispute over a cure amount, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts assumed pursuant to Article VII.A. of the Plan, and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts rejected pursuant to Article VII.A. of the Plan.

3.      *__Inclusiveness__*

Unless otherwise specified on Schedule 7.1, each executory contract listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in

any manner affects such executory contract, without regard to whether such agreement, instrument or other document is listed on Schedule 7.1.

4.      *Cure of Defaults*

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract to be assumed pursuant to Article VII.A of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts to be assumed pursuant to Article VII.A of the Plan, an Assumption Notice, which shall list the cure amount as to each executory contract to be assumed.  The parties to such executory contracts to be assumed or assumed and assigned by the Debtors shall have twenty (20) days from the date of service of the Assumption Notice to file and serve any objection to assumption or the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court shall hear the objections at the Confirmation Hearing or on such other date as may be set by the Bankruptcy Court.  Notwithstanding Article VII.A of the Plan, the Debtors shall retain their rights to reject any of their executory contracts that are subject to a dispute concerning amounts necessary to cure any defaults through the Confirmation Date.

5.      *Claims Based on Rejection of Executory Contracts*

Claims created by the rejection of executory contracts pursuant to Article VII.A. of the Plan, or the expiration or termination of any executory contract after the entry of the Confirmation Order, but prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtors, the TMFE Plan Administrator and the TMI Responsible Person no later than thirty (30) days after service of notice of the Effective Date.  Any Claims arising from the rejection of an executory contract pursuant to Article VII.A. of the Plan for which proofs of Claim against TMI are not timely filed within that time period will be forever barred from assertion against the Debtors, the TMI Estate, the TMI Responsible Person, the TMFE Plan Administrator, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein and, in the case of Claims against TMFE, may be disallowed.  All such Claims against TMI (and with respect to TMFE, such Claims against TMFE as are disallowed) shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.F. of the Plan.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

6.      *Indemnification and Reimbursement*

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtors for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtors against any Claims, costs, liabilities or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws,

other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (i) paid only to the extent of any applicable insurance coverage, and (ii) to the extent a proof of Claim has been timely filed and is Allowed, treated as Allowed General Unsecured Claims to the extent such Claims are not covered by any applicable insurance, including deductibles.  Nothing contained herein shall affect the rights of directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtors, the TMI Responsible Person, the TMFE Plan Administrator or the Debtors' Estates to object to, seek to subordinate or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtors pursuant to this Article VII.F. or otherwise. Notwithstanding any other order of the Bankruptcy Court or anything in this Plan to the contrary, a liquidated, non-contingent proof of Claim for indemnification, defense, reimbursement, or limitation of liability of directors, officers, or employees of the Debtors may be asserted against TMFE or TMI at any time prior to the dissolution of TMI or TMFE; provided, however, that such Claims shall be subject to the TMI Responsible Person or the TMFE Plan Administrator's opportunity to object, contest, challenge, subordinate or dispute such Claims pursuant to the Plan.

###  7.  *D&O Insurance Policies*

No prepaid D&O Insurance Policy shall be cancelled, and the Debtors' directors, officers and employees who have valid claims against the D&O Insurance Policies for indemnification, defense, reimbursement, or limitation of liability may be paid from the D&O Insurance Policies to the extent of the coverage provided by the D&O Insurance Policies.  As such, and notwithstanding anything in the Plan to the contrary, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract providing for such is determined to be an executory contract, shall be deemed assumed by the Debtors.

###  8.  *Certain Insurance Policy Matters*

Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable or contractual rights and defenses, if any, of the insureds, the Debtors or any insurer with respect to any insurance policies or related agreements.  The rights and obligations of the insureds, the Debtors, the TMFE Plan Administrator, the TMI Responsible Person and insurers shall be determined under the insurance policies or related agreements, including all terms, conditions, limitations and exclusions thereof, which shall remain in full force and effect, and under applicable non-bankruptcy law.  Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way (i) limit a Debtor, the TMFE Plan Administrator, the TMI Responsible Person or their assignees from asserting a right or claim to the proceeds of any insurance policy that insures any such Debtor, was issued to any such Debtor or was transferred to the TMI Responsible Person or the TMFE Plan Administrator by operation of the Plan, nor (ii) limit any right of any other party to challenge such right or claim.

### G.    CONDITIONS PRECEDENT

#### 1.    *Conditions Precedent to the Confirmation Date*

The following are conditions precedent to the Confirmation Date that must be satisfied or waived:

a.    The aggregate amount of Allowed Claims in Class 2.A. is not in excess of $16,800,000 (or the amount as adjusted upward to account for the Stipulated Additional Allowed Claims).  Notwithstanding anything to the contrary herein, in the event that the aggregate amount of Allowed Claims in Class 2.A. is in excess of $16,800,000 (or the amount as adjusted upward to account for the Stipulated Additional Allowed Claims) and such condition to confirmation of the Plan is not waived or otherwise satisfied, the Debtors, Creditors' Committee and the Cayman Liquidators may continue to support an alternative plan of liquidation on terms and conditions comparable to the Plan, and the Equity Committee shall reserve all rights to object to the alternative plan of liquidation.

b.    The IRS Claim shall be resolved for no greater than $500,000 in Cash.

c.    The Confirmation Date shall be not later than December 15, 2012.

d.    The Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Creditors Committee, the Equity Committee and NXP.

The Debtors believe that each of these conditions will be met.

#### 2.    *Conditions Precedent to the Effective Date*

The following are conditions precedent to the Effective Date that must be satisfied or waived:

a.    The Effective Date shall be not later than December 31, 2012.

b.    The Bankruptcy Court shall have entered the Confirmation Order

c.    The Confirmation Order has become a Final Order, which such Confirmation Order shall contain full standard and customary releases provided by both TMI and TMFE as allowed by law.

d.    The Confirmation Order shall be in full force and effect.

e.    All agreements and instruments that are exhibits to the Plan or included in the Plan Supplement shall be in a form reasonably acceptable to the Debtors, the Creditors Committee and the Equity Committee and NXP, and have been duly executed and delivered; provided, however, that no party to any such agreements and instruments may unreasonably withhold its execution and delivery of such documents to prevent this condition precedent from occurring.

f.      The approval of the New Joint Protocol by the Bankruptcy Court and the Cayman Court.

g.      The appointment of the TMI Responsible Person and the TMFE Plan Administrator shall have been confirmed by order of the Bankruptcy Court.

**3.**      *Waiver*

Notwithstanding the foregoing conditions in Article VIII.A and B of the Plan, the Debtors, with the written consent of the Equity Committee and the Creditors Committee and NXP, reserve, in their sole discretion, the right to waive the occurrence of any condition precedent or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than the written consent of the Equity Committee and the Creditors Committee and proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**H.      INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS**

**1.**      *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Equity Interests.

**2.**      *Releases*

**Releases by the Debtors.  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties each of the Debtors shall be deemed to have provided a full and complete release to the Released Parties, and TMI shall be deemed to have provided a full and complete release of the JPLs and the Cayman Liquidators (and each such Released Party, the JPLs and the Cayman Liquidators, so released shall be deemed released and discharged by the Debtors) from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors would have been legally entitled to assert or that**

any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Chapter 11 Cases or the Plan; provided, however, that the foregoing provisions of Article IX.B.1 of the Plan shall not release or otherwise affect any objection that has been or may be filed against any Claim asserted by a Released Party (except for any Claim asserted by NXP related to its Equity Interests); provided, further, that the foregoing provisions of this Article IX.B.1 shall not operate to waive or release any Causes of Action of the Debtors against their non Debtor subsidiaries; provided, further, that the foregoing provisions of this Article IX.B.1 shall not operate to waive or release any Causes of Action accrued by the Debtors in the ordinary course of business against holders of General Unsecured Claims (other than NXP, but not with respect to Outstanding NXP Receivables); provided, further that the foregoing provisions of this Article IX.B.1 shall not operate to waive, extinguish or release any Intercompany Claims.

      **Releases by Holders of Claims and Equity Interests**.  Except as otherwise provided in Article IX.B of the Plan, each Person, other than either of the Debtors, who votes to accept the Plan and therefore affirmatively grant such release, shall be deemed to forever release and waive the Released Parties, the JPLs and the Cayman Liquidators of and from any and all Claims and Causes of Action relating to the Debtors, their subsidiaries or their Representatives existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise, provided, however that the foregoing provisions of this Article IX.B.2 shall not operate to waive, extinguish or release any Intercompany Claims.  On the Effective Date, each of NXP's, David Kerko's and Richard Clemmer's respective obligations under the 2004 Orders shall be deemed completely and finally satisfied and released.

      Notwithstanding anything to the contrary herein, the Debtors shall not provide any releases to NXP (and NXP shall not provide any such releases to the Debtors) for any claims or defenses, including, without limitation, claims seeking reimbursement, offset or contribution rights, concerning the Outstanding NXP Receivables.

      Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this Article IX.B pursuant to Bankruptcy Rule 9019 and its finding that they are:  (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by the Plan; (b) in the best interests of the Debtors and all holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or Releasing Parties asserting any Claim or Cause of Action thereby released.

      3.     *Exculpation*

      Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability relating to these Bankruptcy Cases to any

Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases; *provided*, *however*, that the foregoing provisions of this Article IX.C shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided*, *further*, that the foregoing provisions of this Article IX.C shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or any defenses thereto.

## 4. *Withdrawal and Release of Certain Claims*

Upon the Effective Date, the following Claims shall be deemed withdrawn with prejudice: (a) Claim No. 135 filed by NXP against TMFE, received by the Debtors' claims agent on July 12, 2012, in the amount of $270,500.00; (b) Claim No. 138 filed by NXP against TMI, received by the Debtors' claims agent on July 12, 2012, in the amount of $2,408,348.47; (c) Claim No. 136 filed by David Kerko against TMI, received by the Debtors' claims agent on July 12, 2012 and (d) Claim No. 154, filed by Richard Clemmer against TMI and received by the Debtors' claims agent on July 13, 2012.

## 5. *Preservation of Causes of Action*

a.    Vesting of Causes of Action

Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that TMI or its Estate may hold against any Entity shall remain with TMI on and after the Effective Date.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the TMI Responsible Person shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Causes of Action that were held by TMI or its Estate, in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

For the avoidance of doubt, any Causes of Action that TMFE or its Estate may hold against any Entity shall remain with TMFE on and after the Effective Date other than Outstanding NXP Receivables which shall be assigned to TMI to the extent necessary.

Notwithstanding anything to the contrary herein, on or before the Effective Date, any objection against Class 2.B Claims asserted by the Creditors Committee, whether in the form of a Claims objection or an adversary proceeding, shall be dismissed with prejudice.

b.    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors and/or their Estates expressly reserve such Cause of Action for later adjudication or administration by the TMI Responsible Person and the TMFE Plan Administrator (as applicable) (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in 0) or any other Final Order (including the Confirmation Order). In addition, the Debtors and their Estates expressly reserve the right of the TMI Responsible Person and the TMFE Plan Administrator (as applicable) to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits. Notwithstanding anything to the contrary herein, this Plan shall not waive, relinquish, release, compromise or settle, and the Debtors and/or their Estates expressly reserve any Cause of Action relating to (i) that certain Asset Purchase Agreement dated as of January 18, 2012 by and between Entropic Communications, Inc. as Purchaser and Trident Microsystems, Inc. and specified Trident Microsystems Subsidiaries as Sellers (as may be subsequently amended, restated or supplemented from time to time) and (ii) that certain Asset Purchase Agreement dated as of March 21, 2012 by and between Sigma Designs, Inc. as Purchaser and Trident Microsystems, Inc. and specified Trident Microsystems Subsidiaries as Sellers (as may be subsequently amended, restated or supplemented from time to time).

Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the TMI Responsible Person or the TMFE Plan Administrator (as applicable) subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors as disputed, contingent or unliquidated.

**6.    _Injunction_**

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of

or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Debtors in Possession, the Estates, their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests of any nature whatsoever, against the Debtors or any of their assets or properties.  On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby, from:

> (a) commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, their successors and assigns and their assets and properties;

> (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, their successors and assigns and their assets and properties;

> (c) creating, perfecting or enforcing any encumbrance of any kind against any Debtor or the property or estate of any Debtor;

> (d) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Debtor or against the property or estate of any Debtor, except to the extent a right to setoff, recoupment or subrogation is asserted with respect to a timely filed proof of claim; or

> (e) commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

**7.    _Releases of Liens_**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estates distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtors.

I.       **RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.       allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest against TMI, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests, *provided, however*, Disputed Claims against TMFE shall be subject to the jurisdiction of to the Cayman Court in accordance with Articles IV and VI of the Plan;

2.       grant, deny or otherwise resolve any and all applications of professionals or Persons retained in the Chapter 11 Cases by the Debtors or the Committees for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.       resolve any matters related to the assumption, assignment or rejection of any executory contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.       ensure that Distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

5.       decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the TMFE Plan Administrator and/or the TMI Responsible Person after the Effective Date, including with respect to any Outstanding NXP Receivables or any rights related to certain contractual rights of payment from Innovus Prime LLC or its affiliates related to intellectual property disputes or litigation, provided, however, that the Debtors and their Estates and, following the Effective Date, the TMI Responsible Person and the TMFE Plan Administrator, shall reserve the right to commence actions in all appropriate jurisdictions;

6.       enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

7.       resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.       issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.      enforce Article IX.A, Article IX.B, Article IX.C and Article IX.D. of the Plan;

10.     enforce the Injunction set forth in Article IX.E of the Plan;

11.     resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

12.     enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.     resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.     enter an order and/or the decree contemplated in Federal Rule of Bankruptcy Procedure 3022 concluding the Chapter 11 Cases.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Cayman Court shall, after the Effective Date, retain such jurisdiction over TMFE with respect to all matters related to the Cayman Proceeding, TMFE, the assets of TMFE and the Plan as is legally permissible and in accordance with this Plan, the Joint Protocol and the New Joint Protocol, including, without limitation, approval of the expenses of the TMFE Plan Administrator pursuant to the Plan.

## J.    MISCELLANEOUS PROVISIONS

### 1.      *Modification of Plan*

Subject to the limitations contained in the Plan: (1) the Debtors, with the consent of the Equity Committee, the Creditors Committee and NXP, reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; provided, however, that any pre-Confirmation amendments shall not materially or adversely affect the interests, rights or treatment of any Allowed Claims or Equity Interests under the Plan; and (2) after the entry of the Confirmation Order, the Debtors, the TMFE Plan Administrator or the TMI Responsible Person may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 2.      *Revocation of Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans, with the consent of the Creditors Committee, the Equity Committee and NXP.  If the Debtors revoke or withdraw the Plan or if

entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

### 3. *Binding Effect*

On the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, a Debtor and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

### 4. *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 5. *Governing Law*

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the principles of conflict of laws thereof.

### 6. *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

### 7. *Article 1146 Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

8.    *Section 1125(e) Good Faith Compliance*

Confirmation of the Plan shall act as a finding by the Court that the Debtors and each of their respective Representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

9.    *Further Assurances*

The Debtors, the TMFE Plan Administrator, the TMI Responsible Person, all holders of Claims and Equity Interests receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

10.    *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by first class U.S. mail, postage prepaid as follows:

To the Debtors:

**Trident Microsystems, Inc.**
5201 Great America Parkway, Suite 320
Santa Clara, CA 95054
Attn.:  David L. Teichmann

*with a copy to:*

**DLA Piper, LLP (US)**
203 N. LaSalle Street, Suite 1900
Chicago, Illinois  60601
Attn: Richard A. Chesley
Kimberly D. Newmarch
Chun I. Jang

and

**DLA Piper, LLP (US)**
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Attn:  Stuart M. Brown

11.    *Filing of Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

### 12.    *No Stay of Confirmation Order*

The Debtors shall request that the Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e) and 6004(h).

## ARTICLE VII.

## CERTAIN FACTORS AFFECTING THE DEBTORS

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.    *Risk of Non-Confirmation of the Joint Plan of Liquidation*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

### 2.    *Risk of Non-Confirmation of the New Joint Protocol*

Although the Debtors believe the New Joint Protocol will be approved by the Bankruptcy Court and the Cayman Court, there can be no assurance that the Bankruptcy Court and the Cayman Court will reach the same conclusion.  Unless the Bankruptcy Court and the Cayman Court approve the New Joint Protocol thereby permitting the Debtors and the Cayman Liquidators to implement the Plan, the Plan cannot become effective.

### 3.    *Non-Consensual Confirmation*

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired non-insider class from each Debtor has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes.  Because Class 3 (Equity Interests in TMFE) is deemed to reject the Plan, these requirements must be satisfied with respect to such Class at TMFE.  The Debtors believe that the Plan satisfies these requirements.

### 4.    *Risk of Delay in Confirmation of the Plan*

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.  In addition, as with any judicial proceeding, there are risks of unavoidable delay with a chapter 11 proceeding and there are risks of objections from certain stakeholders.  Any material delay in the confirmation of the Plan, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

5.      _Adjudication and Distribution by Cayman Liquidators_

In the event that the Plan is not confirmed with respect to TMFE, the Cayman Liquidators may seek to proceed with the adjudication of Claims against TMFE pursuant to Cayman laws and procedure in any event and with the distribution of TMFE's assets.  There is no requirement for a Plan to be in place in order for the Cayman Liquidators to do so as a matter of Cayman Islands law.

6.      _Termination of Plan Support Agreement_

The Plan Support Agreement, as described more fully in Article V.I.2 herein, contains certain conditions to effectiveness including, without limitation, that (i) the aggregate amount of Class 2.A Claims must not exceed $16,800,000 (or the amount as adjusted upward to account for the Stipulated Additional Allowed Claims); (ii) the IRS Claim shall be resolved for no greater than $500,000 in Cash; (iii) the Confirmation Date shall be not later than December 15, 2012; and (iv) the Effective Date shall be not later than December 31, 2012.  Although the Debtors believe that these and other conditions to effectiveness will be satisfied, in the event that they are not, the parties to the Plan Support Agreement may choose to terminate such agreement and, thus, the Plan would not be confirmable.   In such event, the Debtors would be required to formulate a new plan of liquidation, but doing so would add substantial expense, delay and uncertainty to the process.

B.      **ADDITIONAL FACTORS TO BE CONSIDERED**

1.      _The Debtors Have No Duty to Update_

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.      _No Representations Outside This Disclosure Statement Are Authorized_

No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.      _Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary_

Certain of the information contained in this Disclosure Statement is, by nature, forward looking and contains estimates and assumptions which might ultimately prove to be incorrect and projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and the projections and estimates

herein should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

**4.**      ***Debtors Could Withdraw the Plan***

Under the Plan, the Debtors could withdraw the Plan with respect to any Debtor and proceed with confirmation of the Plan with respect to the other Debtor.

**5.**      ***No Legal or Tax Advice Is Provided to You by This Disclosure Statement***

The contents of this Disclosure Statement should <u>not</u> be construed as legal, business or tax advice.  Each creditor or equity interest holder should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or equity interest.

This Disclosure Statement is <u>not</u> legal advice to you.  This Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**6.**      ***No Admission Made***

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

<div align="center">

**ARTICLE VIII.**

**<u>CONFIRMATION OF THE PLAN OF LIQUIDATION</u>**

</div>

**A.      CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of liquidation.  The Bankruptcy Court has scheduled the confirmation hearing for 1:00 p.m. (EST) on December 13, 2012.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtors' estate(s) or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served upon (a) counsel to the Debtors: DLA Piper LLP (US), 203 N. LaSalle Street, Suite 1900, Chicago, IL 60601 (Fax: 312-236-7516) (Attn: Richard A. Chesley, Esq. (richard.chesley@dlapiper.com)) and DLA Piper LLP (US), 919 N. Market Street, Suite 1500, Wilmington, DE 19801 (Fax: 302-394-2341) (Attn: Stuart M. Brown, Esq. (stuart.brown@dlapiper.com)); (b) counsel to the Official Committee of Unsecured Creditors:  Pachulski Stang Ziehl & Jones, LLP,  150 California Street, 15th Floor, San Francisco, California 94111 (Attn: John Fiero, Esq. (jfiero@pszjlaw.com)); (c) counsel to

the Statutory Committee of Equity Holders:  Proskauer Rose LLP, Eleven Times Square, New York, New        York 10036-8299        (Attn: Martin        J.        Bienenstock,        Esq. (mbienenstock@proskauer.com)); and (d) the Office of the United States Trustee: US Trustee, 844 King Street, Suite 2207, Lockbox #35, Wilmington, Delaware, 19899-0035 (Fax: 302-573-6497) (Attn:  Juliet Sarkessian, Esq. (Juliet.M.Sarkessian@usdoj.gov)), so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on November 26, 2012.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.      REQUIREMENTS FOR CONFIRMATION OF THE JOINT PLAN OF LIQUIDATION**

       **1.      _Requirements of Section 1129(a) of the Bankruptcy Code_**

       a.      General Requirements

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.      The Plan has been proposed in good faith and not by any means proscribed by law.

4.      Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.      The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

6.      With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the

Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

7.      Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims other than priority tax claims will be paid in full on the Effective Date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six years after the date of assessment of such claims, of a value, as of the Effective Date, equal to the allowed amount of such claims.

9.      At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

10.     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

11.     The Plan provides for the continuation after the Effective Date of payment of all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to subsection 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits, if any.

        b.      Best Interests Test

Each holder of a Claim or Equity Interest in an Impaired Class must either (i) accept the Plan or (ii) receive or retain under the Plan Cash or property of a value, as of the Effective Date of the Plan, that is not less than the value such holder of a Claim or Equity Interest would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  The Bankruptcy Court will determine whether the Cash and property issued under the Plan to each Class equals or exceeds the value that would be allocated to such holders of Claims or Equity Interests in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors believe the holders of Claims against and Equity Interests in the Debtors will have an equal or greater recovery as a result of the liquidation of the Debtors' assets as discussed herein and under the Plan than could be realized in a chapter 7 liquidation for the following reasons.

The Plan is a liquidating plan and, therefore, is not seeking to require Creditors to accept non-cash consideration so that the Estates could pursue going concern value.  Accordingly, the only question is whether the Creditors will have recovered more (or at least as much) under the Plan than they would recover through an asset liquidation by a chapter 7 trustee.

To determine the value that a holder of a Claim or Equity Interest in an Impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must

determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' assets if the Debtors' Chapter 11 Cases had been converted to a chapter 7 liquidation case and the Debtors' assets were liquidated by a chapter 7 trustee. The liquidation value would consist of the net proceeds from the disposition of the Debtors' assets, augmented by Cash held by the Debtors and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 reorganization case.

As explained below, the liquidation value available for satisfaction of Claims and Equity Interests in the Debtors would be reduced by: (a) the costs, fees and expenses of the liquidation under chapter 7, which would include disposition expenses and the compensation of a trustee and his or her counsel and other professionals retained, (b) the fees of the chapter 7 trustee and (c) certain other costs arising from conversion of the Chapter 11 Cases to chapter 7. Furthermore, the Plan is premised on coordination with the Cayman Liquidators for the liquidation and distribution of the assets of TMFE. Conversion to chapter 7 would likely cause additional delay and confusion on the role of a chapter 7 trustee with respect to TMFE.

The Debtors believe that Creditors have and will continue to clearly benefit from the liquidation by the Debtors. Had the assets been liquidated by a chapter 7 trustee, the Debtors project that the maximum recovery would have been substantially less. The Debtors have realized a greater return than a chapter 7 trustee would have obtained on the sale of their assets, specifically due to the Debtors' familiarity with the assets, the ability to retain employees that were essential to such sales, and their ability to negotiate the highest and best price for the sale thereof. The Debtors have already reduced the significant majority of their assets to Cash through auction or private sales approved by the Bankruptcy Court. Therefore, the Debtors have already established systems and protocols for the efficient disposition of the assets of the Estates and are in the process of liquidating their limited remaining assets.

In addition, converting the Chapter 11 Cases to a chapter 7 liquidation at this stage of the winddown would result in an immense waste of the Debtors' resources that were already expended in connection with the sale of the assets and would delay converting the remaining assets to Cash. It would also result in substantial additional claims against the Estates.

Moreover, under the Plan, the Debtors will avoid the increased costs and expenses of a chapter 7 liquidation, including the fees payable to a chapter 7 trustee and his or her professionals. Although the Debtors have already incurred many of the expenses associated with generating the proceeds, the Cash to be distributed to Creditors would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee. Bankruptcy Code section 326(a) permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors.[5] The chapter 7 trustee's professionals, including legal counsel and accountants, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims against the

---

[5]    Bankruptcy Code § 326(a) permits a chapter 7 trustee to receive 25% of the first $5,000 distributed to creditors, 10% of additional amounts up to $50,000, 5% of additional distributions up to $1 million and reasonable compensation up to 3% of distributions in excess of $1 million.

Debtors.   Moreover, these chapter 7 trustee fees would reduce the assets available for distribution to the Estates' Creditors from additional recoveries such as preferential payments, expunged administrative claims and the proceeds of successful Estate litigation or settlement.   In contrast, the TMI Responsible Person and the TMFE Plan Administrator will be highly familiar with the Debtors' operations and the issues pertaining thereto and, therefore, the Estates will avoid the significant administrative burden associated with the familiarization process of a chapter 7 trustee and his or her legal and accounting professionals.

It is also anticipated that a chapter 7 liquidation would result in a significant delay in payments being made to creditors. Bankruptcy Rule 3002(c) provides that conversion of chapter 11 cases to chapter 7 will trigger a new bar date for filing claims against the Estates, and that the new bar date will be more than 90 days after the chapter 11 cases convert.   Not only would a chapter 7 liquidation delay distribution to creditors, but it is possible that additional claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Estates. The Debtors have received and are analyzing late-filed claims and may file claims objections in the near future.   Reopening the bar date in connection with conversion to chapter 7 would provide these and other claimants an additional opportunity to timely file claims against the Estates.   Moreover, the Debtors would lose the benefit of having an established Administrative Claims Bar Date.

The above analysis does not consider the potential impact of conversion of the cases to ones under chapter 7.  Specifically, the conversion to chapter 7 would terminate the Plan Support Agreement that serves as the basis for the consensual agreement embodied in the Plan.  In that event, extensive litigation would arise, likely in the United States and Cayman Islands, regarding the amount and priority of the Intercompany Claim asserted by TMI against TMFE.   The professional fees relating to this litigation would likely exceed $5 million.   Additionally, the ultimate result of this litigation, which would likely require more than 12 months to complete, could materially modify the amount and classification of the Intercompany Claim of TMI and the recovery to TMFE third-party unsecured creditors.

Attached hereto as Exhibit D is the Debtors' liquidation analysis and recovery summary.

For the reasons set forth above and in the liquidation analysis set forth on Exhibit D, the Debtors believe that the Plan provides a superior recovery for holders of Claims and Equity Interests, and the Plan meets the requirements of the Best Interest Test.

c.        Feasibility

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder.  The Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

**2.      _Requirements of Section 1129(b) of the Bankruptcy Code_**

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.  If the Debtors seek a cramdown under section 1129(b) of the Bankruptcy Code, the factors listed below must be with respect to each Debtor.

_No Unfair Discrimination_.  This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

_Fair and Equitable Test_.  This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

_Unsecured Claims_.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

_Equity Interests_.  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement, notwithstanding that Class 3 will likely receive no Distribution, because as to such Classes, there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the claims or equity interests in such class.

**ARTICLE IX.**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE JOINT PLAN OF LIQUIDATION**

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

**A.      LIQUIDATION UNDER CHAPTER 7**

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by

the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations. Furthermore, as explained above, the Plan is premised on coordination with the Cayman Liquidators for the liquidation and distribution of the assets of TMFE. Conversion to chapter 7 would likely cause additional delay and confusion on the role of a chapter 7 trustee with respect to TMFE.

Additional information relating to a chapter 7 liquidation can be found in Article VIII.B.1.b herein, and also in the liquidation analysis attached as <u>Exhibit D</u> hereto.

## B.    ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different chapter 11 plan of reorganization. Such a plan of reorganization might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets under chapter 11. With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances.

<div align="center">

**ARTICLE X.**

**<u>CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN</u>**

</div>

The following is a summary of certain U.S. federal income tax consequences of the Plan to certain holders of Claims and Equity Interests. This summary is based on the Internal Revenue Code of 1986, as amended (the "<u>Tax Code</u>"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. Events occurring after the date of the Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences described herein. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims or Equity Interests that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business

investment companies, employees, persons who receive their Claims or Equity Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Equity Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

For purposes of this summary, a "U.S. Holder" means a holder of Claims or Equity Interests that, in any case, is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust (x) if a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust or (y) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

A "Non-US. Holder" means a holder of Claims that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds Claims, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the entity's ownership or disposition of Claims.

The U.S. federal income tax consequences of the Plan are complex. The following summary is for information purposes only and is not a substitute for careful tax planning and advice based on the particular circumstances of each holder of a Claim or Equity Interest. Each holder of a Claim or Equity Interest is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, upon implementation of the Plan.  The U.S. federal income tax consequences are only described below with respect to TMI.  TMFE is an exempt Cayman entity and, therefore, there are no U.S. federal tax consequences with respect to TMFE.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. THE TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING

ATTACHMENTS) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR

**A.    GENERAL CONSEQUENCES TO U.S. HOLDERS OF CLAIMS AND EQUITY INTERESTS**

**1.    _Realization and Recognition of Gain or Loss, In General_**

The federal income tax consequences of the implementation of the Plan to a U.S. Holder of a Claim or Equity Interest will depend, among other things, upon the origin of the holder's Claim, when the holder receives payment in respect of such Claim or Equity Interest, whether the U.S. Holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Claim at a discount, and whether the U.S. Holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Equity Interest. A U.S. Holder of an Equity Interest should consult its tax advisor regarding the timing and amount of any potential worthless stock loss.

Generally, a U.S. Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the U.S. Holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, see section X.A.3 — "Allocation of Consideration to Interest" below.

When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the U.S. Holder and has been held for more than one year. Each U.S. Holder of an Allowed Claim or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

**2.    _Holders of Claims in All Classes Except Class 3_**

Except for Class 3, the Plan provides, in certain circumstances, for a distribution of Cash, as distributed from time to time (but in no instance to exceed the amount of the Allowed Claim) to each Allowed Claim against the Debtors. A U.S. Holder of an Allowed Claim in the foregoing Classes generally will realize gain or loss in an amount equal to the difference, if any, between (a) the amount of Cash and the fair market value of any other property received in the exchange (other than amounts allocable to accrued but unpaid interest) and (b) the U.S. Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). It is possible that any loss, or a portion of any gain, realized by a holder of a Claim may have to be deferred until all of the distributions to such holder are received.

As discussed in the next section, the amount of Cash or other property received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a U.S. Holder under such holder's method of tax accounting.

### 3.    *Allocation of Consideration to Interest*

All distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim). However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent any amount received by a U.S. Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each U.S. Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### 4.    *Market Discount*

A U.S. Holder will be considered to have acquired a Claim at a market discount if its tax basis in the Claim immediately after acquisition is less than the sum of all amounts payable thereon (other than payments of qualified stated interest, as defined in the Tax Code) after the acquisition date, subject to a statutorily-defined "de minimis" exception. Market discount generally accrues on a straight line basis from the acquisition date over the remaining term of the obligation or, at the U.S. Holder's election, under a constant yield method. A U.S. Holder that acquired a Claim at a market discount previously may have elected to include the market discount in income as it accrued over the term of the Claim.

A U.S. Holder that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income (instead of capital gain) to the extent of accrued market discount not previously included in gross income by the holder.

### 5.    *Bad Debt Deduction and Worthless Securities Deduction*

A U.S. Holder of an Allowed Claim that is not a security for purposes of section 165(g) of the Tax Code who receives, pursuant to the Plan, an amount less than such holder's tax basis in that Allowed Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction under section 166(a) of the Tax Code or may be entitled to a loss under section 165(a) in the year of receipt. A U.S. Holder of a security, the Allowed Claim with respect to which is wholly worthless, may be entitled to a worthless securities deduction under sections 165(g) and 165(a) of the Tax Code. A worthless securities deduction is generally treated as a loss from the sale or exchange of a capital asset. U.S. Holders should consult their own tax advisers as to the appropriate tax year in which to claim a worthless securities deduction. The rules governing the timing and amount of deductions place considerable emphasis on the facts and circumstances of

the holder, the obligor and the instrument with respect to which a loss or deduction is claimed. Such loss or deduction would be limited to the U.S. Holder's adjusted tax basis in the indebtedness underlying its Allowed Claim. U.S. Holders of Allowed Claims are urged to consult their own tax advisors with respect to their ability to take any loss or deduction described above.

### 6.    *Limitation on Use of Capital Losses*

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan or as a result of a deduction described in the preceding paragraph will be subject to limits on the use of such capital losses. For a non-corporate holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year, but may carry over unused capital losses for the five years following the capital loss year

## B.    INFORMATION REPORTING AND WITHHOLDING

Distributions under the Plan are subject to applicable tax reporting and withholding. Under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at then applicable rates (currently 28%). Backup withholding generally applies if the U.S. Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN it provided is correct and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax, provided the required information is timely provided to the IRS. Certain persons are exempt from backup withholding, including, in most circumstances, corporations and financial institutions.

Treasury Regulations generally require a taxpayer to disclose certain transactions on its federal income tax return, including, among others, certain transactions that result in a taxpayer claiming a loss in excess of a specified threshold. Holders are urged to consult their tax advisors as to whether the transactions contemplated by the Plan would be subject to these or other disclosure or information reporting requirements. The foregoing summary is provided for informational purposes only. U.S. Holders of Claims are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences of the Plan.

C.    **GENERAL CONSEQUENCES TO NON-U.S. HOLDERS OF CLAIMS AND EQUITY INTERESTS**

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. Each Non-U.S. Holder should consult with its own tax advisor to determine the effect of U.S. federal, state, local and foreign income tax laws, as well as treaties, with regard to its participation in the transactions contemplated by the Plan, and its ownership of Claims. .

1.    *Tax Consequences to Non-U.S. Holders Under the Plan*

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to the receipt of Cash under the Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met. Non-U.S. Holders should discuss the applicability of these rules with their tax advisors.

## ARTICLE XI.

## DEFINITIONS AND INTERPRETATION

A.    **DEFINITIONS**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*505 Motion*" means a motion filed by TMI in the Chapter 11 Cases pursuant to section 505(b) of the Bankruptcy Code requesting an expedited determination of any unpaid tax liability of TMI or its Estate, as determined under applicable tax laws.

2.    "*2004 Motion*" has the meaning set forth in Article V.

3.    "*2004 Orders*" means, collectively, (i) Agreed Order Granting in Part Motion of Statutory Committee of Equity Security Holders for Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Examination of (I) NXP B.V., (II) NXP Semiconductors Netherlands B.V. and (III) NXP-Appointed Directors and in the Alternative Pursuant to 11 U.S.C. § 105(a) And Hague Convention for Authority to Issue Letters of Request for International Judicial Assistance, entered by the Bankruptcy Court on May 25, 2012 [D.I. 631] and (ii) Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004.1 Directing the Examination of Debtors' Former Director David Kerko and KKR & Co. L.P., entered by the Bankruptcy Court on August 20, 2012 [D.I. 887].

4.    "*Accrued Professional Compensation*" means, at any given moment, all accrued and/or unpaid fees and expenses (including, without limitation, fees or expenses allowed or awarded by a Final Order of the Bankruptcy Court, the Cayman Court or any other court of competent jurisdiction) for legal, financial advisory, accounting, liquidation and other professional services and reimbursement of expenses of such professionals that are awardable

and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code or section 109 or 104(5) of the Cayman Companies Law, or otherwise rendered prior to the Effective Date, or thereafter including in connection with (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code; (b) motions seeking the enforcement of the provisions of the Plan or Confirmation Order, by all Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not previously been paid regardless of whether a fee application has been filed for any such amount; and (c) applications for allowance of Administrative Expenses arising under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(6) of the Bankruptcy Code.  To the extent the Bankruptcy Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Accrued Professional Compensation.

5.      "*Administrative Claims*" means Claims that have been timely filed before the Administrative Claims Bar Date, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises).  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Article V.N. of the Plan.  Notwithstanding anything to the contrary herein, the filing of an Administrative Claim shall not be required in order to receive payment for any tax liability described in sections 503(b)(1)(B) and (C) in accordance with section 503(b)(1)(D) of the Bankruptcy Code.

6.      "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days after the Effective Date and is the deadline for a holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Claim in the manner indicated in Article II of the Plan.

7.      "*Affiliate*" means an (a) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; (b) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; (c) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or (d) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

8.      "*Allowed*" means, with respect to any Claim or Equity Interest against a Debtor, except as otherwise provided herein:  (a) a Claim or Equity Interest that has been scheduled by the Debtors in their Schedules filed in the Chapter 11 Cases as other than disputed, contingent or unliquidated and as to which the Debtors or other parties-in-interest have not filed an objection by the Claims Objection Bar Date (in respect of Claims or Equity Interests against TMI only); (b) a Claim or Equity Interest filed in the Chapter 11 Cases and that either is not Disputed or has been allowed by a Final Order; (c) a Claim or Equity Interest, either scheduled or the subject of a proof of claim, against TMFE only that is not rejected by the TMFE Plan Administrator and/or the Cayman Court and that is not the subject of an appeal or an application to expunge in the Cayman Proceedings; or (d) a Claim or Equity Interest that is allowed:  (i) in any stipulation of amount and nature of Claim executed prior to the entry of the Confirmation Order and approved by the Bankruptcy Court; (ii) in any stipulation with Debtors of amount and nature of Claim or Equity Interest executed on or after the entry of the Confirmation Order; or (iii) in or pursuant to any contract, instrument or other agreement entered into or assumed in connection herewith; or (d) a Claim or Equity Interest that is allowed pursuant to the terms of the Plan.

9.      "*Analog Business*" has the meaning set forth in Article V.

10.      "*Assumption Notice*" means notice provided to counterparties of executory contracts to be assumed pursuant to Article VII of the Plan.

11.      "*Audio Business*" has the meaning set forth in Article V.

12.      "*Ballot*" has the meaning set forth in Article I.

13.      "*Bankruptcy Cod*e" means Articles 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

14.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

15.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the U.S. Bankruptcy Court for the District of Delaware, the Local Rules of Civil Practice and Procedure of the U.S. District Court for the District of Delaware, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Cases and as amended from time to time.

16.      "*Bar Date*" means July 13, 2012 as the bar date for filing proofs of claim, with only those exceptions permitted by the Bar Date Order.

17.      "*Bar Date Order*" means that certain order of the Bankruptcy Court dated as of June 8, 2012, establishing July 13, 2012 as the general bar date for filing proofs of claim, with only those exceptions permitted thereby.

18.      "*Beneficiaries*" means holders of Allowed Claims and Equity Interests entitled to receive Distributions from the Debtors under the Plan, whether or not such Claims or Equity Interests were Allowed Claims or Allowed Equity Interests on the Effective Date.

19.     "*Books and Records*" means, with respect to a particular Debtor or the Debtors, all books and records of such Debtor(s), including, without limitation, all documents and communications of any kind, whether physical or electronic.

20.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Federal Rules of Bankruptcy Procedure 9006(a)).

21.     "*Cambridge*" means Cambridge Silicon Radio Limited.

22.     "*Cash*" means cash and cash equivalents in certified or immediately available funds, including but not limited to bank deposits, checks and similar items.

23.     "*Causes of Action*" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims (including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code) against any Person or Entity, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date.

24.     "*Cayman Committee*" means the official committee of creditors anticipated to be appointed in the Cayman Proceedings on September 25, 2012.

25.     "*Cayman Companies Law*" means the Companies Law (2011 Revision) of the Cayman Islands.

26.     "*Cayman Court*" means the Grand Court of the Cayman Islands.

27.     "*Cayman Liquidators*" means Eleanor Fisher and Gordon MacRae of Zolfo Cooper (Cayman) Limited, as the official liquidator(s) of TMFE appointed in the Cayman Proceedings.

28.     "*Cayman Proceedings*" means the insolvency proceedings of TMFE commenced in the Cayman Court on January 4, 2012, Cause No. FSD 1 of 2012.

29.     "*Cayman Provisional Committee*" means the committee of creditors appointed in the provisional liquidation proceedings of TMFE which such committee was discharged on the commencement of the official liquidation on August 8, 2012 for all purposes except for the purpose of approving the fees of the JPLs.

30.     "*Chapter 11 Cases*" means the chapter 11 cases commenced when the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date and with the following case numbers:  12-10069 (CSS), and 12-10070 (CSS), which are jointly administered under case number 12-10069 (CSS).

31.    "*Claim*" means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

32.    "*Claims Agent*" means Kurtzman Carson Consultants LLC, the Bankruptcy Court appointed claims, noticing and balloting agent in these jointly administered Chapter 11 Cases.

33.    "*Claims Objection Bar Date*" means the bar date for objecting to proofs of claim at TMI only, which shall be one hundred twenty (120) days after the Effective Date; *provided*, *however*, that the Debtors, the TMFE Plan Administrator or the TMI Responsible Person may seek additional extensions of this date from the Bankruptcy Court.  A party requesting to extend the Claims Objection Bar Date may specify which entities may benefit from such an extension.

34.    "*Class*" means a category of holders of Claims or Equity Interests as set forth in Article III of the Plan and pursuant to section 1122(a) of the Bankruptcy Code.

35.    "*Committees*" means, collectively, the Cayman Committee, the Creditors' Committee and the Equity Committee.

36.    "*Company*" means TMI and all of its Debtor and non-Debtor subsidiaries.

37.    "*Companies Winding Up Rules*" means the Cayman Islands Companies Winding Up Rules 2008 (as amended).

38.    "*Confirmation Date*" means the date on which the Confirmation Order is entered by the Bankruptcy Court; provided, however, that in no event shall the Confirmation Date be later than December 15, 2012 unless such condition is otherwise waived pursuant to Article VIII.C of the Plan.

39.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code in form and substance satisfactory to the Creditors Committee, Equity Committee and the Cayman Liquidators.

40.    "*Creditor*" shall have the meaning in Bankruptcy Code § 101(10).

41.    "*Creditors Committee*" means the Official Committee of Unsecured Creditors in the case of TMFE appointed by the U.S. Trustee.

42.    "*D&O Insurance Policies*" means all primary and excess insurance policies of the Debtors that provide for, among other things, coverage for liability related to the actions or omissions of the Debtors' directors or officers.

43.    "*Debtor Intercompany Agreements*" has the meaning set forth in Article III.

44.    "*Debtors*" means TMI and TMFE and, where applicable, the Estates thereof.

45.    "*Demod Business*" has the meaning set forth in Article V.

46.    "*Disbursing Agent*" means the person or entity empowered and authorized to make all Distributions pursuant to Article V.C of the Plan.

47.    "*Disclosure Statement*" means this *Disclosure Statement for the Debtors' Second Amended Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code*, dated October 22, 2012, prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law, and approved by the Bankruptcy Court, as it is amended, supplemented or modified from time to time, and approved by the Bankruptcy Court.

48.    "*Disclosure Statement Order*" has the meaning set forth in Article I.

49.    "*Disputed*" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest:  (a) listed on the Schedules as unliquidated, disputed or contingent, unless a proof of Claim has been filed in a liquidated, non-contingent amount; (b) as to which a Debtor, the TMFE Plan Administrator, the TMI Responsible Person or any other party in interest, including, without limitation, the Equity Committee and the Creditors Committee, has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or a request for a sanction order, an order for directions or an expungement order from the Cayman Court; (c) as to which the TMFE Plan Administrator  has determined shall not be Allowed or not Allowed in full or (d) as otherwise disputed in accordance with applicable bankruptcy or insolvency law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; *provided*, *however*, that for purposes of Distributions under the Plan, the TMI Responsible Person and the TMFE Plan Administrator shall have the power, up to and including the Claims Objection Bar Date (with such time limit being in respect of Claims at TMI only), to determine a Claim to be Disputed upon review of the claims register and the books and records and may cause the amendment of the Schedules to reflect any such determination.

50.    "*Disputed Claims Reserve*" means the reserve funds created pursuant to Article VI.A. of the Plan.

51.    "*Distributions*" means the distributions of Cash to be made in accordance with the Plan.

52.    "*Effective Date*" means a Business Day selected by the Debtors that is on or after the date by which all conditions precedent specified in Article VIII of the Plan have been satisfied or waived; *provided*, *however*, that the Effective Date shall not be later than December 31, 2012 unless such condition is otherwise waived pursuant to Article VIII.C of the Plan. Within five (5) Business Days of the Effective Date, notice of the Effective Date shall be filed in the Bankruptcy Court and the Cayman Court.

53.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

54.    "*Entropic*" means Entropic Communications, Inc.

55. "*Equity Committee*" shall mean the Statutory Committee of Equity Security Holders of Trident Microsystems, Inc. appointed by the U.S. Trustee.

56. "*Equity Interest*" means any equity interest in a Debtor that existed immediately prior to the Petition Date.

57. "*Estates*" means the TMI and TMFE estates created pursuant to section 541 of the Bankruptcy Code upon the filing of the Chapter 11 Cases.

58. "*Exculpated Parties*" means, collectively, the Debtors, the Cayman Liquidators, the JPLs, the Committees, and the individual members thereof, the TMFE Plan Administrator, the TMI Responsible Person, and each of their current and former respective Representatives (each of the foregoing in its individual capacity as such including, without limitation, former officers and directors of the Debtors appointed by NXP) and NXP, together with NXP's current and former Representatives and Professionals.

59. "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

60. "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to file an appeal, motion for reconsideration or rehearing, or request for a stay has expired.

61. "*Foreign Subsidiaries*" has the meaning set forth in Article III.

62. "*General Bar Date*" means 5:00 p.m. prevailing Eastern Time on July 13, 2012 as established in the Bar Date Order.

63. "*General Unsecured Claims*" means Claims against any Debtor that are not Administrative Claims, Secured Claims, Priority Tax Claims, Other Priority Claims, or Equity Interests.

64. "*HR*" has the meaning set forth in Article III.

65. "*Impaired*" means "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

66. "*Indemnified Persons*" means the TMFE Plan Administrator and the TMI Responsible Person and the individuals comprising the TMFE Plan Administrator and the TMI Responsible Person, and the TMFE Plan Administrator's and the TMI Responsible Person's employees, officers, directors, agents, Representatives, and Professionals, as the case may be.

67. "*Initial Distribution Date*" means (a) the date that is as soon as practicable on or after the Effective Date, when Distributions under the Plan shall commence to holders of Allowed Claims and Allowed Equity Interests in all Classes other than Class 2.B. and (b) with respect to Distributions to Class 2.B., the date that is as soon as practicable after the Effective Date and after appropriate reserves have been established in accordance with Article III hereof,

including, without limitation, reserves on account of the Disputed Claims Reserve, Administrative Claims, and sufficient funds necessary for the TMFE Plan Administrator and TMI Responsible Person (as applicable) to carry out their respective duties.

68.     "*Intercompany Agreements*" has the meaning set forth in Article III.

69.     "*Intercompany Claims*" means Claims held by a Debtor or Affiliate of the Debtors against another Debtor or Affiliate of the Debtors.

70.     "IRS Claim" means the Debtors' liability to the Internal Revenue Service, including but not limited to, any Claim for proposed adjustments as described in the Notice of Proposed Adjustments, dated March 23, 2012 (as amended on or about May 17, 2012, and as further amended) and the Proof of Claim filed by the Internal Revenue Service on or about January 31, 2012 (as amended on or about September 6, 2012, and as further amended).

71.     "*IRS Notice*" has the meaning set forth in Article V.

72.     "*IT*" has the meaning set forth in Article III.

73.     "*Joint Protocol*" means the Cross-Border Insolvency Protocol Stipulation Regarding Trident Microsystems, Inc, and Trident Microsystems (Far East) Ltd. (in official liquidation) (as it may be amended) as approved by the Bankruptcy Court and the Cayman Court on September 12, 2012.

74.     "*Joint Provisional Liquidation Protocol*" means the Cross-Border Insolvency Protocol Stipulation Regarding Trident Microsystems, Inc, and Trident Microsystems (Far East) Ltd. and the JPLs (as amended) as approved by the Bankruptcy Court and the Cayman Court in the provisional liquidation of TMFE on January 25, 2012 as amended and restated on June 8, 2012.

75.     "*JPLs*" means the provisional liquidators appointed in the Cayman Proceedings.

76.     "*KCC*" means Kurtzman Carson Consultants LLC, the Debtors' claims and noticing agent.

77.     "*KEIP*" has the meaning set forth in Article V.

78.     "*Lien*" shall mean any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt or litigation.

79.     "*MSA*" has the meaning set forth in Article III.

80.     "*New Joint Protocol*" means the Cross-Border Insolvency Protocol Stipulation proposed to be implemented between the Debtors, the Cayman Liquidators and Mr. Andrew Hinkelman and the Cayman Liquidators in substantially the form attached as Exhibit C to the Disclosure Statement, and as is ultimately approved by the Bankruptcy Court and the Cayman Court that will become effective on the Effective Date, which, among other things, will set out

processes pursuant to which (a) Claims against TMFE were adjudicated by the Cayman Liquidators in accordance with Cayman Islands Law and (b) the Cayman Liquidators will make Distributions pursuant to the Plan in accordance with, and subject to the priorities of, United States Bankruptcy Law.

81.    "*Non-Debtor Intercompany Agreements*" has the meaning set forth in Article III.

82.    "*NXP*" means NXP B.V., NXP Semiconductors Netherlands B.V. and any Affiliate or Representative of NXP B.V. or NXP Semiconductors Netherlands B.V.  TMI and TMFE shall not be considered an Affiliate of NXP for purposes of this definition.

83.    "*Other Priority Claims*" means Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims.

84.    "*Outstanding NXP Receivables*" means any claims or defenses against NXP arising from payment of (or failure to pay) post-petition invoices and other accounts receivable, including, without limitation, any such reimbursement or offset rights relating to any claims asserted by Cadence Design Systems, Inc. or its affiliates.

85.    "*Person*" means an individual, partnership, corporation, limited liability company, cooperative, trust, estate, unincorporated organization, association, joint venture, government unit or agency or political subdivision thereof or any other form of legal entity or enterprise.

86.    "*Petition Date*" means January 4, 2012, the date on which the Debtors filed the Chapter 11 Cases.

87.    "*Plan*" means the Debtors' Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code including exhibits and supplements, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code or the Bankruptcy Rules.

88.    "*Plan Supplement*" means the supplement(s) to the Plan containing certain documents relevant to the implementation of the Plan.

89.    "*Plan Support Agreement*" means the Plan Support Agreement, dated as of September 12, 2012, by and among (i) TMI and TMFE, (ii) the Cayman Liquidators, (iii) the Creditors Committee and (iv) the Equity Committee.

90.    "*Priority Tax Claims*" means Claims of governmental units of the kind specified in section 507(a)(8) of the Bankruptcy Code.

91.    "*Privileges*" means the right to assert or waive any privilege, including, but not limited to, any attorney-client privilege, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written, electronic or oral), and rights to direct current or former agents, attorneys, advisors and other professionals of such Debtor(s) to deliver such documents or communications.

92.     "*Pro Rata*" shall mean the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims (including Disputed Claims, but excluding disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

93.     "*Professionals*" means any Person employed pursuant to a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to and including the Effective Date pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.

94.     "*PWC*" means PricewaterhouseCoopers LLP.

95.     "*Record Date*" means the date that the Disclosure Statement is approved by the Bankruptcy Court.

96.     "*Released Parties*" means, collectively, the Debtors, the Committees and each of their respective members and current and former Representatives and Professionals (each of the foregoing in its individual capacity as such and including, without limitation, former officers and directors of the Debtors appointed by NXP) and NXP, together with NXP's current and former Representatives and Professionals.

97.     "*Representatives*" means, with regard to an Entity (including the Debtors), any current or former officers, directors, employees, attorneys, Professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, independent contractors, members and professionals).

98.     "*Resolution Event*" has the meaning set forth in Article I.

99.     "*R&D*" has the meaning set forth in Article III.

100.    "*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

101.    "*Secured Claims*" means Claim(s) against the Debtors that are secured by a Lien on property in which the Estates have an interest, which Liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

102.    "*Sigma*" means Sigma Designs, Inc.

103.    "*SoC*" has the meaning set forth in Article III.

104.    "*STB Business*" has the meaning set forth in Article III.

105.    "*Stipulated Additional Allowed Claims*" means any Administrative Claims, or portions thereof, filed by Holders of Claims in Class 2.A. prior to August 17, 2012, including but not limited to any Claim asserted by Cadence Design Systems, Inc. or its affiliates, that are subsequently reclassified as Allowed General Unsecured Claims.

106.    "*Supplemental Letter*" has the meaning set forth in Article V.

107.    "*Support Services Agreement*" has the meaning set forth in Article III.

108.    "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

109.    "*Tax Returns*" means all tax returns, reports, certificates, forms or similar statements or documents, including amended tax returns or requests for refunds.

110.    "*TMFE*" means Trident Microsystems (Far East) Ltd., one of the Debtors in these jointly administered Chapter 11 Cases, and as applicable, the Estate thereof.

111.    "*TMFE IP Assets*" means all right, title and interest to any and all intellectual property of the Debtors, including, without limitation, the 25 MEMC patents which were ultimately excluded from the Debtors' sale of its set top box business.

112.    "*TMFE Plan Administrator*" means the Cayman Liquidators as the administrator and liquidator of TMFE pursuant to the Plan and the laws of the Cayman Islands.

113.    "*TMFE TMHK Agreement*" has the meaning set forth in Article III.

114.    "*TMFE TMI Agreements*" has the meaning set forth in Article III.

115.    "*TMHK*" means Trident Microsystems (Hong Kong) Limited.

116.    "*TMI*" means Trident Microsystems, Inc., one of the Debtors in these jointly administered Chapter 11 Cases and as applicable, the Estate thereof.

117.    "*TMI Assets*" means all assets of TMI as of the Effective Date, including all Cash of the Estate, Causes of Action of TMI, if any, all Books and Records of TMI and Privileges of TMI, and which shall include any recovery on behalf of TMI on account of its Class 2.B Claims.

118.    "*TMI Claim*" means proof of claim number 159 filed by TMI against TMFE on July 13, 2012, as such proof of claim may be amended from time to time.

119.    "*TMI Responsible Person*" shall mean the person appointed for the sole purpose of liquidating and distributing the TMI Assets, which such TMI Responsible Person shall be identified in the Plan Supplement.

120.    "*TMI-TMHK Agreement*" has the meaning set forth in Article III.

121.    "*TV Business*" has the meaning set forth in Article III.

122.    "*Trident*" means TMI and all of its Debtor and non-Debtor subsidiaries.

123.    "*TSAs*" has the meaning set forth in Article V.

124.    "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the District of Delaware.

125.    "*Unimpaired*" means not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

126.    "*Voting Deadline*" means 5:00 p.m. (Prevailing Eastern Time) on November 26, 2012.

127.    "*WIP Note*" has the meaning set forth in Article V.

## B.    OTHER TERMS

The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan as a whole and not to any particular article, section or clause contained in the Plan. A reference to an "Article" refers to an Article, or referenced portion thereof, of the Plan. A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in or by the Bankruptcy Code. The rules of construction set forth in section 102 of the Bankruptcy Code shall apply in constructing the Plan.

## C.    EXHIBITS

All Exhibits to the Plan and the Plan Supplement are incorporated by reference into and are made a part of the Plan as if set forth in full herein.

## ARTICLE XII.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of Impaired Claims in Classes 2.A., 2.B. and 6 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 5:00 p.m. (EST) on November , 2012.

Dated:  October 22, 2012

Wilmington, Delaware

Respectfully submitted,

Trident Microsystems, Inc.

By: _____

Its:     Chief Restructuring Officer_____


Trident Microsystems (Far East) Ltd.

By: _____

Its: _____

Dated: October 22, 2012

Wilmington, Delaware

Respectfully submitted,

Trident Microsystems, Inc.

By: _____
Its: _____

Trident Microsystems (Far East) Ltd.

By:  Eleanor G. Fisher
Its:  Joint Official Liquidator

**Exhibit A**
**Debtors' Chapter 11 Plan**

A-1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------------x
                                          :
In re:                                    :   Chapter 11
                                          :
Trident Microsystems, Inc., et al.,[1]    :   Case No. 12-10069 (CSS)
                                          :
            Debtors.                      :   (Jointly Administered)
                                          :
                                          :
-------------------------------------------------------------x
```

**DEBTORS' SECOND AMENDED JOINT PLAN OF LIQUIDATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**DLA PIPER LLP (US)**
**Stuart M. Brown (DE 4050)**
**919 North Market Street, Suite 1500**
**Wilmington, Delaware 19801**
**Telephone:  (302) 468-5700**
**Facsimile:  (302) 394-2341**

     **-and-**

**Richard A. Chesley (IL 6240877)**
**Kimberly D. Newmarch (DE 4340)**
**Chun I. Jang (DE 4790)**
**203 N. LaSalle Street, Suite 1900**
**Chicago, Illinois 60601**
**Telephone:  (312) 368-4000**
**Facsimile:  (312) 236-7516**

*Attorneys for Debtors and Debtors in Possession*

**Dated:   October 22, 2012**
       **Wilmington, Delaware**

---

[1]    The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd.  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 5201 Great America Parkway, Suite 320, Santa Clara, California 95054.

# TABLE OF CONTENTS

**Article**                                                                **Page**

I.    DEFINED TERMS AND RULES OF INTERPRETATION............................................. 1
      A.    Defined Terms .................................................................................................. 1
      B.    Rules of Interpretation .................................................................................. 10
      C.    Exhibits ........................................................................................................... 10

II.   ADMINISTRATIVE AND PRIORITY CLAIMS .................................................... 11
      A.    Establishment of the Administrative Claims Bar Date ....................................... 11
      B.    Administrative Claims .................................................................................... 11
      C.    Professional Compensation and Reimbursement Claims ................................. 12
      D.    Priority Tax Claims ........................................................................................ 12
      E.    Other Priority Claims ..................................................................................... 12

III.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
      INTERESTS ......................................................................................................... 12
      A.    Summary .......................................................................................................... 12
      B.    Classification and Treatment of Claims and Equity Interests............................ 13
      C.    Special Provision Governing Unimpaired Claims and Equity Interests.............. 16
      D.    Separate Plans of Liquidation ....................................................................... 16
      E.    Nonconsensual Confirmation......................................................................... 16

IV.   MEANS FOR IMPLEMENTATION OF THE PLAN................................................. 17
      A.    TMI Responsible Person to Effectuate Distributions ........................................ 17
      B.    Cayman Liquidators as TMFE Plan Administrator ........................................... 17
      C.    Assignment of Contracts................................................................................ 17
      D.    The TMI Responsible Person and the TMFE Plan Administrator....................... 17
      E.    Role of the TMI Responsible Person and the TMFE Plan Administrator .......... 18
      F.    TMI Responsible Person's and the TMFE Plan Administrator's Tax
            Powers............................................................................................................... 20
      G.    Cash.................................................................................................................. 21
      H.    Costs and Expenses of the TMI Responsible Person and Liquidation of
            TMFE................................................................................................................. 21
      I.    Compensation of the TMFE Plan Administrator and the TMI Responsible
            Person................................................................................................................ 21
      J.    Retention of Professionals by the TMFE Plan Administrator and the TMI
            Responsible Person .......................................................................................... 22
      K.    Tax Reporting .................................................................................................. 22
      L.    Dissolution ...................................................................................................... 22
      M.    Indemnification of the TMFE Plan Administrator and the TMI
            Responsible Person .......................................................................................... 23
      N.    Operations of the Debtors Between the Confirmation Date and the
            Effective Date .................................................................................................. 24
      O.    Term of Injunctions or Stays........................................................................... 24
      P.    The Committees ............................................................................................... 24
      Q.    Books and Records .......................................................................................... 24

# TABLE OF CONTENTS

(continued)

**Article**                                                                                           **Page**

V.       PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS ............................... 25
         A.       Voting of Claims ............................................................................................ 25
         B.       Distribution Dates .......................................................................................... 25
         C.       Disbursing Agents .......................................................................................... 25
         D.       Record Date for Distributions ........................................................................ 26
         E.       Delivery of Distributions ............................................................................... 26
         F.       Undeliverable and Unclaimed Distributions .................................................. 27
         G.       Manner of Cash Payments Under the Plan ..................................................... 27
         H.       Compliance with Tax Requirements ............................................................... 27
         I.       No Payments of Fractional Dollars ................................................................ 28
         J.       Interest on Claims .......................................................................................... 28
         K.       No Distribution in Excess of Allowed Amount of Claim ............................... 28
         L.       Setoff and Recoupment .................................................................................. 29
         M.       De Minimis Distributions; Charitable Donation ............................................ 29
         N.       United States Trustee Fees ............................................................................. 29

VI.      DISPUTED CLAIMS ............................................................................................... 29
         A.       Disputed Claims Reserves ............................................................................. 29
         B.       Resolution of Disputed Claims ...................................................................... 30
         C.       Objection Deadline ........................................................................................ 30
         D.       Estimation of Claims ...................................................................................... 30
         E.       No Distributions Pending Allowance ............................................................. 31
         F.       Resolution of Claims ...................................................................................... 31

VII.     TREATMENT OF EXECUTORY CONTRACTS ..................................................... 31
         A.       Assumption or Rejection of Executory Contracts .......................................... 31
         B.       Approval of Assumption or Rejection of Executory Contracts ....................... 32
         C.       Inclusiveness .................................................................................................. 32
         D.       Cure of Defaults ............................................................................................. 32
         E.       Claims Based on Rejection of Executory Contracts ....................................... 33
         F.       Indemnification and Reimbursement .............................................................. 33
         G.       D&O Insurance Policies ................................................................................. 34
         H.       Certain Insurance Policy Matters ................................................................... 34

VIII.    CONDITIONS PRECEDENT .................................................................................. 34
         A.       Conditions Precedent To The Confirmation Date .......................................... 34
         B.       Conditions Precedent To The Effective Date ................................................. 35
         C.       Waiver ............................................................................................................ 35

IX.      INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED
         PROVISIONS .......................................................................................................... 36
         A.       Compromise and Settlement ........................................................................... 36
         B.       Releases .......................................................................................................... 36
         C.       Exculpation .................................................................................................... 37

# TABLE OF CONTENTS

(continued)

**Article**                                                                        **Page**

D.      Withdrawal and Release of Certain Claims ........................................................ 38
E.      Preservation of Causes of Action........................................................................ 38
F.      Injunction ............................................................................................................ 39
G.      Releases of Liens ................................................................................................ 40

X.      RETENTION OF JURISDICTION .................................................................... 40

XI.     MISCELLANEOUS PROVISIONS.................................................................... 42
A.      Modification of Plan ........................................................................................... 42
B.      Revocation of Plan.............................................................................................. 42
C.      Binding Effect..................................................................................................... 43
D.      Successors and Assigns....................................................................................... 43
E.      Governing Law .................................................................................................... 43
F.      Reservation of Rights.......................................................................................... 43
G.      Article 1146 Exemption ...................................................................................... 43
H.      Section 1125(e) Good Faith Compliance............................................................ 43
I.      Further Assurances.............................................................................................. 44
J.      Service of Documents ......................................................................................... 44
K.      Filing of Additional Documents ........................................................................ 44
L.      No Stay of Confirmation Order .......................................................................... 45

## DEBTORS' SECOND AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Pursuant to the Bankruptcy Code,[2] the Debtors and Debtors in Possession in the above-captioned cases hereby respectfully propose the following Debtors' Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code.

## ARTICLE I.

## DEFINED TERMS AND RULES OF INTERPRETATION

### A.    Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*2004 Orders*" means, collectively, (i) Agreed Order Granting in Part Motion of Statutory Committee of Equity Security Holders for Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Examination of (I) NXP B.V., (II) NXP Semiconductors Netherlands B.V. and (III) NXP-Appointed Directors and in the Alternative Pursuant to 11 U.S.C. § 105(a) And Hague Convention for Authority to Issue Letters of Request for International Judicial Assistance, entered by the Bankruptcy Court on May 25, 2012 [D.I. 631] and (ii) Order Pursuant to Bankruptcy Rule 2004 and Local Bankruptcy Rule 2004.1 Directing the Examination of Debtors' Former Director David Kerko and KKR & Co. L.P., entered by the Bankruptcy Court on August 20, 2012 [D.I. 887].

2.    "*Accrued Professional Compensation*" means, at any given moment, all accrued and/or unpaid fees and expenses (including, without limitation, fees or expenses allowed or awarded by a Final Order of the Bankruptcy Court, the Cayman Court or any other court of competent jurisdiction) for legal, financial advisory, accounting, liquidation and other professional services and reimbursement of expenses of such professionals that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code or section 109 or 104(5) of the Cayman Companies Law, or otherwise rendered prior to the Effective Date, or thereafter including in connection with (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code; (b) motions seeking the enforcement of the provisions of the Plan or Confirmation Order, by all Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not previously been paid regardless of whether a fee application has been filed for any such amount; and (c) applications for allowance of Administrative Expenses arising under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(6) of the Bankruptcy Code.  To the extent the Bankruptcy Court

---

[2]    All capitalized terms not otherwise defined herein shall be subject to the definition of such capitalized terms in Article I.A. hereof.

or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Accrued Professional Compensation.

3.    "*Administrative Claims*" means Claims that have been timely filed before the Administrative Claims Bar Date, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises).  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Article V.N. of the Plan.  Notwithstanding anything to the contrary herein, the filing of an Administrative Claim shall not be required in order to receive payment for any tax liability described in sections 503(b)(1)(B) and (C) in accordance with section 503(b)(1)(D) of the Bankruptcy Code.

4.    "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days after the Effective Date and is the deadline for a holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Claim in the manner indicated in Article II herein.

5.    "*Affiliate*" means an (a) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; (b) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; (c) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or (d) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

6.    "*Allowed*" means, with respect to any Claim or Equity Interest against a Debtor, except as otherwise provided herein:  (a) a Claim or Equity Interest that has been scheduled by the Debtors in their Schedules filed in the Chapter 11 Cases as other than disputed, contingent or unliquidated and as to which the Debtors or other parties-in-interest have not filed an objection by the Claims Objection Bar Date (in respect of Claims or Equity Interests against TMI only); (b) a Claim or Equity Interest filed in the Chapter 11 Cases and that either is not Disputed or has been allowed by a Final Order; (c) a Claim or Equity Interest, either scheduled or the subject of a proof of claim, against TMFE only that is not rejected by the TMFE Plan Administrator and/or the Cayman Court and that is not the subject of an appeal or an application to expunge in the Cayman Proceedings; or (d) a Claim or Equity Interest that is allowed:  (i)  in any stipulation of

amount and nature of Claim executed prior to the entry of the Confirmation Order and approved by the Bankruptcy Court; (ii) in any stipulation with Debtors of amount and nature of Claim or Equity Interest executed on or after the entry of the Confirmation Order; or (iii) in or pursuant to any contract, instrument or other agreement entered into or assumed in connection herewith; or (d) a Claim or Equity Interest that is allowed pursuant to the terms of this Plan.

7.      "*Assumption Notice*" means notice provided to counterparties of executory contracts to be assumed pursuant to Article VII of the Plan.

8.      "*Bankruptcy Code*" means Articles 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

9.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

10.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the U.S. Bankruptcy Court for the District of Delaware, the Local Rules of Civil Practice and Procedure of the U.S. District Court for the District of Delaware, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Cases and as amended from time to time.

11.     "*Bar Date Order*" means that certain order of the Bankruptcy Court dated as of June 8, 2012, establishing July 13, 2012 as the general bar date for filing proofs of claim, with only those exceptions permitted thereby.

12.     "*Beneficiaries*" means holders of Allowed Claims and Equity Interests entitled to receive Distributions from the Debtors under the Plan, whether or not such Claims or Equity Interests were Allowed Claims or Allowed Equity Interests on the Effective Date.

13.     "*Books and Records*" means, with respect to a particular Debtor or the Debtors, all books and records of such Debtor(s), including, without limitation, all documents and communications of any kind, whether physical or electronic.

14.     "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Federal Rules of Bankruptcy Procedure 9006(a)).

15.     "*Cash*" means cash and cash equivalents in certified or immediately available U.S. funds, including but not limited to bank deposits, checks and similar items.

16.     "*Causes of Action*" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims (including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code) against any Person or Entity, based in law or equity, including, without limitation, under the Bankruptcy Code, whether

direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date.

17.    "*Cayman Committee*" means the official committee of creditors appointed in the Cayman Proceedings.

18.    "*Cayman Companies Law*" means the Companies Law (2011 Revision) of the Cayman Islands.

19.    "*Cayman Court*" means the Grand Court of the Cayman Islands.

20.    "*Cayman Liquidators*" means Eleanor Fisher and Gordon MacRae of Zolfo Cooper (Cayman) Limited, as the official liquidator(s) of TMFE appointed in the Cayman Proceedings.

21.    "*Cayman Proceedings*" means the insolvency proceedings of TMFE commenced in the Cayman Court on January 4, 2012, Cause No. FSD 1 of 2012.

22.    "*Chapter 11 Cases*" means the chapter 11 cases commenced when the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date and with the following case numbers:  12-10069 (CSS), and 12-10070 (CSS), which are jointly administered under case number 12-10069 (CSS).

23.    "*Claim*" means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

24.    "*Claims Agent*" means Kurtzman Carson Consultants LLC, the Bankruptcy Court appointed claims, noticing and balloting agent in these jointly administered Chapter 11 Cases.

25.    "*Claims Objection Bar Date*" means the bar date for objecting to proofs of claim at TMI only, which shall be one hundred twenty (120) days after the Effective Date; *provided*, *however*, that the Debtors, the TMFE Plan Administrator or the TMI Responsible Person may seek additional extensions of this date from the Bankruptcy Court.  A party requesting to extend the Claims Objection Bar Date may specify which entities may benefit from such an extension.

26.    "*Class*" means a category of holders of Claims or Equity Interests as set forth in Article III herein and pursuant to section 1122(a) of the Bankruptcy Code.

27.    "*Committees*" means, collectively, the Cayman Committee, the Creditors' Committee and the Equity Committee.

28.    "*Companies Winding Up Rules*" means the Cayman Islands Companies Winding Up Rules 2008 (as amended).

29.     "*Confirmation Date*" means the date on which the Confirmation Order is entered by the Bankruptcy Court; provided, however, that in no event shall the Confirmation Date be later than December 15, 2012 unless such condition is otherwise waived pursuant to Article VIII.C of the Plan.

30.     "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code in form and substance satisfactory to the Creditors Committee, Equity Committee and the Cayman Liquidators.

31.     "*Creditor*" shall have the meaning in Bankruptcy Code § 101(10).

32.     "*Creditors Committee*" means the Official Committee of Unsecured Creditors in the case of TMFE appointed by the U.S. Trustee.

33.     "*D&O Insurance Policies*" means all primary and excess insurance policies of the Debtors that provide for, among other things, coverage for liability related to the actions or omissions of the Debtors' directors or officers.

34.     "*Debtors*" means TMI and TMFE and where applicable, the Estates thereof.

35.     "*Disbursing Agent*" means the person or entity empowered and authorized to make all Distributions pursuant to Article V.C herein.

36.     "*Disclosure Statement*" means the *Disclosure Statement for the Debtors' Second Amended Joint Plan of Liquidation under Chapter 11 of the Bankruptcy Code*, dated October 22, 2012, prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law, and approved by the Bankruptcy Court, as amended, supplemented or modified from time to time, and approved by the Bankruptcy Court.

37.     "*Disputed*" means, with respect to any Claim or Equity Interest, any Claim or Equity Interest:  (a) listed on the Schedules as unliquidated, disputed or contingent, unless a proof of Claim has been filed in a liquidated, non-contingent amount; (b) as to which a Debtor, the TMFE Plan Administrator, the TMI Responsible Person or any other party in interest, including, without limitation, the Equity Committee and the Creditors Committee, has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or a request for a sanction order, an order for directions or an expungement order from the Cayman Court; (c) as to which the TMFE Plan Administrator  has determined shall not be Allowed or not Allowed in full or (d) as otherwise disputed in accordance with applicable bankruptcy or insolvency law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; *provided*, *however*, that for purposes of Distributions under the Plan, the TMI Responsible Person and the TMFE Plan Administrator shall have the power, up to and including the Claims Objection Bar Date (with such time limit being in respect of Claims at TMI only), to determine a Claim to be Disputed upon review of the claims register and the books and records and may cause the amendment of the Schedules to reflect any such determination.

38.     "*Disputed Claims Reserve*" means the reserve funds created pursuant to Article VI.A. herein.

39.    "*Distributions*" means the distributions of Cash to be made in accordance with the Plan.

40.    "*Effective Date*" means a Business Day selected by the Debtors that is on or after the date by which all conditions precedent specified in Article VIII have been satisfied or waived; provided, however, that the Effective Date shall be not later than December 31, 2012 unless such condition is otherwise waived pursuant to Article VIII.C of the Plan.  Within five (5) Business days of the Effective Date, notice of the Effective Date shall be filed in the Bankruptcy Court and the Cayman Court.

41.    "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

42.    "*Equity Committee*" shall mean the Statutory Committee of Equity Security Holders of Trident Microsystems, Inc. appointed by the U.S. Trustee.

43.    "*Equity Interest*" means any equity interest in a Debtor that existed immediately prior to the Petition Date.

44.    "*Estates*" means the TMI and TMFE estates created pursuant to section 541 of the Bankruptcy Code upon the filing of the Chapter 11 Cases.

45.    "*Exculpated Parties*" means, collectively, the Debtors, the Cayman Liquidators, the JPLs, the Committees, and the individual members thereof, the TMFE Plan Administrator, the TMI Responsible Person, and each of their current and former respective Representatives (each of the foregoing in its individual capacity as such including, without limitation, former officers and directors of the Debtors appointed by NXP) and NXP, together with NXP's current and former Representatives and Professionals.

46.    "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

47.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to file an appeal, motion for reconsideration or rehearing, or request for a stay has expired.

48.    "*General Bar Date*" means 5:00 p.m. prevailing Eastern Time on July 13, 2012 as established in the Bar Date Order.

49.    "*General Unsecured Claims*" means Claims against any Debtor that are not Administrative Claims, Secured Claims, Priority Tax Claims, Other Priority Claims, or Equity Interests.

50.    "*Impaired*" means "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

51.    "*Indemnified Persons*" means the TMFE Plan Administrator and the TMI Responsible Person and the individuals comprising the TMFE Plan Administrator and the TMI

Responsible Person, and the TMFE Plan Administrator's and the TMI Responsible Person's employees, officers, directors, agents, Representatives, and Professionals, as the case may be.

52.     "*Initial Distribution Date*" means (a) the date that is as soon as practicable on or after the Effective Date, when Distributions under this Plan shall commence to holders of Allowed Claims and Allowed Equity Interests in all Classes other than Class 2.B. and (b) with respect to Distributions to Class 2.B., the date that is as soon as practicable after the Effective Date and after appropriate reserves have been established in accordance with Article III hereof, including, without limitation, reserves on account of the Disputed Claims Reserve, Administrative Claims, and sufficient funds necessary for the TMFE Plan Administrator and TMI Responsible Person (as applicable) to carry out their respective duties.

53.     "*Intercompany Claims*" means Claims held by a Debtor or Affiliate of the Debtors against another Debtor or Affiliate of the Debtors.

54.     "*IRS Claim*" means the Debtors' liability to the Internal Revenue Service, including but not limited to, any Claim for proposed adjustments as described in the Notice of Proposed Adjustments, dated March 23, 2012 (as amended on or about May 17, 2012, and as further amended) and the Proof of Claim filed by the Internal Revenue Service on or about January 31, 2012 (as amended on or about September 6, 2012, and as further amended).

55.     "*Joint Protocol*" means the Cross-Border Insolvency Protocol Stipulation Regarding Trident Microsystems, Inc, and Trident Microsystems (Far East) Ltd. (in official liquidation) (as it may be amended) as approved by the Bankruptcy Court and the Cayman Court on September 12, 2012.

56.     "*JPLs*" means the provisional liquidators appointed in the Cayman Proceedings.

57.     "*Lien*" shall mean any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt or litigation.

58.     "*New Joint Protocol*" means the Cross-Border Insolvency Protocol Stipulation proposed to be implemented between the Debtors, the Cayman Liquidators and Mr. Andrew Hinkelman and the Cayman Liquidators in substantially the form attached as Exhibit C to the Disclosure Statement, and as is ultimately approved by the Bankruptcy Court and the Cayman Court that will become effective on the Effective Date, which, among other things, will set out processes pursuant to which (a) Claims against TMFE were adjudicated by the Cayman Liquidators in accordance with Cayman Islands Law and (b) the Cayman Liquidators will make Distributions pursuant to the Plan in accordance with, and subject to the priorities of, United States Bankruptcy Law.

59.     "*NXP*" means NXP B.V., NXP Semiconductors Netherlands B.V. and any Affiliate or Representative of NXP B.V. or NXP Semiconductors Netherlands B.V.  TMI and TMFE shall not be considered an Affiliate of NXP for purposes of this definition.

60.     "*Other Priority Claims*" means Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims.

61.     "*Outstanding NXP Receivables*" means any claims or defenses against NXP arising from payment of (or failure to pay) post-petition invoices and other accounts receivable, including, without limitation, any such reimbursement or offset rights relating to any claims asserted by Cadence Design Systems, Inc. or its affiliates.

62.     "*Person*" means an individual, partnership, corporation, limited liability company, cooperative, trust, estate, unincorporated organization, association, joint venture, government unit or agency or political subdivision thereof or any other form of legal entity or enterprise.

63.     "*Petition Date*" means January 4, 2012, the date on which the Debtors filed the Chapter 11 Cases.

64.     "*Plan*" means this Debtors' Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code including exhibits and supplements, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code or the Bankruptcy Rules.

65.     "*Plan Supplement*" means the supplement(s) to the Plan containing certain documents relevant to the implementation of the Plan.

66.     "*Priority Tax Claims*" means Claims of governmental units of the kind specified in section 507(a)(8) of the Bankruptcy Code.

67.     "*Privileges*" means the right to assert or waive any privilege, including, but not limited to, any attorney-client privilege, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written, electronic or oral), and rights to direct current or former agents, attorneys, advisors and other professionals of such Debtor(s) to deliver such documents or communications.

68.     "*Pro Rata*" shall mean the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims (including Disputed Claims, but excluding disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

69.     "*Professionals*" means any Person employed pursuant to a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to and including the Effective Date pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.

70.      "*Record Date*" means the date that the Disclosure Statement is approved by the Bankruptcy Court.

71.     "*Released Parties*" means, collectively, the Debtors, the Committees and each of their respective members and current and former Representatives and Professionals (each of the foregoing in its individual capacity as such and including, without limitation, former officers and directors of the Debtors appointed by NXP) and NXP, together with NXP's current and former Representatives.

72.     "*Representatives*" means, with regard to an Entity (including the Debtors), any current or former officers, directors, employees, attorneys, Professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, independent contractors, members and professionals).

73.     "*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

74.     "*Secured Claims*" means Claim(s) against the Debtors that are secured by a Lien on property in which the Estates have an interest, which Liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

75.     "*Stipulated Additional Allowed Claims*" means any Administrative Claims, or portions thereof, filed by Holders of Claims in Class 2.A. prior to August 17, 2012, including, but not limited to any Claim asserted by Cadence Design Systems, Inc. or its affiliates, that are subsequently reclassified as Allowed General Unsecured Claims.

76.     "*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

77.     "*Tax Returns*" means all tax returns, reports, certificates, forms or similar statements or documents, including amended tax returns or requests for refunds.

78.     "*TMFE*" means Trident Microsystems (Far East) Ltd., one of the Debtors in these jointly administered Chapter 11 Cases, and as applicable, the Estate thereof.

79.     "*TMFE IP Assets*" means all right, title and interest to any and all intellectual property of the Debtors, including, without limitation, the 25 MEMC patents which were ultimately excluded from the Debtors' sale of its set top box business.

80.     "*TMFE Plan Administrator*" means the Cayman Liquidators as the administrator and liquidator of TMFE pursuant to the Plan and the laws of the Cayman Islands.

81.     "*TMI*" means Trident Microsystems, Inc., one of the Debtors in these jointly administered Chapter 11 Cases, and as applicable, the Estate thereof.

82.     "*TMI Assets*" means all assets of TMI as of the Effective Date, including all Cash of the Estate, Causes of Action of TMI, if any, all Books and Records of TMI and Privileges of TMI, and which shall include any recovery on behalf of TMI on account of its Class 2.B Claims.

83.     "*TMI Claim*" means proof of claim number 159 filed by TMI against TMFE on July 13, 2012, as such proof of claim may be amended from time to time.

84.    "*TMI Responsible Person*" shall mean the person appointed for the sole purpose of liquidating and distributing the TMI Assets, which such TMI Responsible Person shall be identified in the Plan Supplement.

85.    "*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the District of Delaware.

86.    "*Unimpaired*" means not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

## B.    Rules of Interpretation

1.    For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    The provisions of Federal Rule of Bankruptcy Procedure 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

3.    All references herein to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## C.    Exhibits

All exhibits and schedules, if any, to the Plan, including the Plan Supplement, are incorporated into and are part of the Plan as if set forth herein.  All exhibits and schedules to the Plan, including the Plan Supplement, shall be filed with the Clerk of the Bankruptcy Court not later than ten (10) days prior to the deadline set by the Bankruptcy Court to vote to accept or reject the Plan.  Such exhibits may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court, or on the website of the Debtors' Claims Agent at www.kccllc.net/Trident.  Holders of Claims or Equity Interests may also obtain a copy of such exhibits, once filed, from the Debtors by a written request sent to the following address:

**DLA PIPER LLP (US)**
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Attn:  Chun I. Jang

## ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

**A.    Establishment of the Administrative Claims Bar Date**

1.      Except as otherwise provided herein, on or before 5:00 p.m., prevailing Eastern time, on the Administrative Claims Bar Date, each holder of an Administrative Claim shall file with the Claims Agent a request for payment of Administrative Claim by mailing, hand delivering or delivering by courier service such request for payment of Administrative Claim to the Claims Agent at Trident Microsystems Claims Processing c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, Attention:  Trident Claims Processing Center.

2.      The request for payment of an Administrative Claim will be timely filed only if it is ***actually received*** by the Claims Agent by 5:00 p.m., prevailing Eastern time, on the Administrative Claims Bar Date.  Requests for payment of Administrative Claims may **not** be delivered by facsimiles, telecopy, or electronic mail transmission.

3.      Notwithstanding anything herein, the Debtors' and the Committees' Professionals shall not be required to file a request for payment of any Administrative Claim on or before the Administrative Claims Bar Date for fees and expenses arising under sections 330, 331 or 503(b)(2-5) of the Bankruptcy Code, as such Professionals will instead file final fee applications as required by the Bankruptcy Code, Bankruptcy Rules and the Confirmation Order.

**B.    Administrative Claims**

The TMI Responsible Person and the TMFE Plan Administrator (as applicable) shall pay each holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash:  (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (3) at such time and upon such terms as may be agreed upon by such holder and the TMI Responsible Person or TMFE Plan Administrator; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; *provided*, *however*, that Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date, unless the TMI Responsible Person or the TMFE Plan Administrator, as applicable, in their discretion, choose to treat such Claims as Administrative Claims.

C.      **Professional Compensation and Reimbursement Claims**

The deadline for submission by Professionals for Bankruptcy Court approval of Accrued Professional Compensation shall be forty-five (45) days after the Effective Date.    All Professionals employed by the Debtors, the Creditors' Committee, the Equity Committee or professionals engaged by the Cayman Liquidators and the Cayman Committee shall provide to the Debtors and the Cayman Liquidators an estimate of their Accrued Professional Compensation through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) before the Effective Date.

D.      **Priority Tax Claims**

The TMI Responsible Person and the TMFE Plan Administrator (as applicable) shall pay each holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the latest of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

E.      **Other Priority Claims**

On or as soon as practicable after the Effective Date, the TMI Responsible Person and the TMFE Plan Administrator (as applicable) shall pay each holder of an Allowed Other Priority Claim, in satisfaction of such Allowed Other Priority Claim the full unpaid amount of such Allowed Other Priority Claim in Cash.

<div align="center">

**ARTICLE III.**

**CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS**

</div>

A.      **Summary**

1.      This Plan constitutes a separate chapter 11 plan of liquidation for each Debtor. Except for Administrative Claims, Priority Tax Claims and Other Priority Claims, all Claims against and Equity Interests in a particular Debtor are placed in Classes for each of the Debtors. In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims and Other Priority Claims, as described in Article II.

2.      The following table classifies Claims against and Equity Interests in each Debtor for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.    The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.    A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.    Each Class set forth below is treated hereunder as a distinct Class for voting and Distribution purposes.

3.     Summary of Classification and Treatment of Classified Claims and Equity Interests.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Secured Claims against TMFE | Paid in full | Deemed to Accept |
| 2.A. | General Unsecured Claims against TMFE not held by Debtors' Affiliates | Impaired | Entitled to Vote |
| 2.B. | General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims | Impaired | Entitled to Vote |
| 3 | Equity Interests in TMFE | Impaired and No Distribution | Deemed to Reject |
| 4 | Secured Claims against TMI | Paid in full | Deemed to Accept |
| 5 | General Unsecured Claims against TMI | Paid in full | Deemed to Accept |
| 6 | Equity Interests in TMI | Impaired | Entitled to Vote |

**B.     Classification and Treatment of Claims and Equity Interests**

1.     **Secured Claims against TMFE (Class 1)**

(a)     **Classification**:  Class 1 consists of Secured Claims against TMFE.

(b)     **Treatment**:  To the extent that any Secured Claims against TMFE exist, except to the extent that a holder of an Allowed Secured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMFE shall receive from TMFE, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed.

(c)     **Voting**:  Class 1 is Unimpaired and, therefore, holders of Secured Claims against TMFE in Class 1 are deemed to have accepted the Plan.

**2.A.     General Unsecured Claims against TMFE not held by Debtors' Affiliates (Class 2.A.)**

(a)     **Classification**:  Class 2.A. consists of General Unsecured Claims against TMFE not held by Debtors' Affiliates.

**(b)**     **Treatment**:   After (i) reservation of sufficient funds necessary to pay outstanding Administrative Claims against TMFE in full and (ii) payment of Allowed TMFE Secured Claims in Class 1; except to the extent that a holder of a General Unsecured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMFE not held by Debtors' Affiliates, in Class 2.A, including any holder of a Stipulated Additional Allowed Claim, shall receive a 90% recovery on account of the Allowed Amount of such Claims, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed.

**(c)**     **Voting**:   Class 2.A. is Impaired and, therefore, holders of General Unsecured Claims against TMFE not held by Debtors' Affiliates in Class 2.A are entitled to vote to accept or reject the Plan.

**2.B.     General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims (Class 2.B.)**

**(a)**     **Classification**:   Class 2.B. consists of General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims.

**(b)**     **Treatment**:   After (i) payment of Allowed TMFE Secured Claims in Class 1, (ii) payment of Allowed General Unsecured Claims against TMFE not held by Debtors' Affiliates in Class 2.A. (iii) reservation of sufficient funds necessary (a) to satisfy the Disputed Claims Reserve with respect to Disputed Claims against TMFE, (b) for the TMFE Plan Administrator to carry out its duties and for the fees, costs and expenses incurred in the Cayman Proceedings, (c) to pay outstanding Administrative Claims in full and (d) to pay any unclaimed or undeliverable Distributions to holders of Class 2.A. Claims; except to the extent that a holder of a General Unsecured Claim against TMFE held by Debtors' Affiliates has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMFE held by Debtors' Affiliates in Class 2.B., shall receive the remaining assets of TMFE, and which such remaining assets of TMFE shall constitute TMI Assets, on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Claim becomes Allowed; provided, however, that in no event shall the Cash recovery (on a percentage basis) on account of Class 2.B. Claims be greater than the recovery (on a percentage basis) on account of Class 2.A. Claims.

**(c)**     **Voting**:   Class 2.B. is Impaired and, therefore, holders of General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims in Class 2.B. are entitled to vote to accept or reject the Plan.

3.     **Equity Interests in TMFE (Class 3)**

**(a)**     **Classification**:   Class 3 consists of Equity Interests in TMFE.

**(b)**     **Treatment**:   Class 3 is Impaired and will receive no Distribution under the Plan.

**(c)      Voting**: Class 3 will receive no Distribution under the Plan and therefore, holders of Equity Interests in TMFE in Class 3 are deemed to have rejected the Plan and are not entitled to vote on the Plan.

4.      **Secured Claims against TMI (Class 4)**

**(a)      Classification**:  Class 4 consists of Secured Claims against TMI.

**(b)      Treatment**:  To the extent that any Secured Claims against TMI exist, except to the extent that a holder of an Allowed Secured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMI shall receive from TMI, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed.

**(c)      Voting**:  Class 4 is Unimpaired and, therefore, holders of Secured Claims against TMI in Class 4 are deemed to have accepted the Plan.

5.      **General Unsecured Claims against TMI (Class 5)**

**(a)      Classification**:   Class 5 consists of General Unsecured Claims against TMI.

**(b)      Treatment**:  After: (i) the reservation of sufficient funds necessary for the TMI Responsible Person to carry out its duties and to pay outstanding Administrative Claims against TMI in full, (ii) payment of Allowed TMI Secured Claims in Class 4, and (iii) reservation of sufficient funds necessary to satisfy all Disputed Claims against TMI in full, except to the extent that a holder of a General Unsecured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMI shall receive from TMI, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed.

**(c)      Voting**:   Class 5 is Unimpaired and, therefore, holders of General Unsecured Claims against TMI in Class 5 are conclusively presumed to have accepted the Plan.

6.      **Equity Interests in TMI (Class 6)**

**(a)      Classification**:  Class 6 consists of Equity Interests in TMI.

**(b)      Treatment**:  After: (i) the reservation of sufficient funds necessary for the TMI Responsible Person to carry out its duties and to pay outstanding Administrative Claims against TMI in full, (ii) payment of Allowed TMI Secured Claims in Class 4 and (iii) payment of Allowed TMI General Unsecured Claims in Class 5 or funding of the Disputed Claims Reserve pursuant to Article VI of the Plan; the TMI Responsible Person

shall pay each holder of Equity Interests in TMI in Class 6, a Pro Rata share of the remaining TMI Assets, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Equity Interest becomes Allowed; provided, however, that pursuant to the settlement negotiated between and among the Debtors, the Equity Committee and NXP, (i) the Distribution to NXP on account of its Class 6 Equity Interests in TMI, which such Equity Interests shall be Allowed in the amount of 104,204,348 shares representing 57.82% of TMI's outstanding stock, shall be (a) reduced in the amount of $2,381,471.40, with such amount being distributed instead, Pro Rata, to non-NXP holders of Equity Interests in TMI in Class 6 (in addition to the Distribution that is otherwise distributable under the Plan), and (b) subject to a $2 million reserve to be held and retained by the TMI Responsible Person pending satisfaction of the Outstanding NXP Receivables; provided, however, that neither the establishment nor the amount of the reserve shall limit, extend or otherwise affect any party's rights, claims and defenses with respect to such Outstanding NXP Receivables, including but not limited to any right of setoff and (ii) NXP shall receive all right, title and interest to the TMFE IP Assets free and clear of all liens, claims and encumbrances, except for the Divested Company Agreement between Koninklijke Philips Electronics N.V. and Trident Microsystems (Far East) Ltd., dated May 11, 2011 (effective as of February 8, 2010).

(c)    **Voting**:  Class 6 is Impaired and, therefore, holders of Equity Interests in TMI in Class 6 are entitled to vote to accept or reject the Plan.

## C.    Special Provision Governing Unimpaired Claims and Equity Interests

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights with respect to any Unimpaired Claim or Equity Interest, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim or Equity Interest.

## D.    Separate Plans of Liquidation

The Plan constitutes a separate chapter 11 plan of liquidation for each Debtor.

## E.    Nonconsensual Confirmation

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126 of the Bankruptcy Code, the Debtors reserve the right to amend the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.  With respect to impaired Classes that are deemed to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by such Class of Claims.

# ARTICLE IV.

# MEANS FOR IMPLEMENTATION OF THE PLAN

## A.    TMI Responsible Person to Effectuate Distributions

Prior to the filing of the Plan Supplement, a TMI Responsible Person shall be appointed for the sole purpose of liquidating and distributing the TMI Assets and with no objective to continue or engage in the conduct of a trade or business.

## B.    Cayman Liquidators as TMFE Plan Administrator

Pursuant to the terms of the Joint Protocol and the New Joint Protocol, unless otherwise ordered by the Bankruptcy Court and the Cayman Court after notice and a hearing, the assets of TMFE shall be administered and adjudicated by the TMFE Plan Administrator pursuant to Cayman law and subject to the jurisdiction of the Cayman Court, *provided*, *however*, that the priority and classification of Claims shall be determined and adjudicated pursuant to United States law, including without limitation, sections, 507 (Priorities), 509 (Claims of Codebtors), 510 (Subordination) and 1129 (Absolute Priority) of the Bankruptcy Code and in accordance with the priorities stated in this Plan.  The costs of the TMFE Plan Administrator shall be paid from the assets of TMFE.  The TMFE Plan Administrator shall have all of the powers and authority granted under this Plan and under the laws of the Cayman Islands as a liquidator appointed by the Cayman Court.  Notwithstanding anything to the contrary herein, the TMFE Plan Administrator shall not transfer funds out of the TMFE bank accounts currently held in the United States except for purposes of Distribution or for payment of expenses of the TMFE Plan Administrator pursuant to the provisions of the Plan.  On the Effective Date, the Cayman Liquidators shall be appointed as the TMFE Plan Administrator.  TMFE shall remain in existence on and after the Effective Date until an application for dissolution is made as provided in Article IV.L.

## C.    Assignment of Contracts

Upon consent of the Equity Committee and the TMFE Plan Administrator, TMFE shall assume contracts listed on Schedule 7.1 entered into by TMFE.  As such, counterparties to any such contracts assumed pursuant to the Plan, and counterparties to any subcontracts related to such contracts, shall be prohibited from terminating or otherwise altering the terms of such contract as a result of the assumption and/or assignment of such contract pursuant to the Plan.

## D.    The TMI Responsible Person and the TMFE Plan Administrator

The TMFE Plan Administrator (with respect to TMFE) and the TMI Responsible Person (with respect to TMI) shall be deemed to have been appointed as the respective Estates' representative by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  The TMI Responsible Person shall be entitled to retain counsel and other professionals to carry out its duties.  The TMFE Plan Administrator may consult with the TMI Responsible Person, and the TMI Responsible Person may consult with the TMFE Plan Administrator regarding effectuation of this Plan.

**E.      Role of the TMI Responsible Person and the TMFE Plan Administrator**

In furtherance of and consistent with the purpose of the Plan, the TMI Responsible Person shall, among other things, have the rights, powers and duties, subject to the limitations set forth herein:  (i) to hold, manage, dispose of, sell, convert to Cash, and distribute the TMI Assets, including investigating, prosecuting and resolving the Causes of Action of TMI, if any; (ii) to hold the TMI Assets for the benefit of the TMI Creditors and holders of Equity Interests that are entitled to Distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date; (iii) in the TMI Responsible Person's reasonable business judgment, to investigate, prosecute, settle, liquidate, dispose of, and/or abandon the TMI Assets, including rights, Causes of Action or litigation; (iv) to monitor and enforce the implementation of the Plan; (v) to file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to TMI; (vi) in the TMI Responsible Person's reasonable business judgment, to reconcile and object to Claims and Equity Interests against TMI, and manage, control, prosecute and/or settle on behalf of the Estate of TMI objections to Claims and Equity Interests on account of which the TMI Responsible Person (as Disbursing Agent) will be responsible (if Allowed) for making Distributions under the Plan, (vii) to take all actions necessary, and create any documents necessary, to wind up the affairs and effect a dissolution of TMI and implement the Plan; (viii) to hold, manage, and distribute TMI Assets obtained through the exercise of its power and authority; (ix) to act as a signatory of TMI and for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of TMI Assets; (x) to dispose of the books and records transferred to the TMI Responsible Person in a manner deemed appropriate by the TMI Responsible Person; *provided*, *however*, that the TMI Responsible Person shall not dispose of any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party without further order of the Bankruptcy Court; (xi) to take all necessary action and file all appropriate motions to obtain an order closing the Chapter 11 Case of TMI; (xii) to enter into and exercise rights under contracts that are necessary or desirable to the administration of TMI and execute any documents or pleadings related to the liquidation of the TMI Assets; (xiii) to establish and maintain bank accounts and terminate such accounts as the TMI Responsible Person deems appropriate; (xiv) to set off amounts owed to TMI against Distributions to the Creditors of, or holders of Equity Interests in TMI, which any such determinations may be challenged in Bankruptcy Court or any other court with jurisdiction; (xv) to bring suits or defend itself against such suits, if any, as the TMI Responsible Person determines in connection with any matter arising from or related to the Plan that affects in any way the rights or obligations of Creditors or holders of Equity Interests in TMI; (xvi) to take such other and further actions as are permitted by the Plan and are not inconsistent with the Plan. In all circumstances, the TMI Responsible Person shall act in the best interests of all beneficiaries of the TMI Assets.

The TMI Responsible Person may resign by giving at least thirty (30) days prior written notice thereof to the Bankruptcy Court.  Such resignation shall become effective on the later to occur of (i) the date specified in such written notice and (ii) the effective date of the appointment of a successor TMI Responsible Person in accordance with the terms hereof and such successor's acceptance of such appointment in accordance with the terms hereof.

The TMI Responsible Person may be removed, with cause, and replaced by the Bankruptcy Court upon motion by any holder of TMI Equity Interests duly noticed to the TMI Responsible Person and all holders of TMI Equity Interests, who shall have the right to appear and be heard with respect to such motion.  Such removal shall become effective on the date specified in such action by the Bankruptcy Court.

The resignation, removal, incompetency, bankruptcy or insolvency of the TMI Responsible Person shall not operate to revoke any existing agency created pursuant to the terms of the Plan, or the Confirmation Order or invalidate any action theretofore taken by the TMI Responsible Person.  All fees and expenses incurred by the TMI Responsible Person prior to the resignation, incompetency or removal shall be paid from the TMI Assets, unless such fees and expenses are disputed by the successor TMI Responsible Person, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor TMI Responsible Person that are subsequently allowed by the Bankruptcy Court shall be paid from the TMI Assets.  In the event of the resignation or removal of the TMI Responsible Person, such TMI Responsible Person shall:  (a) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor TMI Responsible Person or directed by the Bankruptcy Court to effect the termination of such TMI Responsible Person's capacity under the Plan and Confirmation Order; (b) promptly deliver to the successor TMI Responsible Person all documents, instruments, records and other writings related to the administration of the TMI Assets as may be in the possession of such TMI Responsible Person; provided, however, that such TMI Responsible Person may retain one copy of each of such documents for its purposes, subject to the terms of any joint prosecution and common interest agreement to which the TMI Responsible Person is party; and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor TMI Responsible Person.

Any successor TMI Responsible Person appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and, in case of the TMI Responsible Person's resignation, to the resigning TMI Responsible Person.  Thereupon, such successor TMI Responsible Person shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor with like effect as if originally named TMI Responsible Person and shall be deemed appointed pursuant to Bankruptcy Code section 1123(b)(3)(B).  The resigning or removed TMI Responsible Person shall duly assign, transfer and deliver to such successor TMI Responsible Person all property and money held by such resigning or removed TMI Responsible Person hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor TMI Responsible Person, execute and deliver an instrument or instruments conveying and transferring to such successor TMI Responsible Person, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed TMI Responsible Person.

In furtherance of and consistent with the purpose of the Plan, the TMFE Plan Administrator shall, among other things, have the rights, powers and duties, subject to the limitations under the laws of the Cayman Islands, including the requirement to obtain the approval of the Cayman Court where applicable: (i) to take possession of, collect, get in, manage, dispose of, sell, convert to Cash, and distribute the assets of TMFE; (ii) to take

possession of the assets of TMFE for the benefit of the Creditors of TMFE that are entitled to Distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date; (iii) in the TMFE Plan Administrator's reasonable business judgment, to investigate, prosecute, settle, liquidate, dispose of, and/or abandon the assets of TMFE, including rights, Causes of Action or litigation of TMFE; (iv) to monitor and enforce the implementation of the Plan; (v) to file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to TMFE; (vi) in the TMFE Plan Administrator's reasonable business judgment, to reconcile and determine Claims against TMFE, and to the extent necessary, manage, control, prosecute and/or settle on behalf of the Estate of TMFE objections to Claims on account of which the TMFE Plan Administrator (as Disbursing Agent) will be responsible (if Allowed) for making Distributions under the Plan, (vii) to take all actions necessary, and create any documents necessary, to wind up the affairs of the TMFE and implement the Plan; (viii) to take possession of, collect, get in, manage, and distribute Cash or non-Cash assets of TMFE obtained through the exercise of its power and authority; (ix) to act as a signatory of TMFE and for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of TMFE's assets; (x) to take possession and control of the books and records of TMFE, including those maintained in electronic form and keep them in safe custody until the TMFE Plan Administrator is authorized or directed to destroy them in accordance with an order of the Cayman Court; provided, however, that the TMFE Plan Administrator shall not dispose of any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party without further order of the Cayman Court; (xi) to take all necessary action and file all appropriate motions to obtain an order closing the Chapter 11 Case of TMFE and the Cayman Proceedings; (xii) to enter into and exercise rights under contracts that are necessary or desirable to the administration of the Estate of TMFE and execute any documents or pleadings related to the liquidation of the TMFE assets; (xiii) to establish and maintain bank accounts and terminate such accounts as the TMFE Plan Administrator deems appropriate; (xiv) to exercise such rights of set off as TMFE may have against the Creditors of TMFE; (xv) to bring suits or defend itself against such suits, if any, as the TMFE Plan Administrator determines in connection with any matter arising from or related to the Plan that affects in any way the rights or obligations of TMFE, the TMFE Plan Administrator or the Creditors of TMFE; (xvi) to obtain and maintain insurance coverage with respect to the liabilities and obligations of the TMFE Plan Administrator; (xvii) to take all actions necessary and appropriate to minimize any adverse state or federal tax consequences to Creditors of TMFE provided such actions do not result in an adverse tax consequence to the TMFE. In all circumstances, the TMFE Plan Administrator shall act in the best interests of the Estate of TMFE.

In furtherance thereof, each of the Debtors shall execute on or prior to the Effective Date a power of attorney authorizing the TMI Responsible Person or the TMFE Plan Administrator (as applicable) to take actions consistent with Article IV.E of the Plan to the same extent as if the TMI Responsible Person or the TMFE Plan Administrator were the Debtor.

## F.    TMI Responsible Person's and the TMFE Plan Administrator's Tax Powers

1.    Following the Effective Date, the TMFE Plan Administrator and the TMI Responsible Person shall prepare and file (or cause to be prepared and filed), on behalf of the applicable Debtor all Tax Returns required to be filed or that the TMFE Plan Administrator and

the TMI Responsible Person otherwise deem appropriate, including the filing of amended Tax Returns or requests for refunds.

2.      For all taxable periods ending on or prior to the Effective Date, the TMFE Plan Administrator and the TMI Responsible Person shall have full and exclusive authority in respect of all taxes of the Debtors to the same extent as if the TMFE Plan Administrator and the TMI Responsible Person were the debtors in possession.

3.      Following the Effective Date, the TMI Responsible Person and the TMFE Plan Administrator shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes (i) of the applicable Debtor(s) to the same extent as the applicable Debtor would otherwise be entitled with respect to any taxable period ending on or prior to the Effective Date and (ii) of the applicable Debtor(s) to the same extent as the applicable Debtor would otherwise be entitled with respect to any taxable period ending after the Effective Date.

4.      The TMFE Plan Administrator, the TMI Responsible Person and the Debtors shall reasonably cooperate with each other, and shall cause their respective officers, employees, agents, auditors and other Representatives to reasonably cooperate, in preparing and filing all Tax Returns (including amended Tax Returns and claims for refunds) and in resolving all disputes and audits with respect to all taxable periods relating to the Debtors.  Any information obtained under this Article IV.F shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refunds or in conducting an audit or other proceeding.

## G.      Cash

The TMI Responsible Person may invest Cash (including any earnings thereon or proceeds therefrom) in any manner permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

## H.      Costs and Expenses of the TMI Responsible Person and Liquidation of TMFE

The costs and expenses of the TMI Responsible Person and the fees, costs and expenses incurred in the Cayman Proceedings, including the reasonable fees and expenses of the TMFE Plan Administrator and the TMI Responsible Person, and each of their respective retained professionals, and the fees and expenses of maintaining the Disputed Claims Reserves, shall be paid out of the TMI Assets and the assets of TMFE (as applicable), except for the TMFE IP Assets.  Such amounts for fees, costs and expenses shall be estimated and provided to the Debtors and the Cayman Liquidators before the Effective Date.

## I.      Compensation of the TMFE Plan Administrator and the TMI Responsible Person

The TMI Responsible Person shall be entitled to reasonable compensation approved in an amount consistent with that of similar functionaries in similar roles.  The TMFE Plan Administrator shall be entitled to compensation in accordance with section 109 of the Cayman Companies Law and the Insolvency Practitioners Regulations 2008 (as amended).

**J.    Retention of Professionals by the TMFE Plan Administrator and the TMI Responsible Person**

The TMFE Plan Administrator and the TMI Responsible Person may retain and compensate attorneys and other professionals to assist in their duties as TMFE Plan Administrator or the TMI Responsible Person (as applicable) on such terms (including on a contingency or hourly basis) as such TMFE Plan Administrator or the TMI Responsible Person deem reasonable and appropriate without Bankruptcy Court approval.

**K.    Tax Reporting.**

1.    The TMFE Plan Administrator and the TMI Responsible Person shall file (or cause to be filed) any statements, returns or disclosures relating to TMFE or TMI (as applicable) that are required by any governmental unit.

2.    The TMFE Plan Administrator and the TMI Responsible Person shall be responsible for payment, out of the TMI Assets or the assets of TMFE (as applicable) except for the TMFE IP Assets, of any taxes imposed on TMI or TMFE or their respective assets, including the applicable Disputed Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the applicable Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the TMFE Plan Administrator and the TMI Responsible Person (as applicable) as a result of the resolution of such Disputed Claims.

3.    The TMI Responsible Person or the TMFE Plan Administrator may request an expedited determination of taxes of TMI or TMFE, including the applicable Disputed Claims Reserve, or the applicable Debtor(s) under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the applicable Debtor(s) for all taxable periods through the dissolution of TMI or TMFE.

**L.    Dissolution**

TMI shall be dissolved at the earlier of:  (i) all of the TMI Assets having been distributed pursuant to the Plan or (ii) the TMI Responsible Person determining, in its sole discretion, that the administration of the TMI Assets is not likely to yield sufficient additional proceeds to justify further pursuit; provided, however, that in no event shall TMI be dissolved later than three (3) years from the Effective Date.  If at any time the TMI Responsible Person determines, in reliance upon such professionals as the TMI Responsible Person may retain, that the expense of administering the TMI Assets, including the making of a final Distribution to its Creditors and holders of Equity Interests, is likely to exceed the value of the assets remaining in TMI, the TMI Responsible Person may apply to the Bankruptcy Court for authority to (i) reserve any amounts necessary to dissolve TMI, (ii) donate any balance, if Distributions to holders of Claims and Equity Interests are complete pursuant to Article III of the Plan, to a charitable organization or a

charitable trust that is unrelated to the Debtors, the TMFE Plan Administrator and the TMI Responsible Person, and (iii) dissolve TMI.

The TMFE Plan Administrator shall make an application to the Cayman Court to dissolve TMFE at the earlier of:  (i) all of the assets of TMFE having been distributed pursuant to the Plan and the affairs of TMFE having been completely wound up or (ii) the TMFE Plan Administrator determining, in its sole discretion, that further administration of the remaining assets of TMFE is not likely to yield sufficient additional proceeds to justify further pursuit and in all other respects the affairs of TMFE have been completely wound up.  If at any time the TMFE Plan Administrator determines, in reliance upon such professionals as the TMFE Plan Administrator may retain, that the expense of administering the assets of TMFE, including the making of a final Distribution to holder of Claims against TMFE, is likely to exceed the value of the assets remaining in TMFE, the TMFE Plan Administrator may apply to the Cayman Court for authority to (i) reserve any amounts necessary to dissolve TMFE and (ii) donate any balance to a charitable organization or a charitable trust that is unrelated to the Debtors, the TMFE Plan Administrator or the TMI Responsible Person.  Notwithstanding anything to the contrary herein, the TMFE IP Assets shall be transferred to NXP consistent with Article III.B.6 of the Plan.

**M.    Indemnification of the TMFE Plan Administrator and the TMI Responsible Person**

The Indemnified Persons shall be held harmless and shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the TMFE Plan Administrator or the TMI Responsible Person, except those acts that are determined by Final Order to have arisen out of their own intentional fraud, willful misconduct or gross negligence, and each shall be entitled to be indemnified, held harmless, and reimbursed for fees and expenses including, without limitation, reasonable attorney's fees, which such Persons and Entities may incur or may become subject to or in connection with any action, suit, proceeding or investigation that is brought or threatened against such Persons or Entities in respect of that Person's or Entity's or the TMFE Plan Administrator's and the TMI Responsible Person's actions or inactions regarding the implementation or administration of this Plan, or the discharge of their duties hereunder, except for any actions or inactions that are determined by Final Order to have arisen from intentional fraud, willful misconduct or gross negligence.  Any Claim of the Indemnified Persons to be indemnified, held harmless, or reimbursed shall be satisfied solely from the TMI Assets or assets of TMFE (as applicable), except for the TMFE IP Assets, or any applicable insurance coverage.  Each Indemnified Person shall be entitled to an advance of their reasonable attorneys' fees and other costs and expenses from TMFE or TMI (as applicable) incurred in connection with the defense of any action, suit, proceeding or investigation involving such Indemnified Person for which indemnity will or could be sought.  In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to TMFE or TMI (as applicable) if it shall be determined by final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification pursuant to this Article.  If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to TMFE or TMI (as applicable) (without interest) by the Indemnified Person.  Notwithstanding the foregoing, the TMFE Plan Administrator and the TMI Responsible Person shall not be under any obligation to consult with

their retained professionals, and their determination not to do so shall not result in the imposition of liability on the TMFE Plan Administrator or the TMI Responsible Person unless such determination is based on willful misconduct, gross negligence, or intentional fraud.

**N.**     **Operations of the Debtors Between the Confirmation Date and the Effective Date**

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date.  The retention and employment of the Professionals retained by the Debtors shall terminate as of the Effective Date, *provided*, *however*, that the Debtors shall exist, and their Professionals shall be retained, after such date with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order and (c) such other matters as may be determined by the Debtors or TMFE Plan Administrator, including without limitation, the filing and prosecuting of objections to Claims solely with respect to Claims against TMI and Administrative Claims against TMFE.

**O.**     **Term of Injunctions or Stays**

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or section 97 of the Cayman Companies Law, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed and with respect to TMFE, until the Cayman Proceedings are concluded.

**P.**     **The Committees**

Upon the Effective Date, the Creditors' Committee and the Equity Committee shall dissolve, and their members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Cases.  The retention and employment of the Professionals retained by the Creditors' Committee and the Equity Committee shall terminate as of the Effective Date, *provided*, *however*, that the Creditors' Committee and the Equity Committee shall exist, and their Professionals shall be retained, after such date with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order and (c) with respect to the Creditors Committee only, the filing and prosecuting of objections to Claims against TMFE and nothing herein shall be deemed to confer such standing under Cayman Companies Law.  For the avoidance of doubt, the Cayman Committee, appointed for the purpose of the official liquidation of TMFE, and its retention and employment of its professionals shall continue for the duration of the Cayman Proceedings.

**Q.**     **Books and Records**

As part of the appointment of the TMI Responsible Person, to the extent not already transferred on the Effective Date, TMI shall transfer dominion and control over all books and records to the TMI Responsible Person in whatever form, manner or media, including, without limitation, the specific provision and presentation to the TMI Responsible Person of all passcodes for security systems and computers, keys, keycards and notice letters to landlords, warehousemen or other relevant parties.  TMI may abandon all other books and records of the

TMI Estate on or after ninety (90) days from the Effective Date, *provided*, *however*, that the TMI Responsible Person shall not dispose or abandon any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party without further order of the Bankruptcy Court.  Pursuant to section 554 of the Bankruptcy Code, this Article IV.Q shall constitute motion and notice, so that no further notice or Bankruptcy Court filings are required to effectuate the aforementioned abandonment of the books and records of the TMI Estate.

As part of the appointment of the TMFE Plan Administrator, to the extent not already transferred on the Effective Date, TMFE shall transfer dominion and control over all books and records to the TMFE Plan Administrator in whatever form, manner or media, including, without limitation, the specific provision and presentation to the TMFE Plan Administrator of all passcodes for security systems and computers, keys, keycards and notice letters to landlords, warehousemen or other relevant parties.

## ARTICLE V.

## PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

### A.    Voting of Claims

Each holder of an Allowed Claim or Equity Interest in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article II and Article III of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

### B.    Distribution Dates

Distributions to holders of Claims and Equity Interests shall be made as provided in Articles II and III of the Plan.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### C.    Disbursing Agents

All Distributions under the Plan by the TMFE Plan Administrator or the TMI Responsible Person shall be made by the TMFE Plan Administrator or the TMI Responsible Person as Disbursing Agent or such other entity designated by the TMFE Plan Administrator or the TMI Responsible Person as Disbursing Agent.

The Disbursing Agents shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform their duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent them with respect to their responsibilities and, (d) exercise such other powers as may be vested in the Disbursing Agents by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agents to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agents shall only be required to act and make Distributions in accordance with the terms of the Plan and shall have no (x) liability for actions taken in accordance with the Plan or in reliance upon information provided to them in accordance with the Plan or (y) obligation or liability for Distributions under the Plan to any party who does not hold an Allowed Claim at the time of Distribution or who does not otherwise comply with the terms of the Plan.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agents (including, without limitation, taxes and reasonable attorneys fees and expenses) on or after the Effective Date shall be paid in Cash by TMI and TMFE (as applicable) in the ordinary course of business.

## D.    Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date. The Debtors, the TMFE Plan Administrator (subject to Order 18 r.19 of the Companies Winding Up Rules) and the TMI Responsible Person shall have no obligation to recognize any transfer of any Claim occurring after the Record Date. In making any Distribution with respect to any Claim, the Debtors, the TMFE Plan Administrator (subject to Order 18 r.19 of the Companies Winding Up Rules) and the TMI Responsible Person shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that are known to the Debtors, the TMFE Plan Administrator or the TMI Responsible Person (as applicable) as of the Record Date.

## E.    Delivery of Distributions

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the holders of Allowed Claims shall be made by the Disbursing Agents at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Debtors or the TMFE Plan Administrator or the TMI Responsible Person have been notified in writing of a change of address; *provided, however*, that Distributions to holders of Equity Interests in TMI shall be issued through participants (including securities brokers and dealers, banks, trust companies, clearing corporations and other financial organizations) of the Depository Trust Company, as depositary. For as long as the Depository Trust Company serves as depositary for TMI's Equity Interests, the TMI Responsible Person may rely solely on the information and records of the Depository Trust Company to make Distributions and forward communications to the holders of such Equity Interests, and, in doing so, the Debtors and the TMI Responsible Person shall be fully protected and incur no liability to any holder of the TMI Equity Interests, any transferee (or purported transferee) thereof, or any other Entity.

**F.      Undeliverable and Unclaimed Distributions**

In the event that any Distribution to any holder of an Allowed Claim against TMI is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder; *provided, however*, that all Distributions to holders of Allowed Claims against TMI under the Plan that are unclaimed for a period of one (1) year after Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in TMI and any entitlement of any holder of any Claims to such Distributions shall be extinguished and forever barred.  The TMI Responsible Person shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim may receive future Distributions on account of such Claim by contacting the TMI Responsible Person at some point prior to the final Distribution.

In the event that any Distribution to any holder of an Allowed Claim against TMFE is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder.  In the event the Distribution remains unclaimed upon the dissolution of TMFE, the unclaimed Distributions shall be held by the TMFE Plan Administrator on trust for the benefit of the claimant to whom such funds are owed.  To this end, the TMFE Plan Administrator will establish an interest bearing bank account into which all funds representing unclaimed Distributions shall be transferred.  At the end of one (1) year after the dissolution of TMFE, any monies still held on trust shall be transferred to the Financial Secretary of the Cayman Islands who shall manage them in accordance with Part VIII of the Cayman Islands Public Management and Finance Law (2010 Revision).

For the avoidance of doubt, the TMFE Plan Administrator and the TMI Responsible Person shall not be required to retain an outside investigator to determine the current address of any holders of an Allowed Claim whose Distribution is returned as undeliverable.

**G.      Manner of Cash Payments Under the Plan**

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the TMFE Plan Administrator or TMI Responsible Person or by wire transfer from a domestic bank, at the option of the TMFE Plan Administrator or TMI Responsible Person.

**H.      Compliance with Tax Requirements**

The TMFE Plan Administrator or TMI Responsible Person may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution on account of Claims against TMI or TMFE.  All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims against

TMFE and TMI.  The TMFE Plan Administrator and TMI Responsible Person shall be authorized to collect such tax information from the holders of Claims and Interests against TMFE (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan.  In order to receive Distributions under the Plan, all holders of Claims and Equity Interests against TMI or TMFE will need to identify themselves to the TMFE Plan Administrator and TMI Responsible Person (as applicable) and provide tax information and the specifics of their holdings, to the extent the TMI Responsible Person and TMFE Plan Administrator deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder).  The TMFE Plan Administrator and TMI Responsible Person may refuse to make a Distribution to any holder of a Claim or Equity Interest against TMI or TMFE that fails to furnish such information in a timely fashion, until such information is delivered; *provided*, *however*, that, upon the delivery of such information by a holder of a Claim or Equity Interest against TMI or TMFE, the TMFE Plan Administrator and TMI Responsible Person (as applicable) shall make such Distribution to which the holder of the Claim or Equity Interest against TMI or TMFE is entitled, without interest; and, *provided further* that, if the holder fails to comply with such a request within one (1) year, such Distribution shall be deemed an unclaimed Distribution, and, *provided further* that, if the TMFE Plan Administrator or TMI Responsible Person fails to withhold in respect of amounts received or distributable with respect to any such holder and such TMFE Plan Administrator or TMI Responsible Person is later held liable for the amount of such withholding, such holder shall reimburse such TMFE Plan Administrator or TMI Responsible Person for such liability.

**I.      No Payments of Fractional Dollars**

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

**J.      Interest on Claims**

Except as specifically provided for in this Plan or the Confirmation Order or required by the Bankruptcy Code, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest on any Claim accruing on or after the Petition Date.  Interest shall not accrue on any General Unsecured Claim that is a Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim.  Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or similar charges.

**K.      No Distribution in Excess of Allowed Amount of Claim**

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

## L.      Setoff and Recoupment

The TMFE Plan Administrator and TMI Responsible Person may setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that any of the Debtors or the Estates may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Estates of any right of setoff or recoupment that any of them may have against the holder of any Claim.  Any such setoffs or recoupments may be challenged in Bankruptcy Court or any other court with jurisdiction.

## M.      De Minimis Distributions; Charitable Donation

Notwithstanding anything to the contrary therein, the TMFE Plan Administrator and the TMI Responsible Person shall not be required to make a Distribution to any Creditor if the dollar amount of the Distribution is less than $5 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution.  On or about the time that the final Distribution is made, the TMFE Plan Administrator or the TMI Responsible Person may make a charitable donation with undistributed funds if, in the reasonable judgment of such TMFE Plan Administrator or the TMI Responsible Person, the cost of calculating and making the final Distribution of the remaining funds is excessive in relation to the benefits to the or holders of Claims or Equity Interests against TMI or TMFE who would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtors, the TMI Responsible Person or the TMFE Plan Administrator.

## N.      United States Trustee Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the TMFE Plan Administrator and the TMI Responsible Person shall pay any and all such fees payable by TMFE and TMI, respectively, when due and payable, and shall file with the Bankruptcy Court quarterly reports for TMFE and TMI, respectively, in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE VI.

## DISPUTED CLAIMS

## A.      Disputed Claims Reserves

After the Effective Date, the Disputed Claims Reserve shall be managed by the TMI Responsible Person and TMFE Plan Administrator (as applicable) for the treatment of Disputed Claims and Disputed Equity Interests.  On each Distribution date after the Effective Date in which any of the TMI Responsible Person and/or the TMFE Plan Administrator makes Cash Distributions to holders of Claims or Equity Interests against TMI or TMFE, the TMI

Responsible Person and/or the TMFE Plan Administrator (as applicable) shall retain on account of Disputed Claims an amount the TMFE Plan Administrator or TMI Responsible Person (as applicable) estimates is necessary to fund the Pro Rata Share of such Distributions to holders of Disputed Claims if such Claims were Allowed.  Cash retained on account of Disputed Claims shall be retained in the applicable Disputed Claims Reserve for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. If any Disputed Claim is disallowed or Allowed in an amount that is lower than the aggregate assets retained on account of such Disputed Claim, then the TMFE Plan Administrator or TMI Responsible Person (as applicable) shall within sixty (60) days after such disallowance or allowance return the assets that exceed the Allowed amount of such Claim to the TMI or the TMFE Estate (as applicable).

## B.    Resolution of Disputed Claims

The TMFE Plan Administrator will adjudicate Claims asserted against TMFE in accordance with Cayman Islands Law and procedure.  However, as the assets of TMFE are located in the United States, the TMFE Plan Administrator will then make Distributions in accordance with the provisions of this Plan and the United States Bankruptcy Code, including without limitation, provisions relating to priority of Distribution.  Any appeals against the determination of the TMFE Plan Administrator shall be subject to the exclusive jurisdiction of the Cayman Court and any such appeals must be filed within twenty-one (21) days following notification by the TMFE Plan Administrator to such Creditor of its Claim adjudication.  The costs of the TMFE Plan Administrator shall be paid from the Estate of TMFE.

The TMI Responsible Person shall have the right to make and file objections to Claims against and Equity Interests in TMI in the Bankruptcy Court.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims or Equity Interests against TMI shall be subject to the exclusive jurisdiction of the Bankruptcy Court.  The costs of pursuing objections to Claims against and Equity Interest in TMI shall be paid from the TMI Assets.

## C.    Objection Deadline

All objections to Disputed Claims against TMI or Disputed Equity Interests against TMI shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court and the Cayman Court after notice and a hearing.

## D.    Estimation of Claims

At any time, TMI or the TMI Responsible Person may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether TMI or the TMI Responsible Person have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount

constitutes a maximum limitation on the Claim, TMI or the TMI Responsible Person may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

The TMFE Plan Administrator may estimate the value of any contingent, unliquidated or other Claim against TMFE which for any other reason does not bear a certain value regardless of whether TMFE has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The TMFE Plan Administrator may revise any estimate previously made, if the TMFE Plan Administrator reasonably believes such change is warranted as a result of a change in circumstances or to newly acquired information.  Upon the TMFE Plan Administrator estimating a Claim, the TMFE Plan Administrator shall provide reasonable notification to the holder of the Claim and the holder of the Claim may appeal to the Cayman Court to dispute the estimate of the TMFE Plan Administrator.  The TMFE Plan Administrator may also apply to the Cayman Court for directions with respect to any contingent or unliquidated Claims.

**E.      No Distributions Pending Allowance**

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim or Equity Interest been allowed on the Effective Date.

**F.      Resolution of Claims**

On and after the Effective Date, the TMFE Plan Administrator and the TMI Responsible Person shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims against the Estates of TMFE and TMI, respectively, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Claims relating to compensation of professionals in accordance with the laws of the Cayman Islands (as applicable), provided, however, that the TMFE Plan Administrator shall require the approval of the Cayman Court to compromise any Claims.

## ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS

**A.      Assumption or Rejection of Executory Contracts**

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts that exist between the Debtors and any Person shall be deemed rejected by the Debtors

as of immediately prior to the Confirmation Date, except for any executory contract (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court or the Cayman Court entered prior to the Confirmation Date, (ii) as to which a motion for approval of the assumption of such executory contract has been filed and served prior to the Confirmation Date, (iii) that is specifically designated as a contract to be assumed on Schedule 7.1 upon consent of the Equity Committee, which Schedule shall be contained in the Plan Supplement; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Schedule 7.1 to delete any executory contract therefrom, or no later than 20 days prior to the Confirmation Date, or add any executory contract, in which event such executory contract(s) shall be deemed to be, respectively, either rejected or assumed as of the Effective Date.  The Debtors shall provide prompt notice of Schedule 7.1 and of any amendments to Schedule 7.1 to the parties to the executory contracts affected thereby.  The listing of a document on Schedule 7.1 shall not constitute an admission by the Debtors that such document is an executory contract or that the Debtors have any liability thereunder.

## B.     Approval of Assumption or Rejection of Executory Contracts

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date and subject to the Debtors' right pursuant to Article VII.D. of the Plan to reject any executory contract that is subject to a dispute over a cure amount, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts assumed pursuant to Article VII.A. of the Plan, and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts rejected pursuant to Article VII.A. of the Plan.

## C.     Inclusiveness

Unless otherwise specified on Schedule 7.1, each executory contract listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract, without regard to whether such agreement, instrument or other document is listed on Schedule 7.1.

## D.     Cure of Defaults

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract to be assumed pursuant to Article VII.A of the Plan, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the Confirmation Hearing, file with the Bankruptcy Court and serve by first class mail on each non-debtor party to such executory contracts to be assumed pursuant to Article VII.A of the Plan, an Assumption Notice, which shall list the cure amount as to each executory contract to be assumed.  The parties to such executory contracts to be assumed or assumed and assigned by the Debtors shall have twenty (20) days from the date of service of the Assumption Notice to file and serve any objection to assumption or the cure amounts listed by the Debtors.  If there are any objections filed, the Bankruptcy Court shall hear the objections at the Confirmation Hearing or on such other date as may be set by the

Bankruptcy Court.  Notwithstanding Article VII.A of the Plan, the Debtors shall retain their rights to reject any of their executory contracts that are subject to a dispute concerning amounts necessary to cure any defaults through the Confirmation Date.

## E.      Claims Based on Rejection of Executory Contracts

Claims created by the rejection of executory contracts pursuant to Article VII.A herein, or the expiration or termination of any executory contract after the entry of the Confirmation Order, but prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtors, the TMFE Plan Administrator and the TMI Responsible Person no later than thirty (30) days after service of notice of the Effective Date.  Any Claims arising from the rejection of an executory contract pursuant to Article VII.A for which proofs of Claim against TMI are not timely filed within that time period will be forever barred from assertion against the Debtors, the TMI Estate, the TMI Responsible Person, the TMFE Plan Administrator, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein and, in the case of Claims against TMFE, may be disallowed.  All such Claims against TMI (and with respect to TMFE, such Claims against TMFE as are disallowed) shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX F herein.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III herein.

## F.      Indemnification and Reimbursement

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtors for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtors against any Claims, costs, liabilities or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (i) paid only to the extent of any applicable insurance coverage, and (ii) to the extent a proof of Claim has been timely filed and is Allowed, treated as Allowed General Unsecured Claims to the extent such Claims are not covered by any applicable insurance, including deductibles.  Nothing contained herein shall affect the rights of directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtors, the TMI Responsible Person, the TMFE Plan Administrator or the Debtors' Estates to object to, seek to subordinate or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtors pursuant to this Article VII.F. or otherwise. Notwithstanding any other order of the Bankruptcy Court or anything in this Plan to the contrary, a liquidated, non-contingent proof of Claim for indemnification, defense, reimbursement, or limitation of liability of directors, officers, or employees of the Debtors may be asserted against TMFE or TMI at any time prior to the dissolution of TMI or TMFE; provided, however, that such Claims shall be subject to the TMI Responsible Person or the TMFE Plan Administrator's opportunity to object, contest, challenge, subordinate or dispute such Claims pursuant to the Plan.

### G.    D&O Insurance Policies

No prepaid D&O Insurance Policy shall be cancelled, and the Debtors' directors, officers and employees who have valid claims against the D&O Insurance Policies for indemnification, defense, reimbursement, or limitation of liability may be paid from the D&O Insurance Policies to the extent of the coverage provided by the D&O Insurance Policies. As such, and notwithstanding anything in the Plan to the contrary, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract providing for such is determined to be an executory contract, shall be deemed assumed by the Debtors.

### H.    Certain Insurance Policy Matters

Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way operate to, or have the effect of, impairing in any respect the legal, equitable or contractual rights and defenses, if any, of the insureds, the Debtors or any insurer with respect to any insurance policies or related agreements. The rights and obligations of the insureds, the Debtors, the TMFE Plan Administrator, the TMI Responsible Person and insurers shall be determined under the insurance policies or related agreements, including all terms, conditions, limitations and exclusions thereof, which shall remain in full force and effect, and under applicable non-bankruptcy law. Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), shall in any way (i) limit a Debtor, the TMFE Plan Administrator, the TMI Responsible Person or their assignees from asserting a right or claim to the proceeds of any insurance policy that insures any such Debtor, was issued to any such Debtor or was transferred to the TMI Responsible Person or the TMFE Plan Administrator by operation of the Plan, nor (ii) limit any right of any other party to challenge such right or claim.

## ARTICLE VIII.

## CONDITIONS PRECEDENT

### A.    Conditions Precedent To The Confirmation Date

The following are conditions precedent to the Confirmation Date that must be satisfied or waived:

1.    The aggregate amount of Allowed Claims in Class 2.A. is not in excess of $16,800,000 (or the amount as adjusted upward to account for the Stipulated Additional Allowed Claims). Notwithstanding anything to the contrary herein, in the event that the aggregate amount of Allowed Claims in Class 2.A. is in excess of $16,800,000 (or the amount as adjusted upward to account for the Stipulated Additional Allowed Claims) and such condition to confirmation of the Plan is not waived or otherwise satisfied, the Debtors, Creditors' Committee and Cayman Liquidators may continue to support an alternative plan of liquidation on terms and conditions comparable to the Plan, and the Equity Committee shall reserve all rights to object to the alternative plan of liquidation.

2.      The IRS Claim shall be resolved for no greater than $500,000 in Cash.

3.      The Confirmation Date shall be not later than December 15, 2012.

4.      The Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Creditors Committee, the Equity Committee and NXP.

**B.      Conditions Precedent To The Effective Date**

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1.      The Effective Date shall be not later than December 31, 2012.

2.      The Bankruptcy Court shall have entered the Confirmation Order.

3.      The Confirmation Order has become a Final Order, which such Confirmation Order shall contain full standard and customary releases provided by both TMI and TMFE as allowed by law.

4.      The Confirmation Order shall be in full force and effect.

5.      The approval of the New Joint Protocol by the Bankruptcy Court and the Cayman Court.

6.      The appointment of the TMI Responsible Person and the TMFE Plan Administrator shall have been confirmed by order of the Bankruptcy Court.

7.      All agreements and instruments that are exhibits to the Plan or included in the Plan Supplement shall be in a form reasonably acceptable to the Debtors, the Creditors Committee and the Equity Committee and NXP, and have been duly executed and delivered; provided, however, that no party to any such agreements and instruments may unreasonably withhold its execution and delivery of such documents to prevent this condition precedent from occurring.

**C.      Waiver**

Notwithstanding the foregoing conditions in Article VIII.A and B, the Debtors, with the written consent of the Equity Committee and the Creditors Committee and NXP, reserve, in their sole discretion, the right to waive the occurrence of any condition precedent or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than the written consent of the Equity Committee and the Creditors Committee and proceeding to consummate the Plan.  Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## ARTICLE IX.

## INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

**A.      Compromise and Settlement**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Equity Interests.

**B.      Releases**

1.      **Releases by the Debtors.  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties each of the Debtors shall be deemed to have provided a full and complete release to the Released Parties, and TMI shall be deemed to have provided a full and complete release of the JPLs and the Cayman Liquidators (and each such Released Party, the JPLs and the Cayman Liquidators, so released shall be deemed released and discharged by the Debtors) from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Chapter 11 Cases or the Plan; provided, however, that the foregoing provisions of Article IX.B.1 of the Plan shall not release or otherwise affect any objection that has been or may be filed against any Claim asserted by a Released Party (except for any Claim asserted by NXP related to its Equity Interests); provided, further, that the foregoing provisions of this Article IX.B.1 shall not operate to waive or release any Causes of Action of the Debtors against their non Debtor subsidiaries; provided, further, that the foregoing provisions of this Article IX.B.1 shall not operate to waive or release any Causes of Action accrued by the Debtors in the ordinary course of business against holders of General Unsecured Claims (other than NXP, but not with respect to Outstanding NXP Receivables); provided, further that the foregoing provisions of this Article IX.B.1 shall not operate to waive, extinguish or release any Intercompany Claims.**

2.      **Releases by Holders of Claims and Equity Interests.  Except as otherwise provided in Article IX.B of the Plan, each Person, other than either of the Debtors, who**

votes to accept the Plan and therefore affirmatively grant such release, shall be deemed to forever release and waive the Released Parties, the JPLs and the Cayman Liquidators of and from any and all Claims and Causes of Action relating to the Debtors, their subsidiaries or their Representatives existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise, provided, however that the foregoing provisions of this Article IX.B.2 shall not operate to waive, extinguish or release any Intercompany Claims.  On the Effective Date, each of NXP's David Kerko's and Richard Clemmer's respective obligations under the 2004 Orders shall be deemed completely and finally satisfied and released.

3.      Notwithstanding anything to the contrary herein, the Debtors shall not provide any releases to NXP (and NXP shall not provide any such releases to the Debtors) for any claims or defenses, including, without limitation, claims seeking reimbursement, offset or contribution rights, concerning the Outstanding NXP Receivables.

4.      Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this Article IX.B pursuant to Bankruptcy Rule 9019 and its finding that they are:  (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by this Plan; (b) in the best interests of the Debtors and all holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors or Releasing Parties asserting any Claim or Cause of Action thereby released.

C.      **Exculpation**

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability relating to these Bankruptcy Cases to any Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases; provided, however, that the foregoing provisions of this Article IX.C shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that the foregoing provisions of this Article IX.C shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or any defenses thereto.

**D.      Withdrawal and Release of Certain Claims**

Upon the Effective Date, the following Claims shall be deemed withdrawn with prejudice: (a) Claim No. 135 filed by NXP against TMFE, received by the Debtors' claims agent on July 12, 2012, in the amount of $270,500.00; (b) Claim No. 138 filed by NXP against TMI, received by the Debtors' claims agent on July 12, 2012, in the amount of $2,408,348.47; (c) Claim No. 136 filed by David Kerko against TMI, received by the Debtors' claims agent on July 12, 2012 and (d) Claim No. 154, filed by Richard Clemmer against TMI and received by the Debtors' claims agent on July 13, 2012.

**E.      Preservation of Causes of Action**

1.      Vesting of Causes of Action

**(a)**      Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that TMI or its Estate may hold against any Entity shall remain with TMI on and after the Effective Date.

**(b)**      Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the TMI Responsible Person shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Causes of Action that were held by TMI or its Estate, in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

**(c)**      For the avoidance of doubt, any Causes of Action that TMFE or its Estate may hold against any Entity shall remain with TMFE on and after the Effective Date other than Outstanding NXP Receivables which shall be assigned to TMI to the extent necessary.

**(d)**      Notwithstanding anything to the contrary herein, on or before the Effective Date, any objection against Class 2.B Claims asserted by the Creditors Committee, whether in the form of a Claims objection or an adversary proceeding, shall be dismissed with prejudice.

2.      Preservation of All Causes of Action Not Expressly Settled or Released

**(a)**      Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors and/or their Estates expressly reserve such Cause of Action for later adjudication or administration by the TMI Responsible Person and the TMFE Plan Administrator (as applicable) (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines

of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article IX.B.1) or any other Final Order (including the Confirmation Order).  In addition, the Debtors and their Estates expressly reserve the right of the TMI Responsible Person and the TMFE Plan Administrator (as applicable) to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

       **(b)**      Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the TMI Responsible Person or the TMFE Plan Administrator (as applicable) subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether:  (i) such Entity has filed a proof of claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors have objected to any such Entity's proof of claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors as disputed, contingent or unliquidated.

**F.**       **Injunction**

       1.      From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.

       2.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Debtors in Possession, the Estates, their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

       3.      The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests of any nature whatsoever, against the Debtors or any of their assets or properties.  On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.

4.      Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby, from:

(a)      commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, their successors and assigns and their assets and properties;

(b)      enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, their successors and assigns and their assets and properties;

(c)      creating, perfecting or enforcing any encumbrance of any kind against any Debtor or the property or estate of any Debtor;

(d)      asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Debtor or against the property or estate of any Debtor, except to the extent a right to setoff, recoupment or subrogation is asserted with respect to a timely filed proof of claim; or

(e)      commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

## G.      Releases of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estates distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtors.

## ARTICLE X.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest against TMI, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests, *provided, however*, Disputed Claims against TMFE shall be subject to the jurisdiction of to the Cayman Court in accordance with Articles IV and VI herein;

2.      grant, deny or otherwise resolve any and all applications of professionals or Persons retained in the Chapter 11 Cases by the Debtors or the Committees for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.      resolve any matters related to the assumption, assignment or rejection of any executory contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.      ensure that Distributions to holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the TMFE Plan Administrator and/or the TMI Responsible Person after the Effective Date, including with respect to any Outstanding NXP Receivables or any rights related to certain contractual rights of payment from Innovus Prime LLC or its affiliates related to intellectual property disputes or litigation, provided, however, that the Debtors and their Estates and, following the Effective Date, the TMI Responsible Person and the TMFE Plan Administrator, shall reserve the right to commence actions in all appropriate jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.      issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

9.      enforce Article IX.A, Article IX.B, Article IX.C and Article IX.D hereof;

10.     enforce the Injunction set forth in Article IX.F hereof;

11.     resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX herein, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

12.     enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

13.     resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

14.     enter an order and/or the decree contemplated in Federal Rule of Bankruptcy Procedure 3022 concluding the Chapter 11 Cases.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Cayman Court shall, after the Effective Date, retain such jurisdiction over TMFE with respect to all matters related to the Cayman Proceeding, TMFE, the assets of TMFE and the Plan as is legally permissible and in accordance with this Plan, the Joint Protocol and the New Joint Protocol, including, without limitation, approval of the expenses of the TMFE Plan Administrator pursuant to the Plan.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

### A.     Modification of Plan

Subject to the limitations contained in the Plan:  (1) the Debtors, with the consent of the Equity Committee, the Creditors Committee and NXP, reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; provided, however, that any pre-Confirmation amendments shall not materially or adversely affect the interests, rights or treatment of any Allowed Claims or Equity Interests under the Plan; and (2) after the entry of the Confirmation Order, the Debtors, the TMFE Plan Administrator or the TMI Responsible Person may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### B.     Revocation of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans, with the consent of the Creditors Committee, the Equity Committee and NXP.  If the Debtors revoke or withdraw the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

## C.      Binding Effect

On the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Interest in, a Debtor and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

## D.      Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## E.      Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the principles of conflict of laws thereof.

## F.      Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

## G.      Article 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

## H.      Section 1125(e) Good Faith Compliance

Confirmation of the Plan shall act as a finding by the Court that the Debtors and each of their respective Representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

**I.**       **Further Assurances**

The Debtors, the TMFE Plan Administrator, the TMI Responsible Person, all holders of Claims and Equity Interests receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

**J.**       **Service of Documents**

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by first class U.S. mail, postage prepaid as follows:

To the Debtors:

> **Trident Microsystems, Inc.**
> 5201 Great America Parkway, Suite 320
> Santa Clara, CA 95054
> Attn.:  David L. Teichmann
>
> *with a copy to*:
>
> **DLA Piper, LLP (US)**
> 203 N. LaSalle Street, Suite 1900
> Chicago, Illinois  60601
> Attn:  Richard A. Chesley
> Kimberly D. Newmarch
> Chun I. Jang
>
> and
>
> **DLA Piper, LLP (US)**
> 919 North Market Street, Suite 1500
> Wilmington, Delaware 19801
> Attn:  Stuart M. Brown

**K.**       **Filing of Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**L.        No Stay of Confirmation Order**

The Debtors shall request that the Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e), 6004(h) and 7062.

Dated:    October 22, 2012
           Wilmington, Delaware

<div align="right">

**Trident Microsystems, Inc.**


By:_____
   Name:
   Title:


**Trident Microsystems (Far East) Ltd.**


By:_____
   Name:
   Title:

</div>

<div align="center">

**<u>SCHEDULES</u>**

</div>

Schedule 7.1 - Executory Contracts to be Assumed

**Exhibit B**
**Disclosure Statement Order**

EAST\51978115.6

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------x
                                            :   Chapter 11
In re:                                      :
                                            :   Case No. 12-10069 (CSS)
Trident Microsystems, Inc., et al.,¹        :
                                            :   (Jointly Administered)
           Debtors.                         :
                                            :   Re Docket No. 963
--------------------------------------------------------x
```

## ORDER (I) APPROVING THE DISCLOSURE STATEMENT, (II) APPROVING NOTICE AND OBJECTION PROCEDURES FOR THE DISCLOSURE STATEMENT HEARING, (III) ESTABLISHING SOLICITATION AND VOTING PROCEDURES, (IV) SCHEDULING A CONFIRMATION HEARING, AND (V) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE PROPOSED PLAN

Upon the motion (the "Motion"),² dated September 17, 2012, of Trident Microsystems,

Inc. ("TMI") and Trident Microsystems (Far East) Ltd. ("TMFE" and together with TMI, the

"Debtors"), for the entry of an order pursuant to sections 105, 502, 1125, 1126, and 1128 of the

Bankruptcy Code, Rules 2002, 3003, 3016, 3017, 3018, 3020, 9013 and 9014 of the Bankruptcy

Rules and Rules 2002-1 and 3017-1 of the Local Rules of Bankruptcy Practice and Procedure of

the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), entry of an

order, (i) approving the disclosure statement (the "Disclosure Statement")³ for the Debtors'

---

[1]     The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd.  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 5201 Great America Parkway, Suite 320, Santa Clara, California 95054.

[2]     Capitalized terms not defined herein shall have the meaning assigned to such term in the Motion.

[3]     *Disclosure Statement for Debtors' Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, filed on October 15, 2012 [Docket No. 1031] (as may be subsequently amended, supplemented or modified).

EAST\51980670.4

proposed plan (the "Proposed Plan"),[4] (ii) approving notice and objection procedures for the hearing on approval of the Disclosure Statement, (iii) establishing solicitation and voting procedures for the Proposed Plan (the "Solicitation Procedures"); (iv) scheduling a confirmation hearing for the Proposed Plan (the "Confirmation Hearing"), and (v) establishing notice and objection procedures for confirmation of the Proposed Plan, all as more fully described in the Motion; and the Court having held a hearing to consider the relief requested herein (the "Disclosure Statement Hearing") with the appearances of all interested parties noted in the record of the Disclosure Statement Hearing; and upon the record of the Disclosure Statement Hearing, and all of the proceedings before the Court, the Court hereby finds and determines the following:

### Jurisdiction and Venue

A.    Consideration of the Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    The Court has jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334.

### The Disclosure Statement

D.    The Disclosure Statement contains adequate information within the meaning of section 1125 of the Bankruptcy Code (as approved, the "Disclosure Statement"). No further information is necessary.

---

[4]    *Debtors' Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* filed on October 15, 2012 [Docket No. 1032] (as may be subsequently amended, supplemented or modified).

**The Committee Support Letters**

E.    The *Plan Support Recommendation to Creditors in Connection with Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* [D.I. 1039] (the "Creditors' Committee Support Letter"), filed by the Creditors' Committee, as modified at the request of the U.S. Trustee, contains adequate information within the meaning of section 1125 of the Bankruptcy Code when combined with the Disclosure Statement.

F.    The *Statutory Committee of Equity Security Holders' Submission of Proposed Form of Plan Support Recommendation to Equity Security Holders  in Connection with Second Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code* [D.I. 1055] (the "Equity Committee Support Letter") filed by the Statutory Committee of Equity Security Holders of Trident Microsystems, Inc. (the "Equity Committee") contains adequate information within the meaning of section 1125 of the Bankruptcy Code when combined with the Creditors' Committee Support Letter and the Disclosure Statement.

**Balloting and Voting Procedures**

G.    The procedures set forth below for the solicitation and tabulation of votes to accept or reject the Plan provide for a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code.

***Ballots***

H.    The ballots substantially in the forms annexed hereto as Exhibits 1-1 and 1-2, (collectively, the "Ballots"), including all voting instructions provided therein, are consistent with Official Form No. 14, address the particular needs of these chapter 11 cases, and provide adequate information and instructions for each individual entitled to vote to accept or reject the Plan. No further information or instructions are necessary.

*Parties Entitled to Vote*

I.    Pursuant to the Proposed Plan, allowed claims and interests in Class 2.A (General Unsecured Claims against TMFE not held by Debtors' Affiliates), Classes 2.B (General Unsecured Claims against TMFE held by Debtors' Affiliates as Intercompany Claims) and Class 6 (Equity Interests in TMI) are impaired and are entitled to receive distributions under the Proposed Plan. Accordingly, holders of allowed claims and equity interests in such classes are entitled to vote (collectively, the "Voting Classes").

*Parties Not Entitled to Vote*

J.    Pursuant to the Proposed Plan, allowed claims and equity interests in Class 1 (Secured Claims Against TMFE), Class 4 (Secured Claims Against TMI) and Class 5 (General Unsecured Claims Against TMI) are unimpaired (the "Unimpaired Classes"). Accordingly, pursuant to section 1126(f) of the Bankruptcy Code, holders of such claims or equity interests are conclusively presumed to accept the Plan and are not entitled to vote.

K.    Pursuant to the Proposed Plan, interests in Class 3 (Equity Interests in TMFE) (the "Non-Voting Impaired Class") will not receive or retain any property under the Plan. Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, holders of such interests are deemed to reject the Plan and are not entitled to vote on account of such interests (together with the Unimpaired Classes, the "Non-Voting Classes").

*Notices of Non-Voting Status*

L.    The Notices of Non-Voting Status, substantially in the forms annexed hereto as Exhibits 2-1 and 2-2, comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and, together with the Confirmation Hearing Notice, provide adequate notice to holders of claims or equity interests in the Non-Voting Classes of their non-voting status. No

the SEC, (v) the IRS; and (v) any party in interest who specifically requested such documents in the manner specified in the Disclosure Statement Notice. Such service complies with Bankruptcy Rule 3017(a) and no further service of such documents is necessary.

R.    The form and manner of notice of the time set for filing objections to, and the time, date, and place of, the Disclosure Statement Hearing to consider the approval of the Disclosure Statement and the other relief requested in the Motion was adequate and comports with due process and no further notice is necessary.

S.    All notices provided to date of the Disclosure Statement Hearing and all notices to be provided relating to confirmation of the Plan pursuant to the procedures set forth herein constitute good and sufficient notice to all parties in interest of all matters pertinent hereto and of all matters pertinent to the Confirmation Hearing and no other or further notice need be provided.

T.    The legal and factual bases set forth in the Motion establish just and sufficient cause to grant the relief requested therein.

NOW, THEREFORE, IT IS HEREBY ORDERED that:

1.    The Motion is GRANTED as set forth herein.

**Disclosure Statement and Committee Support Letters**

2.    The Disclosure Statement, Creditors' Committee Support Letter and Equity Committee Support Letter contain adequate information in accordance with section 1125 of the Bankruptcy Code and are APPROVED.

3.    All objections, if any, to the Disclosure Statement that have not been withdrawn or resolved are overruled.

## Solicitation and Voting Procedures

### *Appointment of Kurtzman Carson Consultants LLC as Solicitation Agent*

4.      Kurtzman Carson Consultants LLC is authorized to perform all balloting and solicitation services and any services incidental thereto.

### *Temporary Allowance / Disallowance of Claims and Equity Interests*

5.      Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a claim or equity interest, and without prejudice to the rights of the Debtors in any other context, each claim or interest within a class of claims or interests entitled to vote to accept or reject the Plan is temporarily allowed in an amount equal to the amount of such claim or interest as set forth in the Schedules or the Debtors' or the Solicitation Agent's records, as applicable, *provided that*:

   (a)      If a claim or equity interest is deemed allowed under the Proposed Plan, such claim is allowed for voting purposes in the deemed allowed amount set forth in the Proposed Plan;

   (b)      If a proof of claim was filed in an amount that is liquidated and non-contingent, such claim is temporarily allowed in the amount set forth on the proof of claim, unless such claim is disputed as set forth in subparagraph (g) below, or, if no proof of claim has been filed in respect of such claim, such claim is allowed for voting purposes in the amount, if any, of such claim as set forth in the Schedules;

   (c)      If a claim for which a proof of claim has filed is stated on its face to be contingent, unliquidated, or disputed, such claim is accorded one vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution, unless such claim is disputed as set forth in subparagraph (g) below;

   (d)      If a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim is temporarily allowed in the amount so estimated or allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

   (e)      If a claim is listed in the Schedules as contingent, unliquidated, or disputed or in a zero or an unknown amount, and a proof of claim was not (a) filed

or (b) deemed filed by an order of the Court prior to the Voting Deadline, such claim shall be disallowed for voting purposes pursuant to Bankruptcy Rule 3003(c);

(f)    If a claim is listed in the Schedules or on a filed proof of claim as partially contingent, unliquidated, or disputed, such claim is temporarily allowed in the amount that is liquidated, non-contingent, and undisputed for voting purposes only, and not for purposes of allowance or distribution, unless such claim is disputed as set forth in subparagraph (g) below;

(g)    If the Debtors have filed an objection or request for estimation of a claim on or before the Voting Record Date, such claim is temporarily disallowed except as ordered by the Court before the Voting Deadline; *provided, however,* that if the Debtors' objection seeks to reclassify or reduce the allowed amount of such claim, then such claim is temporarily allowed for voting purposes in the reduced amount and/or as reclassified, except as ordered by the Court before the Voting Deadline; and

(h)    For Class 2.A Claims only, if the Joint Official Liquidators shall have admitted a Claim in writing and no objection to such admission shall have been filed within 21 days of notice to the claimholder, then such claim shall be allowed for voting purposes in the admitted amount.

6.    If any creditor or equity interest holder seeks to challenge the allowance or disallowance of its claim or equity interest for voting purposes, such creditor or equity interest holder shall file with this Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim for voting purposes in a different amount (a "Rule 3018(a) Motion"). Upon the filing of any such motion, such creditor's or equity interest holder's Ballot shall be counted in accordance with the above-designated guidelines unless temporarily allowed in a different amount by an order of this Court entered prior to or concurrent with entry of an order confirming the Plan. Any Rule 3018(a) Motion must be filed no later than November 16, 2012.

7.    Each creditor or equity interest holder that votes to accept or reject the Plan is deemed to have voted the full amount of its claim or equity interest. A creditor or equity interest holder who holds claims or interests in multiple classes may vote to accept or reject the

Plan for each such class, and is deemed to have voted the full amount of its claim or equity interest for such classes, subject to paragraph 26(d) herein.

### *The Voting Record Date*

8.    The Voting Record Date shall be set as October 22, 2012.

9.    The record holders of claims shall be determined, as of the Voting Record Date, based upon the records of the Debtors and the Solicitation Agent. Accordingly, any notice of claim transfer received by the record holder of the Debtors' debt securities, the Debtors or the Solicitation Agent after the Voting Record Date shall not be recognized for purposes of voting or receipt of Plan confirmation materials.

10.    With respect to transfers of claims pursuant to Bankruptcy Rule 3001, the transferor of such claim shall be deemed to be the holder of the claim as of the Voting Record Date and be entitled to cast the ballot with respect to that claim unless the documentation evidencing such transfer was docketed by the Court prior to the Voting Record Date and no timely objection with respect to such transfer was filed by the transferor.

### *Solicitation Packages*

11.    The Solicitation Packages are APPROVED.

12.    The Voting Solicitation Package shall be distributed to each member of the Voting Classes, shall be mailed no later than five business days following entry of this Order and shall contain the following materials:

    (a)    this Order (without exhibits);

    (b)    the Confirmation Hearing Notice (as defined herein);

    (c)    a CD-ROM containing the Disclosure Statement, which shall include the Plan as an attachment;

(d)     the Creditors' Committee Support Letter (only to the holders of Claims in Class 2.A (General Unsecured Claims against TMFE not held by Debtors' Affiliates));

(e)     the Equity Committee Support Letter (only to the holders of Claims in Class 6 (Equity Interests in TMI); and

(f)     a Ballot customized for such holder and conforming to Official Bankruptcy Form No. 14, in the form described below, and a postage-prepaid return envelope.

13.     The Non-Voting Solicitation Packages shall be distributed to each member of the Non-Voting Class and shall contain the following materials:

(a)     a Notice of Non-Voting Status, in one of the forms as described below; and

(b)     the Confirmation Hearing Notice.

14.     The Debtors shall distribute the Notice Solicitation Packages to (i) the U.S. Trustee; (ii) counsel for the Creditors' Committee; (iii) counsel to the Equity Committee (iv) the SEC; (v) the IRS; (vi) all parties to executory contracts and unexpired leases that have not been assumed or rejected prior to entry of this Order and which are not already receiving the Voting Solicitation Packages; and (vii) any other party in interest who requests in writing a copy of the Disclosure Statement and the Proposed Plan, including any party that has requested notice of pleadings in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

15.     The Notice Solicitation Package shall contain the following materials:

(a)     the Confirmation Hearing Notice; and

(b)     a CD-ROM containing this Order (with Exhibits), the Disclosure Statement, which shall include the Plan as an attachment.

16.     The Debtors shall distribute the Confirmation Hearing Notice to any creditor, interest holder or other party in interest that would not otherwise receive a Solicitation Package.

17.    The Debtors may send the Disclosure Statement in a CD-ROM format instead of printed hard copies; *provided, however,* that any creditor or equity interest holder in a Voting Class may request a hardcopy of the Disclosure Statement and/or the Plan, and this Order by contacting Debtors' counsel or the Solicitation Agent by phone at (866) 967-0267, or by emailing TridentInfo@kccllc.com. In addition, the Disclosure Statement and the Proposed Plan shall be available for free to download at http://www.kccllc.net/Trident.

18.    With respect to addressees from which Disclosure Statement Notices, Confirmation Hearing Notices or Solicitation Packages are returned as undeliverable, the Debtors are excused from mailing Solicitation Packages or any other materials related to voting or confirmation of the Plan to those entities listed at such addresses unless the Debtors are provided with accurate addresses for such entities before the Solicitation Date, and failure to mail Solicitation Packages or any other materials related to voting or confirmation of the Plan to such entities shall not constitute inadequate notice of the Confirmation Hearing or the Voting Deadline and shall not constitute a violation of Bankruptcy Rule 3017(d) or otherwise.

### *Notices of Non-Voting Status*

19.    The Notices of Non-Voting Status are APPROVED.

20.    To creditors and equity interest holders in the Non-Voting Classes whose claims are unimpaired pursuant to the Plan, the Debtors shall send a Notice of Non-Voting Status – Unimpaired Class substantially in the form attached hereto as Exhibit 2-1. To creditors and equity interest holders in the Non-Voting Classes whose claims or equity interests are impaired and who are not entitled to receive distributions under the Plan, the Debtors shall send a Notice of Non-Voting Status – Impaired Class substantially in the form attached hereto as Exhibit 2-2.

### *Ballots*

21.   The Ballots are APPROVED.

22.   The Voting Deadline is set as November 26, 2012 at 5 p.m. (EST).

23.   All Ballots must be properly executed, completed, and delivered to the Solicitation Agent by (i) by first-class mail, in the return envelope provided with each Ballot, (ii) by overnight courier, or (iii) by hand delivery, so that they are *actually received* by the Solicitation Agent no later than the Voting Deadline.

24.   To holders of Allowed General Unsecured Claims in Classes 2.A and 2.B, the Debtors shall send a General Unsecured Ballot substantially in the form annexed hereto as Exhibit 1-1.

25.   To Holders of allowed Equity Interests in Classes 6, the Debtors shall send an Equity Interest Ballot substantially in the form annexed hereto as Exhibit 1-2.

### *Tabulation Procedures*

26.   The following tabulation procedures are APPROVED:

(a)   Whenever a holder of a claim or equity interest casts more than one Ballot voting the same claim(s) or equity interest(s) before the Voting Deadline, the last valid Ballot received before the Voting Deadline shall be deemed to reflect the voter's intent, and thus, to supersede any prior Ballots.

(b)   The following Ballots shall not be counted:

(1)   any Ballot that is properly completed, executed, and timely returned to the Solicitation Agent, but does not indicate either an acceptance or rejection of the Proposed Plan;

(2)   any Ballot that is properly completed, executed, and timely returned to the Solicitation Agent, but indicates both an acceptance and a rejection of the Proposed Plan;

(3)   any Ballot received by the Solicitation Agent, on the same day, but which are voted inconsistently;

(4)    any Ballot received after the Voting Deadline unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot;

(5)    any Ballot that is illegible or contains insufficient information to permit the identification of the voter;

(6)    any Ballot cast by a person or entity that does not hold a claim or equity interest in a class that is entitled to vote to accept or reject the Proposed Plan;

(7)    any Ballot cast by a person who is not entitled to vote, even if such individual holds a claim or equity interest in a Voting Class;

(8)    any unsigned Ballot;

(9)    any Ballot which the Court determines, after notice and a hearing, was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code; or

(10)    any Ballot transmitted to the Solicitation Agent by e-mail, facsimile or other means not specifically approved herein.

(c)    If a party that is entitled to vote has more than one claim within the same class against one Debtor based upon different transactions, that said party shall be entitled to one vote for numerosity purposes in the aggregate dollar amount of all of said claims.

(d)    If a party that is entitled to vote has claims (either scheduled or filed or both) against more than one of the Debtors based on the same transaction (*e.g.*, a claim against one Debtor that was guaranteed by another Debtor), that said party shall be entitled to one vote for numerosity purposes in a dollar amount based upon its claim against the Debtor that is the primary obligor.

27.    To assist in the solicitation process, the Solicitation Agent may, but is not obligated to, contact parties that submit incomplete or otherwise deficient Ballots to cure such deficiencies.

**The Confirmation Hearing**

28.    The Confirmation Hearing shall be held on December 13, 2012 at 1:00 p.m. (EST); *provided, however,* that the Confirmation Hearing may be adjourned or

continued from time to time by the Court or the Debtors without further notice other than adjournments announced in open Court or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Court.

### *Objection Procedures*

29.    The Confirmation Objection Deadline to object or respond to confirmation of the Proposed Plan shall be November 26, 2012 at 4:00 p.m. (EST).

30.    Objections and responses, if any, to confirmation of the Plan must (a) be in writing, (b) conform to the Bankruptcy Rules and the Local Rules, (c) set forth the name of the objecting party, the nature and amount of claims or interests held or asserted by the objecting party against the Debtors' estates or property, and (d) set forth the basis for the objection and the specific grounds therefore.

31.    Any objection or response must be filed with the Court, together with the proof of service, and served upon and received by the following parties no later than the Confirmation Objection Deadline:

| Debtors | Counsel to the Debtors |
|---|---|
| Trident Microsystems, Inc.<br>5201 Great America Parkway, Suite 320, Santa Clara, California 95054<br>Attn: David Teichmann<br>Facsimile: (408) 786-0174<br>Email: David.Teichmann@tridentmicro.com | DLA PIPER LLP (US)<br>203 North LaSalle Street, Suite 1900<br>Chicago, Illinois 60601<br>Attn: Richard A. Chesley<br>　　　Kimberly D. Newmarch<br>　　　Chun I. Jang<br>Facsimile: (312) 236-7516<br>Email: richard.chesley@dlapiper.com<br>　　　kim.newmarch@dlapiper.com<br>　　　chun.jang@dlapiper.com<br>and |
| **Office of the U.S. Trustee**<br><br>The Office of the United States Trustee<br>844 King Street<br>Suite 2207<br>Wilmington, Delaware 19801<br>Attn: Juliet M. Sarkessian<br>Facsimile: (302) 573-6497<br>Email: Juliet.M.Sarkessian@usdoj.gov | DLA PIPER LLP (US)<br>919 North Market Street, Suite 1500<br>Wilmington, Delaware 19801<br>Attn: Stuart M. Brown<br>Facsimile: (302) 394-2341<br>Email: stuart.brown@dlapiper.com |

32.    The Debtors are authorized to file and serve replies or an omnibus reply to any objections or responses to confirmation of the Plan no later than two business days prior to the Confirmation Hearing.

33.    Objections or responses to confirmation of the Plan that are not timely filed, served, and actually received in the manner set forth above may not be considered and may be deemed overruled.

### *Confirmation Hearing Notice*

34.    The notice substantially in the form annexed hereto as <u>Exhibit 3</u> (the "Confirmation Hearing Notice") is **APPROVED**.

35.    The Debtors shall publish a notice of the Confirmation Hearing, substantially in the form of the Confirmation Hearing Notice, once not later than twenty-eight (28) days before the Confirmation Objection Deadline in *The Wall Street Journal*.

EAST\51980670.4

15

36.    The Debtors are authorized, in their sole discretion, to take or refrain from taking any action necessary or appropriate to implement the terms of and the relief granted in this Order without seeking further order of the Court.

**_Key Dates_**

37.    The deadlines and dates below are hereby approved.

| | |
|---|---|
| Voting Record Date | October 22, 2012 |
| Deadline to Object to Claims for Voting Purposes | October 22, 2012 |
| Solicitation Date | October 29, 2012 |
| Deadline to file Rule 3018(a) Motion | November 16, 2012 |
| Voting Deadline | November 26, 2012 at 5:00 p.m. (EST) |
| Confirmation Objection Deadline | November 26, 2012 at 4:00 p.m. (EST) |
| Confirmation Hearing | December 13, 2012 at 1:00 p.m. (EST) |

38.    The Debtors are authorized to make nonsubstantive changes to the Disclosure Statement, the Plan, the Ballots, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure Statement, the Plan and any other materials in the Solicitation Packages prior to mailing.

Dated:    October 22 , 2012
            Wilmington, Delaware

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1-1

**General Unsecured Ballot for Class 2.A and 2.B**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-----------------------------------------------------x
                                        :  Chapter 11
In re:                                  :
                                        :  Case No. 12-10069 (CSS)
Trident Microsystems, Inc., et al.,¹    :
                                        :  (Jointly Administered)
            Debtors.                    :
                                        :
-----------------------------------------------------x
```

## BALLOT FOR HOLDERS OF GENERAL
## UNSECURED CLAIMS IN CLASS 2.A AND 2B

Trident Microsystems, Inc. and Trident Microsystems (Far East) Ltd.(collectively, the "Debtors"), are soliciting votes with respect to the *Debtors' First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, dated September 17, 2012 (as it may be amended or modified, the "Proposed Plan"), from the holders of certain impaired claims and interests against the Debtors. All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to such terms in the Proposed Plan. If you have any questions on how to properly complete this Ballot, please call Kurtzman Carson Consultants LLC (the "Solicitation Agent") at (866) 967-0267.

**THIS BALLOT IS TO BE USED FOR VOTING BY HOLDERS OF GENERAL UNSECURED CLAIMS AGAINST TRIDENT MICROSYSTEMS (FAR EAST) LTD.**

**VOTING INSTRUCTIONS FOR COMPLETING THE BALLOT FOR HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASSES 2.A and 2.B**

**You should review the Disclosure Statement and the Proposed Plan before you vote. You may wish to seek legal advice concerning the Proposed Plan and your classification and treatment under the Proposed Plan. Your claim has been placed in Class 2 under the Plan. If you hold claims or equity interests in more than one class, you will receive a ballot for each class in which you are entitled to vote. The tabulation procedures for the Ballots can be found in Paragraph 26 of the Bankruptcy Court's Order approving the Disclosure Statement.**

---

[1]    The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd. The mailing address of each of the Debtors, solely for purposes of notices and communications, is 5201 Great America Parkway, Suite 320, Santa Clara, California 95054.

1.   This Ballot is submitted to you to solicit your vote to accept or reject the Proposed Plan. **PLEASE READ THE PROPOSED PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.   The Proposed Plan will be accepted by each of the Classes 2.A and 2.B if it is accepted by the holders of two-thirds in amount and more than one-half in number of Claims in such Class voting on the Proposed Plan.  In the event that any of Class 2.A and 2.B reject the Proposed Plan, the Bankruptcy Court may nevertheless confirm the Proposed Plan and thereby make it binding on holders of claims in such Class if the Bankruptcy Court finds that the Proposed Plan does not unfairly discriminate against, and accords fair and equitable treatment to, the holders of Claims in such Class and all other Classes of Claims and Equity Interests rejecting the Proposed Plan, and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  If the Proposed Plan is confirmed by the Bankruptcy Court, all holders of Claims against and Equity Interests in the Debtors (including those holders who abstain from voting on or reject the Proposed Plan, and those holders who are not entitled to vote on the Proposed Plan) will be bound by the confirmed Proposed Plan and the transactions contemplated thereby.

3.   To properly complete this Ballot, you must follow the procedures described below:

   a.   make sure to supply the information requested in Item 1 below;

   b.   cast a vote to accept or reject the Proposed Plan by checking the appropriate box in Item 2 below;

   c.   if you are completing this Ballot on behalf of another person or entity, indicate your relationship with such person or entity and the capacity in which you are signing.  You may be requested to provide satisfactory evidence of your authority to so act (e.g., a power of attorney or a certified copy of board resolutions authorizing you to so act);

   d.   if you also hold other claims or interests in classes entitled to vote, you should receive a different Ballot for each such claim or interest.  Your vote will be counted in determining acceptance or rejection of the Proposed Plan by a particular class only if you complete, sign and return the Ballot labeled for that class in accordance with the instructions on that Ballot;

   e.   if you believe that you have received the wrong Ballot, please contact the Solicitation Agent, Kurtzman Carson Consultants LLC, by phone at (866) 967-0267, or by emailing TridentInfo@kccllc.com immediately;

f.    fill in all of the information sought under Item 3 below including your name and mailing address;

g.    sign and date your Ballot where indicated in Item 3 below;

h.    return your Ballot (with an **original signature**) using the enclosed pre-addressed return envelope <u>or</u> by hand delivery or overnight courier to the Solicitation Agent at the following address so that it is received no later than **5:00 p.m. (EST) on November 26, 2012**:

> Trident Microsystems Voting
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, California 90245

**Ballots will NOT be accepted by e-mail, telecopy, facsimile, or other electronic means of transmission.**

and

i.    In order for your vote to be counted, this Ballot must be properly completed, signed, and returned in the envelope provided. The Solicitation Agent **must receive all Ballots with original signatures by no later than 5:00 p.m. (EST) on November 26, 2012** (the "<u>Voting Deadline</u>"), unless such time is extended in writing by the Debtors.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH THIS BALLOT, IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT, PROPOSED PLAN OR ORDER APPROVING THE DISCLOSURE STATEMENT OR IF YOU NEED ADDITIONAL COPIES OF THIS BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DEBTORS' SOLICITATION AGENT, KURTZMAN CARSON CONSULTANTS LLC AT (866) 967-0267 OR BY EMAIL AT TridentInfo@kccllc.net. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT. PLEASE ALSO NOTE THAT THE SOLICITATION AGENT IS NOT PERMITTED TO GIVE LEGAL ADVICE.

**PLEASE COMPLETE THE FOLLOWING:**

**Item 1.    Amount of General Unsecured Claims.** The undersigned hereby certifies that it holds General Unsecured Claims against the Debtor referenced below in the amount set forth below.

> **Debtor:**  Trident Microsystems (Far East) Ltd.
> **Amount of General Unsecured Claims:** $_____

**Item 2.   Vote on the Proposed Plan.**  The undersigned holder of the General Unsecured Claims identified in Item 1 above hereby votes to:

<u>IMPORTANT:</u>   SECTION IX.B.2 OF THE PLAN PROVIDES THAT HOLDERS OF GENERAL UNSECURED CLAIMS WHO VOTE TO ACCEPT THE PLAN SHALL BE DEEMED TO HAVE RELEASED ALL CLAIMS AGAINST THE DEBTORS AND CERTAIN THIRD PARTIES UPON THE EFFECTIVE DATE OF THE PLAN.  YOU WILL BE BOUND BY THE RELEASE PROVISIONS SET FORTH IN SECTION IX.B.2 IF YOU VOTE TO ACCEPT THE PLAN.  PLEASE SEE ARTICLE IX OF THE PLAN AND ARTICLE VI OF THE DISCLOSURE STATEMENT FOR FURTHER INFORMATION ABOUT THE RELEASES.

<p align="center"><u>Check One Box Only</u></p>

<p align="center">☐ <b>Accept</b> the Proposed Plan</p>

<p align="center">☐ <b>Reject</b> the Proposed Plan</p>

**Item 3.   Acknowledgements and Certification.**   By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Disclosure Statement and the Proposed Plan, including all exhibits thereto, as well as notice of the hearing to consider confirmation of the Proposed Plan.  The undersigned certifies that (i) it is the holder of the General Unsecured Claims identified in Item 1 above as of the Voting Record Date and (ii) it has full power and authority to vote to accept or reject the Proposed Plan.  The undersigned further acknowledges that the Debtors' solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for the solicitation of votes to accept or reject the Proposed Plan contained therein.

| | |
|---|---|
| Print or Type Name of Claimant | _____ |
| Social Security No./Federal Tax I.D. No. | _____ |
| Signature | _____ |
| Name of Signatory (if different than claimant) | _____ |
| If by Authorized Agent, Title of Agent | _____ |
| Street Address | _____ |
| | _____ |
| City, State and Zip Code | _____ |
| Telephone Number | _____ |
| Email Address | _____ |
| Date Completed | _____ |

*Please check <u>one or both</u> of the below boxes, if the above address is a change of address for the purpose(s) of:*

☐   *future notice mailings; <u>AND/OR</u>*

☐   *distribution payments*

If any creditor or equity interest holder seeks to challenge the allowance or disallowance of its claim or equity interest for voting purposes in accordance with Paragraph 5 of the Bankruptcy Court's Order approving the Disclosure Statement , such creditor or equity interest holder shall file with this Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim for voting purposes in a different amount (a "Rule 3018(a) Motion"). Upon the filing of any such motion, such creditor's or equity interest holder's Ballot shall be counted in accordance with the guidelines set forth in paragraph 5 of the Order approving the Disclosure Statement, unless temporarily allowed in a different amount by an order of this Court entered prior to or concurrent with entry of an order confirming the Plan. Any Rule 3018(a) Motion must be filed no later than November 16, 2012.

The Plan Supplement shall be filed no later than November 16, 2012 and will be available on the website of the Solicitation Agent, Kurtzman Carson Consultants LLC, http://www.kccllc.net/Trident, or by contacting them by phone at (866) 967-0267, or by emailing TridentInfo@kccllc.com.

## Exhibit 1-2

## Equity Interest Ballot

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------x
                                      :    Chapter 11
In re:                                :
                                      :    Case No. 12-10069 (CSS)
Trident Microsystems, Inc., et al.,[1]  :
                                      :    (Jointly Administered)
         Debtors.                     :
                                      :
                                      :
-------------------------------------------------------x
```

## BALLOT FOR HOLDERS OF EQUITY INTERESTS IN CLASS 6

Trident Microsystems, Inc. and Trident Microsystems (Far East) Ltd.(collectively, the "Debtors"), are soliciting votes with respect to the *Debtors' First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code*, dated September 17, 2012 (as it may be amended or modified, the "Proposed Plan"), from the holders of certain impaired claims and interests against the Debtors.  All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to such terms in the Proposed Plan.  If you have any questions on how to properly complete this Ballot, please call Kurtzman Carson Consultants LLC (the "Solicitation Agent") at (866) 967-0267.

**THIS BALLOT IS TO BE USED FOR VOTING BY HOLDERS OF EQUITY INTERESTS IN TRIDENT MICROSYSTEMS INC. ONLY.**

## VOTING INSTRUCTIONS FOR COMPLETING THE BALLOT FOR HOLDERS OF EQUITY INTERESTS IN CLASS 6

**You should review the Disclosure Statement and the Proposed Plan before you vote. You may wish to seek legal advice concerning the Proposed Plan and your classification and treatment under the Proposed Plan. Your equity interests have been placed in Class 6 under the Plan. If you hold claims or equity interests in more than one class, you will receive a ballot for each class in which you are entitled to vote.  The tabulation procedures for the Ballots can be found in Paragraph 26 of the Bankruptcy Court's Order approving the Disclosure Statement.**

---

[1]    The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd.  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 5201 Great America Parkway, Suite 320, Santa Clara, California 95054.

1.    This Ballot is submitted to you to solicit your vote to accept or reject the Proposed Plan. **PLEASE READ THE PROPOSED PLAN AND THE DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.    The Proposed Plan will be accepted by Class 6 if it is accepted by the holders of two-thirds in amount of the Equity Interests in such Class voting on the Proposed Plan. In the event that Class 6 rejects the Proposed Plan, the Bankruptcy Court may nevertheless confirm the Proposed Plan and thereby make it binding on holders of Equity Interests in such Class if the Bankruptcy Court finds that the Proposed Plan does not unfairly discriminate against, and accords fair and equitable treatment to, the holders of Equity Interests in such Class and all other Classes of Claims and Equity Interests rejecting the Proposed Plan, and otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Proposed Plan is confirmed by the Bankruptcy Court, all holders of Claims against and Equity Interests in the Debtors (including those holders who abstain from voting on or reject the Proposed Plan, and those holders who are not entitled to vote on the Proposed Plan) will be bound by the confirmed Proposed Plan and the transactions contemplated thereby.

3.    To properly complete this Ballot, you must follow the procedures described below:

    a.    make sure to supply the information requested in Item 1 below;

    b.    cast a vote to accept or reject the Proposed Plan by checking the appropriate box in Item 2 below;

    c.    if you are completing this Ballot on behalf of another person or entity, indicate your relationship with such person or entity and the capacity in which you are signing. You may be requested to provide satisfactory evidence of your authority to so act (e.g., a power of attorney or a certified copy of board resolutions authorizing you to so act);

    d.    if you also hold other claims or interests in classes entitled to vote, you should receive a different Ballot for each such claim or interest. Your vote will be counted in determining acceptance or rejection of the Proposed Plan by a particular class only if you complete, sign and return the Ballot labeled for that class in accordance with the instructions on that Ballot;

    e.    if you believe that you have received the wrong Ballot, please contact the Solicitation Agent, Kurtzman Carson Consultants LLC, by phone at (866) 967-0267, or by emailing TridentInfo@kccllc.com immediately;

    f.    fill in all of the information sought under Item 3 below including your name and mailing address;

g.    sign and date your Ballot where indicated in Item 3 below;

h.    return your Ballot (with an **original signature**) using the enclosed pre-addressed return envelope <u>or</u> by hand delivery or overnight courier to the Solicitation Agent at the following address so that it is received no later than **5:00 p.m. (EST) on November 26, 2012**:

> Trident Microsystems Voting
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, California 90245

**Ballots will NOT be accepted by e-mail, telecopy, facsimile, or other electronic means of transmission.**

and

i.    In order for your vote to be counted, this Ballot must be properly completed, signed, and returned in the envelope provided. The Solicitation Agent **must receive** all Ballots with original signatures by no later than **5:00 p.m. (EST) on November 26, 2012** (the "<u>Voting Deadline</u>"), unless such time is extended in writing by the Debtors.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT, IF YOU DID NOT RECEIVE A RETURN ENVELOPE WITH THIS BALLOT, IF YOU DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT, PROPOSED PLAN OR ORDER APPROVING THE DISCLOSURE STATEMENT OR IF YOU NEED ADDITIONAL COPIES OF THIS BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DEBTORS' SOLICITATION AGENT, KURTZMAN CARSON CONSULTANTS LLC AT (866) 967-0267 OR BY EMAIL AT TridentInfo@kccllc.com. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT. PLEASE ALSO NOTE THAT THE SOLICITATION AGENT IS NOT PERMITTED TO GIVE LEGAL ADVICE.

**PLEASE COMPLETE THE FOLLOWING:**

**Item 1. Number of Equity Interests.** The undersigned hereby certifies that it holds Equity Interests against the Debtor referenced below in the amount set forth below.

> **Debtor:** Trident Microsystems, Inc.
> **Number of Shares:** _____

**Item 2.  Vote on the Proposed Plan.**  The undersigned holder of the Equity Interests identified in Item 1 above hereby votes to:

<u>IMPORTANT:</u>  SECTION IX.B.2 OF THE PLAN PROVIDES THAT HOLDERS OF EQUITY IN CLASS 6 WHO VOTE TO ACCEPT THE PLAN SHALL BE DEEMED TO HAVE RELEASED ALL CLAIMS AGAINST THE DEBTORS AND CERTAIN THIRD PARTIES UPON THE EFFECTIVE DATE OF THE PLAN.  YOU WILL BE BOUND BY THE RELEASE PROVISIONS SET FORTH IN SECTION IX.B.2 IF YOU VOTE TO ACCEPT THE PLAN.  PLEASE SEE ARTICLE IX OF THE PLAN AND ARTICLE VI OF THE DISCLOSURE STATEMENT FOR FURTHER INFORMATION ABOUT THE RELEASES.

<u>**Check One Box Only**</u>

☐ **Accept** the Proposed Plan

☐ **Reject** the Proposed Plan

**Item 3.  Acknowledgements and Certification.**  By signing this Ballot, the undersigned acknowledges that the undersigned has been provided with a copy of the Disclosure Statement and the Proposed Plan, including all exhibits thereto, as well as notice of the hearing to consider confirmation of the Proposed Plan.  The undersigned certifies that (i) it is the holder of the Equity Interests identified in Item 1 above and (ii) it has full power and authority to vote to accept or reject the Proposed Plan.  The undersigned further acknowledges that the Debtors' solicitation of votes is subject to all terms and conditions set forth in the Disclosure Statement and the order of the Bankruptcy Court approving the Disclosure Statement and the procedures for the solicitation of votes to accept or reject the Proposed Plan contained therein.

**By signing this ballot you authorize and request that any institution through which you hold shares of Trident Microsystems, Inc. ("TMI") to verify to TMI (I) that as of the Voting Record Date you held shares in TMI and (ii) the number of shares you held. Further, you understand that if you do not hold the TMI shares in your own name you must provide evidence with this ballot that you actually owned the TMI shares as of the Voting Record Date.**

| | |
|---|---|
| **Print or Type Name of Claimant** | _____ |
| **Social Security No./Federal Tax I.D. No.** | _____ |
| **Signature** | _____ |
| **Name of Signatory (if different than claimant)** | _____ |
| **If by Authorized Agent, Title of Agent** | _____ |
| **Street Address** | _____ |
| | _____ |

| | |
|---|---|
| City, State and Zip Code | _____ |
| Telephone Number | _____ |
| Email Address | _____ |
| Date Completed | _____ |

If any creditor or equity interest holder seeks to challenge the allowance or disallowance of its claim or equity interest for voting purposes in accordance with Paragraph 5 of the Bankruptcy Court's Order approving the Disclosure Statement , such creditor or equity interest holder shall file with this Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim for voting purposes in a different amount (a "Rule 3018(a) Motion").  Upon the filing of any such motion, such creditor's or equity interest holder's Ballot shall be counted in accordance with the guidelines set forth in paragraph 5 of the Order approving the Disclosure Statement, unless temporarily allowed in a different amount by an order of this Court entered prior to or concurrent with entry of an order confirming the Plan.  Any Rule 3018(a) Motion must be filed no later than November 16, 2012.

The Plan Supplement shall be filed no later than November 16, 2012 and will be available on the website of the Solicitation Agent, Kurtzman Carson Consultants LLC, http://www.kccllc.net/Trident, or by contacting them by phone at (866) 967-0267, or by emailing TridentInfo@kccllc.com.

## Exhibit 2-1

**Notice of Non-Voting Status to Unimpaired Classes**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------x
                                                  :   Chapter 11
In re:                                            :
                                                  :   Case No. 12-10069 (CSS)
Trident Microsystems, Inc., et al.,¹              :
                                                  :   (Jointly Administered)
            Debtors.                              :
                                                  :
-------------------------------------------------x
```

## NOTICE OF NON-VOTING STATUS TO UNIMPAIRED CLASSES[2]

    **Approval of Disclosure Statement.** By order, dated October 22, 2012 (the "<u>Disclosure Statement Order</u>"), the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") approved the Debtors' disclosure statement (the "<u>Disclosure Statement</u>") for the *Debtors' First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code,* dated September 17, 2012 (the "<u>Proposed Plan</u>") pursuant to chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Disclosure Statement Order authorizes the Debtors to solicit votes to accept or reject the Debtors' Proposed Plan.

    The Disclosure Statement Order authorizes the Debtors to solicit votes to accept or reject the Proposed Plan, a copy of which is annexed as <u>Exhibit A</u> to the Disclosure Statement. Interested parties may review and download the Plan, Disclosure Statement, Order approving the Disclosure Statement and related documents free of charge at http://www.kccllc.net/Trident, or by requesting a paper copy by calling the Solicitation Agent, Kurtzman Carson Consultants LLC, at (866) 967-0267, or by emailing TridentInfo@kccllc.com.

    The Plan Supplement shall be filed no later than November 16, 2012 and will be available on the website of the Solicitation Agent, Kurtzman Carson Consultants LLC, http://www.kccllc.net/Trident, or by contacting them by phone at (866) 967-0267, or by emailing TridentInfo@kccllc.com.

## UNDER THE TERMS OF THE PROPOSED PLAN AND AS OUTLINED BELOW, YOUR CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS

---

[1]    The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd. The mailing address of each of the Debtors, solely for purposes of notices and communications, is 5201 Great America Parkway, Suite 320, Santa Clara, California 95054.

[2]    Unimpaired Classes include the following: allowed claims and equity interests in Class 1 (Secured Claims Against TMFE), Class 4 (Secured Claims Against TMI) and Class 5 (General Unsecured Claims Against TMI) under the Proposed Plan.

**ARE NOT IMPAIRED AND THEREFORE, PURSUANT TO SECTION 1126(f) OF BANKRUPTCY CODE CODE, YOU ARE (I) DEEMED TO HAVE ACCEPTED THE PROPOSED PLAN AND (II) ARE NOT ENTITLED TO VOTE ON THE PROPOSED PLAN. IF YOU HAVE ANY QUESTIONS ABOUT THE STATUS OF YOUR CLAIMS OR EQUITY INTERESTS, OR YOU WANT TO REQUEST A COPY OF THE PROPOSED PLAN AND DISCLOSURE STATEMENT, YOU SHOULD CONTACT THE DEBTORS' SOLICITATION AGENT, KURTZMAN CARSON CONSULTANTS LLC AT KURTZMAN CARSON CONSULTANTS AT (866) 967-0267.   PLEASE NOTE THAT THE SOLICITATION AGENT IS NOT PERMITTED TO GIVE LEGAL ADVICE.**

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount | Approximate Percentage Recovery |
|---|---|---|---|---|
| 1 | Secured Claims Against TMFE | Not impaired.  To the extent that any Secured Claims against TMFE exist, except to the extent that a holder of an Allowed Secured Claim against TMFE has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMFE shall receive from TMFE, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed. | $0 | 100% |
| 4 | Secured Claims Against TMI | Not impaired.  To the extent that any Secured Claims against TMI exist; except to the extent that a holder of an Allowed Secured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of an Allowed Secured Claim against TMI shall receive from TMI, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed. | $0 | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount | Approximate Percentage Recovery |
|---|---|---|---|---|
| 5 | General Unsecured Claims Against TMI | Not impaired. After: (i) the reservation of sufficient funds necessary for the TMI Responsible Person to carry out its duties and to pay outstanding Administrative Claims against TMI in full, (ii) payment of Allowed TMI Secured Claims in Class 4, and (iii) reservation of sufficient funds necessary to satisfy all Disputed Claims against TMI in full; except to the extent that a holder of a General Unsecured Claim against TMI has been paid by the Debtors, in whole or in part, prior to the Effective Date or agrees to a less favorable treatment, each holder of a General Unsecured Claim against TMI shall receive from TMI, Cash in the full amount of such Allowed Claim, on or as soon as reasonably practicable after the later of (a) the Initial Distribution Date and (b) the date such Claim becomes Allowed. | $2,200,000 to $3,200,000 | 100% |

Dated:  October 22, 2012            Respectfully submitted,
        Wilmington, Delaware

/s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
Cynthia Moh (DE 5041)
DLA PIPER LLP (US)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@dlapiper.com
       cynthia.moh@dlapiper.com

-and-

Richard A. Chesley (IL 6240877)
Kimberly D. Newmarch (DE 4340)
Chun I. Jang (DE 4790)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516
Email:  richard.chesley@dlapiper.com
       kim.newmarch@dlapiper.com
       chun.jang@dlapiper.com

ATTORNEYS FOR DEBTORS

## Exhibit 2-2

**Notice of Non-Voting Status to Impaired Classes**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------x
                                                     :    Chapter 11
In re:                                               :
                                                     :    Case No. 12-10069 (CSS)
Trident Microsystems, Inc., et al.,¹                 :
                                                     :    (Jointly Administered)
            Debtors.                                 :
                                                     :
-----------------------------------------------------x
```

### NOTICE OF NON-VOTING STATUS TO IMPAIRED CLASSES[2]

**Approval of Disclosure Statement.**  By order, dated October 22, 2012 (the "Disclosure Statement Order"), the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") approved the Debtors' disclosure statement (the "Disclosure Statement") for the *Debtors' First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code,* dated September 17, 2012 (the "Proposed Plan") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Disclosure Statement Order authorizes the Debtors to solicit votes to accept or reject the Debtors' Proposed Plan.

The Disclosure Statement Order authorizes the Debtors to solicit votes to accept or reject the Proposed Plan, a copy of which is annexed as Exhibit A to the Disclosure Statement. Interested parties may review and download the Plan, Disclosure Statement, Order approving the Disclosure Statement and related documents free of charge at http://www.kccllc.net/Trident, or by requesting a paper copy by calling the Solicitation Agent, Kurtzman Carson Consultants LLC, at (866) 967-0267, or by emailing TridentInfo@kccllc.com.

The Plan Supplement shall be filed no later than November 16, 2012 and will be available on the website of the Solicitation Agent, Kurtzman Carson Consultants LLC, http://www.kccllc.net/Trident, or by contacting them by phone at (866) 967-0267, or by emailing TridentInfo@kccllc.com.

**UNDER THE TERMS OF THE PROPOSED PLAN, YOU WILL NOT RECEIVE OR RETAIN ANY DISTRIBUTION OR PROPERTY UNDER THE PLAN ON ACCOUNT OF YOUR EQUITY INTERESTS IN THE DEBTORS AND THEREFORE, PURSUANT TO SECTION 1126(g) OF THE BANKRUPTCY CODE, YOU ARE (I)**

---

[1]    The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd.  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 5201 Great America Parkway, Suite 320, Santa Clara, California 95054.

[2]    Class 3 Equity Interests in Trident Microsystems Far East (Ltd) under the Proposed Plan is not entitled to vote.

DEEMED TO HAVE REJECTED THE PROPOSED PLAN AND (II) ARE NOT ENTITLED TO VOTE ON THE PROPOSED PLAN. IF YOU HAVE ANY QUESTIONS ABOUT THE STATUS OF YOUR EQUITY INTERESTS, OR YOU WANT TO REQUEST A COPY OF THE PROPOSED PLAN AND DISCLOSURE STATEMENT, YOU SHOULD CONTACT THE DEBTORS' SOLICITATION AGENT, KURTZMAN CARSON CONSULTANTS AT (866) 967-0267.    PLEASE NOTE THAT THE SOLICITATION AGENT IS NOT PERMITTED TO GIVE LEGAL ADVICE.

Dated:  October 22, 2012
       Wilmington, Delaware

Respectfully submitted,

/s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
Cynthia Moh (DE 5041)
DLA PIPER LLP (US)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@dlapiper.com
       cynthia.moh@dlapiper.com

-and-

Richard A. Chesley (IL 6240877)
Kimberly D. Newmarch (DE 4340)
Chun I. Jang (DE 4790)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email:  richard.chesley@dlapiper.com
       kim.newmarch@dlapiper.com
       chun.jang@dlapiper.com

ATTORNEYS FOR DEBTORS

## Exhibit 3

**Notice of the Confirmation Hearing**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------x
                                          :   Chapter 11
In re:                                    :
                                          :   Case No. 12-10069 (CSS)
Trident Microsystems, Inc., et al.,[1]    :
                                          :   (Jointly Administered)
           Debtors.                       :
                                          :   Hearing Date: Dec. 13, 2012 at 1:00 p.m. (EST)
                                          :   Objection Deadline: Nov. 26, 2012 at 4:00 p.m. (EST)
---------------------------------------------------x
```

### NOTICE OF (I) APPROVAL OF THE
### DISCLOSURE STATEMENT, (II) ESTABLISHMENT OF
### SOLICITATION AND VOTING PROCEDURES, (III) SCHEDULING A
### CONFIRMATION HEARING, AND (IV) ESTABLISHMENT OF NOTICE AND
### OBJECTION PROCEDURES FOR CONFIRMATION OF THE PROPOSED PLAN

TO ALL PARTIES IN INTEREST IN TRIDENT MICROSYSTEMS, INC. AND TRIDENT MICROSYSTEMS (FAR EAST) LTD. (COLLECTIVELY, THE "DEBTORS"), PLEASE TAKE NOTICE THAT:

**Approval of Disclosure Statement**. By order, dated October 22, 2012 (the "Disclosure Statement Order"), the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") approved the Debtors' disclosure statement (the "Disclosure Statement") for the *Debtors' First Amended Joint Plan of Liquidation Under Chapter 11 of the Bankruptcy Code,* dated September 17, 2012 (the "Proposed Plan") pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Disclosure Statement Order authorizes the Debtors to solicit votes to accept or reject the Debtors' Proposed Plan.

**Confirmation Hearing**. The Bankruptcy Court shall hold a hearing (the "Confirmation Hearing") to consider the confirmation of the Proposed Plan on **December 13, 2012 at 1:00 p.m. (EST)**, before The Honorable Christopher S. Sontchi, United States Bankruptcy Judge, in Courtroom #6 of the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice other than the announcement by the Debtors in open court of the adjourned date(s) at the Confirmation Hearing or any continued hearing or as indicated in any notice of agenda of matters scheduled for hearing filed with the Bankruptcy

---

[1]    The Debtors are the following two entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Trident Microsystems, Inc. (6584) and Trident Microsystems (Far East) Ltd. The mailing address of each of the Debtors, solely for purposes of notices and communications, is 5201 Great America Parkway, Suite 320, Santa Clara, California 95054.

Court. The Debtors may modify the Proposed Plan, if necessary, prior to, during, or as a result of the Confirmation Hearing in accordance with the terms of the Proposed Plan without further notice.

**Voting Procedures.** Certain holders of impaired claims against or equity interests in the Debtors' estates as of **October 22, 2012** (the "Voting Record Date") are entitled to vote. If you hold such a claim or equity interest, you will receive a solicitation package which shall include a copy of (i) the Disclosure Statement Order, (ii) this Notice, (iii) a CD-ROM containing the Disclosure Statement, with the Proposed Plan attached to it, and (iv) one or more ballots. Please review the ballot(s) and the attached instructions for how to vote on the Proposed Plan. Failure to follow the voting instructions may disqualify your vote.

**Voting Deadline.** The deadline to vote on the Proposed Plan is **November 26, 2012 at 5:00 p.m. (EST)** (the "Voting Deadline"). The Debtors' solicitation agent, Kurtzman Carson Consultants LLC, must **receive** your ballot with an original signature by the Voting Deadline, otherwise your vote will not be counted.

**Parties in Interest Not Entitled to Vote.** Holders of unimpaired and certain impaired claims against or equity interests in the Debtors' estates are not entitled to vote. If you hold such a claim or equity interest, you will receive a notice of your non-voting status.

**Plan Supplement.** The Plan Supplement shall be filed no later than November 16, 2012 and will be available on the website of the Solicitation Agent, Kurtzman Carson Consultants LLC, http://www.kccllc.net/Trident, or by contacting them by phone at (866) 967-0267, or by emailing TridentInfo@kccllc.com.

**Objections to Confirmation.** Objections or responses to confirmation of the Proposed Plan, if any, must (i) be in writing; (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the District of Delaware; (iii) set forth the name of the objecting party, the nature and amount of claims or equity interests held or asserted by the objecting party against the Debtors' estates or property and (iv) provide the basis for the objection and the specific grounds therefore.

All objections and responses to the confirmation of the Proposed Plan must be filed with the Bankruptcy Court, together with proof of service, and served, so as to be received no later than **November 26, 2012 at 4:00 p.m. (EST)**, upon:

| Debtors | Counsel to the Debtors |
|---|---|
| Trident Microsystems, Inc.<br>5201 Great America Parkway, Suite 320, Santa Clara, California 95054<br>Attn: David Teichmann<br>Facsimile: (408) 786-0174<br>Email: David.Teichmann@tridentmicro.com | DLA PIPER LLP (US)<br>203 North LaSalle Street, Suite 1900<br>Chicago, Illinois 60601<br>Attn: Richard A. Chesley<br>    Kimberly D. Newmarch<br>    Chun I. Jang<br>Facsimile: (312) 236-7516<br>Email: richard.chesley@dlapiper.com |
| **Office of the U.S. Trustee** | kim.newmarch@dlapiper.com<br>chun.jang@dlapiper.com |
| The Office of the United States Trustee<br>844 King Street<br>Suite 2207<br>Wilmington, Delaware 19801<br>Attn: Juliet M. Sarkessian<br>Facsimile: (302) 573-6497<br>Email: Juliet.M.Sarkessian@usdoj.gov | and<br><br>DLA PIPER LLP (US)<br>919 North Market Street, Suite 1500<br>Wilmington, Delaware 19801<br>Attn: Stuart M. Brown<br>Facsimile: (302) 394-2341<br>Email: stuart.brown@dlapiper.com |

Pursuant to Bankruptcy Rule 3020(b), if no objection to confirmation of the Proposed Plan is timely filed, the Bankruptcy Court may determine that the Proposed Plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues.

If any creditor or equity interest holder seeks to challenge the allowance or disallowance of its claim or equity interest for voting purposes in accordance with Paragraph 5 of the Bankruptcy Court's Order approving the Disclosure Statement , such creditor or equity interest holder shall file with this Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such claim for voting purposes in a different amount (a "Rule 3018(a) Motion"). Upon the filing of any such motion, such creditor's or equity interest holder's Ballot shall be counted in accordance with the guidelines set forth in paragraph 5 of the Order approving the Disclosure Statement unless temporarily allowed in a different amount by an order of this Court entered prior to or concurrent with entry of an order confirming the Plan. Any Rule 3018(a) Motion must be filed no later than November 16, 2012.

**Additional Information.** For more information about the solicitation procedures, please contact Kurtzman Carson Consultants LLC, the Debtors' solicitation agent, by phone at (866) 967-0267, or by emailing TridentInfo@kccllc.com. To obtain a copy of the Disclosure Statement Order, the Disclosure Statement, the Proposed Plan, or any related documents, please contact Kurtzman Carson Consultants LLC or visit the http://www.kccllc.net/Trident. **Please note that the Solicitation Agent is not permitted to give legal advice.**

**Key Dates.** Some of the key dates and deadlines related to the Proposed Plan are:

| | |
|---|---|
| Voting Record Date | October 22, 2012 |
| Deadline to Object to Claims for Voting Purposes | October 22, 2012 |
| Solicitation Date | October 29, 2012 |
| Deadline to file Rule 3018(a) Motion | November 16, 2012 |
| Voting Deadline | November 26, 2012 at 5:00 p.m. (EST) |
| Confirmation Objection Deadline | November 26, 2012 at 4:00 p.m. (EST) |
| Confirmation Hearing | December 13, 2012 at 1:00 p.m. (EST) |

**The Proposed Plan contains an injunction which, if the Proposed Plan is confirmed, prevents, among other things, any holder of any claim or equity interest or any other party in interest in the Debtors' chapter 11 cases from directly or indirectly commencing or continuing, in any manner, any action or other proceeding of any kind against the Debtors, enforcing judgments related to such claims or interests, asserting rights of setoff (except with respect to setoffs fully exercised pre-petition), or subrogation, or interfering in any way with the Proposed Plan.**

Dated:    October 22, 2012
         Wilmington, Delaware

Respectfully submitted,

/s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
Cynthia Moh (DE 5041)
DLA PIPER LLP (US)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@dlapiper.com
       cynthia.moh@dlapiper.com

    -and-

Richard A. Chesley (IL 6240877)
Kimberly D. Newmarch (DE 4340)
Chun I. Jang (DE 4790)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516
Email:  richard.chesley@dlapiper.com
      kim.newmarch@dlapiper.com
      chun.jang@dlapiper.com

ATTORNEYS FOR DEBTORS

**Exhibit C**
**New Joint Protocol**

EAST\51978115.6

### AMENDED CROSS-BORDER INSOLVENCY PROTOCOL STIPULATION REGARDING TRIDENT MICROSYSTEMS (FAR EAST), LTD. (IN OFFICIAL LIQUIDATION)

Whereas on January 4, 2012, Trident Microsystems Inc ("TMI") and Trident Microsystems (Far East), Ltd. ("TMFE") commenced proceedings in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") pursuant to United States Bankruptcy Code 11 U.S.C. §§ 101-1532 (the "Bankruptcy Proceedings").

Whereas on January 4, 2012, TMFE filed a petition in the Grand Court of the Cayman Islands (the "Cayman Court") seeking the winding up of TMFE and the appointment of liquidators (Cause No. FSD 1 of 2012 (PCJ)) (the "Winding Up Petition").

Whereas on August 8, 2012 the Grand Court of the Cayman Islands (the "Cayman Court") ordered that TMFE be wound up and appointed Gordon MacRae and Eleanor Fisher, each of Zolfo Cooper ("ZC"), as joint official liquidators of TMFE (the "Cayman Liquidators")

Whereas pursuant to orders of the Cayman Court and the Bankruptcy Court granted on September 12, 2012, the Cayman Liquidators, together with Trident Microsystems, Inc. ("TMI") and TMFE, entered into a Stipulation Regarding a Cross-Border Insolvency Protocol for the official liquidation of TMFE (the "Original Stipulation and Protocol").

Whereas paragraph 44 of the Original Stipulation and Protocol provides for the amendment of the Original Stipulation and Protocol, subject to the further authorisation of the Cayman Court and the Bankruptcy Court.

Whereas the Cayman Liquidators, TMFE and TMI wish to amend the Original Stipulation and Protocol to implement a plan of liquidation for TMFE and TMI (the "Plan") whereby "Claims" asserted against TMI and TMFE will be adjudicated and assets distributed, for which purpose "Claim" shall have the meaning set out at Article I.A.23 of the Plan.

Wherefore the Cayman Liquidators, together with TMI and TMFE, now enter into this Amended Stipulation Regarding a Cross-Border Insolvency Protocol (the "<u>Amended Stipulation and Protocol</u>")

**Preliminary Statement**

The purpose of the Amended Stipulation and Protocol is to ensure the just, efficient and expeditious administration of the insolvency proceedings of TMFE in the Cayman Islands (the "<u>Cayman Proceedings</u>") and the Bankruptcy Proceedings and in particular the efficient adjudication of Claims and the subsequent distribution of the assets of TMFE to its creditors pursuant to the terms of the Plan.  It is in the interest of all parties, including the Cayman Liquidators, TMFE and its creditors, TMI and its creditors and shareholders, the Cayman Court and the Bankruptcy Court, to cooperate to the greatest extent possible in the conduct of the Cayman Proceedings and the Bankruptcy Proceedings (collectively "<u>Insolvency Proceedings</u>"), with the following Objectives:

- Providing a framework for protecting the interests of, and maximizing returns to, TMFE's and TMI's creditors and stakeholders;

- Providing a framework for the just, efficient and expeditious adjudication of Claims;

- Expediting the distribution of the available assets of TMFE and TMI to their creditors and, to the extent that TMFE and/or TMI has surplus assets after the discharge of all their liabilities to creditors, the distribution of such surplus assets to their shareholders;

- Minimizing the overall costs incurred in the administration of the estate of TMFE and TMI;

- Avoiding or minimizing duplication of efforts;

- Avoiding or minimizing any potential conflict between the Cayman Proceedings and the Bankruptcy Proceedings;

- Ensuring transparency and accountability in the conduct of the Insolvency Proceedings;

- Expediting the dissolution of TMFE and its exit from the Insolvency Proceedings.

Mindful of these Objectives, the parties hereby enter into this Amended Stipulation and Protocol.

## Background

### *The Parties*

TMI was incorporated in California in 1987 and reincorporated in Delaware in 1992. TMI is the sole shareholder of TMFE, and TMFE is the direct or indirect parent of certain subsidiary entities organized under the laws of various foreign jurisdictions (the "Foreign Subsidiaries," collectively with TMI and TMFE, the "Group"). TMI's principal executive offices were located in Sunnyvale, California. Prior to the commencement of the Insolvency Proceedings, TMI served as the corporate head of the Group's entities and provided corporate oversight and administrative services necessary for the operations of the Group.

TMFE was incorporated in the Cayman Islands in 1996. Immediately prior to the commencement of the Insolvency Proceedings, TMFE had no employees and its board of directors was comprised of executives employed by TMI. At that time its principal assets comprised work in progress, receivables and intellectual property in the form of approximately 1,600 patents, and its interest in the Foreign Subsidiaries. As at the date hereof, TMFE has no employees and its principal assets comprise cash or bank deposits, receivables, certain patents, and its interests in the Foreign Subsidiaries.

Immediately prior to the commencement of the Insolvency Proceedings, TMFE, through administrative services performed by its subsidiaries in Hong Kong and by TMI, was responsible

for the control and administration of accounts payable on behalf of the entire Group. As at the date hereof TMFE's responsibilities with respect to accounts payable have been substantially diminished and are now primarily related to claims reconciliation and payments for the wind-down of the Foreign Subsidiaries.

### The Insolvency Proceedings

1.      On January 4, 2012, TMI and TMFE commenced the Bankruptcy Proceedings in the Bankruptcy Court. On February 24, 2012 the Bankruptcy Court retrospectively approved the appointment of Andrew Hinkelman of FTI Consulting, Inc. as the chief restructuring officer of TMFE and TMI as of the commencement of the Bankruptcy Proceedings ("CRO" or "Mr. Hinkelman"). During the course of the Bankruptcy Proceedings, TMI and TMFE have acted as debtors in possession pursuant to section 1107 of the United States Bankruptcy Code (the "Bankruptcy Code"), and have operated their businesses pursuant to section 1108 of the Bankruptcy Code. The businesses of TMI and TMFE have now been substantially wound down and substantially all of their tangible assets have been sold. As at August 8, 2012 TMFE had ceased to carry on business, except to the extent it had assets to administer, creditor claims to pay, and litigation-type claims to assert.

2.      On January 4, 2012, TMFE filed the Winding Up Petition in the Cayman Court.

3.      On January 11, 2012, the Cayman Court appointed Gordon MacRae and Eleanor Fisher as joint provisional liquidators of TMFE (the "JPLs"). The Cayman Court also adjourned the hearing of the Winding Up Petition; the Cayman Court subsequently fixed the substantive hearing date of the Winding Up Petition to be August 8, 2012.

4.      On January 17, 2012, an Official Committee of Unsecured Creditors of TMFE ("TMFE's US Creditors' Committee") was constituted in the Bankruptcy Proceedings.  On March 8, 2012 a liquidation committee of TMFE's unsecured creditors was constituted in the Cayman Proceedings ("Provisional Committee").  TMFE's US Creditors' Committee and the Provisional Committee (collectively, the "Provisional Committees") were comprised of the same creditors.

5.      During the course of the provisional liquidation of TMFE it continued to carry on business and operate as a debtor in possession in the Bankruptcy Proceedings, subject to the oversight and input of the CRO, the JPLs and the Provisional Committees.

6.      The JPLs, TMI and TMFE entered into a *Stipulation and Cross Border Insolvency Protocol*, which the Cayman Court and the Bankruptcy Court approved on January 25, 2012 (the "Stipulation and Protocol for the Provisional Liquidation"), for the purpose of the efficient administration of the Insolvency Proceedings during the course of TMFE's provisional liquidation.  The Stipulation and Protocol for the Provisional Liquidation was subsequently amended, which amendments were approved by the Cayman Court and the Bankruptcy Court on June 8, 2012, to provide for procedures for creditors to file claims against TMFE and TMI (the "Claims Filing Procedures").

7.      At the hearing of the Winding Up Petition on August 8, 2012 the Cayman Court discharged Mr. MacRae and Ms. Fisher as joint provisional liquidators of TMFE, ordered that TMFE be put into official liquidation (the "Official Liquidation") and appointed Mr. MacRae and Ms. Fisher as the Cayman Liquidators of TMFE.  Upon the discharge of Mr. MacRae and

Ms. Fisher as joint provisional liquidators, the Stipulation and Protocol for the Provisional Liquidation ceased to have effect.

8.      For the purpose of the Official Liquidation, the Cayman Liquidators, TMI, TMFE and Mr. Hinkelman entered into the Original Stipulation and Protocol, which the Cayman Court and the Bankruptcy Court approved on September 12, 2012.  Pursuant to the terms of the Original Stipulation and Protocol and the Claims Filing Procedures exhibited at Exhibit A thereto, the Claims Filing Procedures were adopted by the parties for the purpose of the Official Liquidation.

9.      Upon the commencement of the Official Liquidation, the Provisional Committee was discharged.  On September 25, 2012, a liquidation committee of TMFE's unsecured creditors was constituted for the purpose of the official liquidation ("TMFE's Cayman Creditors' Committee".  The members of TMFE's Cayman Creditors' Committee are the same as those of TMFE's US Creditors' Committee (collectively "TMFE's Creditors' Committees").

10.     On August 17, 2012, TMFE and TMI filed the Plan and related disclosure statement ("Disclosure Statement") with the Bankruptcy Court.  TMFE's Creditors' Committees, the Equity Committee, TMI, TMFE and the Cayman Liquidators signed a Plan Support Agreement on September 13, 2012 whereby TMFE's Creditors' Committees and the Equity Committee agreed to support the Plan with certain amendments. In this regard, the Plan and Disclosure Statement were duly amended on September 17, 2012.

11.     The Bankruptcy Court approved the Disclosure Statement on October 22, 2012 and the Disclosure Statement was duly dispatched to holders of Claims against TMFE and TMI.

12.     On [*], and pursuant to section 1129 of the Bankruptcy Code, the Bankruptcy Court entered an order approving the Plan.  It was a pre-condition to the Plan becoming effective that this Amended Stipulation and Protocol be approved by the Bankruptcy Court and the Cayman Court.

13.     The effective date is anticipated to be [December 12, 2012] but in any event will be no later than December 31, 2012 ("Effective Date").

### *The Amended Stipulation and Protocol*

14.     The Cayman Liquidators, TMFE, TMI and Mr. Hinkelman, [1] agree that a framework of general principles is appropriate to address certain issues that are likely to arise in connection with the Insolvency Proceedings including, without limitation, (a) the administration of the estates of TMFE and TMI during the Insolvency Proceedings, (b) the adjudication of Claims against TMFE and TMI, (c) the distribution and payment of the assets of TMFE and TMI pursuant to the terms of the Plan.

15.     The purpose of the protocol contemplated by this Amended Stipulation and Protocol is to protect the interests of all of TMFE's and TMI's creditors, shareholders and other parties in interest, and to protect the process by which the Insolvency Proceedings are administered.  The Amended Stipulation and Protocol provides a framework for cooperation between the jurisdictions and seeks to eliminate, or otherwise minimize, duplication of effort and to promote judicial economy.

NOW THEREFORE, the Cayman Liquidators, TMFE, TMI, and Mr. Hinkelman hereby stipulate and agree to the following:

---

[1] All references to Mr. Hinkelman herein refer to Mr Hinkelman in his capacity as the CRO of TMFE and/or TMI.

**General obligations of the parties**

1.      The parties acknowledge that the motion dated January 4, 2012 seeking an order that the administration of the bankruptcy cases of TMI and TMFE before the Bankruptcy Court be administered jointly was sought for administrative and procedural convenience only.

2.      The parties acknowledge that each of the Statutory Committee of Equity Security Holders of Trident Microsystems, Inc. (the "Equity Committee"), TMFE's US Creditors' Committee and TMFE's Cayman Creditors' Committee have certain statutory rights and duties pursuant to United States law and/or Cayman Islands law.  Nothing contained in this Amended Stipulation and Protocol shall modify or alter the existing rights and duties of TMFE's Creditors' Committees and the Equity Committee in the Insolvency Proceedings.  Further, nothing contained herein shall diminish TMFE's obligations as a debtor in a United States bankruptcy proceeding, specifically including those obligations imposed upon debtors under Title 11 of the United States Code.  Except as specifically provided in this protocol, the Cayman Liquidators shall not cause TMFE to take any actions inconsistent with the Bankruptcy Code.

3.      TMFE shall continue to act as a debtor for the purpose of the Bankruptcy Proceedings subject to the control of the Cayman Liquidators.  The directors and officers of TMFE, including for the avoidance of doubt Mr. Hinkelman, shall have no authority to act on behalf of TMFE without the prior authorization of the Cayman Liquidators.  The Cayman Liquidators shall become the persons responsible for the affairs of TMFE and ensuring TMFE's compliance with all orders entered by the Bankruptcy Court.

4.      With respect to the remaining non-cash assets of TMFE, these assets are to be transferred to TMI and any of the Group subsidiaries that hold unsecured claims against TMFE pursuant to the terms of the Plan once the Plan becomes effective.

5.      As soon as reasonably practicable after February 8, 2013 (and thereafter at such intervals as the Cayman Court may direct) the Cayman Liquidators shall submit a report to the Cayman Court, which report will also be served on TMFE's Cayman Creditors' Committee.  To the extent the Bankruptcy Proceedings remain open, a copy of such reports shall be served on United States Trustee for the District of Delaware.  Such reports shall provide financial information for TMFE and shall report on the Cayman Liquidators' conduct of the liquidation of TMFE and the state of its affairs.

6.      Until the Effective Date, TMFE, TMI and the Cayman Liquidators shall use their reasonable best efforts to ensure that a representative of TMI (including the CRO) and of the Cayman Liquidators shall be available for weekly conference calls with TMFE's Creditors' Committees, or at such longer period as TMI, the Cayman Liquidators, the CRO, and TMFE's Creditors' Committees may mutually agree from time to time.  At such weekly conference calls, the representatives will provide such information as TMFE's Creditors' Committees may reasonably require relating to the conduct of the liquidation of TMFE and the state of its affairs.

7.      Nothing contained in paragraph 5 or 6 shall alter or modify the obligations of TMI and TMFE to file operating reports as required by the Office of the United States Trustee in the Bankruptcy Proceedings.

**Powers of the Cayman Liquidators**

8.      The Cayman Liquidators shall have the power to act jointly and severally and shall be authorized to exercise the following powers without further order from the Bankruptcy Court or the Cayman Court.  The Cayman Liquidators will exercise these powers in a manner consistent with the Plan:

a.      The power to take possession of, collect and get in the property of TMFE and for that purpose to take all such actions and proceedings as they consider necessary save that the Cayman Liquidators shall not transfer funds out of the TMFE bank accounts currently held in the United States except for purposes of making distributions to creditors or for payment of costs, fees and expenses of the official liquidation including the remuneration and disbursements of the Cayman Liquidators that are in the best interests of the TMFE estate.

b.      The power to do all acts and execute, in the name and on behalf of TMFE, all deeds, receipts and other documents and for that purpose to use when necessary the seal of TMFE and in this regard, to operate the bank accounts of TMFE.

c.      The power to prove, rank and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against the estate, and to receive dividends in the bankruptcy, insolvency or sequestration in respect of that balance, as a separate debt due from the bankrupt or insolvent and ratably with the other separate creditors;

d.      The power to draw, accept, make and endorse any bill of exchange or promissory note in the name and on behalf of TMFE, with the same effect in respect of TMFE's liability as if the bill or note had been drawn, accepted, made or endorsed by or on behalf of TMFE in the ordinary course of its business (save that the Cayman Liquidators acknowledge that prior to the Effective Date any action set forth in this section that is outside the ordinary course of TMFE's business shall require that the Cayman Liquidators first obtain an order from the Bankruptcy Court pursuant to section 363 or 364 of the Bankruptcy Code);

e.      The power to promote a scheme of arrangement pursuant to section 86 of the Companies Law of the Cayman Islands (the "Companies Law");

    f.  The power to distribute the property of TMFE in satisfaction of its liabilities pari passu and thereafter to the members according to their rights and interests in the company;

    g.  The power to convene meetings of creditors and contributories of TMFE;

    h.  The power to engage PricewaterhouseCoopers LLP and FTI Consulting, Inc. to assist them in the performance of their functions pursuant to Part 1 of Schedule 3 of the Companies Law;

    i.  The power to continue the Bankruptcy Proceedings in the name of and on behalf of TMFE; and

    j.  The power to do all other things incidental to the exercise of their powers.

  9.  The Cayman Liquidators shall be authorised to exercise the powers set out below subject to the approval of the Cayman Court and, if necessary under the Bankruptcy Code, the Bankruptcy Court.  The Cayman Liquidators will exercise these powers in a manner consistent with the Plan:

    a.  The power to bring or defend any action or other legal proceeding in the name and on behalf of TMFE (other than the Bankruptcy Proceedings);

    b.  The power to carry on the business of TMFE so far as may be necessary for its beneficial winding up;

    c.  The power to dispose of any property of TMFE to a person who is or was related to the company;

    d.  The power to pay any class of creditors in full (save that it is acknowledged that the Cayman Liquidators will make payments to the creditors in accordance with the terms the Plan);

e.      The power to make any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against TMFE or for which the company may be rendered liable including by way of a plan of liquidation in the Bankruptcy Proceedings;

f.      The power to compromise on such terms as may be agreed, all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between TMFE and a contributory or alleged contributory or other debtor or person apprehending liability to the company;

g.      The power to deal with all questions in any way relating to or affecting the assets or the winding up of TMFE, to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it;

h.      The power to sell any of TMFE's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels;

i.      The power to raise or borrow money and grant securities therefore over the property of TMFE;

j.      The power to engage staff (whether or not as employees of TMFE) to assist the Cayman Liquidators in the performance of their functions; and

k.      The power to engage attorneys and other professionally qualified persons (other than PricewaterhouseCoopers LLP and FTI Consulting, Inc.) to assist the Cayman Liquidators in the performance of his functions.

10.      To facilitate the orderly winding down of the affairs of TMI and TMFE and the Group, prior to the Effective Date, the Cayman Liquidators, Mr. Hinkelman (or other authorized representatives of FTI Consulting, Inc.) and/or the officers and directors (or their authorized representatives) of any of TMI, TMFE, or its subsidiaries where necessary, shall meet in person

or by telephone or videoconference or by whatever means is most appropriate on a weekly basis (or such other period as the Cayman Liquidators and Mr. Hinkelman may agree from time to time) to address budgeting, cash expenditures, employee matters, ordinary course transactions and any other matters relating to the winding down of the Group's business and affairs.

11.     The Cayman Liquidators shall receive and be given notice of all applications and hearings in the Bankruptcy Court in accordance with the practices of the Bankruptcy Court and have the right to appear and be heard by counsel in all proceedings in the Bankruptcy Court for and on behalf of TMFE.  Prior to the Effective Date, the Cayman Liquidators shall give notice to Mr. Hinkelman, TMFE's Creditors' Committees, the Equity Committee and TMI of all applications and hearings in the Cayman Court and they will not object to Mr. Hinkelman, TMFE's Creditors Committees or TMI attending and seeking to be heard by counsel at any hearings before the Cayman Court.  Insofar as they may consider it necessary and appropriate, the Cayman Liquidators and TMFE are at liberty to apply to the Cayman Court and/or the Bankruptcy Court that any specific document (or any part of any such document) on the court file be kept under seal and not be made available to any particular person or class of person.

12.     For the avoidance of doubt the Cayman Liquidators shall be required to act in a manner consistent with the terms of all orders issued in the Bankruptcy Proceedings and the Cayman Proceedings.  Nothing in this Amended Stipulation and Protocol should be construed to require the Cayman Liquidators to act, or to omit to act, in a manner which would be unlawful or improper pursuant to Cayman Islands law, any order of the Cayman Court, any order of the Bankruptcy Court or any other applicable law.

**Role of FTI Consulting and Andrew Hinkelman**

13.     FTI Consulting Inc. and Mr. Hinkelman are engaged by TMFE pursuant to the Order of the Bankruptcy Court dated February 24, 2012 and in accordance with the Order of the Cayman Court dated August 8, 2012   and are subject to the supervision of the Cayman Liquidators,.

14.     Neither FTI Consulting Inc. nor Mr. Hinkelman, shall have authority to act on behalf of TMFE without the prior authorization of the Cayman Liquidators.

## Cash Management

15.     Until the Effective Date, TMFE is authorized to:   (a) maintain the cash management system in substantially the same form as described in the Motion of the Debtors and Debtors in Possession for an Order (A) Approving the Continued Use of the Debtors' Cash Management System, (B) Approving Continued Transfers Between Debtors and Non-Debtor Subsidiaries, (C) Scheduling a Final Hearing on the Motion and (D) Granting Related Relief [Bankruptcy Court Dkt. No. 899] (the "Cash Management Motion") and (b) open and close bank accounts.  Prior to the Effective Date, TMFE shall provide notice of:  (a) any ordinary course changes to their cash management system and (b) the opening and closing of any bank accounts to (i) the United States Trustee (ii) TMFE's US Creditors' Committee and (iii) the Equity Committee.  In addition, prior to the Effective Date, TMFE may only make changes to the cash management system for TMFE or open or close any bank accounts for TMFE on the authorization of the Cayman Liquidators, and after providing TMFE's Creditors' Committees and the Equity Committee five business days' notice of any such proposed change.  Prior to the Effective Date, to the extent that either TMFE's Creditors Committees or the Equity Committee objects to any proposed change to be made to the Cash Management System or the opening or

closing of any bank account, either of them may seek a hearing before the Bankruptcy Court regarding such objection; provided that the party making such objection <u>must</u> <u>request</u> that the hearing be held before expiration of the five business day period.  Pending the outcome of any such hearing, the Official Liquidators shall not make the proposed change to the Cash Management System or open or close the bank account in question.

16.    TMFE is authorized to continue to use the Bank Accounts (as that term is defined in the Cash Management Motion) under existing account numbers without interruption provided however, that TMFE must be authorized to do so by the Cayman Liquidators; and provided further that no checks issued against the Bank Accounts prior to the commencement of these chapter 11 cases shall be honored, except as otherwise authorized by an order of the Bankruptcy Court and directed by TMFE.

17.    The banks are authorized to act on instructions from Mr. Hinkelman and/or the Cayman Liquidators which are consistent with this protocol.  The banks shall not be liable to any party on account of:   (a) following TMFE's or the Cayman Liquidators' instructions or representations as to this Protocol; or (b) the honoring of any prepetition check or item in a good faith belief that the Bankruptcy Court has authorized such prepetition check or item to be honored despite implementation of reasonable item-handling procedures.

18.    TMFE may open additional bank accounts or close certain of its current bank accounts, but may only do so with the authorization of the Cayman Liquidators, and the banks are authorized to honor TMFE's or Cayman Liquidators' requests to open or close, as the case may be, any such bank accounts; and provided further, that prior to the Effective Date, TMFE gives notice within fifteen (15) days to the Office of the United States Trustee for the District of

Delaware, TMFE's US Creditors Committee and the Equity Committee; and provided further, that prior to the Effective Date, TMFE shall open any such new bank account at banks that have executed a Uniform Depository Agreement with the Office of the United States Trustee for the District of Delaware, or at such banks that are willing to immediately execute such an agreement.

19.    Prior to the Effective Date, the Cayman Liquidators, TMFE and the CRO shall hold weekly meetings regarding any and all payments to be made by TMFE during the upcoming week.  Notwithstanding anything to the contrary herein, the Cayman Liquidators, in consultation with the CRO, shall have the sole and absolute discretion to authorize all expenditures of cash by TMFE, whether for payment to third parties or for intercompany transfers, which prior to the Effective Date, shall be subject to the pre-existing notice to TMFE's US Creditors' Committee, the Equity Committee and, with respect to any payments for services or goods provided to TMFE prior to January 4, 2012, the limitations of the Bankruptcy Code.

20.    Starting February 1, 2012 and continuing on the Wednesday of each week thereafter until the Effective Date, TMFE shall provide the TMFE's US Creditors' Committee and the Equity Committee with a detailed weekly budget for projected intercompany transfers from TMFE to be made during the following week and a variance analysis showing actual versus projected intercompany transfers for the prior week.

21.    Nothing herein shall permit TMFE to cause their non-debtor subsidiaries to make any transfers outside the ordinary course of business prior to the Effective Date.  Prior to the Effective Date, TMFE shall not permit their non-debtor subsidiaries to make any transfers on account of prepetition obligations owed by TMFE without (i) notice to the TMFE's US Creditors Committee and the Equity Committee, (ii) authorization of the Cayman Liquidators, and (iii) an

order of the Bankruptcy Court.  Prior to the Effective Date, TMFE shall not make any transfers to non-debtor subsidiaries for the purpose of winding-up, liquidating, or satisfying employee severance obligations of such subsidiaries without (i) the authorization of the Cayman Liquidators and (ii) providing at least 5 business days' notice to the United States Trustee for the District of Delaware, the TMFE Creditors' Committees and the Equity Committee.  Further, the Cayman Liquidators and TMFE agree that if TMFE Creditors' Committees or the Equity Committee objects to any proposed transfer to be made to non-debtor subsidiaries for the purpose of winding-up, liquidating, or satisfying employee severance obligations of such subsidiaries, TMFE and the Cayman Liquidators will not object to TMFE's Creditors Committees or the Equity Committee filing a motion with the Bankruptcy Court seeking a hearing with respect to such payment within such five business day period; provided that the objecting party must request that the hearing be held before expiration of the five business day period.  Pending the outcome of any such hearing, the Cayman Liquidators shall not make the payment that is in dispute.

22.    TMFE shall maintain accurate and detailed records of all transfers, including intercompany transfers, so that all transactions may be readily ascertained, traced, recorded properly and distinguished between prepetition and post-petition transactions.

**Creditor Claims Procedure**

23.    TMI, TMFE and the Cayman Liquidators have adhered to the procedures set out in the Claims Procedure at Exhibit A to the Original Stipulation and Protocol.  Claims validly filed by a claimant in accordance with the Claims Procedure shall be treated as having been

validly filed in both the Bankruptcy Proceedings and the Cayman Proceedings and the claimants

shall not be obliged to make duplicate or dual filings in both sets of proceedings.

24.     Subject to any limitations in applicable law, TMI, TMFE and the Cayman

Liquidators agree to provide access to one another, and prior to the Effective Date, to TMFE's

Creditors' Committees and the Equity Committee to claims and other financial information

necessary or useful to the Claims Procedure (the "Shared Information Material").  The parties

agree to preserve and protect the confidentiality of Shared Information Material, unless it is

jointly agreed that such material can be disclosed for use in the course of the administration of

the Bankruptcy Proceedings only or the Cayman Proceedings only.  TMI, TMFE, the Cayman

Liquidators, TMFE's Creditors Committees, the Equity Committee further agree that the sharing

or disclosure of Shared Information Material between them and their counsel and the sharing or

disclosure of such material by them with their respective agents, as permitted by law, will not

diminish the confidentiality of the Shared Information Material and will not constitute a waiver

of any privileges or protections applicable to the Shared Information Material including work

product privilege, legal professional privilege, nor a waiver of any right to refuse to share such

material in future.  Confidential information belonging to third parties may not be disclosed

between TMI, TMFE, the Cayman Liquidators, TMFE's Creditors Committees and the Equity

Committee without the consent of the third parties or leave of the relevant court being obtained.

Notwithstanding the foregoing, if the Shared Information Material is no longer confidential

because it has previously been disclosed in a manner which did not preserve confidentiality,

nothing in the Claims Procedure will create any confidentiality rights for third parties and TMI,

TMFE and the Cayman Liquidators will have no confidentiality obligations with respect to such

Shared Information Material.

The obligations of the parties with respect to Shared Information Material already provided (if any) to other parties hereunder shall survive the termination of this Amended Stipulation and Protocol.  Upon termination, any Shared Information Material previously provided to any party to the Amended Stipulation and Protocol may be retained by it subject to its obligations (if any) under the Amended Stipulation and Protocol and under applicable law.

**Adjudication of Claims against TMFE**

25.     All Claims made against TMFE pursuant to the Claims Procedures have been adjudicated by the Cayman Liquidators in accordance with Cayman Islands law, subject to the jurisdiction of the Cayman Court and in accordance with the procedures set out below *provided*, *however*, that the priority and classification of such Claims for the purpose of distribution of assets shall be determined and adjudicated pursuant to United States law including without limitation sections 507 (Priorities), 509 (Claims of Co-debtors) and 510 (Subordination) of the Bankruptcy Code and in accordance with the priorities stated in the Plan.

26.     The parties acknowledge that Cayman Islands law does not provide a mechanism for the setting of a single bar date by which all creditor claims are to be filed.  Accordingly, the Cayman Liquidators will not refuse to accept an otherwise valid proof of claim in relation to TMFE for the purpose of subsequent adjudication solely on the basis that it has been submitted after July 13, 2012.  Instead, in the event a valid proof of claim is filed against TMFE, before any distributions are made pursuant to the Plan, the Cayman Liquidators will adjudicate such claim in accordance with Cayman Islands law, subject to the jurisdiction of the Cayman Court and in accordance with the procedures set out below.

27.     The Cayman Liquidators have determined that Unites States Dollars will be the currency of the liquidation.  Any foreign currency Claims made against TMFE will be converted to United States dollars as at the mid-market exchange rates prevailing on August 8, 2012 (being the date of upon which the Cayman Court ordered that TMFE be wound up) in accordance with section 150(2)(b) of the Cayman Companies Law.

28.     Unless otherwise provided pursuant to the terms of an enforceable contract between the claimant and TMFE, every claimant shall bear the cost of proving his own Claim against TMFE, including the cost of responding to any request from the Cayman Liquidators that he provide further details in respect of his Claim.

29.     The Cayman Liquidators' fees and costs of adjudicating the Claims will be paid out of the assets of TMFE as an expense of the official liquidation.

30.     Any claimant may withdraw or vary his Claim at any time with the agreement of the Cayman Liquidators.

31.     The Cayman Liquidators may admit in whole or in part any Claim.  The Cayman Liquidators will notify each claimant in writing whether his Claim has been admitted in full or admitted in part or rejected.  Where the Cayman Liquidators have admitted a Claim in part or rejected a Claim, the Cayman Liquidators will provide the claimant with (a) an explanation as to the Cayman Liquidators' reasons for rejecting the whole or part of the Claim and (b) confirmation of the claimant's right to appeal to the Cayman Court to have the decision of the Cayman Liquidators reversed or varied.  It is acknowledged that the Cayman Liquidators have already provided such notices to all claimants who made their Claims against TMFE pursuant to the Claims Procedures.

32.     Contractual rights of set-off or netting of Claims between TMFE and any creditor, (including without limitation any bilateral or multi-lateral set-off or netting agreements) are enforceable against TMFE for the purpose of quantifying Claims.  Equally, where there are mutual credits, mutual debts or other mutual dealings between TMFE and a creditor, an account shall be taken of what is due from each party to the other in respect of the mutual dealings, and the sums due from one party shall be set off against the sums due from the other provided that amounts due from TMFE to any creditor shall not be set-off, if that creditor had actual notice of the winding up petition at the time the amounts became due.

33.     A creditor's contractual rights to interest against TMFE shall be provable up to January 4, 2012.  For so long as TMFE is insolvent, no creditor shall be entitled to prove for any interest accrued after January 4, 2012.

34.     In the case of rent and other payments of a periodical nature, a claimant may prove for any unpaid amounts accrued up to August 8, 2012.

35.     A claimant may prove for a debt for which payment by TMFE was not yet due on August 8, 2012.  If the Cayman Liquidators declare a distribution to be payable before the date on which such a debt would have fallen due, the amount of the distribution shall be discounted for accelerated payment using the rate of interest prescribed by the Judgement Debts (Rates of Interest) Rules.

36.     The Cayman Liquidators will estimate the value of any claim which by reason of it being subject to a contingency, or for any other reason, does not bear a certain value and they may revise their estimate if circumstances change or new information becomes available.  Where

the Cayman Liquidators put an estimated value on a contingent claim, they must notify the claimant of this and state:

      a.      the basis upon which the estimate has been made;

      b.      the fact that the claimant has a right to submit a varied proof if circumstances change;

      c.      the fact that the Cayman Liquidators may vary their estimate having regard to changed circumstances; and

      d.      the Cayman Liquidators agree to extend generally the creditor's time for appealing his decision to the Cayman Court.

**Distributions to creditors of TMFE**

37.      On September 21 and 22, the Cayman Liquidators published a notice of intention to declare a final dividend requiring any claimant who had not filed a proof of claim in accordance with the Claim Procedures to do so before November 24, 2012.  Any claimant of TMFE who lodges his proof of claim after the date specified in the notice and after the Cayman Liquidators have made distributions pursuant to the Plan, is not entitled to disturb the dividend on the basis that he has not participated.  Such a claimant, to the extent it is determined to have a valid claim, will not be excluded from any subsequent dividend payment by TMFE and, if subsequently admitted as a creditor, is entitled to be paid the amount of the prior dividend out of any/to the extent of any remaining assets available before the payment of any further dividends to the other creditors.  It is acknowledged that the Plan does not envisage further dividend payments being made.  Holders of claims against TMFE who have already filed their claims pursuant to the Claims Filing Procedures are not required to file a further proof of claim.

38.        The Cayman Liquidators shall make distributions to creditors of TMFE in accordance with the terms of the Plan having made the necessary reserves envisaged by the terms of the Plan.

39.        Notwithstanding anything to the contrary herein, the Cayman Liquidators shall not be required to make a distribution to any creditor if the dollar amount of the distribution is less than US$5 or otherwise so small that the cost of making that distribution exceeds the dollar amount of such distribution.  On or about the time that the final distribution is made, the Cayman Liquidators may make a donation to any charity with undistributed funds if, in the reasonable judgment of the Cayman Liquidators, the cost of calculating and making the final distribution of the remaining funds is excessive in relation to the benefit that would accrue to the holders of Claims against TMFE.

40.        In the event any distribution remains unclaimed upon the dissolution of TMFE, the unclaimed distribution shall be held by the Cayman Liquidators in trust for the benefit of the claimant to whom such funds are owed.  To this end, the Cayman Liquidators will establish an interest bearing bank account into which all funds representing unclaimed distributions shall be transferred.  At the end of one year after the dissolution of TMFE, any monies still held on trust shall be transferred to the Financial Secretary of the Cayman Islands.

**Appeals to the Cayman Court and Expunging of Claims**

41.    If any claimant is dissatisfied with the Cayman Liquidators' decision with respect to his Claim, including any decision on the question of priority pursuant to the provisions of the Bankruptcy Code, he may appeal to the Cayman Court for the decision to be reversed or varied.

42.     Any appeal to the Cayman Court must be made within 21 days of the claimant receiving the Cayman Liquidators' notice of their decision in respect of the Claim.  Notice of the appeal must be served on the Cayman Liquidators.   It is acknowledged that the Cayman Liquidators have already provided such notices of their decision to all claimants who made their Claims against TMFE pursuant to the Claims Procedures.

43.     The Cayman Liquidators' costs of the appeal shall be paid out of the assets of TMFE as an expense of the official liquidation.  If the Cayman Court reverses or varies the Cayman Liquidators' decision in respect of the claimant's claim, the Cayman Court may make an order that the claimant's costs be paid as an expense of the liquidation.

44.     Where it appears to the Cayman Liquidators, on the basis of information not available to them at the time of their adjudication of a Claim, that a Claim ought not to have been admitted, or ought to have been admitted for a lesser amount, the Cayman Liquidators may apply to the Cayman Court to expunge a Claim which has been admitted or reduce the amount in respect of which it has been admitted.

45.     A creditor who is dissatisfied with the Cayman Liquidators' decision to admit the whole or part of any other claimant's Claim for an amount exceeding US$100,000 or 5% of TMFE's total liabilities (whichever is less) may apply to the Cayman Court to expunge the Claim on the ground that it should not have been admitted.

46.     An application to expunge a Claim must be made promptly and, in any event, not later than the date upon which a distribution is paid in respect of it.  Notice of an application to expunge must be served on the Cayman Liquidators and the creditor in respect of which it is sought to expunge the claim.

**Legal Fees**

47.     In respect of legal fees incurred by TMFE in the Cayman Proceedings, in the event that the Cayman Liquidators or TMFE's Cayman Creditors' Committee consider that the amount of fees and expenses charged by counsel is excessive, the Cayman Liquidators may require that such fees and expenses be assessed on the indemnity basis by the taxing officer of the Cayman Court.

48.     In respect of legal fees incurred by TMFE and TMI in the Bankruptcy Proceedings, such fees will be subject to the approval of Bankruptcy Court in accordance with the Bankruptcy Code and the procedures ordered by the Bankruptcy Court.  TMFE and TMI filed an allocation motion with the Bankruptcy Court and the Cayman Court to confirm the appropriate allocation of legal fees between TMFE and TMI.  TMFE's Creditors' Committees, the Equity Committee and the Cayman Liquidators were afforded an opportunity to object and be heard with respect to any objections regarding allocation of such fees amongst TMI and TMFE.

49.     The Cayman Liquidators will need to satisfy the Cayman Court that all disbursements incurred by TMFE, including legal fees incurred by or allocated to TMFE in the Insolvency Proceedings, were properly incurred.  In this regard, the parties may request that the Cayman Court and the Bankruptcy Court hold joint hearings where appropriate including a joint hearing in respect of the application for the allocation of legal fees as between TMI and TMFE.

**Joint Hearings**

50.     The Bankruptcy Court, and the Cayman Court, may, to the extent permitted by practice and procedure, and with the prior consent of each court, conduct joint hearings or

conferences with respect to any matter related to the conduct, administration, determination or disposition of any aspect of the Cayman Proceedings, or Bankruptcy Proceedings where considered by the two Courts to be necessary or advisable and in particular, without limiting the generality of the foregoing, to facilitate or coordinate the proper and efficient conduct of the Bankruptcy Proceedings and Cayman Proceedings.  With respect to any such hearings or conferences, unless otherwise ordered, the following may be considered to be appropriate:

> i.      A telephone link may be established such that the two Courts may be able to simultaneously hear the matter in the other Court.

> ii.      TMFE, TMI and the Cayman Liquidators shall ensure that appropriate materials (including all briefs, memoranda or skeleton arguments) are filed in advance of such hearing consistent with the procedural and evidential rules and requirements of each participating Court, such that each Court has identical or substantially similar materials before it, to enable each Court to properly consider the issues to be determined at the joint hearing.

51.      The Cayman Court and the Bankruptcy Court may, but are not required to, communicate with one another, without advance notice to counsel or counsel being present for any purpose, including, without limitation, to establish guidelines for the orderly making of submissions and rendering of decisions to deal with any other procedural, administrative, or preliminary matters or for the purpose of determining whether consistent rulings can be made by the Cayman Court and/or the Bankruptcy Court and the terms upon which such rulings should be

made, and to deal with any other procedural or non-substantive matter in relation to such applications.

**<u>Jurisdiction</u>**

52.     The Cayman Court shall have sole jurisdiction and power over the Cayman Liquidators, as to their tenure in office, the conduct of the Cayman Proceedings under Cayman Islands Law, the appointment, role and powers of the Cayman Liquidators and the hearing and determination of matters arising in the Cayman Proceedings under Cayman Islands law.  The Cayman Liquidators shall be compensated for their services in accordance with Cayman principles under Cayman Islands law.

53.     The Bankruptcy Court shall have sole jurisdiction and power over the conduct of the Bankruptcy Proceedings, the compensation of the professionals rendering services in the Bankruptcy Proceedings, (save that it is acknowledged that the Cayman Court will need to approve the fees, disbursements and expenses of the Cayman Liquidators) and the hearing and determination of matters arising in the Bankruptcy Proceedings.

54.     The Bankruptcy Court and Cayman Court shall retain jurisdiction over the parties for the purpose of enforcing the terms and provisions of this Amended Stipulation and Protocol or approving any amendments or modifications thereto.

55.     The Amended Stipulation and Protocol is not intended to otherwise circumvent, alter, or otherwise affect the rights, obligations, or laws of any jurisdiction and accordingly, if a party to this Amended Stipulation and Protocol is directed by the Bankruptcy Court or the Cayman Court to act (or not to act) with respect to a particular issue whether on his own

application or otherwise, that party's obligation to follow that court's direction should not be impaired or abridged by this Amended Stipulation and Protocol. To the extent any party's obligation to follow that Court's order conflicts with its obligations under this Amended Stipulation and Protocol, that party shall be relieved from its obligation under this Amended Stipulation and Protocol, but such party must notify in writing all other parties of the conflict between that court's direction or order and this Amended Stipulation and Protocol. In all other material respects, the affected party will remain bound by the terms of this Amended Stipulation and Protocol.

**Miscellaneous**

56.     This Amended Stipulation and Protocol shall be binding on and inure to the benefit of the parties hereto and their respective successors, assigns, representatives, heirs, executors, administrators, trustees (including any trustees under chapters 7 or 11 of the Bankruptcy Code), and receivers, receiver managers, or custodians appointed under United States law, Cayman Islands law, as the case may be.

57.     This Amended Stipulation and Protocol may be supplemented from time to time by the parties hereto as circumstances may require with any supplementing stipulations as the Bankruptcy Court and Cayman Court may approve.

58.     This Amended Stipulation and Protocol may not be waived, amended, or modified orally or in any other way or manner (in whole or in part) except by written instrument signed by the party to be bound, and after any approval or authorization of the Bankruptcy Court (so long as the Bankruptcy Proceedings remain open) or Cayman Court as may be necessary and appropriate has been obtained. If any party proposes to waive, amend or modify this Amended

Stipulation and Protocol (in whole or in part), for so long as the Bankruptcy Proceedings remain open, it shall notify the Bankruptcy Court and the United States Trustee for the District of Delaware, the Cayman Court, TMI and TMFE and their counsel of record and the Cayman Liquidators, and prior to the Effective Date, shall also notify Mr. Hinkelman and any representative of TMFE's Creditors' Committees and the Equity Committee (the "Notice Parties") of the proposed waiver, amendment or modification.  .

59.    Any party's application for an order which would be, or may be, contrary to the provisions of this Amended Stipulation and Protocol shall be made on notice to the Notice Parties in accordance with applicable notice procedures under United States and/or Cayman Islands law as appropriate.

60.    Each party represents and warrants to the other that its execution, delivery, and performance of this Amended Stipulation and Protocol are within the power and authority of such party and have been duly authorized by such party, except that, with respect to the Cayman Liquidators and TMI,  the approval of the Cayman Court and Bankruptcy Court, respectively, is required.

61.    This Amended Stipulation and Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by facsimile or other electronic means, which shall be deemed to constitute an original signature.

62.    The parties hereto are hereby authorized to take such actions and execute such documents as may be necessary and appropriate to implement and effectuate this Amended Stipulation and Protocol.

63.    This Amended Stipulation and Protocol shall be deemed effective upon its approval of the Bankruptcy Court and the Cayman Court.  This Amended Stipulation and Protocol shall have no binding or enforceable legal effect until approved by the Bankruptcy Court and the Cayman Court.

IN WITNESS WHEREOF the parties hereto have caused this Amended Stipulation and Protocol to be executed either individually or by their respective attorneys or representatives hereunto authorized.

TRIDENT MICROSYTEMS, INC.

By:_____

Andrew Hinkelman, CEO

TRIDENT MICROSYTEMS (FAR EAST), LTD. (IN OFFICIAL LIQUIDATION)

By:_____

Andrew Hinkelman, CRO

JOINT OFFICIAL LIQUIDATORS

By:_____

By:_____

**Exhibit D**
**Liquidation Analysis**

EAST\51978115.6

**Trident Microsystems Inc.**
*Recovery Analysis - Distribution Summary*

| | Estimated Recoveries | |
|---|---|---|
| Creditor | Ch. 11 Liquidation | Ch.7 Liquidation |
| Trident Microsystems (Far East) | | |
| General Unsecured Claims (Low) | 90% | 46% |
| General Unsecured Claims (High) | 90% | 100% |
| | | |
| Trident Mircosystems Inc. | | |
| General Unsecured Claims (Low) | 100% | 100% |
| General Unsecured Claims (High) | 100% | 100% |
| | | |
| Equity Per Share (Low Estimate) | $ 0.25 | $ 0.18 |
| Equity Per Share (High Estimate) | $ 0.28 | $ 0.26 |

**Trident Microsystems Inc.**
*Recovery Analysis - Distribution Summary*

| ($000s except per share recovery) | High Claim | Low Claim | | Chapter 11 Liquidation with Plan Support Agreement | | | |
|---|---|---|---|---|---|---|---|
| | | | | Weak Recovery | Strong Recovery | Weak % | Strong % |
| **TMFE Waterfall** | | | | | | | |
| Cash at TMFE - December 31, 2012 | | | $ | 65,624 $ | 66,624 | | |
| Proceeds from Non-Debtor Subsidiaries | | | | 5,377 | 7,377 | | |
| Proceeds Avail at TMFE for Distribution | | | | 71,001 | 74,001 | | |
| TMFE Admin/Priority Claims (non Prof Fees) | 2,540 | 1,540 | | 2,540 | 1,540 | | |
| TMFE Admin/Priority Claims (Prof Fees) | 374 | 299 | | 374 | 299 | | |
| | 2,914 | 1,839 | | 2,914 | 1,839 | 100% | 100% |
| Proceeds Available for General Unsecured Claims ("GUC") | | | | 68,087 | 72,162 | | |
| TMFE General Unsecured Claims | 17,188 | 16,688 | | 15,469 | 15,019 | 90% | 90% |
| Intercompany Claim (Owed to TMI) | 96,445 | 73,215 | | 52,617 | 57,142 | 55% | 78% |
| | 113,633 | 89,903 | $ | 68,087 $ | 72,162 | 60% | 80% |
| **TMI Waterfall** | | | | | | | |
| Cash Avail at TMI for Distribution | | | $ | 112 $ | 112 | | |
| Proceeds from TMI GUC Claim Available for Distribution | | | | 52,617 | 57,142 | | |
| Total Proceeds Available at TMI for Distribution | | | | 52,729 | 57,254 | | |
| TMI Admin/Priority Claims (non Prof Fees) | 1,500 | 1,000 | | 1,500 | 1,000 | | |
| TMI Priority Claims (Prof Fees) | 2,763 | 2,263 | | 2,763 | 2,263 | | |
| | 4,263 | 3,263 | | 4,263 | 3,263 | 100% | 100% |
| Proceeds Available for General Unsecured Claims | | | | 48,466 | 53,991 | | |
| TMI General Unsecured Claims | 3,073 | 2,240 | | 3,073 | 2,240 | 100% | 100% |
| Intercompany Claims | - | - | | - | - | 100% | 100% |
| | 3,073 | 2,240 | | 3,073 | 2,240 | 100% | 100% |
| Proceeds to Equity After TMI Claims Paid | | | $ | 45,393 $ | 51,751 | | |
| Total Shares Outstanding (000's) | | | | 183,870 | 183,870 | | |
| Recovery per Share | | | $ | 0.25 $ | 0.28 | | |

**Trident Microsystems Inc.**
*Recovery Analysis - Distribution Summary*

| ($000s except per share recovery) | High Claim | Low Claim | | Ch. 7 Liquidation - Equity Committee Prevails in Litigation | | | |
|---|---|---|---|---|---|---|---|
| | | | | Weak Recovery | Strong Recovery | Weak % | Strong % |
| **TMFE Waterfall** | | | | | | | |
| Cash at TMFE - December 31, 2012 | | | $ | 63,624 $ | 64,624 | | |
| MEMC Patents | | | | 1,000 | 1,500 | | |
| Proceeds from Non-Debtor Subsidiaries | | | | 6,377 | 6,377 | | |
| Proceeds Avail at TMFE for Distribution | | | | 71,001 | 72,501 | | |
| TMFE Admin/Priority Claims (non Prof Fees) | 3,040 | 2,040 | | 3,040 | 2,040 | | |
| TMFE Ch. 7 Trustee Fees | 431 | 440 | | 431 | 440 | | |
| TMFE Admin/Priority Claims (Prof Fees) | 1,799 | 1,299 | | 1,799 | 1,299 | | |
| | 5,271 | 3,780 | | 5,271 | 3,780 | 100% | 100% |
| Proceeds Available for General Unsecured Claims | | | | 65,730 | 68,721 | | |
| TMFE General Unsecured Claims | 17,188 | 16,688 | | 7,946 | 8,094 | 46% | 49% |
| Intercompany Claim (Owed to TMI) | 125,000 | 125,000 | | 57,785 | 60,627 | 46% | 49% |
| | 142,188 | 141,688 | $ | 65,730 $ | 68,721 | 46% | 49% |
| **TMI Waterfall** | | | | | | | |
| Cash Avail at TMI for Distribution | | | $ | 112 $ | 112 | | |
| Proceeds from TMI GUC Claim Available for Distribution | | | | 57,785 | 60,627 | | |
| Total Proceeds Available at TMI for Distribution | | | | 57,897 | 60,739 | | |
| TMI Admin/Priority Claims (non Prof Fees) | 2,500 | 2,000 | | 2,500 | 2,000 | | |
| TMI Ch. 7 Trustee Fees | 1,725 | 1,761 | | 1,725 | 1,761 | | |
| TMI Admin/Priority Claims (Prof Fees) | 7,763 | 6,263 | | 7,763 | 6,263 | | |
| | 11,988 | 10,024 | | 11,988 | 10,024 | 100% | 100% |
| Proceeds Available for General Unsecured Claims | | | | 45,908 | 50,715 | | |
| TMI General Unsecured Claims | 3,073 | 2,240 | | 3,073 | 2,240 | | |
| Intercompany Claims | - | - | | - | - | | |
| | 3,073 | 2,240 | | 3,073 | 2,240 | 100% | 100% |
| Proceeds to Equity After TMI Claims Paid | | | $ | 42,835 $ | 48,475 | | |
| Total Shares Outstanding (000's) | | | | 183,870 | 183,870 | | |
| Recovery per Share | | | $ | 0.23 $ | 0.26 | | |

**Trident Microsystems Inc.**
*Recovery Analysis - Distribution Summary*

| ($000s except per share recovery) | High Claim | Low Claim | | Ch. 7 Liquidation - UCC Prevails in Litigation | | | |
|---|---|---|---|---|---|---|---|
| | | | | Weak Recovery | Strong Recovery | Weak % | Strong % |
| **Consolidated Waterfall** | | | | | | | |
| Cash at TMFE - December 31, 2012 | | | $ | 63,624 | $ 64,624 | | |
| Cash at TMI - December 31, 2012 | | | | 112 | 112 | | |
| MEMC Patents | | | | 1,000 | 1,500 | | |
| Proceeds from Non-Debtor Subsidiaries | | | | 6,377 | 6,377 | | |
| Proceeds Avail at TMFE for Distribution | | | | 71,113 | 72,613 | | |
| | | | | | | | |
| Ch. 7 Trustee Fees | 2,157 | 2,202 | | 2,157 | 2,202 | | |
| TMFE Admin/Priority Claims (non Prof Fees) | 3,040 | 2,040 | | 3,040 | 2,040 | | |
| TMFE Admin/Priority Claims (Prof Fees) | 1,799 | 1,299 | | 1,799 | 1,299 | | |
| TMI Admin/Priority Claims (non Prof Fees) | 2,500 | 2,000 | | 2,500 | 2,000 | | |
| TMI Admin/Priority Claims (Prof Fees) | 7,763 | 6,263 | | 7,763 | 6,263 | | |
| | 17,259 | 13,804 | | 17,259 | 13,804 | 100% | 100% |
| Proceeds Available for General Unsecured Claims | | | | 53,854 | 58,809 | | |
| | | | | | | | |
| TMFE General Unsecured Claims | 17,188 | 16,688 | | 17,188 | 16,688 | 100% | 100% |
| TMI General Unsecured Claims | 3,073 | 2,240 | | 3,073 | 2,240 | 100% | 100% |
| | 20,262 | 18,928 | $ | 20,262 | $ 18,928 | 100% | 100% |
| Proceeds to Equity After Claims Paid | | | $ | 33,593 | $ 39,881 | | |
| Total Shares Outstanding (000's) | | | | 183,870 | 183,870 | | |
| Recovery per Share | | | $ | 0.18 | $ 0.22 | | |

**Trident Microsystems Inc.**
*Recovery Analysis - Distribution Summary*

Notes:
Except for the classes designated as "Intercompany Claims," each class of claims and interests on these charts are comprised of persons and entities that are not affiliated with the debtors.

The conversion to chapter 7 would terminate the Plan Support Agreement that serves as the basis for the consensual agreement embodied in the Plan.  In that event, extensive litigation would arise, likely in the United States and Cayman Islands, regarding the amount and priority of the Intercompany Claim asserted by TMI against TMFE.  The professional fees relating to this litigation would likely exceed $5 million.  Additionally, the ultimate result of this litigation, which would likely require more than 12 months to complete, could materially modify the amount and classification of the Intercompany Claim of TMI and the recovery to TMFE third-party unsecured creditors.

Beginning cash in the chapter 7 scenarios is lower due to the anticipated additional professional fees, contractor fees and other administrative costs that would be incurred prior to year end if a consensual plan cannot be reached.

In a chapter 7 liquidation, a Ch. 7 Trustee would be required to be paid pursuant to the following schedule:

The terms "weak recovery" and "strong recovery" as included herein relate solely to the potential recoveries to holders of Claims in Class 6 (TMI Equity Interests).

| Guideline Scale | % of Dist as Fees | Applicable Amount (Low) | Applicable Amount (High) | Fee Limitation (Low) | Fee Limitation (High) |
|---|---|---|---|---|---|
| $5000 or less | 25% | $            5 | $            5 | $            1 | $            1 |
| $5,001 to $50,000 | 10% | 45 | 45 | 5 | 5 |
| $50,001 to $1,000,000 | 5% | 950 | 950 | 48 | 48 |
| $1,000,000 or more | 3% | 70,113 | 71,613 | 2,103 | 2,148 |
| | | | | $      2,157 | $      2,202 |